```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                        TYLER DIVISION

3

  UNITED STATES OF AMERICA      )
4                               )    DOCKET NO. 6:21mj28
         -vs-                   )
5                               )    Tyler, Texas
                                )    4:57 - 6:24 p.m.
6  ALEX KIRK HARKRIDER          )    January 22, 2021

7

      TRANSCRIPT OF PRELIMINARY HEARING AND DETENTION HEARING
8           BEFORE THE HONORABLE K. NICOLE MITCHELL,
                 UNITED STATES MAGISTRATE JUDGE
9

10                    A P P E A R A N C E S

11
     FOR THE GOVERNMENT:
12
     MR. RYAN LOCKER
13   ASSISTANT U.S. ATTORNEY
     110 North College, Suite 700
14   Tyler, Texas 75702

15
     FOR THE DEFENDANT:
16
     MR. GREGORY A. WALDRON
17   MR. DAVID MOORE
     HOLMES & MOORE, PLLC
18   110 West Methvin
     P.O. Drawer 3267
19   Longview, Texas 75606

20
     COURT REPORTER:         MS. SHEA SLOAN
21                           FEDERAL OFFICIAL COURT REPORTER
                             211 W. Ferguson
22                           Tyler, Texas 75702
                             shea_sloan@txed.uscourts.gov
23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by computer-aided transcription.

25
```

```
1                              INDEX

2    WITNESS                                       PAGE

3
     GREGORY HARRY
4

5    DIRECT EXAMINATION:  BY MR. LOCKER              6

6    VOIR DIRE EXAMINATION:  BY MR. WALDRON          8

7    DIRECT EXAMINATION (CONT.):  BY MR. LOCKER     10

8    CROSS-EXAMINATION:  BY MR. WALDRON             25

9    REDIRECT EXAMINATION:  BY MR. LOCKER           60

10   RECROSS-EXAMINATION:  BY MR. FILES             62

11                          *******

12   PROFFER:  BY MR. WALDRON                       64

13   ARGUMENT BY MR. LOCKER                         67

14   ARGUMENT BY MR. WALDRON                        68

15   COURT'S FINDINGS                               73

16   CERTIFICATE                                    75

17
                        EXHIBIT INDEX
18

19   GOVERNMENT'S        DESCRIPTION            ADMITTED

20       9              Snapchat                    8

21      10              Video Clip                 11

22      11              Photo Image                14

23      12              Tomahawk (photo)           16

24      13              Photo Image                61

25   (GOVERNMENT'S 1-8 INCLUDED IN THIS HEARING FROM 6:21MJ29.)
```

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Hardwick, if you will call the next

4    case, please.

5              THE CLERK:  Yes, Your Honor.

6              Court calls Criminal Action 6:21mj28, United States

7    of America vs. Alex Kirk Harkrider.

8              THE COURT:  Announcements?

9              MR. LOCKER:  Good afternoon, Your Honor.  Ryan

10   Locker for the Government, and ready to proceed.

11             MR. WALDRON:  Your Honor, good afternoon.  Greg

12   Waldron and David Moore for Mr. Harkrider.  And we are ready

13   to proceed.

14             THE COURT:  All right.  We are here today,

15   Mr. Harkrider, for a preliminary hearing and a detention

16   hearing.  We are going to determine whether there is probable

17   cause to believe that an offense has been committed and that

18   you have committed it, and also to determine whether you will

19   be released on bond or detained pending trial.

20             Mr. Locker, will the Government be calling any

21   witnesses?

22             MR. LOCKER:  Yes, Your Honor.  But before we do,

23   however, I would ask the Court to take judicial notice of the

24   entire proceedings of the last hearing.

25             THE COURT:  Mr. Waldron, any objection to that?

1          MR. WALDRON:  Judge, I do.  Understanding that --

2   and I will step to the podium here and get this mask off.

3          THE COURT:  Thank you.

4          Mr. Harkrider, you may have a seat.  Thank you.

5          MR. WALDRON:  Oh, it feels good to get that off.

6          Judge, I did have some objections.  I understand

7   that the Rules of Evidence do not apply.  The biggest concern

8   I have is a lot of the documents, evidence, exhibits that

9   were offered, videos that were offered, applied and were

10  Mr. Nichols.  They were not Mr. Harkrider.

11         I know specifically the bullhorn statements were

12  Mr. Nichols.  I understand the Court has the ability to parse

13  as to each individual.  I would just object to the relevance

14  of any of those bullhorn statements, as they are not

15  applicable to Mr. Harkrider or not attributable to

16  Mr. Harkrider.

17         That was in some -- it was a text message document

18  and attached.  I don't know that it was offered as an exhibit

19  number.  That is what we were trying to figure out as the

20  Court walked in, what the exhibit numbers were.  But I would

21  object to that as far as the hearing against my client in

22  regards to his detention.

23         THE COURT:  Mr. Locker, let me get a response on

24  that.

25         Is your objection to the exhibit in its entirety

1     because it references the bullhorn statements?

2           MR. WALDRON:  Yes.  The -- I don't know if it is an

3     exhibit, the text messages now between my client and

4     Mr. Nichols.  The bullhorn statements is the front page of

5     that document.  I would object to that as being irrelevant to

6     the detention hearing of Mr. Harkrider.

7           MR. LOCKER:  Your Honor, my response would be that

8     these are co-Defendants who are charged with aiding and

9     abetting each other.  And while we agree that it is

10    Mr. Nichols who spoke those words into the bullhorn,

11    Mr. Harkrider is standing next to him at the time, enabled

12    him to maintain that high ground over the crowd, and,

13    therefore, is assisting him in presenting the -- his point to

14    the crowd in allowing him to continue to speak without

15    interference from other members of the crowd.

16          So I agree he did not state them, but they are not

17    the subject of elements of the offense, but they do indicate

18    his state of mind in his assistance of Mr. Nichols.  And so,

19    while I agree they are less relevant, it does not make them

20    irrelevant.

21          MR. WALDRON:  And, Judge, and my response to that

22    is we are not talking about elements of the offense.  What we

23    are talking is flight risk and danger.  Specifically, as to

24    danger I believe would be the concern by these statements.

25    And I would just ask that the Court not consider those in

1    regards to the detention of my client, who did not make those

2    statements.

3              THE COURT:  The Court will take judicial notice of

4    the last hearing, but the Court understands and is fully

5    aware that those were not the statements of Mr. Harkrider.

6    Okay?

7              MR. WALDRON:  And there are several like that,

8    Judge, and they would be the same objection.

9              THE COURT:  Right.  Okay.  If you want to point

10   them out specifically, but I understand your objection.

11             MR. WALDRON:  Okay.  Thank you, Judge.

12             THE COURT:  Thanks.

13             All right.  Mr. Locker, you may call your first

14   witness.

15             MR. LOCKER:  Thank you, Your Honor.

16             I call Detective Harry.

17             THE COURT:  Detective Harry, I am just going to

18   remind you that you are still under oath.

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  All right.

21             I am sorry it is warm in here.  We are trying to

22   get it cool.

23      GREGORY HARRY, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

24                       DIRECT EXAMINATION

25   BY MR. LOCKER:

1  Q.   For the benefit of the record, you are the same

2  Detective Harry that previously testified in this case -- or

3  in the co-Defendant's case?

4  A.   Yes, sir, I am.

5  Q.   In addition to all of the evidence that you have already

6  testified about regarding Mr. Harkrider's co-Defendant,

7  Ryan Nichols, was there other evidence in addition to that

8  that specifically and particularly implicates Mr. Harkrider's

9  conduct and state of mind surrounding these events?

10  A.   Yes.

11  Q.   Was there a Snapchat post that Mr. Harkrider posted from

12  inside the Capitol that is relevant to the Court's

13  consideration regarding the seriousness of the conduct,

14  detention, and also probable cause for the offenses for which

15  he is charged?

16  A.   Yes, there is a Snapchat.  However, I can't say for sure

17  that he posted it while he was in the Capitol, but the image

18  depicting him is from inside the Capitol.  I just want to

19  make that distinction.

20  Q.   Thank you for that clarification.  By that you mean that

21  based on the location where a certain image was taken from

22  inside, it is possible that he did not post it until after he

23  left?

24  A.   Correct.

25  Q.   But the text of the post indicates that it probably was

1  from within; is that correct?

2  A.   That's my inference, yes.

3          MR. LOCKER:   Permission to publish Government's 9.

4  I suppose it is probably cleaner for us to -- a continuous

5  exhibit numbering between these two exhibits?

6          THE COURT:   If we are going to incorporate all of

7  the prior exhibits through judicial notice, then, yes.   But

8  are you offering Exhibit No. 9?

9          MR. LOCKER:   I am, Your Honor.   It is the Snapchat

10 post.

11         THE COURT:   Is there any objection to that,

12 Mr. Waldron?

13         MR. WALDRON:   Judge, may I take the witness on voir

14 dire?

15         THE COURT:   You may, sure.

16                   VOIR DIRE EXAMINATION

17 BY MR. WALDRON:

18 Q.   Detective Harry, in regards to this Snapchat post, tell

19 the Court how you obtained that post.

20 A.   Mr. Waldron, I'm not sure exactly which place we got

21 this from.   All of the images -- well, excuse me.   Most of

22 the images that we have and certainly most of the images that

23 we presented in addition to the Snapchat post here -- that we

24 are going to present here, I believe -- well, I know we

25 obtained through open source.

1          This one, if my memory serves me correctly, we

2   found on a Twitter page for some woman whose name escapes me

3   at the moment.  I apologize.  She shares the post, and I

4   believe she actually tags it at the FBI.  She names him.  We

5   came across it on her Twitter page.

6   Q.   Okay.  So some woman obviously has to take a screenshot

7   of a Snapchat post; is that correct?

8   A.   That's correct.  I don't know if she is the one who took

9   it.  Somebody took -- captured the image that we are talking

10  about here.  And we -- and the version that we have was

11  captured from her Twitter page.  I don't know who actually

12  screenshotted it, though I do believe her reference is that

13  she did.

14  Q.   Okay.  There is typing on this picture, a statement made

15  on this picture; is that correct?

16  A.   Yes, sir.

17  Q.   Do we have any way to know that that woman that

18  screenshotted it, did not type in that statement on the

19  page?

20  A.   I actually think we recovered this from another source,

21  as well, but I am not sure as I sit here.  So, no, I have not

22  gotten the statement from her.  So, no, I can't for sure 100

23  percent verify that your client typed the text.

24  Q.   Okay.  So we don't know if that is Alex Harkrider's

25  words on this Snapchat post?

1  A.    I can't definitively say that.

2           MR. WALDRON:   Okay.   Your Honor, I would object to

3  relevance.

4           MR. LOCKER:   Your Honor, my response is that, while

5  that may go to the weight of the exhibit, I don't think it

6  goes to its admissibility.

7           THE COURT:   Well, I am going to overrule the

8  objection.   I am going to admit it.   And you may proceed.

9  That is Government's No. 9.

10                    DIRECT EXAMINATION CONTINUED

11  BY MR. LOCKER:

12  Q.    Detective Harry, can you read the text at the bottom of

13  this image?

14           THE COURT:   I don't see this image.

15           MR. LOCKER:   Oh, I'm sorry.

16           THE COURT:   That is what I was trying to figure

17  out.   Thank you.   No.

18           MR. LOCKER:   The source from my computer -- I'm

19  sorry.   I think it is the ELMO.   There we go.

20           THE COURT:   I'm sorry.

21  A.    I'm sorry?

22  BY MR. LOCKER:

23  Q.    Could you read the text at the bottom of the image?

24  A.    The text says:   We are in.   Two people killed already.

25  We need all of the patriots of this country to rally the fuck

1  up and fight for our freedom before it is gone forever.  Give

2  us liberty or give us death.  We won't stand for it.

3  Q.   Detective Harry, we saw a video earlier that depicted

4  approximately an hour and a half of the conduct outside the

5  Capitol.  There is a shorter video that specifically shows

6  Mr. Harkrider emerging from the window; is that correct?

7  A.   Yes, there is actually a couple of videos.

8            MR. LOCKER:  I'd like to display that and admit it

9  as Government's Exhibit 10 now.

10            THE COURT:  Mr. Waldron, any objection?

11            MR. WALDRON:  Judge, I don't know which one he is

12  presenting.

13            THE COURT:  Why don't y'all confer at Mr. Locker's

14  laptop about which video this is before we show it?

15            Ms. Hardwick, will you take it down briefly?

16            Thanks.  I just want them to confer.

17            THE CLERK:  Okay.

18            MR. WALDRON:  I know what video now, Judge.  No

19  objection.

20            THE COURT:  Mr. Locker, you may show it.

21            MR. LOCKER:  Thank you, Your Honor.  Let me turn up

22  the volume.  I had it muted earlier.

23            (Video played.)

24            (Video stopped.)

25  BY MR. LOCKER:

1    Q.   We see Mr. Harkrider emerge from the window and make a

2    throat-slashing gesture, along with some other gestures.  Do

3    you interpret that to be a call to violent action to the

4    remainder of the crowd?

5    A.   Yes.

6    Q.   Is there a text message threat that you discovered on

7    Mr. Harkrider's phone the day after, indicative of his views

8    on whether or not he had done the right thing or whether or

9    not he was proud of his actions?

10   A.   Yes, sir.

11   Q.   And this is a group text with some other men, including

12   a person named Pauly Bartel?

13   A.   Yes, sir, that's correct.

14   Q.   And does he have a back-and-forth with Mr. Bartel?

15   A.   He does.

16   Q.   Can you describe that for the Court?

17   A.   The first message in that exchange from Pauly:  Alex,

18   you all good, Bud?

19           Harkrider response:  Yeah.

20           Pauly:  Glad to hear it.

21           Mr. Harkrider responds:  Who is y'all's favorite

22   domestic terrorists?  And then he inserts a laughing face

23   emoji.

24   Q.   When you executed the search warrant for Mr. Harkrider's

25   phone, did you find a souvenir that had been pilfered from

1  the Capitol?

2  A.    We did.

3  Q.    What was that item?

4  A.    It is a -- actually, I haven't seen it, but to the best

5  of my understanding, it is a little -- it's a piece of a

6  wooden leg or maybe a table from -- well, the testimony ended

7  up being that it was taken from the Capitol, but I'm not sure

8  exactly where it came from.  But it is a little piece of

9  wood.

10 Q.    To be clear, that is an inference that we are making

11 based on where Mr. Harkrider was located, its location in his

12 home, and then also viewing the video that we have seen that

13 Mr. Harkrider was present in a window where individuals were

14 pilfering furniture and we see table legs or chair legs, some

15 type of furniture legs being passed out the same window that

16 Mr. Harkrider exits from?

17 A.    That's correct.  He also admitted that it came from the

18 Capitol.

19 Q.    So he made a statement to that effect to agents?

20 A.    Correct, pursuant to his arrest.

21 Q.    Let's talk about the weapon that Mr. Harkrider took into

22 the Capitol.  Do you have that with you in the courtroom

23 today?

24 A.    I do, sir.

25 Q.    Can you hold that up for the Court?

1   A.    So it is currently in its sheathe.  Can I take it out?

2   Q.    Please unsheathe it?

3   A.    This is a sheath we believe was affixed to the vest, and

4   this is a tomahawk.

5        MR. LOCKER:  I'd like to admit that as Government's

6   Exhibit 11.  And I will go ahead and request leave of the

7   Court that at the conclusion of the hearing to substitute an

8   image of that for the physical exhibit.

9        THE COURT:  Any objection?

10        MR. WALDRON:  No objection, Your Honor.

11        THE COURT:  All right.  It will be admitted.  And,

12   yes, you may swap it for an image upon the conclusion of this

13   hearing.

14   BY MR. LOCKER:

15   Q.    And does that same tomahawk appear in multiple images

16   with the Defendant attached to his plate carrier or molle

17   vest or tactical vest?

18   A.    It does.  The image we are more familiar with is

19   probably when it is in its sheath, but you can't see the part

20   at the bottom.  But you can see the end here with this

21   lanyard and the camo handle is the image that you most

22   commonly see in all of the footage and images of

23   Mr. Harkrider.

24   Q.    It appears upon the right side of his chest, is that

25   correct, sort of with the handle facing up towards his

15

1    face?

2    A.   Correct.

3    Q.   When he was arrested, did Mr. Harkrider surrender any

4    weapons to you that were recovered during the execution of

5    the search warrant?

6    A.   There were several weapons that were located.  None were

7    taken, but there were several other weapons, firearms,

8    located in the residence and his vehicle.

9    Q.   When interviewed, did Mr. Harkrider make statements

10   about whether or not he took firearms with him to D.C.?

11   A.   Yes, sir.  My understanding of the interview is that his

12   statement to agents at the time of his arrest was that he

13   took a -- I believe it was a CZ pistol and a .30-30 rifle --

14   or .30-06 -- I think it was a .30-30 rifle, a bolt -- a

15   lever-action rifle.

16   Q.   And just to be clear, we don't see him in any images at

17   the Capitol carrying either of those.  We don't know that he

18   took those.  We just know from his own admissions that he

19   took them on his trip to D.C.

20   A.   That's correct.

21            MR. LOCKER:  At this time I would like to show --

22   display an image and offer as Government's Exhibit 11 -- 12,

23   an image.  And this is the image of Mr. Harkrider holding the

24   OC canister over his head.

25            That you and I discussed, Mr. Waldron.

16

1              THE COURT:  Any objection, Mr. Waldron?

2              MR. WALDRON:  I'm sorry, Judge.  I was --

3              THE COURT:  I'll have him repeat that.

4              Can you describe that image one more time,

5    Mr. Locker?

6              MR. LOCKER:  It is the image of Mr. Harkrider

7    holding the OC can in his right hand that we talked about --

8    I believe you have it.

9              MR. WALDRON:  No objection.

10             THE COURT:  All right.  It will be admitted.

11   BY MR. LOCKER:

12   Q.   Detective Harry, the image that we see here on the

13   screen in the middle, is that Mr. Harkrider holding over his

14   head an OC canister?

15   A.   Yes.  And the blue -- the cap with the blue back and the

16   white -- or gray bill.

17   Q.   And that is consistent with the video that we have

18   already seen; is that correct?

19   A.   Yes, that actually -- yes.

20   Q.   And we don't know for certain it is the same OC

21   canister.  It just appears to be the same type and model as

22   the one that Mr. Nichols used?

23   A.   I don't know for sure that it is the same canister.  I

24   also am not for sure that this is the same instance as we

25   watched earlier.  I haven't had time to marry those videos up

1  to verify that.

2  Q.   There is a lot of footage of the -- at the Capitol at

3  this point in time; is that right?

4  A.   From a lot of different angles, yes.

5  Q.   Now, you had already testified about the text message

6  conversation that he had with Mr. Nichols prior to their trip

7  to Washington, D.C.; but related to weapons, Mr. Harkrider,

8  although he is the recipient of most of those text messages,

9  he responded with a very specific one to Mr. Nichols

10  regarding bringing firearms with him, did he not?

11  A.   Yes.

12  Q.   What did he tell Mr. Nichols in response?

13  A.   Just when they were talking about legally transporting

14  guns to D.C., Mr. Harkrider's response to:  I will bring

15  every freedom blaster I own then.

16  Q.   Do you know freedom blaster to be a colloquial term,

17  slang term for a firearm?

18  A.   That's my understanding.

19  Q.   In addition to the firearms that were -- that

20  Mr. Harkrider admitted to taking on his trip to Washington,

21  were there other firearms located in his home at the time

22  that the search warrant was executed?

23  A.   The combination between in his home and in his vehicle,

24  I am not sure which were where, as I sit here.

25  Q.   At the searched premises?

1  A.   That's correct.

2  Q.   Did that include a Winchester rifle and a .22 revolver,

3  and then there are also four firearms including that .30-30

4  rifle that had been discussed, in his truck?

5  A.   Six total?

6  Q.   Yes.

7  A.   That's my understanding as I sit here.  I was not at

8  that search team and have not seen those search reports

9  yet.

10 Q.   Because of the simultaneous execution of the search

11 warrants, you were actually at Mr. Nichols' house when a

12 separate team was at Mr. Harkrider's house; is that

13 correct?

14 A.   That's correct.

15 Q.   Do you believe that Mr. Harkrider may present a danger

16 to himself or others on account of mental health issues?

17 A.   I do.

18 Q.   Are you aware of his admission of being a 100 percent

19 disabled veteran on account of PTSD?

20 A.   Yes, sir, I am.

21 Q.   Did Mr. Harkrider make statements to law enforcement

22 regarding suicidal ideation?

23 A.   Yes, sir, he did.  That is the information that I

24 have.

25 Q.   In fact, did he make a specific statement to FBI agents

1  when he was arrested about what he wished had happened in
2  Washington?
3  A.    So he made a statement where he referenced that he
4  wished he had been shot at the door.  There is some debate
5  between the two investigators that were there as to whether
6  that statement, because it was pursuant to his arrest, was
7  referencing his time at the Capitol or whether it was
8  actually upon his arrest by the SWAT team.  So they are not
9  sure which two of those things he meant.
10 Q.    In either of those two options --
11 A.    Correct.
12 Q.    -- he is still expressing potentially a suicide-by-cop
13 desire?
14 A.    That's correct.
15 Q.    Which, just to be clear, that kind of endeavor doesn't
16 only endanger the individual but also the law enforcement
17 officers involved?
18 A.    Correct.
19 Q.    When he was booked into jail, did he also make
20 additional statements as to whether or not he had been
21 contemplating suicide?
22 A.    My understanding from the investigators that were there
23 that it was asked, posed:  Are you feeling suicidal?  And his
24 answer was in the affirmative, but he tried to kind of play
25 it off as a joke.

1          Still, having said that, the investigators that

2    were there booking him in did not take that statement as a

3    joke and actually marked on the paperwork that they submitted

4    that he did express that he was feeling suicidal.

5    Q.    In addition to his statements that he was feeling

6    suicidal, during an interview did he also state that he had

7    suicidal ideation in the past?

8    A.    That's my understanding, yes.

9    Q.    Regarding drug usage, Mr. Harkrider reciprocated in that

10   conversation with Mr. Nichols about the use of psychodelic

11   drugs on their trip to Washington, D.C.; is that correct?  He

12   responded -- participated by sending a GIF that was

13   psychodelic in nature talking about taking LSD; is that

14   correct?

15   A.    Yes.

16   Q.    To take acid to see reality GIF?

17   A.    I'm sorry.  Yes, I was looking for it.

18   Q.    Just to be clear, that is mostly a one-way conversation;

19   that is mostly Mr. Nichols telling Mr. Harkrider what he

20   plans to do.  But when he says, "I'm going to bring some

21   goodies, some goodies you haven't had before," the context

22   indicates that he is expecting Mr. Harkrider to be a

23   participant because he has been a participant in similar

24   activities in the past?

25   A.    Correct.  Mr. Harkrider -- he is the one who brings up

1  the drugs there.

2  Q.   Does Mr. Harkrider have any connection to the District

3  of Columbia other than his criminal conduct on this time

4  frame?

5  A.   Not to my knowledge.

6  Q.   Did Mr. Harkrider make -- have a text message

7  conversation with someone else indicating that he was going

8  to avoid being an -- avoid being home, specifically related

9  to him being a suspect in these events?

10 A.   He did, yes.

11 Q.   And what was that conversation, and when did it take

12 place?

13 A.   That exchange, as we saw it, was with a subject by the

14 name of Randy Smith -- or at least it was in his phone as

15 Randy Smith.

16       Randy sends a message:  You make it back home?

17       Mr. Harkrider responds:  Yeah, I'm back.  I've been

18 in Shreveport with my mom hiding out.  Ha. Ha.

19 Q.   So we don't know the full context of that, but at least

20 he is telling his buddy that he is out of town intentionally

21 for the purpose of not -- of being scarce?

22 A.   Correct.

23 Q.   Are you aware of Mr. Nichols' -- Mr. Harkrider's

24 employment situation?

25 A.   I don't believe he has an employment situation.

1  Q.   He is unemployed?

2  A.   That is my understanding -- it is my understanding.  He

3  collects disability, is my understanding.

4  Q.   Did agents interview Mr. Harkrider's roommate?

5  A.   Yes, they did.

6  Q.   And are you aware that that roommate appears to be

7  moving out?

8  A.   I was not aware of that.

9  Q.   Let's talk about the charges that Mr. Harkrider is

10  facing.  They are largely the same as Mr. Nichols, with two

11  notable absences.

12         Mr. Harkrider is charged in Count 1 with violation

13  of Title 18, United States Code, Section 1752(a) and

14  1752(b)(1)(A), that being conspiracy and unlawful entry with

15  a dangerous weapon.

16         Is a tomahawk a dangerous weapon?

17  A.   Yes, sir.

18  Q.   And do we know from the video footage that Mr. Harkrider

19  entered the Capitol carrying a dangerous weapon?

20  A.   Yes, we do.

21  Q.   And, in fact, more than dangerous weapon, we would

22  classify that as a deadly weapon; is that fair?

23  A.   I would feel absolutely comfortable calling it that.

24  Q.   Count 2 charges the Defendant with violation of 40,

25  United States Code, Section 5104(e)(2), 5104(e)(2)(D) and

1  (G), that being violent entry and disorderly conduct on

2  Capitol Grounds.

3       It is a violation for an individual or group of

4  individuals to willfully and knowingly utter loud,

5  threatening, or abusive language, or engage in disorderly or

6  disruptive conduct, at any place in the Grounds or any area

7  of the Capitol Buildings with the intention to impede,

8  disrupt, or disturb the orderly conduct of a session of

9  Congress.

10       As we have discussed before, Mr. Harkrider's

11  conduct squarely fits those elements; is that correct?

12  A.   Yes, I believe it does.

13  Q.   You believe there is probable cause to support each and

14  every element of those offenses?

15  A.   I do.

16  Q.   And then Count 5 charge -- I'm sorry.  As to this

17  Defendant, Count 3 charges the Defendant with 18, United

18  States Code, Section 8 -- Section 2, that being aiding and

19  abetting, which charges that anyone whoever aids, abets,

20  counsels, commands, induces, or procures the commission of a

21  federal offense is punishable as a principal.

22       Having viewed this footage with Mr. Harkrider

23  repeatedly, does it appear that he and Mr. Nichols cast their

24  lots together, in that their endeavor in Washington was a

25  joint endeavor?

1  A.   Yes.  In almost every instance of evidence that we have,

2  they are two peas in a pod; they are right next to each

3  other.

4  Q.   They are battle buddies, as they would say in the

5  military?

6  A.   Absolutely.

7  Q.   They are looking out for each other?

8  A.   Yes.

9  Q.   It is a dangerous situation there, is that correct, even

10  for them?

11  A.   Yes.

12  Q.   And they are looking out for each other by ensuring that

13  one can get through an entryway and one is doing okay.  They

14  know each other's location at all times.  Does it appear that

15  way in the footage?

16  A.   I certainly believe they are there watching out for each

17  other and have each other's back, yes.

18  Q.   Based on the evidence that you have seen, does it appear

19  that Mr. Harkrider regularly not only engaged in his own

20  criminal conduct, but encourages and aids and abets that of

21  Mr. Nichols?

22  A.   Yes.

23  Q.   So do you believe that there is probable cause to

24  support each and every element of all three of these charges

25  against Mr. Harkrider in this case?

 1    A.    I do.

 2               MR. LOCKER:    Pass the witness.

 3               THE COURT:    Cross-examination.

 4                         CROSS-EXAMINATION

 5    BY MR. WALDRON:

 6    Q.    Thank you, Your Honor.

 7               We've been here a while today.  You've gotten to

 8    testify quite awhile.  I have probably a lengthy --

 9    A.    That's okay.

10    Q.    -- amount of questions, so just have patience with me

11    here.

12    A.    No problem.

13    Q.    Let's start with just going over what you testified here

14    in the hearing against my client, Mr. Harkrider.

15               Specifically, on the Snapchat we talked about it

16    briefly and I, on cross-examination previously, I asked you

17    did you know who typed that message on the picture that was

18    shown.  And you said you did not.

19    A.    That's correct.

20    Q.    Okay.  Clearly, it appears to be a picture of

21    Mr. Harkrider.

22    A.    It is a picture of Mr. Harkrider.

23    Q.    Okay.  Do you think you can tell he is inside the

24    Capitol -- there is no doubt.  We can see on the video, at

25    some point he is in a room in the Capitol; is that right?

1   A.   That's right.

2   Q.   What room is that?

3   A.   I couldn't tell you.

4   Q.   Inside that room you have no idea what the ingress or

5   egress is to the rest of that building, do you?

6   A.   That is totally fair, I do not know.

7   Q.   You do not know if he is in the middle of the building

8   hundreds of yards away from the Senate or the House, do

9   you?

10   A.   I do not know.  That's correct.

11   Q.   Okay.  You don't -- how long would you say he was in the

12   building?

13   A.   As I discussed with Mr. Files, I am really not

14   comfortable -- best guess, I am thinking a couple of minutes.

15   I don't have any -- I don't have any good, hard data for you

16   on that, but that's my guesstimate is -- you know, somewhere

17   between probably two and 10 minutes at the very most, but

18   probably less.

19   Q.   Okay.

20   A.   We just have not had a chance to sit -- I presume that

21   there is going to be footage from the Capitol building that

22   should hopefully show that room that would probably give us

23   an answer to that, but I don't have it as we sit here.   I'm

24   just guessing.

25   Q.   And we don't have that?

1    A.    That's correct.

2    Q.    So we don't know if he went anywhere besides that one

3    room?

4    A.    I do not know that, that's correct.

5    Q.    In fact, the photos that you have seen -- I don't know

6    who posted those -- the photos that you have seen of him in

7    that room looks like he is standing still in that room; is

8    that correct?

9    A.    Yes, sir, whatever room that is, yes.

10    Q.    All right.  Likewise, from the standpoint of

11    Mr. Harkrider, do you ever see him, in that room or outside,

12    tear up, destroy any property of the Federal Government there

13    on the grounds?

14    A.    I would say no -- other than they are rocking with the

15    group; but, no, certainly nothing of him breaking a chair or

16    smashing a window, I have not seen any footage of anything

17    like that.

18    Q.    In fact, you can see the guy smashing the window out,

19    the top window out of that room that they go into?

20    A.    Yes.  That's a much longer video, and a lot of people

21    took part in that in breaking that -- the one we just watched

22    was that guy who succeeded at the top.  But, no, I have

23    nothing to indicate that Mr. Harkrider bashed any of those

24    windows at all.

25    Q.    Okay.  And, likewise, you have no information, either

1  video or witness statements or any other information, that
2  Mr. Harkrider used a weapon against anyone, including
3  officers, do you?
4  A.    The only thing that comes to mind when we say "weapon"
5  is just passing the OC canister.  I have nothing, as I sit
6  here, to indicate that he physically used that, as I sit
7  here.
8  Q.    Okay.  Well, let's talk about that.  That is on the
9  video.  You recall that, right?
10  A.    Yes, sir, it is captured a couple of times.
11  Q.    And you see someone tap him on his shoulder and hand him
12  that over the shoulder, do you not?
13  A.    In one of the -- yes, in one of the videos, yes, that is
14  what happens.
15  Q.    He never drops it down.  In fact, within a matter of
16  seconds, he is giving it to somebody else; and that is the
17  extent of him touching that OC canister?
18  A.    In that frame, yes, that's correct.
19  Q.    And you have no other evidence of him touching an OC
20  canister?
21  A.    As I said -- I want to be careful how I say this because
22  there is the -- the long -- the hour-long,
23  hour-and-a-half-long video when Mr. Locker actually paused
24  it, that was, to be honest with the Court, that was the first
25  time I even noticed that particular set of footage actually

1  caught it in his hand.

2          I am not comfortable saying that that is the same

3  footage -- that that action is the same action that is caught

4  in the other video with the still shot that we watched,

5  because that is from a video as well.  It probably is.  But

6  there is a lot of stuff moving through the crowd.

7  Q.   Okay.  So you can't say there were two separate times?

8  A.   Not as I sit here, that's correct.

9  Q.   All right.  I know there was some testimony in the

10  previous hearing about Mr. Harkrider exiting his body out the

11  window, and I think the statement was he makes a slashing

12  symbol or something like that?

13  A.   Correct.

14  Q.   I know Mr. Files cross-examined you about did the crowd

15  increase their chanting or whatever.  We can see now, we

16  watched it a second time, that didn't happen, did it?

17  A.   I'm not comfortable saying that he directly is the one

18  who enticed or -- again, I'm not comfortable saying that.

19  Q.   In fact, they were singing the National Anthem when he

20  comes out; is that right?

21  A.   I actually think the crowd behind him was, though I

22  think his intention was to rile them up.  But I can't say for

23  sure that that worked.

24  Q.   Okay.  All right.  Nobody was paying attention to

25  that -- I mean, nobody saw what he was doing --

1  A.    Well, certainly the camera man was fixated on that
2  window.
3  Q.    Yes.
4            MR. WALDRON:  All right.  Judge -- and I am going
5  to get into some about statements.  I would point out at this
6  stage I have not received a copy of my client's recorded
7  interview.  I have not received a copy of the roommate's
8  recorded interview or the results of search warrant, any of
9  those reports.
10           I know that some are available now just prior to
11  the hearing.  Others are not available yet.  I want to say I
12  reserve the right to reopen this hearing if new evidence is
13  learned once I am available to review those.
14           THE COURT:  You have that right.  Thank you.
15  BY MR. WALDRON:
16  Q.    Let's talk about the tomahawk.  What -- all right.
17  Let's talk about that.  When did you first discover or first
18  learn that he, in fact, was in possession of a tomahawk at
19  the Capitol?
20  A.    To when we knew it was a tomahawk?
21  Q.    Yeah.
22  A.    When we recovered it during the search warrant.
23  Q.    In fact, the affidavit says he had a baton in his
24  jacket, right?
25  A.    We weren't sure what it was, that's correct.

1  Q.   Okay.

2  A.   Because all you could see was just the handle.

3  Q.   So the only way you learned he even has a tomahawk is

4  through his cooperation during that interview with your guys

5  when he was first arrested?

6  A.   No.  I think we would have made that conclusion when we

7  found it during the search warrant.  It is very unique.

8  Q.   Did you have a search warrant for the house?

9  A.   We did.

10 Q.   Okay.

11 A.   It was executed at that time.

12 Q.   I thought that was a voluntary consent.  Am I wrong on

13 that?  I have not seen a search warrant for the house.

14 A.   We were there on a search warrant.

15          MR. WALDRON:  Okay.  Judge, I'd also request a copy

16 of that, obviously at some point so I can review for a later

17 date and see if I need to reopen.

18          MR. LOCKER:  Your Honor, no objection.  The

19 discovery is an ongoing process.  I don't think I have

20 misrepresented how we were in Mr. Harkrider's home to

21 Mr. Waldron.  I've been doing my best to keep up with

22 discovery obligations.  Given our constrained time table, it

23 has been a challenge, but I don't think at any point I

24 misrepresented the way by which we located these items or

25 were in Mr. Harkrider's home.

1     MR. WALDRON:  I don't think he did.  That's my

2  client representing that he consented.  They came to the

3  door, and he let them in, is what he has told me.  I may be

4  wrong about that.

5  BY MR. WALDRON:

6  Q.   How was the approach to his house; do you know?

7  A.   A SWAT team was used to take him into custody.

8  Q.   Did they knock the door in?

9  A.   I don't have any answers.  I'm not sure.  I was not at

10  that site.  I don't know, as I sit here.  I'm sorry.

11  Q.   Okay.  Where was he interviewed?

12  A.   My understanding is that he was interviewed at I believe

13  the Panola County Sheriff's Office or Carthage PD.  It was a

14  law enforcement facility.  I think it was the sheriff's

15  office.  I could be wrong on that.

16  Q.   He was taken from site to Panola County; is that

17  right?

18  A.   I believe so.

19  Q.   Okay.  And --

20  A.   I haven't seen the report either.

21  Q.   Have you listened to the interview?

22  A.   I have not, sir, no.

23  Q.   You don't know how long it is?

24  A.   No, sir, I do not.

25  Q.   But you are aware that he told law enforcement that is

1   what he had in his jacket?

2   A.   That was what was represented to me from the

3   investigators that I spoke with.  He did acknowledge it was a

4   tomahawk.

5   Q.   Did he also advise law enforcement he took no other

6   weapon to the Capitol?

7   A.   Into -- yes, to the Capitol, yes, that's correct.

8   Q.   And did he advise law enforcement that he, in fact, took

9   Uber to the Capitol from his hotel?

10  A.   I do feel like I remember hearing that.  I believe that

11  is correct.  To my understanding, that sounds right.

12  Q.   Okay.

13  A.   I am sorry I am not more familiar with the interview.

14  Q.   So a vehicle with potential weapons would have been left

15  at the hotel, and then an Uber is taken; is that correct?

16  A.   I believe that is correct from another source as well,

17  from Mr. Nichols' dad mentioned the same thing, that they had

18  parked maybe 10 miles away, 10 minutes away, something like

19  that.

20  Q.   Okay.  And isn't it true he told law enforcement that

21  the reason he had the tomahawk was the concern that Antifa or

22  other Black Lives Matter and other groups may be there to

23  oppose them or attack them?

24  A.   My recollection from what the investigators told me was

25  that it was a personal protection device, not meant to be an

1  offensive weapon.  I don't remember -- I don't remember being
2  told specifically that it was for the purposes of Antifa or
3  Black Lives Matter.
4  Q.   Isn't it true that he told investigators that when he
5  went to Washington, he had no intent of storming or going
6  into the Capitol?
7  A.   I don't recall having that -- or asking that specific
8  question, Mr. Waldron, to the detectives who interviewed him.
9  I am really not comfortable speculating on that.  I just
10  don't know the answer to that question, as I sit here.  I'm
11  sorry.
12  Q.   Isn't it true he told investigators he started his day
13  wherever the speeches were being given by the President and
14  Rudy Giuliani and whoever else stirred this crowd up?
15  A.   I do believe that's correct.  Yes, that's my
16  understanding.
17  Q.   And you watched this hour-and-a-half video, correct?
18  A.   In pieces, yes, sir.
19  Q.   The very first 30 seconds, which were cut off, what is
20  on that first 30 seconds?
21  A.   It is President Trump speaking to that crowd.
22  Q.   And what does he tell them to do?
23  A.   I did not watch his speech live.  I'm not sure exactly
24  what he told the crowd to do.
25  Q.   Well, it's on that video where he says -- tells them to

1   go down to the Capitol, and I will be there with you.  Is
2   that right?
3   A.   I have heard that, but I have not watched that.  I
4   didn't watch it in real time.  I actually haven't watched a
5   recording of his speech since.  I can't speak to what he
6   said.
7   Q.   Are you aware this is some mile, mile and a half away
8   from where the Capitol is?
9   A.   I am not.  If you say it is, I believe it.
10  Q.   Are you aware of the crowds that were there for those
11  speeches and the protests that day?
12  A.   I have heard the estimates were as many as 114,000
13  people.
14  Q.   Okay.  So we have 114,000 people that started out down
15  the street, maybe a mile, listening to speeches of the
16  President and Rudy Giuliani and the Trump kids.  Is that
17  correct?
18  A.   Again, I am not sure of who spoke.  But that sounds
19  right.
20  Q.   The videos that you have watched online, you see the
21  crowd then walking, marching, whatever it may be --
22  A.   Correct.
23  Q.   -- to the Capitol?
24  A.   Yes, sir.
25  Q.   After being told to do so?

1   A.    I concede the crowd started somewhere else and moved to
2   the Capitol.  We are in agreement there.
3   Q.    And outside the perimeter of the Capitol, they are met
4   with limited resistance by law enforcement; is that
5   correct?
6   A.    I am not sure.
7   Q.    Okay.  And I say outside the perimeter.  I am not
8   talking right at the building.  There is law enforcement out
9   there saying, hey, look, let's not get crazy.  And the people
10  approached the plaza area of the Capitol; is that right?
11  A.    Again, I'm not sure what -- about the Capitol, sorry.
12  Q.    Do you know if people entered the Capitol from all
13  sides?
14  A.    I don't have an answer to that.  I don't know.
15  Q.    Okay.  The people that were involved that we see -- in
16  these videos we see, we don't see the guy with the Viking
17  helmet, do we?
18  A.    Correct, no, we do not.
19  Q.    We don't see any evidence where we can point to of the
20  female that got shot that got in, correct?
21  A.    No, sir, not in anything --
22  Q.    Okay.  So those people had to have come in from some
23  other location; would you agree?
24  A.    That's what I believe to have happened, yes.
25  Q.    Okay.  Right now we are just focused on this one

1  entrance.

2          Does anybody get past law enforcement in that

3  entrance there?

4  A.   I don't have -- as far as the doors?

5  Q.   The doors.

6  A.   I don't know.

7  Q.   Okay.  And you don't know what happens inside -- if

8  anyone got outside that room, do you?

9  A.   Where the picture was taken?

10 Q.   Yes.  Where the picture was taken?

11 A.   I don't, no, sir.

12 Q.   So the people that are going in that window, not just

13 Mr. Harkrider and not just Mr. Nichols, but the other people

14 that go in, we also see most of them coming back out that

15 window also, correct?

16 A.   I would say there is as steady of a flow in as there is

17 a steady of a flow out.

18 Q.   But you see a lot of the same faces going in and coming

19 out?

20 A.   Uh-huh.

21 Q.   Pretty good indication that there is some barrier or

22 something that prevents them from coming too deep in there

23 because they are coming right back out the window; would you

24 agree with that?

25 A.   It could be a series of rooms that they had access to

38

1    and just like you -- no doubt they ran into some sort of

2    blockade or something somewhere that they couldn't pass go,

3    so they had to come back out.  I think that is fair.

4    Q.   Okay.  All right.  Mental health.  Have you read the

5    bond report?  Have you seen the Pretrial Services Report?

6    A.   We discussed it briefly this morning with Mr. Locker.  I

7    have not reviewed it.  That is not typically something that

8    is given to us.

9    Q.   All right.  You are aware he is retired military --

10   I guess we would say retired.  He was forced retirement based

11   on PTSD, mental disability.  Is that right?

12   A.   I was not aware he was force retired.  I was aware he

13   was a former Marine and has 100 percent disability for

14   PTSD.

15   Q.   Have you heard or are you aware that he did tours in

16   both Afghanistan and Iraq?

17   A.   Yes, sir, I have heard that.

18   Q.   You are aware he was an infantryman?

19   A.   Yes, sir.

20   Q.   So he was involved in firefights?

21   A.   I'm sure he was.

22   Q.   Okay.  So he is not the only one that is involved in

23   firefights and an infantryman that served tours of duty that

24   had PTSD; is that correct?

25   A.   Certainly not.

1   Q.   In fact, there were many veterans that were there at

2   Washington that day; is that correct?

3   A.   That's my understanding, yes, sir.

4   Q.   So, as we sit here today, he has been in jail since

5   Monday, have you received any information of him attempting

6   suicide or attempting to harm himself since he has been in

7   jail or in custody since Monday?

8   A.   I don't have any information to that, no, sir.

9   Q.   Okay.  I want to talk about the cell phone and the text

10  messages.

11  A.   Okay.

12  Q.   You and I had a conversation earlier about this printout

13  on these text messages, and I asked you prior to being on the

14  record, do we have this in a time sequence as to how these

15  text messages went down?  And your response was, you don't

16  right now; you just took messages off his phone.

17  A.   Correct.  As I sit here, I'm not sure of the cadence or

18  the sequence or timestamps or anything like that.

19  Q.   Have you dumped his phone yet?

20  A.   No, sir.

21  Q.   All right.  So I don't have copies of his phone either,

22  right?

23  A.   Neither of us.

24  Q.   Okay.  So when we are looking at those text messages,

25  which you and I said -- we both agreed cadence is important

1   to know and understand the context of these messages?

2   A.    Absolutely.

3   Q.    12:31, the text messages before the Court, there is only

4   a text message from Mr. Nichols, is that correct, where he

5   sends a picture to Harkrider?

6   A.    That's the only one that we are presenting.  I don't

7   want to misrepresent that there are other text messages

8   possibly on December 31st.

9   Q.    If Harkrider had responded, would you have put that in

10  here?

11  A.    I did not prepare this document.  If I believed it was

12  exculpatory or in any way helped or hurt him, if it had

13  evidentiary value, I certainly would have put it in here.

14  Q.    Okay.  So looking at this document that you didn't

15  prepare, you have no evidence that Harkrider responded to him

16  on 12/31?

17  A.    As I sit here, I do not know if he responded, that's

18  correct.

19  Q.    So based on the fact that we have responses on other

20  dates, we can assume that he did not; would that be a fair

21  assumption?

22  A.    I'm not prepared to say that.  Only that I didn't think

23  that it either helped or -- helped our cause or was

24  beneficial to the Defense.  Obviously, we would have provided

25  it if it was exculpatory in some sort of manner.  I'm not

1  prepared to say that.

2  Q.   And I am not going to argue with you about that as far

3  as who gets to determine what is exculpatory.

4  A.   Sure.

5  Q.   But right now we have nothing in here where

6  Mr. Harkrider responded?

7  A.   Correct.   In this document, that's correct.

8  Q.   And on January 1st where Nichols sends three text

9  messages to Mr. Harkrider, which you have read to the Court

10 about needing first aid kits and we need to speak in person,

11 Harkrider never responds to any of those messages, according

12 to this document, does he?

13 A.   Again, not that we are presenting.  I am not comfortable

14 saying that he didn't.  I also have not looked at the

15 phone.

16 Q.   Okay.  And --

17 A.   With respect to these particular messages.  I'm sorry.

18 Q.   Okay.  The first evidence that we see in the documents

19 presented of text messaging between -- where Mr. Harkrider

20 responds is when they are talking about a movie called Soul,

21 which is a cartoon movie, correct?

22 A.   I haven't seen it, but I presume that is what it is,

23 yes, sir.

24 Q.   Well, I've seen it.  I can represent to you it is a

25 cartoon movie.

1   A.   My kids aren't there yet.

2   Q.   So that's the first time he responds is when he is

3   talking about a movie, not talking about going to D.C.   Is

4   that right?

5   A.   For this document yes, sir, that's correct.

6   Q.   Okay.   You talk about drug usage, and you base that on

7   this "I have got goodies for the trip, goodies you have

8   requested."

9            Do you have any evidence from any of the

10  photographs or any other information that they, in fact, took

11  anything with them?

12  A.   No, sir, not as I sit here.

13  Q.   Do you have any information that Mr. Harkrider took any

14  drugs while in Washington, D.C.?

15  A.   No, sir, not as I sit here.

16  Q.   Okay.   You have talked a little bit about the group

17  messages.   And both comments you say attribute to

18  Mr. Harkrider that you gave said:   Who is y'all's favorite

19  domestic terrorists?   With an S, and he has a laughing face

20  emoji?

21  A.   Yes, sir.

22  Q.   And this is the day after they were up in D.C.?

23  A.   Correct.

24  Q.   How did every news media portray anybody that was

25  there?

43

1   A.    Domestic terrorist.

2   Q.    So, basically, it was an admission he was there, and

3   look at the news media, look how they have labeled us?

4   A.    Correct.

5   Q.    Likewise, you say -- you make it back home.  Yeah, I am

6   back.  Been in Shreveport with my mom hiding out.  Ha. Ha.

7         Are you aware he has a sister that lives in

8   Shreveport?

9   A.    I am aware he has a sister.  I'm not sure where she

10  lives.

11  Q.    If the bond report reflects that, you don't have any

12  reason to dispute that?

13  A.    No, not as I sit here, no, sir.

14  Q.    All right.  And, likewise, finally, the text message,

15  this family support text message -- and it says family

16  support, violent conduct.  I learned today that would be

17  Mr. Nichols' dad; is that right?

18  A.    Yes, sir.

19  Q.    That text message, there is no evidence in this document

20  that Mr. Harkrider responded to that?

21  A.    Correct, in this document, that is correct.

22  Q.    Getting back to the tomahawk and I said, before he

23  advised you it was a tomahawk, you guys did not know it, that

24  it was a tomahawk?

25  A.    That's correct.

1    Q.   And the reason you didn't know it is he never pulled

2    that tomahawk out of his jacket the entire time that you see

3    him on video, did he?

4    A.   Not that I have seen, no, sir.

5    Q.   There was no evidence that you have seen up to this

6    point two weeks into this investigation that would indicate

7    he ever brandished that weapon?

8    A.   I have no evidence of that.  And, in fact, I believe he

9    told the investigators during his custodial interview that he

10   did not -- never took it out of his sheath.

11   Q.   Okay.  So it was in the sheath actually in his jacket?

12   A.   I don't know -- but I believe the sheath was how he

13   affixed it to either his jacket or his vest, yes, sir.

14   Q.   Okay.  Do you know if any were met with resistance by

15   any outside groups, whether it is Black Lives Matter or

16   Antifa or whoever had opposition to them; are you aware of

17   any of that?

18   A.   As to Mr. Nichols and Mr. --

19   Q.   Any of this protest?  Was any of that a part of this

20   protest?

21   A.   Other than hearing rumors, nothing that I can certainly

22   say concrete or there is -- I can refer to this defendant

23   somewhere.  I would imagine that happened, but I have nothing

24   specific about it.  I'm sorry.

25   Q.   The reason I ask that question, he advised you that that

1  was his concern that that would be the clash -- or he advised
2  the investigators of that?
3  A.    Right.
4  Q.    He didn't take it to break into the Capitol; he took it
5  in case he was assaulted to defend himself.  Right?
6  A.    That is the information that I believe he gave to
7  investigators.
8  Q.    And that would go hand in hand with him telling, I never
9  brandished this; I never pulled it out?
10 A.    With respect to the tomahawk, sure, I agree.
11 Q.    Besides about five years of living in Judson, Texas,
12 after military, are you aware that he is a life-long resident
13 of Carthage, Texas?
14 A.    I was not -- I am not aware of that.
15 Q.    Okay.  Are you aware that his mother, who is sitting
16 right here, Donna Cox, is also a long-time resident of
17 Carthage, Texas?
18 A.    I was not aware of that.
19 Q.    Are you aware she lives a half of a mile from his
20 house?
21 A.    I am not.
22 Q.    Okay.  You are aware now that he is 100 percent
23 disabled, and he totally survives on his disability check
24 through the military?
25 A.    That's my understanding, yes, sir.

1  Q.   You are aware that obviously with disability comes

2  constant contact with the VA to reassess and reevaluate any

3  disabilities through the military?

4  A.   I would imagine that it is, but I am not familiar with

5  VA's practices.

6  Q.   Okay.  The cases that are involved here, one is a 0 to

7  10 year case and the other is a misdemeanor; you are aware of

8  that, right?

9  A.   Yes, sir.

10 Q.   Okay.  Have you even looked at the Sentencing Guidelines

11 to see where they fall for this offense?

12 A.   I sure haven't.

13 Q.   Okay.  So you are not aware that they would potentially

14 be 0 to 6 months in this case?

15 A.   I am not aware of that.

16 Q.   Other than Washington, the interaction with law

17 enforcement prior to that, are you aware it is only DWI

18 related?

19 A.   I want to say -- I know about the DWIs.  I want to say

20 there was maybe a criminal mischief sometime in his past, as

21 well.  But certainly nothing more significant than those that

22 I am aware of.

23 Q.   Misdemeanor?

24 A.   Yes.

25 Q.   And his only DWI conviction would have been 2010 or '11;

1   is that right?

2   A.   If you say -- I have -- I am not -- I am sorry.  I am

3   not intimately familiar with his criminal history at this

4   moment, as I sit here.

5   Q.   Okay.  I am looking at the affidavit for arrest warrant,

6   and I realize that there is a lot going on with this.  Okay?

7   I'm not trying to put you in the box here.  But you learned

8   of Mr. Harkrider and Mr. Nichols on January 7th, is that

9   correct, FBI did?

10  A.   So I do believe that was the first reporting of that by

11  the witness Aryeh Ohayon.  I am messing his name up.  I'm

12  sorry.  Ohayon.  As far as -- and that was made to the FBI on

13  January 7th.  As far as when that tip trickled down to us

14  took some time.  And I want to say the first time I really

15  dug into them was that Monday, that following Monday,

16  whatever day that is.  I'm sorry.

17  Q.   Okay.  I don't have my calendar in front of me.  But he

18  is arrested on the 18th, so I think it would be the 11th?

19  A.   That sounds right.  It was roughly a week from when I

20  first was familiar with -- or looked into either of them,

21  yes.

22  Q.   Okay.  First tip, January 7th, from witness number one.

23  Second tip, January the 9th, witness number two?

24  A.   Uh-huh.

25  Q.   Both identifying Harkrider and Nichols, and that is

1   Paragraphs 13 and 15 of the affidavit.

2   A.   That sounds right, yes, sir.

3   Q.   This affidavit for arrest warrant, it is signed by an

4   agent I guess out of D.C.; is that right?

5   A.   That's correct, the Washington Field Office.

6   Q.   Okay.  So you didn't prepare this?

7   A.   No, sir.  Other than that we discussed with Mr. Files,

8   obviously this is built in large part off the search warrants

9   for the Defendants' residences.  Obviously, it has been

10  reworded and rephrased and things like that --

11  Q.   Okay.

12  A.   -- by the attorneys, of course, and that agent as

13  well.

14  Q.   All right.  So when you get the case on the 11th, what

15  do you immediately start doing?

16  A.   Well, we wanted to take sure -- this is going to sound

17  bad.  My first goal is to make sure that these guys are

18  actually in my territory.  If I can kick the work off to

19  somebody else, because we have got a whole bunch of these,

20  I'm going to do that.  So that was our first step was to --

21  you know, we got this tip about these two guys, are they in

22  our territory?  Yes, they were.  We were able to verify that.

23           Then we started to take steps to see -- I think I

24  described this earlier, because the tips called us to their

25  Facebook pages, that was the first place we went.  And I

49

1    think, as I discussed earlier, the pages had been kind of

2    sanitized though.

3            I think with respect to your client, there really

4    was not much of an allegation that his Facebook page was

5    littered with videos or pictures anyway.  A lot of the images

6    that we have now -- I am sorry.  I am rambling here -- are

7    Mr. Nichols' images, which depict Mr. Harkrider, but he is

8    tagged.  Yeah.  Ryan Nichols is angry with Alex Harkrider,

9    and his Facebook page is tagged.

10   Q.   Okay.

11   A.   I'm sorry, I kept going there.

12   Q.   I get it.  But that is Ryan Nichols posting; that is not

13   Alex Harkrider?

14   A.   That's correct.

15   Q.   Just tagging Mr. Harkrider?

16   A.   Correct.

17   Q.   Okay.  To get back to -- this is an important part, too,

18   as far as cooperation.  I know you guys made a big deal about

19   how Mr. Nichols sanitizes his Facebook.  He gets rid of his

20   clothes.  His AR is nowhere to be found.  He wasn't

21   completely truthful about a lot of stuff.  Okay?  He didn't

22   sit down and give you an hour-long interview, or whatever it

23   was, like Mr. Harkrider did?

24   A.   That's correct.

25   Q.   Mr. Harkrider tells you where everything is, tells you

1  exactly what happened, tells you what he has, still had the
2  text messages, which are the basis for these text messages
3  that we have.  Right?
4  A.   I think that is fair.  The only thing I would add to
5  that is that the investigators, when they initially asked him
6  about his conduct, he initially denied all of those things.
7  And it was kind of one of those things, okay, you weren't in
8  the Capitol?  Okay.  Well, what about this picture?  Okay.
9  You got me.  That kind of thing.
10       Now, he does end up admitting the conduct that we
11  allege.  The pictures that we showed him, he does acknowledge
12  his involvement, but --
13 Q.   Okay.
14 A.   -- I want to make that notation there.
15 Q.   And it is a comparative basis, obviously?
16 A.   Totally fair, yes.
17 Q.   You know, you have got one guy that is not cooperative;
18 you have one guy that is very cooperative -- or cooperative.
19 He gives you that (indicating), that tomahawk that is sitting
20 right there on the desk?
21 A.   Well, he confesses to that.  We had that anyway.  We
22 certainly would have had it with the search warrant.
23 Q.   He didn't dispose of it?
24 A.   No, no, that is totally fair, you're right.
25 Q.   Still in his house?

1   A.   Yes.  As well as his clothing that he wore, and he

2   didn't delete messages in his phone.

3   Q.   Yeah.  So we have two different pictures of cooperation

4   here, correct?  One a total lack of and one cooperation.  And

5   one that didn't try to destroy evidence.

6   A.   As far as I know.  I think that is fair.

7   Q.   Okay.  So getting back to the timeline.  You started

8   work on the 11th.  He is not arrested until the 18th.

9   A.   Yes, sir.

10  Q.   Okay.  When was it during that time frame that you

11  believe that Mr. Harkrider now is a complete danger to the

12  community, himself, and others; and he needs to be taken off

13  the streets?

14  A.   I don't know that there was any one moment.  Just kind

15  of something that you kind of come up with as you learn all

16  things throughout it.

17  Q.   By the 12th did you have that opinion?

18  A.   I can't answer that.  I don't remember specifically

19  having those thoughts.  My focus at the time and fixation was

20  on developing evidence, if there was any, preparing the

21  complaints and search warrants in coordination with the case.

22  My mind was not on detention.  It was not on -- I know what

23  you are asking, but that is not where my head was.

24  Q.   Well, and I guess what I am asking is this:  There have

25  been many people identified in this riot that committed acts

1   of violence?

2   A.   Yes, sir.

3   Q.   Whether it is clubbing an officer with a stick?

4   A.   Sure, uh-huh.

5   Q.   Whether it is throwing a fire extinguisher at an officer

6   and hitting an officer -- one I think even passed away; is

7   that correct?

8   A.   Yes, sir.

9   Q.   They have been identified; is that right?

10   A.   A lot of them have, yes, sir.

11   Q.   Okay.  And those people, without hesitation, once it was

12   identified and learned that they committed those acts of

13   violence, they were taken off the streets immediately, were

14   they not?

15   A.   As soon as the appropriate complaint could be worked up,

16   search warrants, yes.  I mean, all of that is taken into

17   consideration with what are we going to get -- how do we need

18   to proceed?

19           And as you know and you have seen the complaint,

20   this was filed in District of Columbia.  There was -- they

21   were not quite as expeditious in their preparing of the -- or

22   getting the complaint signed as I think we would be here in

23   the Eastern District.  They are a little bit overwhelmed

24   right now.

25   Q.   That's fair enough.

1   A.   To be fair.

2   Q.   That's fair enough.

3   A.   We could not proceed -- if your question is, would I

4   have liked to have arrested Mr. Harkrider on the 12th, the

5   answer is yes.  We did not have a complaint in hand at that

6   time.

7   Q.   Okay.

8   A.   And the guidance we got was that the complaint needed to

9   be signed in the District of Columbia.

10  Q.   Okay.  But you had provided your information by then?

11  A.   My search warrant wasn't done until pretty much Friday

12  morning, whatever that -- maybe the 15th or 16th -- whatever

13  day we got the search warrant signed.  I'm sorry.  I am a

14  little tired.

15  Q.   So between the 6th and 18th when he is arrested, are you

16  aware of any acts of violence that Mr. Harkrider committed?

17  A.   No, sir, not as I sit here.

18  Q.   Between the 6th and the 18th, are you aware, from going

19  through his phone, of any plans of Mr. Harkrider to flee?

20  A.   I am not aware of any of that.  However, again, for the

21  purposes of -- I want to be transparent with the Court -- we

22  have not totally gone through anybody's phones, obviously.

23  The Snapchats that we have are very finite.  We were looking

24  for the -- pretty much the time frame to, again, build

25  evidence for the purposes of detention and for probable

1  cause, quite frankly, to make sure we were right on the

2  money, which I think we are.

3  Q.    Okay.  He is arrested at home?

4  A.    Uh-huh.

5  Q.    Carthage, Texas, where he has been living for the last

6  eight to 10 years, I believe?

7  A.    Yes, sir.  I think he bought that home in June is my

8  recollection.

9  Q.    Well, Carthage is longer --

10  A.    Carthage is his hometown, sure.

11  Q.    Obviously, you know the issues before the Court; flight

12  risk, danger, there are a lot of factors that go into that,

13  nature of the offense being one of them?

14  A.    Sure.

15  Q.    So in that assessment, that is the reason why -- and I

16  guess the question becomes -- or is your opinion that he is

17  both a flight risk and a danger; is that what your testimony

18  is?

19  A.    I have some concerns that he has no ties to D.C.  I am

20  concerned that the reference, in whatever context it may be

21  that he was, quote, unquote, hiding out, and my -- most

22  probably my paramount concern is his danger to himself, the

23  reference that he wished he had been killed or shot by

24  police.

25              Whether it is during when he was arrested or at the

1    Capitol, either way, that is very concerning.  And if he is

2    driving his car and, you know, he gets pulled over for a

3    speeding ticket, he might not know that that is all it is.

4            You know, hopefully, he reacts -- you know,

5    responds to that in kind.  But that is a pretty bold

6    statement to make, that I wish they would have killed me.

7    Q.   Distraught over being arrested for a federal offense?

8    A.   I'm sorry?

9    Q.   Distraught over being arrested for a federal offense?

10   A.   Yes.

11   Q.   Okay.

12   A.   Yes.

13   Q.   Distraught over being arrested for being involved in

14   something at the behest of the President of the United

15   States?

16   A.   I don't know if that is why he is distraught.  I do know

17   that one of the information that was related to me that he

18   specifically asked if, as a result of what we are doing here,

19   if he would lose his disability payments and stuff, which if

20   that is his sole income, I can see how that would be

21   distressing as well.

22   Q.   Yeah.

23   A.   Got to be able to put food on the table.

24   Q.   Yeah.

25   A.   And I believe he has a child.  I could be wrong about

1  that.

2  Q.   You are correct.  I believe he has got a 15-year-old;

3  15, 16-year-old daughter.

4  A.   Somebody that he, I mean, probably needs to provide for,

5  as well as himself.

6  Q.   There has been something made about this heave-ho deal

7  where we can spot different people in the crowd, including

8  Mr. Harkrider?

9  A.   Uh-huh.

10  Q.   Do you recall watching that video?

11  A.   Yes, sir.

12  Q.   Do you recall Mr. Harkrider in the crowd?

13  A.   Yes, sir.

14  Q.   There is obviously some steps up to where those officers

15  are, by the appearance of the angle people's heads are; would

16  that be safe to say?

17  A.   Yes, sir.  There is definitely an elevation of some

18  kind.

19  Q.   And he is definitely not up at the front fighting with

20  the officers?

21  A.   No, sir.

22  Q.   He is in the crowd?

23  A.   Correct.

24  Q.   At one point you can actually see him with his head down

25  and his arm stuck up in the air like this (indicating)?

1   A.   Uh-huh.

2   Q.   Is that fair to say?

3   A.   Yes, sir, I know exactly what you are talking about.

4   Q.   He is not pushing the crowd one way or another; that

5   crowd is moving him at that stage.  Would you agree with

6   me?

7   A.   I don't know that I am comfortable saying that.  I

8   certainly think it is fair to say he couldn't get his arms

9   down.  He is obviously significantly taller than the rest of

10   that crowd, unfortunate to him in this instance because it

11   made him stick out very easily to us.

12   Q.   And we have got no evidence of him saying heave-ho, do

13   we?

14   A.   No, not as I sit here today.

15   Q.   Not everyone in that crowd participated in the heave-ho,

16   did they?

17   A.   Certainly not everybody who was present in that frame of

18   footage, no.  I would agree with that.

19   Q.   That mash of bodies, not everyone participated in it;

20   you would agree with that?

21   A.   I'm sorry, I don't.

22   Q.   So you think everyone in that body, that mass, even the

23   ones that later get out of that mass, they were participating

24   in it?

25   A.   I think Mr. Harkrider and Mr. Nichols participated in

1  that swaying motion, and I think they knew what they were a
2  part of.
3  Q.   And you base that on their other conduct or what you
4  view in that video?
5  A.   All of it.  I mean, what is in that video and the
6  totality of their conduct and what I know.
7  Q.   I believe in that same frame about the time we are
8  talking about, you see an individual specifically in a brown
9  cowboy hat and camouflage.  You remember seeing that?  And
10  the guy saying:  Stop and pray, stop and pray?
11  A.   Yes.  That is later than when they are rocking, but,
12  yes, sir.
13  Q.   Yes.  Shortly thereafter?
14  A.   Uh-huh.
15  Q.   Okay.  And he was in that crowd, right?
16  A.   In the swaying crowd, I'm not sure, as I sit here.  If
17  you say it.  I haven't been fixated on him.
18  Q.   Just to clarify, the bullhorn comments were all made by
19  Mr. Nichols?
20  A.   That's correct.
21  Q.   Not a single time do you have Mr. Harkrider holding a
22  bullhorn?
23  A.   I have no evidence that Mr. Harkrider held a bullhorn or
24  made a statement through the bullhorn.
25  Q.   And, likewise, there is a video that was introduced in

1  Mr. Nichols' hearing of him spraying OC spray.  No evidence
2  of us ever spraying any OC spray?  Nor were we charged with
3  that, were we?
4  A.   The Defendant was not charged with that, and I don't
5  have any evidence of him spraying the OC spray, that's
6  correct.
7  Q.   Okay.  Just to be clear, too, you have no evidence that
8  my client has any knowledge of Mr. Nichols shooting at an
9  airplane flying over his head -- over his house, do you?
10 A.   I don't have any evidence of that right now, but I would
11 love to talk to him about it.
12 Q.   Didn't find an AR or any 10-round magazines in my
13 client's house either, did you?
14 A.   Not that I am aware of, no, sir.
15 Q.   We talked about that piece of furniture that was found.
16 Have you seen it?
17 A.   I haven't.
18 Q.   Can you describe it, how big, how small?
19 A.   My understanding is that it is pretty little, and they
20 believe it is a leg.  What I kind of envisioned, how it was
21 described to me was from a very low -- like a low chair.
22 Well, kind of sort of like just an old antique chair leg, in
23 my mind is what I am picturing, but I haven't seen it.  I'm
24 sorry.
25 Q.   Okay.

1   A.   But there probably is a picture of it, though, in the
2   search photos from his residence.  I haven't looked at those
3   either, but I would imagine there was one in there since we
4   took it.
5           MR. WALDRON:  Judge, I will pass the witness.
6           THE COURT:  All right.  Redirect?
7           MR. LOCKER:  Yes, Your Honor, and I will keep it
8   brief.
9                   REDIRECT EXAMINATION
10  BY MR. LOCKER:
11  Q.   Regarding the heave-ho discussion --
12  A.   Yes, sir.
13  Q.   -- in your viewing of the video, does it appear that
14  Mr. Harkrider throws his weight into that crowd as they are
15  heaving and hoeing?
16  A.   That is what it appears to me, yes.
17  Q.   Wherever his hand is, it appears he is leaning his
18  shoulder into it and participating with the sway?
19  A.   Yes.
20  Q.   Regarding Mr. Harkrider's PTSD, are you aware that he
21  has been prescribed medication for that?
22  A.   That is the information that I have, yes.
23  Q.   And you also have information that he is non-compliant
24  with taking of that medication?
25  A.   My understanding is that is the statement that he made

61

1   to investigators was that he was not complying with his

2   medication, that is correct.

3            MR. LOCKER:  Your Honor, I would like to offer for

4   admission Government's Exhibit 12 or 13 at this point.

5            THE CLERK:  It's 13.

6            THE COURT:  13.

7            MR. LOCKER:  13.  And it is an image that shows

8   Mr. Nichols and Mr. Harkrider outside the window, and then

9   attached to it is a second image that shows them inside the

10  same room which they appeared outside of at first.

11           Mr. Waldron, I have it up on my screen if you would

12  like to see it.

13           MR. WALDRON:  I have seen those pictures.  I have

14  no objection for the purposes of this hearing.

15           THE COURT:  All right.  It will be admitted.

16  BY MR. LOCKER:

17  Q.  So, Detective Harry, this shows that we have Mr. Nichols

18  in the foreground and Mr. Harkrider in the background.  I'm

19  going to zoom in somewhat.

20           And, although you can tell from this image that

21  Mr. Nichols -- you can't tell if Mr. Nichols or Mr. Harkrider

22  are in some other room besides the arched-window room that

23  they entered within, it is clear from this image that they

24  didn't merely remain in the two- or three-foot proximity of

25  the window; they are fully in that room.  Is that fair?

1    A.    Correct, yes.

2              MR. LOCKER:  I will pass the witness.

3              THE COURT:  Any recross?

4                      RECROSS-EXAMINATION

5    BY MR. WALDRON:

6    Q.    Agent, do you believe that is the window they entered

7    right there?

8    A.    I do.

9    Q.    Okay.  So, obviously, we are talking a still photo.

10   Depth-perception-wise, it's really hard to say exactly how

11   far that window is away, isn't it?

12   A.    Yes.

13   Q.    We don't know if it is eight feet, 10 feet, five feet;

14   we don't know how far away it is?

15   A.    I don't know a distance, but I can certainly -- you can

16   look at points of reference in the image.  The can lights on

17   the ceiling is a pretty good indicator to me of kind of how

18   far they are.

19              I certainly think they are at least four lights

20   back.  I mean, we can only see three.  But they look further

21   back than that to me.  But just even if you look at the can

22   lights rights above the Judge's Chambers, I mean, those are

23   probably at least four feet apart.

24   Q.    Sure.  So it looks my guy is further down the table,

25   Mr. Harkrider is further down the table under that second

1  light.

2          What does it look like he is doing there?

3  A.   My assumption is that he is actually playing on his

4  phone.   He is texting or taking a picture or doing something.

5  Q.   He is not tearing anything up, is he?

6  A.   Not in that image.

7  Q.   Not yielding a weapon of any type?

8  A.   No, sir.

9  Q.   Do we know if this is a police officer standing beside

10  him with his patch on his arm?

11  A.   The gentleman to the right?

12  Q.   Yeah.

13  A.   I have no idea.

14  Q.   That could be a Capitol Police Officer.   We don't even

15  know, do we?

16  A.   Could be another Marine.

17  Q.   Could be.

18          MR. WALDRON:   I will pass the witness.

19          THE COURT:   Anything further?

20          MR. LOCKER:   Nothing further, Your Honor -- no,

21  Your Honor.

22          THE COURT:   All right.   You may step down.

23          THE WITNESS:   Thank you, Your Honor.

24          MR. LOCKER:   The Government rests.

25          THE COURT:   Okay.   Mr. Waldron, who will be your

1    first witness?

2              MR. WALDRON:  Judge, I just have a proffer.

3              THE COURT:  Proceed.

4              MR. WALDRON:  That would be it.

5              THE COURT:  All right.

6              MR. WALDRON:  Judge, I have family members here

7    present.  I have got Mr. Harkrider's mother, Donna Cox.

8              Would you stand up, Ms. Cox?

9              And then I have got his aunt and uncle here.

10             And, I'm sorry, you wrote your names down, and I

11   can't remember.

12             But his aunt and uncle are here also from Carthage.

13             Judge, the proffer would be, this family lives in

14   close proximity, less than a mile from Mr. Harkrider.  His

15   mother is here today to offer to be third-party custodian.

16   And if she was called to testify, she would say exactly that.

17             Her house, and I have looked it up, is .7 miles

18   from Mr. Harkrider's house in downtown Carthage.

19             If she was called to testify, she would say that

20   her son, who she helps out a lot anyway with various errands,

21   she would allow him to live with her, if this Court would

22   allow that.

23             She has a job with CIGNA; that she works in the

24   area; she would be home in the evenings; and would be able to

25   take care of him; take care of his needs; make sure he gets

1    to his VA appointments; make sure he gets all of his grocery

2    shopping; and his bills paid; and whatever it may be.

3            She is not opposed, obviously, to the electronic

4    monitor being in the house.  In fact, she welcomes that.

5    That would be fine with her.

6            She -- you know, if called to testify, she would

7    talk about right now what he does for his PTSD is he raises

8    peppers.  He gardens, and he is trying to do it with the

9    non-medication way in addressing his PTSD.

10            She would testify she does not believe he is

11    suicidal.  He is distraught over being arrested.

12            But she would abide by the restrictions of this

13    Court.  She would, obviously, call his Probation Officer if

14    he did, in fact, violate any condition of his -- of his bond

15    requirements.

16            So I am offering her as a third-party custodian,

17    someone that is very close to him, someone that sees him on a

18    regular basis.

19            As Mr. Files previously said, obviously a mother

20    loves her child.  It doesn't mean she agrees with everything

21    that her child does.  At the same time recognizing he has to

22    be in D.C. at some point to answer to this potentially, she

23    is willing to make sure he makes all those court appearances.

24            She is able.  She is capable.  She is in good

25    health.  She can take care of this.  So I would offer her as

1   third-party custodian.

2           The other thing is I wanted to talk a little bit

3   about the electronic monitoring because I know it is

4   recommended.  And we are not opposed to that.  That is fine.

5   He is 100 percent disabled.  He stays at home.  He doesn't go

6   and do.  He did not drive to D.C.  He rode with Mr. Nichols

7   to D.C.  I think that is borne out by the messages.

8           I talked to Mr. Manley beforehand, and he said

9   right now currently that electronic monitoring doesn't have

10  the GPS technology, but they have ways of closely monitoring,

11  and they can make it where he is restricted to his residence

12  24/7 with the exceptions of doctors' appointments and certain

13  essential needs.

14          Well, with his mother here, she has already said, I

15  can take care of the essential needs.  The only thing we

16  would need to go to is court and VA appointments.  Outside of

17  that, he could be restricted to his home pending the outcome

18  of this case.

19          So, Judge, I would -- that is my proffer is that

20  she would be third-party custodian.

21          THE COURT:  Thank you, Mr. Waldron.  With that, do

22  you rest?

23          MR. WALDRON:  I do, Your Honor.

24          MR. LOCKER:  Government closes.

25          THE COURT:  All right.  And the Defendant will

1  close.

2          So, Mr. Locker, I will let you argue the motion at

3  this time.

4          MR. LOCKER:  Thank you, Your Honor.  May it please

5  the Court.

6          We are in.  Two people killed already.  We need all

7  of the patriots in this country to rally the F up and fight

8  for our freedom before it's gone forever.  Give us liberty or

9  give us death.  We won't stand for it.

10          The Defendant's own words.  We believe that that is

11  a reasonable inference that those were his words.

12          Who is y'all's favorite domestic terrorists?

13          Made in jest or otherwise, it is still his words.

14          He makes a throat-slashing gesture to the crowd.

15  There is no other way to interpret this besides a call to

16  violent action.

17          Regarding weapons.  He took a tomahawk into the

18  United States Capitol, and he can be seen holding an OC spray

19  canister over his head same, the same kind that Mr. Nichols

20  used to assault law enforcement officers.

21          His mental health raises legitimate questions about

22  his stability, and his suicidal comments indicate he is a

23  danger to himself, very sadly.

24          And while he may have been following his friend,

25  Mr. Nichols, his conduct was just as serious and his

1  intention as equally warranted and necessary to protect the
2  public and deter his and other's desire to continue their
3  attack on the rule of law.

4         Plenty of people, leaders and followers of all
5  walks of life and background, were in the crowd that day.
6  Yet, as you can see from the video, only a tiny fraction
7  committed the kinds of offenses that he and Mr. Nichols
8  committed.

9         I ask the Court to detain him.

10         THE COURT:  Your response?

11         MR. WALDRON:  Thank you, Your Honor.

12         Your Honor, I would note that there is no
13  presumption in this case based on 3142(f), and we are asking
14  the Court to take note of that.

15         And we are also asking the Court to take judicial
16  notice of the Pretrial Services Report where it documents
17  Mr. Harkrider's history, including both mental health
18  history, his medical history, his criminal history.  It is
19  all documented in here; and it is confirmed by his mother,
20  who is present today.  I had her review this prior to the
21  hearing.  She said this is all accurate.  I think some of the
22  information she, in fact, provided.

23         Judge, it gets back to those factors and what we
24  need to do here.  It is not about sending a message, because
25  of the nature of this offense, to everybody that is involved.

1 Each individual is entitled to an assessment based on the

2 factors.

3          I get that there are crimes that were committed

4 that day.  I get that people are outrageously upset about

5 what happened that day.  But when it boils down to it, we

6 shouldn't be judged by the actions of the Ryan Nichols or any

7 other individual.  Judge us on our actions.  Judge us on

8 where we are in life and our past conduct.

9          We haven't shot at airplanes or been accused of

10 that.  We have not assaulted construction workers.  We live

11 at home.  We fought for the country.  We served two tours

12 where we were shot at and had to return fire and, as a

13 result, had PTSD.

14          This agent testified his biggest concern is the

15 suicidal thoughts that my client has had.  I have a mother

16 right here that says she does not believe her son is

17 suicidal.  Anybody is going to be distraught about being

18 arrested and drug into federal court on a felony charge when

19 you have never committed a felony in your life and the worst

20 thing you have done is driven intoxicated.  That has been his

21 life for 33 years.

22          He has a daughter that he pays child support to

23 that he sees on a regular basis.  He has a mother and aunts

24 and uncles that live in close proximity that he sees on a

25 regular basis.

1          His sister leaves in Shreveport.  There was no

2    hiding out in Shreveport.  There was a laugh face at the end

3    of that.  He didn't try to conceal anything that he had done.

4          He didn't delete text messages, as he was

5    instructed to by Mr. Nichols.  He didn't hide that tomahawk.

6    He could have gotten away, and they never knew he had a

7    tomahawk hidden in his jacket because it was never revealed.

8    The believed it was a baton.

9          He cooperated.  Sure you can search my phone.

10   Sure.  Even though they might have a warrant, he didn't

11   object to anything from the standpoint of the search of his

12   house and gave them all of his weapons.

13          I think that goes to the difference in nature that

14   you have seen this afternoon of two different, separate

15   Defendants, not basing it just on this charged conduct.

16          And even looking at the charged conduct, we have

17   got Mr. Nichols spraying pepper spray at whoever he was

18   spraying at.  We didn't do that.  We touch an OC can, and all

19   of a sudden we are on the same level as Nichols.  That was

20   handed to us.  It is clear on the video.  And he gets rid of

21   it as clear as he can.  He didn't participate in that.

22          That picture at the end was the best evidence of

23   what was going on in that room that we can't see.  He is

24   standing there on his phone, probably taking the picture that

25   we saw.

1    The writing on there, they can't even say that what

2    was written was attributed to him.  It is a screenshot.

3    Anybody could have typed that in.  They have no evidence of

4    that.  They got his phone.  We haven't seen that phone yet.

5    But they got his phone.

6    I don't know how -- I know Snapchat has some

7    features where pictures and images and all is wiped clean

8    after a period of time.  So I don't know if that even exists

9    on that phone anymore.

10   Judge, I have looked at this, studied it, spent a

11   lot of time with Mr. Harkrider and his mother.  I have looked

12   at the factors set forth in (G), and it talks about the

13   nature and circumstances of the offense charged being one

14   factor.  But it also talks about the history and

15   characteristics of the person, the person's character, talks

16   about his physical and mental condition.  And there is some

17   concern about suicidal.  He does have PTSD.  But he has lived

18   with that now for a number of years, and he is on 100 percent

19   disability.

20   It talks about financial resources.  He doesn't

21   have hardly anything in the bank.  He represented that to

22   you.

23   Length of residence.  In the community most of his

24   life.  Community ties.  Past conduct.  History related to

25   drug or alcohol abuse.  We know we have a DWI.  But we don't

1  have anything else outside of that.

2          Criminal history.  Record concerning appearance in

3  court proceedings.  We have none of that.

4          And he was not on probation or parole at the time

5  that this offense was committed.

6          So, Judge, when you take into consideration these

7  factors that Congress has given us as guidelines in

8  determining, they weigh heavily in favor of releasing

9  Mr. Harkrider.

10          We have the Pretrial Services Report that makes a

11  recommendation to this Court.  Release Mr. Harkrider.  We

12  think he will abide by your conditions.  Put him on that

13  electronic monitor and monitor him 24/7.  Let his mom run his

14  errands for him.  Let him be home pending the outcome of this

15  case.

16          And, Judge, one of the strongest arguments, I have

17  looked at the Guidelines, how they applied in this case.  We

18  have had these conversations quite often.  And, obviously,

19  there is wiggle room for somebody to make a motion for an

20  upward departure based on the nature and circumstance and

21  being involved.  But the Guidelines in this case are 0 to 6

22  months.  If he is detained, he could serve more time than he

23  would actually get under a Guideline sentence.  I think that

24  is my biggest concern.

25          This is a probation-eligible case.  Whether it ends

1     that way, I don't know.  But right now his Guidelines are 0

2     to 6 months, and I think he ought to be given a chance to

3     prove himself.

4               Thank you.

5               THE COURT:  Any final word?

6               MR. LOCKER:  No, Your Honor.

7               THE COURT:  All right.

8               Thank you all.  In light of the testimony and

9     evidence, I do find that probable cause exists to believe

10    that an offense has been committed by Mr. Harkrider.

11              In addition, based on what I have heard here today,

12    even just specific to Mr. Harkrider, concerning the nature of

13    the charged offense and the additional evidence I have heard,

14    I do not believe that there are conditions that would

15    reasonably assure the safety of the community or

16    Mr. Harkrider's appearance.

17              Specifically, as to this Defendant, there are text

18    communications discussing bringing firearms to the Capitol.

19    Mr. Harkrider did, in fact, bring a weapon into the Capitol,

20    although not a firearm.  There is video evidence showing him

21    trying to and successfully getting into the Capitol.

22              In addition to the instant offense, I am concerned

23    about his mental health history and his past issues with

24    alcohol consumption.

25              So I appreciate the attorneys' argument.  I do.

1    But for all of these reasons, Mr. Harkrider is going to be

2    detained pending trial.  I will enter an order detaining him.

3              Is there anything further from the Government?

4              MR. LOCKER:  No, Your Honor.

5              THE COURT:  Anything further from the Defendant?

6              MR. WALDRON:  Judge, I know my appointment may be

7    limited, obviously, to this district in this case, but I

8    would ask -- and I know Mr. Locker will continue to provide

9    discovery, if there is something new learned from that, I

10   will let the Court know --

11             THE COURT:  Yes, and you have absolutely retained

12   your right to revisit this issue upon receipt of new

13   evidence.  Okay?

14             MR. WALDRON:  Thank you, Judge.

15             THE COURT:  All right.

16             All right.  Mr. Harkrider, you are remanded to the

17   custody of the United States Marshals.

18             And we are adjourned.

19             COURT SECURITY OFFICER:  All rise.

20             (Hearing adjourned.)

21

22

23

24

25                        CERTIFICATION

1

2              I HEREBY CERTIFY that the foregoing is a true

3    and correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7    /s/ Shea Sloan _____                    February 5, 2021
     SHEA SLOAN, CSR, RPR
8    Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25