**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

RYAN TAYLOR NICHOLS,

*Defendant*.

Case No. 21-cr-00117-TFH-1

**DEFENDANT RYAN NICHOLS' MOTION FOR MODIFICATION OF BAIL TO**
**PLACE DEFENDANT ON CONDITIONAL RELEASE PENDING TRIAL**

### I.      INTRODUCTION

Ryan Nichols, by and through his counsel, Joseph D. McBride, Esq., respectfully moves this Court, pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141 et seq., to review the Detention Order issued on January 22, 2021, and to release the defendant on personal recognizance. Alternatively, if the Court is not amenable to release on personal recognizance, defendant moves this Court to release him into the third-party custody of his wife, and commit him to the supervision of a High Intensity Supervision Program (HISP) with GPS monitoring by local Pretrial Services.

The charges from this case stem from the events that took place on January 6, 2021 at the U.S. Capitol.  The allegations are serious, controversy never ending, and the smear tactics deployed against every January Sixth protestor seem to know no bounds.  Ryan Nichols is thankful that he is not being tried in the court of public opinion and that the presumption of innocence as well as the presumption in favor of release support this application, which he now respectfully brings before this Court. *See United States v. Salerno,* 481 U.S. 739, 755 (1987) (highlighting "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception").

1

Ryan Nichols categorically denies each charge and is eager to prove his innocence at trial. Mr. Nichols denies aiding and abetting his co-defendant, Alex Harkrider, in any crimes. Mr. Nichols denies having ever formed or executed any plan to attack law enforcement. Mr. Nichols denies having ever formed or executed any plan to breach the Capitol. Mr. Nichols denies possessing a deadly or dangerous weapon. Mr. Nichols denies assaulting any officer with or without a dangerous weapon. Mr. Nichols denies witness tampering, parading, disorderly conduct and every element of each crime to which he has been charged. Mr. Nichols denies having ever brought firearms into Washington, D.C. Mr. Nichols denies having ever purchased mace, bear spray, O.C. spray, and/or any other kind of chemical designed to disarm or incapacitate.

Mr. Nichols asserts the presumption of his innocence at this time. Prior to the instant offense date, Mr. Nichols asserts that he had reason to believe that on January 6th he or co-defendant Harkrider could be attacked by members of the violent extremist groups known as Antifa and Black Lives Matter (BLM), who were deploying Blac Bloc tactics at protests, such as wearing: black clothing; sun glasses; ski masks; scarves; goggles; helmets; and full-on riot gear[1] indistinguishable from police dressed in riot gear.[2]

Mr. Nichols asserts that he had reason to believe that his fellow protesters could have also been attacked by members of the violent extremist groups as well. Mr. Nichols asserts that he studied the laws regarding his right to bear arms in Virginia before departing to Washington, D.C., because he would be lodging there. Mr. Nichols asserts that he studied the laws regarding his right to bear arms in Washington, D.C. because he would be traveling there. Mr. Nichols asserts that at

---

[1] *See* https://www.fdd.org/analysis/2021/06/14/behind-the-black-bloc; *see also* See *Blac Bloc Tactics* @ https://crimethinc.com/posters/black-bloc-tactics (last visited on October 31, 2021).

[2] *See* Blac Bloc Antifa Related Documents attached as **Exhibits 1a-1b**; *compare to* Documents Relating to Police in Riot Gear attached as **Exhibits 1c-1d**.

no time did he possess a dangerous weapon on January 6, 2021. Mr. Nichols asserts that he never committed a single illegal act of violence or been part of any extremist group.

Accordingly, Mr. Nichols respectfully submits, that his personal history, lack of criminal history, and non-violent background are overwhelming evidence that he is does not present a risk of flight.

Ryan Nichols is an excellent candidate for pretrial release.  He is unique in the fact that his ties to his community are deep and long lasting.  He has been gainfully employed for his entire adult life.  He is a husband and father to two young boys.  He is a successful business and a home owner.  Mr. Nichols is a decorated veteran that served this country during times of war, and was honorably discharged from the United States Marine Corps in 2015 after four years of service. After he was honorably discharged, Mr. Nichols founded a 501(c)(3) nonprofit called Rescue the Universe that specializes in search and rescue.  Because of this, he spends somewhere between 50-75 days per year rescuing helpless people from natural disasters.  Mr. Nichols is held in high esteem by both the January Sixth Detainees and the prison guards at the DC jail where he has languished in horrific conditions for the past ten months.  This is demonstrated by the fact that he earned his way onto the Detail Crew shortly after arriving at the DC jail and that his good conduct and exemplary behavior have been formally recognized by the guards on four separate occasions.[3]

These facts are more than sufficient to support the conclusion that Ryan Nichols is the best possible candidate for pretrial release.  However, when considered alongside the presumption of innocence as well as the presumption against pretrial detention the evidence supporting the conclusion that Ryan Nichols is (1) does not present a risk of flight, and (2) is not a danger to the community— is overwhelming.

---

[3] *See* Ryan Nichols' Written Letters of Good Conduct from the DC Jail all attached as **Exhibit 2**.

Accordingly, Mr. Nichols respectfully requests that this Court overrule the Detention Order imposed by a United States Magistrate Judge in the Eastern District of Texas and release Mr. Nichols to his home in Longview, Texas under the least restrictive means possible.

## II.    BACKGROUND

Ryan Nichols, age 30, was born on December 6, 1990 in Rowlett, Texas.  He is the son of Patti Nichols, now a retired school teacher of 30 years, and Don Nichols, a retired Marine and Baptist Pastor, who is currently helping manage the family wholesale business.  Ryan is a husband to a remarkable wife whose name is Bonnie Nichols. He is a father to two young sons; Ryan Jr., who is seven-years-old and Blake, who is five-years-old. Ryan's parents instilled in him the values of faith, family, fidelity, patriotism, and service– early on in life.  It is, therefore, unsurprising that he has lived a life of compassion, honor, and public service.  Ryan is beloved by his family, valued by members his church, held in high esteem by his employees, and counted on by his friends.

Ryan Nichols is a decorated veteran, successful business owner, home owner, husband, and father with no criminal record or history of violence.  He founded and runs a nationally recognized search and rescue 501(c)(3) called Rescue the Universe, which specializes in rescuing humans and animals from natural disasters and other highly dangerous situations.[4] Ryan spends the majority of his time running his business, being a devoted family man, and attending service at Mobberly Baptist Church, in Longview, TX.  When Ryan is not engaged in his work or domestic life, he spends the rest of his time doing search and rescue missions, which is on average, approximately 50-75 days per year.[5]

---

[4] *See* Rescue the Universe Website, available at https://www.rescuetheuniverse.com/ (last visited November 1, 2021).
[5] *See* January 22, 2021 Hearing Transcripts at p. 92-99 attached as **Exhibit 3**.

Ryan Nichols was in the eighth grade when he went out on his first search and rescue mission with his father Don during Hurricane Katrina.  Rescue missions pose two sets of dangers. The first set of dangers are usually related to the storm itself, such as rescuing people from a flooded house with downed power lines.  The second set of dangers involve the unfortunate reality of being robbed and killed by other people.  During one rescue mission, Don and Ryan were about to cross over into a notoriously bad area for a search and rescue. Prior heading into said area, the police stopped Don and Ryan to make sure they understood the possible dangers that lay ahead. "I knew the neighborhood was bad when the police came by and asked us 'You packing?' which of course we were because "… when you start on a trip, you research the laws and regulations, especially about weapons."[6] Ryan's dad taught him many lessons, including that the best search and rescue guys are: (1) courageous, aware, prepared, and trained, (2) have the ability to defend themselves and, more importantly, (3) the ability to defend other people in dangerous situations.

These lessons were echoed in Ryan's Marine Corps training during four years of active duty. The core values of service, love of country, tradition, fidelity, honor, responsibility, preparedness, awareness, brotherhood, and readiness during times of war and peace—are encapsulated in the Marine Corps' motto "Semper Fidelis" or "*Always Faithful*."   Semper Fi is a greeting and motivational expression that unites Marines of any age by reminding them of their code to be *Always Faithful,* to God, Country, and the Commander in Chief.  It is an exhortation, to treat all veterans with compassion, dignity, and acceptance. These words carry profound meaning for Ryan Nichols.  Their utterance is akin to a sacred calling— requiring him to make a difference in this world by living a life of leadership, self-sacrifice, excellence, and respect.

---

[6] *See* Sworn Statement of Don Nichols at p. 2-3 attached as **Exhibit 4**.

This is demonstrated not just by Ryan's Honorable Military Discharge, but by the fact that he is a decorated veteran who served overseas with distinction.  Some of his accolades include: the Marine Corps Good Conduct Medal; Global War on Terrorism Service Medal; Sea Service Deployment Ribbon; Expert Rifle Qualification Badge; and the National Defense Service Medal. Ryan no longer serves on active-duty, yet he continues to serve the public, often at great personal risk. Each time he shakes his father's hand– he also shakes the hand of another Marine.  Each time he travels into another dangerous search and rescue situation with fellow veteran Alex Harkrider– another Marine, is right beside him.  *Always Faithful*— personified.

Ryan Nichols is a respected business owner and employs anywhere between 10-15 people at his family wholesale business.  Approximately half of his employees are ex-convicts and/or persons recovering from various addictions.  Known as "Second Chancers," Mr. Nichols employs them not because he feels bad for them, but because he believes that people should not be defined by their worst moments, but rather, by their best.[7]

Mr. Nichols's search and rescue work is easily findable via a Google or YouTube search, as is the fact that he was recognized by Ellen DeGeneres in 2018 after a video of him rescuing six dogs left behind by their owners during Hurricane Florence surfaced on the Internet.[8]  DeGeneres was so moved by Ryan's work that she made a $25,000.00 donation to the Humane Society in his name. And after finding out that Ryan and Bonnie Nichols missed their honeymoon because of Hurricane Harvey, DeGeneres wrote them a $10,000.00 check to take a honeymoon trip to Hawaii.

Ryan and Bonnie Nichols decided that while the money for their trip to Hawaii was deeply appreciated, it could be put to better use by buying a rescue boat to enhance Ryan's rescue efforts

---

[7] *See* FN 5, *supra.*

[8] *See* ABC News Video: *Volunteers Rescue residents, pets from flooded homes during Florence*, available at https://www.air.tv/watch?v=AqeWZWPEQXe7BJCJO4EQvQ (last visited on November 1, 2021).

with Rescue the Universe.   Immediately after purchasing the rescue boat, Ryan Nichols participated in dozens of hurricane rescues and disaster relief efforts, during which he saved multiple lives and brought lifesaving supplies to helpless people.[9]   Ryan's right-hand man in the vast majority of these search and rescue missions has been fellow Marine Corps veteran and best-friend, Alex Harkrider.[10]   It is worthy that Alex Harkrider was granted pretrial release by Your Honor in this very court on April 26, 2021, and to note further that Your Honor has three times granted Mr. Harkrider permission to travel to Louisiana to provide disaster relief to Hurricane Ida victims as a volunteer with the Cajun Army. Should Mr. Nichols be released from jail, he would certainly seek permission to do the same, at the appropriate time.

### III.    STATEMENT OF FACTS

There are three groups of people that entered and left the Capitol on January 6, 2021. Group One is comprised of the people who showed up to exercise their constitutionally protected rights to participate in political protest while never entering the interior of the Capitol or participating in any melee. Group Two is comprised of the people who planned and executed a premeditated attack on the Capitol by committing acts of violence to property and personnel.

---

[9] *See* Photos Regarding Mr. Nicolas Rescue Work attached as follows:
  **Exhibit 5(a)**:  Nichols rescuing a woman from flood waters;
  **Exhibit 5(b)**:  Nichols rescuing five children and two adults from flood waters;
  **Exhibit 5(c)**:  Nichols's boat filled with cases of water;
  **Exhibit 5(d)**:  Nichols and Harkrider heading out into flood waters;
  **Exhibit 5(e)**:  Facebook picture of Nichols rescuing six dogs locked in Hurricane Florence flood
      waters;
  **Exhibit 5(f)**:  Picture from Nichols' GoPro where he is rescuing a young woman and infant;
  **Exhibit 5(g)**:  Picture from Nichols' GoPro where from inside boat with supply box, rescuing
      an elderly woman, and mother and child;
  **Exhibit 5(h)**:  Nichols giving medical attention to an elderly woman in Panama City, FL after
      he called in a helicopter rescue;
  **Exhibit 5(i)**:  Picture of Nichols' rescue boat pulling up to a flood house with woman inside; and
  **Exhibit 5(j)**:  Picture of Nichols on the Ellen DeGeneres show.

[10] *See* January 22, 2021 Hearing Transcripts at p. 92-99 attached as **Exhibit 3** (highlighting that on September 16, 2020, Ryan and co-defendant Alex Harkrider used that boat to rescue an Alabama man who almost drowned and was in serious need of medical attention during Hurricane Sally).

Group Three is comprised of the people who showed up to participate in political protest, yet ended up either: (a) inside the Capitol despite having no premediated intent to do so, and/or (b) used force in defense of themselves or others despite having no premediated intent to do so.

Ryan Nichols is a member of Group Three and freely admits that like many other Americans, he and co-defendant Alex Harkrider made a decision to attend the "Save America Rally" scheduled to take place on January 6, 2021.  As is customary in any cross-country trip, the two began to plan their excursion in the same fashion that they planned all their prior search and rescue missions.  They considered the time, distance, duration, location, dangers, and emergency planning needed to accomplish their objective— of exercising their First Amendment right to peacefully assemble and petition the United States Government for redress of grievances.

Nothing about their plan was nefarious or illegal. Everything about their plan was well thought out and familiar.  This search and rescue duo had traveled to save Americans from dangerous situations dozens of times before.  And as Marines, they have both traveled to distant lands to serve America during times of war.  Therefore, when the call to Save America from having its democracy stolen was sent out from the sitting President of The United States and Commander-in-Chief, Ryan Nichols answered without hesitation— Semper Fidelis: *Always Faithful.*[11]

Ryan Nichols' ability to attend the Save America Rally and protest peacefully came with reasonably foreseeable risks that were totally unrelated to him.  For instance, Mr. Nichols was well aware that members of the militant extremist group known as Black Lives Matter (BLM) had become increasing violent in recent years, and were responsible for all kinds of violence, including

---

[11] The Oath of Enlistment was sworn as follows: "I, Ryan Taylor Nichols, do solemnly swear that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God."

firebombing the police; mass looting, and the burning of entire cities.  Furthermore, Mr. Nichols was also aware that the extremely violent anarchist group known as Antifa, and its affinity groups, had been routinely targeting conservative rallies and publicly assaulting Trump Supporters since 2016, and had been doing so with increasing regularity.  He was further aware that these extremist groups regularly use Blac Bloc tactics at protests which made them indistinguishable from police.

On January 4, 2021, Nichols and Harkrider left Texas for their Virginia hotel, and arrived at their hotel on January 5th. Nichols and Harkrider then took an Uber to Washington, D.C. on the night of the January 5th to take in the sites.  They encountered multiple political protests along the way; some were peaceful while others were quite contentious.

On the morning of January 6, 2021, Nichols and Harkrider took another Uber to Washington, D.C.  Ryan Nichols did not bring any firearms, knives, chemical sprays, taser, stun gun, sharp object, hand cuffs, rope, or zip-ties into Washington, D.C.  He wore: (1) a Marine Corps issued Boonie Hat that he had worn in multiple search and rescue missions, (2) Steel toe boots that he takes to every search and rescue mission, (3) His GoPro to film the events of that day, just as he does during search and rescue missions, (4) a crowbar in case of an emergency, his research indicated that it was legal to carry, (5) a jacket to protect from the cold and rain, (6) Chest Protection with 1 plate on the front to protect from knives or bullets in the event he was attacked, and (7) a Pocket constitution in his jacket pocket to remind him of his sworn oath. Each of these actions are constitutionally protected and reasonable, especially considering the possibility of having to defend himself or others, against attacks from organized extremist groups.

Ryan Nichols exited the Uber at the Ellipse in President's Park to attend the "Save America Rally." At the rally they would listen to all the speakers, and alongside throngs of other likeminded and concerned citizens, peacefully exercised his First Amendment right to petition this Government for redress of grievances.  Ryan denies having prior knowledge of any march to the Capitol until the President of the United States made the following statement:

> Now, it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down. . . Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated. I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.[12]

Ryan and Alex take a post- speech 15-minute sit down to rest and then bean their walk down to the Capitol to have their voices peacefully heard around 1:30 pm.  People marched and sang; the Spirit of Patriotism was palpable.  They arrived at the Capitol grounds somewhere between 2:30 pm and 2:45 pm, and are confronted by a sea of protestors chanting and waving flags.  They walk on to the inauguration stage just before 3:00 pm.  There are no barricades. They are not told to leave.  People are congregating around the Lower Western Terrace's Tunnel Entrance ("the tunnel").  On their approach to the tunnel, they start to see protestors who look distressed. They hear people screaming in pain and crying for help—women and old men are bloodied and injured.  Training and instincts kick, in and they head to the tunnel, wondering if an accident had happened and if other people were even more seriously injured. [13]

---

[12] *See* Transcript of Trump's speech at rally before US Capitol riot, available at https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27 (visited last on October 29, 2021).

[13] *See* "West Terrace 3 Hour Block" video at minute mark 1:01:20 attached as **Exhibit 13** (please note that all sensitive material under the Protective Order will be attempted to be filed under Seal); *see also* "4_Warning Graphic Content_Raw Footage of The Capitol Yesterday" at 1:05:51 attached as **Exhibit 14** (showing man coming out, and people screaming).

The tunnel is elevated, and it takes a few minutes to arrive at the entrance. Ryan arrives but still does not know what is going on. More people are coming out injured and the crowd is chanting "Antifa" and "Fuck Antifa" while pointing up towards the entrance.[14] Ryan enters the tunnel just after 3:16 pm and stays in the tunnel for two minutes.  It is loud and confusing; Ryan still does not understand what is going on.  There is pushing and shoving.  Ryan never makes contact with any officers. Ryan exits the tunnel just after 3:18 pm[15] and heads to the bottom of the stairs.

Ryan hears a big commotion and looks up top at the tunnel entrance. He sees a man in riot gear get dragged out of the tunnel and into the crowd.  Ryan did not know if the man was Antifa or a police officer.  Then someone from the crowd punched the man that was being dragged straight in the face.  Ryan was able to see that it was a police officer who got punched.  Ryan turns around and screamed "Alex!" and then points at the officer who was clearly in distress. Thinking on his feet, Ryan realized a few things very quickly.  Speaking in general terms, the group to the right of Ryan appeared to want to help the officer.  Those people were screaming "Save him!  Save him!" and "Don't hurt the cops!"  While a handful of guys on Ryan's left give him the impression that they sought to harm the officer.  Ryan realized in that moment, that he would not be able to help the officer if the officer was dragged past where Ryan was standing.  So, Ryan decided to intervene. On October 28, 2021, Ryan sworn a statement to the undersigned highlighting the following:

> . . . I learned several rescue techniques in the Marine Corps, including one during 'Work Rescue Drills" where you have to drag a victim to safety with two hands while holding them close to your body.  There are different variations of this, depending on the rescue scenario.  And after years of my own search and rescue work, I have

---

[14] *See* "GoPro Raw 360 Clip" at 3:14:30 p.m., attached as **Exhibit 15** (showing when the crowd is chanting "Antifa" and "Fuck Antifa" while pointing up towards the hallway).

[15] *See* "GoPro Raw 360 Clip" at minute mark 1:40 or 3:16:10 pm as shown in video, attached as **Exhibit 15**; *see also* "West Terrace 3 Hour Block" at minute mark 1:16:10 or 3:18:09 pm, as shown in video, attached as **Exhibit 13**; *see also* **Exhibit 13** at minute mark 1:18:11.

found a few techniques to be very effective.  For instance, when rescuing a person in danger of drowning, I grab them with two hands which as much force I can muster, pull them close to my body, and then to safety.  Here, right after my instinct to help Fanone kicked in, the unction to deploy this technique followed straight away.

The whole Officer Fanone situation looks much slower on video compared to how it actually played out in real life.  What I can tell you is this:  the way he was dragged out of the tunnel and into the crowd, is similar to someone being dragged out to sea.  And like an injured man floating down a river, he looked to be heading into greater danger– fast. I knew that if I could intercept the path he was traveling that I could (1) grab him and pull him to safety, (2) redirect him in the direction of safety, and/or (3) ensure that he was not dragged past me and into potentially deeper and more perilous waters.

When the chance came, I tried to grab him with two hands as forcefully as I could, but I could not get a grip.  Next Alex, and I— along with a few others made a wall around the area where Fanone was so no one looking to hurt him could get to him.  And it those moments, I can say with confidence that he knew he was safe.  Officer Fanone was no longer screaming, and did not appear to be gripped by fear or in distress.  I have not yet had the chance to see Officer Fanone's body cam footage, but something tells me that on it, you will hear a bunch of us yelling "hands off!", "Don't hurt him!" and "Send him back up!"

*See* Sworn Statement of Ryan Nichols attached as **Exhibit 11** (regarding Michael Fanone); *Compare to* "GoPro Raw 360 Clip" at minute mark 4:40, which is at 3:19 pm, attached as **Exhibit 15** (establishing Nichols and Harkrider watched Officer Fanone get pulled down stairwell); *Compare with* **Exhibit 15** at minute mark 4:55-5:03 (supporting how Ryan Nichols contributes to Fanone being safely returned to the tunnel).

Ryan went back up toward the tunnel entrance several times, because in his gut, he felt that something was not right.  Accusations of "Antifa!" and "He's an agent!" swirled about.  Ryan noticed several men that appeared to be out of place. There was talk that people posing as Trump supporters committing nefarious acts.  But each time Ryan went up to the front, something else would happen.

For instance, just after 4:00 pm, Ryan is sprayed multiple times by an officer standing on ledge in tunnel.[16]  He is also separated from a woman who stood next to Ryan at different times at the Western Terrace.  They interacted at different times.  She was middle aged and nice.  Ryan promised to keep an eye on her.  The woman was wearing a red shirt and a MAGA hat. Shortly thereafter, officers begin terrorizing people in and around the tunnel.  People are screaming and getting crushed. There is a pile of human beings stacked on top of each other at the tunnel entrance. People are trapped and there is nowhere to go.

Ryan watches as a struggling woman gets maced. Ryan sees the woman whom he promised to keep an eye on getting pushed around like a rag doll, and forced into the tunnel area.  Someone hands Ryan a bottle from the crowd that looks like a fire extinguisher.  Ryan points it at the officers who are spraying people, and he sprays them back.  The spray appears to have no effect of any kind, on any one.  Ryan has no idea what was in the bottle.  The bottle leaves Ryan just as quickly as it came to him, and he never sees it again.[17]

 Screams and cries for help keep pouring out of the tunnel.  The place has literally turned into the Gates of Hell.  Ryan is about eight feet from the entrance, and is keeping an eye on the middle-aged White woman with the red shirt and red MAGA hat.  As Ryan watches the woman, he sees Officer Badge # L359, wearing a long-sleeve White-shirt, begin to beat a man for no apparent reason.  This same officer in the White-shirt started beating the man at 2:06:15 in the video, which equates to approximately 4:06 pm. This officer beats the man so badly that the man crawls over to the woman with the MAGA hat at 2:06:59 in the video, or 4:06pm.  White-shirt

---

[16] *See* "West Terrace 3 Hour Block" video attached as **Exhibit 13** (showing this officer was instructed to stop spraying multiple times by another officer, but simply ignored him.  Consequentially, the other officer walked out of the tunnel as a result.  This matter is still being investigated by undersigned counsel at this time.).

[17] *See* "West Terrace 3 Hour Block" video at minute mark 2:02:34-41, actual time: 4:02:35 - 4:02:41, attached as **Exhibit 13.**

sees the man escaping the tunnel, and at 2:07:01, or 4:07 pm, White-shirt swings for the man one last time but misses and knocks the woman's MAGA hat off instead. Then for reasons that no fair minded or decent human being will ever understand— White-shirt turns his attention to the woman and begins to pulverize her.  The weapon this officer appears to be using is a collapsible stick, designed to break windows in emergency situations. This stick is neither designed nor to be used against another human being.

Here is analysis of the beating as seen from **Exhibits 13 and 14** (Please note that the time stamps pertain to the three-hour long video itself, attached as Exhibit 13, and not the time of day on January 6, 2021), as follows:

| | |
|---|---|
| 2:07:01: | White-shirt hits the woman in the head with his baton five times in seven seconds; |
| 2:07:22: | The woman is sprayed directly in the eyes by officer on ledge; |
| 2:07:24: | White-shirt uses his baton to hit another person with a mask on; |
| 2:07:30 | The woman and others are still being maced and hit by White-shirt and ledge officer; |
| 2:07:38 | Blood is visibly coming out of the woman's head and can be seen on the white hoody; |
| 2:07:55 | White-shirt and other officers are randomly assaulting people for no apparent reason; |
| 2:08:17 | White-shirt makes his way to front of crowd again and targets woman who is attempting to escape; |
| 2:08:30 | White-shirt spears and pokes the woman his baton about the head, neck, and face so as to inflict maximum pain; |
| 2:08:46 | White-shirt beats the woman with his baton striking her eight times in six seconds; |

| 2:09:13 | White-shirt punches the woman in the face, with his left-hand, landing five punches in five seconds, with all of his might; |
| --- | --- |
| 2:09:35 | Another officer joins in and starts beating the woman in the head with his baton, landing twelve strikes in seven seconds; |
| 2:10:47 | If you pause the video here, you will see the welts on the woman's face along with a disturbing look of helplessness; |
| 2:10:54 | Officers push the woman around the tunnel. |
| 2:10:55 | The woman temporarily collapses. |
| 2:11:13 | White-shirt follows the woman to the front of the tunnel and beats her with his baton as she's collapsing; and |
| 2:11:24 | The woman is re-taken to the back of tunnel and is never seen again. |

Ryan has his eyes peeled on the tunnel but the woman never comes out.  As he is looking for her, he sees a blonde-haired woman attempting to leave the tunnel, just as she is about to exit, she gets kicked and stomped in the head by an officer. She is screaming, and so are others.[18]  Ryan walks away from the tunnel in disgust.  He sees people entering a window and is told by many that the window leads into a meaningless conference room.

Ryan enters out of curiosity just after 4:14 pm.[19] While in the conference room, two things of note happen.  First, Ryan is informed that an unarmed woman, and veteran, named Ashil Babbitt

---

[18]  *See* "West Terrace 3 Hour Block" video at minute mark 2:10:45-2:11:24, or 4:11:22pm, attached as **Exhibit 13**; *See also* video "Patriots Storm US Capitol" at minute mark 1:07:22, attached as **Exhibit 19**.

[19] *See* "His Pants are Falling Down" video at minute mark 1:50, attached as **Exhibit 16**.

had just been shot and killed by the Capitol Police.  Second, Ryan receives a text message from

his father Don, which reads, as follows:

> They have labeled you all anarchists.  The patriots have taken the
> hill, both the Senate and Congress.  The DC police, the FBI, and the
> Secret Service are getting together with the national guard.  They
> are discussing using lethal force to disburse people off the hill. Go
> get your weapons.

*See FBI* Interview of Donald Nichols Jr.; Collection of Ryan Nichols' Cell phone on January 20,
2021, attached as **Exhibit 9**.

At 4:21 pm, after having read his father's text, and in light of the abject brutality he

witnessed in the tunnel, as well as the news pertaining to Ashli Babbitt.  Ryan Nichols, consumed

with concern and emotion grabbed a bullhorn from someone in the crowd and told the crowd:

"This is not a peaceful protest." That is an accurate statement.  The protest on the Western Terrace

had turned into a riot.  Ryan told people to take up arms so they could defend themselves: "If you

have a weapon grab a weapon, you need to get your weapon."[20]    Ryan said this because he

unequivocally believed that their lives were in grave, imminent danger— and that people who

were being brutally and unjustifiably attacked had a right to defend themselves.  And in the heat

of the moment, Ryan made a few hyperbolic statements to a crowd of people that could barely

hear him.  No one was listening to Ryan.  People's attentions are focused on the tunnel entrance…

the crowd starts screaming "Stop! Stop!" they killed her!"  "She's dead!" Then a ferocious fight

breaks out in front of the tunnel entrance. People are crying, while others are in shock.  Philip

Anderson is knocked unconscious on the floor.  Roseann Boyland who was next to him— laid

there dead.[21]

---

[20]*See FBI* Interview of Donald Nichols Jr.; Collection of Ryan Nichols' Cell phone on January 20, 2021, attached as
**Exhibit 9**.
[21]  *See* Picture of Roseann Boyland, deceased, on ground in front of Tunnel, and Philip Anderson who was left for
dead but survived, attached as **Exhibit 6**; *See also* "West Terrace 3 Hour Block" video at minute mark 2:21:12, or
4:21:12pm, attached as **Exhibit 13** (showing Roseanne Boyland dying/dead); *Compare to* "Patriots Storm US Capitol"

Here is an excerpt from Michael Joseph Foy's Emergency Bond Review Motion describing the reasons why Foy who witnessed these events from the steps at the bottom of the tunnel, charged to the top of the steps and used a hockey stick against the police in defense of others.

"In the two minutes before Mr. Foy became involved, the following statements are heard:

'Someone is being crushed!  Let 'em out! Get her up please, save her life!  Stop! Stop! She's gonna die!  She's gonna die! Please stop pepper spray, we're trying (inaudible)!  People are getting tased! Save her!  Save her!  She's gonna die!  She's gonna die!  She's dead!  She's dead!  I need somebody, she's dead!  I need medical'

The officers either did not hear or did not heed the warnings and appear to push forward… despite being told that people were pressed under them, the officers continued to push with their batons. And while it is not apparent on this particular video, the statements of individuals in the crowd suggest that the officers were using pepper spray and tasers."[22]

Roseanne Boyland's body is dragged into the tunnel at 4:30 pm, and is never seen again.[23]

Ryan Nichols and Alex Harkrider begin the process of exiting the Capitol's grounds at 4:34 pm[24] and are gone by 4:45 pm.[25]   Alex Harkrider was released in this court by Your Honor on April 26, 2021.  Michael Joseph Foy was released by the Honorable Tanya S. Chutkan on July 2, 2021. Ryan Nichols has been languishing in prison under horrible conditions since surrendering himself

---

video at minute mark 1:13:25 attached as **Exhibit 19** (establishing Roseanne Boyland was beaten by officer Lila Morris);  *Compare with* "West Terrace 3 Hour Block" video at minute mark 2:28:00, attached as **Exhibit 13**.

[22] *See* Michael Joseph Foy's Emergency Bond Review Motion at p. 5-9, attached as **Exhibit 7**.

[23] *See* "I Can't Breathe" video at minute mark 4:23, approximately at 4:30:40pm, attached as **Exhibit 17** (establishing how and when officers are signaling to bring Roseanne's body in hallway, as shown in video); *See also* "West Terrace 3 Hour Block" video at minute mark 2:30:40 attached as **Exhibit 13**; "Patriots Storm US Capitol" at minute mark 1:22:16, which is 4:34pm attached as **Exhibit 19**.

[24] *See* "West Terrace 3 Hour Block" video at minute mark 2:34:07 attached as **Exhibit 13** (establishing Alex and Ryan exit room window and leave capitol grounds).

[25] *See* "RSBN _ US Capitol on Lockdown" at minute mark 32:30, or approximately at 4:44pm, attached as **Exhibit 18** (showing Alex and Ryan are on back of inauguration stage and shown leaving)

on January 18, 2021, and has not seen his seven-year-old son Ryan Jr.,  his five-year-old son Blake, or wife Bonnie, in two hundred eighty-eight days.

## IV.     MEMORANDUM OF LAW

In our society, "liberty is the norm" and "detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act, 18 U.S.C. § 3141 *et seq*., thus provides that a defendant must be released pending trial unless it is determined that no condition or combination of conditions exist which will reasonably assure his appearance as required or the safety of the community. 18 U.S.C. § 3142(c). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (*quoting United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

If the rebuttable presumption under 18 U.S.C. § 3142(e)(2) does not apply, as in the instant case, then with regard to the risk of flight analysis as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence during future court proceedings.[26] When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by clear and convincing evidence. 18 U.S.C. § 3142(f). Short of that, a judicial officer is generally required to release the defendant "subject to the least restrictive condition or combination of conditions" to effect these goals. *Id.*

The factors that must be considered in assessing the defendant's future dangerousness are laid out in § 3142(g) of the Bail Reform Act as: (1) the nature and circumstances of the offense

---

[26] *See United States v. Xulam*, 318 U.S. App. D.C. 1, 84 F.3d 441, 442 (1996) (*citing United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)) (explaining that a finding must be based on clear and convincing evidence that the defendant poses a danger to the community or a preponderance of the evidence to support the defendant's likelihood to flee).

charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.[27]

In *United States v. Chrestman*, Chief Judge Howell outlined six factors to be considered in assessing the nature and circumstances of January 6, 2021 related offenses, including whether a defendant: (1) has been charged with misdemeanors or felonies; (2) engaged in prior planning before arriving at the Capitol, for example by obtaining weapons or tactical gear; (3) carried or used a dangerous weapon, be it a firearm, large pipe, wooden club, or other offensive use instrument; (4) coordinate with participants before, during, or after the riot; (5) assumed either a formal or defacto leadership role by encouraging other rioters misconduct; the nature of the defendant's words and movements during the riot.[28]

Regarding whether a defendant presents an a clearly identifiable and articulable future threat to the community the district court must consider, in light of all record evidence, whether a defendant charged with felonies involving the possession of dangerous weapons at the U.S. Capitol on January 6, 2021, presents an a clearly identifiable and articulable future threat to the community. Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. *United States v. Munchel*, 991 F.3d 1273 (DC Cir. 2021).

Additionally, in making an individualized assessment a dangerousness, the court must consider whether the defendant has prior felony convictions, ties to extremist organizations, and

---

[27] 18 U.S.C. § 3142(g); *see also Munchel*, 991 F.3d at 1279–80; *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

[28] *United States v. Chrestman*, No. 21-mj-218, 2021 (D.D.C. 2021).

whether his post January 6th related behavior presents an articulable threat to the community, in light of evidence that a defendant did not commit illegal acts of violence, or did not participate in planning / coordinating a January 6th related attack on the U.S. Capitol. *United States v. Tanios,* 856 Fed. Appx. 325 (D.C. Cir. 2021).

The *Munchel*, *Tanios,* and *Chrestman* line of cases give no guidance regarding what weight and effect the legitimate assertion of an applicable affirmative defense should be given when analyzing accusations of violence under the Bail Reform Act. "Nothing in the Bail Reform Act shall be construed as limiting the presumption of innocence." 3242(j).  As such, we respectfully submit that the reasonable assertion of a legitimate defense should counterbalance the weight given to facts suggesting the presence of dangerousness for purposes of a 3242(g) analysis, as all allegations at this phase are merely based upon a finding of probable cause.  We submit further that the reasonable assertion of an affirmative defense should weigh heavily in a defendant's favor when analyzing dangerousness under section 3142(g)— especially in situations where the presumption of release still applies.

For example, Defense of a Third Person is an affirmative defense for assault, whereby a person may use a reasonable amount of force in defending against an attack without being guilty of assault. *Frost v. United States,* 618 A.2d 653 (D.C. 1992). In order for a defendant to prove that he had a right to use force in defense of a third person, he must show that he reasonably believed, and actually believed that the third person had a right to defend herself. *Frost v. United States,* 618 A.2d 653 (D.C. 1992).  In order for this defense to be viable, the intervenor must demonstrate that the third party was the innocent victim of an unlawful attack. *Taylor v. U.S.*, 380 A.2d 989 (D.C. 1977).  Applied to this case— this defense should weigh heavily in Nichols' favor.

## V.     ARGUMENT

Release is warranted in this case, because (1) the Government has not proven by a preponderance of the evidence to show that Mr. Nichols is a flight risk, (2) The Government has not proven by clear and convincing evidence that Mr. Nichols is a danger to any person or the community, and (3) Assuming arguendo that Government somehow can meet its burden, the Government cannot prove that there is no condition, or combination of conditions that will reasonably assure Mr. Nichols' appearance in court and the safety of any person or the community. Because of this, Mr. Nichols should be released subject only to the least restrictive condition or combination of conditions necessary to ensure his return to court and the safety of the community.

**POINT ONE: <u>Ryan Nichols Does Not Present a Risk of Flight</u>.**

The Magistrate Judge wrongfully determined that Mr. Nichols presents a risk of flight because the Detention Order failed to consider all of the required factors under bail reform act. Factors which clearly demonstrate that the government simply cannot prove that Ryan Nichols presents a risk of flight by a preponderance of the evidence. *See* Order (filed 1/25/2021), *US v. Nicolas*, 6:21-mj-00029 (KNM), ECF Doc. #: 9. In its decision and order, the Magistrate states this conclusion: "The government has shown . . . by a preponderance of the evidence that there is a serious risk that the defendant will flee or not appear in court when required." *Id.*

This conclusion is unsupported by law and fact.  First, at no point in the Government's summation did the government state, allege, or argue that Mr. Nichols presents a risk of flight— never mind prove risk of flight by a preponderance of the evidence. (*See* January 22, 2021 Hearing Transcripts at pp. 111-115 attached as **Exhibit 3**).  Second, all legitimate judicial decisions stem from application of law to fact.  Despite this reality, at no point in the oral Decision or written Order does the magistrate analyze the facts presented under the relevant portions of the Bail

Reform Act.  Importantly, when presented the opportunity to check boxes which speak toward risk of flight in PART III of Detention Order, all of the boxes pertaining to risk of flight were unchecked.  *See* Order (filed 1/25/2021), *US v. Nicolas*, 6:21-mj-00029 (KNM), ECF Doc. #: 9.

The Magistrate's finding of risk of flight should be disregarded in its entirety because: (1) the Prosecutor never argued that Ryan Nichols is a flight risk, (2) the Magistrate does not articulate in her oral Decision or written Order any facts she relied upon to deem Nichols a flight risk, and (3) the fact that the neither the Decision or Order ever mention the Bail Reform Act is proof positive that the operative portion of the Bail Reform Act was ever applied.

The arguments supporting the conclusion that Ryan Nichols is NOT a flight risk are as follows: (1) Ryan Nichols has no criminal record and no history of failing to appear in court, (2) Mr. Nichols is a United States Citizen that has strong community ties to East Texas; (3) specifically, Mr. Nichols is a husband and has been married to his wife Bonnie for eight years; (4) Mr. Nichols is a home owner, and an active loving father to two beautiful young boys; (5) Mr. Nichols has been gainfully employed his entire adult life and is 50% owner in a successful family wholesale business; (6)  Mr. Nichols runs a non-profit organization called Rescue the Universe that specializes in rescuing people and animals in areas destroyed by natural disasters and extreme weather, (7) Ryan Nichols is a decorated Marine who served his Country with honor and distinction during a time of war, and (8) He has no ties or citizenship in any foreign country.  In short, he has every reason to stay home and no reason to flee.

These facts, when viewed through the lens of the presumptions of liberty and innocence, both of which Mr. Nichols is entitled and has formally asserted, lead to only one reasonable conclusion: the Government has not, cannot, and will not prove that Ryan Nichols is a flight risk by a preponderance of the evidence.

**POINT TWO: The Government has not Proven by Clear and Convincing Evidence that Mr. Nichols Presents a Danger to the Community.**

The Detention Order determined that the Government established Mr. Nichols a danger to others and the community by clear and convincing evidence.  This is an egregious error.  It is an error as a matter of law because the Detention Order fails to consider all the required factors under 18 U.S.C. 3142(g).  It is an error as a matter of fact because the record clearly indicates that Ryan Nichols is not a danger to any person or the community under 3142(g).

Most importantly, the Government has not shown and the record is devoid of any facts suggesting that Ryan Nichols is presents a clearly identifiable and articulable future threat to the community. For instance, Ryan Nichols has no criminal record and is not a member of any extremist group.  His history and characteristics make it abundantly clear that the community is a much safer place when Ryan Nichols is out in it— saving lives.  The government has gone through great lengths to reduce his entire life story to their interpretation of the event that took place at the U.S. Capitol on January 6, 2021.  This is a desperate and disgraceful attempt to mischaracterize the entire life of a good man who has time and again displayed heroic virtue, compassion, in situations and circumstances where most people would never dare to tread.

It is, therefore, abundantly apparent Magistrate Judge failed to factor the following points into her analysis: (1) The presumption of liberty favoring release to which Ryan Nichols is entitled, (2) The presumption of innocence to which Ryan Nichols is entitled, (3) Pretrial Services recommendation that Ryan Nichols should have been released on January 18, 2021,  (4) The nature and circumstances of the offense charged,  (5) The weight of the evidence,  (6) Ryan Nichols's history and characteristics, (7) The risk of danger to the community,  (8) The presence or absence of an identified and articulable threat, (9) Whether any condition or combination of conditions can assure Nichols' return to court and the safety of the community, and (10) The fact that the

Prosecutor suggested that Mr. Nichols was guilty of the crime of insurrection in his summation, despite knowing that Nichols was not charged with Insurrection under 18 U.S.C. §2383.  This statement was highly prejudicial and appears to have influenced the Magistrate's decision so much so that immediately jailed Mr. Nichols absent any meaningful legal analysis directly after the statement was made.  We object to this patently false and prejudicial statement and will argue in our pre-trial motions that the term "insurrection" not be used at trial by the prosecution.

### POINT THREE: 3142(g) Factor, The Nature and Circumstances of the Charged Offense Clearly Favor Release.

Ryan Nichols is not a danger based upon the six advisory "guideposts" articulated in *United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb 26, 2021), for assessing the comparative culpability of a given defendant in relation to others on January 6, 2021.  The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others." *Id.* at 7-8.

### (1) Whether the Defendant has Been Charged with Felony or Misdemeanor Offenses

Mr. Nichols has been charged with felonies.  This is the first time that he has ever been charged with a felony or a crime of violence, and he is without question presumed innocent of all charges.  Nothing in the Bail Reform Act "shall be construed as modifying or limiting the presumption of innocence."  18 U.S.C. 3142(j).

**(2) The Extent of the Defendant's Prior Planning**

The right of the people to peaceably assemble for the purpose of petitioning Congress for redress of grievances, or for anything else connected with the powers or the duties of national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by the United States.[29] The Second Amendment guarantees the individual the right to possess and carry weapons in case of confrontation.  The natural meaning of "bear arms," as used in the Second Amendment, means to wear, bear, or carry upon the person, or within a person's clothing, or within a person's pocket, for the specific purpose of being armed and ready for offensive or defensive action in case of conflict.[30]

As is customary in any cross-country trip, Ryan Nichols and Alex Harkrider began to plan their excursion in the same fashion that they planned all their prior search and rescue missions. Everything about their plan was well thought out and familiar, because this search and rescue duo had traveled to save Americans from dangerous situations dozens of times before.  Nothing about their plan was nefarious or illegal. They considered the time, distance, duration, location, dangers, and emergency planning needed to accomplish their objective of exercising their First Amendment right to peacefully assemble and protest.

Ryan's ability to attend the Rally came with reasonably foreseeable risks that were totally unrelated to him.  He was well aware that BLM, Antifa, and Blac Bloc were extreme, violent, and dangerous.  They were literally all over the Internet burning, looting, targeting conservatives, and attacking Trump supporters in large groups, absent consequence.  Vice President Harris had

---

[29] *U.S. v. Cruikshank*, 92 U.S. 542, 2 Otto 542, 1875 WL 17550, 23 L.Ed. 588 (1875).

[30]  U.S.C.A. CONST.AMEND. 2., *see District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783 (2008); *see also McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 130 S.Ct. 3020 (2010).

famously tweeted to help BLM and Antifa make bail after they mass burning and looting.[31] Because of this, he planned accordingly.

Ryan did not bring any firearm, any knife, chemical spray, taser, stun gun, sharp object, hand cuffs, rope, or zip-ties into Washington, D.C.  He wore a Marine Corps issued Boonie Hat that he had worn in multiple search and rescue missions.  Steel toe boots that he takes to every search and rescue mission.  His GoPro to film the events of that day, just as he does during search and rescue missions.  A crowbar in case of an emergency, since his research indicated that it was legal to carry.  A jacket to protect from the cold and rain.  Chest Protection with a single plate on the front to protect from knives or bullets in the event he was attacked. And Pocket constitution in my jacket pocket to remind him of the oath he took, and his right to be there. Each of these actions are constitutionally protected and reasonable, especially considering the possibility of having to defend himself or others, against attacks from organized extremist groups.  None of these actions speak toward the kind of planning suggested in *Chrestman.*  There are no maps, manifestos, entry points with big red circles around them.  There are no communications with extremist groups.

**(3) Whether the Defendant Used or Carried a Dangerous Weapon**

Mr. Nichols never carried a dangerous weapon— Mr. Nichols carried a crowbar.  The prosecution has not cited any caselaw indicating that a crowbar is a de facto dangerous weapon. There is, however, a litany of January 6th related cases where defendants have converted non-dangerous instruments into dangerous ones through (1) modification or (2) use.  For instance, Jacob Chansley possessed a modified flag pole that appeared to have a blade on top of it.  This modification resulted in a finding that the non-dangerous flag pole had become a dangerous flag

---

[31] *See* VP Harris' June 1, 2020 tweet supporting bail fund for BLM and Antifa, after having recently burned and looted Minneapolis attached as **Exhibit 8**.

pole, and therefore a dangerous instrument for purposes of 3142(g).[32]  There is also a litany of January 6th related cases where other defendants converted non-dangerous instruments (flag poles, sports equipment, etc…) into dangerous instruments by violent use.  Ryan Nichols did not swing, poke, hit, smash, or hook, any person or piece of property with his crowbar.  Ryan did not brandish it in a threatening manner.  He carried the item in his belt under his coat, only removing it when crawling into the conference room window.  There is, therefore, no evidence indicating that he converted this non-dangerous instrument into a dangerous instrument by modification or use.

Regarding the allegation of O.C. Spray, we know this— Mr. Nichols never purchased any sprays.  There is no evidence indicating the bottle's origin, contents, or whether it had ever been modified, refilled, or tampered with. No chain of custody has ever been established.  No labs have ever been done.  No bottle has ever been recovered.  There is insufficient proof proving this fact.  For the sake of argument, assuming it was O.C. Spray, and that O.C. spray qualifies as a dangerous weapon under the law— Nichols' still passes this test because he never carried it and certainly did not possess it.  The video evidence clearly shows that a bottle is passed to him, which he then sprays and hands off.  He never moves from his spot.  Therefore, he never carries it.

**(4) Evidence of Coordination with Other Protestors Before, During, or After the Riot**

Ryan Nichols and Alex Harkrider have been traveling together for years.  Nothing about their plans were nefarious or illegal.  Neither man is a member of any extremist group.  Neither man coordinated with any stranger before, during, or after January 6th.  Neither man used radios, walkie-talkies, or anything else.  The only communication that took place while they were at the Capitol was a text message from Ryan's father.

---

[32] *See United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079 (D.D.C. Mar. 8, 2021).

**(5) Whether the Defendant Played a Leadership Role in the Events of January 6, 2021**

Mr. Nichols did not have a leadership role. He is not a member of any extremist organization, militia, or hate group. He is not a member of any group that supports violence against the government. He is never seen using any electronic ear piece, walkie-talkie, etc. He is never seen commanding anyone. And the only time he screams and motions for Alex Harkrider to do anything, was to try and help him save Officer Fanone.

**(6) The Defendant's Words and Movements During the Riot**

After watching a woman get brutally beaten and possibly killed by White-shirt Officer Badge# L359. After watching another woman get stomped in the head by the officer standing on the ledge of the tunnel. After witnessing men and woman being crushed. After learning that an unarmed woman, and veteran had been shot at point blank range by Capitol Police. After receiving the text message from his father, he was handed a bullhorn from someone in the crowd and told the crowd the protest was no longer peaceful. Because it was not. Ryan told people to take up arms so they could defend themselves because he unequivocally believed that their lives were in grave, imminent danger. And in the heat of the moment and height of passion. Ryan made a few hyperbolic statements to a crowd of people that could not hear him. That is not a leadership role— it is a moment of passion and anxiety, during a once in a lifetime event that will never take place again. It should be noted that Ryan Nichols genuinely contributed to returning Officer Michael Fanone to safety, which should factor as a major positive in this analysis. It should be noted further that Mr. Nichols never made any physical contact with any other officer, which should also serve as major positive in the analysis.

**POINT FOUR: 3142(g) Factor, The Weight of the Evidence is Not Strong, Especially with Respect the Most Serious Charges.**

**Count 7:**    Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a
Deadly or Dangerous Weapon
18 USC Section 1752(a)(2) and (b)(1)(a)

The Government will never be able to prove the most crucial element of its prosecution of Ryan Nichols, which is the allegation that he possessed and used a dangerous instrument. There is no chain of custody.  Mr. Nichols never purchased any sprays, and there is no evidence indicating the bottle's origin, contents, or whether it had ever been modified, refilled, or tampered with.  No chain of custody will ever be established.  No bottle has ever been recovered, which means there is no weapon.  No lab test has ever been done, not on the bottle or the victims clothing.  And if a lab test were to ever be done, it would be impossible to conclude with any degree of certainty that whatever liquid is on the victim's person is directly attributable to Ryan.   No victim has ever been identified. The undersigned counsel has watched hundreds of hours of video footage from the tunnel and can say without reservation, that unlike the *Tanios* case where the police who were sprayed were (1) clearly identifiable; (2) reacted by running from the line of duty to rinse their eyes with water; (3) suffered long term injury— none of that happened here.  The chances that the Government can prove this charge beyond a reasonable doubt are slim to none.

Ryan Nichols never possessed a dangerous weapon. For the sake of argument, assuming the bottle was O.C. Spray, and that O.C. spray qualifies as a dangerous weapon under the law, the government will not be able to prove possession.  At no time did Nichols exert dominion and control over the bottle.  He did not do so physically or constructively. The video evidence shows that like a beach ball at a concert many bottles were being passed around.  The idea that temporarily holding and or using any item in this context equivocated to legal possession is lunacy.  Consider this hypothetical:  a cigarette smoker approaches a man and asks him for a light.  The man hands

him a lighter.  The smoker strikes it once, and then twice to light his cigarette.  Does the fact that

he used the lighter now mean he has taken legal possession?  Absolutely not. Again, the chances

that the Government can prove this charge beyond a reasonable doubt are slim to none.

**Count 5:**     Entering and Remaining in a Restricted Building or Grounds with a Deadly or
Dangerous Weapon
18 USC Section 1752(a)(1) and (b)(1)(a)

**Count 7:**     Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a
Deadly or Dangerous Weapon
18 USC Section 1752(a)(2) and (b)(1)(a)

As previously argued, the non-dangerous instrument Ryan Nichols carried on January 6th

is distinguishable from the non-dangerous instruments other January 6th defendants converted into

dangerous ones by modification or use. [33]  Because the Government will not be able to prove that

Ryan Nichols possessed a dangerous instrument, or that he knew it was a dangerous weapon, they

will not be able to prove that he entered a conference room with one. Therefore, the chances of

proving entering Capitol grounds with a dangerous weapon are slim to none as well.    It is worthy

to not that Mr. Nichols was in the conference room for a handful of minutes, and that no point in

time did he enter the Senate Chamber, the House Chamber, or Speaker Pelosi's Office Suite.

**Count 3:**     Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon
18 USC Sections 111(a)(1) and (b)

**Count 12:**    Act of Physical Violence in the Capitol Grounds or Buildings
Title 40 USC, Section 5104(e)(2)(F)

---

[33] *See United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079 (D.D.C. Mar. 8, 2021).

Defense of a Third Person is an affirmative defense for assault, whereby a person may use a reasonable amount of force in defending against an attack without being guilty of assault. *Frost v. United States,* 618 A.2d 653 (D.C. 1992). In order for a defendant to prove that he had a right to use force in defense of a third person, he must show that he reasonably believed, and actually believed that the third person had a right to defend herself. *Frost v. United States,* 618 A.2d 653 (D.C. 1992). In order for this defense to be viable, the intervenor must demonstrate that the third party was the innocent victim of an unlawful attack. Taylor v. U.S., 380 A.2d 989 (D.C. 1977)

As set forth in great detail in the facts of this case, Ryan Nichols saw an incredible amount of violence perpetrated against helpless women and men in tunnel. The video and facts regarding Officer White-shirt clearly demonstrates the animus that multiple members of the Capitol police held toward Trump supporters on January 6, 2021. The White middle-aged woman was pushed into the tunnel and desperately tried to escape. She never raises a finger to the police and never commits an offensive act. She is simply stuck, and they know it. So, what do they do? They attack her mercilessly. And there is nothing she can do about it.

An officer wearing a white shirt, in a room full of officers with dark shirts, is always the highest-ranking officer in the room. He sets the bar for everyone else to follow. And here, he did just that. He set the tone and the example for the horrors that would follow, when he pulverized a defenseless woman that was half his size for wearing a MAGA hat. She is hit approximately thirty-five times over the course of four minutes and thirty seconds, while appearing to be begging for mercy the entire time. She is hit with the baton while facing away. She is hit with the baton while facing forward. She is speared and poked with the baton about the face so as to inflict maximum pain. She collapses more than once and is stood up by the officers only to be maced and beaten again. At some point, White-shirt puts away his baton, not because he is showing mercy, but

because he has a clear avenue to her face.  As such, he unloads on the defenseless woman punching her five times in five seconds, directly in the face, with all of his might.[34]  This is an evil man that should be stripped of his position of power and sent to prison for his crimes for aggravated assault and attempted murder, not unlike the officer who killed George Floyd.   Instead, the people who came to her aid, and others like her— are languishing in prison in pre-trial detention..

Ryan is watching the tunnel entrance waiting for the woman to reappear, but she never does.  He sees a woman with blonde hair try to escape, and she is viciously kicked in the head by the officer on the ledge.  Ryan walks away in disgust and enters a conference room where he learns that Ashli Babbitt has been shot.  You can hear the conversations happening when he is in there.  Ryan receives he Father's text message, exits the room, and grabs a bull horn.  Of course, he says grab your weapons… people are literally dying.  Minutes later in front of the tunnel entrance Roseanne Boyland is killed.  The police do not heed the repeated warnings of the crowd that speak to her impending death, they push, poke, spray, and baton—until she dies.

For the sake of argument, assuming the bottle Ryan sprayed was O.C. spray, our defenses will be (1) Third Person Defense and (2) Self Defense.  Third Person because he saw multiple people at the tunnel being beaten, who were certainly entitled to defend themselves, most of them just could not, or attempted to with little to no effect—never resulting in an officer even flinching.  The beatings kept happening.  Many people were injured, and some certainly died.  Moreover, Ryan was maced for no reason shortly before he touched that bottle.  He was simply standing there and was maced right in the face.  The law of self-defense is very much like an eye for an eye, a punch for punch, etc… That is the logic behind proportionality. And here, spray for spray is a legally sufficient and justifiable response under both theories.  Moreover, if Ryan Nichols really

---

[34] *See* "West Terrace 3 Hour Block" video at minute mark 2:06:00-2:08:00 attached as **Exhibit 13**.

wanted to hurt an officer, he could have attempt to at any point in the day— but there is no evidence of that.  There is, however, evidence of him helping get Officer Fanone to safety, because rescuing people from danger is something he prides himself on being able to do.

We respectfully submit, that the law and applicable defenses support the conclusion that the Government will not be able to prove each element of every crime charged beyond a reasonable doubt.  Because of this, the weight of the evidence against Mr. Nichols is not strong.

### POINT FIVE: 3142(g) Factor, the History and Characteristics of Ryan Nichols Heavily Favor Release.

Ryan Nichols is a decorated veteran who received an honorable discharge after serving this country as a marine during a time of war.  Mr. Nichols is also a successful business owner, home owner, husband, and father with no criminal record or history of violence.  Mr. Nichols founded and runs a nationally recognized search and rescue 501(c)(3) called Rescue the Universe that specializes in rescuing humans and animals from natural disasters and other highly dangerous situations.  Therefore, during the times where Ryan is not running his business or attending to the needs of his family, he is performing rescue missions approximately 50-75 days per year.

Ryan Nichols is a good-natured loving husband who adores his wife.  He is an active and involved father to his two sons, Ryan Jr. and Blake.  Ryan decided to leave the Marine Corps after his first son was born because he did not want to be an absentee father.  Ryan has never been apart from his boys for more than then a week.  The fact that he has not seen them in almost three hundred days is absolutely gut-wrenching for Ryan.  Both of his sons are devastated by his absence.  His youngest son Blake (age 5) recently started blaming himself for his father's absence.  His elder son Ryan Jr. (age 7) has had to confront issues too difficult for most adults to process.  His wife Bonnie is running the household and family business in his absence, while fighting to smile for her boys every day despite walking around with an open wound in her heart.   The absence of a

dangerous man could never provoke such a reaction in anyone's life— never mind those who are around him the most.

Ryan Nichols is a decorated veteran, some of his military accolades include: the Marine Corps Good Conduct Medal; Global War on Terrorism Service Medal; Sea Service Deployment Ribbon; Expert Rifle Qualification Badge; and the National Defense Service Medal.  Ryan Nichols is an honorable employer who treats each of his employees with dignity and respect. Ryan Nichols employs as little as 10 and as many as 15 people at his family business.  Approximately half of his employees are ex-convicts and/or persons recovering from various addictions, trying to find purpose and legitimacy in life.  These are the actions of an honorable, good-hearted, and compassion man.  He is NOT the man the Government purports him to be.

Ryan Nichols's search and rescue work is easily findable via a Google or YouTube search, as is the fact that he was recognized by Ellen DeGeneres in 2018 after a video of him rescuing six dogs left behind by their owners during Hurricane Florence surfaced on the Internet. Some of Mr. Nichols' other search and rescue accomplishments include participating in dozens of rescues and disaster relief efforts, during which he has saved multiple lives, brought lifesaving supplies to helpless people,[35] often alongside law enforcement, first responders, the Cajun Navy, and the Unites States Coast Guard.  Exhibits 5(a)-5(j) are proof positive of his honorable lifesaving work. Your Honor has twice approved Mr. Nichols' co-defendant Alex Harkrider to travel to Louisiana to do search and rescue under the banner of Rescue the Universe.  Should Mr. Nichols be released from jail, he would certainly seek to be able to perform search and rescue missions once again, should Your Honor choose to allow him to do so.

---

[35] *See* FN 9, *supra.*

### 1.  Release Poses No Risk to the Community

The Detention Order determined that the Government established Mr. Nichols a danger to others and the community by clear and convincing evidence.  This is an egregious error.  It is an error as a matter of procedure because the Detention Order fails to consider all the required factors under 18 U.S.C. 3142(g).  It is an error as a matter of fact because the record clearly indicates that Ryan Nichols is not a danger to any person or the community under 3142(g).

Most importantly, the Government has not shown and the record is devoid of any facts suggesting that Ryan Nichols is presents a clearly identifiable and articulable future threat to the community. For instance, Ryan Nichols has no criminal record and is not a member of any extremist group.  His history and characteristics make it abundantly clear that the community is a much safer place when Ryan Nichols is out in it— saving lives.  The government has gone through great lengths to reduce his entire life story to their interpretation of the event that took place at the U.S. Capitol on January 6, 2021.  We OBJECT any pathetic attempt to mischaracterize the entire life of a good man who has time and again displayed heroic virtue, compassion, in situations and circumstances where most people would never dare to tread.

In looking to create a history of violence where none exists, the Government made several false allegations against Mr. Nichols during his January 22, 2021, bail hearing.  Each of these will be easily dispensed with in the order in which they appeared:

### A.  The Airplane Incident

Here, the Government used disgruntled neighbor to advance a fiction that Ryan shot at the plane, which did not happen.  This is corroborated by the fact the FAA sent Ryan a letter on April 24, 2020, thanking him for helping their investigation and closing the case.[36]

---

[36] *See* FAA Letter Thanking Nichols for contributing the FAA investigation and closure of case **Exhibit 20**.

Mr. Nichols called in a complaint that a plane was flying dangerously low over his house.

He followed up the next day with an email, which stated:

> Subject: Airplane Incident - Hillside Heights
>
> Good Afternoon,
>
> I wanted to make sure I had all of the info from yesterday, including videos and plane numbers before I emailed over. I can't fit all videos due to size restrictions, but will tag you in the post on Facebook that's public. Here are the videos. The plane buzzed lower than anyone is comfortable with, or what looks to be legal about 5-7 times. Many women, children, and men were scared to death, and wondering what was going on. My own 5 year old son said he thought he was going to die, and I have that chilling video recorded as well in the comments section. If I need to meet you in person to transfer these videos, I absolutely will. The plane numbers are: N50DM, and is registered to a Cory Miller. I have many people in the neighborhood that will give a statement as well if needed. We would like to see something done about this to ensure Mr. Miller knows that his actions are not tolerated, accepted, or legal.
>
> Thank you so much! Ryan Nichols

(*See* January 22, 2021 Hearing Transcripts at p. 49-51 attached as **Exhibit 3**);

## B.  The Construction Crew Incident

Ryan and his wife Bonnie run a wholesale business.  They store items in the warehouse and in trailers.  A group of hostile construction workers broke the lock on one trailer without permission and emptied the items so they could move it.  When they could not get into another trailer, they used a fork-lift to pick it up and toss it aside, and in doing so ruined the trailer and damaged thousands of dollars of merchandise.  Understandably upset, Ryan confronted them and asked them to pay for their damages.  The men responded by attacking him.  Ryan was attacked by approximately eight men.  Exhibits 21(a)-21(e) are pictures from that day clearly showing Ryan's injuries. (*See* January 22, 2021 Hearing Transcripts at p. 51-54 attached as **Exhibit 3**);

### C.  The Disgruntled Employee

Cullen stone is a former employee of Ryan's who Ryan hired as a "Second Chancer." Stone was upset at Ryan for firing him.  When the FBI came to interview Stone about Ryan— Stone used it as an opportunity to hurt Ryan.  Stone has since recanted his statement in its entirety and explained why he made the statement to begin with.  Stone's recantation and sworn statement is attached hereto as **Exhibit 12**. (*See also* January 22, 2021 Hearing Transcripts at p. 56-57 attached as **Exhibit 3**);

### D.  Weaponization of PTSD and Drug Use

The Prosecutor suggested that Ryan Nichols's use of marijuana and psychedelics are indicia of dangerousness and/or risk of flight.  The Magistrate's decision indicates that these allegations were used against Nichols in her Decision to detain him.  The Prosecutor in his argument even went as far to weaponize private messages between two Marine Corps veterans, who both have PTSD from serving in the military.  The Prosecutor also suggested that PTSD somehow qualifies as indicia of dangerousness.  These arguments are disgusting and shameful. We OBJECT to their mischaracterization of Mr. Nichols and to the healing value that marijuana and psychedelics can bring to military veterans with PTSD.   The prosecutor literally weaponizes a conversation about taking psychedelics and watching a Disney and Pixar Movie called "Soul." This is an egregious invasion of privacy into the lives of two Honorably Discharged Marine Corps veterans that served their country with honor.[37]  It should have never been used against Mr. Nichols, especially in light of the fact that he is diagnosed with PTSD and has medical prescriptions for Ketamine and Marijuana. (*See* January 22, 2021 Hearing Transcripts at p. 56-58 attached as **Exhibit 3**).

---

[37] *See* Form DD2-14        Honorable Military Discharge, Medals, and Ribbons **Exhibit 22.**

**POINT SIX: There are Multiple Conditions, and Combination of Conditions that this Court Can Impose to Assure Mr. Nichols' Appearance and the Safety of the Community.**

Ryan Nichols was recommended for pretrial release because his personal history and characteristics are overwhelming evidence of a man who has lived a life of distinction and honor. Ryan has been in prison for almost ten months. During this time, he has developed a reputation as a well-thought-out man with wisdom, to whom many of the detainees regularly come to for advice. Ryan holds a position of distinction above the other detainees, in that he works on the detail crew, which is a merit-based position.  Ryan's work ethic and demeanor have been formally recognized by the guards in writing on four separate occasions.  Ryan's wife Bonnie is prepared to be his third-party-custodian.  She is a loving wife, and a strong woman that will no doubt make him walk the line.  Ryan received an Honorable Discharge from the Marine Corps and several service medals because he knows how to flourish in a command structure and responds well to authority.  All of these facts speak toward a strong ability to comply with any conditions of release.

Ryan owns a home and a business.  Not only is he gainfully employed, he also employs others.  He is a father, son, husband and friend to many.  He is dependable and reliable.  His passion is literally rescuing people from dangerous situations.  As such, the community is without question safer when he is out in it saving lives.  Co-defendant Alex Harkrider's behavior is something to consider as well, given the fact that these men share the same values, and both seek to make the world a better place.  The undersigned attorney's understanding is that Alex is flourishing.  I implore Your Honor to give Ryan Nichols a chance to flourish too.

## VI.   PRETRIAL DETAINEES AND CONDITIONS OF CONFINEMENT

Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.[38]  As such, the rights of pretrial detainees are different than the rights of post-conviction detainees.  While the Eighth Amendment protects convicted prisoners only against cruel and unusual punishment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description.[39]

The threshold, therefore, for establishing that a pretrial detainee's constitutional rights have been violated is clearly lower than the threshold for convicted prisoners who seek to establish the same.  For the group not yet convicted, "the question is whether the prison conditions amount to punishment of the detainee."  A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal". *United States v. Riggins,* 456 F.Supp.3d 138 (2020)(*citing Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The proper avenue for relief for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death.  *United States v. Martin,* 447 F.Supp.3d. 999 (D.Md. 2020); *see also Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979).

---

[38] *Kingsley v. Hendrickson*, 576 U.S, 389m 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (*citing Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

[39] *United States v. Riggins,* 456 F.Supp.3d 138 (2020) *citing Hardy v. District of Columbia,* 601 F.Supp. 2d 182,188 (D.D.C. 2009).

**A. The Conditions of Confinement at the DC-Jail Violate the Due Process' Clause Prohibition Against Punishing Pretrial Detainees—Mandating Release.**

On August 3, 2021, the undersigned counsel submitted an "EMERGENCY REQUEST TO INVESTIGATE MISTREATMENT OF PRE- TRIAL DETAINEES FROM THE JANUARY 6, 2021 U.S. CAPITOL PROTEST".[40] to Amnesty International and the American Civil Liberties Union. The request articulated numerous specific instances where January Sixth Detainees were held in prolonged solitary confinement for months at a time, as well as specific instances of: medical abuse; merciless beatings; and extremely damaging psychological torture. The request also highlighted the fact that detainees were being prevented from counsel visits and had been denied access to discovery.

The District Court has taken notice since that time, and on October 13, 2021, Judge Royce C. Lamberth found "that the Warden of the DC Jail Wanda Patten and Director of the D.C. Department of Corrections, Quincy Booth are in civil contempt of court."[41]

The jail responded by immediately retaliating against January Sixth Detainees the very next day, when officers stormed into the Patriot Pod and removed the WiFi tower, and by doing so cut off electronic communication to counsel and the word. The men responded by gathering and praying.[42] It is worthy to note that while this was happening, the jail sent in maintenance

---

[40] **Exhibit 23** EMERGENCY REQUEST TO INVESTIGATE MISTREATMENT OF PRE- TRIAL DETAINEES.

[41] *See U.S. v. Worrell,* Order dated 10/13/21, Document 106.

[42] "After months of abuse, neglect, and countless violations of our human, civil, and constitutional rights, the warden of this jail and the deputy director of DC's Department of Corrections was held in contempt of court by Judge Lambeth.

Less than 24-hours later, our access to counsel and ability to communicate with our families and the outside world has been cut off. Nothing good happens in secret. Evil operates under the cover of darkness. We demand transparency, openness, and light.

Today you come to us promising a solution with one hand while stripping us of our rights with the other. Until our rights are restored, we will sit here and pray. We will pray for you. We will pray for us. And we will pray for the betterment of our country.

workers and janitors who frantically scrubbed rust, painted walls, and bleached the floors.  The prison swapped out every single piece of linen, and gave the detainees new clothing.  None of this was done out of concern for any detainee.  All of this was done to cover up what they could, as fast as it could be done, before the jail was inspected.   Nothing else has changed.

Ryan Nichols has been detained for two hundred eighty-eight days.  Mr. Nichols and fellow January 6th detainee Robert Morss recently penned the undersigned a letter for public release that was signed by thirty-six (36) January Sixth Detainees.[43]  The letter specifically addresses seventy-seven (77) ongoing violations at the prisons that directly affect Ryan Nichols on an ongoing basis.  Mr. Nichols is happy to provide specific instances regarding the continuing deplorable conditions in a supplemental motion.

Ryan Nichols has been prohibited from contact visits with his family.  As a reasonable alternative, he was initially given video visits.  This was beneficial to him emotionally and psychologically. He was then stripped of video visits without explanation.  Ryan's sons, Ryan Jr and Blake, have not seen their father's face on video in almost six months.  This is psychologically damaging to Ryan and his family.  It is, however, even more difficult for Ryan due to the fact that he has documented Post Traumatic Stress Disorder (PTSD).   This treatment is targeted psychological punishment.  It serves no legitimate governmental interest.  Especially in light of the fact that the non-January Sixth detainees housed at the DC Jail have regular family video visits.

---

We demand the return of the wifi access so we can talk to our attorneys for guidance during this situation." October 14, 2021 Statement by Ryan Nichols on behalf of the January 6th Detainees.

[43] **Exhibit 24** J6 letter on conditions of confinement.

Ryan is a pastor's son and a practicing Christian.  Ryan has been denied the right to worship at any Sunday service or from participating in Bible studies of any kind. DC Jail uses COVID-19 as a pretext to deny Ryan his First Amendment rights.   The jail has not offered any reasonable alternative.  This blanket denial of his rights is unconstitutional on its face and tantamount to punishment. Ryan is regularly discriminated against for being White.  He is forced to endure disgusting racial animus and slurs regularly.  The jail also prevents him from having reasonable access to reading materials while simultaneously streaming anti-White messages and Critical Race Theory propaganda across his tablet.  This is psychologically damaging.

As stated above, Ryan Nichols received an Honorable Discharge from the U.S. Marine Corps, and was awarded the Global War on Terrorism Service Medal. Despite this reality, the jail routinely circulates a periodical called "THE FINAL CALL" which is the official publication of The Nation of Islam, a fanatical fundamentalist Islamic organization that hates the American Military, openly supports actual terrorist organizations, and preaches that the White Race is inherently evil because it descends from Satan.[44]

The NOI has long been designated as an anti-White, anti-Gay, and Anti-Semitic "Extremist Hate Group" by the Southern Poverty Law Center, who describes its leader Louis Farrakhan as having "earned the NOI a prominent position in the ranks of organized hate."[45]  Attached as Exhibit 10, are copies of this deplorable publication that Ryan Nichols has signed, evidencing the fact that he is being regularly fed this psychologically traumatizing propaganda by the United States Government in the DC Jail.

---

[44] *See* https://www.finalcall.com/artman/publish/Minister_Louis_Farrakhan_9/Separation-Or-Death.shtml.

[45] *See* https://www.splcenter.org/fighting-hate/extremist-files/group/nation-islam.

Importantly, many of the guards who have openly attacked January Sixers and who regularly assault them with racial slurs read The Final Call while sitting in the jail on a regular basis.  This guards appear to be radicalized and are very abusive.  These abuses are corroborated by the hundreds of grievances filed by January Sixers since the Patriot Wing was birthed into existence.  Moreover, the Government is suppressing all forms of Christianity at the jail while circulating an Islamic fundamentalist religious periodical.   Such actions give rise to the question of whether this rises to the level of state sponsored religion?

Ryan Nichols is a Marine Corps veteran with documented PTSD.  This means that he is a pretrial detainee with a serious pre-existing condition who has either been negligently or purposefully exposed to serious psychological punishment during his confinement at the DC jail, which without question exasperates his pre-existing condition.  PTSD is a serious condition which can lead to serious medical complications and death when not properly treated— especially in the case of military veterans, which means that Ryan is in grave risk of danger.

Therefore, the Fifth Amendment's due process is clearly triggered.  The law is clear on what relief is provided in circumstances such as this— release. These deeply troubling instances of abuses of power give rise to cognizable claims of civil rights violations under 42 U.S. Code § 1983 - Civil action for deprivation of rights, which Nichols will certainly seek out in the future.

## VII.    THE DEFENSES OF OUTRAGEOUS GOVERNMENT CONDUCT AND ENTRAPMENT.

There are numerous unidentified persons of interest who appear to be working in concert with uniformed police of January 6, 2021. One theory suggest that these unidentified persons were undercover agents working to effectuate some legitimate law enforcement purpose in the crowd. Another theory suggests that these unidentified persons conspired to provoke conflict between protestors and uniformed law enforcement personnel. While a third theory suggests that these

unidentified persons worked alongside uniformed law enforcement to incite conflict between protestors and the crowd. We have a good faith basis to advance all of these theories.

After months of investigation, we believe that we have identified multiple bad actors in the crowd that give all appearances of undercover government agents. There are dozens of instances where plain clothed persons/agents appear to be speaking into electronic communication devices, and immediately thereafter serious conflict breaks out. There are dozens more where plain clothed persons/agents appear to be directly interacting with uniformed law enforcement personnel to set conditions of entrapment.[46] Specifically, on the Capitol's Lower West Terrace Entrance, commonly referred to as the "Tunnel" undercover agents appear to converge together at the entrance to sequester weapons from the crowd while using unsuspecting people to pass O.C. spray, sledge hammers, poles, collapsible sticks, and riot shields. There are also dozens of situations where plain clothed persons/agents appear to be using military hand signals and coordinating events, possibly even attacks.

If these are government agents, their conduct is certainty outrageous, offending the principles of due process, fundamental fairness, and the universal sense of justice. If proven- this would be an absolute defense to crimes to which Ryan Nichols and other January Sixers have been charged.[47] The defense is prepared to make all relevant documentation related to this section available to the Court at any time.

---

[46] In their zeal to enforce the law, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958); *United States v. Russell,* 411 U.S. 423, 435-436, 93 S.Ct. 1637, 1644-1645, 36 L.Ed.2d 366 (1973).

[47] To claim relief under doctrine of outrageous government conduct, the government's conduct must violate Fifth Amendment due process clause, which is violated only when government violates defendant's protected rights. *U.S. v. Cyprian*, C.A.7 (Ind.) 1994, 23 F.3d 1189, certiorari denied 115 S.Ct. 211, 513 U.S. 879, 130 L.Ed.2d 139. The court may dismiss an indictment upon a finding of outrageous government misconduct that causes prejudice to a defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988).

## VIII.   CONCLUSION

WHEREFORE, for the foregoing reasons, and any others which may appear in our reply brief at a full hearing on this matter, and any others this Court deems just and proper, defendant through counsel, respectfully requests that he be released on personal recognizance. If that request is denied, defendant requests as an alternative, that he be released on Third Party Custody and placed into the High Intensive Supervision Program of the Pretrial Services Agency conditioned on reasonable conditions including but not limited to electronic monitoring, work release and curfew.

Dated:  November 1, 2021

Respectfully Submitted,

 /s/ **Joseph D. McBride, Esq.**
_____
Joseph D. McBride, Esq.
THE MCBRIDE LAW FIRM, PLLC
Attorneys for the Defendant
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone:* (917) 757-9537
*Email:*  jmcbride@mcbridelawnyc.com

## **CERTIFICATE OF SERVICE**

I hereby certify on the 1st day of November, 2021, a copy of same was delivered to the parties of record, by email pursuant to the Covid standing order and the rules of the Clerk of Court.

### /s/ **Joseph D. McBride, Esq.**