1

```
1                    IN THE UNITED STATES DISTRICT COURT
2                  FOR THE EASTERN DISTRICT OF TEXAS
                              TYLER DIVISION
3

4    UNITED STATES OF AMERICA        )
                                     )     DOCKET NO. 6:21mj29
5         -vs-                       )
                                     )     Tyler, Texas
6    RYAN TAYLOR NICHOLS             )     1:35 - 4:47 p.m.
                                     )     January 22, 2021
7

8            TRANSCRIPT OF IDENTITY HEARING, PRELIMINARY HEARING, AND
                              DETENTION HEARING
9             BEFORE THE HONORABLE K. NICOLE MITCHELL,
                     UNITED STATES MAGISTRATE JUDGE
10

11                        A P P E A R A N C E S

12   FOR THE GOVERNMENT:

13   MR. RYAN LOCKER
     ASSISTANT U.S. ATTORNEY
14   110 North College, Suite 700
     Tyler, Texas 75702
15

16   FOR THE DEFENDANT:

17   MR. F. R. BUCK FILES, JR.
     BAIN FILES JARRETT & BAIN PC
18   109 West Ferguson
     Tyler, Texas 75702
19

20   COURT REPORTER:          MS. SHEA SLOAN
                              FEDERAL OFFICIAL COURT REPORTER
21                            211 W. Ferguson
                              Tyler, Texas 75702
22                            shea_sloan@txed.uscourts.gov

23   Proceedings taken by Machine Stenotype; transcript was
     produced by computer-aided transcription.
24

25
```

2

INDEX

WITNESS

PAGE

GREGORY HARRY

DIRECT EXAMINATION:  BY MR. LOCKER                      5

VOIR DIRE EXAMINATION:  BY MR. FILES                    28

DIRECT EXAMINATION (CONT.):  BY MR. LOCKER              31

VOIR DIRE EXAMINATION:  BY MR. FILES                    32

DIRECT EXAMINATION (CONT.):  BY MR. LOCKER              33

VOIR DIRE EXAMINATION:  BY MR. FILES                    37

DIRECT EXAMINATION (CONT.):  BY MR. LOCKER              39

CROSS-EXAMINATION:  BY MR. FILES                        63

REDIRECT EXAMINATION:  BY MR. LOCKER                    86

RECROSS-EXAMINATION:  BY MR. FILES                      88


BONNIE NICHOLS

DIRECT EXAMINATION:  BY MR. FILES                       90

CROSS-EXAMINATION:  BY MR. LOCKER                       104

REDIRECT EXAMINATION:  BY MR. FILES                     108

                        * * * * * * *

ARGUMENT BY MR. LOCKER                                  111

ARGUMENT BY MR. FILES                                   115

ARGUMENT BY MR. LOCKER                                  119

COURT'S FINDINGS                                        120

CERTIFICATE                                             122

```
 1                        EXHIBIT INDEX

 2
      GOVERNMENT'S          DESCRIPTION              ADMITTED
 3

 4         1               Video Clip                  25

 5         2               Video Clip                  26

 6         3               Photo Image                 33

 7         4               Video File                  34

 8         5               Video File                  43

 9         6               Photo Image                 44

10         7               Photo Image                 45

11         8               Photo Image                 61

12

13

14
      DEFENDANT'S
15

16         1               Photo Image                 94

17         2               Photo Image                 94

18         3               Photo Image                 94

19         4               Photo Image                 94

20         5               Copy of DD-214             103

21

22

23

24

25
```

4

1                     P R O C E E D I N G S

2         THE COURT:  Good afternoon.  Please be seated.

3    Ms. Hardwick, if you will call the case, please.

4         THE CLERK:  Yes, Your Honor.

5         The Court calls Criminal Action 6:21mj29, United

6    States of America vs. Ryan Taylor Nichols.

7         THE COURT:  Announcements?

8         MR. LOCKER:  Ryan Locker on behalf of the

9    Government, Your Honor.  Ready to proceed.

10        MR. FILES:  Buck Files and J. Brett Harrison on

11   behalf of Mr. Nichols.  We are ready, Your Honor.

12        THE COURT:  All right.  Mr. Nichols, we are here

13   today for an identity hearing, a preliminary hearing, and a

14   detention hearing.  The reason we are having the hearing --

15   there are three reasons.

16        One, I want to determine whether you are the same

17   person named in the complaint.

18        Two, I want to determine whether there is probable

19   cause to believe that an offense has been committed and that

20   you are the person who committed it.

21        And, three, I want to determine whether you will be

22   released on bond or detained pending the trial.

23        All right.  Mr. Locker, does the Government have

24   any witnesses?

25        MR. LOCKER:  Yes, Your Honor.

```
 1              THE COURT:  How many?
 2              MR. LOCKER:  Yes, Your Honor.  I have one witness
 3    to present.  In addition to that witness, my understanding
 4    from conversations prior to this hearing with Mr. Files is
 5    they are waiving identity and stipulating that this is the
 6    same Ryan Nichols that is charged in the complaint.
 7              THE COURT:  Is that correct, Mr. Files?
 8              MR. FILES:  Your Honor, we have had the opportunity
 9    to review a lot of video in the matter and also other
10    material, and there is no issue as to identity.  So we do not
11    raise an issue as to identity.
12              THE COURT:  All right.
13              All right.  Mr. Locker, you may call your first
14    witness.
15              MR. LOCKER:  Thank you, Your Honor.  Government
16    calls Greg Harry.
17              THE CLERK:  Please raise your right hand.
18              (Witness sworn.)
19         GREGORY HARRY, GOVERNMENT'S WITNESS, SWORN
20                    DIRECT EXAMINATION
21    BY MR. LOCKER:
22    Q.    Can you state your name for the record, please?
23    A.    My name is Gregory Harry.
24    Q.    How are you employed?
25    A.    I am currently employed by the Tyler Police Department
```

6

1  as a detective.  I am also assigned to the FBI office here in
2  Tyler as a task force officer.
3  Q.   All right.  How long have you been a peace officer?
4  A.   I have been a peace officer since I was hired with the
5  Tyler Police Department in August of 2010.
6  Q.   And how long have you worked with the FBI as a TFO?
7  A.   I have been assigned to the FBI office since roughly the
8  later part of 2015.
9  Q.   Can you tell the Court your involvement, how you became
10  involved in the investigation of conduct by Ryan Taylor
11  Nichols and Alex Kirk Harkrider?
12  A.   As part of my duties at the FBI, as I mentioned a task
13  force officer, I am currently assigned to the joint terrorism
14  task force.  In response to the events that happened on
15  January 6th of 2021 in the United States Capitol, the FBI
16  obviously took the lead in that investigation as to -- many
17  offices were conducted there.
18        But the FBI office here in Tyler received leads
19  from our Washington Field Office to follow up on tips that
20  they received as far as people who were involved in
21  that -- the incidents at the Capitol on January 6th.
22  Q.   Are you aware of an affidavit that has been filed in the
23  District of Columbia related to these events?
24  A.   Yes, sir, I am.
25  Q.   And did you contribute to its authorship?

1  A.   Yes, sir, I did.

2  Q.   And did you provide a large substance of the

3  investigation that led to its signing by a judge in the

4  District of Columbia?

5  A.   That's correct, I did.

6  Q.   Now, the dates that this was signed was subsequent to

7  your involvement in some other warrants; that there may have

8  been some additional details that were added after you last

9  worked on this affidavit.  But, nonetheless, you are familiar

10  with the contents of this affidavit.  Is that correct?

11  A.   Yes, I am.

12  Q.   Having spent a significant amount of time investigating

13  both Mr. Nichols and Mr. Harkrider and their conduct

14  preceding January 6th, on January 6th, and subsequent to

15  that, have you had the chance to review information,

16  including text messages and videos, other information posted

17  on social media, that were provided by others for the purpose

18  of alerting law enforcement to the conduct of certain

19  individuals?

20  A.   That's correct, I have.

21  Q.   And can you sort of give the Court some context as to

22  how the FBI has been processing such a large volume of cases

23  and leads that have been provided, given that there were

24  thousands upon thousands of people at the U.S. Capitol on

25  January 6th -- and, obviously, the FBI does not have cases on

8

1   all of them -- how did the FBI come to investigate certain
2   individuals versus others?

3   A.    We have a fairly extensive triage process, obviously
4   voluminous data.  As the tips come in, we try to parse --
5   well, they try to parse the information that comes in the
6   tip.

7         For instance, in this instance, we were alerted to
8   Mr. Harkrider and Mr. Nichols.  The information that was
9   received in almost all of those tips was the location of
10  pretty much where their Facebook said that they currently
11  lived, i.e., Ryan Nichols residing in Longview, Texas; Alex
12  Harkrider residing in Converse or Carthage, Texas.

13        Then our field office -- or, I'm sorry, WFO, our
14  Washington Field Office, takes that information, tries to
15  parse from it what they can, and then they push those leads
16  out to the respective office where they think the
17  investigation needs to take place.  In this case, Longview
18  and Carthage both being in the Dallas Division in the Tyler
19  resident agency, they came to our office and were
20  subsequently assigned to me.

21  Q.   So once you received this lead from the Washington Field
22  Office, what steps did you take to investigate that lead?

23  A.    So there were several leads.  Obviously, the first thing
24  that most of the leads called attention to was, again, their
25  Facebook.  They gave us several Facebook pages.

1          One was facebook.com/theryannichols, and the other
2    one was facebook.com/alex.harkrider, I believe.  So we went
3    to those pages, and see if we can identify these subjects.
4    When confirmed that they are, in fact, in our area of
5    responsibility and, if they are, then take logical steps from
6    that point forward to see what we can determine, if there is
7    any evidence out there.

8          In this case, we did and were able to compare the
9    images that we saw on Facebook and that was associated with
10   their Facebook pages, other details including where they work
11   and produce where they work, and compare that, marry that
12   with the information we were able to uncover about the
13   subjects here.

14         So we do research on Ryan Nichols residing in
15   Longview, Texas.  That search reveals the Defendant.  What do
16   we know about that Defendant?  He works at this place.  Okay.
17   That's what it says there.  We obviously compare the driver's
18   license image, as well as the images that are present on the
19   Facebook page.  Do those people match up?  And, in this case,
20   obviously, they did.

21         And let me pause here for a second there.  Although
22   the Defendant has stipulated to his identity for this
23   hearing, did determining his identity from state
24   identification and from social media play a role in your
25   ability to analyze additional evidence that was provided to

10

1   you?

2   A.   Yes.

3   Q.   And can you elaborate as to -- why was that important,

4   why was it so important for you to become very familiar with

5   these Defendants' faces in order to analyze the large volume

6   of evidence that was presented to you?

7   A.   It was helpful -- I mean, their clothing, the things

8   they wore, they commonly wore on their faces, appear in a lot

9   of video.  The only really good way to distinguish them from

10  other people present in the videos is because -- there are a

11  lot of people that were present during the incident.

12  Q.   What is doxing, and how did it play a role in the

13  discovery of evidence in this case?

14  A.   So doxing, kind of simply, is basically where people

15  take steps to out or publicly -- or publicly kind of -- I

16  don't know if "shame" is the right word, but they want to

17  call attention to a subject that they usually have a problem

18  with.

19        In this case, a lot of the people who -- well, some

20  of the people who provided information to the FBI obviously

21  had a lot of problems with the actions that were taking

22  place, I believe.  And, as a part of that, they do whatever

23  research they can do, and then try to -- let's say

24  somebody -- let's say that they work -- they show that they

25  work at the Subway in Tyler, Texas, on their Facebook, as an

1  example.

2          What people will do is they will repeatedly email,

3  call the owners of that Subway in Tyler, Texas, and say, hey,

4  you have this person who works with you.  They are a racist,

5  as an example.  They are a, you know, a terrorist, as an

6  example.  They hate this or that.  And they try to have some

7  adverse reaction happen to that person based on the

8  information, the doxing.

9  Q.   And, just to be clear, that level of doxing played no --

10  no influence on your investigation of Mr. Nichols or

11  Mr. Harkrider; it was more of the gorilla journalism style

12  video capturing and publishing that was relevant here.  Can

13  you describe that for the Court?

14  A.   Correct.  So, again, what people were doing trying to

15  identify -- to really help us in the end, people who were

16  present at the Washington -- or excuse me, at the Capitol.

17  So you really had, as you pointed out, a ton of people who

18  are doing investigative work for us.

19          People -- obviously, I didn't know -- I don't know

20  the Defendants prior to this incident, but there are people

21  who do.  And they did that background research and say, hey,

22  I know these people.  And they push it to the FBI in hopes of

23  aiding our investigation to both identify them and

24  investigate them.  And we used a lot of the information that

25  we received.

1   Q.   And the information that you did not use in furtherance
2   of this investigation you determined to be not credible?  I
3   guess what I am asking is, you didn't just take everything at
4   face value as truthful; you sought to corroborate that
5   information and only use it if it was corroborated.  Is that
6   correct?
7   A.   Correct.
8   Q.   So once you had viewed the Defendants' conduct, what
9   steps were taken to move forward the investigation and the
10  prosecution of the case?
11  A.   So one of the first things we did was -- as I mentioned
12  before, we went to their Facebook pages because that is where
13  we were directed at first.  We noticed that those pages
14  appeared to be sanitized.  And what I mean by that is, that
15  the images that were purported to us that there are pictures
16  and video of the subjects engaging in criminal activity at
17  the U.S. Capitol, we did not see those, which either meant
18  that they were deleted or were hidden from us because we are
19  not friends, privacy setting, or something else was going on.
20          However, just doing open source searching through
21  Facebook, typing in the Defendants' names through Google
22  search bars, on Twitter, revealed a ton of information of
23  people who had captured images, screenshots, if you will, of
24  the Defendants' social media pages as those things were
25  posted live.

1          In some instances you have screen capture that
2    shows the date and time and whose Facebook page, et cetera.
3    In other instances they just simply saved the image and
4    tagged the Defendants in it.  And in a lot of cases tagged
5    @FBI on Twitter.  That should, in theory, link to the FBI's
6    Twitter page and provide that information to us.
7    Q.   I would like to go to the different charges that
8    Mr. Nichols is charged in -- charged with in the complaint,
9    in order that we might have a background and a backdrop of
10   the elements that we are required to show here during this
11   hearing.
12          So Count 1 of the complaint alleges that the
13   Defendant on or about January 6th of this year, committed a
14   violation of Title 18, United States Code, Section 1752(a)
15   and 1752(b)(1)(A), that being conspiracy and unlawful entry
16   into the Capitol -- or on Capitol Grounds with a dangerous
17   weapon.
18          And, Investigator Harry, was the U.S. Capitol
19   restricted grounds at the time that the conduct that you
20   viewed involving Mr. Nichols occurred?
21   A.   Yes.
22   Q.   And also Mr. Harkrider?
23   A.   Yes, that's correct.
24   Q.   And was there a lawful function of the United States
25   Government ongoing inside the Capitol at the time of these

1  events?

2  A.    That's correct.

3  Q.    What was that event?

4  A.    The -- they were doing the certification of the election

5  results for President and Vice President of the United

6  States.

7  Q.    And had the building -- access to the building been

8  restricted for that purpose?

9  A.    Yes, that's my understanding.

10  Q.    And then Count 2 charges the Defendant with a violation

11  of Title 40, United States Code, Section 5104(e)(2) and

12  (e)(4) -- (2)(D) and (G), that being violent entry and

13  disorderly conduct on Capitol Grounds.

14        And that specifically charges that the Defendant

15  willfully and knowingly uttered a loud, threatening, or

16  abusive language or engaged in disorderly or disruptive

17  conduct at any place on any of the grounds or in any of the

18  Capitol buildings, with the intent to impede, disrupt, or

19  disturb the orderly conduct of a session of Congress.

20        Was Congress in session at that time?

21  A.    Yes, sir, it was.

22  Q.    Did the activities of the Defendants contribute to the

23  disturbance of orderly conduct of that session?

24  A.    Yes, sir.  The information that I had was that they had

25  to actually suspend their session and evacuate the

1   building.

2   Q.   Count 3 charges the Defendant with a violation of

3   Title 18, United States Code, Section 231(a)(3), that being

4   civil disorder.  That requires that -- or that is a violation

5   of a person who attempts to obstruct, impede, or interfere

6   with a law enforcement officer carrying out his or her

7   official duties incident and during a civil disorder, and the

8   civil disorder in any way either adversely affects commerce

9   or the performance of a federally protected function.

10          So let's go to that first element.  So did

11  Mr. Nichols impede or interfere with law enforcement officers

12  carrying out their official duties?

13  A.   Yes.

14  Q.   And we are going to provide additional evidence of that;

15  is that correct?

16  A.   That's correct.

17  Q.   And those officers, were they Capitol Police Officers,

18  and were they discharging their official duties of protecting

19  the Capitol?

20  A.   Yes.

21  Q.   And was there an ongoing civil disorder?

22  A.   Yes.

23  Q.   And regardless of whether or not it affected commerce,

24  it did affect the performance of a federally protected

25  function; is that correct?

1   A.   That's my understanding.

2   Q.   That was the session of Congress that was affected?

3   A.   Correct, to certify the election results.

4   Q.   Count 4 charged the Defendant with violation of Title

5   18, United States Code, Section 111(a) and (b), that being

6   assault on a federal officer using a deadly or dangerous

7   weapon.

8          And it is a violation for someone who forcibly

9   assaults, resists, opposes, impedes, intimidates, or

10  interferes with any person designated in the federal codes

11  while engaged in or on account of the performance of their

12  official duties.

13         And so similar to above, the individuals that we

14  are going to see Mr. Nichols engaged with, they were in

15  performance of their official duties protecting the Capitol;

16  is that correct?

17  A.   That's correct.

18  Q.   And that is enhanced on account of the use of a deadly

19  or dangerous weapon.  Is OC spray, what is commonly known as

20  OC spray, is that a dangerous weapon?

21  A.   Correct, it is.

22  Q.   And then Count 5 charges aiding and abetting, that being

23  whoever aids, abets, counsels, commands, induces, or procures

24  the commission of a federal offense is punishable as a

25  principal.

1            And so when we talk about some of this conduct, it

2   is not only Mr. Nichols' own conduct, but his aid of others,

3   including his co-Defendant in this case Mr. Harkrider; is

4   that correct?

5   A.   That's correct.

6   Q.   So once you were aware of the conduct that appeared to

7   be observed by Mr. Nichols and Mr. Harkrider together at the

8   Capitol Grounds, what other types of steps did you take

9   besides looking at public social media to further investigate

10  the case?

11  A.   We tried to interview anybody that we could.  In the

12  matter of time, I also prepared a search warrant for their

13  residences.

14  Q.   And that search warrant was signed by a judge here in

15  the Eastern District of Texas on Friday of last week, a week

16  ago today.  Is that correct?

17  A.   That's correct.

18  Q.   And then the complaint for their arrest was signed that

19  Sunday, and then you executed both the search warrant and the

20  arrest warrant on Monday morning; is that correct?

21  A.   That's correct.

22  Q.   And were search warrants executed simultaneously at both

23  Mr. Nichols' and Harkrider's homes?

24  A.   As near as they could be, yes, sir.

25  Q.   Was Mr. Harkrider present at his home?

1    A.    He was.

2    Q.    Was he taken into custody without incident?

3    A.    He was.

4    Q.    Was Mr. Nichols present in his home?

5    A.    No, he was not.

6    Q.    Did you learn where he was at the time?

7    A.    Yes, sir, we did.

8    Q.    Where did you learn that he was?

9    A.    The information that he gave me over the phone was that

10   he was in Ada, Oklahoma, or had been in Ada, Oklahoma.

11   Q.    And were you able to reach him by telephone?

12   A.    I was.

13   Q.    And did you tell him that you had an arrest warrant and

14   you would like for him to turn himself in based on the arrest

15   warrant?

16   A.    I did.

17   Q.    Did he comply with that?

18   A.    He did.

19   Q.    Did you seize evidence from the homes of Mr. Nichols and

20   Mr. Harkrider that is relevant to the Court's consideration

21   today?

22   A.    Yes, sir, we did.

23   Q.    Can you tell the Court -- I want to go through some of

24   this chronologically now in terms of how the evidence

25   presented itself in terms of when the evidence was created.

1          So, eventually, did you receive consent from

2    Mr. Harkrider to seize and search his phone?

3    A.    We were able to seize his phone from the search warrant.

4    We did receive his consent to search that device pursuant to

5    his arrest.

6    Q.    And based on the search of that phone pursuant to

7    consent, did you discover communications between Mr. Nichols

8    and Mr. Harkrider that preceded January 6th that is relevant

9    to the consideration here?

10   A.    That's correct, we did.

11   Q.    So let's start by walking through some text messages

12   that occurred starting on December 31st of last year.

13          Was there a relevant message sent from Mr. Nichols

14   to Mr. Harkrider on that date?

15   A.    Yes, sir, there was.

16   Q.    Could you describe it to the Court, please?

17   A.    Mr. Nichols sent a picture of body armor with a price to

18   his co-Defendant, Mr. Harkrider, with a mention that it

19   protects against 5.56 and 7.62 rounds.  Those are bullets.

20   Q.    And 5.56 and 7.62 rounds, are those the two most common

21   rounds used by law enforcement and military?  For rifles, not

22   for handguns?

23   A.    I would agree with that.

24   Q.    At least in America?

25   A.    I would agree with that.

1   Q.   And then on the next day, on January 1st, New Year's

2   Day, was there a text message from Mr. Nichols -- or a series

3   of three text messages from Mr. Nichols that are relevant to

4   our consideration here?

5   A.   Yes, that's correct.

6   Q.   Can you describe the first one for the Court?

7   A.   The first one that we have that is relevant is a comment

8   from Mr. Nichols to Mr. Harkrider that says, quote: We are

9   going to need first aid kits and tourniquets.

10          The second quote: I need to speak with you in

11  person. And then it continues: Everything is okay. We just

12  need a game plan, laugh out loud, LOL.

13          The third is: We have to speak in person. LOL.

14  What I am about to relay can't be done over the phone.

15  Q.   And then the next day, on January 2nd of 2021, did

16  Mr. Nichols engage in a conversation with co-Defendant

17  Harkrider related to the use of psychodelic drugs?

18  A.   Yes.

19  Q.   Can you describe that for the Court, please?

20  A.   The exchange, and I want to be clear about this for the

21  Court, it is not message for message. We are kind of pulling

22  what is related here.

23          So Mr. Nichols says: Bro, watch Soul. OMFG.

24          Which stands for Oh My ... God.

25          Harkrider responds: I think I saw something about

1   that.   Animated movie?

2              Nichols responds:   Yes, the best movie I ever saw.

3              The next message, Harkrider's response:   I will

4   give it a go.

5              Nichols then sends:   You won't regret it.

6   Everything I have seen in Ketamine, mushrooms, and DMT is

7   confirmed in that Pixar movie, and they made it for kids, but

8   it is as much of an adult show as I have ever seen.

9   Q.   And do you know Ketamine, mushrooms, and DMT to be

10  hallucinogenic drugs?

11  A.   Yes, I do.

12  Q.   And those are scheduled; they are not over the counter

13  available legally.   Is that correct?

14  A.   That's correct.

15  Q.   The next day, on January 3rd, does this conversation

16  continue between Mr. Nichols and Mr. Harkrider -- continue

17  related to their trip to D.C. and also involving the use of

18  drugs, or appears to?

19  A.   Yes, it does.

20  Q.   Can you describe that conversation to the Court?

21  A.   Mr. Nichols sends a text that says:   I have got goodies

22  for the trip.

23              He follows up with:   Goodies that you have --

24              I'm sorry.

25              Goodies that you have requested before but never

1    got.

2         Harkrider responds and he sends a GIF, that's a

3    graphic information file, kind of one of those things that

4    moves, and it says -- in the image, it says:  Take acid and

5    see reality.  And it kind of has like a pulsing waving sound.

6         He then sends a -- I'm sorry, Harkrider sends

7    another message:  Could it be?!  Ha.  Ha.

8         Nichols responds:  Still some other stuff we have

9    to talk about before we leave.

10        I'm sorry, do you want me to keep --

11   Q.   Yes.  Please.

12   A.   I'm sorry.

13   Q.   At this point the conversation turns away from drug

14   usage and more to general preparation; is that correct?

15   A.   Correct.

16   Q.   So continue.

17   A.   So Mr. Nichols says:  Still some other stuff we have to

18   talk about before we leave.  The line in the sand.  Dad and I

19   are building a gun container in the truck today.  Just know

20   that I have intel that Washington will be a war zone.  Big

21   possibility that actual battle goes down.

22        Harkrider's response:  I am looking forward to it.

23        Mr. Nichols:  I know how to get guns legally into

24   D.C. now.  It is called transporting.

25        He puts quotations around transporting.

1          Harkrider's response:  I will bring every

2    freedom --

3          Excuse me.

4          I will bring every freedom blaster that I own.

5          Excuse me.

6          I will bring every freedom blaster I own then.

7          Harkrider then sends another message:  We are

8    stopping in Kentucky on the way for those plate carriers,

9    too, right?

10         And then Nichols responds there -- another message:

11   Do you have any 10-round mags for an AR?

12   Q.   From context, what does he mean by 10-round mags for an

13   AR?

14   A.   So, I guess, did an open source search -- or researched

15   the District of Columbia, my understanding is that there was

16   a law on the books that limits the magazine capacity for D.C.

17   as 10 rounds.

18   Q.   And AR, is that AR-15 or what's -- that's a civilian

19   version of a military assault weapon, correct?

20   A.   That's my understanding.

21   Q.   So, in addition to these text messages that you viewed

22   from Mr. Harkrider's phone, are we aware of other media that

23   provides context as to what Mr. Nichols and Mr. Harkrider did

24   preceding the events of January 6th?

25   A.   Yes.

1   Q.   And so we have already talked about the text message

2   about body armor.  And whether or not that happened or not,

3   at least it was discussed that they intended to pick up body

4   armor en route to D.C.; is that correct?

5   A.   That's correct.

6   Q.   And then the night before January 6th, that being the

7   evening of January 5th, have we recovered some videos where

8   the videos have been provided to us either from the Defense

9   or from doxers, members of the public who provided this via

10  the Internet, that depicts the Defendant, and Mr. Harkrider

11  at least in one of them, the night before the 6th; is that

12  correct?

13  A.   That's correct.

14        MR. LOCKER:  At this time, Your Honor, I would like

15  to display video for the Court.

16        THE COURT:  Are you offering it as an exhibit?

17        MR. LOCKER:  I am, Your Honor.  And I will submit

18  all of these in digital format after we are over.  These have

19  been provided to the Defendants via our online discovery

20  portal.

21        THE COURT:  So would this be Government's Exhibit

22  No. 1?

23        MR. LOCKER:  Government's Exhibit No. 1,

24  Your Honor.

25        THE COURT:  Mr. Files, do you have any objection to

1   that video?

2           MR. FILES:  No objection to that video for this

3   hearing only.

4           THE COURT:  All right.   It will be admitted.

5           Proceed, Mr. Locker.

6           (Video played.)

7           (Video paused.)

8   BY MR. LOCKER:

9   Q.   I'm going to pause it here.

10          Investigator Harry, can you describe for the Court

11  what we see mounted to Mr. Nichols' chest?

12  A.   It appears to me to be a GoPro camera on a chest

13  mount.

14  Q.   And that's one of these action cameras that is rugged

15  and can be doused in water and that sort of thing, used in

16  extreme sports, that sort of thing?

17  A.   That's correct.

18  Q.   Were they a common feature of the events of January 5th

19  and 6th in Washington, D.C.?

20  A.   GoPros, as well as other media recording types.  As you

21  see in the video, there are cameras everywhere.

22  Q.   In fact, in the video we are going to watch in a moment,

23  hundreds of people have them?

24  A.   Indeed.

25  Q.   And it is, in fact, those people posting those videos

26

1   online that provided a lot of the information that the FBI

2   has used to analyze the situation; is that correct?

3   A.    That's correct.

4           MR. LOCKER:  And so I would like to show one more

5   video from January 5th, Your Honor.  And this was provided to

6   me by Mr. Files today.

7           MR. FILES:  If it please the Court, may I put this

8   in context?

9           THE COURT:  You may.

10          MR. FILES:  We came upon these videos; and in

11  reviewing them, it appeared that we would be required under

12  the Texas Disciplinary Rules of Professional Conduct to turn

13  them over to the Government.  It is not something we would

14  normally have done in any other case.  But in the scope of

15  the investigation and what the Government was seeking and in

16  the context of the case that is before the Court, it appeared

17  that we had no duty other than to turn them over.

18          THE COURT:  Do you have any objection to their

19  admissibility for this hearing, Mr. Files?

20          MR. FILES:  I would love to have an objection, but

21  I don't.

22          THE COURT:  Okay.  We will identify this as

23  Government's Exhibit No. 2?

24          MR. LOCKER:  Yes, Your Honor.

25          THE COURT:  It is admitted.

1   BY MR. LOCKER:

2   Q.   Before I display that, to put this in context, in the

3   last video that we saw, that GoPro that was mounted to the

4   Defendant's chest, was it -- did it have a red blinking light

5   on it?

6   A.   It did.

7   Q.   What does that indicate to you?

8   A.   That it is recording.

9   Q.   Are you familiar with these devices enough to know that

10  they have an indicator so that the user can tell whether or

11  not it is operating specifically in record mode?

12  A.   That's correct, and that is its purpose.

13  Q.   And that is the red blinking light?

14  A.   Yes.

15          (Video played.)

16          (Video stopped.)

17  BY MR. LOCKER:

18  Q.   So, Investigator, we displayed that one because it shows

19  Mr. Nichols the night before.  He appears to be wearing the

20  same clothing that he is wearing in the prior video that is

21  provided from other sources where he appears to be yelling at

22  law enforcement.  Is that correct?

23  A.   That's correct.

24  Q.   So he is wearing the same clothes, and that video

25  features Mr. Harkrider as well; is that right?

1    A.   That's correct.

2    Q.   Mr. Files provided four files to us; is that correct?

3    A.   That's my understanding, yes, sir.

4    Q.   Did any of the files that we see overlap with times that

5    we reasonably deduce Mr. Nichols' GoPro camera to be

6    recording because he appears on other people's footage with a

7    red blinking light on his chest?

8    A.   The videos that we received did not appear to depict

9    what we should have been seeing if those were GoPro videos.

10   It was understanding that they were GoPro videos that were

11   provided to us.  Then, if that is the case, then the video

12   from that -- what we saw them yelling, that should have been

13   there, and it was not.

14   Q.   So we still have not seen, other than the four files

15   provided to us by the Defense, we don't know where those

16   files are, whether or not they have been destroyed or deleted

17   or for other purposes?

18               MR. FILES:  May I have the witness on voir dire for

19   the purpose of a possible objection?

20               THE COURT:  You may.  Proceed, Mr. Files.

21               MR. FILES:  May I come to the podium?

22               THE COURT:  Yes, proceed.

23                          VOIR DIRE EXAMINATION

24   BY MR. FILES:

25   Q.   Detective Harry, if I understood your answer correctly,

1  the device, the recording device, the visual audio recording

2  device has a red light on it that shows that it is working?

3  A.    Yes, sir.

4  Q.    Correct?

5  A.    Recording.

6  Q.    Recording?

7  A.    Yes, sir.

8  Q.    And on the video that was just played, you had seen the

9  red light; is that correct?

10  A.    Yes, sir.

11  Q.    Now, on the videos that you are looking at of our client

12  at the Capitol, and you talked about the video there, the

13  other video is not his, the other videos?

14  A.    Okay.

15  Q.    Could you tell from the camera whether it was

16  recording?

17  A.    I'm sorry.  You are saying from the next day when he is

18  at the Capitol?

19  Q.    On January 6th, could you tell whether the camera that

20  was being used -- that he had around his neck -- excuse me --

21  the camera that he had around his neck, could you see a red

22  light on that?

23  A.    I don't believe he was wearing the GoPro camera on

24  January 6th.

25  Q.    So there is no reason to believe that he has hidden,

30

1    secreted, or done something with videos that he would have
2    taken on January 6th?

3    A.    I have no reason to believe he has any videos from
4    January 6th at this point.

5            THE COURT:  Let me -- I have some clarification.
6    Are we talking about the first video, Government's Exhibit
7    No. 1, taken from someone else and in that video was the red
8    light blinking on Mr. Nichols' camera --

9            THE WITNESS:  And that's on January 5th, yes,
10   ma'am.

11           MR. FILES:  We agree with that.

12           THE COURT:  Okay.

13           MR. FILES:  It appeared from Counsel's question
14   that he was suggesting that there were other pictures that
15   Mr. Nichols would have had that were hidden, secreted, done
16   away with, and not furnished to the Government as we were
17   required to on the first part.  But we clarified that there
18   was no such indication from the witness's earlier
19   testimony.

20           THE COURT:  I believe the point the Government is
21   making is that they do not have a copy of that video.  We see
22   the video from the vantage of someone else.  We don't see the
23   video from Mr. Nichols, but it appears that the video camera
24   was recording.

25           MR. FILES:  Your Honor --

1     THE COURT:  Are you saying that is not consistent
2  with the testimony I have heard?
3     MR. FILES:  No, Your Honor.  He just said that he
4  had no reason to believe it was recording on January 6th.
5     THE COURT:  Y'all are talking about different
6  dates, right?  I am just trying to clarify so we are all
7  talking about the same thing.
8     MR. FILES:  January 5th, recording; January 6th,
9  not recording.
10     THE COURT:  Okay.
11     MR. FILES:  With that clarification, we have no
12  objection.
13     THE COURT:  Thank you, Mr. Files.
14     MR. FILES:  Yes, Your Honor.
15     THE COURT:  All right.  Mr. Locker, you may
16  proceed.
17     MR. LOCKER:  Thank you, Your Honor.
18                DIRECT EXAMINATION CONTINUED
19  BY MR. LOCKER:
20  Q.   In addition to the two videos we just saw, we have an
21  image of the Defendants, what appears to be taken at their
22  hotel prior to them traveling to Capitol Grounds?
23  A.   We believe -- I believe it to be an image taken prior to
24  them going, yes.
25  Q.   Does that become significant because it aids in

1    identifying them amongst a scrum of thousands of people?

2    A.    Yes.

3             MR. LOCKER:  At this time I'd like to display

4    Government's Exhibit No. 3 as an image, Your Honor.

5             THE COURT:  Any objection, Mr. Files?

6             MR. FILES:  May I have the witness again on voir

7    dire?

8             THE COURT:  You may.

9                    VOIR DIRE EXAMINATION

10   BY MR. FILES:

11   Q.    In fairness, I think you have already answered my

12   question on what you just said.  You don't know when the

13   video was taken, so you don't know whether it was before the

14   6th or after the 6th?

15   A.    What video are you referring to?

16   Q.    What the Government is just proffering.

17   A.    The video that we were talking about before where the

18   video is blinking on his chest, the camera is blinking on his

19   chest --

20   Q.    No.  He just asked you about a video that he wants to

21   offer.  And the question was, was it taken -- was it made

22   before -- at the hotel before the 6th before he would have

23   been at the Capitol, or was it made at a later time?

24             And the question is, do you know whether it was

25   made before Mr. Nichols went to the Capitol or after he went

1   to the Capitol?

2   A.   That's correct, no, I do not know.

3   Q.   You do not know then.  Thank you.

4          MR. FILES:  Then I have no objection.

5          MR. LOCKER:  Just to clarify, we are talking about

6   a still image here, not a video?

7          THE WITNESS:  Still image, correct.

8          THE COURT:  No objection to Government's Exhibit

9   No. 3.  It is admitted.

10         MR. FILES:  And, Your Honor, I said "video,"

11  meaning still.

12               DIRECT EXAMINATION CONTINUED

13  BY MR. LOCKER:

14  Q.   So, in fairness, we don't know exactly when this was

15  taken, but we do know we see these Defendants wearing this

16  same attire on Capitol Grounds?

17  A.   Correct.

18  Q.   On January 6th?

19  A.   Correct.

20  Q.   From where was this image recovered?

21  A.   My recollection of this image, I want to say this one

22  was one of the ones that was provided to us that we recovered

23  from an NGR file.  Everything that we have is from social

24  media; Facebook, YouTube, Instagram, Twitter, to my

25  knowledge.  I believe this was recovered by someone else from

34

1   his Facebook.

2   Q.   When we say "his," we mean Mr. Nichols' Facebook?

3   A.   His, is my understanding, I believe.

4            MR. LOCKER:   Now, having contextualized in helping

5   us identify the Defendants from these images, I would like to

6   offer and admit and display Government's Exhibit No. 4, which

7   is -- this is a lengthy video; it is by far the most lengthy

8   exhibit Your Honor has -- I would like to play approximately

9   24 minutes of a video from outside the Capitol.

10           THE COURT:   Any objection, Mr. Files?

11           MR. FILES:   For a detention hearing, we have no

12   valid objection we could make.

13           THE COURT:   All right.   It will be admitted.

14           You may proceed, Mr. Locker.

15           MR. LOCKER:   Your Honor, I intend to admit and

16   provide the entirety of the file to the Court and admit it

17   for these purposes; however, for display purposes, I'm going

18   to begin at approximately the 59-minute mark.

19           THE COURT:   Thank you.

20           MR. FILES:   We have been provided with that,

21   Your Honor, and have had a chance to review it.

22           THE COURT:   Thank you.

23           (Video played.)

24           (Video paused.)

25   BY MR. LOCKER:

1   Q.   Detective Harry, who do we see in the middle of the

2   image?

3   A.   Mr. Harkrider and Mr. Nichols.

4           (Video played.)

5           (Video paused.)

6   BY MR. LOCKER:

7   Q.   Mr. Harkrider's blue and gray hat is quite apparent,

8   along with his brown jacket and his hair sticking out the

9   back of his hat; but Mr. Nichols' appearance is partially

10  hidden -- or mostly hidden by the flag we are seeing here; is

11  that correct?

12  A.   Yeah.  He is wearing the camo boonie hat.  It is

13  obstructed by the flag mostly, in this still that you have it

14  stopped at right now.

15          (Video played.)

16          (Video paused.)

17  BY MR. LOCKER:

18  Q.   What did we see in Mr. Harkrider's right hand?

19  A.   The bullhorn.

20  Q.   I'm sorry.  Let me replay that.  I believe that was the

21  OC canister.

22          (Video replayed.)

23          (Video paused.)

24  A.   I'm sorry.  Yes.  You said Mr. Harkrider.  I was looking

25  at Mr. Nichols.  Yes, the OC canister.

36

1                   (Video played.)

2                   (Video paused.)

3    BY MR. LOCKER:

4    Q.    Is that Mr. Nichols in the foreground there of this

5    image, lower right corner?

6    A.    Lower right, yes, in that camo boonie hat.

7                   (Video played.)

8                   (Video paused.)

9    BY MR. LOCKER:

10   Q.    Is this Mr. Nichols we see here with the megaphone?

11   A.    Yes, sir.

12   Q.    And Mr. Harkrider standing right next to him?

13   A.    That's correct.

14                  (Video played.)

15                  (Video paused.)

16   BY MR. LOCKER:

17   Q.    Is this Mr. Harkrider here whipping up the crowd and

18   also making a throat-slash motion to the crowd?

19   A.    Certainly riling up the crowd.

20                  (Video played.)

21                  (Video paused.)

22   BY MR. LOCKER:

23   Q.    We have seen Mr. Nichols emerging from the building --

24   the Capitol at this point?

25   A.    That's correct.  You see the second half of him coming

1    out.  We have another video that it shows him completely

2    emerging from that window.

3                  (Video played.)

4                  (Video paused.)

5    BY MR. LOCKER:

6    Q.    And it appears here he is helping Mr. Harkrider out of

7    that window he just emerged from; is that correct?

8    A.    That's correct.

9                  (Video played.)

10                 (Video stopped.)

11   BY MR. LOCKER:

12   Q.    During the time that Mr. Nichols is in possession of

13   that bullhorn, at least from context and listening to what

14   you can -- the video covers while it is still on him with the

15   bullhorn and listening to this over and over again, have you

16   been able to identify certain things that it appears

17   Mr. Nichols yelled to the crowd through the bullhorn?

18   A.    Correct.  There is at least two videos of -- that

19   capture him on the bullhorn.  We have put together what we

20   think -- we believe him to be saying.

21                 MR. FILES:  May I have the witness on voir dire for

22   the purposes of possible objections?

23                 THE COURT:  You may.

24                       VOIR DIRE EXAMINATION

25   BY MR. FILES:

1   Q.   If I understood the context of the question, and I may

2   be in error, I thought what he was asking had to do with this

3   particular video, and you are listening to this particular --

4   the audio on this particular video in an attempt to identify

5   Mr. Nichols' voice.  Could you identify his voice from this

6   video and the audio?

7   A.   We know it is his voice from what we can hear in this

8   video, which marries up with another video that we have that

9   is closer to him, to Mr. Nichols.  And so between those two,

10  we are sure that the audio that we are hearing, which is a

11  more complete version of what he is saying, is the same -- it

12  is same voice from the other video.  So that's how I know it

13  is Mr. Nichols.  Does that make sense?

14  Q.   What could you hear him say on this video?

15  A.   Would you like for me to answer?

16  Q.   Yes, sir.

17  A.   Okay.  So we hear:  Get in the building.  Get in there.

18  This is the second revolution right here, folks.  If you have

19  a weapon, you need to get your weapon.

20  Q.   Okay.  You can clearly hear that on this video?

21  A.   When we, yes, wear headphones, we can hear that audio;

22  and we know it is his voice because we can match it with the

23  other video.

24              MR. FILES:  Okay.  No objection.

25              THE COURT:  Proceed, Mr. Locker.

DIRECT EXAMINATION CONTINUED

1

2   BY MR. LOCKER:

3   Q.   Detective Harry, we selected this video in particular

4   because it covers images of the crowd and provides a time

5   context for the conduct that we are looking at; is that

6   correct?

7   A.   Correct.

8   Q.   Is this by any means the only video that you looked at

9   of this conduct?

10   A.   It is not.

11   Q.   And when taken in combination with other videos that you

12   have viewed from these same events, are you able to identify

13   those same statements that you just told to Mr. Files and

14   also some additional ones that are relevant here?

15   A.   Yes, this is our -- yes.

16   Q.   Okay.  So let's start with the beginning and go in

17   sequence, because there is a series of approximately eight to

18   10 statements that we have been able to identify that is

19   coming specifically from Mr. Nichols while he had the

20   bullhorn.

21   A.   So he begins:  Give me one second, please.  I will give

22   you all of the info you need.  Get in the building.  This is

23   your country.  They have already taken it away.  What are you

24   going to do, stand there?  Get in there.  This is the second

25   revolution right here, folks.  We are not going to let them

40

1    take it away. This is not a peaceful protest. What they are

2    doing is anarchist. If you have a weapon, you need to get

3    your weapon.

4           He repeats that several times, the "get your

5    weapon" part.

6           MR. LOCKER: At this point I would like to play

7    another video.

8    BY MR. LOCKER:

9    Q.   Detective Harry, is there a separate video from

10   approximately the same time period, but not exactly what we

11   just saw, that specifically shows Mr. Nichols beckoning an OC

12   cannister, receiving it from another rioter, and then

13   spraying it into Capitol Police?

14   A.   Yes.

15   Q.   And, although the snippet that we are going to see is

16   one narrower angle than what we just saw, taken in

17   conjunction with what we just saw, is there any doubt, first

18   of all, what it is he is using and, second of all, who he is

19   firing at?

20   A.   I believe it to be OC based on the reaction of the crowd

21   and the look of the bottle. You can't -- obviously, you

22   can't definitively say, but taken in context, that is what I

23   believe it to be. You can actually see a number on the

24   canister at one point in the video.

25           I believe it is actually a law enforcement canister

1   that they got ahold of.  In the longer video here -- in this

2   video from this angle, you actually see people's responses

3   when that can is sprayed.  They are covering their faces.

4   You saw people rinsing their eyes out with water.

5           In my training and experience, that is a reaction

6   from OC or some sort of bear spray type of chemical agent.

7   Q.   Now, OC is a -- that is an acronym that stands for

8   essentially what we know as pepper spray?

9   A.   Correct.

10  Q.   And law enforcement uses it as a riot control aid?

11  A.   Correct.

12  Q.   The canister that we see Mr. Harkrider having held over

13  his head in this video we just watched and the video we are

14  about to watch appears to be the same type, same make and

15  model; is that correct?

16  A.   It appears to be, yes.

17  Q.   And we can't say for certain it is the exact same

18  canister, but it appears to be the same make and model.  Is

19  that correct?

20  A.   I am not comfortable saying it is the exact same

21  canister.

22  Q.   In the video that we are about to watch, the canister

23  that Mr. Nichols handles appears to have the number 72

24  written on it; is that correct?

25  A.   Correct.

42

1  Q.    Is that indicative to you of something?

2  A.    In my mind, when I think of a situation and how our law

3  enforcement would respond, I imagine there is probably an

4  armory or some sort of a room with a whole bunch of these

5  canisters all numbered.  Officer Harry, you are issued

6  canister 72.

7        In my mind, that is what I believe this to be, and

8  that is what I believe that number references.  I don't

9  see -- I could be wrong.  I have never seen anything like

10  that for sale on the kind of public market, Amazon, something

11  like that.  You certainly couldn't get that from Walmart.  I

12  don't see any reason know why that would be numbered like

13  that.

14  Q.    For any other reason?

15  A.    For any other reason.

16  Q.    And, by way of contrast, there are members of the crowd

17  who do have commercially available OC pepper spray and mace,

18  that type of spray, that they are spraying in the situation;

19  is that correct?

20  A.    Yes.  Much smaller canisters with a kind of a top handle

21  you see.  One that comes to mind is you see silver a lot, and

22  that is something that you see more commercially.

23  Q.    At this time I would like to display Government's

24  Exhibit 5, I believe we are at right now?

25        THE COURT:  Any objection?

43

1          MR. FILES:  For the detention hearing only, no

2    objection.

3          THE COURT:  All right.  It will be admitted.

4          You may show it, Mr. Locker.

5          (Video played.)

6          (Video stopped.)

7    BY MR. LOCKER:

8    Q.   Now, Detective Harry, even in this video, you can see

9    what is called overspray or backspray in the response to that

10   overspray and backspray from some of the members of the crowd

11   that were in that stream.  It appears that the canister runs

12   out.  It goes from shooting a long stream to sort of a puff

13   of mist.  And that affects the individuals who were around.

14   They start wiping their eyes.  Is that accurate?

15   A.   They are not happy.

16         MR. LOCKER:  At this time, Your Honor, I ask the

17   Court to the take judicial notice of the complaint affidavit

18   in its entirety.

19         MR. FILES:  No objection, Your Honor.

20         THE COURT:  The Court will take judicial notice of

21   the affidavit.

22   BY MR. LOCKER:

23   Q.   Detective Harry, were there social media posts that

24   Mr. Nichols appears to have put up on the Internet

25   contemporaneous with these events?

1    A.    Yes, that's correct.

2              MR. LOCKER:  At this time, Your Honor, I would like

3    to display the first of those, Government's 6.

4              THE COURT:  Any objection to Government's 6?

5              MR. FILES:  Not for the purposes of this hearing.

6              THE COURT:  It will be admitted.

7              You may show it.

8    BY MR. LOCKER:

9    Q.    Detective Harry, can you describe this to the Court?

10   A.    This is an image that was provided to us from a witness.

11   In my recollection, it was that she captured this image on

12   January 6th as she had been watching Mr. Nichols' Facebook

13   page during the day.

14             She described it to me, and what it appears to me

15   to be is Mr. Nichols tried to make a live stream or post a

16   video with the caption -- as you can see it there in the

17   middle of the screen:  Are patriots calling for violence?

18   Why won't you hear?  We have to talk.

19             Then the screenshot is, of course, that; and then

20   what I presume is a notice from Facebook saying:  Sorry.

21   Something went wrong.  There was a problem posting your

22   status.

23             What it appears is, if you look just a little bit

24   above that, is the caption:  We have removed something that

25   you have posted.  Which I believe is Facebook taking that

1    off.

2            He kept the screenshot of this and then posted the

3    screenshot of attempting to post that image, if that makes

4    any sense, with the caption:  Facebook won't let my truth be

5    spoken.  Come join patriots in D.C. and fight for your

6    country.

7            MR. LOCKER:  I would like to display the next post.

8    It will be Government's 7.

9            Mr. Files, any objection?

10           MR. FILES:  Not for this hearing.

11           THE COURT:  All right.  It will be admitted.

12   BY MR. LOCKER:

13   Q.   What is displayed here, Detective Harry?

14   A.   So this again is another screen capture from that same

15   witness that provided this image to us.  The caption there

16   from Mr. Nichols' Facebook page:  We witnessed death today,

17   and we are about to make them pay.  The only enemy is our

18   elected officials.  It is time to make them pay.

19           And then the link to the news article there that he

20   is sharing appears to be the female subject that -- I'm

21   sorry, I can't remember her name -- that was killed inside

22   the Capitol.

23   Q.   What information do you have about Mr. Nichols

24   possessing weapons, firearms that he may have taken to D.C.?

25   A.   We know from the images -- or from the videos, in

1  particular, that you see there that he had at least a crowbar

2  with him. You can actually see him holding that at several

3  points in time.

4        We also have text messages, that we read earlier,

5  that describe at least an intent to take firearms to D.C.

6  with him.

7  Q.   And since Mr. Nichols is charged as an aider and abetter

8  along with his co-Defendant Mr. Harkrider, do we know that

9  Mr. Harkrider indeed carried a weapon into the Capitol?

10 A.   We do.

11 Q.   What kind of weapon was that?

12 A.   It was a tomahawk.

13 Q.   In the text messages that Mr. Nichols and Mr. Harkrider

14 exchanged prior to their trip to Washington, what was the

15 reference regarding transporting firearms?

16 A.   I'm sorry? That he knew how to get firearms into D.C.;

17 is that what you are referring to?

18 Q.   Yes. And also didn't they discuss construction of a

19 container to transport those firearms?

20 A.   Yes. I think we went over this earlier. Mr. Nichols

21 mentioned that he and his father were building a gun

22 container and the truck today -- I know there was -- there

23 was a message: I know how to get guns legally into D.C. now.

24 It is called transporting.

25        And then the reference to the 10 round AR mags.

1   Q.   Are you familiar with some laws that pertain
2   specifically to firearms in D.C. that require them to be in a
3   container separate from the passenger compartment?
4   A.   I am not familiar with that.
5   Q.   If that were the law, would a truck container that was
6   outside, such as for an open-bed truck, would providing a
7   locked container inside that bed satisfy that requirement if
8   it had to be outside of the passenger compartment of an
9   open-bed truck?
10  A.   It sounds like it would.  I am not familiar with that
11  law.  I hate to speculate on it.
12  Q.   Regarding the 10-round mags for ARs that were discussed
13  earlier, did you locate any of those inside Mr. Nichols'
14  house?
15  A.   When we were in Mr. Nichols' house while searching --
16  for our search warrant, while I was in the garage, I actually
17  observed several 10-round AR mags, most of which were
18  actually still in the packaging, on the deck of the boat that
19  is parked in the garage.  The 10-round AR mags, they are the
20  Magpul brand for -- specifically for the AR-15 platform.
21  Q.   Did you find the host weapon for those magazines?
22  A.   We did not find a weapon in the house capable of
23  accepting those magazines.
24  Q.   Do you have information from other sources that
25  Mr. Nichols, in fact, owns a firearm that hosts those

1 magazines?

2 A.   During an interview of Mr. Nichols' father, he mentioned

3 that he and Ryan -- that he knew that Ryan had an AR.  He

4 didn't want to say that he owned it.  May have even borrowed

5 it.  He was not comfortable saying that he owned it, or at

6 least not comfortable telling us that.

7        He did mention that they had fired AR -- an AR --

8 or that Ryan, excuse me, had fired an AR-15-style weapon on

9 or about Christmastime of this year, Christmas 2020.

10 Q.   The context of Mr. Nichols' text message exchange with

11 Mr. Harkrider indicates that he had access to and intended to

12 take an AR-15 on their trip to D.C.; is that accurate?

13 A.   That's my conclusion, yes.

14 Q.   And yet none of it was recovered; is that correct?

15 A.   That's correct.

16 Q.   And there was also discussion in those text messages

17 that Mr. Nichols expected to be arrested or expected some law

18 enforcement attention, did he not?

19 A.   That is our conclusion, yes.

20 Q.   Did you also find some empty pistol boxes in the house

21 with guns not recovered?

22 A.   There was an empty pistol box in Mr. Nichols' closet, as

23 well as one inside -- one of the vehicles outside, a Nissan

24 Juke.  I don't have that in front of me.

25        I believe one was a Smith & Wesson -- excuse me,

1   Smith & Wesson .380 -- or, excuse me, .38 special revolver

2   box.  And the other one was for a -- it was a SIG Sauer

3   pistol, .380 caliber pistol.  We did not recover either of

4   those firearms, but we did have the boxes.  So those guns are

5   somewhere.

6   Q.   Are you aware of other situations where Mr. Nichols is

7   accused of acts of violence that would cause the Court to be

8   concerned should he be released?

9   A.   Yes, I am.

10  Q.   Let's discuss an incident involving a low-flying plane

11  in April of last year.  Can you tell the Court about this

12  incident?

13  A.   So this first came to our attention actually during the

14  day of the search warrant on January 18th.  While

15  interviewing with some of the neighbors, it was brought to

16  our attention that -- at least there was a rumor or

17  Mr. Nichols had fired a weapon at a low-flying airplane over

18  their neighborhood in the neighborhood where we ran the

19  search warrant.  This actually came to us from a couple of

20  sources.

21         We did several interviews to try to follow up on

22  that with what we could.  Obviously, that is a fairly

23  significant federal crime.

24  Q.   So, just to be clear, we don't have footage of

25  Mr. Nichols firing a firearm at an airplane; is that

1    correct?

2    A.    We do not have specific footage of that, no, that is

3    correct.

4    Q.    And there is no doubt it was a low-flying airplane; the

5    whole neighborhood was concerned; it was disturbing; many of

6    them took video footage.  Is that correct?

7    A.    That is -- yes, that's correct.

8    Q.    And at least one neighbor provided you footage of a

9    low-flying airplane over this neighborhood that, from casual

10   viewing, sounds like it has multiple gunshots in it, is that

11   fair, as the plane passes over Mr. Nichols' home?

12   A.    That's correct.

13   Q.    And that same neighbor also believed that --

14   corroborated by the video, believed he heard gunfire from

15   Mr. Nichols' backyard at that time?

16   A.    That's what the statements to us were.

17   Q.    And did Mr. Nichols do anything else after that point

18   that further corroborated that belief by the neighbor?

19   A.    During our interview of the witnesses to that incident

20   that captured the video, their statement to us was that after

21   what they understood to be shots were fired and the plane had

22   flown over, within a few minutes they were able to see from

23   their position in the front of their residence, Mr. Nichols

24   come out from the front of his home to his truck, which was

25   parked in the part of their driveway you could clearly see,

1   the testimony was that they observed Mr. Nichols throw an

2   AR-15-style rifle into the vehicle.  Seemed to be in kind of

3   a hurry.  Went back into the house presumably for a moment.

4   Came back out.  Was putting clothes on.

5            The statement was then that they observed him throw

6   what they believed to be a pistol inside the truck, come out

7   of the driveway, and then come drive by the witness's house

8   and make a comment, you know, basically -- to the effect of:

9   Did you see that?  Can you believe that?  I am on my way to

10  the airport right now to see the deal was, or to find out

11  what was going on.

12           I don't have the statement in front of me.

13  Q.   With apparently two weapons in hand?

14  A.   Correct.

15  Q.   Did the neighborhood indicate that they are scared of

16  Mr. Nichols on account of this incident?

17  A.   Several of the witnesses that we interviewed were very

18  concerned that -- one, that Mr. Nichols would find out that

19  they had spoken to us, and they were not -- certainly less

20  than thrilled to potentially have to reveal their identities

21  to him because they obviously are going to continue to live

22  in that neighborhood.

23  Q.   Mr. Nichols was arrested in 2018 for arrest.  Are you

24  aware of the circumstances and facts surrounding that

25  incident?

1   A.    I have obtained a Longview Police Department report that

2   I believe is for that incident, yes.

3   Q.    And, just to be clear, your knowledge of this incident

4   comes from those reports exclusively; is that correct?

5   A.    That's correct.

6   Q.    Based on your review of those reports, can you relay

7   that incident in summary to the Court?

8   A.    The Longview Police Department was called to -- or,

9   rather, dispatched to -- I will get you an address in a

10  minute, 2835 East Cotton Street in Longview, Harrison County,

11  Texas, after there was a report of essentially a disturbance

12  fight.

13        Upon arrival, what the investigation revealed was

14  that -- the allegation was that Mr. Nichols had assaulted a

15  couple of construction workers who had moved some trailers on

16  his property to do whatever construction project they were

17  doing, without Mr. Nichols' consent.

18        He became very upset about that, confronted those

19  individuals.  The report indicates that impartial witness

20  testimony is that one of the people responsible for moving

21  those vehicles had apologized to Mr. Nichols.  But to quote a

22  part of the report:  But the man -- in parentheses Nichols --

23  wouldn't let it go.  Nichols then continued downstairs and

24  was chest-bumping the other individual.  The one who

25  apologized.

1        And then they saw -- the reference here is that

2 Mr. Nichols pushed and then hit the other individual. And

3 then they observed Mr. Nichols push a second person, an older

4 individual who was related -- I believe is related to the

5 first individual -- it is a father and son, if I am

6 understanding correctly.

7        The police report indicates that they had

8 interviewed Mr. Nichols about that, as well as his wife, and

9 that the statements provided by Mr. Nichols and his wife were

10 not consistent with the other impartial witnesses who were

11 not associated with the incident and were at a different

12 location. They were not consistent.

13 Q.   The context of this incident is basically that the

14 landlord at Mr. Nichols' business hired a contracting crew to

15 resurface their parking lot, and a couple of trailers

16 belonging to Mr. Nichols, or associated with his business,

17 were in the way. They moved them as best they could. It

18 infuriated Mr. Nichols, and he picked a fight with the

19 contractors.

20 A.   That's correct.

21 Q.   And someone -- and so the version of events that was

22 told by the contractors was that Mr. Nichols picked the

23 fight; is that correct?

24 A.   Correct.

25 Q.   And did Mr. Nichols tell that same story, or did he

1  reverse the responsibility in that situation?

2  A.   That's correct.  He, in fact, said that he was the

3  victim and actually said he wanted to pursue charges.

4  Q.   And, in fact, Mr. Nichols' wife said the same version of

5  events as Mr. Nichols; is that correct?

6  A.   That's correct, according to the report.

7  Q.   But there was a neutral third party who saw it?

8  A.   Two neutral third parties, actually.

9  Q.   And whose version did they corroborate?

10  A.   The contractors, not Mr. Nichols and Mrs. Nichols.

11  Q.   But due to the fact that all -- that the contractors

12  decided to drop the charges, they were not pursued; is that

13  correct?

14  A.   My understanding -- it is tough to kind of parse out

15  from the report because the report doesn't actually mention

16  that Mr. Nichols was arrested; however, a review of other

17  records does indicate that he was arrested.  But we also know

18  that those charges were dropped, according to records

19  available, to me, at least at this time.

20  Q.   Are you aware of Mr. Nichols making any threatening

21  statements to other individuals subsequent to the events on

22  January 6th?

23  A.   Yes.

24  Q.   In fact, did Mr. Nichols make a threatening post on an

25  individual's Facebook page when he confronted Mr. Nichols

1   about being at the Capitol on January 6th?

2   A.   That's correct.

3   Q.   What was the name of that individual that Mr. Nichols

4   threatened?

5   A.   I'm going to mess up his name.  It's Aryeh Ohayon.

6   Q.   And can you read that threatening post to the Court,

7   please?

8   A.   It is -- my understanding is, Mr. Ohayon made a comment

9   on a post that Mr. Nichols had.  It was on a relative of

10  Mr. Ohayon's page.  The comment was roughly:  You spelled

11  "terrorist" wrong.

12          I don't have the picture that he was commenting on,

13  but, roughly:  You spelled "terrorist" wrong.

14          Mr. Nichols' response to Mr. Ohayon's comment is --

15  excuse me:  But you won't come step up -- excuse me -- and

16  say --

17          THE WITNESS:  Can I use a curse word, Your Honor?

18          THE COURT:  Yes.

19  A.   "But you won't come step up and say shit though.  You

20  are a coward, and we would smash your face.  Steal our

21  election.  Won't hear us in court.  Then we will no longer be

22  peaceful.  So fuck you and your liberal mindset.  Patriots

23  are here to fuck people up like you now."

24  Q.   Do you believe that the Court has reason to have concern

25  about Mr. Nichols' mental health that would govern the

56

1    Court's decision regarding release?

2    A.    I do.

3    Q.    In your interview with the Defendant's father, did he

4    reveal information that indicated that Mr. Nichols may suffer

5    from PTSD from multiple sources?

6    A.    He did.

7    Q.    And, in fact, did Mr. Nichols' father tell you that

8    Mr. Nichols medicates himself with marijuana for his PTSD?

9    A.    That's correct.

10   Q.    Do you have information that the Defendant may be a

11   danger to himself because of suicidal ideation?

12   A.    Yes.

13   Q.    How do you come by that information?

14   A.    The statement from the father was that he had --

15   Mr. Nichols has had suicidal ideations in the past.

16   Q.    Did an interview with Defendant Harkrider's roommate

17   provide additional information on this topic, not on suicidal

18   ideation but on mental health in general?

19   A.    Yes.  The statement from Mr. Harkrider's roommate, he

20   referred to Mr. Nichols, in fact, as a psycho.

21   Q.    Did that same roommate indicate that Mr. Harkrider was a

22   user of psychodelic drugs?

23   A.    He did, that's correct.

24   Q.    And that was corroborated by the text message string

25   that we have already discussed regarding Ketamine, LSD, DMT,

1   et cetera; is that correct?

2   A.   Yes, sir.

3   Q.   Did you find anything relevant to drug usage in the

4   Defendant's home at the time that you executed the search

5   warrant?

6   A.   Yes, we did.   During a search of the Defendant's -- a

7   safe in the master bedroom closet, inside the larger safe we

8   found a small amount of marijuana, pretty high-grade

9   marijuana, a pipe -- oh, I can't -- a pipe to smoke

10  marijuana.   It had residue in it, as well as a marijuana

11  grinder.

12          Just outside the safe was a at-home drug test kit

13  which tested for multiple controlled substances, as well as

14  marijuana being one of them.

15  Q.   Was this drug test kit still in its packaging unused?

16  A.   It was.   It appeared to be unseal -- it appeared to be

17  totally sealed.

18  Q.   Are you aware of any concerns regarding travel or flight

19  that the Court should -- would give the Court concern

20  regarding non-appearance of the Defendant?

21          Let me ask specifically, does the Defendant have

22  the any ties to the District of Columbia other than the

23  criminal conduct that we are discussing today?

24  A.   Not that I am aware of.

25  Q.   Were you aware that -- actually, let me back up to the

1    marijuana issue regarding the comments from the father.

2            Did Mr. Nichols' father discuss his marijuana usage

3    with you?

4    A.   Very briefly.  He said that Mr. Nichols used it to treat

5    his PTSD.  He also made a comment that he a -- excuse me, a

6    medical marijuana card for California -- for the State of

7    California.

8    Q.   So based on the father's statements regarding that

9    medical marijuana card, it appears that Mr. Nichols travels

10   to California for the purpose of self-medication, et

11   cetera?

12   A.   I don't know that I am comfortable saying that he

13   travels there for that purpose.

14   Q.   Was he out of state at the time that you called him for

15   the search warrant execution?

16   A.   He was.  At the time, the information that I have is

17   that he was in or near Ada, Oklahoma, where his wife's family

18   currently -- some members of his family currently live.

19   Q.   Are you aware of conduct by Mr. Nichols that may

20   constitute obstructive conduct that would give the Court

21   concern whether or not Mr. Nichols would comply with the

22   Court's orders going forward?

23   A.   I am.

24   Q.   Specifically, the failure to locate certain items in his

25   home that you would expect to find based on statements,

1  images, et cetera, did that give you great concern?

2  A.   It did.

3  Q.   What items did you not locate that you expected to

4  locate in his home during the execution of the search

5  warrant?

6  A.   Not unlike Mr. Harkrider's home, I expected to find that

7  tactical vest, number one, the boonie hat, the yellow

8  gloves -- the leather gloves that were there, the crowbar,

9  and I also expected to find an AR-15 in there.  We did not

10  find any of those items.

11  Q.   Very specifically, did Mr. Nichols exchange text

12  messages with Mr. Harkrider instructing him to delete

13  evidence?

14  A.   He did.

15  Q.   On January 8th, can you read for the Court a text

16  message that Mr. Nichols sent to Mr. Harkrider, to this

17  end?

18  A.   The text message says:  Delete it all, including our

19  text conversation together.  Also, delete them from your

20  phone as well.

21  Q.   The next day did Mr. Nichols send a follow-up or

22  similarly-related text message to Mr. Harkrider?

23  A.   That's correct, he did.

24  Q.   And what did that state?

25  A.   On January 9th, Mr. Nichols sent a link -- excuse me --

Case 1:21-cr-00117-TFH   Document 57-6   Filed 11/09/21   Page 60 of 61

1    a web link to the Marshall Report website. The text under it

2    with that link says:  Watch the video and then delete what

3    you have.

4    Q.   Does Mr. Nichols' Facebook page appear to reflect all of

5    the things that you would expect it to reflect, given all of

6    the information that you have received from third parties?

7    A.   It does not.

8    Q.   Does it appear that Mr. Nichols has sanitized his social

9    media presence?

10   A.   Yes.

11   Q.   Does it appear that Mr. Nichols has changed his

12   appearance prior to today, prior to his arrest?

13   A.   Yes, it does.

14   Q.   Are you aware of communications from Mr. Nichols' family

15   members that would give the Court pause regarding his support

16   network should he be released?

17   A.   Yes.

18   Q.   In fact, did Mr. Nichols' father send a text message to

19   Mr. Harkrider on January 6th that is relevent to these

20   events?

21   A.   He did.

22   Q.   What did that text message say?

23   A.   January 6th, Mr. Nichols' father sent a text message to

24   Mr. Harkrider, actually.  And the message says:  They have

25   labeled you all anarchists.  The patriots have taken the

1    Hill, both the Senate and Congress.  The D.C. Police, the

2    FBI, and the Secret Service are getting together with the

3    National Guard.  They are discussing using lethal force to

4    disperse people off of the Hill.  Go get your weapons.

5             MR. LOCKER:  Your Honor, may I have a moment?

6             THE COURT:  You may.

7             (Pause in proceedings.)

8    BY MR. LOCKER:

9    Q.   Detective Harry, there is one final Facebook post that

10   the Defendant posted that I would like to go over with you.

11            MR. LOCKER:  Mr. Files, I provided this to you as

12   well.  Any objection?

13            MR. FILES:  No.  Not -- Once again, not for the

14   purposes of this hearing.

15            THE COURT:  Thank you.

16            What is this Government's Exhibit?

17            MR. LOCKER:  8, I believe, Your Honor.

18            THE COURT:  8, yes.

19   BY MR. LOCKER:

20   Q.   Can you read the text?

21   A.   This is a -- what I understand to be a post from

22   Mr. Nichols' Facebook.  He tags -- obviously, it has got him,

23   and he tags Alex Harkrider with him.

24            The comment is:  We will not bend.  We will not

25   break.  We will never give in.  We will never give up.  We