1   will never surrender.  Headed home to better reorganize.

2   This fight for our country has just -- excuse me -- this

3   fight for our country just begun -- just began.

4           I'm sorry.

5   BY MR. LOCKER:

6   Q.   Detective Harry, do you believe there is probable cause

7   to support each and every element of each of the offenses

8   alleged in this complaint?

9   A.   I do.

10          THE COURT:  Pass the witness.

11          MR. FILES:  Would it be appropriate to take a break

12  at this time, Your Honor?

13          THE COURT:  I was just going to suggest that,

14  Mr. Files.  We have been going for a while.  We are going to

15  take a 15-minute recess.

16          We will be in recess.

17          COURT SECURITY OFFICER:  All rise.

18          (Recess was taken at this time.)

19          COURT SECURITY OFFICER:  All rise.

20          THE COURT:  Please be seated.

21          Mr. Locker, you passed the witness, right?

22          MR. LOCKER:  Prior to taking my seat, I need to

23  make a correction that I learned of during the break.  I

24  learned from Ms. Hall with Mr. File's office that the videos

25  that came from Mr. Nichols' GoPro device that were provided

1    to Counsel and then provided to the Government are a subset

2    of a larger number of files that the Defense is in possession

3    of.

4           All of us have been working long hours and are

5    under very tight time constraints.  I certainly understand.

6    It is one of the things where I understand that the reason we

7    don't have those digital files was simply due to time

8    constraints.

9           And so if I left a false impression with the Court

10   that the lack of files is attributable to the Defendant, I

11   need to correct that; and that is why I wanted to bring that

12   to the Court's attention.

13              THE COURT:  All right.  Thank you very much.

14              All right.  Cross-examination.

15              MR. FILES:  May it please the Court.

16                   CROSS-EXAMINATION

17   BY MR. FILES:

18   Q.   In the old days, it was Detective Harry.  Now it is Task

19   Force Officer Harry.  You could be Mr. Harry.  How would you

20   prefer that I address you, sir?

21   A.   It really doesn't matter, Mr. Files.  Whatever you are

22   most comfortable with.

23   Q.   If I just say Mr. Harry, is that okay?

24   A.   It doesn't bother me at all.

25   Q.   Thank you, sir.

1          You had indicated to us that you had participated

2    to some significant extent in coming up with the material

3    that is in the criminal complaint, but that you had not done

4    all of it.  Is that a fair beginning?

5    A.    That's correct, yes, sir.

6    Q.    So you would be able to go through and look at the

7    complaint and be able to draw a circle around or square

8    around or something or brackets and indicate what part of

9    this complaint you were responsible for, and that would leave

10   the rest of it that someone else is responsible for.  Is that

11   correct?

12   A.    I would say it is a collective project.  Certainly, we

13   worked on all of it together and have reviewed most all of it

14   together.

15          MR. FILES:  Your Honor, may I approach the witness?

16          THE COURT:  You may.

17   BY MR. FILES:

18   Q.    I hand you my copy of the complaint, and ask you if you

19   would look at it and see if you can go through and identify

20   those parts which are really yours.  It is primarily your

21   work product that is included.

22   A.    Okay.

23   Q.    Do you have a pen?

24   A.    I do, sir.

25          Would you like just a star out beside it?  Would

1    that be okay?

2    Q.    Just brackets or something just to show what is yours?

3    A.    (Witness complies.)

4          I want to be clear that this is not my words

5    verbatim.  They have been tweaked around here and there by

6    attorneys and things like that and the other investigator.

7    Q.    But that still does show --

8    A.    These are things that I have intimate knowledge of.

9    Q.    Thank you, sir.

10         Let's sort of go backwards rather than frontwards.

11   Let's go back to that low-flying aircraft.

12   A.    Yes, sir.

13   Q.    You have been a task force officer for a better part of

14   five years?

15   A.    Yes, sir.

16   Q.    You are familiar with Federal United States Grand

17   Juries?

18   A.    Yes, sir.

19   Q.    Have you ever testified in front of a Grand Jury?

20   A.    I have.

21   Q.    Are you in and out of the United States Attorney's

22   Office on a regular basis?

23   A.    I am.

24   Q.    You are aware that the United States Attorney's Office

25   is responsible for the prosecution of federal crimes that

66

1   would happen in the Tyler Division of the Eastern District of

2   Texas, the folks here, correct?

3   A.   Yes, sir.  Uh-huh.

4   Q.   You have talked about a low-flying aircraft.

5   A.   Correct.

6   Q.   Shots being fired.  Witnesses being interviewed.  To

7   your knowledge, was that case ever presented to a United

8   States Grand Jury?

9   A.   No, sir.

10   Q.   Is there a case pending at this particular time on this

11   issue?

12   A.   I wouldn't say there is a case pending before the Grand

13   Jury.  We are investigating the matter.

14   Q.   It is currently an investigation?

15   A.   Correct.

16   Q.   And when did this occur?

17   A.   Sir?

18   Q.   When did these events -- when are they supposed to have

19   occurred?

20   A.   The plane incident?

21   Q.   Yes.

22   A.   April 23rd, 2020.

23   Q.   April 23rd, 2020.  This is January of '21.  That means

24   nine months ago?

25   A.   Roughly.

1   Q.   And nothing has been done?

2   A.   That's correct.

3   Q.   Correct.

4        Let's talk about neutral and detached witnesses.

5   You talked about an assault case in Gregg County, and you

6   have got some folks saying one thing and you have got some

7   folks saying another.  But because someone else gives a

8   version that matches up with one of them, you put stock in it

9   because that person is a neutral and detached witness; is

10  that correct?

11  A.   And it matches another -- the statements of another

12  neutral and detached witness, yes, sir.

13  Q.   But you don't know whether these people are neutral and

14  detached or whether they have a bias or prejudice against my

15  client.  You don't know what their relationship is in the

16  past.  You don't have any way of saying they were neutral.

17  You simply have two witnesses or one witness who backs up one

18  side and not the other.

19  A.   I think that is fair.

20  Q.   Is that a fair statement?

21  A.   Absolutely.

22  Q.   Let's go to the long video, the one that started at .59.

23  How many times have you had the opportunity to look at

24  that?

25  A.   Unfortunately, I have watched it several times.  I don't

1   know that I have stared at it just without glancing away one

2   whole time altogether, if that makes any sense.  But we have

3   watched certainly bits and pieces a lot.

4   Q.   And what have you learned from that video concerning my

5   client other than he is in the crowd -- correct?

6   A.   Yes, sir.

7   Q.   Did you try to figure out approximately how many other

8   people were in the same crowd doing some exactly -- some of

9   the exact same things that he was doing?

10  A.   Other than just watching it and kind of just in my mind

11  making a guesstimate, no, there hasn't -- I certainly have

12  not counted, if that is what you are talking about.

13  Q.   Would you guess a hundred, 150 people?

14  A.   I think that is probably fair.

15  Q.   And is it fair to say that many of them were doing

16  almost exactly the same thing?

17  A.   At certain points of time in the video, yes, sir.

18  Q.   You would agree with that?

19  A.   I would.

20  Q.   Now, you have talked about what you could hear from the

21  bullhorn?

22  A.   Yes, sir.

23  Q.   With the exception of the bullhorn, could you hear what

24  he was saying while he was in the crowd?

25  A.   While Mr. Nichols was in the crowd, no, sir.

1   Q.   So he was there for a long period of time.  For a short

2   period of time he had a bullhorn.  You believe from another

3   video you can match up with what he is saying there.  But

4   that is the only thing that you could match up as far as what

5   he is saying?

6   A.   As far as what he is saying, yes, sir.  I think that

7   is -- other than if we are excluding what he has posted on

8   social media?

9   Q.   Yes.

10  A.   Verbally, yes, I agree.

11  Q.   And there are other people who seem to be as involved in

12  that event as he was, correct?

13  A.   At certain points in time, at certain things --

14  Q.   There are people who are actually breaching and going

15  in?

16  A.   Sure, yes, sir.

17  Q.   There are people who are going over the top?

18  A.   Yes, sir.

19  Q.   Correct?

20  A.   Correct.

21  Q.   There are people throwing things toward the inside?

22  A.   Correct.

23  Q.   And he is not doing any of those things?

24  A.   No.  And in the same way that some other people aren't

25  using -- not everybody is using pepper spray, not everybody

70

1  has got a bullhorn, so certainly --

2  Q.  We will come back to those.  I am just talking about

3  what he is not doing.

4  A.  Okay.

5  Q.  And what he is not doing is the same thing that the

6  other people are also not doing or maybe they are doing.

7          How long was he in the building?  Were you able to

8  determine that?

9  A.  My best guesstimate, Mr. Files, is a couple of minutes.

10  We have not had a chance to parse through Capitol security

11  footage to get at a good time.  That is just an off-the-cuff

12  guess at this point.

13  Q.  So, roughly, he is the building plus or minus two

14  minutes?

15  A.  Your guess is as good as mine, sir.

16  Q.  I thought a couple of minutes -- short amount of time?

17  A.  I have no reason to believe he was in there for hours or

18  anything like that, but I am not prepared to speculate --

19  Q.  You have no knowledge or belief that he has done

20  something in the inside as far as destruction of property,

21  assaultive conduct, theft, going through secure documents,

22  anything like that.  You simply know he went in, and he came

23  out.  Is that correct?

24  A.  As it pertains to Mr. Nichols, yes, sir, that's

25  correct.

1   Q.   Okay.  You mentioned that his companion in the case

2   was -- came to the window and was stirring up the crowd.  I

3   think those were your terms.  Is that correct?

4   A.   Yes, sir.

5   Q.   Okay.  And Mr. Harkrider is up there.  He says

6   something.  And you say he stirred up the crowd.

7   A.   I don't know if he said anything, but he is up there

8   and -- you know.

9   Q.   Could you tell the crowd was behaving any differently

10  after he came out and did that (waving arms) than they were

11  before?  Was there really a difference between how the crowd

12  behaved when he came out and how they were behaving before?

13  A.   I don't think so.  Not anything discernible, no.

14  Q.   So, really, it would be maybe a stretch to say he

15  stirred up the crowd?  He simply made some movements and the

16  crowd was making noise, and they continued to make noise;

17  isn't that a fact?

18  A.   I think it is a -- this conduct is great -- it is

19  certainly not, go away, this is bad.  If anything, it is,

20  this is okay, and the party is inside.  Come on in.

21  Q.   Were the decibels any greater after he did this than

22  they were before?

23  A.   Not that I -- no, not anything that I could discern,

24  no.

25  Q.   Thank you sir.

1              Let's talk about the spray.

2    A.   Okay.

3    Q.   Tell me what you observed, sir, as you watched that

4    video and as you watched it in the past, just the video

5    about -- with the spray.

6    A.   He is in the crowd.  They are close to the entrance to

7    that Capitol building with the -- you saw the wooden -- I

8    don't know what you call that, but wherever that arch is.  He

9    has got his face mask up, his boonie hat on, and the gloves.

10   The pepper spray -- or the can that I believe is the pepper

11   spray -- is being passed.  You see him motion, hey, give me,

12   here.  He takes it.  Sprays it in the direction of the

13   opening where the officers are; we know them to have been.

14   Kind of pauses and goes back and gives it another little go.

15   And then passes the canister back off.

16   Q.   And you talk about people reacting to the spray?

17   A.   Yes, sir.

18   Q.   Have you been pepper sprayed?

19   A.   Unfortunately, yes, sir.

20   Q.   And you know what it feels like?

21   A.   It is not --

22   Q.   It is not good?

23   A.   It is not.

24   Q.   And there were people there that were reacting to it?

25   A.   Yes, sir.

73

1   Q.   What is the name of the officer, if there was one, who

2   actually got sprayed?

3   A.   Fair question.  That is something we are exploring, but

4   I don't have the name of a specific officer.

5   Q.   You can't tell from that video that was played that an

6   officer was actually sprayed, can you?  From this video that

7   was played for the Court, can you tell that definitively that

8   an officer was sprayed?

9   A.   I think it is fair to say I cannot identify the name of

10  any specific officer that is sprayed.  Yeah, I think that is

11  fair.

12  Q.   And you can't tell for certain that an officer was

13  sprayed.  There was somebody sprayed.  But you can't tell

14  that there was an officer sprayed from the video that was

15  played for the Court?

16  A.   So we know that there were police there, okay, in that

17  exact space.  But, again, I cannot identify a specific

18  officer who was hit.

19  Q.   I'm not saying specific officer.  We're saying any

20  officer.  There is -- clearly, he takes it, he sprays it, he

21  takes it, he sprays it again.  But the question is, does he

22  hit an officer with the spray?  And from the video that was

23  played, I challenge you to tell me that you can tell an

24  officer was actually hit.

25  A.   I believe that officers were hit.

74

1   Q.   You believe it because you tell it from the video?

2   A.   That's correct.

3   Q.   There were other people who had shields there, weren't

4   there?

5   A.   Yes, sir.

6   Q.   So you had civilians with shields, you had officers with

7   shields, correct?

8   A.   I think that is fair, yes, sir.

9   Q.   And there was a shield there, you could see the shield;

10  but there is no officer behind the shield that you could

11  identify as being an officer, is there?

12  A.   I believe there are officers -- you could see through

13  those translucent shields.  I believe those subjects are

14  officers.

15  Q.   There are people back there; you would agree with that?

16  A.   Yes, sir, I think they are officers.

17  Q.   But your investigation has not come up with specifically

18  who the officers were or what they were doing or whether they

19  were hit?

20  A.   It is a fair question.  I cannot give you the name of

21  any specific officer who was there.  That's fair.

22  Q.   You don't have any information that would tag

23  Mr. Nichols to the possession of a firearm at any time while

24  he is there at the Capitol, do you?

25  A.   On Capitol Grounds?

1    Q.    Yes.

2    A.    No, sir.

3    Q.    Absolutely nothing?

4    A.    Not a firearm, no, sir.

5    Q.    Absolutely nothing having to do with a firearm there.

6          The question was asked about a D.C. statute and

7    would a box comply with the D.C. statute.  And simply stated,

8    I think you were candid when you said you didn't know what

9    the statute was.

10   A.    I do not.

11   Q.    If there was a box, if there was a weapon in a box.  If,

12   if, if.  You can't say that was a violation of a D.C. statute

13   or that was not a violation of a D.C. statute?

14   A.    That's correct.  I'm not comfortable speculating on

15   that.

16   Q.    Okay.  How did you get in touch with Mr. Nichols?

17   A.    Ryan?  The Defendant?

18   Q.    Yes.

19   A.    We called -- so during the day of the search warrant,

20   one of the Longview PD officers who knows Mr. Nichols somehow

21   and had reached out to him while our SWAT team was there

22   trying to execute the warrant at his house.  Nobody had come

23   to the door.

24          We were trying to get in touch with him before we

25   made entry.  The information that was related to me was that

1   Mr. Nichols had called that officer back.  That officer then

2   relayed that information to another task force officer who

3   called me and said:  Hey, Nichols called.  He wants the FBI

4   person who is responsible to call him.

5           I then called Mr. Nichols -- excuse me -- on the

6   phone number that I had for him that we had been trying to

7   call.  His wife answered the phone and then told me he was on

8   his way back to Texas.

9   Q.   So, basically, the word went out that y'all were

10  interested in him.  You have a conversation.  The wife said

11  he is on the way.  He comes in and surrenders.  Is that

12  correct?

13  A.   Yes, I did talk to him in between that time.  But,

14  yes.

15  Q.   He came in?

16  A.   That's correct.

17  Q.   Didn't hide, didn't run, didn't go away?

18  A.   No, sir, not to my knowledge.  He came right to us.  If

19  he was in Oklahoma, he made good time.

20  Q.   And it is your understanding that he was at his wife's

21  place, and you don't have any reason to doubt that is

22  correct?

23  A.   Not at this point, no, sir.

24  Q.   Did you talk to the wife up there?

25  A.   Yes, sir.

1    Q.   Wife's place.  Wife is there.  He gets the word.  He

2    comes back home.  He doesn't run away --

3    A.   Yes, sir, that's correct.

4    Q.   -- correct?

5             Nothing to show that while he was at the Capitol he

6    had on body armor?

7    A.   I'm sorry?

8    Q.   Nothing to show that while he was at the Capitol he had

9    on body armor?

10   A.   So we can see in the video he is wearing what I

11   recognize to be a plate carrier.  And I believe our

12   information from Mr. Harkrider's interview was that they each

13   had one armor plate in the front panel of those carriers;

14   that Mr. Harkrider had a plate, and Mr. Nichols had a

15   plate.

16   Q.   And that would be what you would be relying on.  But

17   there was nothing in the videos or any other information that

18   would show he had a plate?

19   A.   That's correct.

20   Q.   You talked about having empty pistol boxes.  Anything

21   unusual about having an empty pistol box?

22   A.   Other than there is a pistol that belongs to it

23   somewhere, and I don't know where it is.

24   Q.   Do you have pistol boxes at your house?

25   A.   I do, but my pistols are not too far away.

1   Q.   You normally keep your pistol in a pistol box or in a

2   holster?

3   A.   No.  I keep it in a holster, but, I mean, when I am at

4   home and my pistol box is there, they are in the attic, the

5   pistols are there in the home with --

6   Q.   Yes.

7            Are you aware of when Mr. Nichols left the Capitol

8   Grounds?

9   A.   As far as a time, no, sir, I don't.  I presume he went

10  home on January 6th at some point -- or left the grounds at

11  January 6th, but I don't have a hard time.

12  Q.   Talking about the demonstration, all the people are

13  there, he is there.  Do you have any of idea when he left?

14  Is there any way you can tell from the video, if nothing else

15  by the fact you simply can't see him anymore?

16  A.   From the longer video that we watched, and I know we cut

17  it off before the conclusion of it, they do appear to kind of

18  walk out of the frame from up near the Capitol.  My

19  understanding is, and forgive me, I am not sure if it is in

20  this video or another video, that they do walk to the edge

21  of -- it has been a long time since I have been at the

22  Capitol, but where they kind of were is an elevated position,

23  a platform -- I don't have a better term for it.  But my

24  understanding is that in another video or maybe that same

25  video that they walked to the edge towards the railing, if

1    you will, to kind of look out.

2         But, to my knowledge, that is kind of the last

3    little bit we have of them.  I don't have any information to

4    say that they went back up towards the Capitol or went inside

5    after that, beyond what you have seen here.

6    Q.   How many officers do you know that have had PTSD or that

7    have PTSD?

8    A.   You mean police officers?

9    Q.   Yes.

10   A.   I don't have a number.  But I know it is not uncommon.

11   Q.   It's not uncommon at all, is it?

12   A.   No, sir.

13   Q.   And, obviously, these people have managed to function as

14   police officers even with PTSD?

15   A.   A lot of people function with PTSD.

16   Q.   But you seem to be concerned that there might be a

17   problem on my client being released because his father said

18   he had PTSD?

19   A.   Yes, sir.

20   Q.   So if it is an officer, it is okay to have PTSD.  If it

21   is a defendant in a case, he can't have PTSD because he may

22   not show up or he might be a problem.  Is that what you are

23   saying?

24   A.   Not at all.  I think -- this was a pretty traumatic

25   incident, certainly being charged with criminal offenses,

1   potentially losing some freedom is going to trigger a

2   reaction or response from him, a stressful response.  I am

3   concerned that that response will affect him adversely.  I am

4   concerned for him, for his safety.

5   Q.   Are you aware of what he has been doing as far as a

6   nonprofit organization for years now?

7   A.   To the best -- open source research, I believe I am

8   aware of --

9   Q.   What is that?

10  A.   -- the rescue, rescue the world -- Rescue the Universe.

11  They go in after natural disasters, tornadoes, hurricanes,

12  tropical storms, fires, and try to rescue people that have

13  been stranded -- that are stranded --

14  Q.   Are in the water?

15  A.   Exactly.  Exactly.

16  Q.   They are in trouble or lost?

17  A.   Sure.

18  Q.   So you have been aware that he has been doing this for

19  some particular length of time?

20  A.   I don't know how long he has been doing it, but I am

21  aware it has been going on for a little while, yes, sir.

22  Q.   You realize that there are many, many causes of PTSD,

23  and you don't necessarily have to do something bad to have

24  PTSD; you understand that, don't you?

25  A.   Sure.

81

1   Q.   You spoke of Mr. Nichols' father, Mr. Nichols, Sr.,

2   talking to you?

3   A.   Yes, sir.

4   Q.   He interviewed you for what -- or you interviewed him

5   for 36, 38 minutes, something like that?

6   A.   Something like that.

7   Q.   Was he cooperative?

8   A.   Absolutely.

9   Q.   He is a minister; do you understand that?

10  A.   I don't know that -- he told us that, but I don't know

11  that from any other source --

12  Q.   Didn't play hide the ball with you or anything?

13  A.   Not at all.

14        MR. FILES:  Your Honor, I need just a moment to

15  flip through and see what Mr. Harry has marked here on this

16  affidavit.

17        (Pause in proceedings.)

18  BY MR. FILES:

19  Q.   What were you looking for in the search warrant that you

20  obtained?

21  A.   So for Mr. Nichols' house, in particular --

22  Q.   Yes, sir.

23  A.   -- we were looking for any items of indicia to establish

24  that he lived there.  I was looking specifically for the

25  clothing that he wore during the Capitol incident on January

82

1   6th, again, the boonie hat, the vest, the jacket -- excuse

2   me -- that green beaded necklace that you might have noticed

3   in there, the yellow gloves, crowbar, the GoPro mount and

4   GoPro camera, and then -- I'm sorry -- any electronic devices

5   which might have captured media during the time he was there,

6   any devices where he might have transferred the media he

7   captured, i.e., plugged my GoPro or cell phone into a

8   computer, the data transfer is there, those kinds of things,

9   as well as any type of paperwork receipts, boarding passes to

10  indicate travel to Washington, D.C., or places that he stayed

11  along the way, and some other things on there.  But that is

12  the meat and potatoes.

13  Q.   At simplest, anything that would tie him to being in

14  Washington, D.C., on or about January 6th of 2021?

15  A.   That's correct.

16  Q.   Pictures, or anything, without regard to what it was?

17  A.   Correct.

18        MR. FILES:  Your Honor, may I approach the witness?

19        THE COURT:  You may.

20  BY MR. FILES:

21  Q.   I hand you what is numbered as Page 11 of your

22  affidavit.

23  A.   Okay.

24  Q.   If you would, just read that to yourself, and I have a

25  question for you, sir.

1    A.    Additional video evidence shows Nichols near an entrance

2    to the U.S. Capitol -- near the U.S. Capitol building in a

3    large crowd actively forcing entry into the building, which

4    was guarded by U.S. Capitol Police.  During the video, the

5    screenshot of which is shown below, Nichols can be seen

6    taking a large red aerosol canister from another person in

7    the crowd and spraying an unknown agent believed, based on

8    its appearance, to be OC/pepper spray in the direction of the

9    entrance into the U.S. Capitol building where federal law

10   enforcement officers were engaged in the performance of

11   official duties, that is, seeking to restrain a mob of

12   individuals who were forcing entry.  Figures 8 and 9 below

13   are still shots from the OC/pepper spray video with arrows

14   indicating Nichols' clothing and suspected OC/pepper

15   canister.

16   Q.    This goes back, sir, to what we were talking about

17   earlier.  The language that you have in here:  Spraying an

18   unknown agent believed, based on its appearance, to be

19   OC/pepper spray in the direction of the entrance into the

20   U.S. Capitol building where federal law enforcement officers

21   were engaged in the performance of official duties; that is,

22   seeking to restrain the mob of individuals who were forcing

23   entry.

24          Now, what you say is, he sprayed it in the

25   direction of the Capitol building where federal law

1    enforcement officers were engaged in the performance.  You

2    don't say he sprayed at them.  You don't say he sprayed and

3    hit them.  You say that he sprayed in the direction of the

4    entrance where some officers were.

5              I am correct in my reading of this Page 11, aren't

6    I?

7    A.    That is what it says, yes, sir.

8    Q.    Thank you.

9              Let's talk about once again what isn't there.

10   A.    Okay.

11   Q.    Just coming home and watching the news, and maybe you

12   have had enough that you didn't do that, but there have been

13   hours and hours of footage of this demonstration on the 6th,

14   haven't there?

15   A.    Yes, sir.

16   Q.    And either in the performance of your duties in

17   investigating this case or simply because you were interested

18   in it, you have watched at least some of that, correct?

19   A.    Yes, sir.

20   Q.    Okay.  And there are pictures of people with various

21   items breaking out windows, going through windows; you have

22   seen that?

23   A.    Yes, sir.  It was on the video we played.

24   Q.    Breaching?

25   A.    Yes, sir.

1   Q.   And you have no reason to believe that Mr. Nichols was

2   engaged in that conduct?

3   A.   As far as to the breaking of the windows?

4   Q.   Things like that.

5   A.   I don't have any evidence --

6   Q.   Forcible breaching in order to get inside the Capitol?

7   A.   I don't have any evidence --

8   Q.   No evidence tying him to being close to the Senate

9   Chambers?

10  A.   Mr. Files, I am not familiar enough with the U.S.

11  Capitol to know where he was in the building.  Whether that

12  is close to the Senate side, the rotunda, the House side, I'm

13  not familiar enough with that to speak intelligently about

14  it.

15  Q.   And the question is, you don't have anything to tie him

16  to being at the Senate Chambers or the House Chambers?

17  A.   No, sir, not as I sit here, that's correct.

18  Q.   Thank you.

19          MR. FILES:  May I have a moment, Your Honor?

20          THE COURT:  Yes.

21          MR. FILES:  Thank you.  One moment.

22  BY MR. FILES:

23  Q.   Once again, we have nothing to tie Mr. Nichols to having

24  possession of an AR-15 at the Capitol Grounds on January 6th,

25  2020 [sic]?

1   A.   Physically possessing it on Capitol Grounds, no, sir.

2           MR. FILES:  That's all at this time.  Pass the

3   witness.

4           THE COURT:  All right.  Redirect?

5           MR. LOCKER:  Briefly, Your Honor.

6                    REDIRECT EXAMINATION

7   BY MR. LOCKER:

8   Q.   Detective Harry, is OC spray like bullets, in that it

9   hits one target in a linear path and whatever it hits, it

10  hits, and that is the end of it?

11  A.   No, not necessarily.

12  Q.   It is a liquid; is that correct?

13  A.   Correct.

14  Q.   It balances and aerosolizes.  So if you are in a

15  confined space in which OC spray is sprayed, does it matter,

16  in terms of whether or not you are affected, where you are

17  hit directly?  As in it may affect you more if you are hit

18  directly in the face, if it hit your arm, or the back of your

19  head or your chest or your leg, in that tight of a space, is

20  it still going to affect you?

21  A.   And in larger spaces, yes, and I think the video shows

22  that.

23  Q.   Mr. Files in his questioning used the term "breaching"

24  in a very technical sense.  It sounds like what he meant was

25  the act of breaking down a barrier.

1  A.   That is what I understood him to mean.

2  Q.   In the first part of the video we displayed, Mr. Nichols

3  and Mr. Harkrider are both participating as the crowd heaves

4  and hoes as they try to force in that gap of that doorway?

5  A.   That's a good point, yes.

6  Q.   Would you agree that that constitutes breaching?

7  A.   Yeah.  I just don't know whether they were successful in

8  that endeavor or not.

9  Q.   But they were at least attempting that at that point?

10  A.   Correct.

11  Q.   And in a broader context of the term "breaching" as we

12  have used in terms of breaching the Capitol, Mr. Nichols, in

13  fact, did breach the Capitol, meaning he entered the Capitol

14  building at a time when he was prohibited from doing so.  Is

15  that correct?

16  A.   Yes, they both did.

17  Q.   Do you know how Mr. Nichols knows Mr. Harkrider?

18  A.   My understanding is that they are both United States

19  Marines or former United States Marines.  I'm not sure if

20  that is how they met, as I sit here.  But I know they worked

21  together in the not-for-profit organization that we discussed

22  earlier.  I know they at least know each other in that way

23  and appear to be friends.

24          MR. LOCKER:  I'll pass the witness.

25          THE COURT:  Anything further, Mr. Files?

1           MR. FILES:  Briefly.

2                    RECROSS-EXAMINATION

3  BY MR. FILES:

4  Q.   Sir, you have been in a crowd at sometime, I assume,

5  where everybody was trying to get through the doors --

6  A.   Yes, sir.

7  Q.   -- and it was one of these if you had claustrophobia,

8  you would really be uncomfortable --

9  A.   Yes, sir.

10 Q.   -- correct?

11 A.   Yes, sir.

12 Q.   So in a crowd where people are going heave and ho, there

13 is no question but that Mr. Harkrider and Mr. Nichols were in

14 that area, correct?

15 A.   Correct.

16 Q.   But they weren't up at the place where they could

17 actually push and try to get in.  They were back in the crowd

18 someplace surrounded by human beings.

19 A.   I'm going to disagree with that.

20 Q.   You are telling me they were at the door pushing on the

21 door?

22 A.   No.

23 Q.   No.

24 A.   But that is the value in the whole crowd push.  We all

25 do it together; and by the force of 30 or 40 of us, we are

1   able to get a whole lot more momentum or energy or whatever

2   you want to -- I'm not a, you know, physicist or whatever,

3   but to push that door through.

4   Q.   And you are not telling us that they were pushing into

5   the crowd and the crowd was moving together and that they

6   were pushing people in front of them in order to try to break

7   down the door.  You are not telling us that, are you?

8   A.   It looked very organized.  Yes, I believe --

9   Q.   I didn't ask about organized.  I'm asking about

10  Mr. Nichols.  And you are not telling us that he was doing

11  that, and I am gesturing pushing my hands from rear to front

12  as though trying to force my way through?  You are

13  not telling -- that is not on the video, is it?

14  A.   I believe -- well, not necessarily fully hands extended,

15  but I certainly believe the video depicts him engaging in the

16  push with everybody else.  I do believe it depicts that.

17              MR. FILES:  Pass the witness.

18              THE COURT:  Anything further?

19              MR. LOCKER:  No, Your Honor.

20              THE COURT:  All right.  Mr. Harry, you may step

21  down.

22              THE WITNESS:  Thank you, Your Honor.

23              MR. LOCKER:  The Government rests, Your Honor.

24              THE COURT:  All right.  Mr. Files, who will be your

25  first witness?

1          MR. FILES:  May I have just a moment, Your Honor?

2          THE COURT:  Yes.

3          MR. FILES:  Your Honor, we will call Bonnie

4    Nichols.

5          THE COURT:  Ms. Nichols, come forward, please.  If

6    you will come right over here to the edge of the witness box.

7    Yeah, we are going to ask you to come around.  Thank you.  If

8    you will just stand right there and raise your right hand to

9    be sworn.

10          (Witness sworn.)

11          THE CLERK:  Thank you.  Have a seat.

12          BONNIE NICHOLS, DEFENSE WITNESS, SWORN,

13                    DIRECT EXAMINATION

14   BY MR. FILES:

15   Q.   Please state your name.

16   A.   Bonnie Nichols.

17   Q.   Ms. Nichols, how do you know Mr. Nichols, who has been

18   sitting there with me today?

19   A.   That is my husband.

20   Q.   How long have you been married?

21   A.   We have been married for seven-and-a-half years.

22   Q.   Would you keep your voice up just a little bit, please,

23   ma'am?

24   A.   Yes, sir.

25   Q.   Do you have any children?

1   A.   Yes, sir.  We have two boys, ages 6 and 4.

2   Q.   Let's talk about you just a little bit so the Court will

3   have some background when we get into the issue of

4   third-party custodian.

5            How old were you when you graduated from high

6   school?

7   A.   I was 16 years old.

8   Q.   And when you graduated, what did you do then?

9   A.   I went off to college and got a job quickly after.

10  Q.   Did you also -- or where were you in college?

11  A.   I went to San Jacinto College and U.T. Arlington in

12  Dallas.

13  Q.   How long did you continue in your studies there are U.T.

14  Arlington?

15  A.   About two years.

16  Q.   And why did you discontinue your studies?

17  A.   I met Ryan shortly after.

18  Q.   How did you meet him?

19  A.   I met him online while he was stationed in Okinawa,

20  Japan.

21  Q.   He was in the Marine Corps?

22  A.   Yes, sir.

23  Q.   And did you eventually get married?

24  A.   Yes, sir, we did.

25  Q.   Was he still in the Marine Corps when you got married?

92

1   A.   Yes, sir, he was.

2   Q.   And did you live aboard the base there at Camp

3   Pendleton?

4   A.   Yes, sir.

5   Q.   At some time he got out of the Marine Corps, and what

6   did you and he do?

7   A.   We came back to Texas to be with our family and start a

8   business shortly after, named Wholesale Universe.

9   Q.   What kind of business did you-all start?

10  A.   We have a business that we purchase generally from big

11  box retailers like Macy's, Dillard's and Bloomingdale's.  And

12  we buy wholesale pallets at deep discounted prices and sell

13  and resell and wholesale online and offline to clients.

14  Q.   Where is your business located?

15  A.   In Longview, Texas.

16  Q.   Do you have a significant inventory?

17  A.   Yes, sir, we do.

18  Q.   What about Longview -- what all do you do in Longview

19  besides just be a family and participate in that business?

20  A.   We are members of Mobberly church.

21  Q.   What church is that?

22  A.   Mobberly church is one of the biggest churches in

23  Longview, Texas.  We are active members there.

24  Q.   Do y'all go there on a regular basis?

25  A.   Yes, sir, we do.

1   Q.   Who all is employed there at the business?

2   A.   We have about 10 to 15 staff members depending on the

3   year -- or depending on the time of the year.

4   Q.   Do you work in the business yourself?

5   A.   Yes, sir.

6   Q.   Does Ryan also work in the business?

7   A.   Yes, sir, we both own the business jointly.

8   Q.   Is there another business, or nonprofit I should say, a

9   501(c)(3), that Ryan is participating in?

10  A.   Yes, sir, Rescue the Universe.

11  Q.   And what is the nature of that business?

12  A.   They provide relief efforts in search and rescue for

13  animals and humans and all life to help others.

14  Q.   What kind of search and rescue does he do?  I mean, what

15  kind of event causes him to be involved in that?

16  A.   Any natural disaster, hurricane, tornado, fire,

17  flooding.  Anything that requires health or relief support

18  around the world.

19  Q.   Hurricanes?

20  A.   Yes, sir.

21  Q.   Tornadoes?

22  A.   Yes, sir.

23  Q.   Was he doing that even before you got married?

24  A.   Yes, sir.  Since he was young.

25  Q.   Approximately, as best you can recall, how many

94

1   hurricane rescues has he participated in?

2   A.  15 or more.

3   Q.  Has he received national recognition for this?

4   A.  Yes, sir, he has.

5   Q.  What kind of recognition or publicity has he gotten for

6   this?

7   A.  He has been recognized by Ellen DeGeneres, A&E, Daily

8   Mail, ABC News, The Weather Channel, and many others.

9         MR. FILES:  Your Honor, we furnished copies of the

10   pictures we have, to the Government.  We have a total of

11   four, which we would like to show, and would offer those at

12   this time.

13         MR. LOCKER:  No objection.

14         THE COURT:  Objection?

15         Defense Exhibits 1 through 4 will be admitted.

16         You may show those, Mr. Files.

17   BY MR. FILES:

18   Q.  I show you what has been admitted as Defendant's

19   Exhibit 1.  Can you tell us what that is, what is it a

20   picture of?

21   A.  That is, I believe, in Beaumont, Texas.  I can't recall

22   the hurricane.  I don't know if it was Sally or -- it was one

23   of the really bad floodings down in Beaumont, Texas, where

24   they provided relief and rescued children and elderly out of

25   drowning waters.

1   Q.   Is there anything unusual about the boat in which they

2   are?

3   A.   That boat was donated by Ellen DeGeneres.

4   Q.   Did she give you a choice of spending money for that or

5   something else?

6   A.   Yes, sir.  She offered us a honeymoon, that we never got

7   to receive.  And instead of going to Hawaii, we decided --

8   Ryan decided to get a rescue boat to continue his rescue

9   efforts.

10  Q.   And are the people in there, other than Ryan,

11  Mr. Harkrider, are they people who were rescued?

12  A.   Yes, sir.

13  Q.   I show you what has been admitted as Defendant's

14  Exhibit 2.  I ask if you can tell us what that is?

15  A.   I believe that was a rescue in Louisiana of an elderly

16  woman that was needing rescue.  Her house was flooded, and

17  she could not -- she was disabled, and so we -- they went in

18  there and rescued her with the Cajun Navy.

19  Q.   I show you what has been admitted as Defendant's

20  Exhibit 3.  Can you tell us what that is, and who is the guy

21  in the sarong?

22  A.   That young gentleman was missing for over 24 hours, him

23  and his wife, in a lake in Louisiana.  Their boat had

24  capsized, and Ryan and Alex went out with the Cajun Navy to

25  go and rescue that man, and they found him.

96

1  Q.   I show you what has been admitted as Defendant's

2  Exhibit 4.  Can you tell us what that is?

3  A.   That is Ryan Harkrider -- I'm sorry, Ryan Nichols and

4  Alex Harkrider in search and rescue efforts rescuing humans,

5  children, animals, and all life.  I believe that was

6  Beaumont, Texas.

7  Q.   Did your husband and his colleague, do they wait for

8  everything to be over, or do they go in while things were

9  still hot and heavy?

10 A.   They go in the day before the storm hits so that they

11 can figure out where the flooding areas are and regroup and

12 game plan before the storm hits.

13 Q.   Approximately how many days a year would you suggest

14 that your husband has been involved in this kind of rescue

15 work?

16 A.   Per year, I would say 50 to 75 days a year.  Any chance

17 that they get, they go.

18 Q.   Has this effort -- has this taken a toll on your

19 husband?

20 A.   Yes, sir.

21 Q.   Do you have any concerns about his PTSD or having PTSD

22 as a result of it?

23 A.   Yes, sir, I do.

24 Q.   Is he still able to function even with that?

25 A.   Yes, sir, he is.

1  Q.   Are you aware of an incident when he was in the Marine

2  Corps which also would have caused PTSD?

3  A.   Yes, sir.

4  Q.   And would you describe that for us?

5  A.   I know that while he was stationed in Okinawa, Japan,

6  there was a man that tried to climb the fence.  I don't

7  know if -- I know that he was a threat, and Ryan was on duty

8  patrolling and making sure that the military base was secure,

9  and he almost had to shoot the man to protect the base.

10  Q.   Did that appear to impact him?

11  A.   Yes, sir, it did.

12  Q.   Now, the term "suicidal ideation" has been mentioned

13  earlier.  Do you have any concern about your husband

14  committing suicide?

15  A.   No, sir, I don't.

16  Q.   What does he live for?

17  A.   His family and to serve -- serve the community and his

18  boys.

19  Q.   Tell me about his relationship with his boys.

20  A.   He is an amazing father.  He loves his boys.  And I

21  couldn't imagine a better father for my children.

22  Q.   Now, you had mentioned Cajun Navy.  Can you tell us what

23  the Cajun Navy is?

24  A.   So I believe the Cajun Navy is a search and rescue group

25  of men and women in the Louisiana area that provide search

1   and rescue efforts to serve the community during natural

2   disasters of any shape or form.

3   Q.   And has your husband also worked with the Coast Guard?

4   A.   Yes, sir, he has.

5   Q.   During Hurricane Michael and maybe another hurricane?

6   A.   Yes, sir, helicopter rescues, Hurricane Michael.

7   Q.   Is he supposed to be recognized on yet another

8   television show later this year?

9   A.   Yes, sir, I believe in April The Weather Channel.

10  Q.   And what was that for?

11  A.   That was for one of the last hurricanes that he

12  participated in.

13  Q.   Are there any firearms at your home at this time?

14  A.   No, sir, there is not.

15  Q.   Do you do drugs?

16  A.   No, sir.

17  Q.   Do you do alcohol?

18  A.   No, sir.

19  Q.   Do you have alcohol or drugs in your possession at your

20  home?

21  A.   No, sir.

22  Q.   We have -- we are asking the Court to permit you to be

23  what is known as a third-party custodian?

24  A.   Yes, sir.

25  Q.   If the Court were to permit -- or is to permit your

1   husband to be released, one of the things that she can

2   require is that there be a human being designated as a

3   third-party custodian to see that -- to give reasonable

4   assurance that your husband would appear, as required, for

5   court?

6   A.   Yes, sir.

7   Q.   We have talked about that.

8          You understand that the Court would have certain

9   conditions, and I want to go through these with you.  Remain

10  in the custody -- in your custody.  Who agrees to assume

11  supervision and to report any violation of a release

12  condition to the Court if the designated person is able to

13  assure the judicial officer that the person will appear as

14  required and will not pose a danger to the safety of any

15  other person of the community.

16  A.   Yes, sir.

17  Q.   Let's go to the gut issue.  You are married to him?

18  A.   Yes, sir.

19  Q.   You love him?

20  A.   Yes.

21  Q.   He is the father of your children?

22  A.   Yes, sir.

23  Q.   You want him to come home?

24  A.   Yes, sir.

25  Q.   At some point in time he is going to go to court in the

100

1   District of Columbia or perhaps here in the Eastern District

2   of Texas?

3   A.   Yes, sir.

4   Q.   When he goes to court, there is always the possibility

5   that he gets convicted and sentenced to a term in the

6   penitentiary; you understand that?

7   A.   Yes, sir.

8   Q.   Now, if you were a third-party custodian, you would have

9   taken an oath to report any violation that you would observe

10  of his violating any condition of probation that the Court

11  might impose?

12  A.   Yes.

13  Q.   You love your husband?

14  A.   I do.

15  Q.   Can you tell the Court that you would really pick up the

16  phone and call her or call somebody else if you observed him

17  to do something wrong?

18  A.   You bet I would.  You have my word.  I am a woman of

19  integrity.  And I will make sure that he shows up in court on

20  time.  I will make sure he stays out of trouble.  And I will

21  put my thumb down on him because not only do my children

22  depend on him, but I depend on him.  Our business and our

23  livelihood depends on it.  So you have my word that I will

24  make sure that he shows up in court.

25  Q.   He will be required to maintain employment there at the

1  business.

2  A.    Yes, sir.

3  Q.    If he needed to, he could be required to commence an

4  educational program, but that might be unlikely.  He would be

5  required to abide by specified restrictions on personal

6  associations, places of abode, or travel.  For example, he

7  would be told probably not to leave the Eastern District of

8  Texas except to travel directly to and directly from the

9  District of Columbia for court appearances?

10  A.    Yes, sir.

11  Q.    He would be told that he could not, for example, have

12  conversations with Mr. Harkrider or be around him.  The Court

13  would set out those things that he could not do.  Be proper

14  and common for him to be ordered to report on a regular basis

15  to a pretrial services agency of the United States

16  Government.  Would you see that he would do that?

17  A.    Yes, sir, I will.

18  Q.    Comply with a curfew.  If the Court told him that he had

19  to be home at 8:00 o'clock or 7:00 o'clock or 10:00 o'clock,

20  or whatever it was, you would work to see that he was doing

21  that?

22  A.    Yes, sir, I will.

23  Q.    Refrain from possessing a firearm, destructive device,

24  or other dangerous weapon?

25  A.    Yes, sir, I will.

1  Q.   Refrain from excessive use of alcohol or any narcotic

2  drug or controlled substance --

3  A.   Yes, sir.

4  Q.   -- without a prescription from a licensed medical

5  practitioner?

6  A.   Yes, sir, I will.

7  Q.   Undergo such medical or psychological or psychiatric

8  treatment, including treatment for drug or alcohol

9  dependency, and remain in a specified institution if required

10  for that purpose?

11  A.   Yes, sir, I will.

12  Q.   Something that is not mentioned in the United States

13  Code but would be a restriction on his freedom would be for

14  him to wear a GPS device so that there would be no issue

15  about where he was at any time, perhaps at his own expense.

16       Would you agree that you would help him on that if

17  that is required?

18  A.   Absolutely, I will.

19       MR. FILES:  Defendant's Exhibit 5 would be a

20  DD-214.  We furnished the state -- or the Government.  Excuse

21  me.  We furnished the Government with a copy of it.

22       We would offer Defendant's 5 at this time.

23       THE COURT:  Any objection?

24       MR. LOCKER:  None from the Government,

25  Your Honor.

1          THE COURT:  It is admitted.

2          MR. FILES:  That is absolutely impossible to see

3    unless the Court's eyes are better than mine.  May I simply

4    publish it?

5          THE COURT:  You may.

6          MR. FILES:  Thank you.

7          Name:  Ryan Taylor Nichols.  Department, component

8    and branch:  United States Marine Corps.  Social Security

9    number omitted.  It is there, but no reason to read it into

10   the record.

11         Grade, rate, or rank:  Corporal.  Pay grade:  E4.

12   Date of birth:  ███████████████   Reserve obligation

13   termination date.  Place of entry into active duty:

14   Shreveport, Louisiana, 71118.  Home of record at time of

15   entry:  It's in Diana, Texas.

16         Last duty assignment and major command:  9th

17   Communication Battalion, Camp Pendleton.  Station where

18   separated:  Marine Corps Base, Camp Pendleton.  Primary

19   specialty:  Tactical Switching Operator, one month, five

20   days.  Construction wireman, one month, 11 days.

21         Record of service.  Date entered:  2010, 10 months,

22   18 days.  Separation date:  2014, 10 months, seven days.

23   Active service this period:  Four years.  Total active

24   service:  Four years.  Foreign service:  One month, 11 days.

25   No, excuse me.  11 months, one day -- one year, 11 months,

1    one day.

2            Sea service:  None.  Additional entry training:

3    Four months, 21 days.  Effective date of pay grade:  2012.

4    May 5th -- May 1st on that date.

5            Decorations, medals, badges, citations, campaign

6    ribbons:  Marine Corps Good Conduct Medal, Global War on

7    Terrorism Service Medal, National Defense Service Medal, Sea

8    Service Deployment Ribbon, Expert Rifle Qualification.

9            Military education:  Communications cable and

10   antenna service apprentice -- communications antenna systems

11   service.  Accrued days leave:  2.5.

12           That is really all that would be relevant.

13           May I have one moment, Your Honor?

14           THE COURT:  Yes.

15   BY MR. FILES:

16   Q.   And, in summary, if the Court permits him to be

17   released, you would assist in seeing that he complied with

18   each and every condition of release that she might impose?

19   A.   Yes, sir.  You better believe.  You have my word.

20           MR. FILES:  Pass the witness.

21           THE COURT:  Cross-examination?

22                   CROSS-EXAMINATION

23   BY MR. LOCKER:

24   Q.   Ms. Nichols, I only have a few questions for you.

25   A.   Yes, sir.

1   Q.   Are you aware of your husband's drug usage?

2   A.   I am aware.

3   Q.   What substances are you aware that your husband uses?

4   A.   Marijuana.

5   Q.   Do you have any awareness of him using Ketamine, LSD --

6   A.   No, sir, I do not.

7   Q.   -- DMT?

8        So if he is doing that, he is doing that without

9   your knowledge?

10  A.   Yes, sir.

11  Q.   And if he is discussing that with his friends, he is

12  doing that without your knowledge?

13  A.   Yes, sir.

14  Q.   So you would agree that even under this limited area we

15  have probed, the only area that we have probed so far, there

16  are areas of his life that you can't control even if it is in

17  your best interest to do so; is that correct?  I mean, you

18  would agree it is not in your best interest for your husband

19  to be a regular drug user, would you agree, particularly

20  psychodelic drugs?

21  A.   Can you repeat that question?

22  Q.   Would you agree it is not in your business's best

23  interest for your husband to be a user of psychodelic

24  drugs?

25  A.   Yes, sir, I agree with that.

106

1   Q.   So it would also be in your best interest to know about

2   that and control it and attempt to prevent it, and yet you

3   have been unable to; is that fair?

4   A.   I believe that now I am aware and I can control it and I

5   will.

6   Q.   Does your husband own an AR-15?

7   A.   Yes, sir, he does.

8   Q.   Why was it not at your house when the search warrant was

9   executed?

10  A.   Because it was with him.

11  Q.   In Oklahoma?

12  A.   Yes, sir.

13  Q.   You took it with you to Oklahoma; is that correct?

14  A.   Yes, sir.

15  Q.   Did your husband know he was likely to be arrested?

16  A.   I do not know that.

17  Q.   Did you have discussions with your husband about his

18  concerns about law enforcement contact in the future after

19  his involvement on the 6th?

20  A.   We did have conversations about that, yes, sir.

21  Q.   Were you aware that he had removed the clothing from

22  your home that he had worn to the Capitol on the 6th?

23  A.   No, sir.

24  Q.   The boonie hat, the armor plate carrier, the GoPro

25  videos.  Did you see your husband spending a lot of time on

1    the computer?

2    A.    No, sir.

3    Q.    So you don't know what happened to any of those

4    devices?

5    A.    We turned the GoPro in to the attorney.

6    Q.    You would agree that the person in those images is your

7    husband, right?  We are not disputing --

8    A.    Yes, sir, they are.

9    Q.    And so you would agree that, naturally, law enforcement

10   should have expected to find those clothing items in your

11   home when they executed the search warrant; is that

12   correct?

13   A.    Yes, sir.

14   Q.    And yet they didn't?

15   A.    That's correct.

16   Q.    And so this is now a second area that, despite your

17   conscientious observance of your husband, you are unaware

18   that he has removed evidence from your home, and he has taken

19   efforts to evade detection of his conduct.  Would you agree

20   with that?

21   A.    I don't agree with that.  I feel that they haven't --

22   they may not have been found at the home.  But, I mean, I am

23   open to figuring out where they are and finding them.  I

24   mean, absolutely.  Whatever we can do to cooperate, we

25   will.

1   Q.   Does your husband have a second home?

2   A.   No, sir.

3   Q.   So all of his clothing and personal effects should

4   generally be found in his home or in his vehicle; is that

5   fair?

6   A.   I would say most of everything should be at the home.

7   Q.   So if the officers, like you said, if they just expected

8   to find those items and they didn't is because he probably

9   consciously made an effort to make sure they were not found

10  at the time the search warrant was executed?

11  A.   I don't know.  I don't know.  I am not -- I wasn't

12  there.  I didn't have the articles of clothing.  I don't know

13  how to answer that question.

14          MR. LOCKER:  I will pass the witness.

15          THE COURT:  Any redirect, Mr. Files?

16          MR. FILES:  May I have just a moment?

17          THE COURT:  Yes.

18                  REDIRECT EXAMINATION

19  BY MR. FILES:

20  Q.   In its simplest, has your husband ever done some

21  psychodelic drug at the house?

22  A.   Not that I know of.

23  Q.   Never -- would he do it around the children?

24  A.   No, sir, absolutely not.

25  Q.   Are you aware of any drug use on his part other than

1  marijuana?

2  A.   Other than marijuana, that's it.

3  Q.   And when has he been interested in using marijuana?

4  A.   Only when he is stressed and uses it for anxiety to help

5  him sleep and to calm himself.

6  Q.   After coming back from a mission?

7  A.   Yes, sir.

8        MR. FILES:  Pass the witness.

9        THE COURT:  Any recross?

10       MR. LOCKER:  No, Your Honor.

11       THE COURT:  All right.  Ms. Nichols, thank

12  you.  You may step down.

13       THE WITNESS:  Thank you, Your Honor.

14       THE COURT:  Mr. Files?

15       MR. FILES:  We pass the witness.  May I have just a

16  moment?

17       THE COURT:  You may.

18       MR. FILES:  We rest.

19       THE COURT:  You rest.

20       All right.  Anything further?

21       MR. LOCKER:  No, Your Honor, Government closes.

22       MR. FILES:  We close.

23       THE COURT:  All right.  Then at this time I will --

24  the Government can argue its motion.

25       MR. FILES:  Oh, I apologize.  I had one other

110

1   thing.  Excuse me.

2         THE COURT:  Okay.

3         MR. FILES:  I had furnished the Government with it,

4   and we just didn't get there.  I apologize, Your Honor.  I

5   know better than that.

6         THE COURT:  That's all right, Mr. Files.

7         MR. FILES:  Under the provisions of Title 18,

8   Section 3142(f), we have a proffer.  We have furnished the

9   state -- the Government -- I keep saying state -- the

10   Government with a copy of the proffer, and it would be

11   difficult, so may I read it?

12         THE COURT:  You may.

13         MR. FILES:  Thank you.

14         To the Honorable Judge Mitchell.  I went to

15   Washington, D.C., because I believed that is what the

16   President asked us to do.

17         On January 6th, I was at the Capitol for

18   approximately 45 minutes to an hour.  I did not go into the

19   House or Senate Chambers.  I did not steal anything.  I did

20   not damage anything or take anything as a souvenir.  I left

21   when the President posted on Twitter and Facebook for

22   everyone to leave.  So I did.

23         I know that I am going to have to go to court in

24   Washington, D.C.  I am sincerely asking that I be released on

25   bail and be permitted to travel to Washington, D.C., with my

1  wife, Bonnie, and legal team, including Buck Files and

2  associates.

3          As a Marine, I never failed to be where I was told

4  or ordered to be.  The moment that I discovered that I was in

5  trouble, I drove four-plus hours to turn myself in.

6          I promise that I will be in court whenever and

7  wherever I am told, so help me God.  My intention in life has

8  always been to do the right thing even when it felt

9  uncomfortable, such as now.  And I will do what is required

10 by the Court.

11         Signed, Ryan Taylor Nichols, Sr.

12         Now we rest.  Close.

13         THE COURT:  Mr. Locker, I gave Mr. Files an

14 opportunity to reopen briefly.  Do you have any rebuttal

15 evidence to that evidence?

16         MR. LOCKER:  No, Your Honor.

17         THE COURT:  Okay.  All right.  You may argue your

18 motion.

19         MR. LOCKER:  This is not a peaceful protest.  If

20 you have a weapon, you need to get your weapon.  By his own

21 words and actions, Mr. Nichols was not a peaceful protestor.

22 A peaceful protestor does not storm the Capitol attached with

23 gear, carrying a crowbar, and heave-ho with the crowd and

24 push into the doors of the Capitol and use a bullhorn to whip

25 the crowd into a frenzy and encourage them to commit acts of

1   violence or request other rioters to hand them a canister of

2   OC spray and then use it to assault Capitol Police

3   Officers.

4           Nichols did not get swept up in the moment,

5   Your Honor.  He and Mr. Harkrider made specific preparations

6   for a violent confrontation.  He researched weapon laws in

7   D.C.  He assembled a weapon box for the trip.  He discussed

8   D.C. being a war zone and preparing for battle, with

9   Mr. Harkrider.  He acquired body armor en route.

10          He engaged in a verbal confrontation with D.C. law

11  enforcement the night before.  And he brought a crowbar to

12  the protests.

13          He is also a drug user of both marijuana and

14  psychodelic drugs, who has already acquired the means to

15  assist him with avoiding detection.

16          He has violent tendencies.  He shoots at low-flying

17  planes.  He travels to the airport with a rifle to resolve a

18  problem that should be handled by law enforcement and the

19  FAA.

20          He is a source of fear for his neighbors.

21          He assaults construction workers and lies about it

22  to police.

23          He is known as a hothead to his business neighbors.

24          And he verbally assails and intimates threats to

25  D.C. law enforcement the night of January 5th.

1    He has called into question his mental stability,

2    including statements from his father that he suffers from

3    PTSD and that he has expressed, to his father at least,

4    suicidal ideation.

5    Regarding weapons, we know he is armed, but his

6    AR-15 was not present at his home before it was searched.  We

7    also know he is engaged in obstructive conduct.  He removes

8    evidence, clothing, weapons, a camera -- subject to

9    correction, may not be the same camera -- and body armor.

10    He also instructed Mr. Harkrider to destroy

11    evidence.  He changed his appearance in preparation for

12    arrest.  And he sanitized his social media.

13    And, finally, he has no ties to the District of

14    Columbia except for criminal contact -- conduct.

15    And if there is still doubt as to whether or not

16    Mr. Nichols plans to comply with the law, we should listen to

17    his own words:  We will not bend.  We will not break.  We

18    will never give in.  We will never give up.  We will never

19    surrender.  Headed home to better reorganize.  The fight for

20    our country has just begun.

21    Every insurrectionist thinks he is a patriot.

22    Every revolutionary things he is justified.  As Marines, both

23    men took an oath to defend the Constitution, but instead they

24    helped lead an assault on the nation it governs.

25    As grand as our Government buildings are and as

1    eloquent as our founding documents, our nation is much

2    greater than buildings or documents or flags or individual

3    leaders.  Our nation's bedrock is the mutual assent to a

4    guiding body of principles, that being individual liberty,

5    individual responsibility, the rule of law, and

6    accountability.

7            By violently storming the Capitol, these men

8    assaulted those principles.  They significantly contributed

9    to what could be an existential threat to the continuation of

10   our Republic.  Many Americans are now wondering whether a

11   nation can hold fast, can remain bound together, amidst the

12   current climate of which this riot is the low point.

13           Whether it is an existential threat or one we will

14   overcome largely depends upon how we respond to the crimes

15   committed on January 6th.  There is a legitimate question as

16   to whether or not the inconsistent and often tepid response

17   to this past summer's riots sewed the seeds for January 6th.

18           We cannot answer that question today, but what we

19   can know is our response now will be watched by those

20   considering the next chapter in our nation's unfolding crisis

21   of divisiveness.  We will not deter the next cycle if we wink

22   at these crimes or coddle those that commit them.

23           Detention strongly sends the -- signals the

24   seriousness of which we view these crimes.

25           The vast majority of Americans present that day at

115

```
1  │ the Capitol committed no crimes.  Some committed only
2  │ misdemeanors.  But those who stormed the Capitol with weapons
3  │ encouraging others to commit acts of violence committed or
4  │ contributed to the acts of violence themselves, bragged about
5  │ doing so on social media and then sought to destroy evidence
6  │ of their conduct prior to arrest, most certainly are among
7  │ those that should be detained.
8  │          THE COURT:  Thank you.
9  │          Response?
10 │          MR. FILES:  May it please the Court.
11 │          So we have a criminal complaint that has conspiracy
12 │ and unlawful entry with dangerous weapon, violent entry and
13 │ disorderly conduct, civil disorder, assault on a federal
14 │ officer using a deadly or dangerous weapon and aiding and
15 │ abetting.
16 │          The Court should obviously find whether or not
17 │ there is probable cause to believe the -- that there is
18 │ evidence as to these offenses.  And we have seen video.  And
19 │ the Court, I am sure, has seen video outside this courtroom
20 │ of what happens at the Capitol.
21 │          I would respectfully suggest that the Government is
22 │ lacking on evidence that there was an intentional assault on
23 │ a federal officer using a pepper spray, using a deadly
24 │ weapon.
25 │          And if I can find Mr. Harry's exact words, I will
```

1    parrot them back for the Court.

2              I don't have it marked.  I have to go through it.

3              MR. LOCKER:  Page 11.

4              MR. FILES:  It is page 11.  Thank you.

5              The Government's words.  This is what they say

6    happened.  This is what they have to show the Court probable

7    cause to believe this happened.  They do not say that my

8    client assaulted an officer by the use of pepper spray.  They

9    say that, based on the appearance of what appeared to be OC

10   pepper spray, that in the direction of the entrance to the

11   U.S. Capitol building where federal law enforcement officers

12   were engaged in the performance of their official duties that

13   he had sprayed an unknown agent.  Not at the officers, not

14   hitting the officers, but in the direction of the entrance

15   where they were.

16             I would respectfully suggest that you can look at

17   that video 7,000 times and not be able to ascertain that

18   there was an officer who was hit by pepper spray.  And that

19   is clearly the most significant issue here.  Did he have

20   pepper spray?  Sure he had pepper spray.  Did he spray with

21   pepper spray?  Of course, he did.

22             Did he spray it with the intent to hit an officer?

23   Did he hit an officer?  Did he use it to harm an officer?  He

24   fired in the direction or sprayed in the direction of the

25   entrance where officers were.

1     I would respectfully suggest that the Government

2  has certainly not, on that, met its burden.

3     Without a question of whether the Government has in

4  that or in the other charges, Mr. Nichols is going to be

5  required to answer charges in the United States District

6  Court for the District of Columbia.  The question is, does

7  the Court detain him, or does the Court release him?

8     Probation officers have recommended release.

9     You have heard our suggestion for a third-party

10  custodian.

11     Mr. Nichols has not been a lifetaker; he has been a

12  lifesaver.  How unique is it for an individual to have been

13  on as many as 15 hurricanes at his own expense, 501(c)(3), to

14  try to help people and save lives.  And we gave you just a

15  taste, a smattering of his success in doing that.

16     Ellen DeGeneres gives him a boat instead of paying

17  for a honeymoon, and he takes it and uses it.

18     When his wife was on the witness stand and I asked

19  her about whether or not she would actually be a third-party

20  custodian or whether she might just not -- she might just let

21  it go, what was her body language?  How did she appear?  Did

22  she appear to be a truthteller?  I would respectfully suggest

23  that she came across as being an absolute truthteller using a

24  thumb, putting her thumb; he would be under her thumb.  I

25  have no doubt that what she was saying was from her heart and

118

1   from her head.

2           Use of drugs.  Has her husband ever used a

3   psychodelic?  I don't know.  She has never been around him

4   when he has.  One of the things that the Court would be

5   telling her is you have to make certain that he only uses

6   prescription medication and only in accordance with the

7   dosage that the doctor prescribes.  Not psychodelic drugs,

8   not marijuana, not anything else.  He has to do these and no

9   others.

10          These conditions are conditions that are imposed

11  day after day after day in United States courts.  And people

12  carry them out and people function as third-party custodians

13  and there is no reason to believe that this case would be

14  different.

15          Obviously, there is not evidence before the Court,

16  but it is I think common knowledge for any of us who were

17  following it, the guy that sits in Pelosi's chair is out.  He

18  is not detained.  The one who steals Pelosi's laptop is out.

19  She was not detained.

20          I can't give statistics on how many people are out

21  and how many people are in.  But we don't look at the case

22  and say everybody who participates ought to be there.  The

23  Court has seen the pictures of the people trying to break in

24  the Senate Chambers and the House Chambers and breaking into

25  the Capitol, knocking the windows out, using shields.  We do

1   not have that in this case.

2          We respectfully suggest that we have given the

3   Court every reason in the world to release our client on

4   reasonable conditions; and that if we looked for a hundred

5   years, we could not find a better third-party custodian than

6   the lady whom we have suggested to you, the Defendant's wife.

7          THE COURT:  Thank you, Mr. Files.

8          As it is the Government's motion, any final word?

9          MR. LOCKER:  Just briefly, Your Honor.  The

10  affidavit is only a small portion of what the Court has --

11  the Government has asked the Court to consider regarding

12  evidence for the elements.  It is also supplemented by the

13  testimony of Detective Harry and the exhibits presented today

14  in court.  There is more than ample evidence for the Court to

15  find that there is probable cause for all of the elements for

16  all of all of the offenses.

17         In addition to that, I need to correct a

18  misstatement by Mr. Files.  The individual who -- from the

19  Western District of Arkansas, who has appeared with his feet

20  on Ms. Pelosi's seat -- whose feet was on Ms. Pelosi's desk,

21  he is, in fact, detained.

22         Although the judge for the Western District of

23  Arkansas ordered his release, the Government immediately

24  appealed that, and that was granted.  He is in custody en

25  route to Washington D.C.  And I cannot speak for what has

120

1   been done across the rest of the country, but I can tell you

2   with certainty within this district, 100 percent of the

3   individuals who have been charged with felonies for their

4   involvement on January 6th have been detained, and none of

5   them, none of them, other than Mr. Nichols or Mr. Harkrider,

6   carried weapons into the Capitol.

7           THE COURT:  Thank you.

8           All right.

9           MR. FILES:  I apologize if I have misled the Court.

10  My understanding was that the order of release had been

11  given.  We were unaware of the appeal.

12          THE COURT:  Thank you, Mr. Files.

13          I appreciate the testimony and the evidence

14  provided today from both sides and both attorneys' arguments.

15          In light of the testimony, I do find that there is

16  probable cause to believe that an offense has been committed

17  and that Nichols has committed it.

18          In addition, based on what I have heard today

19  concerning the nature of the charged offense, I do not

20  believe that there are conditions that could reasonably

21  assure the safety of the community or Mr. Nichols'

22  appearance.

23          Pretrial Services does recommend release.  However,

24  the testimony I have heard today paints a picture not of a

25  peaceful protest that got out of hand, but of a planned and

1    predetermined, premeditated attempt to attack the Capitol.

2           The text messages lay out a plan to drive to D.C.

3    with weapons and to acquire body armor on the way.  I saw

4    evidence of threats and antagonizing language toward the

5    crowd.  And over and over again evidence shows intent that

6    this was not to be a peaceful act.

7           I am concerned about evidence of other acts in the

8    past, as well as substance use.

9           And for these reasons, Mr. Nichols will be detained

10   pending trial.

11          I will enter an order detaining the Defendant.

12          Is there anything further from the Government?

13          MR. LOCKER:  No, Your Honor.

14          THE COURT:  Anything further from the Defendant?

15          MR. FILES:  No, Your Honor.

16          THE COURT:  All right.  We are going to be

17   adjourned on this case.

18          We will take a brief recess to reset for

19   Mr. Harkrider.

20          COURT SECURITY OFFICER:  All rise.

21          (Hearing adjourned.)

22

23

24

25

122

1               CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8    /s/ Shea Sloan              February 5, 2021
     SHEA SLOAN, CSR, RPR
9    Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25