<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                           TYLER DIVISION

 3
    UNITED STATES OF AMERICA       )
 4                                 )   DOCKET NO. 6:21mj29
          -vs-                     )
 5                                 )   Tyler, Texas
                                   )   1:35 - 4:47 p.m.
 6  RYAN TAYLOR NICHOLS            )   January 22, 2021

 7
          TRANSCRIPT OF IDENTITY HEARING, PRELIMINARY HEARING, AND
 8                           DETENTION HEARING
            BEFORE THE HONORABLE K. NICOLE MITCHELL,
 9                 UNITED STATES MAGISTRATE JUDGE

10
                         A P P E A R A N C E S
11

12  FOR THE GOVERNMENT:

13  MR. RYAN LOCKER
    ASSISTANT U.S. ATTORNEY
14  110 North College, Suite 700
    Tyler, Texas 75702
15

16  FOR THE DEFENDANT:

17  MR. F. R. BUCK FILES, JR.
    BAIN FILES JARRETT & BAIN PC
18  109 West Ferguson
    Tyler, Texas 75702
19

20  COURT REPORTER:          MS. SHEA SLOAN
                             FEDERAL OFFICIAL COURT REPORTER
21                           211 W. Ferguson
                             Tyler, Texas 75702
22                           shea_sloan@txed.uscourts.gov

23  Proceedings taken by Machine Stenotype; transcript was
    produced by computer-aided transcription.
24

25
</pre>

```
 1                         INDEX

 2  WITNESS                                    PAGE

 3
    GREGORY HARRY
 4

 5  DIRECT EXAMINATION:  BY MR. LOCKER            5

 6  VOIR DIRE EXAMINATION:  BY MR. FILES         28

 7  DIRECT EXAMINATION (CONT.):  BY MR. LOCKER   31

 8  VOIR DIRE EXAMINATION:  BY MR. FILES         32

 9  DIRECT EXAMINATION (CONT.):  BY MR. LOCKER   33

10  VOIR DIRE EXAMINATION:  BY MR. FILES         37

11  DIRECT EXAMINATION (CONT.):  BY MR. LOCKER   39

12  CROSS-EXAMINATION:  BY MR. FILES             63

13  REDIRECT EXAMINATION:  BY MR. LOCKER         86

14  RECROSS-EXAMINATION:  BY MR. FILES           88

15
    BONNIE NICHOLS
16

17  DIRECT EXAMINATION:  BY MR. FILES            90

18  CROSS-EXAMINATION:  BY MR. LOCKER           104

19  REDIRECT EXAMINATION:  BY MR. FILES         108

20                       *******

21  ARGUMENT BY MR. LOCKER                      111

22  ARGUMENT BY MR. FILES                       115

23  ARGUMENT BY MR. LOCKER                      119

24  COURT'S FINDINGS                            120

25  CERTIFICATE                                 122
```

```
 1                    EXHIBIT INDEX

 2
    GOVERNMENT'S        DESCRIPTION              ADMITTED
 3

 4       1              Video Clip                 25

 5       2              Video Clip                 26

 6       3              Photo Image                33

 7       4              Video File                 34

 8       5              Video File                 43

 9       6              Photo Image                44

10       7              Photo Image                45

11       8              Photo Image                61

12

13

14
    DEFENDANT'S
15

16       1              Photo Image                94

17       2              Photo Image                94

18       3              Photo Image                94

19       4              Photo Image                94

20       5              Copy of DD-214            103

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Good afternoon.  Please be seated.

3              Ms. Hardwick, if you will call the case, please.

4              THE CLERK:  Yes, Your Honor.

5              The Court calls Criminal Action 6:21mj29, United

6    States of America vs. Ryan Taylor Nichols.

7              THE COURT:  Announcements?

8              MR. LOCKER:  Ryan Locker on behalf of the

9    Government, Your Honor.  Ready to proceed.

10             MR. FILES:  Buck Files and J. Brett Harrison on

11   behalf of Mr. Nichols.  We are ready, Your Honor.

12             THE COURT:  All right.  Mr. Nichols, we are here

13   today for an identity hearing, a preliminary hearing, and a

14   detention hearing.  The reason we are having the hearing --

15   there are three reasons.

16             One, I want to determine whether you are the same

17   person named in the complaint.

18             Two, I want to determine whether there is probable

19   cause to believe that an offense has been committed and that

20   you are the person who committed it.

21             And, three, I want to determine whether you will be

22   released on bond or detained pending the trial.

23             All right.  Mr. Locker, does the Government have

24   any witnesses?

25             MR. LOCKER:  Yes, Your Honor.

1          THE COURT:  How many?

2          MR. LOCKER:  Yes, Your Honor.  I have one witness

3   to present.  In addition to that witness, my understanding

4   from conversations prior to this hearing with Mr. Files is

5   they are waiving identity and stipulating that this is the

6   same Ryan Nichols that is charged in the complaint.

7          THE COURT:  Is that correct, Mr. Files?

8          MR. FILES:  Your Honor, we have had the opportunity

9   to review a lot of video in the matter and also other

10  material, and there is no issue as to identity.  So we do not

11  raise an issue as to identity.

12         THE COURT:  All right.

13         All right.  Mr. Locker, you may call your first

14  witness.

15         MR. LOCKER:  Thank you, Your Honor.  Government

16  calls Greg Harry.

17         THE CLERK:  Please raise your right hand.

18         (Witness sworn.)

19      GREGORY HARRY, GOVERNMENT'S WITNESS, SWORN

20                   DIRECT EXAMINATION

21  BY MR. LOCKER:

22  Q.   Can you state your name for the record, please?

23  A.   My name is Gregory Harry.

24  Q.   How are you employed?

25  A.   I am currently employed by the Tyler Police Department

1   as a detective.  I am also assigned to the FBI office here in

2   Tyler as a task force officer.

3   Q.   All right.  How long have you been a peace officer?

4   A.   I have been a peace officer since I was hired with the

5   Tyler Police Department in August of 2010.

6   Q.   And how long have you worked with the FBI as a TFO?

7   A.   I have been assigned to the FBI office since roughly the

8   later part of 2015.

9   Q.   Can you tell the Court your involvement, how you became

10  involved in the investigation of conduct by Ryan Taylor

11  Nichols and Alex Kirk Harkrider?

12  A.   As part of my duties at the FBI, as I mentioned a task

13  force officer, I am currently assigned to the joint terrorism

14  task force.  In response to the events that happened on

15  January 6th of 2021 in the United States Capitol, the FBI

16  obviously took the lead in that investigation as to -- many

17  offices were conducted there.

18         But the FBI office here in Tyler received leads

19  from our Washington Field Office to follow up on tips that

20  they received as far as people who were involved in

21  that -- the incidents at the Capitol on January 6th.

22  Q.   Are you aware of an affidavit that has been filed in the

23  District of Columbia related to these events?

24  A.   Yes, sir, I am.

25  Q.   And did you contribute to its authorship?

1   A.   Yes, sir, I did.

2   Q.   And did you provide a large substance of the

3   investigation that led to its signing by a judge in the

4   District of Columbia?

5   A.   That's correct, I did.

6   Q.   Now, the dates that this was signed was subsequent to

7   your involvement in some other warrants; that there may have

8   been some additional details that were added after you last

9   worked on this affidavit.  But, nonetheless, you are familiar

10  with the contents of this affidavit.  Is that correct?

11  A.   Yes, I am.

12  Q.   Having spent a significant amount of time investigating

13  both Mr. Nichols and Mr. Harkrider and their conduct

14  preceding January 6th, on January 6th, and subsequent to

15  that, have you had the chance to review information,

16  including text messages and videos, other information posted

17  on social media, that were provided by others for the purpose

18  of alerting law enforcement to the conduct of certain

19  individuals?

20  A.   That's correct, I have.

21  Q.   And can you sort of give the Court some context as to

22  how the FBI has been processing such a large volume of cases

23  and leads that have been provided, given that there were

24  thousands upon thousands of people at the U.S. Capitol on

25  January 6th -- and, obviously, the FBI does not have cases on

1   all of them -- how did the FBI come to investigate certain

2   individuals versus others?

3   A.   We have a fairly extensive triage process, obviously

4   voluminous data.  As the tips come in, we try to parse --

5   well, they try to parse the information that comes in the

6   tip.

7        For instance, in this instance, we were alerted to

8   Mr. Harkrider and Mr. Nichols.  The information that was

9   received in almost all of those tips was the location of

10  pretty much where their Facebook said that they currently

11  lived, i.e., Ryan Nichols residing in Longview, Texas; Alex

12  Harkrider residing in Converse or Carthage, Texas.

13       Then our field office -- or, I'm sorry, WFO, our

14  Washington Field Office, takes that information, tries to

15  parse from it what they can, and then they push those leads

16  out to the respective office where they think the

17  investigation needs to take place.  In this case, Longview

18  and Carthage both being in the Dallas Division in the Tyler

19  resident agency, they came to our office and were

20  subsequently assigned to me.

21  Q.   So once you received this lead from the Washington Field

22  Office, what steps did you take to investigate that lead?

23  A.   So there were several leads.  Obviously, the first thing

24  that most of the leads called attention to was, again, their

25  Facebook.  They gave us several Facebook pages.

1      One was facebook.com/theryannichols, and the other

2    one was facebook.com/alex.harkrider, I believe.  So we went

3    to those pages, and see if we can identify these subjects.

4    When confirmed that they are, in fact, in our area of

5    responsibility and, if they are, then take logical steps from

6    that point forward to see what we can determine, if there is

7    any evidence out there.

8      In this case, we did and were able to compare the

9    images that we saw on Facebook and that was associated with

10   their Facebook pages, other details including where they work

11   and produce where they work, and compare that, marry that

12   with the information we were able to uncover about the

13   subjects here.

14      So we do research on Ryan Nichols residing in

15   Longview, Texas.  That search reveals the Defendant.  What do

16   we know about that Defendant?  He works at this place.  Okay.

17   That's what it says there.  We obviously compare the driver's

18   license image, as well as the images that are present on the

19   Facebook page.  Do those people match up?  And, in this case,

20   obviously, they did.

21      And let me pause here for a second there.  Although

22   the Defendant has stipulated to his identity for this

23   hearing, did determining his identity from state

24   identification and from social media play a role in your

25   ability to analyze additional evidence that was provided to

1  you?

2  A.   Yes.

3  Q.   And can you elaborate as to -- why was that important,

4  why was it so important for you to become very familiar with

5  these Defendants' faces in order to analyze the large volume

6  of evidence that was presented to you?

7  A.   It was helpful -- I mean, their clothing, the things

8  they wore, they commonly wore on their faces, appear in a lot

9  of video.  The only really good way to distinguish them from

10 other people present in the videos is because -- there are a

11 lot of people that were present during the incident.

12 Q.   What is doxing, and how did it play a role in the

13 discovery of evidence in this case?

14 A.   So doxing, kind of simply, is basically where people

15 take steps to out or publicly -- or publicly kind of -- I

16 don't know if "shame" is the right word, but they want to

17 call attention to a subject that they usually have a problem

18 with.

19       In this case, a lot of the people who -- well, some

20 of the people who provided information to the FBI obviously

21 had a lot of problems with the actions that were taking

22 place, I believe.  And, as a part of that, they do whatever

23 research they can do, and then try to -- let's say

24 somebody -- let's say that they work -- they show that they

25 work at the Subway in Tyler, Texas, on their Facebook, as an

1  example.

2         What people will do is they will repeatedly email,

3  call the owners of that Subway in Tyler, Texas, and say, hey,

4  you have this person who works with you.  They are a racist,

5  as an example.  They are a, you know, a terrorist, as an

6  example.  They hate this or that.  And they try to have some

7  adverse reaction happen to that person based on the

8  information, the doxing.

9  Q.   And, just to be clear, that level of doxing played no --

10  no influence on your investigation of Mr. Nichols or

11  Mr. Harkrider; it was more of the gorilla journalism style

12  video capturing and publishing that was relevant here.  Can

13  you describe that for the Court?

14  A.   Correct.  So, again, what people were doing trying to

15  identify -- to really help us in the end, people who were

16  present at the Washington -- or excuse me, at the Capitol.

17  So you really had, as you pointed out, a ton of people who

18  are doing investigative work for us.

19         People -- obviously, I didn't know -- I don't know

20  the Defendants prior to this incident, but there are people

21  who do.  And they did that background research and say, hey,

22  I know these people.  And they push it to the FBI in hopes of

23  aiding our investigation to both identify them and

24  investigate them.  And we used a lot of the information that

25  we received.

1   Q.   And the information that you did not use in furtherance

2   of this investigation you determined to be not credible?  I

3   guess what I am asking is, you didn't just take everything at

4   face value as truthful; you sought to corroborate that

5   information and only use it if it was corroborated.  Is that

6   correct?

7   A.   Correct.

8   Q.   So once you had viewed the Defendants' conduct, what

9   steps were taken to move forward the investigation and the

10  prosecution of the case?

11  A.   So one of the first things we did was -- as I mentioned

12  before, we went to their Facebook pages because that is where

13  we were directed at first.  We noticed that those pages

14  appeared to be sanitized.  And what I mean by that is, that

15  the images that were purported to us that there are pictures

16  and video of the subjects engaging in criminal activity at

17  the U.S. Capitol, we did not see those, which either meant

18  that they were deleted or were hidden from us because we are

19  not friends, privacy setting, or something else was going on.

20          However, just doing open source searching through

21  Facebook, typing in the Defendants' names through Google

22  search bars, on Twitter, revealed a ton of information of

23  people who had captured images, screenshots, if you will, of

24  the Defendants' social media pages as those things were

25  posted live.

1              In some instances you have screen capture that
2  shows the date and time and whose Facebook page, et cetera.
3  In other instances they just simply saved the image and
4  tagged the Defendants in it.  And in a lot of cases tagged
5  @FBI on Twitter.  That should, in theory, link to the FBI's
6  Twitter page and provide that information to us.
7  Q.   I would like to go to the different charges that
8  Mr. Nichols is charged in -- charged with in the complaint,
9  in order that we might have a background and a backdrop of
10  the elements that we are required to show here during this
11  hearing.
12              So Count 1 of the complaint alleges that the
13  Defendant on or about January 6th of this year, committed a
14  violation of Title 18, United States Code, Section 1752(a)
15  and 1752(b)(1)(A), that being conspiracy and unlawful entry
16  into the Capitol -- or on Capitol Grounds with a dangerous
17  weapon.
18              And, Investigator Harry, was the U.S. Capitol
19  restricted grounds at the time that the conduct that you
20  viewed involving Mr. Nichols occurred?
21  A.   Yes.
22  Q.   And also Mr. Harkrider?
23  A.   Yes, that's correct.
24  Q.   And was there a lawful function of the United States
25  Government ongoing inside the Capitol at the time of these

14

1    events?

2    A.   That's correct.

3    Q.   What was that event?

4    A.   The -- they were doing the certification of the election

5    results for President and Vice President of the United

6    States.

7    Q.   And had the building -- access to the building been

8    restricted for that purpose?

9    A.   Yes, that's my understanding.

10   Q.   And then Count 2 charges the Defendant with a violation

11   of Title 40, United States Code, Section 5104(e)(2) and

12   (e)(4) -- (2)(D) and (G), that being violent entry and

13   disorderly conduct on Capitol Grounds.

14          And that specifically charges that the Defendant

15   willfully and knowingly uttered a loud, threatening, or

16   abusive language or engaged in disorderly or disruptive

17   conduct at any place on any of the grounds or in any of the

18   Capitol buildings, with the intent to impede, disrupt, or

19   disturb the orderly conduct of a session of Congress.

20          Was Congress in session at that time?

21   A.   Yes, sir, it was.

22   Q.   Did the activities of the Defendants contribute to the

23   disturbance of orderly conduct of that session?

24   A.   Yes, sir.  The information that I had was that they had

25   to actually suspend their session and evacuate the

1    building.

2    Q.    Count 3 charges the Defendant with a violation of

3    Title 18, United States Code, Section 231(a)(3), that being

4    civil disorder.  That requires that -- or that is a violation

5    of a person who attempts to obstruct, impede, or interfere

6    with a law enforcement officer carrying out his or her

7    official duties incident and during a civil disorder, and the

8    civil disorder in any way either adversely affects commerce

9    or the performance of a federally protected function.

10           So let's go to that first element.  So did

11   Mr. Nichols impede or interfere with law enforcement officers

12   carrying out their official duties?

13   A.    Yes.

14   Q.    And we are going to provide additional evidence of that;

15   is that correct?

16   A.    That's correct.

17   Q.    And those officers, were they Capitol Police Officers,

18   and were they discharging their official duties of protecting

19   the Capitol?

20   A.    Yes.

21   Q.    And was there an ongoing civil disorder?

22   A.    Yes.

23   Q.    And regardless of whether or not it affected commerce,

24   it did affect the performance of a federally protected

25   function; is that correct?

1    A.    That's my understanding.

2    Q.    That was the session of Congress that was affected?

3    A.    Correct, to certify the election results.

4    Q.    Count 4 charged the Defendant with violation of Title

5    18, United States Code, Section 111(a) and (b), that being

6    assault on a federal officer using a deadly or dangerous

7    weapon.

8           And it is a violation for someone who forcibly

9    assaults, resists, opposes, impedes, intimidates, or

10   interferes with any person designated in the federal codes

11   while engaged in or on account of the performance of their

12   official duties.

13          And so similar to above, the individuals that we

14   are going to see Mr. Nichols engaged with, they were in

15   performance of their official duties protecting the Capitol;

16   is that correct?

17   A.    That's correct.

18   Q.    And that is enhanced on account of the use of a deadly

19   or dangerous weapon.  Is OC spray, what is commonly known as

20   OC spray, is that a dangerous weapon?

21   A.    Correct, it is.

22   Q.    And then Count 5 charges aiding and abetting, that being

23   whoever aids, abets, counsels, commands, induces, or procures

24   the commission of a federal offense is punishable as a

25   principal.

1          And so when we talk about some of this conduct, it

2   is not only Mr. Nichols' own conduct, but his aid of others,

3   including his co-Defendant in this case Mr. Harkrider; is

4   that correct?

5   A.   That's correct.

6   Q.   So once you were aware of the conduct that appeared to

7   be observed by Mr. Nichols and Mr. Harkrider together at the

8   Capitol Grounds, what other types of steps did you take

9   besides looking at public social media to further investigate

10  the case?

11  A.   We tried to interview anybody that we could.  In the

12  matter of time, I also prepared a search warrant for their

13  residences.

14  Q.   And that search warrant was signed by a judge here in

15  the Eastern District of Texas on Friday of last week, a week

16  ago today.  Is that correct?

17  A.   That's correct.

18  Q.   And then the complaint for their arrest was signed that

19  Sunday, and then you executed both the search warrant and the

20  arrest warrant on Monday morning; is that correct?

21  A.   That's correct.

22  Q.   And were search warrants executed simultaneously at both

23  Mr. Nichols' and Harkrider's homes?

24  A.   As near as they could be, yes, sir.

25  Q.   Was Mr. Harkrider present at his home?

```
1    A.    He was.

2    Q.    Was he taken into custody without incident?

3    A.    He was.

4    Q.    Was Mr. Nichols present in his home?

5    A.    No, he was not.

6    Q.    Did you learn where he was at the time?

7    A.    Yes, sir, we did.

8    Q.    Where did you learn that he was?

9    A.    The information that he gave me over the phone was that

10   he was in Ada, Oklahoma, or had been in Ada, Oklahoma.

11   Q.    And were you able to reach him by telephone?

12   A.    I was.

13   Q.    And did you tell him that you had an arrest warrant and

14   you would like for him to turn himself in based on the arrest

15   warrant?

16   A.    I did.

17   Q.    Did he comply with that?

18   A.    He did.

19   Q.    Did you seize evidence from the homes of Mr. Nichols and

20   Mr. Harkrider that is relevant to the Court's consideration

21   today?

22   A.    Yes, sir, we did.

23   Q.    Can you tell the Court -- I want to go through some of

24   this chronologically now in terms of how the evidence

25   presented itself in terms of when the evidence was created.
```

1    So, eventually, did you receive consent from

2  Mr. Harkrider to seize and search his phone?

3  A.   We were able to seize his phone from the search warrant.

4  We did receive his consent to search that device pursuant to

5  his arrest.

6  Q.   And based on the search of that phone pursuant to

7  consent, did you discover communications between Mr. Nichols

8  and Mr. Harkrider that preceded January 6th that is relevant

9  to the consideration here?

10 A.   That's correct, we did.

11 Q.   So let's start by walking through some text messages

12 that occurred starting on December 31st of last year.

13      Was there a relevant message sent from Mr. Nichols

14 to Mr. Harkrider on that date?

15 A.   Yes, sir, there was.

16 Q.   Could you describe it to the Court, please?

17 A.   Mr. Nichols sent a picture of body armor with a price to

18 his co-Defendant, Mr. Harkrider, with a mention that it

19 protects against 5.56 and 7.62 rounds.  Those are bullets.

20 Q.   And 5.56 and 7.62 rounds, are those the two most common

21 rounds used by law enforcement and military?  For rifles, not

22 for handguns?

23 A.   I would agree with that.

24 Q.   At least in America?

25 A.   I would agree with that.

1   Q.   And then on the next day, on January 1st, New Year's

2   Day, was there a text message from Mr. Nichols -- or a series

3   of three text messages from Mr. Nichols that are relevant to

4   our consideration here?

5   A.   Yes, that's correct.

6   Q.   Can you describe the first one for the Court?

7   A.   The first one that we have that is relevant is a comment

8   from Mr. Nichols to Mr. Harkrider that says, quote:  We are

9   going to need first aid kits and tourniquets.

10          The second quote:  I need to speak with you in

11  person.  And then it continues:  Everything is okay.  We just

12  need a game plan, laugh out loud, LOL.

13          The third is:  We have to speak in person.  LOL.

14  What I am about to relay can't be done over the phone.

15  Q.   And then the next day, on January 2nd of 2021, did

16  Mr. Nichols engage in a conversation with co-Defendant

17  Harkrider related to the use of psychodelic drugs?

18  A.   Yes.

19  Q.   Can you describe that for the Court, please?

20  A.   The exchange, and I want to be clear about this for the

21  Court, it is not message for message.  We are kind of pulling

22  what is related here.

23          So Mr. Nichols says:  Bro, watch Soul.  OMFG.

24          Which stands for Oh My ... God.

25          Harkrider responds:  I think I saw something about

1   that.  Animated movie?

2           Nichols responds:  Yes, the best movie I ever saw.

3           The next message, Harkrider's response:  I will

4   give it a go.

5           Nichols then sends:  You won't regret it.

6   Everything I have seen in Ketamine, mushrooms, and DMT is

7   confirmed in that Pixar movie, and they made it for kids, but

8   it is as much of an adult show as I have ever seen.

9   Q.   And do you know Ketamine, mushrooms, and DMT to be

10  hallucinogenic drugs?

11  A.   Yes, I do.

12  Q.   And those are scheduled; they are not over the counter

13  available legally.  Is that correct?

14  A.   That's correct.

15  Q.   The next day, on January 3rd, does this conversation

16  continue between Mr. Nichols and Mr. Harkrider -- continue

17  related to their trip to D.C. and also involving the use of

18  drugs, or appears to?

19  A.   Yes, it does.

20  Q.   Can you describe that conversation to the Court?

21  A.   Mr. Nichols sends a text that says:  I have got goodies

22  for the trip.

23           He follows up with:  Goodies that you have --

24           I'm sorry.

25           Goodies that you have requested before but never

22

1    got.

2            Harkrider responds and he sends a GIF, that's a

3    graphic information file, kind of one of those things that

4    moves, and it says -- in the image, it says:  Take acid and

5    see reality.  And it kind of has like a pulsing waving sound.

6            He then sends a -- I'm sorry, Harkrider sends

7    another message:  Could it be?!  Ha.  Ha.

8            Nichols responds:  Still some other stuff we have

9    to talk about before we leave.

10           I'm sorry, do you want me to keep --

11   Q.   Yes.  Please.

12   A.   I'm sorry.

13   Q.   At this point the conversation turns away from drug

14   usage and more to general preparation; is that correct?

15   A.   Correct.

16   Q.   So continue.

17   A.   So Mr. Nichols says:  Still some other stuff we have to

18   talk about before we leave.  The line in the sand.  Dad and I

19   are building a gun container in the truck today.  Just know

20   that I have intel that Washington will be a war zone.  Big

21   possibility that actual battle goes down.

22           Harkrider's response:  I am looking forward to it.

23           Mr. Nichols:  I know how to get guns legally into

24   D.C. now.  It is called transporting.

25           He puts quotations around transporting.

1              Harkrider's response:  I will bring every

2    freedom --

3              Excuse me.

4              I will bring every freedom blaster that I own.

5              Excuse me.

6              I will bring every freedom blaster I own then.

7              Harkrider then sends another message:  We are

8    stopping in Kentucky on the way for those plate carriers,

9    too, right?

10              And then Nichols responds there -- another message:

11    Do you have any 10-round mags for an AR?

12    Q.   From context, what does he mean by 10-round mags for an

13    AR?

14    A.   So, I guess, did an open source search -- or researched

15    the District of Columbia, my understanding is that there was

16    a law on the books that limits the magazine capacity for D.C.

17    as 10 rounds.

18    Q.   And AR, is that AR-15 or what's -- that's a civilian

19    version of a military assault weapon, correct?

20    A.   That's my understanding.

21    Q.   So, in addition to these text messages that you viewed

22    from Mr. Harkrider's phone, are we aware of other media that

23    provides context as to what Mr. Nichols and Mr. Harkrider did

24    preceding the events of January 6th?

25    A.   Yes.

1  Q.   And so we have already talked about the text message

2  about body armor.  And whether or not that happened or not,

3  at least it was discussed that they intended to pick up body

4  armor en route to D.C.; is that correct?

5  A.   That's correct.

6  Q.   And then the night before January 6th, that being the

7  evening of January 5th, have we recovered some videos where

8  the videos have been provided to us either from the Defense

9  or from doxers, members of the public who provided this via

10  the Internet, that depicts the Defendant, and Mr. Harkrider

11  at least in one of them, the night before the 6th; is that

12  correct?

13  A.   That's correct.

14        MR. LOCKER:  At this time, Your Honor, I would like

15  to display video for the Court.

16        THE COURT:  Are you offering it as an exhibit?

17        MR. LOCKER:  I am, Your Honor.  And I will submit

18  all of these in digital format after we are over.  These have

19  been provided to the Defendants via our online discovery

20  portal.

21        THE COURT:  So would this be Government's Exhibit

22  No. 1?

23        MR. LOCKER:  Government's Exhibit No. 1,

24  Your Honor.

25        THE COURT:  Mr. Files, do you have any objection to

1    that video?

2             MR. FILES:  No objection to that video for this

3    hearing only.

4             THE COURT:  All right.   It will be admitted.

5             Proceed, Mr. Locker.

6             (Video played.)

7             (Video paused.)

8    BY MR. LOCKER:

9    Q.   I'm going to pause it here.

10            Investigator Harry, can you describe for the Court

11   what we see mounted to Mr. Nichols' chest?

12   A.   It appears to me to be a GoPro camera on a chest

13   mount.

14   Q.   And that's one of these action cameras that is rugged

15   and can be doused in water and that sort of thing, used in

16   extreme sports, that sort of thing?

17   A.   That's correct.

18   Q.   Were they a common feature of the events of January 5th

19   and 6th in Washington, D.C.?

20   A.   GoPros, as well as other media recording types.  As you

21   see in the video, there are cameras everywhere.

22   Q.   In fact, in the video we are going to watch in a moment,

23   hundreds of people have them?

24   A.   Indeed.

25   Q.   And it is, in fact, those people posting those videos

1  online that provided a lot of the information that the FBI

2  has used to analyze the situation; is that correct?

3  A.   That's correct.

4         MR. LOCKER:  And so I would like to show one more

5  video from January 5th, Your Honor.  And this was provided to

6  me by Mr. Files today.

7         MR. FILES:  If it please the Court, may I put this

8  in context?

9         THE COURT:  You may.

10        MR. FILES:  We came upon these videos; and in

11 reviewing them, it appeared that we would be required under

12 the Texas Disciplinary Rules of Professional Conduct to turn

13 them over to the Government.  It is not something we would

14 normally have done in any other case.  But in the scope of

15 the investigation and what the Government was seeking and in

16 the context of the case that is before the Court, it appeared

17 that we had no duty other than to turn them over.

18        THE COURT:  Do you have any objection to their

19 admissibility for this hearing, Mr. Files?

20        MR. FILES:  I would love to have an objection, but

21 I don't.

22        THE COURT:  Okay.  We will identify this as

23 Government's Exhibit No. 2?

24        MR. LOCKER:  Yes, Your Honor.

25        THE COURT:  It is admitted.

1   BY MR. LOCKER:

2   Q.   Before I display that, to put this in context, in the

3   last video that we saw, that GoPro that was mounted to the

4   Defendant's chest, was it -- did it have a red blinking light

5   on it?

6   A.   It did.

7   Q.   What does that indicate to you?

8   A.   That it is recording.

9   Q.   Are you familiar with these devices enough to know that

10  they have an indicator so that the user can tell whether or

11  not it is operating specifically in record mode?

12  A.   That's correct, and that is its purpose.

13  Q.   And that is the red blinking light?

14  A.   Yes.

15          (Video played.)

16          (Video stopped.)

17  BY MR. LOCKER:

18  Q.   So, Investigator, we displayed that one because it shows

19  Mr. Nichols the night before.  He appears to be wearing the

20  same clothing that he is wearing in the prior video that is

21  provided from other sources where he appears to be yelling at

22  law enforcement.  Is that correct?

23  A.   That's correct.

24  Q.   So he is wearing the same clothes, and that video

25  features Mr. Harkrider as well; is that right?

1    A.    That's correct.

2    Q.    Mr. Files provided four files to us; is that correct?

3    A.    That's my understanding, yes, sir.

4    Q.    Did any of the files that we see overlap with times that

5    we reasonably deduce Mr. Nichols' GoPro camera to be

6    recording because he appears on other people's footage with a

7    red blinking light on his chest?

8    A.    The videos that we received did not appear to depict

9    what we should have been seeing if those were GoPro videos.

10   It was understanding that they were GoPro videos that were

11   provided to us.  Then, if that is the case, then the video

12   from that -- what we saw them yelling, that should have been

13   there, and it was not.

14   Q.    So we still have not seen, other than the four files

15   provided to us by the Defense, we don't know where those

16   files are, whether or not they have been destroyed or deleted

17   or for other purposes?

18           MR. FILES:  May I have the witness on voir dire for

19   the purpose of a possible objection?

20           THE COURT:  You may.  Proceed, Mr. Files.

21           MR. FILES:  May I come to the podium?

22           THE COURT:  Yes, proceed.

23                        VOIR DIRE EXAMINATION

24   BY MR. FILES:

25   Q.    Detective Harry, if I understood your answer correctly,

1   the device, the recording device, the visual audio recording

2   device has a red light on it that shows that it is working?

3   A.   Yes, sir.

4   Q.   Correct?

5   A.   Recording.

6   Q.   Recording?

7   A.   Yes, sir.

8   Q.   And on the video that was just played, you had seen the

9   red light; is that correct?

10   A.   Yes, sir.

11   Q.   Now, on the videos that you are looking at of our client

12   at the Capitol, and you talked about the video there, the

13   other video is not his, the other videos?

14   A.   Okay.

15   Q.   Could you tell from the camera whether it was

16   recording?

17   A.   I'm sorry.  You are saying from the next day when he is

18   at the Capitol?

19   Q.   On January 6th, could you tell whether the camera that

20   was being used -- that he had around his neck -- excuse me --

21   the camera that he had around his neck, could you see a red

22   light on that?

23   A.   I don't believe he was wearing the GoPro camera on

24   January 6th.

25   Q.   So there is no reason to believe that he has hidden,

1  secreted, or done something with videos that he would have

2  taken on January 6th?

3  A.   I have no reason to believe he has any videos from

4  January 6th at this point.

5            THE COURT:  Let me -- I have some clarification.

6  Are we talking about the first video, Government's Exhibit

7  No. 1, taken from someone else and in that video was the red

8  light blinking on Mr. Nichols' camera --

9            THE WITNESS:  And that's on January 5th, yes,

10  ma'am.

11           MR. FILES:  We agree with that.

12           THE COURT:  Okay.

13           MR. FILES:  It appeared from Counsel's question

14  that he was suggesting that there were other pictures that

15  Mr. Nichols would have had that were hidden, secreted, done

16  away with, and not furnished to the Government as we were

17  required to on the first part.  But we clarified that there

18  was no such indication from the witness's earlier

19  testimony.

20           THE COURT:  I believe the point the Government is

21  making is that they do not have a copy of that video.  We see

22  the video from the vantage of someone else.  We don't see the

23  video from Mr. Nichols, but it appears that the video camera

24  was recording.

25           MR. FILES:  Your Honor --

1          THE COURT:  Are you saying that is not consistent

2     with the testimony I have heard?

3          MR. FILES:  No, Your Honor.  He just said that he

4     had no reason to believe it was recording on January 6th.

5          THE COURT:  Y'all are talking about different

6     dates, right?  I am just trying to clarify so we are all

7     talking about the same thing.

8          MR. FILES:  January 5th, recording; January 6th,

9     not recording.

10          THE COURT:  Okay.

11          MR. FILES:  With that clarification, we have no

12     objection.

13          THE COURT:  Thank you, Mr. Files.

14          MR. FILES:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Locker, you may

16     proceed.

17          MR. LOCKER:  Thank you, Your Honor.

18                    DIRECT EXAMINATION CONTINUED

19     BY MR. LOCKER:

20     Q.   In addition to the two videos we just saw, we have an

21     image of the Defendants, what appears to be taken at their

22     hotel prior to them traveling to Capitol Grounds?

23     A.   We believe -- I believe it to be an image taken prior to

24     them going, yes.

25     Q.   Does that become significant because it aids in

1    identifying them amongst a scrum of thousands of people?

2    A.    Yes.

3                MR. LOCKER:  At this time I'd like to display

4    Government's Exhibit No. 3 as an image, Your Honor.

5                THE COURT:  Any objection, Mr. Files?

6                MR. FILES:  May I have the witness again on voir

7    dire?

8                THE COURT:  You may.

9                      VOIR DIRE EXAMINATION

10   BY MR. FILES:

11   Q.    In fairness, I think you have already answered my

12   question on what you just said.  You don't know when the

13   video was taken, so you don't know whether it was before the

14   6th or after the 6th?

15   A.    What video are you referring to?

16   Q.    What the Government is just proffering.

17   A.    The video that we were talking about before where the

18   video is blinking on his chest, the camera is blinking on his

19   chest --

20   Q.    No.  He just asked you about a video that he wants to

21   offer.  And the question was, was it taken -- was it made

22   before -- at the hotel before the 6th before he would have

23   been at the Capitol, or was it made at a later time?

24                And the question is, do you know whether it was

25   made before Mr. Nichols went to the Capitol or after he went

1    to the Capitol?

2    A.    That's correct, no, I do not know.

3    Q.    You do not know then.  Thank you.

4          MR. FILES:  Then I have no objection.

5          MR. LOCKER:  Just to clarify, we are talking about

6    a still image here, not a video?

7          THE WITNESS:  Still image, correct.

8          THE COURT:  No objection to Government's Exhibit

9    No. 3.  It is admitted.

10         MR. FILES:  And, Your Honor, I said "video,"

11   meaning still.

12                    DIRECT EXAMINATION CONTINUED

13   BY MR. LOCKER:

14   Q.    So, in fairness, we don't know exactly when this was

15   taken, but we do know we see these Defendants wearing this

16   same attire on Capitol Grounds?

17   A.    Correct.

18   Q.    On January 6th?

19   A.    Correct.

20   Q.    From where was this image recovered?

21   A.    My recollection of this image, I want to say this one

22   was one of the ones that was provided to us that we recovered

23   from an NGR file.  Everything that we have is from social

24   media; Facebook, YouTube, Instagram, Twitter, to my

25   knowledge.  I believe this was recovered by someone else from

34

1    his Facebook.

2    Q.   When we say "his," we mean Mr. Nichols' Facebook?

3    A.   His, is my understanding, I believe.

4              MR. LOCKER:  Now, having contextualized in helping

5    us identify the Defendants from these images, I would like to

6    offer and admit and display Government's Exhibit No. 4, which

7    is -- this is a lengthy video; it is by far the most lengthy

8    exhibit Your Honor has -- I would like to play approximately

9    24 minutes of a video from outside the Capitol.

10             THE COURT:  Any objection, Mr. Files?

11             MR. FILES:  For a detention hearing, we have no

12   valid objection we could make.

13             THE COURT:  All right.  It will be admitted.

14             You may proceed, Mr. Locker.

15             MR. LOCKER:  Your Honor, I intend to admit and

16   provide the entirety of the file to the Court and admit it

17   for these purposes; however, for display purposes, I'm going

18   to begin at approximately the 59-minute mark.

19             THE COURT:  Thank you.

20             MR. FILES:  We have been provided with that,

21   Your Honor, and have had a chance to review it.

22             THE COURT:  Thank you.

23             (Video played.)

24             (Video paused.)

25   BY MR. LOCKER:

1    Q.   Detective Harry, who do we see in the middle of the

2    image?

3    A.   Mr. Harkrider and Mr. Nichols.

4              (Video played.)

5              (Video paused.)

6    BY MR. LOCKER:

7    Q.   Mr. Harkrider's blue and gray hat is quite apparent,

8    along with his brown jacket and his hair sticking out the

9    back of his hat; but Mr. Nichols' appearance is partially

10   hidden -- or mostly hidden by the flag we are seeing here; is

11   that correct?

12   A.   Yeah.  He is wearing the camo boonie hat.  It is

13   obstructed by the flag mostly, in this still that you have it

14   stopped at right now.

15             (Video played.)

16             (Video paused.)

17   BY MR. LOCKER:

18   Q.   What did we see in Mr. Harkrider's right hand?

19   A.   The bullhorn.

20   Q.   I'm sorry.  Let me replay that.  I believe that was the

21   OC canister.

22             (Video replayed.)

23             (Video paused.)

24   A.   I'm sorry.  Yes.  You said Mr. Harkrider.  I was looking

25   at Mr. Nichols.  Yes, the OC canister.

36

1          (Video played.)

2          (Video paused.)

3  BY MR. LOCKER:

4  Q.   Is that Mr. Nichols in the foreground there of this

5  image, lower right corner?

6  A.   Lower right, yes, in that camo boonie hat.

7          (Video played.)

8          (Video paused.)

9  BY MR. LOCKER:

10 Q.   Is this Mr. Nichols we see here with the megaphone?

11 A.   Yes, sir.

12 Q.   And Mr. Harkrider standing right next to him?

13 A.   That's correct.

14         (Video played.)

15         (Video paused.)

16 BY MR. LOCKER:

17 Q.   Is this Mr. Harkrider here whipping up the crowd and

18 also making a throat-slash motion to the crowd?

19 A.   Certainly riling up the crowd.

20         (Video played.)

21         (Video paused.)

22 BY MR. LOCKER:

23 Q.   We have seen Mr. Nichols emerging from the building --

24 the Capitol at this point?

25 A.   That's correct.  You see the second half of him coming

1  out.  We have another video that it shows him completely

2  emerging from that window.

3                (Video played.)

4                (Video paused.)

5  BY MR. LOCKER:

6  Q.   And it appears here he is helping Mr. Harkrider out of

7  that window he just emerged from; is that correct?

8  A.   That's correct.

9                (Video played.)

10                (Video stopped.)

11  BY MR. LOCKER:

12  Q.   During the time that Mr. Nichols is in possession of

13  that bullhorn, at least from context and listening to what

14  you can -- the video covers while it is still on him with the

15  bullhorn and listening to this over and over again, have you

16  been able to identify certain things that it appears

17  Mr. Nichols yelled to the crowd through the bullhorn?

18  A.   Correct.  There is at least two videos of -- that

19  capture him on the bullhorn.  We have put together what we

20  think -- we believe him to be saying.

21                MR. FILES:  May I have the witness on voir dire for

22  the purposes of possible objections?

23                THE COURT:  You may.

24                     VOIR DIRE EXAMINATION

25  BY MR. FILES:

1   Q.   If I understood the context of the question, and I may

2   be in error, I thought what he was asking had to do with this

3   particular video, and you are listening to this particular --

4   the audio on this particular video in an attempt to identify

5   Mr. Nichols' voice.  Could you identify his voice from this

6   video and the audio?

7   A.   We know it is his voice from what we can hear in this

8   video, which marries up with another video that we have that

9   is closer to him, to Mr. Nichols.  And so between those two,

10  we are sure that the audio that we are hearing, which is a

11  more complete version of what he is saying, is the same -- it

12  is same voice from the other video.  So that's how I know it

13  is Mr. Nichols.  Does that make sense?

14  Q.   What could you hear him say on this video?

15  A.   Would you like for me to answer?

16  Q.   Yes, sir.

17  A.   Okay.  So we hear:  Get in the building.  Get in there.

18  This is the second revolution right here, folks.  If you have

19  a weapon, you need to get your weapon.

20  Q.   Okay.  You can clearly hear that on this video?

21  A.   When we, yes, wear headphones, we can hear that audio;

22  and we know it is his voice because we can match it with the

23  other video.

24          MR. FILES:  Okay.  No objection.

25          THE COURT:  Proceed, Mr. Locker.

```
 1                    DIRECT EXAMINATION CONTINUED

 2   BY MR. LOCKER:

 3   Q.   Detective Harry, we selected this video in particular

 4   because it covers images of the crowd and provides a time

 5   context for the conduct that we are looking at; is that

 6   correct?

 7   A.   Correct.

 8   Q.   Is this by any means the only video that you looked at

 9   of this conduct?

10   A.   It is not.

11   Q.   And when taken in combination with other videos that you

12   have viewed from these same events, are you able to identify

13   those same statements that you just told to Mr. Files and

14   also some additional ones that are relevant here?

15   A.   Yes, this is our -- yes.

16   Q.   Okay.  So let's start with the beginning and go in

17   sequence, because there is a series of approximately eight to

18   10 statements that we have been able to identify that is

19   coming specifically from Mr. Nichols while he had the

20   bullhorn.

21   A.   So he begins:  Give me one second, please.  I will give

22   you all of the info you need.  Get in the building.  This is

23   your country.  They have already taken it away.  What are you

24   going to do, stand there?  Get in there.  This is the second

25   revolution right here, folks.  We are not going to let them
```

1  take it away.  This is not a peaceful protest.  What they are

2  doing is anarchist.  If you have a weapon, you need to get

3  your weapon.

4          He repeats that several times, the "get your

5  weapon" part.

6          MR. LOCKER:  At this point I would like to play

7  another video.

8  BY MR. LOCKER:

9  Q.   Detective Harry, is there a separate video from

10  approximately the same time period, but not exactly what we

11  just saw, that specifically shows Mr. Nichols beckoning an OC

12  cannister, receiving it from another rioter, and then

13  spraying it into Capitol Police?

14  A.   Yes.

15  Q.   And, although the snippet that we are going to see is

16  one narrower angle than what we just saw, taken in

17  conjunction with what we just saw, is there any doubt, first

18  of all, what it is he is using and, second of all, who he is

19  firing at?

20  A.   I believe it to be OC based on the reaction of the crowd

21  and the look of the bottle.  You can't -- obviously, you

22  can't definitively say, but taken in context, that is what I

23  believe it to be.  You can actually see a number on the

24  canister at one point in the video.

25          I believe it is actually a law enforcement canister

1   that they got ahold of.  In the longer video here -- in this

2   video from this angle, you actually see people's responses

3   when that can is sprayed.  They are covering their faces.

4   You saw people rinsing their eyes out with water.

5            In my training and experience, that is a reaction

6   from OC or some sort of bear spray type of chemical agent.

7   Q.   Now, OC is a -- that is an acronym that stands for

8   essentially what we know as pepper spray?

9   A.   Correct.

10  Q.   And law enforcement uses it as a riot control aid?

11  A.   Correct.

12  Q.   The canister that we see Mr. Harkrider having held over

13  his head in this video we just watched and the video we are

14  about to watch appears to be the same type, same make and

15  model; is that correct?

16  A.   It appears to be, yes.

17  Q.   And we can't say for certain it is the exact same

18  canister, but it appears to be the same make and model.  Is

19  that correct?

20  A.   I am not comfortable saying it is the exact same

21  canister.

22  Q.   In the video that we are about to watch, the canister

23  that Mr. Nichols handles appears to have the number 72

24  written on it; is that correct?

25  A.   Correct.

42

1    Q.   Is that indicative to you of something?

2    A.   In my mind, when I think of a situation and how our law

3    enforcement would respond, I imagine there is probably an

4    armory or some sort of a room with a whole bunch of these

5    canisters all numbered.  Officer Harry, you are issued

6    canister 72.

7              In my mind, that is what I believe this to be, and

8    that is what I believe that number references.  I don't

9    see -- I could be wrong.  I have never seen anything like

10   that for sale on the kind of public market, Amazon, something

11   like that.  You certainly couldn't get that from Walmart.  I

12   don't see any reason know why that would be numbered like

13   that.

14   Q.   For any other reason?

15   A.   For any other reason.

16   Q.   And, by way of contrast, there are members of the crowd

17   who do have commercially available OC pepper spray and mace,

18   that type of spray, that they are spraying in the situation;

19   is that correct?

20   A.   Yes.  Much smaller canisters with a kind of a top handle

21   you see.  One that comes to mind is you see silver a lot, and

22   that is something that you see more commercially.

23   Q.   At this time I would like to display Government's

24   Exhibit 5, I believe we are at right now?

25              THE COURT:  Any objection?

43

1           MR. FILES:  For the detention hearing only, no

2    objection.

3           THE COURT:  All right.  It will be admitted.

4           You may show it, Mr. Locker.

5           (Video played.)

6           (Video stopped.)

7    BY MR. LOCKER:

8    Q.   Now, Detective Harry, even in this video, you can see

9    what is called overspray or backspray in the response to that

10   overspray and backspray from some of the members of the crowd

11   that were in that stream.  It appears that the canister runs

12   out.  It goes from shooting a long stream to sort of a puff

13   of mist.  And that affects the individuals who were around.

14   They start wiping their eyes.  Is that accurate?

15   A.   They are not happy.

16          MR. LOCKER:  At this time, Your Honor, I ask the

17   Court to the take judicial notice of the complaint affidavit

18   in its entirety.

19          MR. FILES:  No objection, Your Honor.

20          THE COURT:  The Court will take judicial notice of

21   the affidavit.

22   BY MR. LOCKER:

23   Q.   Detective Harry, were there social media posts that

24   Mr. Nichols appears to have put up on the Internet

25   contemporaneous with these events?

44

1   A.   Yes, that's correct.

2            MR. LOCKER:  At this time, Your Honor, I would like

3   to display the first of those, Government's 6.

4            THE COURT:  Any objection to Government's 6?

5            MR. FILES:  Not for the purposes of this hearing.

6            THE COURT:  It will be admitted.

7            You may show it.

8   BY MR. LOCKER:

9   Q.   Detective Harry, can you describe this to the Court?

10  A.   This is an image that was provided to us from a witness.

11  In my recollection, it was that she captured this image on

12  January 6th as she had been watching Mr. Nichols' Facebook

13  page during the day.

14            She described it to me, and what it appears to me

15  to be is Mr. Nichols tried to make a live stream or post a

16  video with the caption -- as you can see it there in the

17  middle of the screen:  Are patriots calling for violence?

18  Why won't you hear?  We have to talk.

19            Then the screenshot is, of course, that; and then

20  what I presume is a notice from Facebook saying:  Sorry.

21  Something went wrong.  There was a problem posting your

22  status.

23            What it appears is, if you look just a little bit

24  above that, is the caption:  We have removed something that

25  you have posted.  Which I believe is Facebook taking that

1  off.

2          He kept the screenshot of this and then posted the

3  screenshot of attempting to post that image, if that makes

4  any sense, with the caption:  Facebook won't let my truth be

5  spoken.  Come join patriots in D.C. and fight for your

6  country.

7          MR. LOCKER:  I would like to display the next post.

8  It will be Government's 7.

9          Mr. Files, any objection?

10          MR. FILES:  Not for this hearing.

11          THE COURT:  All right.  It will be admitted.

12  BY MR. LOCKER:

13  Q.   What is displayed here, Detective Harry?

14  A.   So this again is another screen capture from that same

15  witness that provided this image to us.  The caption there

16  from Mr. Nichols' Facebook page:  We witnessed death today,

17  and we are about to make them pay.  The only enemy is our

18  elected officials.  It is time to make them pay.

19          And then the link to the news article there that he

20  is sharing appears to be the female subject that -- I'm

21  sorry, I can't remember her name -- that was killed inside

22  the Capitol.

23  Q.   What information do you have about Mr. Nichols

24  possessing weapons, firearms that he may have taken to D.C.?

25  A.   We know from the images -- or from the videos, in

1    particular, that you see there that he had at least a crowbar

2    with him.  You can actually see him holding that at several

3    points in time.

4            We also have text messages, that we read earlier,

5    that describe at least an intent to take firearms to D.C.

6    with him.

7    Q.   And since Mr. Nichols is charged as an aider and abetter

8    along with his co-Defendant Mr. Harkrider, do we know that

9    Mr. Harkrider indeed carried a weapon into the Capitol?

10   A.   We do.

11   Q.   What kind of weapon was that?

12   A.   It was a tomahawk.

13   Q.   In the text messages that Mr. Nichols and Mr. Harkrider

14   exchanged prior to their trip to Washington, what was the

15   reference regarding transporting firearms?

16   A.   I'm sorry?  That he knew how to get firearms into D.C.;

17   is that what you are referring to?

18   Q.   Yes.  And also didn't they discuss construction of a

19   container to transport those firearms?

20   A.   Yes.  I think we went over this earlier.  Mr. Nichols

21   mentioned that he and his father were building a gun

22   container and the truck today -- I know there was -- there

23   was a message:  I know how to get guns legally into D.C. now.

24   It is called transporting.

25           And then the reference to the 10 round AR mags.

1   Q.   Are you familiar with some laws that pertain
2   specifically to firearms in D.C. that require them to be in a
3   container separate from the passenger compartment?
4   A.   I am not familiar with that.
5   Q.   If that were the law, would a truck container that was
6   outside, such as for an open-bed truck, would providing a
7   locked container inside that bed satisfy that requirement if
8   it had to be outside of the passenger compartment of an
9   open-bed truck?
10  A.   It sounds like it would.  I am not familiar with that
11  law.  I hate to speculate on it.
12  Q.   Regarding the 10-round mags for ARs that were discussed
13  earlier, did you locate any of those inside Mr. Nichols'
14  house?
15  A.   When we were in Mr. Nichols' house while searching --
16  for our search warrant, while I was in the garage, I actually
17  observed several 10-round AR mags, most of which were
18  actually still in the packaging, on the deck of the boat that
19  is parked in the garage.  The 10-round AR mags, they are the
20  Magpul brand for -- specifically for the AR-15 platform.
21  Q.   Did you find the host weapon for those magazines?
22  A.   We did not find a weapon in the house capable of
23  accepting those magazines.
24  Q.   Do you have information from other sources that
25  Mr. Nichols, in fact, owns a firearm that hosts those

1   magazines?

2   A.   During an interview of Mr. Nichols' father, he mentioned

3   that he and Ryan -- that he knew that Ryan had an AR.   He

4   didn't want to say that he owned it.   May have even borrowed

5   it.   He was not comfortable saying that he owned it, or at

6   least not comfortable telling us that.

7        He did mention that they had fired AR -- an AR --

8   or that Ryan, excuse me, had fired an AR-15-style weapon on

9   or about Christmastime of this year, Christmas 2020.

10  Q.   The context of Mr. Nichols' text message exchange with

11  Mr. Harkrider indicates that he had access to and intended to

12  take an AR-15 on their trip to D.C.; is that accurate?

13  A.   That's my conclusion, yes.

14  Q.   And yet none of it was recovered; is that correct?

15  A.   That's correct.

16  Q.   And there was also discussion in those text messages

17  that Mr. Nichols expected to be arrested or expected some law

18  enforcement attention, did he not?

19  A.   That is our conclusion, yes.

20  Q.   Did you also find some empty pistol boxes in the house

21  with guns not recovered?

22  A.   There was an empty pistol box in Mr. Nichols' closet, as

23  well as one inside -- one of the vehicles outside, a Nissan

24  Juke.   I don't have that in front of me.

25        I believe one was a Smith & Wesson -- excuse me,

1    Smith & Wesson .380 -- or, excuse me, .38 special revolver

2    box.  And the other one was for a -- it was a SIG Sauer

3    pistol, .380 caliber pistol.  We did not recover either of

4    those firearms, but we did have the boxes.  So those guns are

5    somewhere.

6    Q.   Are you aware of other situations where Mr. Nichols is

7    accused of acts of violence that would cause the Court to be

8    concerned should he be released?

9    A.   Yes, I am.

10   Q.   Let's discuss an incident involving a low-flying plane

11   in April of last year.  Can you tell the Court about this

12   incident?

13   A.   So this first came to our attention actually during the

14   day of the search warrant on January 18th.  While

15   interviewing with some of the neighbors, it was brought to

16   our attention that -- at least there was a rumor or

17   Mr. Nichols had fired a weapon at a low-flying airplane over

18   their neighborhood in the neighborhood where we ran the

19   search warrant.  This actually came to us from a couple of

20   sources.

21          We did several interviews to try to follow up on

22   that with what we could.  Obviously, that is a fairly

23   significant federal crime.

24   Q.   So, just to be clear, we don't have footage of

25   Mr. Nichols firing a firearm at an airplane; is that

1   correct?

2   A.   We do not have specific footage of that, no, that is

3   correct.

4   Q.   And there is no doubt it was a low-flying airplane; the

5   whole neighborhood was concerned; it was disturbing; many of

6   them took video footage.  Is that correct?

7   A.   That is -- yes, that's correct.

8   Q.   And at least one neighbor provided you footage of a

9   low-flying airplane over this neighborhood that, from casual

10  viewing, sounds like it has multiple gunshots in it, is that

11  fair, as the plane passes over Mr. Nichols' home?

12  A.   That's correct.

13  Q.   And that same neighbor also believed that --

14  corroborated by the video, believed he heard gunfire from

15  Mr. Nichols' backyard at that time?

16  A.   That's what the statements to us were.

17  Q.   And did Mr. Nichols do anything else after that point

18  that further corroborated that belief by the neighbor?

19  A.   During our interview of the witnesses to that incident

20  that captured the video, their statement to us was that after

21  what they understood to be shots were fired and the plane had

22  flown over, within a few minutes they were able to see from

23  their position in the front of their residence, Mr. Nichols

24  come out from the front of his home to his truck, which was

25  parked in the part of their driveway you could clearly see,

1    the testimony was that they observed Mr. Nichols throw an

2    AR-15-style rifle into the vehicle.  Seemed to be in kind of

3    a hurry.  Went back into the house presumably for a moment.

4    Came back out.  Was putting clothes on.

5            The statement was then that they observed him throw

6    what they believed to be a pistol inside the truck, come out

7    of the driveway, and then come drive by the witness's house

8    and make a comment, you know, basically -- to the effect of:

9    Did you see that?  Can you believe that?  I am on my way to

10   the airport right now to see the deal was, or to find out

11   what was going on.

12           I don't have the statement in front of me.

13   Q.   With apparently two weapons in hand?

14   A.   Correct.

15   Q.   Did the neighborhood indicate that they are scared of

16   Mr. Nichols on account of this incident?

17   A.   Several of the witnesses that we interviewed were very

18   concerned that -- one, that Mr. Nichols would find out that

19   they had spoken to us, and they were not -- certainly less

20   than thrilled to potentially have to reveal their identities

21   to him because they obviously are going to continue to live

22   in that neighborhood.

23   Q.   Mr. Nichols was arrested in 2018 for arrest.  Are you

24   aware of the circumstances and facts surrounding that

25   incident?

1  A.    I have obtained a Longview Police Department report that

2  I believe is for that incident, yes.

3  Q.    And, just to be clear, your knowledge of this incident

4  comes from those reports exclusively; is that correct?

5  A.    That's correct.

6  Q.    Based on your review of those reports, can you relay

7  that incident in summary to the Court?

8  A.    The Longview Police Department was called to -- or,

9  rather, dispatched to -- I will get you an address in a

10  minute, 2835 East Cotton Street in Longview, Harrison County,

11  Texas, after there was a report of essentially a disturbance

12  fight.

13        Upon arrival, what the investigation revealed was

14  that -- the allegation was that Mr. Nichols had assaulted a

15  couple of construction workers who had moved some trailers on

16  his property to do whatever construction project they were

17  doing, without Mr. Nichols' consent.

18        He became very upset about that, confronted those

19  individuals.  The report indicates that impartial witness

20  testimony is that one of the people responsible for moving

21  those vehicles had apologized to Mr. Nichols.  But to quote a

22  part of the report:  But the man -- in parentheses Nichols --

23  wouldn't let it go.  Nichols then continued downstairs and

24  was chest-bumping the other individual.  The one who

25  apologized.

1          And then they saw -- the reference here is that

2    Mr. Nichols pushed and then hit the other individual.  And

3    then they observed Mr. Nichols push a second person, an older

4    individual who was related -- I believe is related to the

5    first individual -- it is a father and son, if I am

6    understanding correctly.

7          The police report indicates that they had

8    interviewed Mr. Nichols about that, as well as his wife, and

9    that the statements provided by Mr. Nichols and his wife were

10   not consistent with the other impartial witnesses who were

11   not associated with the incident and were at a different

12   location.  They were not consistent.

13   Q.   The context of this incident is basically that the

14   landlord at Mr. Nichols' business hired a contracting crew to

15   resurface their parking lot, and a couple of trailers

16   belonging to Mr. Nichols, or associated with his business,

17   were in the way.  They moved them as best they could.  It

18   infuriated Mr. Nichols, and he picked a fight with the

19   contractors.

20   A.   That's correct.

21   Q.   And someone -- and so the version of events that was

22   told by the contractors was that Mr. Nichols picked the

23   fight; is that correct?

24   A.   Correct.

25   Q.   And did Mr. Nichols tell that same story, or did he

54

1    reverse the responsibility in that situation?

2    A.    That's correct.  He, in fact, said that he was the

3    victim and actually said he wanted to pursue charges.

4    Q.    And, in fact, Mr. Nichols' wife said the same version of

5    events as Mr. Nichols; is that correct?

6    A.    That's correct, according to the report.

7    Q.    But there was a neutral third party who saw it?

8    A.    Two neutral third parties, actually.

9    Q.    And whose version did they corroborate?

10   A.    The contractors, not Mr. Nichols and Mrs. Nichols.

11   Q.    But due to the fact that all -- that the contractors

12   decided to drop the charges, they were not pursued; is that

13   correct?

14   A.    My understanding -- it is tough to kind of parse out

15   from the report because the report doesn't actually mention

16   that Mr. Nichols was arrested; however, a review of other

17   records does indicate that he was arrested.  But we also know

18   that those charges were dropped, according to records

19   available, to me, at least at this time.

20   Q.    Are you aware of Mr. Nichols making any threatening

21   statements to other individuals subsequent to the events on

22   January 6th?

23   A.    Yes.

24   Q.    In fact, did Mr. Nichols make a threatening post on an

25   individual's Facebook page when he confronted Mr. Nichols

1    about being at the Capitol on January 6th?

2    A.    That's correct.

3    Q.    What was the name of that individual that Mr. Nichols

4    threatened?

5    A.    I'm going to mess up his name.  It's Aryeh Ohayon.

6    Q.    And can you read that threatening post to the Court,

7    please?

8    A.    It is -- my understanding is, Mr. Ohayon made a comment

9    on a post that Mr. Nichols had.  It was on a relative of

10   Mr. Ohayon's page.  The comment was roughly:  You spelled

11   "terrorist" wrong.

12              I don't have the picture that he was commenting on,

13   but, roughly:  You spelled "terrorist" wrong.

14              Mr. Nichols' response to Mr. Ohayon's comment is --

15   excuse me:  But you won't come step up -- excuse me -- and

16   say --

17              THE WITNESS:  Can I use a curse word, Your Honor?

18              THE COURT:  Yes.

19   A.    "But you won't come step up and say shit though.  You

20   are a coward, and we would smash your face.  Steal our

21   election.  Won't hear us in court.  Then we will no longer be

22   peaceful.  So fuck you and your liberal mindset.  Patriots

23   are here to fuck people up like you now."

24   Q.    Do you believe that the Court has reason to have concern

25   about Mr. Nichols' mental health that would govern the

56

1    Court's decision regarding release?

2    A.    I do.

3    Q.    In your interview with the Defendant's father, did he

4    reveal information that indicated that Mr. Nichols may suffer

5    from PTSD from multiple sources?

6    A.    He did.

7    Q.    And, in fact, did Mr. Nichols' father tell you that

8    Mr. Nichols medicates himself with marijuana for his PTSD?

9    A.    That's correct.

10   Q.    Do you have information that the Defendant may be a

11   danger to himself because of suicidal ideation?

12   A.    Yes.

13   Q.    How do you come by that information?

14   A.    The statement from the father was that he had --

15   Mr. Nichols has had suicidal ideations in the past.

16   Q.    Did an interview with Defendant Harkrider's roommate

17   provide additional information on this topic, not on suicidal

18   ideation but on mental health in general?

19   A.    Yes.  The statement from Mr. Harkrider's roommate, he

20   referred to Mr. Nichols, in fact, as a psycho.

21   Q.    Did that same roommate indicate that Mr. Harkrider was a

22   user of psychodelic drugs?

23   A.    He did, that's correct.

24   Q.    And that was corroborated by the text message string

25   that we have already discussed regarding Ketamine, LSD, DMT,

57

1    et cetera; is that correct?

2    A.    Yes, sir.

3    Q.    Did you find anything relevant to drug usage in the

4    Defendant's home at the time that you executed the search

5    warrant?

6    A.    Yes, we did.  During a search of the Defendant's -- a

7    safe in the master bedroom closet, inside the larger safe we

8    found a small amount of marijuana, pretty high-grade

9    marijuana, a pipe -- oh, I can't -- a pipe to smoke

10   marijuana.  It had residue in it, as well as a marijuana

11   grinder.

12            Just outside the safe was a at-home drug test kit

13   which tested for multiple controlled substances, as well as

14   marijuana being one of them.

15   Q.    Was this drug test kit still in its packaging unused?

16   A.    It was.  It appeared to be unseal -- it appeared to be

17   totally sealed.

18   Q.    Are you aware of any concerns regarding travel or flight

19   that the Court should -- would give the Court concern

20   regarding non-appearance of the Defendant?

21            Let me ask specifically, does the Defendant have

22   the any ties to the District of Columbia other than the

23   criminal conduct that we are discussing today?

24   A.    Not that I am aware of.

25   Q.    Were you aware that -- actually, let me back up to the

58

1    marijuana issue regarding the comments from the father.

2          Did Mr. Nichols' father discuss his marijuana usage

3    with you?

4    A.   Very briefly.  He said that Mr. Nichols used it to treat

5    his PTSD.  He also made a comment that he a -- excuse me, a

6    medical marijuana card for California -- for the State of

7    California.

8    Q.   So based on the father's statements regarding that

9    medical marijuana card, it appears that Mr. Nichols travels

10   to California for the purpose of self-medication, et

11   cetera?

12   A.   I don't know that I am comfortable saying that he

13   travels there for that purpose.

14   Q.   Was he out of state at the time that you called him for

15   the search warrant execution?

16   A.   He was.  At the time, the information that I have is

17   that he was in or near Ada, Oklahoma, where his wife's family

18   currently -- some members of his family currently live.

19   Q.   Are you aware of conduct by Mr. Nichols that may

20   constitute obstructive conduct that would give the Court

21   concern whether or not Mr. Nichols would comply with the

22   Court's orders going forward?

23   A.   I am.

24   Q.   Specifically, the failure to locate certain items in his

25   home that you would expect to find based on statements,

59

1    images, et cetera, did that give you great concern?

2    A.   It did.

3    Q.   What items did you not locate that you expected to

4    locate in his home during the execution of the search

5    warrant?

6    A.   Not unlike Mr. Harkrider's home, I expected to find that

7    tactical vest, number one, the boonie hat, the yellow

8    gloves -- the leather gloves that were there, the crowbar,

9    and I also expected to find an AR-15 in there.  We did not

10   find any of those items.

11   Q.   Very specifically, did Mr. Nichols exchange text

12   messages with Mr. Harkrider instructing him to delete

13   evidence?

14   A.   He did.

15   Q.   On January 8th, can you read for the Court a text

16   message that Mr. Nichols sent to Mr. Harkrider, to this

17   end?

18   A.   The text message says:  Delete it all, including our

19   text conversation together.  Also, delete them from your

20   phone as well.

21   Q.   The next day did Mr. Nichols send a follow-up or

22   similarly-related text message to Mr. Harkrider?

23   A.   That's correct, he did.

24   Q.   And what did that state?

25   A.   On January 9th, Mr. Nichols sent a link -- excuse me --

1  a web link to the Marshall Report website.  The text under it

2  with that link says:  Watch the video and then delete what

3  you have.

4  Q.   Does Mr. Nichols' Facebook page appear to reflect all of

5  the things that you would expect it to reflect, given all of

6  the information that you have received from third parties?

7  A.   It does not.

8  Q.   Does it appear that Mr. Nichols has sanitized his social

9  media presence?

10  A.   Yes.

11  Q.   Does it appear that Mr. Nichols has changed his

12  appearance prior to today, prior to his arrest?

13  A.   Yes, it does.

14  Q.   Are you aware of communications from Mr. Nichols' family

15  members that would give the Court pause regarding his support

16  network should he be released?

17  A.   Yes.

18  Q.   In fact, did Mr. Nichols' father send a text message to

19  Mr. Harkrider on January 6th that is relevant to these

20  events?

21  A.   He did.

22  Q.   What did that text message say?

23  A.   January 6th, Mr. Nichols' father sent a text message to

24  Mr. Harkrider, actually.  And the message says:  They have

25  labeled you all anarchists.  The patriots have taken the

1    Hill, both the Senate and Congress.  The D.C. Police, the

2    FBI, and the Secret Service are getting together with the

3    National Guard.  They are discussing using lethal force to

4    disperse people off of the Hill.  Go get your weapons.

5               MR. LOCKER:  Your Honor, may I have a moment?

6               THE COURT:  You may.

7               (Pause in proceedings.)

8    BY MR. LOCKER:

9    Q.   Detective Harry, there is one final Facebook post that

10   the Defendant posted that I would like to go over with you.

11              MR. LOCKER:  Mr. Files, I provided this to you as

12   well.  Any objection?

13              MR. FILES:  No.  Not -- Once again, not for the

14   purposes of this hearing.

15              THE COURT:  Thank you.

16              What is this Government's Exhibit?

17              MR. LOCKER:  8, I believe, Your Honor.

18              THE COURT:  8, yes.

19   BY MR. LOCKER:

20   Q.   Can you read the text?

21   A.   This is a -- what I understand to be a post from

22   Mr. Nichols' Facebook.  He tags -- obviously, it has got him,

23   and he tags Alex Harkrider with him.

24              The comment is:  We will not bend.  We will not

25   break.  We will never give in.  We will never give up.  We

1   will never surrender.  Headed home to better reorganize.

2   This fight for our country has just -- excuse me -- this

3   fight for our country just begun -- just began.

4             I'm sorry.

5   BY MR. LOCKER:

6   Q.   Detective Harry, do you believe there is probable cause

7   to support each and every element of each of the offenses

8   alleged in this complaint?

9   A.   I do.

10            THE COURT:  Pass the witness.

11            MR. FILES:  Would it be appropriate to take a break

12  at this time, Your Honor?

13            THE COURT:  I was just going to suggest that,

14  Mr. Files.  We have been going for a while.  We are going to

15  take a 15-minute recess.

16            We will be in recess.

17            COURT SECURITY OFFICER:  All rise.

18            (Recess was taken at this time.)

19            COURT SECURITY OFFICER:  All rise.

20            THE COURT:  Please be seated.

21            Mr. Locker, you passed the witness, right?

22            MR. LOCKER:  Prior to taking my seat, I need to

23  make a correction that I learned of during the break.  I

24  learned from Ms. Hall with Mr. File's office that the videos

25  that came from Mr. Nichols' GoPro device that were provided

1    to Counsel and then provided to the Government are a subset

2    of a larger number of files that the Defense is in possession

3    of.

4           All of us have been working long hours and are

5    under very tight time constraints.  I certainly understand.

6    It is one of the things where I understand that the reason we

7    don't have those digital files was simply due to time

8    constraints.

9           And so if I left a false impression with the Court

10   that the lack of files is attributable to the Defendant, I

11   need to correct that; and that is why I wanted to bring that

12   to the Court's attention.

13          THE COURT:  All right.  Thank you very much.

14          All right.  Cross-examination.

15          MR. FILES:  May it please the Court.

16                        CROSS-EXAMINATION

17   BY MR. FILES:

18   Q.   In the old days, it was Detective Harry.  Now it is Task

19   Force Officer Harry.  You could be Mr. Harry.  How would you

20   prefer that I address you, sir?

21   A.   It really doesn't matter, Mr. Files.  Whatever you are

22   most comfortable with.

23   Q.   If I just say Mr. Harry, is that okay?

24   A.   It doesn't bother me at all.

25   Q.   Thank you, sir.

1        You had indicated to us that you had participated

2   to some significant extent in coming up with the material

3   that is in the criminal complaint, but that you had not done

4   all of it.  Is that a fair beginning?

5   A.   That's correct, yes, sir.

6   Q.   So you would be able to go through and look at the

7   complaint and be able to draw a circle around or square

8   around or something or brackets and indicate what part of

9   this complaint you were responsible for, and that would leave

10  the rest of it that someone else is responsible for.  Is that

11  correct?

12  A.   I would say it is a collective project.  Certainly, we

13  worked on all of it together and have reviewed most all of it

14  together.

15        MR. FILES:  Your Honor, may I approach the witness?

16        THE COURT:  You may.

17  BY MR. FILES:

18  Q.   I hand you my copy of the complaint, and ask you if you

19  would look at it and see if you can go through and identify

20  those parts which are really yours.  It is primarily your

21  work product that is included.

22  A.   Okay.

23  Q.   Do you have a pen?

24  A.   I do, sir.

25        Would you like just a star out beside it?  Would

1   that be okay?

2   Q.   Just brackets or something just to show what is yours?

3   A.   (Witness complies.)

4        I want to be clear that this is not my words

5   verbatim.  They have been tweaked around here and there by

6   attorneys and things like that and the other investigator.

7   Q.   But that still does show --

8   A.   These are things that I have intimate knowledge of.

9   Q.   Thank you, sir.

10       Let's sort of go backwards rather than frontwards.

11  Let's go back to that low-flying aircraft.

12  A.   Yes, sir.

13  Q.   You have been a task force officer for a better part of

14  five years?

15  A.   Yes, sir.

16  Q.   You are familiar with Federal United States Grand

17  Juries?

18  A.   Yes, sir.

19  Q.   Have you ever testified in front of a Grand Jury?

20  A.   I have.

21  Q.   Are you in and out of the United States Attorney's

22  Office on a regular basis?

23  A.   I am.

24  Q.   You are aware that the United States Attorney's Office

25  is responsible for the prosecution of federal crimes that

1   would happen in the Tyler Division of the Eastern District of

2   Texas, the folks here, correct?

3   A.   Yes, sir.  Uh-huh.

4   Q.   You have talked about a low-flying aircraft.

5   A.   Correct.

6   Q.   Shots being fired.  Witnesses being interviewed.  To

7   your knowledge, was that case ever presented to a United

8   States Grand Jury?

9   A.   No, sir.

10  Q.   Is there a case pending at this particular time on this

11  issue?

12  A.   I wouldn't say there is a case pending before the Grand

13  Jury.  We are investigating the matter.

14  Q.   It is currently an investigation?

15  A.   Correct.

16  Q.   And when did this occur?

17  A.   Sir?

18  Q.   When did these events -- when are they supposed to have

19  occurred?

20  A.   The plane incident?

21  Q.   Yes.

22  A.   April 23rd, 2020.

23  Q.   April 23rd, 2020.  This is January of '21.  That means

24  nine months ago?

25  A.   Roughly.

1    Q.    And nothing has been done?

2    A.    That's correct.

3    Q.    Correct.

4          Let's talk about neutral and detached witnesses.

5    You talked about an assault case in Gregg County, and you

6    have got some folks saying one thing and you have got some

7    folks saying another.  But because someone else gives a

8    version that matches up with one of them, you put stock in it

9    because that person is a neutral and detached witness; is

10   that correct?

11   A.    And it matches another -- the statements of another

12   neutral and detached witness, yes, sir.

13   Q.    But you don't know whether these people are neutral and

14   detached or whether they have a bias or prejudice against my

15   client.  You don't know what their relationship is in the

16   past.  You don't have any way of saying they were neutral.

17   You simply have two witnesses or one witness who backs up one

18   side and not the other.

19   A.    I think that is fair.

20   Q.    Is that a fair statement?

21   A.    Absolutely.

22   Q.    Let's go to the long video, the one that started at .59.

23   How many times have you had the opportunity to look at

24   that?

25   A.    Unfortunately, I have watched it several times.  I don't

68

1    know that I have stared at it just without glancing away one

2    whole time altogether, if that makes any sense.  But we have

3    watched certainly bits and pieces a lot.

4    Q.   And what have you learned from that video concerning my

5    client other than he is in the crowd -- correct?

6    A.   Yes, sir.

7    Q.   Did you try to figure out approximately how many other

8    people were in the same crowd doing some exactly -- some of

9    the exact same things that he was doing?

10   A.   Other than just watching it and kind of just in my mind

11   making a guesstimate, no, there hasn't -- I certainly have

12   not counted, if that is what you are talking about.

13   Q.   Would you guess a hundred, 150 people?

14   A.   I think that is probably fair.

15   Q.   And is it fair to say that many of them were doing

16   almost exactly the same thing?

17   A.   At certain points of time in the video, yes, sir.

18   Q.   You would agree with that?

19   A.   I would.

20   Q.   Now, you have talked about what you could hear from the

21   bullhorn?

22   A.   Yes, sir.

23   Q.   With the exception of the bullhorn, could you hear what

24   he was saying while he was in the crowd?

25   A.   While Mr. Nichols was in the crowd, no, sir.

1    Q.   So he was there for a long period of time.  For a short

2    period of time he had a bullhorn.  You believe from another

3    video you can match up with what he is saying there.  But

4    that is the only thing that you could match up as far as what

5    he is saying?

6    A.   As far as what he is saying, yes, sir.  I think that

7    is -- other than if we are excluding what he has posted on

8    social media?

9    Q.   Yes.

10   A.   Verbally, yes, I agree.

11   Q.   And there are other people who seem to be as involved in

12   that event as he was, correct?

13   A.   At certain points in time, at certain things --

14   Q.   There are people who are actually breaching and going

15   in?

16   A.   Sure, yes, sir.

17   Q.   There are people who are going over the top?

18   A.   Yes, sir.

19   Q.   Correct?

20   A.   Correct.

21   Q.   There are people throwing things toward the inside?

22   A.   Correct.

23   Q.   And he is not doing any of those things?

24   A.   No.  And in the same way that some other people aren't

25   using -- not everybody is using pepper spray, not everybody

70

1   has got a bullhorn, so certainly --

2   Q.   We will come back to those.  I am just talking about

3   what he is not doing.

4   A.   Okay.

5   Q.   And what he is not doing is the same thing that the

6   other people are also not doing or maybe they are doing.

7           How long was he in the building?  Were you able to

8   determine that?

9   A.   My best guesstimate, Mr. Files, is a couple of minutes.

10  We have not had a chance to parse through Capitol security

11  footage to get at a good time.  That is just an off-the-cuff

12  guess at this point.

13  Q.   So, roughly, he is the building plus or minus two

14  minutes?

15  A.   Your guess is as good as mine, sir.

16  Q.   I thought a couple of minutes -- short amount of time?

17  A.   I have no reason to believe he was in there for hours or

18  anything like that, but I am not prepared to speculate --

19  Q.   You have no knowledge or belief that he has done

20  something in the inside as far as destruction of property,

21  assaultive conduct, theft, going through secure documents,

22  anything like that.  You simply know he went in, and he came

23  out.  Is that correct?

24  A.   As it pertains to Mr. Nichols, yes, sir, that's

25  correct.

1  Q.   Okay.  You mentioned that his companion in the case

2  was -- came to the window and was stirring up the crowd.  I

3  think those were your terms.  Is that correct?

4  A.   Yes, sir.

5  Q.   Okay.  And Mr. Harkrider is up there.  He says

6  something.  And you say he stirred up the crowd.

7  A.   I don't know if he said anything, but he is up there

8  and -- you know.

9  Q.   Could you tell the crowd was behaving any differently

10  after he came out and did that (waving arms) than they were

11  before?  Was there really a difference between how the crowd

12  behaved when he came out and how they were behaving before?

13  A.   I don't think so.  Not anything discernible, no.

14  Q.   So, really, it would be maybe a stretch to say he

15  stirred up the crowd?  He simply made some movements and the

16  crowd was making noise, and they continued to make noise;

17  isn't that a fact?

18  A.   I think it is a -- this conduct is great -- it is

19  certainly not, go away, this is bad.  If anything, it is,

20  this is okay, and the party is inside.  Come on in.

21  Q.   Were the decibels any greater after he did this than

22  they were before?

23  A.   Not that I -- no, not anything that I could discern,

24  no.

25  Q.   Thank you sir.

72

1          Let's talk about the spray.

2     A.    Okay.

3     Q.    Tell me what you observed, sir, as you watched that

4     video and as you watched it in the past, just the video

5     about -- with the spray.

6     A.    He is in the crowd.  They are close to the entrance to

7     that Capitol building with the -- you saw the wooden -- I

8     don't know what you call that, but wherever that arch is.  He

9     has got his face mask up, his boonie hat on, and the gloves.

10    The pepper spray -- or the can that I believe is the pepper

11    spray -- is being passed.  You see him motion, hey, give me,

12    here.  He takes it.  Sprays it in the direction of the

13    opening where the officers are; we know them to have been.

14    Kind of pauses and goes back and gives it another little go.

15    And then passes the canister back off.

16    Q.    And you talk about people reacting to the spray?

17    A.    Yes, sir.

18    Q.    Have you been pepper sprayed?

19    A.    Unfortunately, yes, sir.

20    Q.    And you know what it feels like?

21    A.    It is not --

22    Q.    It is not good?

23    A.    It is not.

24    Q.    And there were people there that were reacting to it?

25    A.    Yes, sir.

73

1   Q.   What is the name of the officer, if there was one, who

2   actually got sprayed?

3   A.   Fair question.  That is something we are exploring, but

4   I don't have the name of a specific officer.

5   Q.   You can't tell from that video that was played that an

6   officer was actually sprayed, can you?  From this video that

7   was played for the Court, can you tell that definitively that

8   an officer was sprayed?

9   A.   I think it is fair to say I cannot identify the name of

10  any specific officer that is sprayed.  Yeah, I think that is

11  fair.

12  Q.   And you can't tell for certain that an officer was

13  sprayed.  There was somebody sprayed.  But you can't tell

14  that there was an officer sprayed from the video that was

15  played for the Court?

16  A.   So we know that there were police there, okay, in that

17  exact space.  But, again, I cannot identify a specific

18  officer who was hit.

19  Q.   I'm not saying specific officer.  We're saying any

20  officer.  There is -- clearly, he takes it, he sprays it, he

21  takes it, he sprays it again.  But the question is, does he

22  hit an officer with the spray?  And from the video that was

23  played, I challenge you to tell me that you can tell an

24  officer was actually hit.

25  A.   I believe that officers were hit.

74

1   Q.   You believe it because you tell it from the video?

2   A.   That's correct.

3   Q.   There were other people who had shields there, weren't

4   there?

5   A.   Yes, sir.

6   Q.   So you had civilians with shields, you had officers with

7   shields, correct?

8   A.   I think that is fair, yes, sir.

9   Q.   And there was a shield there, you could see the shield;

10  but there is no officer behind the shield that you could

11  identify as being an officer, is there?

12  A.   I believe there are officers -- you could see through

13  those translucent shields.  I believe those subjects are

14  officers.

15  Q.   There are people back there; you would agree with that?

16  A.   Yes, sir, I think they are officers.

17  Q.   But your investigation has not come up with specifically

18  who the officers were or what they were doing or whether they

19  were hit?

20  A.   It is a fair question.  I cannot give you the name of

21  any specific officer who was there.  That's fair.

22  Q.   You don't have any information that would tag

23  Mr. Nichols to the possession of a firearm at any time while

24  he is there at the Capitol, do you?

25  A.   On Capitol Grounds?

1    Q.    Yes.

2    A.    No, sir.

3    Q.    Absolutely nothing?

4    A.    Not a firearm, no, sir.

5    Q.    Absolutely nothing having to do with a firearm there.

6          The question was asked about a D.C. statute and

7    would a box comply with the D.C. statute.  And simply stated,

8    I think you were candid when you said you didn't know what

9    the statute was.

10   A.    I do not.

11   Q.    If there was a box, if there was a weapon in a box.  If,

12   if, if.  You can't say that was a violation of a D.C. statute

13   or that was not a violation of a D.C. statute?

14   A.    That's correct.  I'm not comfortable speculating on

15   that.

16   Q.    Okay.  How did you get in touch with Mr. Nichols?

17   A.    Ryan?  The Defendant?

18   Q.    Yes.

19   A.    We called -- so during the day of the search warrant,

20   one of the Longview PD officers who knows Mr. Nichols somehow

21   and had reached out to him while our SWAT team was there

22   trying to execute the warrant at his house.  Nobody had come

23   to the door.

24         We were trying to get in touch with him before we

25   made entry.  The information that was related to me was that

1    Mr. Nichols had called that officer back.  That officer then

2    relayed that information to another task force officer who

3    called me and said:  Hey, Nichols called.  He wants the FBI

4    person who is responsible to call him.

5               I then called Mr. Nichols -- excuse me -- on the

6    phone number that I had for him that we had been trying to

7    call.  His wife answered the phone and then told me he was on

8    his way back to Texas.

9    Q.   So, basically, the word went out that y'all were

10   interested in him.  You have a conversation.  The wife said

11   he is on the way.  He comes in and surrenders.  Is that

12   correct?

13   A.   Yes, I did talk to him in between that time.  But,

14   yes.

15   Q.   He came in?

16   A.   That's correct.

17   Q.   Didn't hide, didn't run, didn't go away?

18   A.   No, sir, not to my knowledge.  He came right to us.  If

19   he was in Oklahoma, he made good time.

20   Q.   And it is your understanding that he was at his wife's

21   place, and you don't have any reason to doubt that is

22   correct?

23   A.   Not at this point, no, sir.

24   Q.   Did you talk to the wife up there?

25   A.   Yes, sir.

1  Q.   Wife's place.  Wife is there.  He gets the word.  He

2  comes back home.  He doesn't run away --

3  A.   Yes, sir, that's correct.

4  Q.   -- correct?

5          Nothing to show that while he was at the Capitol he

6  had on body armor?

7  A.   I'm sorry?

8  Q.   Nothing to show that while he was at the Capitol he had

9  on body armor?

10 A.   So we can see in the video he is wearing what I

11 recognize to be a plate carrier.  And I believe our

12 information from Mr. Harkrider's interview was that they each

13 had one armor plate in the front panel of those carriers;

14 that Mr. Harkrider had a plate, and Mr. Nichols had a

15 plate.

16 Q.   And that would be what you would be relying on.  But

17 there was nothing in the videos or any other information that

18 would show he had a plate?

19 A.   That's correct.

20 Q.   You talked about having empty pistol boxes.  Anything

21 unusual about having an empty pistol box?

22 A.   Other than there is a pistol that belongs to it

23 somewhere, and I don't know where it is.

24 Q.   Do you have pistol boxes at your house?

25 A.   I do, but my pistols are not too far away.

1   Q.   You normally keep your pistol in a pistol box or in a

2   holster?

3   A.   No.  I keep it in a holster, but, I mean, when I am at

4   home and my pistol box is there, they are in the attic, the

5   pistols are there in the home with --

6   Q.   Yes.

7            Are you aware of when Mr. Nichols left the Capitol

8   Grounds?

9   A.   As far as a time, no, sir, I don't.  I presume he went

10  home on January 6th at some point -- or left the grounds at

11  January 6th, but I don't have a hard time.

12  Q.   Talking about the demonstration, all the people are

13  there, he is there.  Do you have any of idea when he left?

14  Is there any way you can tell from the video, if nothing else

15  by the fact you simply can't see him anymore?

16  A.   From the longer video that we watched, and I know we cut

17  it off before the conclusion of it, they do appear to kind of

18  walk out of the frame from up near the Capitol.  My

19  understanding is, and forgive me, I am not sure if it is in

20  this video or another video, that they do walk to the edge

21  of -- it has been a long time since I have been at the

22  Capitol, but where they kind of were is an elevated position,

23  a platform -- I don't have a better term for it.  But my

24  understanding is that in another video or maybe that same

25  video that they walked to the edge towards the railing, if

1    you will, to kind of look out.

2           But, to my knowledge, that is kind of the last

3    little bit we have of them.  I don't have any information to

4    say that they went back up towards the Capitol or went inside

5    after that, beyond what you have seen here.

6    Q.    How many officers do you know that have had PTSD or that

7    have PTSD?

8    A.    You mean police officers?

9    Q.    Yes.

10   A.    I don't have a number.  But I know it is not uncommon.

11   Q.    It's not uncommon at all, is it?

12   A.    No, sir.

13   Q.    And, obviously, these people have managed to function as

14   police officers even with PTSD?

15   A.    A lot of people function with PTSD.

16   Q.    But you seem to be concerned that there might be a

17   problem on my client being released because his father said

18   he had PTSD?

19   A.    Yes, sir.

20   Q.    So if it is an officer, it is okay to have PTSD.  If it

21   is a defendant in a case, he can't have PTSD because he may

22   not show up or he might be a problem.  Is that what you are

23   saying?

24   A.    Not at all.  I think -- this was a pretty traumatic

25   incident, certainly being charged with criminal offenses,

1   potentially losing some freedom is going to trigger a

2   reaction or response from him, a stressful response.  I am

3   concerned that that response will affect him adversely.  I am

4   concerned for him, for his safety.

5   Q.   Are you aware of what he has been doing as far as a

6   nonprofit organization for years now?

7   A.   To the best -- open source research, I believe I am

8   aware of --

9   Q.   What is that?

10  A.   -- the rescue, rescue the world -- Rescue the Universe.

11  They go in after natural disasters, tornadoes, hurricanes,

12  tropical storms, fires, and try to rescue people that have

13  been stranded -- that are stranded --

14  Q.   Are in the water?

15  A.   Exactly.  Exactly.

16  Q.   They are in trouble or lost?

17  A.   Sure.

18  Q.   So you have been aware that he has been doing this for

19  some particular length of time?

20  A.   I don't know how long he has been doing it, but I am

21  aware it has been going on for a little while, yes, sir.

22  Q.   You realize that there are many, many causes of PTSD,

23  and you don't necessarily have to do something bad to have

24  PTSD; you understand that, don't you?

25  A.   Sure.

1    Q.   You spoke of Mr. Nichols' father, Mr. Nichols, Sr.,

2    talking to you?

3    A.   Yes, sir.

4    Q.   He interviewed you for what -- or you interviewed him

5    for 36, 38 minutes, something like that?

6    A.   Something like that.

7    Q.   Was he cooperative?

8    A.   Absolutely.

9    Q.   He is a minister; do you understand that?

10   A.   I don't know that -- he told us that, but I don't know

11   that from any other source --

12   Q.   Didn't play hide the ball with you or anything?

13   A.   Not at all.

14          MR. FILES:  Your Honor, I need just a moment to

15   flip through and see what Mr. Harry has marked here on this

16   affidavit.

17          (Pause in proceedings.)

18   BY MR. FILES:

19   Q.   What were you looking for in the search warrant that you

20   obtained?

21   A.   So for Mr. Nichols' house, in particular --

22   Q.   Yes, sir.

23   A.   -- we were looking for any items of indicia to establish

24   that he lived there.  I was looking specifically for the

25   clothing that he wore during the Capitol incident on January

1    6th, again, the boonie hat, the vest, the jacket -- excuse

2    me -- that green beaded necklace that you might have noticed

3    in there, the yellow gloves, crowbar, the GoPro mount and

4    GoPro camera, and then -- I'm sorry -- any electronic devices

5    which might have captured media during the time he was there,

6    any devices where he might have transferred the media he

7    captured, i.e., plugged my GoPro or cell phone into a

8    computer, the data transfer is there, those kinds of things,

9    as well as any type of paperwork receipts, boarding passes to

10   indicate travel to Washington, D.C., or places that he stayed

11   along the way, and some other things on there.  But that is

12   the meat and potatoes.

13   Q.   At simplest, anything that would tie him to being in

14   Washington, D.C., on or about January 6th of 2021?

15   A.   That's correct.

16   Q.   Pictures, or anything, without regard to what it was?

17   A.   Correct.

18            MR. FILES:  Your Honor, may I approach the witness?

19            THE COURT:  You may.

20   BY MR. FILES:

21   Q.   I hand you what is numbered as Page 11 of your

22   affidavit.

23   A.   Okay.

24   Q.   If you would, just read that to yourself, and I have a

25   question for you, sir.

1   A.   Additional video evidence shows Nichols near an entrance

2   to the U.S. Capitol -- near the U.S. Capitol building in a

3   large crowd actively forcing entry into the building, which

4   was guarded by U.S. Capitol Police.   During the video, the

5   screenshot of which is shown below, Nichols can be seen

6   taking a large red aerosol canister from another person in

7   the crowd and spraying an unknown agent believed, based on

8   its appearance, to be OC/pepper spray in the direction of the

9   entrance into the U.S. Capitol building where federal law

10  enforcement officers were engaged in the performance of

11  official duties, that is, seeking to restrain a mob of

12  individuals who were forcing entry.   Figures 8 and 9 below

13  are still shots from the OC/pepper spray video with arrows

14  indicating Nichols' clothing and suspected OC/pepper

15  canister.

16  Q.   This goes back, sir, to what we were talking about

17  earlier.   The language that you have in here:  Spraying an

18  unknown agent believed, based on its appearance, to be

19  OC/pepper spray in the direction of the entrance into the

20  U.S. Capitol building where federal law enforcement officers

21  were engaged in the performance of official duties; that is,

22  seeking to restrain the mob of individuals who were forcing

23  entry.

24          Now, what you say is, he sprayed it in the

25  direction of the Capitol building where federal law

84

1   enforcement officers were engaged in the performance.  You

2   don't say he sprayed at them.  You don't say he sprayed and

3   hit them.  You say that he sprayed in the direction of the

4   entrance where some officers were.

5           I am correct in my reading of this Page 11, aren't

6   I?

7   A.   That is what it says, yes, sir.

8   Q.   Thank you.

9           Let's talk about once again what isn't there.

10  A.   Okay.

11  Q.   Just coming home and watching the news, and maybe you

12  have had enough that you didn't do that, but there have been

13  hours and hours of footage of this demonstration on the 6th,

14  haven't there?

15  A.   Yes, sir.

16  Q.   And either in the performance of your duties in

17  investigating this case or simply because you were interested

18  in it, you have watched at least some of that, correct?

19  A.   Yes, sir.

20  Q.   Okay.  And there are pictures of people with various

21  items breaking out windows, going through windows; you have

22  seen that?

23  A.   Yes, sir.  It was on the video we played.

24  Q.   Breaching?

25  A.   Yes, sir.

1  Q.   And you have no reason to believe that Mr. Nichols was

2  engaged in that conduct?

3  A.   As far as to the breaking of the windows?

4  Q.   Things like that.

5  A.   I don't have any evidence --

6  Q.   Forcible breaching in order to get inside the Capitol?

7  A.   I don't have any evidence --

8  Q.   No evidence tying him to being close to the Senate

9  Chambers?

10 A.   Mr. Files, I am not familiar enough with the U.S.

11 Capitol to know where he was in the building.  Whether that

12 is close to the Senate side, the rotunda, the House side, I'm

13 not familiar enough with that to speak intelligently about

14 it.

15 Q.   And the question is, you don't have anything to tie him

16 to being at the Senate Chambers or the House Chambers?

17 A.   No, sir, not as I sit here, that's correct.

18 Q.   Thank you.

19         MR. FILES:  May I have a moment, Your Honor?

20         THE COURT:  Yes.

21         MR. FILES:  Thank you.  One moment.

22 BY MR. FILES:

23 Q.   Once again, we have nothing to tie Mr. Nichols to having

24 possession of an AR-15 at the Capitol Grounds on January 6th,

25 2020 [sic]?

```
1    A.    Physically possessing it on Capitol Grounds, no, sir.

2              MR. FILES:  That's all at this time.  Pass the

3    witness.

4              THE COURT:  All right.  Redirect?

5              MR. LOCKER:  Briefly, Your Honor.

6                       REDIRECT EXAMINATION

7    BY MR. LOCKER:

8    Q.    Detective Harry, is OC spray like bullets, in that it

9    hits one target in a linear path and whatever it hits, it

10   hits, and that is the end of it?

11   A.    No, not necessarily.

12   Q.    It is a liquid; is that correct?

13   A.    Correct.

14   Q.    It balances and aerosolizes.  So if you are in a

15   confined space in which OC spray is sprayed, does it matter,

16   in terms of whether or not you are affected, where you are

17   hit directly?  As in it may affect you more if you are hit

18   directly in the face, if it hit your arm, or the back of your

19   head or your chest or your leg, in that tight of a space, is

20   it still going to affect you?

21   A.    And in larger spaces, yes, and I think the video shows

22   that.

23   Q.    Mr. Files in his questioning used the term "breaching"

24   in a very technical sense.  It sounds like what he meant was

25   the act of breaking down a barrier.
```

87

1   A.   That is what I understood him to mean.

2   Q.   In the first part of the video we displayed, Mr. Nichols

3   and Mr. Harkrider are both participating as the crowd heaves

4   and hoes as they try to force in that gap of that doorway?

5   A.   That's a good point, yes.

6   Q.   Would you agree that that constitutes breaching?

7   A.   Yeah.   I just don't know whether they were successful in

8   that endeavor or not.

9   Q.   But they were at least attempting that at that point?

10  A.   Correct.

11  Q.   And in a broader context of the term "breaching" as we

12  have used in terms of breaching the Capitol, Mr. Nichols, in

13  fact, did breach the Capitol, meaning he entered the Capitol

14  building at a time when he was prohibited from doing so.   Is

15  that correct?

16  A.   Yes, they both did.

17  Q.   Do you know how Mr. Nichols knows Mr. Harkrider?

18  A.   My understanding is that they are both United States

19  Marines or former United States Marines.   I'm not sure if

20  that is how they met, as I sit here.   But I know they worked

21  together in the not-for-profit organization that we discussed

22  earlier.   I know they at least know each other in that way

23  and appear to be friends.

24          MR. LOCKER:   I'll pass the witness.

25          THE COURT:   Anything further, Mr. Files?

1        MR. FILES:  Briefly.

2                    RECROSS-EXAMINATION

3   BY MR. FILES:

4   Q.   Sir, you have been in a crowd at sometime, I assume,

5   where everybody was trying to get through the doors --

6   A.   Yes, sir.

7   Q.   -- and it was one of these if you had claustrophobia,

8   you would really be uncomfortable --

9   A.   Yes, sir.

10  Q.   -- correct?

11  A.   Yes, sir.

12  Q.   So in a crowd where people are going heave and ho, there

13  is no question but that Mr. Harkrider and Mr. Nichols were in

14  that area, correct?

15  A.   Correct.

16  Q.   But they weren't up at the place where they could

17  actually push and try to get in.  They were back in the crowd

18  someplace surrounded by human beings.

19  A.   I'm going to disagree with that.

20  Q.   You are telling me they were at the door pushing on the

21  door?

22  A.   No.

23  Q.   No.

24  A.   But that is the value in the whole crowd push.  We all

25  do it together; and by the force of 30 or 40 of us, we are

1    able to get a whole lot more momentum or energy or whatever

2    you want to -- I'm not a, you know, physicist or whatever,

3    but to push that door through.

4    Q.   And you are not telling us that they were pushing into

5    the crowd and the crowd was moving together and that they

6    were pushing people in front of them in order to try to break

7    down the door.  You are not telling us that, are you?

8    A.   It looked very organized.  Yes, I believe --

9    Q.   I didn't ask about organized.  I'm asking about

10   Mr. Nichols.  And you are not telling us that he was doing

11   that, and I am gesturing pushing my hands from rear to front

12   as though trying to force my way through?  You are

13   not telling -- that is not on the video, is it?

14   A.   I believe -- well, not necessarily fully hands extended,

15   but I certainly believe the video depicts him engaging in the

16   push with everybody else.  I do believe it depicts that.

17              MR. FILES:  Pass the witness.

18              THE COURT:  Anything further?

19              MR. LOCKER:  No, Your Honor.

20              THE COURT:  All right.  Mr. Harry, you may step

21   down.

22              THE WITNESS:  Thank you, Your Honor.

23              MR. LOCKER:  The Government rests, Your Honor.

24              THE COURT:  All right.  Mr. Files, who will be your

25   first witness?

1          MR. FILES:  May I have just a moment, Your Honor?

2          THE COURT:  Yes.

3          MR. FILES:  Your Honor, we will call Bonnie

4    Nichols.

5          THE COURT:  Ms. Nichols, come forward, please.  If

6    you will come right over here to the edge of the witness box.

7    Yeah, we are going to ask you to come around.  Thank you.  If

8    you will just stand right there and raise your right hand to

9    be sworn.

10          (Witness sworn.)

11          THE CLERK:  Thank you.  Have a seat.

12          BONNIE NICHOLS, DEFENSE WITNESS, SWORN,

13                    DIRECT EXAMINATION

14   BY MR. FILES:

15   Q.   Please state your name.

16   A.   Bonnie Nichols.

17   Q.   Ms. Nichols, how do you know Mr. Nichols, who has been

18   sitting there with me today?

19   A.   That is my husband.

20   Q.   How long have you been married?

21   A.   We have been married for seven-and-a-half years.

22   Q.   Would you keep your voice up just a little bit, please,

23   ma'am?

24   A.   Yes, sir.

25   Q.   Do you have any children?

91

1    A.    Yes, sir.  We have two boys, ages 6 and 4.

2    Q.    Let's talk about you just a little bit so the Court will

3    have some background when we get into the issue of

4    third-party custodian.

5              How old were you when you graduated from high

6    school?

7    A.    I was 16 years old.

8    Q.    And when you graduated, what did you do then?

9    A.    I went off to college and got a job quickly after.

10   Q.    Did you also -- or where were you in college?

11   A.    I went to San Jacinto College and U.T. Arlington in

12   Dallas.

13   Q.    How long did you continue in your studies there are U.T.

14   Arlington?

15   A.    About two years.

16   Q.    And why did you discontinue your studies?

17   A.    I met Ryan shortly after.

18   Q.    How did you meet him?

19   A.    I met him online while he was stationed in Okinawa,

20   Japan.

21   Q.    He was in the Marine Corps?

22   A.    Yes, sir.

23   Q.    And did you eventually get married?

24   A.    Yes, sir, we did.

25   Q.    Was he still in the Marine Corps when you got married?

1   A.   Yes, sir, he was.

2   Q.   And did you live aboard the base there at Camp

3   Pendleton?

4   A.   Yes, sir.

5   Q.   At some time he got out of the Marine Corps, and what

6   did you and he do?

7   A.   We came back to Texas to be with our family and start a

8   business shortly after, named Wholesale Universe.

9   Q.   What kind of business did you-all start?

10   A.   We have a business that we purchase generally from big

11   box retailers like Macy's, Dillard's and Bloomingdale's.  And

12   we buy wholesale pallets at deep discounted prices and sell

13   and resell and wholesale online and offline to clients.

14   Q.   Where is your business located?

15   A.   In Longview, Texas.

16   Q.   Do you have a significant inventory?

17   A.   Yes, sir, we do.

18   Q.   What about Longview -- what all do you do in Longview

19   besides just be a family and participate in that business?

20   A.   We are members of Mobberly church.

21   Q.   What church is that?

22   A.   Mobberly church is one of the biggest churches in

23   Longview, Texas.  We are active members there.

24   Q.   Do y'all go there on a regular basis?

25   A.   Yes, sir, we do.

1   Q.   Who all is employed there at the business?

2   A.   We have about 10 to 15 staff members depending on the

3   year -- or depending on the time of the year.

4   Q.   Do you work in the business yourself?

5   A.   Yes, sir.

6   Q.   Does Ryan also work in the business?

7   A.   Yes, sir, we both own the business jointly.

8   Q.   Is there another business, or nonprofit I should say, a

9   501(c)(3), that Ryan is participating in?

10  A.   Yes, sir, Rescue the Universe.

11  Q.   And what is the nature of that business?

12  A.   They provide relief efforts in search and rescue for

13  animals and humans and all life to help others.

14  Q.   What kind of search and rescue does he do?  I mean, what

15  kind of event causes him to be involved in that?

16  A.   Any natural disaster, hurricane, tornado, fire,

17  flooding.  Anything that requires health or relief support

18  around the world.

19  Q.   Hurricanes?

20  A.   Yes, sir.

21  Q.   Tornadoes?

22  A.   Yes, sir.

23  Q.   Was he doing that even before you got married?

24  A.   Yes, sir.  Since he was young.

25  Q.   Approximately, as best you can recall, how many

94

1    hurricane rescues has he participated in?

2    A.   15 or more.

3    Q.   Has he received national recognition for this?

4    A.   Yes, sir, he has.

5    Q.   What kind of recognition or publicity has he gotten for

6    this?

7    A.   He has been recognized by Ellen DeGeneres, A&E, Daily

8    Mail, ABC News, The Weather Channel, and many others.

9           MR. FILES:  Your Honor, we furnished copies of the

10   pictures we have, to the Government.  We have a total of

11   four, which we would like to show, and would offer those at

12   this time.

13          MR. LOCKER:  No objection.

14          THE COURT:  Objection?

15          Defense Exhibits 1 through 4 will be admitted.

16          You may show those, Mr. Files.

17   BY MR. FILES:

18   Q.   I show you what has been admitted as Defendant's

19   Exhibit 1.  Can you tell us what that is, what is it a

20   picture of?

21   A.   That is, I believe, in Beaumont, Texas.  I can't recall

22   the hurricane.  I don't know if it was Sally or -- it was one

23   of the really bad floodings down in Beaumont, Texas, where

24   they provided relief and rescued children and elderly out of

25   drowning waters.

95

1  Q.   Is there anything unusual about the boat in which they
2  are?
3  A.   That boat was donated by Ellen DeGeneres.
4  Q.   Did she give you a choice of spending money for that or
5  something else?
6  A.   Yes, sir.  She offered us a honeymoon, that we never got
7  to receive.  And instead of going to Hawaii, we decided --
8  Ryan decided to get a rescue boat to continue his rescue
9  efforts.
10  Q.   And are the people in there, other than Ryan,
11  Mr. Harkrider, are they people who were rescued?
12  A.   Yes, sir.
13  Q.   I show you what has been admitted as Defendant's
14  Exhibit 2.  I ask if you can tell us what that is?
15  A.   I believe that was a rescue in Louisiana of an elderly
16  woman that was needing rescue.  Her house was flooded, and
17  she could not -- she was disabled, and so we -- they went in
18  there and rescued her with the Cajun Navy.
19  Q.   I show you what has been admitted as Defendant's
20  Exhibit 3.  Can you tell us what that is, and who is the guy
21  in the sarong?
22  A.   That young gentleman was missing for over 24 hours, him
23  and his wife, in a lake in Louisiana.  Their boat had
24  capsized, and Ryan and Alex went out with the Cajun Navy to
25  go and rescue that man, and they found him.

```
1   Q.   I show you what has been admitted as Defendant's
2   Exhibit 4.  Can you tell us what that is?
3   A.   That is Ryan Harkrider -- I'm sorry, Ryan Nichols and
4   Alex Harkrider in search and rescue efforts rescuing humans,
5   children, animals, and all life.  I believe that was
6   Beaumont, Texas.
7   Q.   Did your husband and his colleague, do they wait for
8   everything to be over, or do they go in while things were
9   still hot and heavy?
10  A.   They go in the day before the storm hits so that they
11  can figure out where the flooding areas are and regroup and
12  game plan before the storm hits.
13  Q.   Approximately how many days a year would you suggest
14  that your husband has been involved in this kind of rescue
15  work?
16  A.   Per year, I would say 50 to 75 days a year.  Any chance
17  that they get, they go.
18  Q.   Has this effort -- has this taken a toll on your
19  husband?
20  A.   Yes, sir.
21  Q.   Do you have any concerns about his PTSD or having PTSD
22  as a result of it?
23  A.   Yes, sir, I do.
24  Q.   Is he still able to function even with that?
25  A.   Yes, sir, he is.
```

1  Q.   Are you aware of an incident when he was in the Marine
2  Corps which also would have caused PTSD?
3  A.   Yes, sir.
4  Q.   And would you describe that for us?
5  A.   I know that while he was stationed in Okinawa, Japan,
6  there was a man that tried to climb the fence.  I don't
7  know if -- I know that he was a threat, and Ryan was on duty
8  patrolling and making sure that the military base was secure,
9  and he almost had to shoot the man to protect the base.
10 Q.   Did that appear to impact him?
11 A.   Yes, sir, it did.
12 Q.   Now, the term "suicidal ideation" has been mentioned
13 earlier.  Do you have any concern about your husband
14 committing suicide?
15 A.   No, sir, I don't.
16 Q.   What does he live for?
17 A.   His family and to serve -- serve the community and his
18 boys.
19 Q.   Tell me about his relationship with his boys.
20 A.   He is an amazing father.  He loves his boys.  And I
21 couldn't imagine a better father for my children.
22 Q.   Now, you had mentioned Cajun Navy.  Can you tell us what
23 the Cajun Navy is?
24 A.   So I believe the Cajun Navy is a search and rescue group
25 of men and women in the Louisiana area that provide search

1    and rescue efforts to serve the community during natural

2    disasters of any shape or form.

3    Q.    And has your husband also worked with the Coast Guard?

4    A.    Yes, sir, he has.

5    Q.    During Hurricane Michael and maybe another hurricane?

6    A.    Yes, sir, helicopter rescues, Hurricane Michael.

7    Q.    Is he supposed to be recognized on yet another

8    television show later this year?

9    A.    Yes, sir, I believe in April The Weather Channel.

10   Q.    And what was that for?

11   A.    That was for one of the last hurricanes that he

12   participated in.

13   Q.    Are there any firearms at your home at this time?

14   A.    No, sir, there is not.

15   Q.    Do you do drugs?

16   A.    No, sir.

17   Q.    Do you do alcohol?

18   A.    No, sir.

19   Q.    Do you have alcohol or drugs in your possession at your

20   home?

21   A.    No, sir.

22   Q.    We have -- we are asking the Court to permit you to be

23   what is known as a third-party custodian?

24   A.    Yes, sir.

25   Q.    If the Court were to permit -- or is to permit your

1   husband to be released, one of the things that she can

2   require is that there be a human being designated as a

3   third-party custodian to see that -- to give reasonable

4   assurance that your husband would appear, as required, for

5   court?

6   A.   Yes, sir.

7   Q.   We have talked about that.

8        You understand that the Court would have certain

9   conditions, and I want to go through these with you.  Remain

10  in the custody -- in your custody.  Who agrees to assume

11  supervision and to report any violation of a release

12  condition to the Court if the designated person is able to

13  assure the judicial officer that the person will appear as

14  required and will not pose a danger to the safety of any

15  other person of the community.

16  A.   Yes, sir.

17  Q.   Let's go to the gut issue.  You are married to him?

18  A.   Yes, sir.

19  Q.   You love him?

20  A.   Yes.

21  Q.   He is the father of your children?

22  A.   Yes, sir.

23  Q.   You want him to come home?

24  A.   Yes, sir.

25  Q.   At some point in time he is going to go to court in the

1   District of Columbia or perhaps here in the Eastern District

2   of Texas?

3   A.   Yes, sir.

4   Q.   When he goes to court, there is always the possibility

5   that he gets convicted and sentenced to a term in the

6   penitentiary; you understand that?

7   A.   Yes, sir.

8   Q.   Now, if you were a third-party custodian, you would have

9   taken an oath to report any violation that you would observe

10  of his violating any condition of probation that the Court

11  might impose?

12  A.   Yes.

13  Q.   You love your husband?

14  A.   I do.

15  Q.   Can you tell the Court that you would really pick up the

16  phone and call her or call somebody else if you observed him

17  to do something wrong?

18  A.   You bet I would.  You have my word.  I am a woman of

19  integrity.  And I will make sure that he shows up in court on

20  time.  I will make sure he stays out of trouble.  And I will

21  put my thumb down on him because not only do my children

22  depend on him, but I depend on him.  Our business and our

23  livelihood depends on it.  So you have my word that I will

24  make sure that he shows up in court.

25  Q.   He will be required to maintain employment there at the

1   business.

2   A.   Yes, sir.

3   Q.   If he needed to, he could be required to commence an

4   educational program, but that might be unlikely.  He would be

5   required to abide by specified restrictions on personal

6   associations, places of abode, or travel.  For example, he

7   would be told probably not to leave the Eastern District of

8   Texas except to travel directly to and directly from the

9   District of Columbia for court appearances?

10  A.   Yes, sir.

11  Q.   He would be told that he could not, for example, have

12  conversations with Mr. Harkrider or be around him.  The Court

13  would set out those things that he could not do.  Be proper

14  and common for him to be ordered to report on a regular basis

15  to a pretrial services agency of the United States

16  Government.  Would you see that he would do that?

17  A.   Yes, sir, I will.

18  Q.   Comply with a curfew.  If the Court told him that he had

19  to be home at 8:00 o'clock or 7:00 o'clock or 10:00 o'clock,

20  or whatever it was, you would work to see that he was doing

21  that?

22  A.   Yes, sir, I will.

23  Q.   Refrain from possessing a firearm, destructive device,

24  or other dangerous weapon?

25  A.   Yes, sir, I will.

1   Q.   Refrain from excessive use of alcohol or any narcotic

2   drug or controlled substance --

3   A.   Yes, sir.

4   Q.   -- without a prescription from a licensed medical

5   practitioner?

6   A.   Yes, sir, I will.

7   Q.   Undergo such medical or psychological or psychiatric

8   treatment, including treatment for drug or alcohol

9   dependency, and remain in a specified institution if required

10  for that purpose?

11  A.   Yes, sir, I will.

12  Q.   Something that is not mentioned in the United States

13  Code but would be a restriction on his freedom would be for

14  him to wear a GPS device so that there would be no issue

15  about where he was at any time, perhaps at his own expense.

16         Would you agree that you would help him on that if

17  that is required?

18  A.   Absolutely, I will.

19         MR. FILES:  Defendant's Exhibit 5 would be a

20  DD-214.  We furnished the state -- or the Government.  Excuse

21  me.  We furnished the Government with a copy of it.

22         We would offer Defendant's 5 at this time.

23         THE COURT:  Any objection?

24         MR. LOCKER:  None from the Government,

25  Your Honor.

1          THE COURT:  It is admitted.

2          MR. FILES:  That is absolutely impossible to see

3    unless the Court's eyes are better than mine.  May I simply

4    publish it?

5          THE COURT:  You may.

6          MR. FILES:  Thank you.

7          Name:  Ryan Taylor Nichols.  Department, component

8    and branch:  United States Marine Corps.  Social Security

9    number omitted.  It is there, but no reason to read it into

10   the record.

11         Grade, rate, or rank:  Corporal.  Pay grade:  E4.

12   Date of birth:  ████████████████       Reserve obligation

13   termination date.  Place of entry into active duty:

14   Shreveport, Louisiana, 71118.  Home of record at time of

15   entry:  It's in Diana, Texas.

16         Last duty assignment and major command:  9th

17   Communication Battalion, Camp Pendleton.  Station where

18   separated:  Marine Corps Base, Camp Pendleton.  Primary

19   specialty:  Tactical Switching Operator, one month, five

20   days.  Construction wireman, one month, 11 days.

21         Record of service.  Date entered:  2010, 10 months,

22   18 days.  Separation date:  2014, 10 months, seven days.

23   Active service this period:  Four years.  Total active

24   service:  Four years.  Foreign service:  One month, 11 days.

25   No, excuse me.  11 months, one day -- one year, 11 months,

1    one day.

2              Sea service:  None.  Additional entry training:

3    Four months, 21 days.  Effective date of pay grade:  2012.

4    May 5th -- May 1st on that date.

5              Decorations, medals, badges, citations, campaign

6    ribbons:  Marine Corps Good Conduct Medal, Global War on

7    Terrorism Service Medal, National Defense Service Medal, Sea

8    Service Deployment Ribbon, Expert Rifle Qualification.

9              Military education:  Communications cable and

10   antenna service apprentice -- communications antenna systems

11   service.  Accrued days leave:  2.5.

12             That is really all that would be relevant.

13             May I have one moment, Your Honor?

14             THE COURT:  Yes.

15   BY MR. FILES:

16   Q.   And, in summary, if the Court permits him to be

17   released, you would assist in seeing that he complied with

18   each and every condition of release that she might impose?

19   A.   Yes, sir.  You better believe.  You have my word.

20             MR. FILES:  Pass the witness.

21             THE COURT:  Cross-examination?

22                       CROSS-EXAMINATION

23   BY MR. LOCKER:

24   Q.   Ms. Nichols, I only have a few questions for you.

25   A.   Yes, sir.

1    Q.    Are you aware of your husband's drug usage?

2    A.    I am aware.

3    Q.    What substances are you aware that your husband uses?

4    A.    Marijuana.

5    Q.    Do you have any awareness of him using Ketamine, LSD --

6    A.    No, sir, I do not.

7    Q.    -- DMT?

8          So if he is doing that, he is doing that without

9    your knowledge?

10   A.    Yes, sir.

11   Q.    And if he is discussing that with his friends, he is

12   doing that without your knowledge?

13   A.    Yes, sir.

14   Q.    So you would agree that even under this limited area we

15   have probed, the only area that we have probed so far, there

16   are areas of his life that you can't control even if it is in

17   your best interest to do so; is that correct?  I mean, you

18   would agree it is not in your best interest for your husband

19   to be a regular drug user, would you agree, particularly

20   psychodelic drugs?

21   A.    Can you repeat that question?

22   Q.    Would you agree it is not in your business's best

23   interest for your husband to be a user of psychodelic

24   drugs?

25   A.    Yes, sir, I agree with that.

1    Q.    So it would also be in your best interest to know about

2    that and control it and attempt to prevent it, and yet you

3    have been unable to; is that fair?

4    A.    I believe that now I am aware and I can control it and I

5    will.

6    Q.    Does your husband own an AR-15?

7    A.    Yes, sir, he does.

8    Q.    Why was it not at your house when the search warrant was

9    executed?

10   A.    Because it was with him.

11   Q.    In Oklahoma?

12   A.    Yes, sir.

13   Q.    You took it with you to Oklahoma; is that correct?

14   A.    Yes, sir.

15   Q.    Did your husband know he was likely to be arrested?

16   A.    I do not know that.

17   Q.    Did you have discussions with your husband about his

18   concerns about law enforcement contact in the future after

19   his involvement on the 6th?

20   A.    We did have conversations about that, yes, sir.

21   Q.    Were you aware that he had removed the clothing from

22   your home that he had worn to the Capitol on the 6th?

23   A.    No, sir.

24   Q.    The boonie hat, the armor plate carrier, the GoPro

25   videos.  Did you see your husband spending a lot of time on

1    the computer?

2    A.    No, sir.

3    Q.    So you don't know what happened to any of those

4    devices?

5    A.    We turned the GoPro in to the attorney.

6    Q.    You would agree that the person in those images is your

7    husband, right?  We are not disputing --

8    A.    Yes, sir, they are.

9    Q.    And so you would agree that, naturally, law enforcement

10   should have expected to find those clothing items in your

11   home when they executed the search warrant; is that

12   correct?

13   A.    Yes, sir.

14   Q.    And yet they didn't?

15   A.    That's correct.

16   Q.    And so this is now a second area that, despite your

17   conscientious observance of your husband, you are unaware

18   that he has removed evidence from your home, and he has taken

19   efforts to evade detection of his conduct.  Would you agree

20   with that?

21   A.    I don't agree with that.  I feel that they haven't --

22   they may not have been found at the home.  But, I mean, I am

23   open to figuring out where they are and finding them.  I

24   mean, absolutely.  Whatever we can do to cooperate, we

25   will.

1   Q.    Does your husband have a second home?

2   A.    No, sir.

3   Q.    So all of his clothing and personal effects should

4   generally be found in his home or in his vehicle; is that

5   fair?

6   A.    I would say most of everything should be at the home.

7   Q.    So if the officers, like you said, if they just expected

8   to find those items and they didn't is because he probably

9   consciously made an effort to make sure they were not found

10  at the time the search warrant was executed?

11  A.    I don't know.  I don't know.  I am not -- I wasn't

12  there.  I didn't have the articles of clothing.  I don't know

13  how to answer that question.

14          MR. LOCKER:  I will pass the witness.

15          THE COURT:  Any redirect, Mr. Files?

16          MR. FILES:  May I have just a moment?

17          THE COURT:  Yes.

18                    REDIRECT EXAMINATION

19  BY MR. FILES:

20  Q.    In its simplest, has your husband ever done some

21  psychodelic drug at the house?

22  A.    Not that I know of.

23  Q.    Never -- would he do it around the children?

24  A.    No, sir, absolutely not.

25  Q.    Are you aware of any drug use on his part other than

1   marijuana?

2   A.   Other than marijuana, that's it.

3   Q.   And when has he been interested in using marijuana?

4   A.   Only when he is stressed and uses it for anxiety to help

5   him sleep and to calm himself.

6   Q.   After coming back from a mission?

7   A.   Yes, sir.

8               MR. FILES:  Pass the witness.

9               THE COURT:  Any recross?

10              MR. LOCKER:  No, Your Honor.

11              THE COURT:  All right.  Ms. Nichols, thank

12   you.  You may step down.

13              THE WITNESS:  Thank you, Your Honor.

14              THE COURT:  Mr. Files?

15              MR. FILES:  We pass the witness.  May I have just a

16   moment?

17              THE COURT:  You may.

18              MR. FILES:  We rest.

19              THE COURT:  You rest.

20              All right.  Anything further?

21              MR. LOCKER:  No, Your Honor, Government closes.

22              MR. FILES:  We close.

23              THE COURT:  All right.  Then at this time I will --

24   the Government can argue its motion.

25              MR. FILES:  Oh, I apologize.  I had one other

1    thing.  Excuse me.

2              THE COURT:  Okay.

3              MR. FILES:  I had furnished the Government with it,

4    and we just didn't get there.  I apologize, Your Honor.  I

5    know better than that.

6              THE COURT:  That's all right, Mr. Files.

7              MR. FILES:  Under the provisions of Title 18,

8    Section 3142(f), we have a proffer.  We have furnished the

9    state -- the Government -- I keep saying state -- the

10   Government with a copy of the proffer, and it would be

11   difficult, so may I read it?

12             THE COURT:  You may.

13             MR. FILES:  Thank you.

14             To the Honorable Judge Mitchell.  I went to

15   Washington, D.C., because I believed that is what the

16   President asked us to do.

17             On January 6th, I was at the Capitol for

18   approximately 45 minutes to an hour.  I did not go into the

19   House or Senate Chambers.  I did not steal anything.  I did

20   not damage anything or take anything as a souvenir.  I left

21   when the President posted on Twitter and Facebook for

22   everyone to leave.  So I did.

23             I know that I am going to have to go to court in

24   Washington, D.C.  I am sincerely asking that I be released on

25   bail and be permitted to travel to Washington, D.C., with my

1   wife, Bonnie, and legal team, including Buck Files and

2   associates.

3           As a Marine, I never failed to be where I was told

4   or ordered to be.  The moment that I discovered that I was in

5   trouble, I drove four-plus hours to turn myself in.

6           I promise that I will be in court whenever and

7   wherever I am told, so help me God.  My intention in life has

8   always been to do the right thing even when it felt

9   uncomfortable, such as now.  And I will do what is required

10  by the Court.

11          Signed, Ryan Taylor Nichols, Sr.

12          Now we rest.  Close.

13          THE COURT:  Mr. Locker, I gave Mr. Files an

14  opportunity to reopen briefly.  Do you have any rebuttal

15  evidence to that evidence?

16          MR. LOCKER:  No, Your Honor.

17          THE COURT:  Okay.  All right.  You may argue your

18  motion.

19          MR. LOCKER:  This is not a peaceful protest.  If

20  you have a weapon, you need to get your weapon.  By his own

21  words and actions, Mr. Nichols was not a peaceful protestor.

22  A peaceful protestor does not storm the Capitol attached with

23  gear, carrying a crowbar, and heave-ho with the crowd and

24  push into the doors of the Capitol and use a bullhorn to whip

25  the crowd into a frenzy and encourage them to commit acts of

1    violence or request other rioters to hand them a canister of

2    OC spray and then use it to assault Capitol Police

3    Officers.

4            Nichols did not get swept up in the moment,

5    Your Honor.  He and Mr. Harkrider made specific preparations

6    for a violent confrontation.  He researched weapon laws in

7    D.C.  He assembled a weapon box for the trip.  He discussed

8    D.C. being a war zone and preparing for battle, with

9    Mr. Harkrider.  He acquired body armor en route.

10           He engaged in a verbal confrontation with D.C. law

11   enforcement the night before.  And he brought a crowbar to

12   the protests.

13           He is also a drug user of both marijuana and

14   psychodelic drugs, who has already acquired the means to

15   assist him with avoiding detection.

16           He has violent tendencies.  He shoots at low-flying

17   planes.  He travels to the airport with a rifle to resolve a

18   problem that should be handled by law enforcement and the

19   FAA.

20           He is a source of fear for his neighbors.

21           He assaults construction workers and lies about it

22   to police.

23           He is known as a hothead to his business neighbors.

24           And he verbally assails and intimates threats to

25   D.C. law enforcement the night of January 5th.

1          He has called into question his mental stability,

2   including statements from his father that he suffers from

3   PTSD and that he has expressed, to his father at least,

4   suicidal ideation.

5          Regarding weapons, we know he is armed, but his

6   AR-15 was not present at his home before it was searched.  We

7   also know he is engaged in obstructive conduct.  He removes

8   evidence, clothing, weapons, a camera -- subject to

9   correction, may not be the same camera -- and body armor.

10          He also instructed Mr. Harkrider to destroy

11   evidence.  He changed his appearance in preparation for

12   arrest.  And he sanitized his social media.

13          And, finally, he has no ties to the District of

14   Columbia except for criminal contact -- conduct.

15          And if there is still doubt as to whether or not

16   Mr. Nichols plans to comply with the law, we should listen to

17   his own words:  We will not bend.  We will not break.  We

18   will never give in.  We will never give up.  We will never

19   surrender.  Headed home to better reorganize.  The fight for

20   our country has just begun.

21          Every insurrectionist thinks he is a patriot.

22   Every revolutionary things he is justified.  As Marines, both

23   men took an oath to defend the Constitution, but instead they

24   helped lead an assault on the nation it governs.

25          As grand as our Government buildings are and as

1    eloquent as our founding documents, our nation is much

2    greater than buildings or documents or flags or individual

3    leaders.  Our nation's bedrock is the mutual assent to a

4    guiding body of principles, that being individual liberty,

5    individual responsibility, the rule of law, and

6    accountability.

7            By violently storming the Capitol, these men

8    assaulted those principles.  They significantly contributed

9    to what could be an existential threat to the continuation of

10   our Republic.  Many Americans are now wondering whether a

11   nation can hold fast, can remain bound together, amidst the

12   current climate of which this riot is the low point.

13           Whether it is an existential threat or one we will

14   overcome largely depends upon how we respond to the crimes

15   committed on January 6th.  There is a legitimate question as

16   to whether or not the inconsistent and often tepid response

17   to this past summer's riots sewed the seeds for January 6th.

18           We cannot answer that question today, but what we

19   can know is our response now will be watched by those

20   considering the next chapter in our nation's unfolding crisis

21   of divisiveness.  We will not deter the next cycle if we wink

22   at these crimes or coddle those that commit them.

23           Detention strongly sends the -- signals the

24   seriousness of which we view these crimes.

25           The vast majority of Americans present that day at

1    the Capitol committed no crimes.  Some committed only

2    misdemeanors.  But those who stormed the Capitol with weapons

3    encouraging others to commit acts of violence committed or

4    contributed to the acts of violence themselves, bragged about

5    doing so on social media and then sought to destroy evidence

6    of their conduct prior to arrest, most certainly are among

7    those that should be detained.

8              THE COURT:  Thank you.

9              Response?

10             MR. FILES:  May it please the Court.

11             So we have a criminal complaint that has conspiracy

12   and unlawful entry with dangerous weapon, violent entry and

13   disorderly conduct, civil disorder, assault on a federal

14   officer using a deadly or dangerous weapon and aiding and

15   abetting.

16             The Court should obviously find whether or not

17   there is probable cause to believe the -- that there is

18   evidence as to these offenses.  And we have seen video.  And

19   the Court, I am sure, has seen video outside this courtroom

20   of what happens at the Capitol.

21             I would respectfully suggest that the Government is

22   lacking on evidence that there was an intentional assault on

23   a federal officer using a pepper spray, using a deadly

24   weapon.

25             And if I can find Mr. Harry's exact words, I will

1    parrot them back for the Court.

2              I don't have it marked.  I have to go through it.

3              MR. LOCKER:   Page 11.

4              MR. FILES:  It is page 11.  Thank you.

5              The Government's words.  This is what they say

6    happened.  This is what they have to show the Court probable

7    cause to believe this happened.  They do not say that my

8    client assaulted an officer by the use of pepper spray.  They

9    say that, based on the appearance of what appeared to be OC

10   pepper spray, that in the direction of the entrance to the

11   U.S. Capitol building where federal law enforcement officers

12   were engaged in the performance of their official duties that

13   he had sprayed an unknown agent.  Not at the officers, not

14   hitting the officers, but in the direction of the entrance

15   where they were.

16             I would respectfully suggest that you can look at

17   that video 7,000 times and not be able to ascertain that

18   there was an officer who was hit by pepper spray.  And that

19   is clearly the most significant issue here.  Did he have

20   pepper spray?  Sure he had pepper spray.  Did he spray with

21   pepper spray?  Of course, he did.

22             Did he spray it with the intent to hit an officer?

23   Did he hit an officer?  Did he use it to harm an officer?  He

24   fired in the direction or sprayed in the direction of the

25   entrance where officers were.

1          I would respectfully suggest that the Government

2    has certainly not, on that, met its burden.

3          Without a question of whether the Government has in

4    that or in the other charges, Mr. Nichols is going to be

5    required to answer charges in the United States District

6    Court for the District of Columbia.  The question is, does

7    the Court detain him, or does the Court release him?

8          Probation officers have recommended release.

9          You have heard our suggestion for a third-party

10   custodian.

11         Mr. Nichols has not been a lifetaker; he has been a

12   lifesaver.  How unique is it for an individual to have been

13   on as many as 15 hurricanes at his own expense, 501(c)(3), to

14   try to help people and save lives.  And we gave you just a

15   taste, a smattering of his success in doing that.

16         Ellen DeGeneres gives him a boat instead of paying

17   for a honeymoon, and he takes it and uses it.

18         When his wife was on the witness stand and I asked

19   her about whether or not she would actually be a third-party

20   custodian or whether she might just not -- she might just let

21   it go, what was her body language?  How did she appear?  Did

22   she appear to be a truthteller?  I would respectfully suggest

23   that she came across as being an absolute truthteller using a

24   thumb, putting her thumb; he would be under her thumb.  I

25   have no doubt that what she was saying was from her heart and

1   from her head.

2          Use of drugs.  Has her husband ever used a

3   psychodelic?  I don't know.  She has never been around him

4   when he has.  One of the things that the Court would be

5   telling her is you have to make certain that he only uses

6   prescription medication and only in accordance with the

7   dosage that the doctor prescribes.  Not psychodelic drugs,

8   not marijuana, not anything else.  He has to do these and no

9   others.

10          These conditions are conditions that are imposed

11  day after day after day in United States courts.  And people

12  carry them out and people function as third-party custodians

13  and there is no reason to believe that this case would be

14  different.

15          Obviously, there is not evidence before the Court,

16  but it is I think common knowledge for any of us who were

17  following it, the guy that sits in Pelosi's chair is out.  He

18  is not detained.  The one who steals Pelosi's laptop is out.

19  She was not detained.

20          I can't give statistics on how many people are out

21  and how many people are in.  But we don't look at the case

22  and say everybody who participates ought to be there.  The

23  Court has seen the pictures of the people trying to break in

24  the Senate Chambers and the House Chambers and breaking into

25  the Capitol, knocking the windows out, using shields.  We do

1    not have that in this case.

2            We respectfully suggest that we have given the

3    Court every reason in the world to release our client on

4    reasonable conditions; and that if we looked for a hundred

5    years, we could not find a better third-party custodian than

6    the lady whom we have suggested to you, the Defendant's wife.

7            THE COURT:  Thank you, Mr. Files.

8            As it is the Government's motion, any final word?

9            MR. LOCKER:  Just briefly, Your Honor.  The

10   affidavit is only a small portion of what the Court has --

11   the Government has asked the Court to consider regarding

12   evidence for the elements.  It is also supplemented by the

13   testimony of Detective Harry and the exhibits presented today

14   in court.  There is more than ample evidence for the Court to

15   find that there is probable cause for all of the elements for

16   all of all of the offenses.

17           In addition to that, I need to correct a

18   misstatement by Mr. Files.  The individual who -- from the

19   Western District of Arkansas, who has appeared with his feet

20   on Ms. Pelosi's seat -- whose feet was on Ms. Pelosi's desk,

21   he is, in fact, detained.

22           Although the judge for the Western District of

23   Arkansas ordered his release, the Government immediately

24   appealed that, and that was granted.  He is in custody en

25   route to Washington D.C.  And I cannot speak for what has

1   been done across the rest of the country, but I can tell you

2   with certainty within this district, 100 percent of the

3   individuals who have been charged with felonies for their

4   involvement on January 6th have been detained, and none of

5   them, none of them, other than Mr. Nichols or Mr. Harkrider,

6   carried weapons into the Capitol.

7                    THE COURT:  Thank you.

8                    All right.

9                    MR. FILES:  I apologize if I have misled the Court.

10  My understanding was that the order of release had been

11  given.  We were unaware of the appeal.

12                    THE COURT:  Thank you, Mr. Files.

13                    I appreciate the testimony and the evidence

14  provided today from both sides and both attorneys' arguments.

15                    In light of the testimony, I do find that there is

16  probable cause to believe that an offense has been committed

17  and that Nichols has committed it.

18                    In addition, based on what I have heard today

19  concerning the nature of the charged offense, I do not

20  believe that there are conditions that could reasonably

21  assure the safety of the community or Mr. Nichols'

22  appearance.

23                    Pretrial Services does recommend release.  However,

24  the testimony I have heard today paints a picture not of a

25  peaceful protest that got out of hand, but of a planned and

1    predetermined, premeditated attempt to attack the Capitol.

2            The text messages lay out a plan to drive to D.C.

3    with weapons and to acquire body armor on the way.  I saw

4    evidence of threats and antagonizing language toward the

5    crowd.  And over and over again evidence shows intent that

6    this was not to be a peaceful act.

7            I am concerned about evidence of other acts in the

8    past, as well as substance use.

9            And for these reasons, Mr. Nichols will be detained

10   pending trial.

11           I will enter an order detaining the Defendant.

12           Is there anything further from the Government?

13           MR. LOCKER:  No, Your Honor.

14           THE COURT:  Anything further from the Defendant?

15           MR. FILES:  No, Your Honor.

16           THE COURT:  All right.  We are going to be

17   adjourned on this case.

18           We will take a brief recess to reset for

19   Mr. Harkrider.

20           COURT SECURITY OFFICER:  All rise.

21           (Hearing adjourned.)

22

23

24

25

1              <u>CERTIFICATION</u>

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8    <u>/s/ Shea Sloan</u>                    February 5, 2021
     SHEA SLOAN, CSR, RPR
9    Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25