**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**RYAN TAYLOR NICHOLS,**<br><br>*Defendant*. | **Case No. 21-cr-117-1(TFH)** |

**DEFENDANT RYAN NICHOLS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR MODIFICATION OF BAIL**

**ARGUMENT 1:** Ryan Nichols' History and Characteristics Do NOT Support Detention

Ryan Nichols is a former United States Marine who received the Good Conduct Medal, National Defense Service Medal, and the Global War on Terrorism Medal during his four years of honorable service to this country. Mr. Nichols has no criminal history. Mr. Nichols is not a part of any hate group or organization espousing violence. He has no history of failing to appear in court. He is a father to two young boys. He has been married for eight years. Mr. Nichols owns a small business. He employs many people, including ex-convicts and recovering drug addicts. Mr. Nichols owns a 501(c)(3) called "Rescue The Universe" that specializes in searching and rescuing people from areas affected by natural disasters. He was nationally recognized for his work with Rescue the Universe. Mr. Nichols' co-defendant Alex Harkrider has been doing search and rescue work under the banner of Rescue the Universe since being released into the custody of Pretrial Services by this Court in April 2021. Mr. Nichols has not been charged with a crime of violence that triggers the presumption of detention. Mr. Nichols asserts the presumption in favor of release to which he is entitled. Mr. Nichols asserts the presumption of innocence to which he is entitled.

1

**ARGUMENT 2:** <u>The Government has Not Overcome the Presumptions of Innocence and Release</u>

The Government has gone to extreme lengths to cast Mr. Nichols in the worst possible light because the truth cuts against the Government's false narrative, which suggests that Mr. Nichols is a dangerous domestic terrorist who committed insurrection. The Government has in this case, and many other January Sixth related cases, made material misrepresentations of fact in order to overcome the presumption of release and the presumption of innocence, both of which Mr. Nichols is constitutionally cloaked in. Time and again, the Government has used hyperbole and drawn damming conclusions that are unsupported by fact, simply because it can. This is not acceptable.

The following examples are demonstrative of the litany of misrepresentations made by the Government in its reply brief: First, Mr. Nichols is an "…individual who believes he is above the law, does not have to answer to law enforcement, and is prone to violence." (See Opp. at Page 28) This hyperbolic conclusion was clearly made in bad faith as it is wholly contradicted by Nichols' history and characteristics.

For instance, Mr. Nichols was honorably discharged from the United States Military and in addition to other medals, received a good conduct medal. He has received five good conduct reports from prison guards at the DC Jail guards during his time as a detainee.[1] He does not have any criminal history, never mind a violent one. All of this speaks to someone who respects authority and has lived a life within the rule of law. Because the Government cannot proffer even a misdemeanor, never mind a violent crime, it has conjured up an angry neighbor and a false allegation from years ago, in a pathetic attempt to create a history of violence where none exists,[2] in an effort to smear Mr. Nichols' good name and trick this Court into thinking that January 6th was not an aberration, but rather the norm in his life. Nothing could be further from the truth.

---

[1] See **EXHIBIT 1** November 15, 2021 Good Conduct Report from Prison (5th Good Conduct Letter)
[2] See Government's Opposition. Pages 30-31

Second, the Government dedicated an entire section called "*Confronting Law Enforcement in Washington, D.C. on January 5, 2021*" (See Opp. at p.9) in order to criminalize free speech that is protected by the First Amendment to the United States Constitution. The Government has also suggested that Mr. Nichols' beliefs about the 2020 Election should be counted against him as indicia of dangerousness and or radicalization. This is demonstrated by the fact that the Government uses the word "election" thirty times in its Reply Brief. The Government seems to have forgotten that the First Amendment to the United States Constitution empowers every citizen to harshly criticize the federal government for any conceivable reason— including election results. Because Mr. Nichols' remarks at the January 5th peaceful protest are constitutionally protected, as are his beliefs about the illegitimacy of the November 2020 election, all reference, suggestion and innuendo purporting that his political beliefs should be weighed against him for purposes of pretrial detention must be dispensed with as a matter of law.

Third, according to the Government, this Court "… should be particularly concerned that nothing seems to have changed for [the defendant] since January 6th. Unlike many of the rioters now facing charges for their conduct, [the defendant] has expressed no remorse for his actions at the Capitol." (See Opp. at p.9) Mr. Nichols submits that this Court should be gravely concerned with the Government's continued disregard for the United States Constitution. Specifically, the Government's suggestion that Mr. Nichols should apologize and/or express remorse for any crime to which he has been charged, while simultaneously asserting the presumption of innocence during an active criminal prosecution— is utterly ridiculous. This is because Mr. Nichols has a constitutionally protected right against self-incrimination under the Fifth Amendment. As such, any silence, alleged lack of remorse, and/or refusal to apologize at this juncture, cannot be weighed against him for purposes of pretrial detention, and must be dispensed with as a matter of law.

3

**ARGUMENT 3:** The Government has NOT Clearly Identified and Articulated a Future Threat to the Community Under the Meaning of the DC Circuit's Decision in *U.S. v Munchel*

When assessing the question of future dangerousness under *Munchel,* the district court must consider whether the defendant presents a clearly identifiable and articulable future threat to the community. In making its assessment, the Court must consider whether the defendant's history, characteristics, and alleged criminal conduct make clear that he poses a concrete, prospective threat to public safety. United States v. Munchel, 991 F.3d 1273 (DC Cir. 2021).

Mr. Nichols' history and characteristics are stellar. He has a remarkable history of non-violence. He is loved by his family and friends. He has strong community ties. He owns a family business where he employs multiple people, including ex-convicts and recovering addicts. He has a 501(c)(3) called Rescue The Universe that specializes in search and rescue work in communities affected by natural disasters. His search and rescue work has been nationally recognized. He is not a member of any extremist organization, hate group, or group that espouses violence. He has no criminal history. He was honorably discharged from the military and received several medals. He surrendered himself the same day he found out that he was wanted for questioning. Clearly, Mr. Nichols' history and characteristics are not demonstrative of someone who presents a clearly identifiable and articulable future threat to the community, but are rather demonstrative of someone who has lived a law-abiding life, every day of his life, excepting January 6, 2021.

The latter prong of the future threat analysis requires an examination of the alleged criminal conduct, which Mr. Nichols discussed during a proffer session with the FBI on June 4, 2021. The 302 Form memorializing his interview with the FBI has been attached to this motion as Exhibit 2. The defense raises the following six points as evidence that Ryan Nichols does not pose a concrete, prospective threat to public safety under United States v. Munchel, 991 F.3d 1273 (DC Cir. 2021).

4

**POINT ONE:** During his interview with the FBI, Nichols recalled a specific instance of an "…unidentified lady getting hit by law enforcement." (*See* Ex. 2 at p. 2) This corroborates Nichols' claim of watching and reacting to the brutal beating in the tunnel given to the lady in the red hat by officer "White-shirt." Moreover, the woman has since come forward, identified herself, and corroborated the claims made by Nichols in the underlying motion. Here is an excerpt of her December 8, 2021 interview with Julie Kelly:

> "One officer in a white shirt focused solely on me. He kept bashing and hitting me over and over."
>
> White described how the officer changed his grip on the metal rod—a device intended to break glass in emergencies, not to be used against human beings—to exact more force.
>
> "He begins to bash and poke me. Then another officer takes my hair and shakes my head back and forth."
>
> As if that weren't enough, the supervisor wearing the white shirt starts hitting her directly in the face. "He takes his left hand, balls it up, and punches me in the face. I finally put my hand on my head and tried to grab his stick to get him to stop."
> …
>
> "I could have died."[3]

As argued in the underlying motion, Mr. Nichols will be asserting the affirmative defenses of self-defense and defense of a third person. Mr. White's interview provides strong corroborative evidence of this claim. As does Mr. Nichols' history and characteristics, the fact that he has no criminal history, was honorably discharged from the Marine Corps, and specializes in search and rescue work. These facts speak to one logical conclusion. Namely, at one point Mr. Nichol's saw a woman in danger of losing her life and at another, he reasonably perceived other people to be in danger, which prompted him to take justifiable remedial actions in defense of self and of others.

---

[3] *See* January 6 Police Beating Victim Speaks: 'I Could Have Died" @ https://amgreatness.com/2021/12/08/150045/ (last visited on December 15, 2021)

5

**POINT TWO:** Ryan Nichols alleged in his underlying motion that he helped Capitol Police Officer Michael Fanone avert serious danger and ultimately get to safety. The Government asserts that Nichols' claims are not credible. (See Opp. at p.12) The Government is wrong.

Officer Fanone testified in front of The House Select Committee to Investigate the January 6th Attack on the United States Capitol on July 27, 2021. Mr. Nichols first spoke of helping Fanone during a June 4, 2021 interview with the FBI.[4] Therefore, statements made by Nichols at his June 4th meeting that are later echoed by Fanone during his July 27th testimony should serve as evidence corroborating Mr. Nichols' claims— because June 4th precedes July 27th by 54 days.

During his June 4th meeting with the FBI, Mr. Nichols recalled that he "observed a uniformed officer being drug outside of the U.S. Capitol on the stairs. He was approximately 5-10 feet away from the officer while he was curled up on the stairs. Nichols stated that he overheard someone say 'take his gun and kill him.' Nichols along with others attempted to assist the officer and curtail the violent crowd." An excerpt of Officer Fanone's July 27th testimony reads as follows: "I was grabbed, beaten, tased… I was at risk of being stripped of, and killed with, my own firearm as I heard chants of 'Kill him with his own gun!" (See Ex. 3 at p.2)

Fanone's testimony clearly corroborate representations of fact made by Mr. Nichols, which suggests that Nichols' statements have a high degree of veracity. Furthermore, Mr. Nichols *bona fides* as a professional search and rescue specialist, time as a uniformed service member, honorable discharge, and the entire history of his life strongly suggests that his claim of coming to Fanone's aid is highly reliable, because rescuing people from danger is literally what Ryan Nichols is trained to do. As such, this information should weigh heavily in favor of release.

---

[4] *See* **EXHIBIT 2:** at page 3 "Nichols stated that he observed a uniformed officer being drug outside of the U.S. Capitol on the stairs. He was approximately 5-10 feet away from the officer … (and) overheard someone say 'take his gun and kill him.' Nichols along with others attempted to assist the officer and curtail the violent crowd."

6

**POINT THREE:** Mr. Nichols stated during his interview that he regretted going to Washington, D.C. and that wished he had not gone. (*See* Ex. 2 at p.4) Yet the Government continues to suggest that he has no regrets of any kind.  Mr. Nichols did not bring anything illegal with him to Washington, D.C.— yet the government would have this Court believe that he showed up armed for war. (*Id.* at p.3) This is demonstrated by the fact that the Government uses the word "war" more than ten times in its opposition.  Nichols was clear in his interview with the FBI that the reason why he "wore a plate carrier and brought a crowbar with him to the rally was because he wanted to be prepared if something bad were to happen." (*Id.* at p.4)  This corroborates Nichols' claim of being prepared for having to defend himself against Antifa and counters the Government's claim that he was preparing for an attack on the Capitol.

**POINT FOUR:** Nichols also stated during his interview with the FBI that he had no intent to go into the U.S. Capitol but got caught up in the moment as the situation became more volatile. (*Id.* at p.3) Nichols stated further that while he was inside the Capitol, he realized he had made an error of judgment which prompted him to leave. (*Id.* at p.4) This undercuts the Government's mischaracterizations of Nichols as someone who was prepared to violently overturn the election. "Nichols viewed the 2020 election as fraudulent, and he was determined to prevent Congress's certification of the election results… through any means necessary." (*See* Opp. at p.1)

Importantly, Mr. Nichols learned while inside a conference room, that Ashli Babbitt had been shot by the Capitol Police while she was in the Capitol.  Nichols responded by doing two things.  First, he blocked the conference room door that led to the interior of the Capitol with a table.   Second, he went outside and gave a speech.  Both of these actions cut against the Government's suggestion that Mr. Nichols is a violent radical terrorist who attempted to lead an insurrection.

Firstly, the fact that Mr. Nichols barricade the door leading into the interior of the Capitol is not evidence of someone hell bent on finding Mike Pence. It is instead evidence of a responsible person making split second decisions during a highly volatile situation. Mr. Nichols's actions are defensive, not offensive. He does not kick open the door and go hunting for government officials. He instead takes defensive measures to protect the people in the room with him. Barricading the door to the room that you are in is a normal reaction to finding out that an unarmed protestor was unjustifiably shot to death in close proximity to you. Barricading the door creates a safe space for you and those around you until you are able to make your next move.

Secondly, Mr. Nichols decides to leave the conference room but is handed a bullhorn while he is standing on the window ledge. The Government has gone through great lengths to cast Mr. Nichols' bull horn speech in the worst possible light while completely ignoring the fact that Nichols had already seen a disproportionate amount of police brutality and had just learned that an unarmed female protestor had been shot by the Capitol Police. His speech, therefore, is a call to safety and self-defense— not a call to insurrection. What does Nichols say? "This is not a peaceful protest!" The is statement of fact it true. "Get inside the building…" because that conference room is a safe space. "Grab your weapons…" not so you can commit insurrection, but so you can defend yourself because people are literally dying. The Government has not factored this explanation into its analysis because it cuts against its narrative which depicts Nichols as a radicalized domestic terrorist. This Court however, must view these statements through the lens of the presumption of innocence, which means in a light that favors Mr. Nichols, not a light that cast a shadow of radicalization and dangerousness over him.[5]

---

[5] In his interview with the FBI Nichols stated that he took out the crowbar to use as "as a prop" while he spoke to the crowd. Nichols "stressed that he did not use [the crowbar] in an offensive/defensive manner…" (Ex. 2 at p.3)

8

**ARGUMENT 4:** United States v. Michael Foy is Applicable to the Facts of this Case.

Ryan Nichols and Michael Foy are both former United States Marines with no criminal records. The charges in Nichols' indictment are almost identical to the charges in Foy's indictment. The facts of each case are similar as well. Importantly, both have been charged with possessing and using dangerous weapons under 18 U.S.C. §§111(a)(1) and (b) 18 U.S.C. §§1752(a)(2) and (b)(1)(A). Both have cited the police brutality and carnage at the area in and around the Western Terrace's Tunnel as a means for using force. Both have asserted defense of a third person as an affirmative defense. Like Foy, Mr. Nichols asserts that he acted on behalf of a defenseless woman who was being attacked by the same group of officers who attacked the defenseless woman (Roseann Boyland) in Foy's case. Dissimilar to Foy, Nichols has not been accused of hitting any police officer, whereas Foy is accused of attacking MPDC officers with a hockey stick multiple times. After months of confinement, Foy successfully argued that his actions in defense of others, in conjunction with his history and characteristics, warranted his release. After months of confinement, Mr. Nichols seeks to do the same and incorporates the District Court's ruling in United States v. Michael Foy, 121-cr-00108-TSC as precedent justifying Mr. Nichols release from detention.[6]

---

[6] The Government's contention that Mr. Nichols' case is analogous to the defendant in United States v. Sabol is wrong. Nichols is distinguishable from Sabol for a multitude of reasons, such as: Sabol was clearly seen physically assaulting two officers while Nichols made no illegal physical contact with any officer. Sabol possessed zip ties, while Nichols did not. The Government was able to point to two victims with bodily injury in Sabol's case but has not proffered any victim in Nichols' case. Sabol destroyed electronic devices, while Nichols did not destroy any electronic devices. This is evidenced by the fact that the FBI took all of Mr. Nichols' electronic devices. Sabol moved guns from his home, Nichols did not. Nichols instead gave the FBI the combination to his safe. Sabol attempted to flee the country, while Nichols drove four hours to turn himself in after discovering that he was wanted by the FBI. Sabol physically attacked and Officer while Mr. Nichols made no illegal physical contact with any officer. As such, Sabol is inapplicable to the facts of this case. United States v Sabol 534.F.Supp.3d 58 (2021)

9

**ARGUMENT 5:** The Police Illegally Used Deadly Force to Defend the Capitol Building

The Government must contend with the reality that police officers illegally used deadly force in defense of property on January 6, 2021.  For instance, The United States Capitol Police Report of Investigation indicates multiple security failures that took place on January 6th.  Failures that put Capitol Police and D.C. Metropolitan Police in an extremely unfair situation. In response to said failures, officers, confronted with throngs of protestors had to make a choice between using deadly force to defend the Capitol building, or not.  Here is an example on an officer wrongfully concluding that the use of deadly force was appropriate to defend the Capitol building after he was blindly sent to defend a Western Terrace door.

UNITED STATES CAPITOL POLICE REPORT OF INVESTIGATION **OPR# 21-006 A**

Officer (redacted):     It's not worth it, it's just a building. (p. 6)

When asked if the officers had a plan about what to do as the group of unauthorized individuals were entering the UWT Door

Officer (redacted) stated, "No, we were just sent into it." (p. 7)

Officer (redacted):     Overwhelmed by an adversary of significant numbers and of size and us, with limited options to repel them after already trying to fight and after having already tried to go to physical force to do so - I had checked off and resolved in my mind that deadly force was going to be the only way to do it and the only way we were going to get there was if we initiated that force on the front end. (p. 7)

I thought that was going to be the fight of my life, for my life but the alternative I think being there and experiencing it - the only way that we could have prevented those people from coming in that door was Killing em…  (p. 7)

I don't know if the department's ready to recon with… Management and leadership is going to have that debate, politicians are going to have to have that debate… to be put in a position to have to use lethal force… that is the thought that I have wrestled with for the last several weeks— optically of course it looks horrible…[7] (p.7)

---

[7] **Exhibit 4:**  UNITED STATES CAPITOL POLICE REPORT OF INVESTIGATION

10

The failure to properly prepare for the Capitol Protests is unequivocally the Government's fault. The Government's negligent planning resulted in the police being outnumbered by a crowd of people who had every right to protest. The officer mentioned above resorted to deadly force as his best option because both he and his command viewed every person in the crowd as a member of a violent mob. There was no parsing between peaceful protestors versus those who may have been seeking to harm members of Congress. Every person coming through that door was viewed as a member of a violent mob, and nothing else. This is a failure of epic proportion.

This is demonstrated by the fact that when deciding on how to defend the door leading to the Western Terrace, the Officer decides that "…launching an aggressive front-end attack of deadly force" is his best option. There is no mention of multiple lines of defense. There is no mention of other non-deadly, more proportionate means of force. The decision is deadly force, and nothing else "…the only way that we could have prevented those people from coming in that door was Killing em…

This report corroborates the defense of others claims made by Ryan Nichols and other similarly situated January 6th Defendants, because this report shows the global "kill or be killed" mindset of officers that day. No person deserves to be shot a point-blank range for protesting. No protestor deserves to be unmercifully beaten for being pushed into a hallway. No protestor deserves to die simply because they were stuck and could not move. But that happened on January 6, 2021. Ashli Babbitt jumped up into the window of a door, and was executed at point blank range. Roseann Boyland could not move fast enough for an officer's liking, so she was beaten until she died. Victoria White was brutally beaten by a supervising MPDC officer for wearing a red MAGA hat, and has been indicted. These things happened in front of Ryan Nichols. These things happened in front of Michael Foy. These men reacted— and the law supports their actions.

**ARGUMENT 6:** Ryan Nichols Must be Released Because he has been Illegally Punished

The Government has argued in its Reply Brief that the conditions of confinement and Mr. Nichols' documented PTSD have no bearing upon the Bail Reform Act. (Opp. at p. 31) We disagree for the reasons stated in Section VI of the underlying motion. Even if that were true, release would still be justified under the Fifth Amendment's Due Process Clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death.[8] In addition to the information provided in Section VI of the underlying motion we offer the following evidence as further proof that release is warranted.

**POINT 1:** Retaliatory Conduct that Violates Mr. Nichols' Sixth Amendment Rights

Ryan Nichols's ability to meaningfully participate in his defense was interrupted by the DC Jail in an act of retaliation after filing his last motion. Simply put, the DC Jail confiscated Mr. Nichol's discovery and ability to use a lap top immediately after learning that he raised his conditions of confinement as an issue in the underlying motion, which in turn precluded Mr. Nichols from being able to review videos, read reports, and meaningfully participate in his defense, during active litigation. This week, the jail removed his ability to access the law library as well. This conduct is clearly retaliatory, and violative of his Sixth Amendment right to counsel as well as his right to meaningfully participate in his defense. Because of this Ryan Nichols should be released so he can participate in his defense in a way that the United States Constitution intended him to.

---

[8] *See* United States v. Riggins, 456 F.Supp.3d 138 (2020)(citing Bell v. Wolfish, 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979)). United States v. Martin, 447 F.Supp.3d. 999 (D.Md. 2020); see also Bell v. Wolfish, 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979).

**POINT 2:**  Denial of Timely Medical Care

On November 3, 2021, Mr. Nichols notified this Court that he received his first vaccine shot.  Nichols informed the Court that his second shot was scheduled to take place on December 2, 2021, and asked the Court to be allowed to appear in person at his December 20, 2021 hearing.

DC Jail denied Mr. Nichols the second shot on December 2, 2021, informing Nichols "Sorry we are out."  Mr. Nichols was refused his second vaccine for 12 more days until the morning of December 14, 2021.   The primary purpose for Nichols taking the vaccine shot was so that he could cut his hair, shave his beard, cut his finger nails for the first time since January, so that he could appear in person, looking respectable, during his December 20th hearing.

On December 14, 2021, Mr. Nichols was informed by the DC Jail that he (1) will not be able to appear in person for his December 20th hearing, and (2) needs to put in requests for haircuts and shaving 30 days in advance.  On December 15, 2021, the jail informed him that the only way that he would be able to cut his hair and appear in court is via an order from this Court.  Not only has the DC Jail denied Mr. Nichols a timely second vaccination it is now interfering with his ability to personally appear in court in a way that is suitable.  As such, undersigned counsel respectfully requests that this Court order the DC Jail to allow Mr. Nichols to appear in court with his hair cut and beard trimmed.

**POINT 3:**      Margorie Taylor Greene's December 2021 Report on the DC Jail[9]

On December 7, 2021, several members of Congress published a report condemning the Conditions of Confinement in the CTF wing of the DC Jail, where January 6th detainees are being held.  The report cites multiple violations of the January 6th Detainees rights including but not limited to the following:

---

[9] **Exhibit 5** Congresswoman Green's December 2021 Report on the DC Jail called "UNUSUALY CRUEL"

(1) They are treated differently or more harshly that other detainees because of their race;
(2) They are treated differently or more harshly than other detainees because of their politics;
(3) They are routinely denied access to amenities that others are given, such as moot court training, medical care, haircuts, educational tablets, a nutritious diet, and prevented from being able to see their families in person or virtually;
(4) They are regularly subjected to racial slurs, forced to inject Critical Race Theory, and are fed racist anti-American, anti-White propaganda from the Nation of Islam.

**POINT 4:**   Deputy Warden Kathleen Landerkin's Conduct

Deputy Warden Kathleen Landerkin's animus toward January Sixers has long since been the source of complaints from January Sixers being held at DC Jail. Just recently, however, her hatred of January Sixers caught national attention when Congresswoman Margorie Taylor Green (MTG) outed Landerkin as a bigot by reposting this November 2019 tweet made by Landerkin:



This tweet made by Deputy Wardern Landerkin further corroborates the multitude of claims that Nichols has made about the mistreatment of Nichols and all January 6th Detainees at being unfairly harassed, abused, and targeted by DC Jail staff.

14

The retaliatory conduct against Mr. Nichols by the DC Jail violates his Sixth Amendment right to counsel and right to meaningfully participate in his defense. The litany of violations laid out in Congresswoman Margorie Taylor Greene's eyewitness report on the DC Jail corroborates Mr. Nichols' claims that he is a pretrial detainee that is being punished. The Tweet made by Deputy Wardern Landerkin demonstrates the fact that the Government has failed in caretaking function with regard to Mr. Nichols and other January Sixth detainees, and further corroborates Mr. Nichols' claims of punishment.

The caselaw is clear, when the prison takes punitive actions against a detainee that is unrelated to any legitimate interest, the remedy is release. The law is even more aggressive in situations where a detainee has a preexisting medical condition, like Mr. Nichols does. Because of this, and for all the reasons stated above, Mr. Nichols should immediately be released from DC Jail for violations of his Fifth and Sixth Amendment rights.[10]

---

[10] The threshold, therefore, for establishing that a pretrial detainee's constitutional rights have been violated is clearly lower than the threshold for convicted prisoners who seek to establish the same. For the group not yet convicted, "the question is whether the prison conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal". *United States v. Riggins,* 456 F.Supp.3d 138 (2020)(*citing Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The proper avenue for relief for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death. *United States v. Martin,* 447 F.Supp.3d. 999 (D.Md. 2020); *see also Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Kingsley v. Hendrickson*, 576 U.S, 389m 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (*citing Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). *United States v. Riggins,* 456 F.Supp.3d 138 (2020) *citing Hardy v. District of Columbia,* 601 F.Supp. 2d 182,188 (D.D.C. 2009).

**ARGUMENT 7:** There is a Combination of Conditions that Will Ensure the Safety of the Community and Ryan Nichols' Return to Court.

Ryan Nichols lives with his two young sons Ryan, J.R. and Blake, and his wife Bonnie. There are no firearms in his home. He has no history of failing to appear in court. He has no history of tampering with witnesses. Mr. Nichols works hard to run his family business efficiently. He employs people from every walk of life. He literally spends his free time saving people's lives with his nonprofit. The idea that he is somehow a danger to society is a lie. The truth is that the world is literally safer when Ryan Nichols is out there saving lives.

Mr. Nichols was honorably discharged from the United States Military and in addition to other medals, received a good conduct medal. He has received five good conduct reports from prison guards at the DC Jail guards during his time as a detainee. He does not have any criminal history, never mind a violent one. All of this speaks to someone who respects authority and has lived a life within the rule of law. These facts are also demonstrative of an ability to function within a command structure such as the military or pretrial services.

Alex Harkrider is Mr. Nichols' co-defendant in this case and best-friend in life. The facts of Harkrider's case and Nichols' case are indistinguishable but for a few minor details. Who these men are on the outside makes it even more difficult to distinguish them from each other. For instance, Harkrider and Nichols both have sons. Harkrider and Nichols are both Marine Corps veterans that were honorably discharged from the United States Military. Harkrider and Nichols are both search and rescue specialist that work for Nichols' 501(c)(3) called Rescue The Universe. Harkrider and Nichols both have PTSD as a consequence of their service to the country. Neither Harkrider or Nichols have a criminal record or history of illegal violence.

**CONCLUSION**

January 6, 2021 is nothing more than an aberration Ryan Nichols' life. His behavior that day is the exception, not the rule. This is demonstrated by his stellar personal history and characteristics. Demonstrated further by his honorable discharge, role as an employer, and by the fact that he is a devoted husband and father. Nothing about his life suggests that he should be detained pretrial.

The Government has NOT proven by any fair application of the law that Mr. Nichols is dangerous or a flight risk. The Government has not offered sufficient evidence demonstrating that Mr. Nichols' release presents a clearly identifiable and articulable future threat to the community. The Government has not offered a scintilla of evidence suggesting that no combination of conditions exist that will ensure Mr. Nichols' return to court and the safety of the community.

Because of this and for all the reasons enumerated in the underlying motion, as well as those listed above, Mr. Nichols respectfully asks this Court to overrule the Magistrate Judge's Detention Order and release Ryan Nichols to his home in Longview, Texas, where he can celebrate Christmas with his family, while he prepares to prove his innocence at trial.

Dated:  December 15, 2021

Respectfully Submitted,

 /s/ **Joseph D. McBride, Esq.**

Joseph D. McBride, Esq.
THE MCBRIDE LAW FIRM, PLLC
Attorneys for the Defendant
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone:* (917) 757-9537
*Email:*  jmcbride@mcbridelawnyc.com

17

## CERTIFICATE OF SERVICE

I hereby certify on the 15th day of December, 2021, a copy of same was delivered to the parties of record, by email pursuant to the Covid standing order and the rules of the Clerk of Court.

/s/ **Joseph D. McBride, Esq.**