**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **Criminal Case No. 21-00117-1 (TFH)** |
| **RYAN NICHOLS,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION & ORDER**

Mr. Ryan Nichols is charged with eight felony and misdemeanor offenses resulting from his participation in the riot at the U.S. Capitol on January 6, 2021. Superseding Indictment [ECF No. 59]. Following a detention hearing before Magistrate Judge K. Nicole Mitchell in the U.S. District Court for the Eastern District of Texas on January 22, 2021, Mr. Nichols was ordered detained pending trial. [ECF Nos. 8, 61-1]. By Motion filed November 1, Mr. Nichols moved this Court for the first time for pretrial release. [ECF No. 55].

Having carefully considered Defendant Ryan Nichols' motion, pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq*., to review the Detention Order issued by the Eastern District of Texas on January 22, 2021 and to release Defendant on personal recognizance ("Motion") [ECF Nos. 55 & 68], the government's Opposition [ECF No. 61], Defendant's reply [ECF No. 71], the evidence, the arguments of counsel, and the factors set forth in 18 U.S.C. § 3142(g), for the reasons summarized below and dictated in the bench opinion on the public record at the December 20, 2021 hearing, Defendant's Motion is hereby **DENIED**.

**BACKGROUND**

A Grand Jury indicted Mr. Nichols on eight counts arising from his participation in the riots at the U.S. Capitol on January 6, 2021: **(1)** Civil Disorder and Aiding and Abetting, in

violation of 18 U.S.C. §§ 231(a)(3) and 2; **(2)** Obstruction of an Official Proceeding and Aiding and Abetting, in violation of  18 U.S.C. § 1512(c)(2) and 2; **(3)** Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); **(4)** Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); **(5)** Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); **(6)** Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); **(7)** Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and **(8)** Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Superseding Indictment.

It is undisputed that Mr. Nichols traveled to Washington, D.C. on January 5, 2021, and that he was at the U.S. Capitol on the afternoon of January 6, 2021, when protestors sieged the building and physically confronted law enforcement, resulting in the disruption of the joint session of Congress convened to certify the vote count of the Electoral College of the 2020 Presidential Election.  Def. Mot. at 9; Gov. Opp. at 8; Statement of Facts at 3-4 [ECF No. 1-1]. At around 2:00 p.m., the crowd overcame the Capitol police and forced their way into the building.  Statement of Facts at 4.  Shortly thereafter, members of Congress and Vice President Pence were forced to evacuate the chambers and the joint session was suspended. *Id*. at 5.

In connection with this Motion, the parties have provided to the Court hours of video footage—some of which was taken on Mr. Nichols' GoPro camera—depicting Mr. Nichols' movements throughout Washington, D.C. on January 5 and 6.  *See* Def. Exs. 13-19; Gov. Exs. 2-18.  On the night of January 5, Mr. Nichols recorded himself in a confrontation with

Metropolitan police, warning them that "[C]ops don't know what's going on. Too many of us, not enough of them," and then later yelling out, "Those people in [the] Capitol building are our enemy." Gov. Ex. 2. On January 6, Nichols posted a Facebook livestream while walking from the Ellipse to the Capitol yelling that he was "hearing reports that Pence caved," that a "second revolution" had begun, and that he was going to "drag" anyone that "treasoned" the country "through the streets." Gov. Opp. 10-11; Gov. Ex. 7. A plethora of security camera and amateur video taken on Capitol grounds then shows a man identified as Nichols pushing to the front a mob that was "heaving" against officers who were defending an entrance to the Capitol near the lower west terrace known as "the tunnel." Gov. Opp. 11-12; Gov. Exs. 8-9.[1] Later, Mr. Nichols is shown motioning for, taking possession of, and spraying that line of police officers with what appears to be a chemical spray.[2] Gov. Exs. 8, 12. Mr. Nichols is also shown in photos and videos entering the Capitol via a broken window, taking a bullhorn and telling the crowd to get inside the building and get their weapons while waving a crowbar, and barricading the door of a conference room that he believed to be Nancy Pelosi's. Gov. Opp. at 14-17; Gov. Exs. 9, 13-16. The night of January 6, Mr. Nichols recorded a ten-minute video on his Facebook, declaring that he had "clashed" with the police, that "Pence did the wrong thing…[s]o we stormed the Capitol building," that "Ryan Nichols stands for violence!," that he would be the "leader" of the "second

---

[1] While law enforcement was not able to recover the items of clothing that Mr. Nichols was wearing, he can be spotted in the crowd wearing a distinctive Marine Corps boonie hat, yellow gloves, and tactical gear. Mr. Nichols' Facebook posts on January 6 depict him wearing those items. *See, e.g.*, Gov. Opp. at 10, 17. At the December 20 hearing, defense counsel informed the Court that Mr. Nichols had "burned" the clothing after January 6. Mr. Nichols has not disputed that it is, in fact, him that appears in the video and photo footage presented in connection with this Motion.

[2] The government has represented to the Court that, based on the size, appearance, and numbers displayed on the can, it appears to be police-issued OC spray—a chemical spray utilized by law enforcement for crowd control.

American revolution," and that he "plan[s] on making other people die first, for their country, if it gets down to that." Gov. Ex. 18.

## **LEGAL STANDARD**

The Bail Reform Act, 18 U.S.C. § 3141 *et seq*., provides that a court shall order a defendant to be detained pending trial if the court determines that no condition or combination of conditions exist which will reasonably assure his appearance as required or the safety of the community. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a flight risk or a danger to the community." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (citing *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)). When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention by clear and convincing evidence. 18 U.S.C. § 3142(f). The factors that must be considered in assessing the defendant's future dangerousness, as set forth in 18 U.S.C. § 3142(g), are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. 18 U.S.C. § 3142(g); *see also Munchel*, 991 F.3d at 1279–80.

Although the D.C. Circuit has yet to rule on the question, *Munchel*, 991 F.3d at 1280, almost every circuit nationwide has held that a magistrate judge's detention order is subject to *de novo* review by the district court. *See United States. v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (collecting cases).

**DISCUSSION**

In his Motion, Mr. Nichols argues that "(1) the Government has not proven by a preponderance of the evidence that he is a flight risk,[3] (2) the Government has not proven by clear and convincing evidence that Mr. Nichols is a danger to any person in the community, and (3) [a]ssuming arguendo that [the] Government somehow can meet its burden, the Government cannot prove that there is no condition, or combination of conditions, that will reasonably assure Mr. Nichols' appearance in court and the safety of any person or the community." Def. Mot. at 21. The government seeks Defendant's continued pretrial detention on the basis of 18 U.S.C. §§ 3142(f)(1)(A)(Crime of Violence), 3142(f)(1)(E)(Felony Involving a Dangerous Weapon), and 3142(f)(2)(B)(Serious Risk to Obstruct Justice). Gov. Opp. at 1. Specifically, the government argues that Defendant's statements before, during, and after the riot threatening "war" against "domestic enemies" "make clear the danger he poses if released pending trial"; that his obstructive conduct by destroying evidence and instructing others to do the same evinces a disregard for the law; and that his violent conduct during the riot demonstrate a clear and articulable threat that is not limited to January 6. *See* Gov. Opp. Both parties argue under the 18 U.S.C. § 3142(g) factors, the six factors delineated by Chief Judge Howell in *United States v.*

---

3 While the magistrate judge's Detention Order specified risk of flight as one of the bases for Defendant's pretrial detention, the government has not argued flight risk here. Thus, the Court's analysis focuses on an evaluation of whether Defendant presents a danger to the community.

*Chrestman* in order to assess the "nature and circumstances" prong of 18 U.S.C. § 3142(g)(1) for January 6 defendants,[4] and the standards set forth in relevant Circuit Court precedent.

For the reasons dictated in its bench opinion and set forth below, the Court finds that Defendant would pose a danger to the community if released and that no condition or combination of conditions of release will reasonably assure the safety of the community. 18 U.S.C. § 3142(e), (g).

**(1) The Nature and Circumstances of the Offense.**

Defendant is charged with five felony offenses, three of which involve the use, possession of, or carrying of a deadly or dangerous weapon. Gov. Opp. at 23. This factor weighs in favor of a finding of dangerousness.

The government presented clear and convincing evidence that Mr. Nichols extensively planned for and coordinated with others for something beyond a peaceful protest on January 6. Shortly after the November 2020 election, Mr. Nichols began to post on Facebook that the election was fraudulent and calling for "war" and violence. *See* Gov. Opp. at 4-5 ("My oath of enlistment was for ALL enemies, both foreign AND domestic!");("Any Democrat found guilty of treason should be executed.. Any Republican found guilty of treason should be VIOLENTLY executed!");("The time for games is OVER.. Patriots will be in Washington DC on Jan 6th! If Pence doesn't do the right thing, WE FIGHT"). Mr. Nichols began to plan his trip to

[4] As set forth by Chief Judge Howell, these considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses;" (2) "engaged in prior planning before arriving at the Capitol;" (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot;" or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct;" and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot." *United States v. Chrestman*, 525 F. Supp. 3d 14, 26-27 (D.D.C. 2021).

Washington, D.C. with co-defendant Harkrider. Gov. Opp. at 5-9. Mr. Nichols told Harkrider that they "may have to take back the country by force," discussed applying to the Proud Boys, transporting firearms to the D.C. area, and sent a link for body armor. *Id*. at 5-8. Mr. Nichols planned extensively for his trip to D.C. by: (1) constructing a gun box in his truck; (2) transporting firearms and ammunition in that box to his hotel in Virginia; (3) joining Zello[5] groups to gather "intel" regarding marches on Washington, D.C. on January 6 and January 20 and applying to the Proud Boys; and (4) acquiring body armor, a crowbar, and tactical gear, all of which he wore on January 6. *See id.* at 5-9, 23-24. Engaging in actions such as "obtaining weapons or tactical gear, suggests that [Nichols] was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes." *Chrestman,* 525 F.Supp.3d at 26. And, unlike co-defendant Harkrider, here, the government has put forth evidence that Mr. Nichols was coordinating with others beyond his co-defendant by gathering "intel"—thereby placing Defendant in "a different category of dangerousness." *Munchel*, 991 F.3d at 1284. Mr. Nichols informed the members of his Zello groups that he would be traveling to D.C. with a "couple of other patriots" and let the members of those groups know when he arrived in D.C., and discussed "scanning the area" before January 6. Gov. Opp. at 8-9. Mr. Nichols' planning and coordination therefore weighs in favor of a finding of dangerousness.

Mr. Nichols also carried and used dangerous weapons during the riot. It is undisputed that Defendant brought a crowbar, body armor, and steel toe boots to the Capitol on January 6.

---

5 The government represents that Zello is a phone application that "emulates walkie-talkies." Gov. Opp. at 8.

Def. Mot. at 9; Gov. Opp. at 8-10. The government presented videos of Defendant, in the midst of a violent rant the night of January 6 threatening further "revolution," "violence," and "war" against elected officials and his fellow citizens, referring to the crowbar as a "weapon" and, separately, of Defendant waving the crowbar in the air during the riot as he commanded the crowd to "get [their] weapon." Gov. Exs. 15-16, 18. Perhaps even more worrisome, the government presented videos objectively depicting that Nichols motioned for, took possession of, and twice sprayed the line of police officers defending the tunnel entrance on the Capitol's lower west terrace with a large cannister of chemical spray. Gov. Opp. at 14; Gov. Exs. 8, 12.

The D.C. Circuit has instructed that "those who actually assaulted police officers …are in a different category of dangerousness than those who cheered on the violence[.]" *Munchel*, 991 F.3d at 1284; *see also United States v. Khater*, 856 F. App'x 322, 323-24 (D.C. Cir. 2021) (affirming that defendant "actually engaged in violence" when he sprayed Capitol police twice with pepper spray); *United States v. Mattice*, 21-cr-00657-BAH, Oct. 26, 2021 Detention Order at 4 [ECF No. 19] (characterizing pepper spray as a "dangerous weapon" and noting that "[a]lthough several items defendant planned to bring could have been used for non-violent defensive purposes… the fact that defendant brought several of these items and then engaged in violent confrontation with law enforcement indicates that their intended use was not benign"). Mr. Nichols' carrying and use of dangerous weapons weighs in favor of a finding of dangerousness.

Mr. Nichols also assumed a leadership role by actively encouraging and directing other rioters—leading up to, during, and after the attack on the Capitol. "[A] defendant who assumed a formal or de facto leadership role in the assault by encouraging other rioters' misconduct, for example, by urging rioters to advance on the Capitol or to confront law enforcement, may have

inspired further criminal conduct on the part of others…[which] enhances the defendant's responsibility for the destabilizing events of January 6." *Chrestman*, 525 F. Supp. 3d at 26-27. In the text messages between Mr. Nichols and co-defendant Harkrider, it is evident that he assumed a leadership role between the two—booking the hotel, sending links to body armor, suggesting bringing weapons and researching how to do so, and passing "intel" he was receiving on Zello channels. Gov. Opp. at 5-9. During the riot, Mr. Nichols made his way to a balcony outside of the Capitol and began screaming into a bullhorn—telling the crowd "This is not a peaceful protest!," "Get in the building! This is your country!," and, repeatedly, "If you have a weapon, you need to get your weapon!" Gov. Ex. 15. Nichols also helped others into a broken window of a conference room, which he (falsely) believed to be Nancy Pelosi's, and barricaded the doors to that conference room. *See* Gov. Opp. 11-17. These actions likely "contributed to the crowd's ability to breach the [] Capitol." *Khater*, 856 F. App'x at 323. Moreover, in a disturbing video taken on the night of January 6, Defendant continued to celebrate his actions in "clash[ing]" with the police, encourage further violence, and referred to himself as the "leader" in a "second American revolution." *See* Gov. Ex. 18. In short, Defendant acted as a leader before and during the riot and continued to sound the call for battle even after the riot had dissipated. This weighs in favor of a finding of dangerousness.

      On balance, the nature and circumstances of the offense militate in favor of a finding of dangerousness. The government presented clear and convincing evidence that Mr. Nichols sprayed chemical spray at a defensive line of law enforcement, took an active leadership role during the riot, engaged in extensive planning for "war," and coordinated with Mr. Harkrider and others.

**(2) The Weight of the Evidence.**

The second factor the Court must consider is the weight of the evidence against Mr. Nichols. 18 U.S.C. § 3142(g)(2). As discussed above, the government presented overwhelming evidence of Mr. Nichols: (1) pushing his way to the front of an active confrontation with the police line at the tunnel; (2) summoning, taking possession of, and spraying the line of police with a chemical spray; (3) assuming a leadership role and encouraging further violence, before, during, and after the riot; (4) planning and coordinating for violence with Mr. Harkrider and others; and (5) entering the Capitol building and barricading doors. *See* Gov. Opp. Defendant's assertions of self defense or defense of others cannot be reconciled at this juncture with the video evidence presented. Indeed, on the night of January 5, Defendant took video of himself in downtown Washington, D.C. confronting law enforcement and telling them "tomorrow is the last f**king stand!"" and "we ain't got your back no more!" Gov. Exs. 5-6; Gov. Opp.at 9-10. In another January 5 video, Defendant proclaims: "Those people in f**king Capitol building are our enemy." Gov. Ex. 2. At the Capitol on January 6, the footage shows Defendant pushing his way to the front of what was an already active scuffle with a line of law enforcement guarding the tunnel. Gov. Exs. 8-9. This seriously calls into question that Mr. Nichols was acting in self defense. And as conceded by counsel on the record, Defendant's allegations of "entrapment" lack any factual support. This factor weighs in favor of detention.

**(3) History and Characteristics of the Defendant.**

Defendant's history and characteristics weigh in favor of his pretrial release. *See* 18 U.S.C. § 3142(g)(3). Mr. Nichols was honorably discharged from the United States Marine Corps, has no criminal history, co-owns a business with his wife, is the father of two young children, owns a home, and engages in volunteer search and rescue missions through his non-

profit organization. Def. Mot. at 33-34. While the Court has considered the government's proffer of evidence regarding alleged drug use and violent incidents that did not result in criminal charges, the balance of the evidence presented for this factor tilts against detention.

**(4) Nature and Seriousness of the Danger Posed by Defendant's Release.**

The Court is mindful that pretrial detention is not appropriate for all January 6 defendants and that it "must identify an articulable threat posed by the defendant to an individual or the community." *Munchel*¸ 991 F.3d at 1283; 18 U.S.C. § 3142(g)(4). The "threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Id*. (citing *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).

The Court has identified such a continuing threat here. Mr. Nichols describes himself as a "patriot" ready to go to "war" against the "enemies" in the Capitol, law enforcement, and elected officials and citizens who "treasoned" the country. *See* Gov. Opp. 10-11, 18-19, 26-27; Gov. Exs. 5-7, 18. He "clashed" with police officers on January 6 in that pursuit, including by spraying a line of officers with chemical spray. Gov. Exs. 8, 12, 18. Once back at his hotel, he posted a 10-minute diatribe reiterating his beliefs in the fraudulent election, anointing himself "leader" of the "second American revolution," making clear that "Ryan Nichols stands for violence," and that he "plan[ned] on making other people die first, for their country, if it gets down to that." Gov. Ex. 18. In the Court's view, this video leaves no question of Nichols' commitment to future violence. After January 6, he posted on social media that the "fight has just began" and about the need to "get better organized and regroup for [January] 20th," and that he was "recruiting more patriots." Gov. Opp. at 19-20. Mr. Nichols viewed himself as a "patriot," and there is no indication that he has changed his views. *See, e.g.,* Def. Mot. at 40 (referring to D.C. Jail Central Treatment Facility as the "Patriot Pod"). Thus, Mr. Nichols

"appears to have been motivated to act violently that day not solely by the presence of the group or President Trump's encouragement, but also by his belief that he is a 'warrior' in a fight against perceived tyranny, and there is ample reason to believe that fight is not finished for Mr. [Nichols] and others like him, making the threat of further violence present, concrete, and continuing." *United States v. Sabol*, 534 F. Supp. 3d 58, 83-85 (D.D.C. 2021), *see Munchel*, 991 F.3d at 1280, 1284. Mr. Nichols therefore remains a danger to his community.

Moreover, the evidence against Mr. Nichols is strong, and he has already destroyed or secreted incriminating evidence—including the hat, gloves, firearms, crowbar, tactical vest, and text messages—and directed others to do so as well. Gov. Opp. at 20-21. Given "all of the preplanning, coordination, and obstructive conduct alleged by the government took place while defendant was at his home," *Chrestman*, 525 F. Supp. 3d at 36, the Court finds on the record before it that no condition or combination of conditions of release will reasonably assure Defendant's compliance with any release conditions.

Finally, with respect to Defendant's constitutional claims, the Court notes that they have no bearing on this Court's Bail Reform Act analysis and, in any event, could likely be addressed by a remedy less drastic than release. While the Court is sympathetic to the increased challenges posed by the COVID-19 pandemic, it is well-settled that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Nor has Defendant shown that the conditions imposed amount to punishment—*i.e.*, they are arbitrary and purposeless. *Bell v. Wolfish*, 441 U.S. 520, 535, 539 (1979). Mr. Nichols has not alleged he has been denied any specific, needed medical care for a documented medical condition, and his "generalized allegations do not rise to the level of a due process violation."

*United States v. Cole*, 459 F. Supp. 3d 116, 123–24 (D.D.C. 2020). He has also failed to demonstrate that the jail's actions are egregious, arbitrary, or purposeless. *Id*. at 124 ("Faced with the difficult task of shielding the community from harm while also protecting the inmate population, the DOC certainly is not imposing 'arbitrary or purposeless' conditions").

For these reasons and for all of the reasons stated on the record in the bench opinion dictated at the December 20, 2021 hearing on Defendant's Motion, it is hereby:

**ORDERED** that Defendant's Motion for Modification of Bail to Place Defendant on Conditional Release Pending Trial [ECF No. 55] is **DENIED**.

**SO ORDERED.**

Dated: December 23, 2021

THOMAS F. HOGAN
United States District Judge