# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
                                                     )
                                                   )
                v.                          ) Case No. 1:21-CR-117(TFH)
                                                   )
ALEX HARKRIDER,                 )
                                                 )
        Defendant.               )
                                                 )

## DEFENDANT HARKRIDER'S MOTION TO DISMISS COUNTS SIX AND EIGHT OF THE INDICTMENT

## TABLE OF CONTENTS

Table of Contents.................................................................................................................2

Table of Authorities.........................................................................................................3-4

I.      INTRODUCTION ........................................................................................................5

II.     STATUTORY HISTORY AND FACTUAL BACKGROUND .......................................5

        A.    Section 1752 and the U.S. Secret Service ...........................................................6

              1.    The legislative history of § 1752.................................................................6

              2.    The current § 1752 ......................................................................................9

              3.    History of the protection of the Executive Mansion ...............................11

        B.    The  Indictment................................................................................................13

III.    ARGUMENT ..............................................................................................................14

        A.    Standard for a Rule 12(b) motion to dismiss a criminal indictment....................14

        B.    The Indictment fails to state an offense because only the USSS
              restricts areas under § 1752 ..............................................................................15

        C.    If the government's interpretation of § 1752 is applied, it is
              unconstitutionally vague as to Harkrider ...........................................................18

              1.    The government's interpretation of § 1752(c) is
                    unconstitutionally vague........................................................................20

              2.    The government's interpretation of § 1752(a)(2) is an
                    unconstitutionally vague boundary standard ..........................................22

        D.    The rule of lenity dictates that ambiguities in § 1752 be resolved in
              Harkrider's favor ..............................................................................................25

        E.    The novel construction principle dictates against the government's
              interpretation, which would operate as an *ex post facto* law...............................26

        F.    The Secret Service did not "restrict" the Capitol or its grounds on
              January 6 ..........................................................................................................27

              1. Vice President Pence was not visiting the Capitol on January 6....................28

IV.     CONCLUSION ....................................................................................................... 30

## **TABLE OF AUTHORITIES**

CASES

*Bouie v. City of Columbia*, 378 U.S. 347 (1964)................................................................25-26

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................... 17

*City of Chicago v. Morales*, 527 U.S. 41 (1999)................................................................21-22

*Citizens United v. FEC*, 558 U.S. 310 (2010) ........................................................................ 18

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926)........................................................22-23

*Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401 (D.C. Cir. 2013) ..................................... 14

*Corley v. U.S.*, 556 U.S. 303 (2009) ....................................................................................... 14

*Edwards v. District of Columbia*, 755 F.3d 886 (D.C. Cir. 2014)............................................ 18

*Hamling v. United States*, 418 U.S. 87 (1974) ....................................................................... 12

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)............................. 17, 20, 23

*Kent v. Dulles*, 357 U.S. 116 (1958)....................................................................................... 22

*Kolender v. Lawson*, 461 U.S. 352 (1983)............................................................................... 17

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ............................................. 14

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.2d 1 (D.C. Cir. 2009) ...................................................... 17

*Papachristous v. City of Jacksonville*, 405 U.S. 156 (1972)................................................ 17, 23

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .....................................................................17-19

*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 354 (1940)............................................. 13

*United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015) ..................................................... 12

*United States v. Brownstein*, 849 F.3d 1101 (D.C. Cir. 2017).................................................. 17

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) ..................................................... passim

*United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661 (D.S.C. Sept. 13, 2004)................. passim

*United States v. Granderson*, 511 U.S. 39 (1994) ........................................................ 24

*United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) ...................................... 12

*United States v. Jabr, 18-CR-105(PLF)* ...................................................................... 29

*United States v. Santos*, 553 U.S. 507 (2008) ............................................................. 24

*United States v. Wiltberger*, 18 U.S. 76 (1820) ........................................................... 24

*United States v. Lanier*, 520 U.S. 259 (1997) ............................................................. 17

*United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979) ............................................ 13

*Williams v. Fears*, 179 U.S. 270 (1900) ...................................................................... 21

*Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86 (D.D.C. 2019) ................................ 16

STATUTES

18 U.S.C. § 1752 ...................................................................................................... passim

18 U.S.C. § 3056 ........................................................................................................... 6-7

RULES AND REGULATIONS

Federal Rule of Criminal Procedure 7 ......................................................................... 11

Federal Rule of Criminal Procedure 12 ....................................................................... 12

31 C.F.R. Part 408 ......................................................................................................... 3

OTHER AUTHORITIES

The White House Historical Association ..................................................................... 7-9

W. Blackstone, Commentaries on the Laws of England ............................................... 19

Defendant Alex Harkrider, through counsel, Kira Anne West, files this motion to dismiss Counts Six and Eight of the Indictment, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, because  they fail to state valid offenses and violate several constitutional protections.

## I.  <u>INTRODUCTION</u>

The Indictment charges that, on January 6, 2021, Harkrider "did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice-President-elect were temporarily visiting, without lawful authority to do so, and during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a tomahawk axe" in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A).  *See* Indictment, Count Six, ECF No. 59.  Count Eight alleges that Harkrider "did knowingly, and with intent to impede and disrupt the orderly conduct of Government Business and official functions, engage in disorderly and disruptive conduce in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted are within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impeded and disrupt the orderly conduct of Government business and official functions and , during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a tomahawk axe" in violation of Title 18, United States Code, Section 1752(a)(2) and (b)(1)(A). *Id* at Count Eight.

Since its enactment in 1970, Section 1752 has criminalized the unlawful entry into areas restricted for the protection of U.S. Secret Service (USSS) protectees.  Statutory text, legislative history, and common sense all point to the conclusion that the agency that restricts such areas is the one that guards them, i.e., the USSS.  But here, the government contends that any federal or state entity may criminalize a person's movements under federal law, provided a USSS protectee

is anywhere within the area it restricts.  It alleges that Harkrider violated § 1752 because the Capitol steps on which he stood had been visibly restricted by the U.S. Capitol Police (USCP). But the USCP do not guard the Secret Service protectees identified in § 1752; they protect members of Congress, who are neither guarded by the USSS nor covered by § 1752.  The government's interpretation of § 1752 is a nonce argument designed for January 6 defendants alone.

These counts in the indictment should be dismissed as they do not state § 1752 offenses. The government's statutory construction would lead to absurd results unintended by Congress. As applied to Harkrider, the government's interpretation of § 1752 is also void for vagueness, requiring dismissal under the Due Process Clause of the Fifth Amendment to the Constitution, particularly in the context of Harkrider's political speech, assembly and petitioning of the government for a redress of grievances.  U.S. Const. Amend I.  Even if the statute's notice were not unconstitutionally vague, the very fact that the government's interpretation of a 50-year-old statute is without precedent means that the rule of lenity, and the novel construction principle, require any ambiguity to be resolved in Mr. Harkrider's favor.

## II.   STATUTORY HISTORY AND FACTUAL BACKGROUND

### A.   Section 1752 and the U.S. Secret Service

#### 1.   The legislative history of § 1752

Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).  At the time, the USSS was part of the Treasury Department.[1]

---

[1] On November 25, 2002, the president signed the Homeland Security Act of 2002, under which USSS was transferred from Treasury to the Department of Homeland Security, effective March 1, 2003.  Homeland Security Act of 2002, 6 U.S.C. § 101 *et seq.*, Public Law 107-296.

Later Congresses would amend Section 1752, but like its current iteration, the 1970 statute provided that it was "unlawful for any person . . . (1) willfully and knowingly to enter or remain in . . .(ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting. . ." 84 Stat. 1891-92.[2]  The statute made clear which entity "prescribed regulations" governing the "posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting": the Treasury Department, of which the USSS was then part. § 1752(d)(2); 84 Stat. 1892.

Following enactment, the Treasury promulgated regulations governing restricted areas under § 1752 in Chapter IV, part 408 of title 31 of the Code of Federal Regulations.  31 C.F.R. §§ 408.1-408.3.  Section 408.1 stated that "the regulations governing access to such restricted areas where the President or any other person protected by the Secret Service is or will be temporarily visiting are promulgated pursuant to the authority vested in the Secretary of the Treasury by 18 U.S.C. § 1752." 31 C.F.R. § 408.1.  Part 408 provided many examples of the USSS, and no other agency, exercising its power under § 1752 to set and define restricted areas:

- A temporary residence of President Reagan in California was defined by USSS using property law metes and bounds, § 408.2(a);

- For temporary residences of other Secret Service protectees, the Secret Service shall provide the description of restricted property, § 408.2(b);

- Concerning temporary offices of Secret Service protectees, the Secret Service shall provide to the pubic "verbal or written notice to prospective visitors at each protective site," § 408.2(c).

---

[2] Unlike the current § 1752, the 1970 statute did not criminalize mere entry into a restricted area but also required the disruption of government business or the obstruction of ingress or egress from the area. 84 Stat. 1891-92.

As for gaining lawful access to areas restricted under § 1752, Part 408 was clear that authorization must be obtained from the Secret Service.  § 408.3.  No other federal agency was mentioned in Part 408.

In 2006, the Secret Service Authorization and Technical Modification Act of 2005, Public Law 109-177, Title VI, Sec. 602, 120 Stat. 252 (Mar. 9, 2006), amended Section 1752 to eliminate references to regulations.  Subsection (d) of § 1752 as enacted in 1970, which authorized the Secretary of the Treasury to issue regulations, was struck.  References to residences as "designated" were also eliminated.[3]   In 2012, § 1752 was amended for a final time in the Federal Restricted Buildings and Grounds Improvement Act of 2011, Public Law 112-98, Sec. 2, 126 Stat. 263 (Mar. 8, 2012).   The Act's legislative history shows that the only agency involved in enforcement of § 1752 is the USSS.   The only agency discussed by members of Congress in connection with § 1752 is the Secret Service.  157 Cong. Rec. H 1372-1373. Members of Congress offered lectures on the history of the Secret Service.  *Id.*   The 2012 bill's author was Congressman Thomas Rooney of Florida.  Addressing the three restricted areas defined in § 1752(c)—the White House or Vice President's residence, a place where a Secret Service protectee is visiting, and special events of national significance—Congressman Rooney simply states the Secret Service is responsible for all three.  157 Cong. Rec. H 1372-1373 ("H.R. 347 ensures that the Secret Service has the ability to secure all necessary areas surrounding restricted buildings and grounds that house our leaders, their families, and foreign heads of state.").  Other representatives flatly state as obvious fact that the Secret Service restricts areas

---

[3] When it later repealed Part 408 of title 31 in April 2018, the Department of Homeland Security, of which the USSS is now part, explained that, in its current form, § 1752 itself defines the restricted areas which were previously described (in the same way) in the regulations, rendering the latter redundant and unnecessary.  Restricted Building or Grounds, 84 Fed. Reg. 18,939 18,940 (Apr. 30, 2018) (repealing 31 C.F.R. Part 408).

under the statute. For example, Congressman Hank Johnson of Georgia: "Current federal law prohibits individuals from entering or remaining in areas cordoned off as restricted because of protection being provided by the Secret Service." 157 Cong. Rec. H 1373.[4]

>    2.    The current § 1752 statute

In its current version, Section 1752 criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).  It also criminalizes,

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. . .

§ 1752(a)(2).

> In turn, "restricted building or grounds" is statutorily defined.  In Section 1752,
>
> (1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—
>
> (A)    of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B)    of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C)    of a building or grounds so restricted in conjunction with an event designated as a special event of national significance;

18 U.S.C. § 1752(c)(1).

The first two subparts of Section 1752(c) concern individuals protected by the USSS.  In subpart (A) those individuals are the President (at the White House) and the Vice President (at

---

[4] Although not relevant to this motion, the 2012 amendment clarified that § 1752 does not apply to people who have lawful authority to enter a restricted area; that the White House and Vice President's residence are restricted areas; and that the requisite *mens rea* is "knowingly," not "willfully."  157 Cong. Rec. H 1372-1373.

his or her official residence).  In subpart (B) the individual protected by the Secret Service is the President or "other person protected by the Secret Service."[5] Members of Congress are not protected by the Secret Service. 18 U.S.C. § 3056(a) (setting forth persons USSS is "authorized to protect").  Protection of Congressmen and Senators is the role of a separate federal agency, the United States Capitol Police.  The U.S. Capitol Police do not provide for the protection of Secret Service protectees.  *See* United States Capitol Police: Our Mission, available at: https://www.uscp.gov/; § 3056(a).

The final Section 1752(c) subpart concerns "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." As Harkrider has noted elsewhere, "designation" in this subpart refers to a specific federal agency process. Major federal government or public events that are considered to be nationally significant may be designated by the President—or his representative, the Secretary of the Department of Homeland Security (DHS)—as National Special Security Events (NSSE).  18 U.S.C. § 3056(e)(1).  Section 3056 designates the USSS as the lead federal agency responsible for coordinating, planning, exercising and implementing security for NSSEs.  *Id.*[6]  Accordingly, all three subparts of 18 U.S.C. § 1752(c)(1) concern decision-making authority or action by the Secret Service.

Section 3056 sets forth the "Powers, authorities, and duties of United States Secret Service." 18 U.S.C. § 3056.  Subsection (d) criminalizes interfering with agents "engaged in the protective functions authorized by this section *or by section 1752 of this title*. . ." 18 U.S.C. §

---

[5] The term "other person protected by the Secret Service" is also statutorily defined.  It means "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential Memorandum, when such person has not declined such protection." 18 U.S.C. § 1752(c)(2).The joint session of Congress that met at the U.S. Capitol on January 6, 2021, to open, certify, and count the November 2020 presidential election votes was not designated an NSSE. National Special Security Events: Fact Sheet, Jan. 11, 2021, p. 1, Congressional Research Service, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.

3056(d) (emphasis added).  Subsection (e) states, "When directed *by the President*, the United States Secret Service is authorized to participate, under *the direction of the Secretary of Homeland Security*, in the planning, coordination, and implementation of security operations at special events of national significance, *as determined by the President*." 18 U.S.C. § 3056(e)(1) (emphasis added).  Finally, subsection (g) stresses the independence of the Secret Service's mission.  "The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function. No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department." 18 U.S.C. § 3056(g).

### 3. History of the protection of the Executive Mansion

The history of the protection of the Executive Mansion shows that it has generally, if not exclusively, been the duty of a single law enforcement actor or entity, not of overlapping, independent agencies.  The following points are drawn from The White House Historical Association:[6]

**1812-1814**: President Madison garrisoned a company of 100 militia on the grounds of the President's House.

**1823**: Commissioner for Public Buildings, Joseph Elgar, recommended to President Monroe that plainclothes officers protect the White House.

---

[6] Founded in 1961 by First Lady Jacqueline Kennedy, The White House Historical Association is a private nonprofit educational organization with a mission to enhance understanding of the Executive Mansion.  The White House Historical Association, About Us, May 10, 2021, available at: https://www.whitehousehistory.org/about.

**1830**: D.C. Marshal Tench Ringgold ordered guards posted at the White House gates to maintain order at the president's "public levees."

**1837-1841**: President Van Burden ordered the White House grounds to be patrolled by day guards and night watchmen.

**1842**: Establishment of the first permanent security force for the White House: an auxiliary guard that consisted of a captain and his three men, who looked out for suspicious-looking people.

**1853-1857**: Franklin Pierce becomes the first president to have a full-time bodyguard, Thomas O'Neil.

**1861**: Metropolitan Police guarded the Executive Mansion but Lincoln "did not want the house to take on the characteristics of an armed camp. Guards inside the Executive Mansion dressed in civilian clothes and concealed their firearms."

**1901**: After the assassination of President McKinley, Congress informally requested Secret Service protection for the president.

**1901-1909**: During the Theodore Roosevelt administration, the Secret Service assumed full-time responsibility for protecting the president.

**1922**: At the request of President Warren G. Harding, a permanent White House Police Force was created.

**1930**: The White House Police Force placed under the administration of the Secret Service.

**1951**: Congress passed Public Law 82-79 which permanently authorized Secret Service protection of the president, his immediate family, the president-elect and the vice president.

**1962**: Congress passed Public Law 87-829, enlarging Secret Service coverage to include the vice president and the vice president-elect.

**1970**: Congress passed Public Law 91-217, renaming the White House Police Force the Executive Protective Service.

**1977**: The Executive Protective Service officially renamed the Secret Service Uniformed Division.

**2003**: Congress passed Public Law 107-296, under which the Secret Service was transferred from the Department of the Treasury to the Department of Homeland Security. Guarding the White House, The White House Historical Association, available at: https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house.

## B. The  Indictment

Count Six of the Indictment alleges that Harkrider "did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, without lawful authority to do so." *See* Indictment, Count Six. Count Eight alleges that Harkrider "did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions." *Id.*, Count Eight.

The charging instrument does not allege any specific "posted, cordoned off, or otherwise restricted area," 18 U.S.C. § 1752(c), established by the Secret Service.   Is the government talking about the steps outside the Capitol or some other place?  They do allege Harkrider "entered or remained in" such an "area." § 1752(a)(1).   The Indictment doesn't allege what

13

Harkrider's "disorderly and disruptive conduct" consisted of or how this "in fact impede[d] and disrupt[ed] the orderly conduct of Government business and official functions."  § 1752(a)(2).

III.    ARGUMENT

    **A.    Standard for a Rule 12(b) motion to dismiss a criminal information**

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1).  This rule performs three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) preventing a person from being subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment.  *See*, *e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  In the Supreme Court's last decision to address the standard, it held that an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974). Unlike an indictment, however, an information has not been subject to the probable-cause review of a grand jury.  *Cf. United States v. Harmon*, 474 F. Supp. 3d 76, 86 (D.D.C. 2020) ("'[A] court's use of its supervisory power to dismiss *an indictment* directly encroaches upon the fundamental role of the grand jury.'") (quoting *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015)) (emphasis added).

**B.**     **The Indictment fails to state an offense because only the USSS restricts areas under § 1752**

The government's legal theory in this case is that (1) "there is no requirement in [§ 1752] for the government to prove that the restricted area was restricted at the direction of the Secret Service," ECF No. 23, pp. 2-3, and (2) Harkrider violated that statute by crossing into an area restricted by the U.S. Capitol Police, i.e., the west front of the U.S. Capitol steps and one interior room on January 6.     The government's position finds no support in the statutory text, the legislative history, or precedent.  Penal statutes are strictly construed.  *United States v. Moore*, 613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979).  As shown above, all three definitions of "restricted building or grounds" in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency.  Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that § 1752 is a statute directed to the USSS and not any other federal agency.  18 U.S.C. § 3056(d).  The legislative history of § 1752 is saturated with references to the USSS and to no other federal agency.

Common sense applies to the statutory analysis. The government claims that any federal or state agency may unilaterally set a "restricted area" and arrest anyone found within it so long as a Secret Service protectee is also present.  The implications of that argument are absurd. Accordingly, such a statutory interpretation is highly disfavored.  *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) ("When [one possible statutory] meaning has led to absurd or futile results this Court has looked beyond the words to the purpose of the act."); *see also Corley v. U.S.*, 556 U.S. 303, 317, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) (interpreting criminal procedure statute to avoid "absurdities of literalism"); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411, 406 U.S. App. D.C. 140 (D.C. Cir. 2013) (recognizing "'the long-standing rule that a statute should not be construed

to produce an absurd result'" (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068, 329 U.S. App. D.C. 341 (D.C. Cir. 1998)).

As Harkrider has noted elsewhere, the government's interpretation countenances the following absurdity.   The U.S. Postal Inspection Service (hypothetically) determines that the Secret Service is not properly protecting the president.   Because, according to the government, "there is no requirement in the statute for the government to prove that the restricted area was restricted at the direction of the Secret Service," ECF No. 23, pp. 2-3, the Postal Service resolves, unilaterally, that the "restricted area" of the White House should extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse, to the east.   Even though the Secret Service may disagree with the Postal Service's view of the appropriate size of the restricted area, for purposes of § 1752 liability that does not matter, and the reader of the brief is liable, and potentially detainable pretrial, unless some federal agency (the Postal Service? The Secret Service? Both?) gives him "lawful authority" to "knowingly" "remain" where he is. 18 U.S.C. § 1752(a)(1).

That is why what little § 1752 precedent there is supports Harkrider, while none supports the government's interpretation.   Instructive is *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005).   There, Bursey entered an area restricted by the USSS in advance of a political rally in South Carolina held by the president.   *Id.*, at 304.   Reviewing the trial record, the Fourth Circuit observed that "the Secret Service designated an area near [the rally] as a restricted area." *Id.*   It also noted that the "authorized persons" admitted into the area all "wore lapel pins issued by the Secret Service," meaning that the USSS was the entity that granted "lawful access" to the area. *Id.*   Intending to protest the Iraq war, Bursey approached the restricted area with a megaphone. A Secret Service Agent advised him he could not remain in that area.   He was repeatedly advised

thereafter of the same by multiple law enforcement agents over a twenty to twenty-five minute period.  *Id.*  Bursey was charged and convicted under § 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he was never advised that the area was a federally restricted zone, *so designated by the Secret Service.*" 416 F.3d at 308 (emphasis added).  The Fourth Circuit rejected this argument.  But not on the ground that § 1752 restricted areas need not be so restricted by the USSS.  Instead, trial evidence showed that Bursey "understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement)." *Id.*  Added the Fourth Circuit,

> [T]here was ample evidence that Bursey understood the area to have been restricted by the Secret Service, *and thus a federally restricted zone*.  Specifically, Bursey testified that he believed that "at that event, October, when the President came to town, that the circumstances would be similar to his prior visits, where … the Secret Service comes in and preempts" local and state police. . . Bursey also acknowledged that, in protesting at two earlier visits to South Carolina by the incumbent President, he was advised in both instances that "the Secret Service had basically preempted the security arrangements" of local police.

*Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear.  Had the Fourth Circuit even contemplated the idea that entities other than the USSS could restrict areas under § 1752, the above reasoning would lack sense.  Likewise, the trial court also simply assumed the USSS was the only entity that restricts areas under the statute.  *United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661, at *31 (D.S.C. Sept. 13, 2004) ("Bursey's own testimony confirms that he understood the restrictions would be established by the Secret Service.").

Albeit in a civil action, this Court considered the meaning of § 1752 in *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86 (D.D.C. 2019) (McFadden, J.).  Wilson ran in the 2016 Democratic presidential primary.  He claimed the DNC conspired with the Hillary Clinton campaign to prevent him from speaking at the Clyburn Fish Fry.  *Id.* at 96.  Because Clinton was

in attendance, the USSS was present at the event.  This Court found that "*the Secret Service*

*established a restricted area and limited access to that area to authorized persons.*" *Id.* (emphasis

added).  The Court made clear it was the Secret Service that bestowed "lawful authority" to enter

that area, by issuing lapel pins to authorized persons.  The Court also noted that when

unauthorized persons tried to enter the area, including Wilson, it was the Secret Service which

stopped them.  *Id.*  Indeed, the crux of Wilson's argument was that the DNC violated the Ku

Klux Klan Act of 1871 by conspiring with the Secret Service to prevent Wilson from speaking at

the Clyburn Fish Fry because, as all parties and the Court simply took for granted, the USSS is

the sole entity that restricts areas under § 1752.  The Court's conclusion that the DNC's motion

for summary judgment should be granted because Wilson "put forward no evidence that [he] had

a right to enter the restricted area" would be in error if there were some reasonable possibility an

entity other than the USSS restricts, and admits access to, areas under § 1752.  If the

government's interpretation in this case is correct, Wilson's Ku Klux Klan Act claim against the

DNC should be reopened to prevent manifest injustice.

Because both Counts Six and Eight of the Indictment are based on the government's

allegation that Harkrider crossed into an area restricted not by the USSS but by the U.S. Capitol

Police, they should be dismissed for failure to state an offense under § 1752.

**C.     If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Harkrider**

If the Court concludes that the Indictment properly charges Harkrider with violating §

1752 by crossing a boundary set by an agency other than the USSS, the statute is

unconstitutionally vague as applied to Harkrider.

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair

notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement."

*United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.2d 1, 23 (D.C. Cir. 2009) (noting that criminal statute must "'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976)). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 67 (1997). "The void-for-vagueness doctrine guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes. And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

In addition, if the law at issue "interferes with the right of free speech or of association, a more stringent vagueness test [] appl[ies]." *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 500 (1982) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)). Vagueness challenges are either facial or as-applied. "'[T]he distinction between facial and as-applied challenges  goes to the breadth of the remedy employed by the Court, not what must be pleaded by the complaint.'" *Edwards v. District of Columbia*, 755 F.3d 886, 1001 (D.C. Cir. 2014) (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)).

Under the government's interpretation of § 1752, there is *no* notice, much less "fair notice," of the conduct proscribed *in this case*. As shown above, the text, legislative history, and common sense all point to the ordinary person's reasonable conclusion that the government agency that may restrict a person from entering an area in which there is a Secret Service protectee is—the Secret Service. The government's allegations in this case are similar to other cases brought against January 6th defendants, that Harkrider saw police lined up outside the U.S.

19

Capitol, whether they were U.S. Capitol Police or Metro Police.  According to the government, Harkrider also saw barricades marked as the property of the police.  *See* ECF No. 1, p. 1.  But if the text, legislative history and common sense inform an "ordinary person" that he violates § 1752 by entering an area *the Secret Service* has restricted—as in *Bursey*, one of the handful of cases interpreting the statute—there is no similar notice in the statute that being on the wrong side of a *police* barricade is, *independent of the Secret Service*, in violation of that statute.  The Indictment does not allege postings on January 6 warning Harkrider that the Secret Service designated the area *he entered* as restricted.  They do not allege any law enforcement officers notified Harkrider of that fact.  Nothing in § 1752 so much as hints at the possibility that disobeying local law enforcement per se may result in liability under that statute, provided some USSS protectee lurks somewhere within the restricted area.

1.   The government's interpretation of Section 1752(c)  is unconstitutionally vague

 In this case, the void-for-vagueness doctrine's function of guarding against arbitrary or discriminatory law enforcement is worth elaborating.  As Justice Gorsuch explained in a *Dimaya* concurrence,

> Vague laws invite arbitrary power.  Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death.  The founders cited the crown's abuse of 'pretended' crimes . . .as one of their reasons for revolution. . . Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same—by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

138 S. Ct. at 1223-24.

 Justice Gorsuch gave some early, foundational examples of statutes that failed to provide fair notice and thus led to arbitrary enforcement:

> Blackstone illustrated the point with a case involving a statute that made "stealing sheep, or other cattle" a felony. 1 Blackstone 88 (emphasis deleted). Because the term "cattle" embraced a good deal more then than it does now (including wild animals, no less), the court held the statute failed to provide adequate notice about what it did and did not

cover—and so the court treated the term "cattle" as a nullity. *Ibid.* All of which, Blackstone added, had the salutary effect of inducing the legislature to reenter the field and make itself clear by passing a new law extending the statute to "bulls, cows, oxen," and more "by name." . . .

This tradition of courts refusing to apply vague statutes finds parallels in early American practice as well. In *The Enterprise*, 8 F. Cas. 732, F. Cas. No. 4499 (No. 4,499) (CC NY 1810), for example, Justice Livingston found that a statute setting the circumstances in which a ship may enter a port during an embargo was too vague to be applied, concluding that "the court had better pass" the statutory terms by "as unintelligible and useless" rather than "put on them, at great uncertainty, a very harsh signification, and one which the legislature may never have designed." *Id.,* at 735. In *United States* v. *Sharp*, 27 F. Cas. 1041, F. Cas. No. 16264 (No. 16,264) (CC Pa. 1815), Justice Washington confronted a statute which prohibited seamen from making a "revolt." *Id.*, at 1043. But he was unable to determine the meaning of this provision "by any authority . . . either in the common, admiralty, or civil law." *Ibid*. As a result, he declined to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid*.

Nor was the concern with vague laws confined to the most serious offenses like capital crimes. Courts refused to apply vague laws in criminal cases involving relatively modest penalties. *See*, *e.g., McJunkins* v. *State*, 10 Ind. 140, 145 (1858).

138 S. Ct. at 1226.

The concern about vagueness-enabled arbitrary enforcement is manifested here. It takes two forms, which might be called specific and general arbitrariness. At a general level, the government's enforcement of § 1752 against Harkrider is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS. Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement. Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Harkrider's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances. U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500 (stricter scrutiny of vague statutes in the context of activities protected by the First Amendment).

Perhaps more serious is the specific arbitrariness here.  The government has offered pictures showing Harkrider standing on the West steps of the Capitol.   Is this the "restricted area" for which he is charged? Those pictures also show hundreds of other individuals "remaining" in the same area.  Yet it is undisputed that most of those people have not been charged under § 1752 like Harkrider.  The explanation for why the government chose to prosecute Harkrider under § 1752, and not others, is not hard to find.  As the government explained in the criminal complaint: "...the FBI obtained screenshots of two Facebook posts made by an account with the name "AlexHarkrider", which contain an accompanying profile photo that appears to be AlexHarkrider.  The posts, ...., corroborate that Harkrider was present at the U.S. Capitol on January 6, 2021, and intended to disrupt the proceedings.  Specifically, Harkrider boasts about a "necessary revolt" against a "tyrannical government" and to engaging in actions that "sent those politicians running."  ECF 1, Criminal Complaint at p. 7.

Of course, none of these things has anything to do with § 1752 or the Secret Service.  But the government's naked reliance on them plainly shows the danger of arbitrariness inherent in the vague and elastic interpretation of § 1752 it offers for this specific set of defendants alone.  In so far as they allege that Harkrider entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Counts six and eight are unconstitutionally vague.

2.     The government's interpretation of § 1752(a)(2) is an unconstitutionally vague boundary standard

Count eight of the indictment alleges that Harkrider engaged in "disorderly and disruptive conduct in and *within such proximity to*, a restricted building and grounds." ECF No. 59, Count eight (emphasis added).  To the extent the government has not properly alleged that the west front of the Capitol steps was a restricted area under § 1752(c) but has somehow alleged that *some* area within the Capitol Building was, the § 1752(a)(2) phrase "within such proximity to" is an unconstitutionally vague boundary standard as applied to Harkrider.

22

"[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause." *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999).  As the Supreme Court described it in *Morales*, the Court has "expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty protected by the Constitution.'" *Id.* (quoting *Williams v. Fears*, 179 U.S. 270, 274 (1900)).  "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,'" *id.* (quoting *Kent v. Dulles*, 357 U.S. 116, 126 (1958)), or "the right to move 'to whatsoever place one's own inclination may direct' identified in Blackstone's commentaries." *Id.* (quoting 1 W. Blackstone, Commentaries on the Laws of England 130 (1765)).

*Morales* concerned a Chicago city ordinance banning "criminal street gang members" and those associating with them from "loitering" in "any public place." Under the ordinance, law enforcement was directed to order all relevant persons to disperse and remove themselves "from the area." 527 U.S. at 47.  If those so ordered disobeyed by not leaving "the area," they were guilty of violating the ordinance.  The Court held that the ordinance was unconstitutionally vague.  Among other notice problems, the Court determined that the ordinance's requirement that the accused remove themselves "from the area," raised a host of ambiguities.  "How far must they move? If each loiterer walks around the block and they meet again at the same location, are they subject to arrest or merely to being ordered to disperse again?" 527 U.S. at 59.

The Supreme Court has similarly found vagueness in statutes that rest on the fuzzy boundary standards of "neighborhood" and "locality." In *Connally v. General Constr. Co.*, 269 U.S. 385 (1926), the Court held that "both terms are elastic and, dependent upon the circumstances, may be equally satisfied by areas measured by rods or by miles." *Id.* at 395. *Connally* concerned an Oklahoma statute requiring that "not less than the current rate of per diem

wages in the locality where the work is performed shall be paid to laborers . . ." *Id.* at 388.

Criminal penalties were imposed for violations.  The Court found the statute unconstitutionally

vague.  The vagueness problem was not just with the terms "neighborhood" and "locality":

> Certainly, the expression "near the place" leaves much to be desired in the way of a delimitation of boundaries; for it at once provokes the inquiry, "how near?" . . . The result is that the application of the law depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal.

269 U.S. at 395.

Just so here.  The government alleges that, on January 6, Harkrider was "within such

proximity to a restricted building and grounds" under § 1752(a)(2).  But: "How near?" *Connally*,

269 U.S. at 395.  Was the West Terrace steps outside of the Capitol "within such proximity to" a

"restricted area" or some other place? Where *was* the restricted area (if any), as set by the USSS?

Were the Senators and Congressmen who themselves objected to the Electoral College vote

count "within such proximity to" a restricted area?  Did they receive permission from the Secret

Service?  Did the President himself give permission when he invited the protestors to the Capitol

that day?  Is "proximity" measured "by rods or by miles"? *Connally*, 269 U.S. at 395.  And if

"'near the place' leaves much to be desired in the way of a delimitation of boundaries,"then how

does "within such proximity to" survive when the noun "proximity" is defined as "nearness to [a]

place. . ." "Proximity." Collins Dictionary.com, available at:

https://www.collinsdictionary.com/us/dictionary/english/proximity (May 17, 2021).

However, the vagueness in the government's § 1752(a)(2) charge here should be more strictly

construed than in *Morales* and *Connally*.  For, unlike in those cases, the criminalized activity

includes pure political speech, assembly and Harkrider's right to petition the government.

*Hoffman Estates*, 455 U.S. at 500; *Papachristou*, 405 U.S. at 156. "The constitutional guaranty" of these rights "cannot be allowed to rest upon a support so equivocal," *Connally*, 269 U.S. at 395, as the vague boundary phrase "within such proximity to." § 1752(a)(2).

### D. The rule of lenity dictates that ambiguities in § 1752 be resolved in Harkrider's favor

Even if § 1752 is not unconstitutionally vague as applied to Harkrider, any ambiguities in the statute should be resolved in his favor under the rule of lenity. Under that principle, "where text, structure, and history fail to establish that the government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994). "When interpreting a criminal statute, we do not play the part of a mindreader." *United States v. Santos*, 553 U.S. 507, 515 (2008) (Scalia, J.). "In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. 'Probability is not a guide which a court, in construing a penal statute, can safely take.'" *Id.* (quoting *United States v. Wiltberger*, 18 U.S. 76 (1820)).

Here, even if the Court decides that the government's interpretation of § 1752 is formally correct—i.e., that any agency may set restricted areas under § 1752(c) and that § 1752(a)(2)'s reference to conduct "within such proximity to" a restricted area applies to the west front of the Capitol steps on January 6—it is plainly not *unambiguously* so. That is shown by the lack of any references in § 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that the USSS plays in all three definitions of "restricted buildings or grounds" in § 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them.

Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Harkrider's favor by dismissing these counts of the Indictment. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

### E. The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law

Because no court has ever construed Section 1752 to mean that agencies other than the USSS may set restricted areas under the statute, such a construction would be novel and therefore the statute did not give Harkrider fair warning of what it proscribed. That is also true of § 1752(a)(2)'s phrase "within such proximity to."

The Supreme Court has held that the novel construction principle is similar to an *ex post facto* law which has been described as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). "[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* If a "legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a [court] is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.*

*Bouie* also concerned a trespass case that gave every indication of being politically motivated. The 1964 case involved a combination drugstore and restaurant in South Carolina. The restaurant would not serve black Americans. Two black college students took seats in the restaurant. After they entered, an employee hung up a "no trespass" sign. The store manager called the police, who asked the students to leave. When they refused, they were arrested and charged with trespass. The students were tried and convicted, with the State Supreme Court upholding the trespass convictions. The Supreme Court reversed, based on the novel construction principle of the Due Process Clause. It reasoned that the South Carolina Supreme

26

Court's construction of the trespass statute was effectively an *ex post facto* law.  By its terms, the state statute merely prohibited "*entry* upon the lands of another .after notice from the owner prohibiting such entry." 378 U.S. at 355 (emphasis added).  However, there "was nothing in the statute to indicate that it also prohibited the different act of remaining on the premises after being asked to leave.  Petitioners did not violate the statute as it was written; they received no notice before entering either the drugstore or the restaurant department."  *Id.*  Finally, "the interpretation given the statute by the South Carolina Supreme Court  . . . ha[d] not the slightest support in prior South Carolina decisions."  *Id.* at 356.

Just so here.  Harkrider did not "violate the statute as it was written." *Bouie*, 378 U.S. at 355.  Section 1752 prohibits entry into an area restricted by the USSS.  There is "nothing in the statute to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of entering into an area restricted by the U.S. Capitol Police.  "The interpretation given the statute by the [government] . . . has not the slightest support in prior [§ 1752] decisions." *Id.*

Accordingly, the novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

### F.     The Secret Service did not "restrict" the Capitol or its grounds on January 6

Both of these charges concern certain conduct related to statutorily "restricted building or grounds." 18 U.S.C. § 1752(c) provides the following definition: (1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area – (A) of the White House or its grounds, or the Vice President's official residence or grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance. 18 U.S.C. § 1782(c)(1)(A)-(C) (emphasis added). The

United States Capitol and its grounds are not specifically included in the definition set forth above. Rather, the government alleges that the Capitol was a "restricted building and grounds" on January 6th because it was a "building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting." 18 U.S.C. § 1752(c)(1)(B). The "other person," as set forth in the Indictment, was then-Vice President Michael Pence. Accordingly, Mr. Harkrider did not violate §1752 unless then-Vice President Pence was 1) "visiting" or "temporarily visiting" the specific area that Mr. Harkrider traversed; and 2) the Secret Service designated that area as a restricted zone. The government cannot establish either element for the reasons that follow.

1.   Vice President Pence was not "Temporarily Visiting" the Capitol

Then-Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia. Vice President Pence lived and worked in D.C. at his official residence, and actually worked at the Capitol Case Building and grounds – it was his place of employment. Vice President Pence had a permanent office "within the United States Capitol and its grounds," in his capacity as President of the Senate. On January 6th, Vice President Pence was working -- he was presiding in the Senate chamber to count the electoral votes. See U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.") (emphasis added). Past cases support this plain, common-sense reading of the statute, as they involve conduct in or near areas where the President and Vice President were clearly "temporarily visiting." *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was

visiting for a political rally); *United State v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then-Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by Secret Service agents); *Blair v. City of Evansville, Ind.*, 361 F. Supp. 2d. 846 (S.D. Ind. 2005) (defendant charged with 18 U.S.C. § 1752 at protest during then-Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President traveling outside of the District of Columbia and "visiting" that area for a "temporary" purpose, consistent with the plain meaning of §1752(c)(1)(B). Vice President Pence was not traveling to a speaking event or political rally on January 6th – rather he was performing a duty of his office in a building where he had a permanent office. Based on the plain language of 18 U.S.C. § 1752, he was not "temporarily visiting" the Capitol building and §1752 does not apply as charged.

The legislative history of 18 U.S.C. § 1752 and the statutory authorization of 18 U.S.C. § 305612 make it clear that only the United States Secret Service ("Secret Service") can restrict areas for temporary visits by the President or Vice President. A particular place does not become restricted just because the Vice President enters it; rather, the Secret Service, the agency in charge of protecting the Vice President, must create the temporary restricted zone to facilitate its duty to protect. Indeed, the Government has specifically argued that it is the "Secret Service" that "exercise[s] its discretion to determine the scope of the restricted area necessary to protect" a designated person. *United States v. Jabr*, Cr. No. 18-105 (PLF), ECF #26 at page 9. The Government does not allege that any of the barriers that Mr. Harkrider allegedly crossed were specifically erected for the Vice-President's visit at the direction of the Secret Service. On January 6, 2021, the restrictions placed on the Capitol were created by the Capitol Police, not the Secret Service. As such, a necessary factual predicate to a 18 U.S.C. § 1752 offense is lacking, and Counts six and eight  must be dismissed for failure to state a claim.

IV.     **CONCLUSION**

For all the foregoing reasons, Harkrider respectfully requests that the Court dismiss

Counts Six and Eight of the Indictment with prejudice.

Respectfully Submitted,

By: Kira Anne West

_____/s/_____
Kira Anne West
DC Bar No. 993523
712 H. Street N.E., Unit 509
Washington, D.C.  20002
(202)-236-2042
kiraannewest@gmail.com
Attorney for Alex Harkrider

Certificate of Service
I certify that a copy of the forgoing was filed via ECF electronically for all parties of record on
this 18th day of July, 2022.
_____/s/_____
Kira Anne West
Attorney for Alex Harkrider