**THE DISTRICT OF THE DISTRICT OF COLUMBIA**

_____
                                            )
UNITED STATES,                              )
                                            )
          v.                                )        Case No. 21-cr-117-1(TFH)
                                            )
RYAN TAYLOR NICHOLS                         )
          Defendant.                        )
_____ )


<u>**DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE PRE-TRIAL RELEASE**</u>
<u>**AND REQUEST FOR AN EMERGENCY HEARING**</u>

Comes now Defendant Ryan Taylor Nichols, by counsel, and moves the Court to order the immediate temporary release from pretrial confinement to the custody of his wife, on conditions suitable to the Court, because (1) the DC Jail is presently retaliating against Defendant for filing a civil case against the Jail by imposing punitive blatantly unlawful measures intended to prejudice Defendant's defense in his criminal case and, worse, to psychologically torture him; (2) the length of Defendant's pretrial confinement is a violation of his due process rights and demands immediate release; and (3) the Defendant is being held in conditions of confinement that violate his civil and human rights.

The urgency of the situation cannot be understated.  As set forth below, the DC Jail may at this moment be in possession of sensitive and confidential attorney-client information that may irreparably prejudice Defendant in this case, and, more importantly, the DC Jail is intentionally inflicting Defendant with psychological torture to aggravate his known PTSD diagnosis, causing irreparable psychological damage. The Court must act swiftly to review this motion and order his immediate release.

## BACKGROUND

The Defendant has been detained without trial and without bail for almost twenty (20) months since January 18, 2021.  The Defendant has been confined in horrific conditions in violation of his civil and human rights.  On August 10, 2022, Defendant filed a civil action petitioning for a writ of habeas corpus with this Court, alleging various violations of civil and human rights.  Defendant's Petition is still pending and is attached as Exhibit B and incorporated as if set forth fully herein.

Attorney Eric Glover, General Counsel for the DC Department of Corrections accepted service of Defendant's Habeas Petition on Friday, August 26, 2022, on behalf of Deputy Warden Michelle Jones.  In direct retaliation, the following Monday, August 29, 2022, at 12:45 PM, the DC Jail burst into the Defendant's cell and forcibly confiscated a USB drive containing the Defendant's discovery materials for this case and also containing sensitive confidential communications between the Defendant and his attorney, as well as hundreds of hours of privileged work product and privileged documents and files that the Defendant was reviewing in preparation of his defense and that reveal the Defendant's litigation strategies.  It has yet to be determined whether the Jail has viewed, shared, copied, deleted, or altered any of the files on the USB drive while it was in its possession.

The Defendant immediately contacted undersigned counsel who within minutes sent the following email at 1:26 PM to the Department of Correction's general counsel.

Good afternoon Mr. Glover.

I was just informed by Ryan Nichols that a non-uniformed DC Jail Staff Member named Ms. Washington (presumably Ingrid Washington) and an ERT team led by Corporal Feliciano, forcibly confiscated Ryan Nichols's discovery today, August 29, 2022, at approximately 12:45 PM.

1

Ryan Nichols requested that Corporal Feliciano turn his body camera on so that Mr. Nichols' could have a record of the incident.  The other members of the ERT team covered their badges.  One of the other officers is called the name "Stretch" by the J6 detainees because of his height.

Importantly, J6 detainees being housed at CTF have been in possession of their hard drives for the past 6 months.  This makes it easier for them to simply plug their discovery into the laptops when they arrive and create files for trial preparation.

Mr. Nichols has hundreds of hours of attorney-client privileged work product on his hard drive that is now in the hands of the United States government.  The idea that federal agents and/or federal prosecutors have copied this information sickens me in the deepest part of my soul.  It is also plainly illegal and violative of Mr. Nichols's Fourth, Sixth, and First Amendment rights.

We will be filing an emergency motion asking for Mr. Nichols' release due to the litany of allegations laid out in his habeas petition, and of course, this new and very unfortunate development.

I am asking **(1)** that Mr. Nichols' hard drive be secured, **(2)** Corporal Feliciano's body cam footage and any other CCTV footage and/or body cam footage be preserved and immediately turned over, and **(3)** that this incident be fully investigated, and the findings/corresponding report be made available for our review at the earliest possible time.

*See* Exhibit A, email from Defendant's counsel to DOC counsel.

The unlawful raid on the Defendant's cell and the confiscation of his discovery materials has had a traumatic impact on the Defendant who already suffers from PTSD.  The Defendant takes very seriously his constitutional right to participate in his own defense; aside from the hope of one day being reunited with his wife and two young children, his ability to work with his attorney in mounting his defense is what has kept the Defendant alive, despite the Jail staff's deliberate aggravation of the Defendant's PTSD to the point that the Defendant was put on suicide watch.  Since the raid, the Defendant has been overwhelmed with feelings of helplessness, hopelessness, and despair.  It has further aggravated his PTSD.

Though the DC Jail returned the USB drive after receiving undersigned counsel's email, the Jail has not complied with the other demands, nor has it provided any assurances that they have

not viewed, shared, copied, altered, or deleted any of the sensitive materials or that this egregious conduct will not be repeated.

## **LEGAL STANDARD**

After an initial determination of pre-trial detention, the Bail Reform Act provides that a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  Under this statutory provision, the defendant otherwise subject to pretrial detention may be granted temporary release by showing the presence of two (2) factors: (1) that his temporary release is necessary for the preparation of his defense or another compelling reason; and, (2) that he could be released to the custody of the an "appropriate person."  *United States v. Dhavale*, No. 19-mj-00092, 2020 U.S. Dist. LEXIS 69800, at *12-13 (D.D.C. Apr. 21, 2020).

## **ARGUMENT**

I.   **Release is necessary both for the preparation of his defense and for other compelling reasons.**

A.   **The DC Jail is retaliating against the Defendant by escalating its unlawful inhumane treatment.**

The raid on the Defendant's cell on the first business day following service on the general counsel for the department of corrections with the Defendant's civil lawsuit is strong circumstantial evidence that the raid had a retaliatory motive.  The civil action alleges flagrant violations of civil and human rights that have put the Defendant at risk of suicide.  *See* Exhibit B. The recent raid of the Defendant's cell shows the Jail intends to escalate its unlawful conduct in retaliation for filing the civil action, which, if allowed to continue, could potentially result in the Defendant's death.  There can be no greater compelling reason for release.

**B. The Defendant's ability to prepare for trial in the Jail has been irreparably compromised by the Jail's unlawful raid on Defendant's cell and the confiscation of his discovery materials.**

A pretrial detainee generally is "hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *United States v. Ali,* 965 F. Supp. 2d 139, 151-52 (D.D.C. 2013) (citing *Barker v. Wingo*, 407 U.S. 514, 520, 533 (1972)).  "Pretrial detention limits defense counsels' access to their client and thus limits counsels' ability to prepare effectively for trial and to prepare the defendant to testify.  Moreover, the physical and psychological toll of pretrial detention, particularly a detention lasting for several years, where the defendant is effectively cut off from everyone but his attorneys, can significantly affect a defendant's ability to participate in his own defense. *Cf. id.* at 520 ("Lengthy exposure to these [pretrial detention] conditions 'has a destructive effect on human character. . . .'")."  *Id.*

This case bears a striking resemblance to *Ali* where this Court found "a disregard for Ali's constitutional rights, as well as the depressing reality of conditions at the D.C. Jail."  *Id.*  In that case, the pretrial detainee was punished without a timely hearing for allegedly possessing "major contraband" in the form of a USB drive containing educational materials.  *Id.*  The Court found that this conduct by the DC Jail "exemplifies the exceedingly harsh conditions that pretrial detainees face while awaiting trial" and "points strongly to a denial of due process." *Id.* (citing *Gonzales Claudio*, 806 F.2d 334, 341(2d Cir. 1986).  The Court accordingly weighed the length of Ali's pretrial detention heavily in his favor in evaluating his due process claim.  *Id.*

The raid of the Defendant's cell and the confiscation of his USB drive shows that "the depressing reality of conditions at the D.C. Jail" still exists almost ten years after the Court's condemnation in *Ali.*  The difference is that the Defendant's case is far more egregious in that, unlike Ali's USB drive that contained educational materials, the Defendant's USB drive contains attorney-client privilege information that is unquestionably protected by the United States

4

Constitution.  Further, Ali was awaiting trial for assisting pirates who held a ship and its crew hostage at sea for sixty-nine days.  Here, the Defendant is exactly the opposite - a decorated military veteran whose bravery and compassion are renowned the world over through his search and rescue work.

The Court's accurate description of the "physical and psychological toll of pretrial detention" and how it can "significantly affect a defendant's ability to participate in his own defense" is all the more so true in the Defendant's case where the DC Jail has deliberately aggravated the Defendant's diagnosed PTSD.  Here, the Defendant has been directly hindered from preparing his defense, possibly irreparably, if the DC Jail has viewed, copied, shared, deleted, or altered any of the files on the USB drive while in its possession.  The impact of the sudden raid traumatized the Defendant in that he no longer feels even the most remote sense that his communications with his attorney are confidential and shielded from the Government prosecutors. It is impossible for him to prepare for trial under these conditions.  As such, the only cure is his immediate release.

### C.  The sheer length of the Defendant's pretrial confinement is a violation of his due process rights.

The Defendant has been detained without trial for almost 20 months in violation of his due process rights.  Pretrial detention violates due process when it "become[s] excessively prolonged, and therefore punitive," rather than regulatory. *United States v. Salerno*, 481 U.S. 739, 747-48 & 747 n.4 (1987). The length of pretrial detention is excessive when it is no longer related to its regulatory purposes, including protecting the public from dangerous defendants and ensuring that they will not flee. *United States v. Torres*, 995 F.3d 695, 709-10 (9th Cir. 2021). There is no set time when pretrial detention crosses the line from regulatory to punitive because due process is a

5

flexible concept and, thus, its limits depend on the facts of the case. *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986).

Courts consider six factors when evaluating whether the length of pretrial detention violates due process: (1) the seriousness of the charges; (2) the strength of the government's proof that the defendant poses a risk of flight or a danger to the community; (3) the strength of the government's case on the merits; (4) the length of the detention; (5) the complexity of the case; and (6) whether the strategy of one side or the other has added needlessly to that complexity. *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986); *see also United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989); *United States v. Ojeda Rios*, 846 F.2d 167, 169 (2nd Cir. 1988); *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986) (same); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986).  In some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention.  *Accetturo*, 783 F.2d at 388.

Beginning with the length-of-detention factor, it is worth noting, as a guidepost, that the First Circuit has expressly stated "we shall assume that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement." *Zannino*, 798 F.2d at 547-48.  In *Zannino,* "the charges against Zannino are of the gravest order, including predicate acts of murder and conspiracy to commit murder. If convicted of all offenses charged, Zannino would face a maximum sentence of imprisonment for 130 years." The government's case on the merits was found to be strong, and he was found to be dangerous. The court also found Zannino to have "played a continuing leadership role in mob activities."  With all that, the Court found that 16 months would have been unconstitutionally excessive for pretrial detention, but for the fact that it was Zannino who had delayed his trial, and not the government.

The Second Circuit condemned as unconstitutionally excessive the fourteen (14) month detention of two defendants charged with participating in the robbery of a Wells Fargo depot by paramilitary Puerto Rican nationalists. *United States v. Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986). The Ninth Circuit has recently stated that a twenty-one-month detention is "significant under any metric and is deeply troubling," when the defendant was a five-time convicted violent drug dealer, caught with an outstanding warrant, a gun with live ammunition, and 64 grams of methamphetamine. *Torres*, 995 F.3d at 709.

Courts not only consider the time already spent in detention, but also "the non-speculative nature of future detention," *i.e.,* the time until trial, and the length of the trial. *See Hare*, 873 F.2d at 801; *see also Ojeda Rios*, 846 F.2d at 168-69. In *Ojeda Rios*, the Second Circuit ordered the release of the defendant even though the district court found that the defendant "posed a risk of flight and also presented a danger to the community," because after considering the length of his confinement *and the fact that the trial was anticipated to take months*, the court found "we do not believe that due process can tolerate any further pretrial detention in this case."

The Defendant, Ryan Nichols, is a former United States Marine who received the Good Conduct Medal, National Defense Service Medal, and the Global War on Terrorism Medal during his four years of honorable service to this country. Mr. Nichols has no criminal history. Mr. Nichols is not a part of any hate group or organization espousing violence. He has no history of failing to appear in court. He is a father to two young boys. He has been married for eight years. Mr. Nichols owns a small business. He employs many people, including ex-convicts and recovering drug addicts. Mr. Nichols owns a 501(c)(3) called "Rescue the Universe" that specializes in searching and rescuing people from areas affected by natural disasters. He was nationally recognized for his work with Rescue the Universe. Even in prison, Ryan has been called a model prisoner by his

supervisors on work-detail and has received stellar reviews.  He is neither a flight risk nor a danger to the community.  Pretrial detention of 20 months is considered "troubling" even for pretrial detainees accused of dangerous violent crimes with long and sordid criminal histories, *see Torres*, 995 F.3d at 709; for a decorated military veteran like Mr. Nichols who has contributed so much good to the world and saved so many lives it is unconscionable and a clear violation of his due process rights.

Regarding the complexity of the case, the Jail's recent egregious and unlawful conduct has needlessly added to the complexity of the case.  The reasons behind the unlawful raid and confiscation are currently a mystery, and the Defendant can only assume that his USB drive was confiscated for its sensitive contents which reveal the Defendant's litigation strategy.  Without a forensic investigation, the Defendant has no way of definitively knowing which files the Government may have viewed, copied, altered, or deleted from his USB drive while it was in the Government's possession, and how any such action may affect the Defendant's trial strategy.  This matter will not be easily resolved and will unquestionably add to the complexity of the case.

Further, the Government continues to needlessly add to the complexity of the case by relentlessly engaging in an unprecedented crusade to find and prosecute hundreds of American citizens who were present at the Capitol on January 6, even for the most minimal non-violent participation.  The riot at the Capitol on January 6 lasted about four hours, yet it has produced the most expansive federal law enforcement investigation in US history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence collected. There are currently over 600 defendants from all 50 states facing charges, with more defendants being investigated, hunted down, and arrested to this day.

The complexity of the case was further compounded by the Government by its decision to charge a multitude of defendants, including Nichols with 18 U.S.C. § 1512(c)(2), a charge that was dismissed on March 7, 2022, in a separate case by Judge Carl Nichols of this Court, rejecting the government's broad interpretation of that statute. *See United States v. Miller*, 2022 WL 823070 (D.D.C. Mar. 7, 2022). The Government has decided to appeal the dismissal to the Court of Appeals for the District of Columbia, and if successful, this issue may go to the Supreme Court. As the Government has insisted on maintaining this highly questionable and unprecedented charge against the Defendant, the issue has already added to and will continue to add to the complexity of this case, through no fault of the Defendant.

The complexity of the case was further compounded by Congress' made-for-television production of the January 6th Committee.  This still ongoing, one-sided show trial aired during prime-time television, where January 6th defendants, including Defendant, were portrayed to millions of Americans as "insurrectionists" and "domestic terrorists," irreparably tainting any possible jury pool.  As recently as August 30, 2022, the day of this filing, the President of the United States stated in a public speech, "Don't tell me you support law enforcement if you won't condemn what happened on January 6.  Don't tell me.  Can't do it.  For God's sake, whose side are you on?"  This will certainly be an issue at trial adding to the complexity of the case, through no fault of the Defendant.

The complexity of the case was further compounded with the recent developments that came to light in a Michigan court, where it was revealed that the alleged plot by alleged right wing extremists to kidnap the Michigan Governor in 2020 was in fact an FBI operation, and one of the key FBI players in the operation was Steven D'Antuono, who at the time was special agent in charge of the Detroit Field Office, and was then coincidentally promoted to assistant director in

charge of the FBI's Washington Field Office, just before January 6, 2021.  This recent revelation that the FBI orchestrated an elaborate scheme to entrap American citizens for political purposes, and that the mastermind behind the scheme was moved to Washington D.C. just prior to January 6, has led millions of Americans to suspect that the FBI may have played a similar role in the events on January 6th. At a Senate hearing in January of 2022, when Jill Sanborn, the FBI's executive assistant director of the National Security Branch, was given a chance to publicly dispel suspicions of FBI involvement, she refused to confirm or deny whether FBI agents or informants incited crimes of violence on January 6. The suspicion of the Government targeting political opponents, including January 6 defendants, was further compounded by the recent raid on President Trump's private residence, authorized by Attorney General Merrick Garland.  As recently as last Friday, August 26, 2022, one of the 13 assistant special directors in charge of the Washington field office resigned amid whistleblower allegations of a pattern political bias. According to Senate Judiciary ranking member Chuck Grassley, there still remain other politically biased FBI agents at the Washington Field Office. These recent developments that suggest Government involvement in the events of January 6 will directly add to the complexity of the January 6 trials, including the Defendant's, through no fault of the Defendant.

For all these reasons, the Government's strategy, not the Defendant's, has added complexity to the case, whereby, this factor should weigh heavily in favor of releasing the Defendant.

### D.  The Defendant's conditions of confinement violate his civil rights and human rights.

As set forth in the Petition for Writ of Habeas Corpus, attached as Exhibit B, the conditions of confinement violate several of the Defendant's constitutional rights.  Any one of the violations by itself justify release, all the more so, the multitude of violations combined.

## II.     The Defendant could be released to the custody of his wife who is an appropriate third-party custodian.

The Defendant proposes to the Court that his wife Bonnie Nichols is an appropriate third-party custodian.  Ms. Nichols is the Defendant's wife of nine years and the mother of his two young children.  She is self-employed and capable of supervising the Defendant at their home. She has no criminal record and is well respected in her community.  As the Defendant is neither a danger to the community or a flight risk, Ms. Nichols is capable of fulfilling all custodial duties.

In light of these facts, the Defendant's wife Bonnie Nichols is an appropriate person into whose custody the Defendant may be released pursuant to § 3142(i).

## CONCLUSION

For the aforementioned reasons, the Court should order the Defendant's immediate release to the custody of his wife, Bonnie Nichols.

Dated: August 30, 2022
Washington, DC                                    Respectfully submitted,

                                                  /s/ Joseph D. McBride, Esq.
                                                  Bar ID: NY0403
                                                  THE MCBRIDE LAW FIRM, PLLC
                                                  99 Park Avenue, 6th Floor
                                                  New York, NY 10016
                                                  p: (917) 757-9537
                                                  e: jmcbride@mcbridelawnyc.com
                                                  Counsel for the Defendant

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on August 30, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.

/s/ Joseph D. McBride, Esq.

11