## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

RYAN TAYLOR NICHOLS,
United States Citizen, Pretrial Detainee
#376795 held at D.C. Jail's Correctional
Treatment Facility, 1901 D Street SE,
Washington, DC 20003-2534

        *Petitioner,*

   v.

MERRICK GARLAND in his official
Capacity as United States Attorney General,
950 Pennsylvania Ave., NW Washington, D.C.
20530;
     and

MICHELLE JONES in her Official Capacity as
DEPUTY WARDEN of D.C. Jail's Correctional
Treatment Facility, 1901 D Street SE,
Washington, DC 20003-2534

       *Respondents,*

Civil Action No. 1:22-cv-02356

---

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. 2241
## AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Joseph D. McBride, Esq.
Bar ID:  NY0403
The McBride Law Firm, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
Telephone: (917) 757-9537
Email: jmcbride@mcbridelawnyc.com

Dated: August 10, 2022
New York, NY

Jonathan S. Gross, Esq.
*Admission Pending*
Bar ID: MD1912170138
2833 Smith Ave., Suite 331
Baltimore, MD 21209
Telephone: (443) 813-0141
e: jon@clevengerfirm.com

I.    INTRODUCTION................................................................................................3

II.   JURISDICTION................................................................................................3

III.  VENUE.............................................................................................................4

IV.  PARTIES..........................................................................................................4

V.   STATEMENT OF FACTS...................................................................................5

      A.  PETITIONER'S PERSONAL HISTORY……………….....………………….…...5

      B.  PETITIONER HAS POST TRAUMATIC STRESS DISORDER (PTSD)……………...………7

      C.  THE CONDITIONS OF CONFINEMENT AT DC JAIL …………….…..……...…..……....9

      D.  BAIL MODIFICATION HEARING: DECEMBER 20, 2021…………………………….…19

      E.  PETITIONER IS A MODEL PRISONER……………...………………………….…22

      F.  DEPRIVATION OF CONSTITUTIONAL RIGHTS: FIRST AMENDMENT………………….24

      G.  DEPRIVATION OF CONSTITUTIONAL RIGHTS: SIXTH AMENDMENT………….………25

      H.  DEPRIVATION OF CONSTITUTIONAL RIGHTS: FIFTH AMENDMENT…………....……...27

      I.  DEPRIVATION OF CONSTITUTIONAL RIGHTS: FIFTH AND EIGHTH AMENDMENTS……...27

      J.  DELIBERATE INDIFFERENCE TO PETITIONER'S SERIOUS UNDERLYING MEDICAL CONDITION…………………………………………………………………. 29

      K.  THE INMATE GRIEVANCE PROCESS IS IRREPARABLY BROKEN………………………33

VI.  LEGAL STANDARD…………………………………………...………...…………... 40

    A.  CONDITIONS OF CONFINEMENT CLAIMS ARE PROPER IN HABEAS….…………..…………. ... 41

    B.  THE DUE PROCESS RIGHTS OF PRETRIAL DETAINEES…………….....................…… 42

    C.  DELIBERATE INDIFFERENCE …………………………...…………………….…..… 43

    D.  SOLITARY CONFINEMENT IS PUNISHMENT…………….………….…….…...……... 44

    E.  THE HUMANE ALTERNATIVES TO LONG TERM SOLITARY CONFINEMENT ACT ……….…46

    F.  THE UNITED NATIONS STANDARD FOR MINIMUM RULES FOR THE TREATMENT OF PRISONERS: THE NELSON MANDELA RULES………………………………………. ….…47

1

G. PROLONGED SOLITARY CONFINEMENT IS TORTURE ……….………...……………...…48

VII. THE PRISON REFORM ACT'S (PRLA) EXHAUSTION OF ADMINISTRATIVE REMEDIES
REQUIREMENT…………………………………………………….………………….....48

A. THE GRIEVANCE SYSTEM IS UNAVAILABLE UNDER THE PRLA………....……………..50

VIII. CAUSES OF ACTION ...................................................................................................53

FIRST CLAIM: DELIBERATE INDIFFERENCE TO PETITIONER'S MEDICAL CONDITION
VIOLATES PETITIONER'S 5TH AMENDMENT RIGHTS…………….………….………53

SECOND CLAIM: THE ILLEGAL USE OF SOLITARY CONFINEMENT VIOLATES PETITIONER'S 5TH
AMENDMENT RIGHTS………………………………………………….....56

THIRD CLAIM: THE ILLEGAL USE OF PROLONGED SOLITARY CONFINEMENT VIOLATES
PETITIONER'S 5TH AND 8TH AMENDMENT RIGHTS…………….…………57

FOURTH CLAIM: INTERFERENCE WITH PETITIONER'S ACCESS TO COUNSEL AND DISCOVERY
VIOLATES HIS 6TH AMENDMENT RIGHTS.........................................................59

FIFTH CLAIM: RETALIATION FOR SPEAKING TO THE PRESS AND MEMBERS OF CONGRESS
VIOLATES PETITIONER'S 1ST AMENDMENT RIGHTS………………….......60

IX. CONCLUSION ……………………………………………………….………...……60

X. PRAYER FOR RELIEF...............................................................................................61

## I.   INTRODUCTION

1.   Petitioner RYAN TAYLOR NICHOLS petitions the Court for a Writ of Habeas Corpus because he is a United States citizen pretrial detainee currently being held at DC Jail's Correctional Treatment Facility, in Washington, D.C., in violation of his constitutional and human rights.

2.   Petitioner alleges that his serious underlying medical condition – Post Traumatic Stress Disorder (PTSD) – has been treated with deliberate indifference, which has caused him to suffer irreparable harm, and that he has been repeatedly punished and subjected to prolonged solitary confinement for punitive reasons.

3.   Petitioner respectfully requests that this Court, amongst other things, grant this Writ and Order his immediate release from Respondents' unlawful custody.

## II.   JURISDICTION

4.   Petitioner brings this action under 28 U.S.C. §§ 2241 and 2242 and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202, the Fifth Amendment to the United States Constitution, the Sixth Amendment to the United States Constitution, and the Eighth Amendment to the United States Constitution. Because he also seeks declaratory relief, Petitioner also relies on Rule 57 of the Federal Rules of Civil Procedure.

5.   This Court is empowered under 28 U.S.C. §§ 2241 to grant the Writ of Habeas Corpus and to entertain the Petition filed by RYAN TAYLOR NICHOLS. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. §§ 2202, as this case involves an actual controversy within the Court's jurisdiction.

## III.    VENUE

6.    Venue is proper in the United States District of Columbia since Petitioner is being detained in

the DC Jail, and, even if the U.S. Marshals acting under the direction of the Respondent

Attorney General were to shift Petitioner to another detention facility located within a different

district, Respondent Attorney General, Petitioner's ultimate custodian, maintains an office in

the district.  Further, a substantial part of the events giving rise to the claim occurred in the

district, at least one respondent may be found in the district, and all respondents are either

officers or employees of the United States or any agency thereof acting in their official

capacities.  28 U.S.C. §§ 1391(b); 1391(e).

## IV.    PARTIES

7.    Petitioner RYAN TAYLOR NICHOLS is a thirty-one-year-old United States Citizen from the

State of Texas. He was arrested pursuant to his participation in the protests and subsequent riot

that occurred at the United States Capitol on January 6, 2021.  He has been in the custody of

the United States Government since January 18, 2021.  He is charged in Case No. 21-cr-117-1

(TFH), which is scheduled for a jury trial on November 1, 2021.  He is currently being detained

in D.C. Jail's Correctional Treatment Facility (hereinafter "CTF").

8.    Respondent MERRICK GARLAND is the Attorney General of the United States.   He has led

the Department of Justice since March 11, 2021.  Respondent Garland first sought Petitioner's

pretrial detention, and his actions keep Petitioner detained today.  Accordingly, Respondent

Garland is ultimately responsible for Petitioner's unlawful detention and is named in his official

capacity.

9.    Respondent Michelle Jones is the Deputy Warden of Central Treatment Facility (CTF) at DC

Jail. Respondent Jones is charged by Respondent Garland with maintaining the custody and

control of Petitioner who is currently detained at CTF as of the filing of this Petition. Accordingly, Respondent Jones is named in this action in her official capacity.

## V.    STATEMENT OF FACTS

**A.    PETITIONER'S PERSONAL HISTORY**

10.    Petitioner is a thirty-one-year-old United States Citizen from the State of Texas States who protested at the United States Capitol on January 6, 2021. The Federal Government conducted a predawn raid on Petitioner's home on the morning of January 18, 2021.  The Government pulled a tank onto Petitioner's front lawn, pointed the turret at his front door, kicked in the front door, and stormed Petitioner's home with dozens of armed agents.  Petitioner was not home, self-surrendered to the FBI a few hours later, and has been in federal custody since that time.

11.    Petitioner is a former United States Marine who received the Good Conduct Medal, National Defense Service Medal, and the Global War on Terrorism Medal during his four years of honorable service to this country.  Petitioner developed PTSD as a result of his honorable service to this country.

12.    Petitioner has no criminal history and is not a part of any hate group or organization espousing violence. He has no history of failing to appear in court. He has received five good conduct reports from prison guards at CTF during his time as a detainee.[1]

13.    Petitioner is a father to two young boys and has been married for almost nine years. Petitioner owns a small business where he employs many people, including ex-convicts and recovering drug addicts. Petitioner founded a 501(c)(3) called "Rescue The Universe" that specializes in searching and rescuing people from areas affected by natural disasters.

14.    Petitioner has participated in more than two dozen hurricane rescues and disaster relief efforts,

---

[1] See EXHIBIT A: Petitioner's Good Conduct Reports from DC Jail

including Hurricane Katrina when he was only 13 years old.

15. As a search and rescue specialist, he also responded to Hurricanes Florence, Michael, Barry, Dorian, Imelda, Cristobal, Arthur, Hanna, Laura, Sally, and Hurricane Harvey—during which, he and his family personally lost most of their belongings in 2017.

16. As a Marine he responded to four typhoons during his deployment to Okinawa, Japan.

17. Petitioner's search and rescue work received international recognition in 2018 after videos of him rescuing puppies during Hurricane Harvey went viral on the Internet.

18. Petitioner's self-sacrifice to save the lives of others came with a heavy cost, as it exacerbated the pre-existing PTSD that he developed during his military service.

19. Petitioner holds himself to an impossible standard, and though he has saved the lives of hundreds of people and animals from the devastation of natural disasters, there were always lives that, despite his herculean efforts, could not be saved, and he personally witnessed unspeakable suffering and death.

20. Even when he was able to save a life, the fear and suffering that he witnessed left him traumatized. For example, during Hurricane Michael, which ultimately resulted in the deaths of 74 people, Petitioner drove from Texas to Florida to assist the coast guard in rescue relief. During the rescue mission, he received a call for help from a woman in the middle of the night. The woman was 8 months pregnant and was trapped in her home, and the roads leading to her home were completely inaccessible. Fortunately, Petitioner was able to save the woman, but the terrified woman's voice and the look on her face haunts him to this very day. On another occasion he was called upon to evacuate several nursing homes. The staff evacuated and had left the elderly residents to die. Putting his own life at risk, Petitioner spared no effort to save as many lives as he could, but he could not save everyone. These and other similar events left

him deeply traumatized.[2]

21.   Petitioner was featured on The Ellen DeGeneres Show on September 25, 2018.  DeGeneres gave Petitioner a ten-thousand-dollar check for a honeymoon trip.  Petitioner and his wife did not use the check for a honeymoon trip but instead purchased a rescue boat that has since been used to rescue hundreds of lives from dangerous flood waters stemming from natural disasters.[3]

## B.   PETITIONER HAS POST TRAUMATIC STRESS DISORDER

22.   As a result of both his service in the Marine Corps. and his search and rescue missions through his non-profit, Petitioner has developed Post Traumatic Stress Disorder (PTSD).[4]

23.   Petitioner's well-documented PTSD diagnosis was made long before he was taken into federal custody in January of 2021, and the government was immediately made aware of Petitioner's diagnosis and medical condition.

24.   According to the National Institute of Health, PTSD afflicts between 10 and 20 percent of military veterans.[5]

25.   According to medical experts, many individuals who experienced the devastation of Hurricane Harvey are also afflicted with PTSD, with symptoms including hypervigilance, flashbacks and nightmares.[6]

26.   At least two separate federal courts have long recognized that combat-induced post-traumatic stress disorder may constitute a "grave affliction" impacting the mental processes of a military

---

[2] *See, e.g.,* Hurricane Michael Rescue- House Collapse On 8 Month Pregnant Woman- Panama City, FL @ https://mail.google.com/mail/u/1/#inbox/FMfcgzGqPpjXzVRPftmxvGrCfBrMMSfr?projector=1.

[3] *See* Petitioner's appearance on Ellen DeGeneres Show @ https://rumble.com/v1ffri1-ryan-nichols-on-the-ellen-degeneres-show.html

[4] *See* EXHIBIT B: Petitioner's PTSD Diagnosis.

[5] *Post-Traumatic Stress Disorder*, www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd.

[6] *One year later: Hurricane Harvey's impact on mental health*, (last visited on July 27, 2022).

veteran.[7]

27.    Petitioner was diagnosed with PTSD after he served as a military veteran.  His condition was

exacerbated by his volunteer work.

28.    Petitioner's symptoms include, but are not limited to: brain fog, sleeplessness, restlessness,

anxiety, depression, hypervigilance, short term memory loss, anger, and suicidal thoughts.

29.    The symptoms are objectively worse when he has no reliable and consistent mental health

therapy.

30.    Prior to his incarceration, Petitioner managed his PTSD with a combination of psychotherapy,

medical marijuana, frequent exercise, family time, and by spending significant time outdoors.

31.    When Petitioner is involuntarily secluded, he experiences intense feelings of hopelessness,

claustrophobia, and being trapped like there is no way out.  This leads to suicidal ideation if

left untreated.

32.    Other psychological triggers include hearing/ witnessing others being abused, screams for

help, not being listened to, lack of sunlight, and being kept indoors for more than a few hours

at a time.

33.    His symptoms are particularly acute when he is in a hostile or dangerous environment, where

he cannot speak with someone he trusts who actively keeps up with his situation.

34.    His Symptoms are exacerbated when he does not have a safe space to receive psychological

therapy, and when he is prevented from spending time with his wife and kids as they have

been a long-standing part of his treatment plan.

35.    Petitioner first notified Respondents of his condition after arriving at DC Jail in 2021.

Respondents refused to allow petitioner access to his prior treatment regimen, denied

Petitioner medication for months, and later prescribed him medication that is better suited to

---

[7] *See United States v. Perry*, 4:CR94-3035, 1995 U.S. Dist. LEXIS 4472, at *19 (D. Neb. Mar. 27, 1995).

treat anxiety and depression instead of PTSD.

36.    Respondents have never made any accommodations for Petitioner's PTSD and have gone out of their way on multiple occasions, sometimes for weeks or months at a time to purposefully exacerbate Petitioner's PTSD.

## C.    THE CONDITIONS OF CONFINEMENT AT DC JAIL

37.    Petitioner has been in federal custody since January 18, 2021.  Since the beginning of his detention and up until to the day of this writing, Petitioner has been subjected to disgusting unconstitutional conditions, punitive punishment, and torture.

38.    Petitioner is under the immediate authority of the United States Marshals Service (the "USMS"), who are under the authority and are directed by Respondent Garland.  The USMS is a bureau within the U.S. Department of Justice under the authority and direction of the Attorney General, 28 U.S.C. § 561(a); *United States v. Tillisy*, No. CR09-269 MJP, 2022 U.S. Dist. LEXIS 121889, at *6 (W.D. Wash. July 11, 2022).  Congress has authorized the Attorney General to provide for "the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities." 18 U.S.C. § 4013(a)(3). "[T]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. *Geo Grp., Inc. v. Newsom*, 493 F. Supp. 3d 905, 920 (S.D. Cal. 2020) (quoting U.S. Marshals Serv., Fact Sheet: Prisoner Operations 2 (2019), https://bit.ly/2Yi5RED).  Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities." *Id.*

39.    Petitioner is currently being detained as a federal detainee at the DC Jail, which is housing Petitioner pursuant to an intergovernmental agreement with USMS.  DC Jail is functioning as an agent or extension of the Federal Government as Petitioner's caretaker.  The DC Jail

comprises two adjacent facilities: the Central Detention Facility (CDF) and the Central Treatment Facility (CTF). Both facilities are under the direct control of the District Columbia Department of Corrections (DC DOC). The two facilities are commonly referred to collectively as the DC Jail.

40.    Petitioner's counsel Joseph McBride first learned about DC Jail's illegal use of solitary confinement and a plethora of other misdeeds taking place at DC Jail during his representation January 6th Defendant Richard Barnett.[8] Mr. Barnett was granted pretrial release on April 27, 2021, after which, Petitioner's counsel learned from Barnett about the myriad abuses January 6th defendants were being forced to endure in DC Jail.

41.    In response to this, Attorney McBride published an article to LinkedIn Pulse titled "American citizens are being tortured right now within five miles of the White House. Tell me… are you okay with this?"[9] In the article, McBride likened DC Jail to Guantanamo Bay and proffered the following call to action:

> Defense Attorneys and Human Rights Activists
>
> If you have failed to speak out against the constitutional and human rights violations taking place at DC-GITMO. You need to drop what you are doing and speak out now. Put your politics aside. Put your selfish ambition aside. Put your fear of criticism aside. Step up, and speak up. Yes, this is uncomfortable, too bad— speak up. Yes, this is controversial, too bad— speak up! Because if you condone this treatment. If you fail to speak out against it. Then you will come out on the wrong side of history. And you will have betrayed your sacred duty to speak out against injustice everywhere, despite the inconvenience, and in every circumstance— no matter what. "Injustice anywhere is a threat to justice everywhere." – Letter from a Birmingham Jail, Martin Luther King, April 16, 1963

42.    On August 3, 2021, Attorney McBride submitted an "EMERGENCY REQUEST TO INVESTIGATE MISTREATMENT OF PRE-TRIAL DETAINEES FROM THE JANUARY

---

[8] *See United States v. Barnett,* 21-cr-38-CRC.
[9] *See* Attorney McBride's June 16, 2021 LinkedIn Pulse Article
@ https://fightthepower.substack.com/p/update-american-citizens-are-being.

10

6, 2021 U.S. CAPITOL PROTEST" to Amnesty International and the American Civil Liberties Union.[10] The request articulated numerous specific instances where January Sixth Detainees were held in prolonged solitary confinement for months at a time, as well as specific instances of: medical abuse; merciless beatings; and extremely damaging psychological torture. The request also highlighted the fact that detainees were being prevented from counsel visits and had been denied access to discovery.

43. On October 13, 2021, Judge Royce C. Lamberth found "that the Warden of the DC Jail Wanda Patten and Director of the D.C. Department of Corrections, Quincy Booth are in civil contempt of court." [11]

44. Specifically, Judge Lamberth chastised the DC DOC for suddenly and without notice to the court implementing policies that made it more difficult for pretrial detainees like Petitioner to access the courts. In open Court, Judge Lamberth stated that "the Court's ability to go forward like this has been hampered by the unbelievably harmful, to the Court, lack of cooperation by the D.C. Department of Corrections[.]"[12]

45. Regarding the mis-treatment of another January 6 pre-trial detainee, Christopher Worrel, Judge Lamberth found that "it's more than just inept and bureaucratic shuffling of papers. I find that the civil rights of the Defendant have been abridged. I don't know if it's because he's a January 6th Defendant or not. But I find that this matter should be referred to the Attorney General of the United States. I will do so by order for a civil rights investigation of whether the D.C. Department of Corrections is violating the civil rights of January 6th Defendants by engaging in the conduct in this and maybe other cases as well. It's clear to me that the rights

---

[10] *See* https://drive.google.com/file/d/1PvbqOeSCNiKUowhCo4xvlJHvKLVHi56n/view (last visited on August 9, 2022).
[11] *See United States v. Worrell*, 1:21-CR-00292-RCL, Transcript of October 13, 2021 hearing in front of Judge Lamberth at page 22, gov.uscourts.dcd.229958.108.0.pdf (courtlistener.com).
[12] *Id.* at 3.

of this Defendant were violated by the D.C. Department of Corrections in this case. And it is apparent that there is more going on here than just laying aside these papers."[13]

46. The US Marshals arrived at DC Jail on October 18, 2021 pursuant to Judge Royce C. Lamberth's contempt order, which was a direct result of the plight of January 6th Defendant Christopher Worrel.

47. Initially the Marshals were denied entry to CTF and were instead sent to CDF.

48. While the USMS were occupied inspecting CDF, prison guards stormed into CTF where Petitioner and other January 6th detainees were being held. The guards removed the WiFi tower, and by doing so cut off electronic communication to counsel and the world. Next, Petitioner and others in CTF were forced to clean the mold and rust. They were also forced to bleach the floors, paint walls, showers, doors, and anything else in deplorable condition. The Jail also sent in maintenance workers and janitors who also frantically scrubbed rust, painted walls, and bleached the floors. The Jail then swapped out every single piece of linen, and gave the detainees new clothing. None of this was done out of concern for any detainee. All of this was done to cover the deplorable conditions in CTF as fast as possible, before being inspected. After CTF was scrubbed and painted, the US Marshals were permitted to enter and inspect CTF.

49. Because of the frantic clearing, CTF managed to pass inspection while CDF miserably failed its inspection. Prior to the clearing, CTF was in the same deplorable condition as CDF and would have also failed inspection, but for the last-minute cleaning effort.

50. It is unlikely that the USMS were so easily duped by an obvious ruse to circumvent Judge Lamberth's contempt order. More likely, the USMS were either willfully blind or worse complicit in the Jail's operation to mask the deplorable conditions of CTF.

---

[13] *Id.* at 22-23.

51.     On November 1, 2021, the U.S. Marshals sent a memo to the District of Columbia Department of Corrections setting forth the findings from the U.S. Marshals inspections from October 18 - October 22, 2021.  The US Marshals found "evidence of systemic failures," specifically that "water and food appeared to be withheld from the detainees for punitive reasons.  Inspectors observed large amounts of standing human sewage (urine and feces) in the toilets of multiple occupied cells.  The smell of urine and feces was overpowering in many locations. The water in many of the cells had been shut off for days, inhibiting detainees from drinking water, washing hands, or flushing toilets.  DOC staff confirmed to inspectors that water to cells is routinely shut off for punitive reasons. Food delivery and storage is inconsistent with industry standards.  Hot meals were observed served cold and congealed.  The Jail's entrance screening procedures were deemed inconsistent and sloppy.  Evidence of drug use was pervasive marijuana smoke and odor were widespread, and the facility had a strong smoke and odor of marijuana.  Detainees had observable injuries with no corresponding medical or incident reports available to inspectors.  DOC staff were observed antagonizing detainees.  DOC staff were observed not following COVID-19 mitigation protocols.  Several DOC staff were observed directing detainees to not cooperate with USMS inspectors.  One DOC staffer was observed telling a detainee to 'stop snitching.'  Supervisors appeared unaware or uninterested in any of these issues."[14]

52.     On November 4, 2021, U.S. Representatives Marjorie Taylor Greene (GA-14) and Louie Gohmert (TX-01) were granted access to the DC Jail after months of being denied access. Representatives Greene and Gohmert visited CTF's C2B, known as the "Patriot Pod" where January Sixth Detainees are held.

---

[14] *See* USMS Report Regarding DC Jail, 794fd9a8-1968-42bc-9928-77620b1b0be1. (washingtonpost.com) (last visited Aug. 9, 2022).

53. On November 10, 2021, an emergency oversight round table was held to discuss the conditions of confinement of the DC Jail.[15]  Charles Allen, chair of the DC City Council's Committee on the Judiciary and Public Safety, began the meeting by stating that "The situation is a crisis and I don't use that term lightly.  The District of Columbia has a moral and constitutional duty to provide dignified and human conditions of confinement and to do so immediately, and that is not happening here.  Period."

54. On November 11, 2021, Petitioner and a fellow January 6th detainee penned a letter for public release that was signed by thirty-six (36) January Sixth Detainees.[16]  The letter specifically addresses seventy-seven (77) ongoing violations at the prisons that directly affect Petitioner on an ongoing basis.

55. The letter graphically describes the conditions of confinement as an unsanitary environment unfit for human habitation, including deprivation of basic necessities like food, water, and medical care.  The cells are covered with mold and rust, and infested with rodents, pests, and vermin.

56. On the same day that Petitioner penned the letter describing the Jail conditions, the family members of another pretrial detainee reported that when one of the January 6 detainees in the DC Jail "refused to wear a mask, the guards responded with some kind of mace or pepper spray…They sprayed the mace or some type of gas at an inmate and kept missing so it went into an intake that fed into other cells and the lady with the key left because she didn't lie the gas, so the inmates in the cells who were being fed the gas from the intake were locked in for like 15 minutes while it was going into their rooms and they couldn't see/breathe…[They]

---

[15] Committee on the Judiciary & Public Safety, Round Table Regarding DC Jail, http://dc.granicus.com/MediaPlayer.php?view_id=44&clip_id=6919 (last visited Aug. 9, 2022).
[16] *See* Letter by Ryan Nichols Regarding Conditions of Confinement at DC Jail, https://storage.courtlistener.com/recap/gov.uscourts.dcd.227549/gov.uscourts.dcd.227549.57.32.pdf (last visited Aug. 9, 2022).

had to take some guys out in stretchers to the med bays."[17]

57. On December 7, 2021, multiple members of Congress, including Rep. Marjorie Taylor Greene, Rep. Matt Gaetz, Rep. Louie Gohmert, and Rep. Paul Gosar issued a scathing report called "UNUSUALLY CRUEL: AN EYEWITNESS REPORT FROM INSIDE THE DC JAIL," condemning DC Jail's CTF and the treatment of January Sixers.[18]

58. In castigating the DC Jail for its "systemic failures," the DC Committee on the Judiciary and Public Safety focused on the deplorable conditions of the Jail, as well as "what happens inside those four walls," *i.e.*, the conduct of the officials and staff that run and work at the facility. The DC City Council Chair personally went to inspect the DC Jail and stated, "When I talked to guards one on one, I found a lack of compassion…The callousness was real and palpable for the individuals that were under their care."[19] He also testified that he personally witnessed guards ignoring prisoners as they called out to them for help.

59. President Biden has stated that Petitioner and other January 6th detainees are insurrectionists and terrorists. Respondent Garland has made similar characterizations. As such, it is not surprising that Respondent Jones and those under her direction have expressed animus and hostility towards the January 6 detainees.

60. In December of 2021, after the public became aware of the deplorable conditions of confinement and the callousness of the prison staff, it was revealed that Deputy Warden Kathleen Landerkin holds personal animus towards supporters of president Trump. In response to a Tweet that stated "...the problem is you [Trump supporters]! I can't wait until you are all extinct" Warden Landerkin publicly tweeted "F@#$ everyone who supports

---

[17] *See United States v. Caldwell*, 1:21-CR-28-8-APM, Notice Regarding News from Detainees in D.C. Jail (CTF) https://www.documentcloud.org/documents/21103797-filing-in-usa-v-meggs (last visited Aug. 9, 2022).
[18] *See* https://greene.house.gov/unusually-cruel (last visited on Aug. 9, 2022).
[19] *See* Committee on the Judiciary & Public Safety Roundtable, *supra* note 15.

15

Trump."

61.      On another occasion, Deputy Warden Landerkin tweeted a response to then-president Trump's criticism of violent and destructive Black Lives Matter riots that burned cities: "You're a traitor. You don't get to determine what's patriotic. Leave the people engaging in peaceful protest alone. Why the hell are you involved in stirring a sh*t pot for your deplorables? Everyone else knows what a pathetic loser you are. Just resign already!"

62.      While President Trump was being investigated for collusion with Russia - a charge later proven false and President Trump was found to be innocent and fully exonerated - Deputy Warden Landerkin tweeted, "How many times did they lie about meeting with the Russians? How many are in prison? The Trump family is a crime family and the GOP is complicit. You're destroying the USA. Schiff is a hero." "Schiff" refers to Congressman Adam Schiff who currently sits on the January 6th committee.

63.      Deputy Warden Landerkin's tweets clearly show her animus towards Petitioner and the January 6th prisoners, and supports the suspicions of this Court and others that the civil rights of January 6th prisoners in the DC Jail is "more than just inept and bureaucratic shuffling of papers,"[20] rather it is a targeted partisan persecution of perceived political enemies.

64.      After Deputy Warden Landerkin's animus was brought to the public's attention, she immediately deleted her Twitter account.

65.      On December 16, 2021, fourteen members of Congress penned a letter to DC Mayor Muriel Bowser demanding Deputy Warden Landerkin's immediate resignation citing specific instances of Landerkin's misconduct. "We remain thoroughly convinced that Landerkin cannot treat the January 6 detainees—non-convicted defendants awaiting trial—with any level of respect given her public comments and past treatment of Members of Congress visiting the

---

[20] *See* Judge Lamberth Transcript *supra* note 11, at 22-23.

jail."[21]

66. Deputy Warden Landerkin was no longer in control of DC Jail's CTF as of On January 18, 2022. DC Jail's CTF is now controlled by Deputy Warden Jones.

> (T)here are two DC DOC facilities that compromise the DC Jail and each facility has a Deputy Warden. I have oversight of the Central Detention Facility. Ryan Nichols is at the Correctional Treatment Facility, which is under DW Jones. I have not been assigned to CTF since 1/18/2020 and I do not have any contact or control over Ryan Nichols.

> Deputy Warden Kathleen Landerkin's May 9, 2022, response email to Attorney McBride

67. Deputy Warden Landerkin was far from the only DC Jail official who displayed open animus as well as antagonistic and abusive conduct towards Petitioner.

68. Corporal Allen has openly expressed hatred for Petitioner and other January 6 pretrial detainees. She calls them "insurrections," terrorists," and other epithets. She has said that she blames Petitioner and others for the deaths of officers at the Capitol. Petitioner has submitted multiple IGPs complaining of her abusive conduct, including one IGP specifically complaining how her abuse was detrimental to Petitioner's mental health. All IGPs involving Corp. Allen have been ignored.

69. Lieutenant Lancaster, the guard in charge of "The Hole" which is the term given to the area of solitary confinement, verbally and mentally abuses inmates. She also oversees officers and guards who do the same, and is suspected of bringing drugs into the prison. The presence of drugs in the prison was confirmed by both the U.S. Marshals' report and the testimony of the DC City Council Chair on the Judiciary and Public Safety. There have also been multiple drug overdoses in the Jail that further corroborate the presence of drugs in the DC Jail.

70. Lieutenant Moore was responsible for gassing prisoners on Veteran's Day, November 11,

---

[21] See Congressional Letter to Mayor Bowser, Deputy Warden Landerkin Termination Letter - Final (12.16.21).pdf (house.gov) (last visited Aug. 9, 2022).

2021, because one inmate would not wear a mask. Lt. Moore's actions led to two detainees, Daniel Caldwell and Lonnie Caffman, being removed on stretchers.

71. Lieutenant Bruce demanded that Petitioner sign a document without telling Petitioner what the document was for. When Petitioner refused, Lt. Bruce sent Petitioner to "The Hole."

72. Corporal Armstrong kicked Petitioner in the head and sexually assaulted another detainee.

73. Sergeant Robinson bragged to Petitioner that he was the one responsible for preventing Petitioner's congressman from entering the prison to visit Petitioner. When the Jail prevented Petitioner from getting a haircut, Sgt Robinson taunted and ridiculed Petitioner.

74. Petitioner learned from an incident that took place in CTF that Corporal Hayes was disciplined for disclosing that DC Jail staff remotely watch Petitioner and other January 6 Detainees, and that unauthorized members of the public have accessed the cameras as well, and by doing so, subjected Petitioner and other January 6 detainees to myriad privacy, constitutional, and human rights violations.

75. Corporal Holmes told Petitioner to "Shut the fuck up" and "fuck America" when Petitioner sang the national anthem in his cell. When another detainee spoke up in defense of Petitioner, Cpl. Holmes ran over to his cell, unlocked the cell, entered the cell, and threatened to "beat his ass."

76. Corporal Pinkney told Petitioner, while petitioner was in solitary confinement for 23 out of 24 hours a day, that if Petitioner didn't "shut up" and stop asking for his tablet, recreation time, or phone calls, that Corporal Pinkney would punish him by taking him to the area of the Jail where the "real BLM will stab you up."

77. Corporal Dandy regularly used racial slurs against Petitioner and other detainees. Dandy was suspended after saying: "Suck my dick White-boy" to detainee Scot Fairlamb.

78. Captain Saunders was present when Corporal Dandy said "suck my dick white boy" to one of the detainees, and later covered for him.

18

79.    Respondent Garland has long been on notice of the deplorable conditions of the DC Jail and the hostile conduct of the Jail's directors and staff

**D.    Bail Modification Hearing: December 20, 2021**

80.    On December 20, 2021, Petitioner appeared before the Honorable Judge Thomas F. Hogan of this Court for a hearing on Petitioner's motion for bail modification.[22]

81.    Petitioner did not receive a haircut for the first eleven months of his captivity.  Petitioner has on multiple occasions gone months without being able to cut his finger and toe nails. Petitioner spent the vast majority of his first ten months in captivity in solitary confinement. Petitioner showed up to his December 20, 2021, Bond Hearing having been denied shower access for five consecutive days. Petitioner appeared before the court looking like, in the words of Petitioner's counsel, "Tom Hanks from Cast Away [or] … like a homeless person on the streets of New York City."[23]

82.    Judge Hogan was "troubled" by Petitioner's disheveled and ungroomed physical appearance, and was prompted to question the government about the conditions of confinement and whether Petitioner's civil rights were being deprived.[24]

83.    The Judge also expressed concern about Petitioner's complaint about, "what he calls obnoxious or improper material being supplied that he feels are racist and improper for him to be given and the attitude of the jail management."[25]

84.    Regarding these allegations, Judge Hogan stated "I don't think it's appropriate to lock someone up and then mistreat them while they're in prison. **That's a basis to release someone, certainly.**"[26]

---

[22] *See* United States v. Nichols, CR 21-117, December 20, 2021 Bail Modification Hearing Transcript, Bond Hearing December 20, 2022.pdf - Google Drive.
[23] *See Id.* at page 55.
[24] *Id.* at page 80.
[25] *Id.*
[26] *Id.* (emphasis added).

85. The government agreed with the Judge and admitted that "the issues that were raised about the Central Detention Facility earlier this year were troubling," and that "no doubt the conditions of confinement are an important issue and one the Court should take seriously."[27]

86. The government argued that procedurally the bail hearing was not the appropriate place to raise the civil rights allegations, stating, "the allegation [of civil rights violations during confinement] aren't relevant to the Court's [Bail Reform Act] analysis under [18 U.S.C.] 3142."[28]

87. However, to allay Judge Hogan's serious concerns for the health and safety of the Petitioner and the other January 6th detainees, the government submitted to the judge that the Petitioner was not held in CDF, that was found to be in deplorable condition by the U.S. Marshal, instead, Petitioner was held in CTF, which passed inspection. The government did not explain why, if the conditions of confinement at CTF were adequate, Petitioner was still denied basic necessities such as the ability to shower, get a haircut, shave, or cut his finger nails.

88. In response to the government's conclusory claim that CTF was found to be "adequate," counsel for Petitioner stated that all of the detainees including Petitioner will testify that the DC Jail deliberately delayed inspectors from inspecting CTF for two full days, and during that time, Petitioner and others were conscripted to frantically white wash CTF, which was in deplorable condition, so that it could pass the U.S. Marshals' inspection. "It is, therefore, no coincidence that the other side of the jail [CDF] failed and CTF somehow magically passed."[29]

89. Prior to undergoing his analysis to determine whether Petitioner should be released pursuant to the Bail Reform Act, "And I'll -- I will grant -- I'm not going to grant release of the defendant on the basis of due process violations. A lot more evidence has to be shown. We've gone so

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 87.

far, I don't see it so egregious and outrageous at this point. **And the defendant, as to the conditions, can file a separate cause of action, if he wishes.**"[30]

90.     Petitioner respectfully submits that this was to be understood as an invitation to file a separate Habeas Petition setting forth evidence that shows the full extent of the egregious and outrageous conduct, which has clearly continued since that time and is ongoing.

91.     The Judge made it a point to note for the record that "there is some evidence of difficulties in the jail that need to be corrected,"[31] and "I accept your argument that his due process rights were violated and that should be another basis for his release."[32]

92.     On December 20, 2021, Petitioner was denied release.  Shortly thereafter, he requested psychiatric services to help him navigate the circumstances regarding his denial, right before the Christmas holiday which he would be spending without his family.  No help ever came.

93.     Petitioner has been prohibited from contact visits with his family. As a reasonable alternative, he was initially given video visits. This was beneficial to him emotionally and psychologically. He was then stripped of video visits without explanation. Ryan's sons, Ryan Jr and Blake, have not seen their father's face in almost two years. This is psychologically damaging to Ryan and his family. It is, however, even more difficult for Ryan because he has documented Post Traumatic Stress Disorder (PTSD). This treatment is targeted psychological punishment. It serves no legitimate governmental interest.

94.     On January 3, 2022, fourteen members of Congress sent a letter to Michael Carvajal, the director of the Federal Bureau of Prisons, demanding that Carvajal immediately investigate the situation,[33] which reads in pertinent part, as follows:

---

[30] *Id.* at 88 (emphasis added).
[31] *Id.* at 89.
[32] *Id.* at 52-53.
[33] *See Higgins Summary Assessment of Policing Executive Order.pdf (house.gov)* (last visited Aug. 9, 2022).

21

Many instances of physical and psychological abuse, denial of medical care, 24-hour solitary confinement, denial of basic personal hygiene, denial of access to legal counsel, destruction of records and general abuse of rights and mandated standards for prisoners have been brought to our attention. Constitutionalist Republicans in Congress will not stand idly by and allow these atrocities to continue. We promise you, good Sir, those responsible within BOP will be held to account. Despite the collaborative effort of some members of Congress and the Executive branch to suppress facts and interfere with our individual investigations, we have, collectively, already harvested a tremendous amount of condemning evidence of abuse and persecution within BOP. Thus, we are somberly prayerful that you will recognize the significance of this official letter, and act to correct the grievances that you must, by any reasonable man's assessment, be knowledgeable of. Failure to act within the parameters of your authority will be interpreted as your personal complicity with the ongoing abuse of American citizens incarcerated within BOP facilities.

. . .

Respectfully, as members of Congress united to stand for the rights of all Americans, we are…

| | |
|---|---|
| Clay Higgins | Marjorie Taylor Greene |
| Jeff Duncan | Jody Hice |
| Andy Biggs | Andrew Clyde |
| Mary E. Miller | Byron Donalds |
| Ralph Norman | Andy Harris M.D. |
| Lauren Bobert | Randy Weber |
| Paul Gosar, D.D.S. | Scott Perry |

95.   Director Carvajal submitted his resignation 24 hours later.

E.   **PETITIONER IS A MODEL PRISONER**

96.   During his time in prison, Petitioner has developed a reputation as a well-thought-out man with wisdom, to whom many of the detainees regularly come to for advice. Petitioner holds a position of distinction above the other detainees, in that he works on the detail crew, which is a merit-based position. It means that he participates in helping clean up and do various other

22

tasks around the jail.

97. Although many of the guards have expressed animus and acted abusively towards Petitioner and the other January 6 detainees, there are also a number of guards who have acted humanely and professionally. Particularly, the guards who supervise the work detail have acted humanely, and Petitioner's work ethic and demeanor have been formally recognized by the guards in writing on numerous occasions.[34]

98. On August 12, 2021, Petitioner's work performance was evaluated by the DC department of corrections. Petitioner received a perfect evaluation, receiving only "Excellent" and "Outstanding" ratings. The evaluation stated that Petitioner "does superior work. Does more work than is expected or required…and exceeds expected productivity." The evaluation also stated that he has "good ideas to improve work, does work to improve skills, works with positive attitude. Work is very reliable, consistent thorough, always completes tasks on time. Makes a real effort to please supervisor, does exactly what is required." His supervisor stated that based upon Petitioner's performance he would "promote [Petitioner] to a more demanding job at a higher rate of pay." The evaluator added a note that stated, "[Petitioner] serves as head detail. Outstanding with maintaining COVID compliance as far as …sanitation. No disciplinary or behavioral concerns. Steller report submitted to zone supervisor."

99. On August 17, August 24, and September 1, Petitioner received perfect evaluations. One supervisor wrote, "[Petitioner] Nichols goes above and beyond his job duties. Always shows respect and will do whatever is asked of him."

100. On another occasion, a supervisor wrote "Inmate Nichols, Ryan DCDC 376-795 has been housed in housing unit C2B since entering the Correctional Treatment Facility. [He] has been an outstanding contribution to C2B since being assigned to the housing unit and the detail

---

[34] *See* EXHIBIT A: Good Conduct Letters.

squad.  His natural leadership ability has been steadfast and unwavering.  [He] gives 100% effort in every assignment that is given to him.  <u>Since entering the Correction Treatment Facility [He] hasn't had any adverse action or any Disciplinary Reports for negative institutional behavior, in</u> fact [Petitioner] consistently shows positive institutional behavior with all staff and the entire inmate population assigned to housing unit C2B.  Inmate Nichols is a mentor that is used daily by uniform and non-uniform staff assigned to the housing unit. Inmate Nichols has been many [sic] assignments with little to no supervision.  Inmate Nichols is a morale booster counselor amongst the Inmate Population assigned to housing unit C2B, his ability to quarrel [sic] disputes between others [sic] inmate's is outstanding.  I recommend that Inmate Nichols be given the next position based off of his excellent work ethic and his ability to continue to display his positive institutional behavior."

## F.   <u>DEPRIVATION OF CONSTITUTIONAL RIGHTS:</u>       <span style="small-caps">FIRST AMENDMENT</span>

101.   Petitioner has been denied his clearly established right to religious services, in violation of the First Amendment, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc.  Petitioner is a pastor's son and a practicing Christian.  Petitioner has been denied the clearly established right to worship at any Sunday service or from participating in Bible studies of any kind.

102.   All forms of Christianity have been suppressed at the jail while prison staff circulate an Islamic fundamentalist religious periodical. Many of the guards who have openly attacked Petitioner and other January Sixers and who regularly assault them with racial slurs regularly read The Final Call while performing their duties at the Jail. These guards appear to be radicalized by the propaganda. The unsolicited distribution of Islamic fundamentalist literature to a vulnerable prisoner trapped in a cell rises to the level of state sponsored religion, even more than requiring "religious conformity from a student as the price of attending her own high

school graduation." *See Lee v. Weissman,* 505 U.S. 577 (1992).

103.   Petitioner has been denied the right to speak to his congressman.

104.   DC Jail retaliates against Petitioner and others anytime Congress takes action on their behalf.

105.   DC Jail retaliates against Petitioner each and every time his lawyer makes a public statement about his mistreatment at DC Jail.

106.   The guards routinely make derogatory comments about Petitioner's Race and skin color.

107.   The guards routinely threaten Petitioner because of his Race and skin color.

108.   The guards routinely make derogatory comments about Petitioner's political views.

109.   The guards routinely threaten Petitioner because of his political views.

110.   The guards routinely make derogatory comments about Petitioner's Christian Faith.

111.   The guards routinely threaten Petitioner because of his Christian Faith.

112.   Petitioner is routinely punished when expressing political views.

113.   Petitioner is regularly denied freedom of speech by being denied access to reading materials and being force fed racist propaganda.

G.   **DEPRIVATION OF CONSTITUTIONAL RIGHTS:**        **SIXTH AMENDMENT**

114.   Petitioner's attorney-client privileged calls are routinely and illegally monitored, which is something that has happened since he was first detained.

115.   Petitioner's ability to meaningfully participate in his defense has repeatedly been interrupted by the DC Jail. As of November 1, 2021, the offenses have been particularly egregious.

116.   Petitioner routinely has his discovery confiscated without ever being given notice or being told why his discovery is being taken.

117.   Petitioner's discovery was confiscated in November of 2021 while he was preparing for his December 20, 2021 bail hearing.

118.   The DC Jail confiscated his discovery on November 1, 2021, during a time when he needed

the discovery to prepare for his bond modification hearing. In doing so, the Jail took away his ability to use a laptop immediately after learning that this issue was raised. Because of this, Petitioner was precluded from being able to review videos, reports, and meaningfully participate in his defense during the entire time that we were writing a reply brief to his bail motion.

119. Petitioner's counsel made multiple calls to the Jail asking why all of a sudden he was being deprived of his discovery, when until that time, it was available to him. The Jail did not provide a reason.

120. Around December 10, 2021, after Petitioner complained about not receiving access to his discovery for a reply motion that was due, the jail removed his ability to access the law library.

121. At the same time, right after he confronted the Jail, they prevented him from making legal calls to his lawyer.

122. Prior to this deprivation, he was making calls on a regular basis, working closely with his attorney to prepare a defense. The Jail disrupted that routine, grinded it to a halt, and prevented him from participating in his defense.

123. Petitioner was denied access to his discovery for the entire month of May 2022. Petitioner was supposed to be provided access to the discovery by accessing the evidence.com website on a "clear tablet" provided by the prison. But from May 1 through May 25, the evidence.com site was paused due to "updates." These updates took all month, and as a result, Petitioner was unable to access his discovery and unable to prepare for trial during the month of May.

124. Petitioner has never been granted access to the Relativity.com discovery database despite Judge Hogan instructing the Government to provide said access on three separate occasions.

**H.**     <u>Deprivation of Constitutional Rights:</u>     Fifth Amendment

125.    Petitioner is a pretrial detainee, as such he is presumed innocent and cannot be punished.

126.    Despite being a model prisoner with a stellar behavioral record, DC Jail has subjected

Petitioner to a multitude of unjust punishments including, but not limited to the following:

   a.   Arbitrary and capricious use of solitary confinement;
   b.   Falsely charging Petitioner without cause;
   c.   Maliciously sentencing Petitioner to prolonged Solitary confinement;
   d.   Denial of medical care;
   e.   Laughing at Petitioner when he requested to be placed on suicide watch;
   f.   Confiscation of discovery and legal paperwork;
   g.   Denial of discovery;
   h.   Confiscation of personal belongings;
   i.   Denial of video visits with his children;
   j.   Targeted harassment by guards including racial slurs; and
   k.   Targeted harassment by guards including threats of physical harm
   l.   Denial of proper drinking water and proper food;
   m.   Being physically assaulted, maced, and cell raided by guards for no reason;
   n.   Denial of sunlight, outdoor time, and recreational activities
   o.   In order to provoke fear and intimidation, the guards have paraded Petitioner through the CDF side of the jail where he had had his life threatened by other inmates

**I.**     <u>Deprivation of Constitutional Rights:</u>     Fifth and Eighth Amendments

127.    PROLONGED SOLITARY CONFINEMENT:     Petitioner spent the first almost nine

months of his detention in solitary confinement. DC Jail used the pandemic as a pretext to

justify its decision to keep Petitioner and other members of CTF's C2B in isolation for this

time. DC Jail had long been on notice that Petitioner has PTSD, but gave Petitioner's

condition no consideration when making the decision to confine him. Petitioner has never

been the same since that time. His mental health has declined significantly and he resembles

a shadow of his former self. On April 20, 2022, Petitioner was placed in solitary confinement

for refusing to sign a document that wrongfully accused him of misconduct. Despite having

known for seventeen months that Petitioner has PTSD, Petitioner was held in solitary

confinement for three weeks. During that time, he was driven to suicide watch. Prior to

requesting suicide watch, petitioner begged for mental health services. Petitioner begged for

27

help from the guards.  Not only was Petitioner denied proper help, the Jail purposefully turned off the water to his cell at his most vulnerable moment. None of this is related to any legitimate penal interest.   All of this is designed to intimidate, punish, and cause physical and psychological pain.

128.   PSYCHOLOGICAL MANIPULATION:      Petitioner is regularly forced to ingest political philosophies that he disagrees with, such as critical race theory, as the Jail provides racist, anti-American, anti-white, propaganda from the Nation of Islam.  The publication called *The Final Call* which is distributed freely to all detainees in the jail, states that white people are devils who have descended from Satan, that Jews are evil and analogous to cockroaches and rats, that gays are a plague that should be purged from the earth, and that soldiers who participated in the war on terror, like Petitioner, have committed an offense against God which is so egregious that it requires his presence in hell.[35] This horrific propaganda was distributed to Petitioner, a white Christian military veteran with PTSD, while he was locked up in solitary confinement for periods of 23 hours a day, with no other reading alternatives.  This practice serves no legitimate government or penal interest and is a purely punitive measure designed to psychologically punish him and push him to the breaking point, and potentially to take his own life.

129.   PETITIONER HAS NOT SEEN HIS CHILDREN IN NINETEEN MONTHS: Petitioner has been prohibited from contact visits with his family.  He was initially given video visits which were beneficial to him emotionally and psychologically, but he was stripped of video visits without explanation. This is psychologically damaging, especially because he has PTSD, and because family contact is at the crux of Petitioner's psychological

---

[35] *See, e.g.,* Final Call
https://www.finalcall.com/artman/publish/Minister_Louis_Farrakhan_9/Separation-Or-Death.shtml.

treatment plan. Put differently, regular family contact helps Petitioner cope with the day-to-day symptoms of his condition. During times where symptoms become debilitating, spending time with his two sons has literally saved Petitioner's life. Prisoners in the DC Jail who are incarcerated for crimes unrelated to January 6th are permitted regular family video visits. The decision, therefore, to disallow Petitioner from having video access to his family is clearly punitive and unrelated to any legitimate governmental interest.

**J.  DELIBERATE INDIFFERENCE TO PETITIONER'S SERIOUS UNDERLYING MEDICAL CONDITION**

130.  Petitioner informed the staff that he had PTSD when he first arrived at DC Jail. Despite knowing that Petitioner had this condition, he was placed in solitary confinement on the day he arrived, even though such treatment endangered his life by creating the risk of suicide due to his PTSD condition.

131.  Petitioner began complaining about how solitary confinement was exasperating his condition during the summer of 2021 when he asked to speak to a psychologist. Prior to arriving at DC Jail, Petitioner had long since treated his condition with a combination of psychotherapy, medical marijuana, frequent exercise, family time, and by spending significant time outdoors. Petitioner did his best to explain his situation and what he was experiencing to the doctor, who did not seem to care and prescribed him Zoloft.

132.  Noticing that his mental health was declining, Petitioner began filing Inmate Grievances about how solitary confinement was affecting his mental health. Petitioner's IGPs were routinely flatly ignored by the Jail. Petitioner continued to make requests for mental health assistance, but the jail continued to ignore his requests. As such, Petitioner continued to file medical IGPs on the refusal to be seen for mental health assistance. Eventually the jail would send someone from mental health to do a wellness check after Petitioner filed grievances on the mental health matter. These mental health wellness checks, however, do not arise to the level

of reasonable medical care. To add insult to injury, the mental health professionals made follow up appointments but then did not keep them. Petitioner has requested mental health services dozens of times during the nineteen months that he has been imprisoned. Petitioner has, of the day of this writing, filed twenty-three (23) mental health related grievances. Adequate services have never been provided, despite the fact that mental health services are a matter of life and death for a person living with PTSD.

133. One example, documented in a grievance filed by Petitioner on May 10, 2022, shows the deliberate indifference to Petitioner's medical condition, as well as the "lack of compassion" and "callousness" that was observed by others. After being in solitary confinement for 15 days, Petitioner reached out to Lieutenant Allen and informed him that he was suicidal. Lieutenant Allen told him to "put in a request." Petitioner pleaded with Lieutenant Allen to come over and have a conversation about his condition, but Lieutenant Allen just walked away and said sarcastically, "I am sorry you feel that way. I hope you don't die."

134. As stated above, Petitioner was placed in solitary confinement for meritless and unjustifiable reasons on April 20, 2022. DC Jail, locked Petitioner in solitary confinement for three weeks with full knowledge of Petitioner's PTSD diagnosis. Petitioner was psychologically tortured during that time. The Jail also cut off drinking water to his cell for over 20 hours. Petitioner harassed and psychologically prodded to the point where he driven to suicide watch. Suicide watch did not come with mental health services. Suicide watch involved Petitioner being stripped naked, being forced to wear a plastic Tyvek suit in a brightly lit room where the guards continued to psychologically harm him and tell him that he should sign the paper admitting he did something wrong and everything would go away. During this time, Attorney McBride received dozens of phone calls from detainees in the DC Jail indicating that Petitioner was being retaliated against for using the grievance system by Major Marr,

Lieutenant Lancaster, Lieutenant Allen, and Deputy Warden Jones.

135. On May 7, 2022, Attorney McBride sent a NOTICE OF VIOLATION OF DETAINEE'S RIGHTS to Eric Glover, General Counsel of the D.C. DOC, stating that the act of placing Petitioner in solitary confinement, especially with full knowledge of his serious underlying medical condition, is a clear violation of Petitioner's civil rights. The Notice demanded that Petitioner be released from solitary confinement and that Petitioner be given the medical help that he desperately needed.

**Attorney McBride to Eric S. Glover General Counsel for the District of Columbia:**

United States military veterans living with PTSD have an astronomically high suicide rate on a good day. Even so, Mr. Nichols, an honorably discharged Marine Corps veteran living with PTSD in your care, has been driven to the point of contemplating suicide by your guards. Mr. Glover, these acts are not just deliberately indifferent to his medical condition— they are criminal.

Be advised that if Mr. Nichols takes his life while in your custody, I will see to it that all the relevant parties are sued in their personal and individual capacities and prosecuted to the fullest extent of the law. I will call dozens of pretrial detainee witnesses against your staff and display the objectively disgusting evils practiced by your facility in front of the whole world, never stopping, until all responsible face justice for encouraging Mr. Nichols to kill himself.

I am demanding that Mr. Nichols be given the medical care he needs, immediately. I am demanding that he be removed from solitary confinement, immediately. I am not interested in what DC Jail's names are for solitary confinement, be they administrative segregation, punitive segregation, or the SHU. Call it whatever you want. My demand is that you (1) release Mr. Nichols from the medieval practice of isolation and punishment, (2) get him the medical help he needs, and (3) that you do so at once.

I hereby give you notice that I will soon be filing a civil lawsuit demanding amongst other things, Mr. Nichols' immediate release…"

**General Counsel Glover's May 9, 2022, response to Attorney McBride:**

Mr. McBride, in response to your May 7, 2022 letter to that District of Columbia Department of Corrections (DOC), be advised that:

1. DOC denies the allegations that your client is being punished in violation of this Fifth and Eight amendments rights or being retaliated against by the agency;

2. There is no "solitary confinement" at DOC;
3. Your client is currently in restrictive housing at DOC because of an incident that he had with another resident. A hearing in the matter was held on April 28, 2022, and another hearing is scheduled for May 12, 2022;
4. I cannot discuss your client's medical care and treatment at DOC without a court order or a signed release;
5. Deputy Warden Landerkin does not oversee DOC's Central Detention Facility (CTF); and
6. Your threats against the agency are both unnecessary and unproductive.

**Attorney McBride's May 9, 2022, response to Mr. Glover:**

Do you deny the fact that Mr. Nichols has been locked in a cell by himself for more than 22 hours a day since April 20, 2022?

Are you aware that evidence fully exonerating the meritless allegations against Mr. Nichols was presented to the jail weeks ago, yet Mr. Nichols remains confined?

Do you deny that DC Jail has been on notice that Mr. Nichols was diagnosed with PTSD years before being detained at DC Jail?

. . .

**General Counsel Glover's May 9, 2022, responses to Attorney McBride:**

(1) I'm not going to litigate this matter via email; however, I will forward the email to DOC's Operations team and ask that they investigate your client's allegations. Also, if you would like to have a conversation regarding your client's allegations, I will certainly make myself available.

(2) Please be advised that your client has been returned to his original housing unit.

136. General Counsel Glover's assertion that "there is no 'solitary confinement' at DOC" is only true in that DOC does not use the term "solitary confinement." They do, in practice, isolate prisoners for 22-23 hours a day with no other human contact. By definition, that practice is solitary confinement, regardless of what DOC calls it.

137. In addition to confining Petitioner under conditions that, by themselves, violate his civil rights, during his time in prison as a pre-trial detainee, the DC Jail has (1) shown deliberate indifference to his health, by repeatedly placing him in prolonged solitary confinement with full knowledge that he has a well-documented PTSD diagnosis; (2) deprived him of numerous

32

basic constitutional rights; (3) arbitrarily, capriciously, and unlawfully punished him, despite his exemplary behavior and status as a pre-trial detainee, not an inmate; and (4) subjected him to unlawful brutal physical and psychological torture.

## K.     THE INMATE GRIEVANCE PROCESS IS IRREPARABLY BROKEN

138.    Petitioner has exhausted all of his remedies using the process for grievances at the DC Jail. There is *prima facie* evidence that the Inmate Grievance Process (IGP) is corrupted, futile, ineffective, and irreparably broken.  Petitioner has submitted over 100 requests and has carefully documented them and the DOC officials' responses.  The documentation shows a clear pattern of obstruction that makes it impossible for Petitioner or any inmate to have even the most serious and life-threatening grievances addressed.

139.    The following example, one of many, regarding the DC Jail's failure to respond to Petitioner's mental health request, demonstrates the corrupted, futile, ineffectual, and irreparably broken nature of the grievance process.

140.    On March 21, 2022, after returning from a general medical visit, Petitioner submitted a mental health request that was ignored for three days, so on March 24, 2022, Petitioner initiated Step 1 of the grievance process, which is to fill out an "Informal Resolution" form and submit it to the Inmate Grievance Process (IGP) coordinator. Petitioner's Informal Resolution form stated that since his March 21, 2022 medical visit, "I have not been seen by medical or asked about my mental health status.  To date, I have put in multiple requests about mental health, and also have [grievance forms] about my mental health to my conditions of confinement affecting my diagnosed PTSD.  I would like to be seen at mental health, please.  Thank you."[36]  According to the procedure at the time, the prison official had seven business days to respond to the

---

[36] EXHIBIT C, Petitioner's Mental Health Grievances, at 1.

grievance. On April 11, 2022, six days past the response deadline, IGP Coordinator T. Campbell[37] responded, "Seen for mental health appointment on 3/25/2022 and 3/30/2022. Grievance resolved." The space on the response form designated for a manager's signature was not signed by a manager, instead, T. Campbell just wrote "COVID-19."

141. Pursuant to the IGP, if Step 1 is not resolved satisfactorily, Step 2 is for Petitioner to file a "Formal Grievance form" and submit it to the IGP coordinator. Step 1 and Step 2 are basically identical, except that instead of having 7 business days to respond to Step 1, the IGP coordinator has 15 business days to respond. On April 13, 2022, Petitioner filled out a "Formal Grievance form" explaining that his Informal Grievance was not resolved as the anonymous official had asserted.[38] In the form he explained to the IGP coordinator that the response to his March 24 Informal Resolution was inadequate and the grievance remained unresolved. His Informal Resolution had asked for mental health care. Instead, on March 25, 2022 he met with someone, not a therapist, for 3-5 minutes to schedule an appointment with a therapist, and on March 30, 2022, he met with a therapist for 10 minutes and during that time, the therapist did not provide any mental health care. During the meeting with the therapist, Petitioner spent most of the 10 minutes explaining how the conditions of confinement were affecting his PTSD. All the therapist said was that, "there is no long-term mental health therapy at DC DOC," and that the therapist would "check in" in two weeks. Accordingly, the informal grievance was not resolved, and Petitioner sought to escalate it to Step 2. In response, on April 20, 2022, the Jail responded "Inmate Nichols has been seen on 3/25/22 and 3/30/22 for evaluation. Per Bruce Reid he will have a follow up appointment to discuss long term therapy options. Grievance resolved." The form was also signed by IGP coordinator T. Campbell. Petitioner's grievance

---

[37] IGP Coordinator Campbell did not print her name, but her signature is identifiable from other documents.
[38] *See* EXHIBIT C, at 2.

that he was not receiving mental health care was still unresolved as he had not received mental health care.

142. Step 3 in the grievance process is a "Request for Warden's Administrative Remedy" form. The Warden has 15 business days to respond, after which, the Petitioner can initiate Step 4, which is an Appeal to the Deputy Director. On April 21, 2022, Petitioner filed a Step 3 Request for Warden's Administrative Remedy Form, which reiterated what he wrote in his Step 1 and 2 forms and the unsatisfactory responses. Further, he added that as of the writing of the Step 3 form, it was three weeks since the therapist who did not provide any mental health care said that he would "check in" in two weeks, and no such "check in" ever occurred. Moreover, in that time, his conditions of confinement became even worse as he was since moved to solitary confinement in retaliation for submitting the grievances. During that time, the water in the cell was shut off as a punishment. He wrote that his mental health was declining and he was experiencing serious PTSD symptoms of anxiety and depression, and that his mental health medication was not delivered to him even though he asked for it multiple times.[39] The deadline for a response from the Warden was May 13, 2022. No response was ever provided. On May 27, 2022, the "Warden's Response" stated, "no response, elevated to next level." The Warden did not sign or date the response. Like the Step 1 and Step 2 forms, the Step 3 form was signed by IGP coordinator T. Campbell.

143. On May 15, 2022, after it was clear that no response to his Step 3 Form was forthcoming, Petitioner submitted a Step 4 "Appeal to the Deputy Director" Form.[40] In the appeal, he documented that due to the lack of responses to his urgent mental health request, he was put on suicide watch in "medical 82 on suicide pre-caution." He was released from suicide watch on

---

[39] *Id.* at 3.
[40] *Id.* at 4.

May 9, 2022, and asked once again for mental health help from the psychiatrist, but there was no follow up. The Deputy Director did not respond, and may not have even received the form. In all that time, he only received mental health care for 10-15 minutes on April 27, 2022, and May 17, 2022. This is unsatisfactory health care for a veteran with PTSD who has been placed in solitary confinement and was also put on suicide watch.

144. The DC Jail's response to Petitioner's Step 4 Appeal to the Deputy Director shows unequivocally that the grievance process at the DC Jail is futile, corrupted, and irreparably broken. The Deputy Director never saw his Step 4 Appeal. Rather, on May 23, 2022, 3 days after a response was due, IGP coordinator T. Campbell responded to the Step 4 Appeal. The purpose of an appeal process - by definition - is to submit the decision to a separate review. But at the DC Jail, the IGP is the final decision maker at every level, from the initial informal grievance to the Appeal to the Deputy Director, in other words, there is no appeal. Worse yet, the system is corrupted so that the process can never be exhausted. In reviewing Petitioner's Step 4 Appeal to the Deputy Director, IGP coordinator T. Campbell crossed out with a pen where it was printed on the form "Step 4: Appeal - Deputy Director" and hand wrote over it "Step 1: Informal."[41] Petitioner had diligently and patiently submitted to the process for 2 months, from his initial grievance on March 24, 2022, to the response from the Step 4 Appeal on May 23, 2022, all the while he was suffering from declining mental health due to PTSD, deprived of his medication, deprived of water, sent to solitary confinement, isolated from his wife and his attorney, yet through all of this he endured the process and followed the procedures. After all of that, with the stroke of her pen, IGP coordinator T. Campbell sent Petitioner straight back to "GO" by converting his Step 4 Appeal to the Deputy Director into an initial grievance, starting the process from the beginning.

---

[41] *Id.*

145.    The very next day, on May 24, 2022, Petitioner filed a Step 1 Informal Grievance against T. Campbell, documenting the grievance regarding his mental health and showing how T. Campbell had subverted his appeal to the Deputy Director.  Petitioner alleged, "this was done maliciously and directly inhibits my ability to exhaust my IGP remedies.  The IGP process at DC DOC is impossible to follow through with."[42]

146.    On June 9, 2022, six days after a response was due, IGP coordinator T. Campbell responded only with "see attached."  The attached document she was referring to stated "After reviewing and investigating Mr. Ryan Nichols Informal Grievance regarding the IGP Coordinator T. Campbell, it was determined that there was no IGP that could be found on file where Ms. Campbell had marked though [sic] the Step 4 of the Deputy Director's Appeal and labeled this document as Step 1.  If you, Mr. Nichols have a copy of the specific document in your possession that you are referencing, please provide a copy of that IGP document to allow further investigation into this matter.  Based upon this information, there is no evidence that supports that T. Campbell intentionally or maliciously sabotaged your IGP to going [sic] to Deputy Director's Ste [sic] 4 Appeal."[43]  The letter was not signed, but was attached to a form signed by IGP coordinator T. Campbell, so it is likely that she wrote this letter herself.

147.    This one example demonstrates how the process is futile, corrupted, and irreparably broken. First, Petitioner has been and continues to be severely retaliated against for engaging in the grievance process, and his only recourse is to submit a grievance to his tormentors.  Second, the time limits set for responses are arbitrary and unreasonable.  The process granted the Jail seven days to respond to a Step 1 informal grievance, regardless of the nature of the grievance, even if the grievance was a matter of life or death, as it was in Petitioner's case.  As of May

---

[42] *Id.* at 5.

[43] *Id.* at 6.

20, 2022, the process was changed so that the Jail has 15 days to respond to a Step 1 informal grievance. This change was made in direct response to Petitioner's use of the grievance process. Further, the process has no oversight, accountability measures, or standard of review of any kind such that Jail officials have unbridled discretion. There is no standard as to what is considered "resolved."

148. Petitioner has filed a total of 108 grievances regarding the above-mentioned wrongful acts. Forty-two of those grievances have been flatly ignored by the jail. Put differently, DC Jail has a non-responsive rate of nearly fifty percent. This statistic alone is sufficient grounds to conclude that the grievance process at DC Jail is completely broken.

149. His grievances are routinely thrown in the trash, ignored, or falsely marked as having been sufficiently addressed. These violations of the administrative process are not limited to Petitioner but are inclusive of the entire January 6th Detainee Cohort. This purposeful obfuscation of the grievance process is a calculated decision by the Jail to prevent Petitioner and others like him from being able to demonstrate that he or they have exhausted all administrative remedies, because doing so, will delegitimize detainee claims of misconduct and kill any civil rights lawsuits and/or habeas petitions at conception.

150. This accusation is not a hunch or an educated guess, but rather the product of more than fourteen months of investigation, during which, the jail guards regularly stated their intention to avoid being sued for their despicable behavior, by forging fake signatures and refusing to sign grievances to avoid being identified. All the while, jail leadership mocked, ridiculed, and retaliated against Petitioner and other J6 detainees for having the audacity to grieve them. None of this is related to any legitimate institutional goal. All of this is designed to intimidate, silence, punish, and ensure that the grievance process fails. And by doing so, they send a message to these American citizens that they should shut up or face torture.

151.  In a deliberate and coordinated effort by DC Jail staff to sabotage countless grievances, DC Jail has created a system of disqualifying the grievances that it does respond to, making it near incredibly difficult for any grievance to be properly escalated for the specific purpose of making the exhaustion of administrative remedies requirement impossible.

152.  DC Jail does not care that Petitioner has a serious underlying medical condition. This is demonstrated by the fact that the majority of Petitioner's grievances are mental health related. He is routinely told that "no mental health services are available." Desperate for help, he escalates those grievances to Step 3 and Step 4, despite the Jail's purposeful non-responsiveness. DC Jail has seven days to respond to Petitioners escalations. Often multiple months go by before Petitioner ever gets a response. For example, Petitioner submitted a grievance on November 11, 2021, expressing his concern about a possible ear infection and requesting medical attention. The grievance was not responded to until February 5, 2022, three months later, when the DOC policy demanded a response within 7 days.

153.  On multiple occasions, officers sabotaged Petitioner's ability to use the grievance process by changing the grievance numbers and therefore breaking the chain of custody. The purpose of this is to make a grievance untraceable. Often grievances are not returned or when they are escalations are crossed out or edited, changing a Step 3 grievance to a Step 1. This is incredibly frustrating and demonstratively unfair and Petitioner will certainly be able to prove it.

154.  The grievance process does not allow for "group grievances," i.e., if a prison action affects multiple prisoners, the grievance process is not available to any one individual. So, for example, when a guard gassed multiple prisoners on November 11, 2021, resulting in three prisoners being removed on stretchers, according to the grievance policy, no individual could submit a grievance because this was a "group issue."

155.  Finally, the process is not made accessible to prisoners.  Petitioner was not made aware of the process until he was in the prison for many months.  He was not provided with a prison handbook or informed about the grievance process by the staff.  There is a poster about the grievance process but it is inconspicuously placed in an area that is not likely to be noticed by prisoners.  Upon examination, the information on the poster is inconsistent and confusing. When they first learned of the process, they only had access to forms for Steps 1, 2, and 4, so it was impossible to exhaust the process because Step 3 was missing.

156.  The original grievance process put time limits for required responses from the Jail.  Step 1 - 7 days; Step 2 - 15 days; Step 3 - 15 days; Step 4 - 21 days.  Therefore, the total process took almost two full months, assuming the Jail responded on time.  In retaliation for Petitioner using the process, on May 20, 2022, the Jail changed the time limits.  Sep 1 - 15 days; Step 2 - 15 days, Step 3 - 20 days; Step 4 - 30 days.  Now, the process takes almost 3 months to be exhausted.  This is completely unreasonable as grievances can be a matter of life or death for a prisoner.

## VI.    LEGAL STANDARD

157.  The practice of arbitrary imprisonment has been, in all ages, the favorite and most formidable instrument of tyranny. The observations of the judicious Blackstone ... are well worthy of recital: 'To bereave a man of life ... or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.' And as a remedy for this fatal

evil, he is everywhere peculiarly emphatical in his encomiums on the habeas corpus act, which in one place he calls 'the BULWARK of the British Constitution.[44]

158.    The Suspension Clause ensures that, except during periods of formal suspension of writ of habeas corpus, the judiciary will have a time-tested device, the writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty.

159.    A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by the color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States.[45]

160.    Aside from § 2241, this Court has jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution.[46]  Sections 2201–02 of Title 28 of the United States Code further provide that a court may, upon the filing of an appropriate pleading, declare the rights and other legal relations of any party seeking such declaration.

## A.    CONDITIONS OF CONFINEMENT CLAIMS ARE PROPER IN HABEAS

161.    The Supreme Court has not definitively ruled as to whether a conditions of confinement claim is proper in habeas but has instead called it an open question. [47]  In lieu of a definitive ruling from the Supreme Court, circuit courts have stepped in to fill the void, one cohort of circuits favors conditions of confinement claims while others oppose it.

162.    The D.C. and Second Circuits allow for conditions of confinement claims to proceed under habeas.  Specifically, in 2014 the D.C. Circuit in Aamer v. Obama, reasoned that custody may

---

[44] *See Boumedine v. Bush,* 553 U.S. 723 (2008) Quoting Hamilton C. Rossiter ed., p. 512 (1961) (quoting 1 Blackstone *136, 4 id., at *438).

[45] *See* 28 U.S.C. §§ 2241(c)(1), (3). For an excellent analysis of the applicability of relief under Section 2241 for prison conditions, see Note, *A Textual Argument for Challenging Conditions of Confinement Under Habeas* 135 Harv. L. Rev. 1397 (Mar 10, 2022).  https://harvardlawreview.org/2022/03/a-textual-argument-for-the-challenging-conditions-of-confinement-under-habeas/

[46] *See Ziglar v. Abbasi* at 137 S. Ct. at 1865 (detainees challenging conditions of confinement could seek an injunction)

[47] *See Ziglar v. Abbasi* at 1863 (citing *Bell v. Wolfish*, 441 U.S. at 526;a *Preiser* 411 U.S. at 499)

be illegal due to "the fact of detention, duration of detention, the place of detention, or the conditions of detention."[48]  And in all such cases, "the habeas petitioner's essential claim is his custody violates the law, and he may employ the writ to remedy such illegality.  The Second Circuit has also "long interpreted § 2241 of the habeas statutes as applying to challenges of prison conditions"[49]

163.    In conditions of confinement claims, a habeas petitioner's rights may be vindicated by an order of transfer, an order enjoining the government from continuing to treat the petitioner in the challenged manner, or the court may order the petitioner released because the unlawful conditions cannot be rectified.[50]

## B.    THE DUE PROCESS RIGHTS OF PRETRIAL DETAINEES

164.    The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law.[51]

165.    Pretrial detainees have a Constitutional right to be free from punishment prior to conviction.[52] To establish punishment, proof of intent or motive to punish is not necessary, rather, a pretrial detainee can prevail on a claim that his due process rights were violated by providing objective evidence that a challenged governmental action is not related to a legitimate governmental objective or that it is excessive in relation to that purpose.[53]

166.    Regarding conditions of confinement, the proper avenue for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate

---

[48] *See Aamer v. Obama* 742 F.3d 1023, 408 U.S.App.D.C. 291 (2014)
[49] *See Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008)
[50] *See* 28 U.S.C.A. § 2241.  Aamer v. Obama 742 F.3d 1023, 408 U.S.App.D.C. 291 (2014)
[51] *See* U.S. Const. amend. V.
[52] *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction").
[53] *See Kingsley v. Hendrickson,* 576 U.S, 389m (2015) (citing *Younberg v. Romero,* 457 U.S. 307, 322 (1982)).

that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death.[54]

167. Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. The threshold question "is whether the prison conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal".[55]

## C. DELIBERATE INDIFFERENCE TO AN UNDERLYING MEDICAL CONDITION

168. A pretrial detainee's constitutional right to be free from punishment includes the right to reasonable safety and medical care.[56] A prison official violates these rights when he acts with "deliberate indifference" to detainees' safety or serious medical needs.[57]

169. A showing of deliberate indifference requires "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003). In order to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference*." Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

170. A showing of irreparable harm. "[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is

---

[54] *See United States v. Martin*, 447 F.Supp.3d. 999 (D.Md. 2020); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, 576 U.S, 389m (2015) (citing *Younberg v. Romero*, 457 U.S. 307, 322 (1982). *United States v. Riggins*, 456 F.Supp.3d 138 (2020) citing *Hardy v. District of Columbia,* 601 F.Supp. 2d 182,188 (D.D.C. 2009).

[55] *See United States v. Riggins*, 456 F.Supp.3d 138 (2020) citing Hardy v. District of Columbia, 601 F.Supp. 2d 182,188 (D.D.C. 2009).

[56] *See Gordon v County of Orange,* 888 F.3d 118, 1124–25 (9th Cir. 2018).

[57] *Id.; Castro v. Los Angeles,* 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

likely to suffer irreparable harm before a decision on the merits can be rendered." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL Practice and Procedure § 2948.1 (2d ed.2013)). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted, emphasis in original).

**D.** **SOLITARY CONFINEMENT IS PUNISHMENT AND ITS USE AGAINST PRETRIAL DETAINEES IS UNLAWFUL**

171. Solitary confinement is a tool that has been used to punish prisoners for thousands of years. The Book of Daniel describes two harrowing instances of King Nebuchadnezzar's implementation of solitary confinement, first in the fiery furnace[58] and second in the lion's den.[59] The Prophet Jeremiah was famously placed in solitary confinement in the cistern of Malkijah.[60] Approximately 800 years later, St. John the Evangelist is exiled to the island of Patmos by the Roman Emperor Domitian.[61]

172. Joseph Stalin regularly used solitary confinement to punish political dissidents. For instance, Semyon Samuilovich Vilensky was charged with intent to commit acts of terror and sentenced to ten years of imprisonment simply for reading an anti-Stalin poem out loud. "I was put in a narrow cell with a concrete floor. The window had bars and thick glass that let in little light."[62]

---

[58] *See* the Book of Daniel Chapter 3
[59] *See* the Book of Daniel Chapter 6
[60] *See* the Book of Jeremiah Chapter 38
[61] *See* the Book of Revelation Chapter 1

[62] *See* https://www.opendemocracy.net/en/odr/comrade-stalins-secret-prison/

173. Nelson Mandela was sentenced to life in prison by South Africa's Apartheid Regime. At Robben Island Prison, he spent years languishing in solitary confinement. "I found solitary confinement the most forbidding aspect of prison life. There is no end and no beginning; there is only one's mind, which can begin to play tricks. Was that a dream or did it really happen? One begins to question everything."[63]

174. The practice of solitary confinement began in the United States Eastern State Penitentiary in Philadelphia in 1829. It is based on a belief that prisoners isolated in stone cells with only a Bible would use the time to repent, pray and find introspection.[64] In 1890, U.S. Supreme Court Justice Samuel Freeman Miller found that " A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."

175. In an October 31, 2019, letter to the Department of Homeland Security's Officer for Civil rights and Liberties (CRCL), Senator Elizabeth Warren questioned the Federal Government's abuse of detainee rights via the use of solitary confinement, stated:

> And now a new set of reports indicate that ICE has continued to overuse and misuse solitary confinement to house detainees who have mental or physical disabilities or otherwise may be especially vulnerable and in need of protection. At least three detainees "with mental illness who have been put in solitary" have died by suicide in the last three years, and another suicide of a detainee held in solitary was reported just this month. It is crucial that the federal government deploy every available tool to stop the abuse of solitary confinement and prevent another avoidable death."
>
> –Senator Elizabeth Warren

---

[63] *See Nelson Mandela's* 1994 autobiography The Long Walk to Freedom
[64] https://www.npr.org/templates/story/story.php?storyId=5579901

**E.**   **THE HUMANE ALTERNATIVES TO LONG-TERM SOLITARY CONFINEMENT ACT**

176.   On March 18, 2021, New York State Governor Andrew Cuomo banned the use of prolonged solitary confinement in New York State, when he signed into law the Humane Alternatives to Long-Term Solitary Confinement Act (HALT), which adopted the United Nations Standard for Minimum Rules for the Treatment of Prisoners, a.k.a. The Nelson Mandela Rules.

177.   HALT bans the use of solitary confinement for any period for those with mental or physical disabilities, pregnant women, those in the first 8 weeks of postpartum recovery, inmates under 21, as well as inmates who are older than 55.

178.   HALT also requires that solitary confinement be used only for "serious conduct" such as the risk of "imminent physical injury" and that all inmates in solitary be offered at least four hours of recreation outside of their cells, as well as one hour of outdoor time.

179.   Importantly, HALT defines prolonged solitary confinement as solitary confinement for more than 15 consecutive days and bans the use of prolonged solitary confinement.  HALT also forbids more than 20 days of solitary confinement during any 60-day period.

180.   While New York law is not controlling authority in this case, Petitioner believes that this law can inform the Court's analysis of the unlawful conduct in this case, especially because of the damage that the inhumane practice of solitary confinement can cause, and because solitary confinement does not properly address the root causes that lead to **punishment.**

> It is no secret that the use of solitary confinement is inhumane, unethical, and constitutes torture under international law if it extends more than fifteen days. It must be discontinued immediately. The passage of HALT in the Senate brings us one step closer to bringing justice to all those who have lost loved ones to the wrongful use of solitary, and the New Yorkers who have been victims of this state-sanctioned torture. This monumental achievement wouldn't be possible without the efforts led by survivors of solitary and their family members, and I am thankful for their tireless advocacy. As the lead sponsor of this bill, I am grateful for the support of the leadership in bringing this bill to the floor, as we seek to create more humane and effective alternatives to harmful incarceration across our state.

> **Senator Julia Salazar, Chair of the Senate Committee on Crime Victims, Crime and Correction**

**F      THE UNITED NATIONS STANDARD FOR MINIMUM RULES FOR THE TREATMENT OF PRISONERS: THE NELSON MANDELA RULES**

181.    International human rights and health organizations have roundly denounced the use of prolonged solitary confinement as a form of torture.[65] The World Health Organization, United Nations, and other international bodies have also recognized solitary confinement as greatly harmful and potentially fatal. In 2016, the National Commission on Correctional Health Care issued guidance to correctional health officials explaining that a period of confinement beyond 15 consecutive days is "inhumane, degrading treatment, and harmful to an individual's health."[66]

182.    The United Nations Standard Minimum Rules for the Treatment of Prisoners (SMRs) were initially adopted by the UN Congress on the Prevention of Crime and the Treatment of Offenders in 1955 and approved by the UN Economic and Social Council in 1957.   On December 7, 2015, a revised version of the Standard Minimum Rules was adopted unanimously by the 70th session of the UN General Assembly in Resolution A/RES/70/175.   This followed a four-year revision process after a 2010 UN General Assembly resolution which requested revision of the SMRs 'so that they reflect recent advances in correctional science and best practices.   The revised Rules are known as the Nelson Mandela Rules, which honor the legacy of the late President of South Africa, Mr. Nelson Mandela, who spent so many years of his life in prison.

183.    Rule 1: All prisoners shall be treated with the respect due to their inherent dignity and value as human beings. No prisoner shall be subjected to, and all prisoners shall be protected from,

---

[65] *See* Solitary confinement should be banned in most cases, UN expert says, UN News (Oct. 18, 2011), https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says (defining solitary in excess of 15 days as a form of torture).

[66] *See* Nat'l Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation), https://www.ncchc.org/solitary-confinement.

torture and other cruel, inhuman, or degrading treatment or punishment, for which no circumstances whatsoever may be invoked as a justification. The safety and security of prisoners, staff, service providers, and visitors shall be ensured at all times.

184. Rule 43 states that under no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhumane, or degrading treatment or punishment.

## G.   PROLONGED SOLITARY CONFINEMENT IS TORTURE

185. Rule 43 section 1 specifically enumerates and prohibits: (a) Indefinite solitary confinement; (b) Prolonged solitary confinement; (c) Placement of a prisoner in a dark or constantly lit cell; (d) Corporal punishment or the reduction of a prisoner's diet or drinking water; (e) Collective punishment.

186. Rule 43 section 3 states that disciplinary sanctions or restrictive measures shall not include the prohibition of family contact. Family contact may only be restricted for a limited time, as is strictly required for the maintenance of security and order.

187. Rule 44 defines solitary confinement as confinement for more than 22 hours a day absent meaningful human contact, and prolonged solitary confinement as 15 consecutive days or more of solitary confinement.

188. Rule 45 states that the imposition of solitary confinement is prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures.

## VII.   THE PRISON LITIGATION REFORM ACT'S EXHAUSTION OF REMEDIES REQUIREMENT

189. The PRLA requires that a prisoner exhaust his administrative requirements with the correctional institution prior to filing suit.  A prisoner fulfills his duty under the PRLA to exhaust his administrative remedies by adhering to specific procedures and deadlines established by prison policy.  PRLA §101(a), 42 U.S.C.A. §1997(e)(a). A prisoner cannot be

48

required to exhaust his administrative remedies prior to bringing suit if such remedies are not available to him. 42 U.S.C.A. §1997(e)

190.   UNAVAILABILITY: An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *Booth v. Churner*, 532 U.S. 731 (2001) Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In *Booth 's* words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,* at 736. So too if administrative officials have apparent authority but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." Id., at 738. When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy. *Ross v. Blake,* 578 U.S. 632, 643 (2016)

191.   THWARTING THE ADMINISTRATIVE PROCESS:   The same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In Woodford, we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) to "trip up all but the most skillful prisoners." *Woodford v. Ngo* 548 U.S., at 102, 126 (2006)

192.   INTERFERENCE (INTIMIDATION, THREATS, AND MISLEADING):   Appellate courts have also addressed a variety of instances in which officials misled or threatened individual inmates to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative

process unavailable. And then, once again, § 1997e(a) poses no bar. *See, e.g., Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted*)); Schultz v. Pugh,* 728 F.3d 619, 620 (C.A.7 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Pavey v. Conley,* 663 F.3d 899, 906 (C.A.7 2011) ("[I]f prison officials misled [a prisoner] into thinking that ... he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available' "); *Tuckel v. Grover,* 660 F.3d 1249, 1252–1253 (C.A.10 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available' "); *Goebert v. Lee County,* 510 F.3d 1312, 1323 (C.A.11 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

## A. PETITIONER IS EXCUSED FROM THE PRLA'S EXHAUSTION REQUIREMENT BECAUSE THE GRIEVANCE PROCEDURE IS UNAVAILABLE

193. Petitioner incorporates and realleges the foregoing paragraphs by reference and alleges that Respondent Garland and Respondent Jones are subjecting him to unlawful pretrial detention amounting to punishment while simultaneously denying him the right to object to said unconstitutional treatment via the Inmate Grievance Process at DC Jail.

194. Petitioner asserts that the facts laid out in Section V, Subsection K of this pleading support the conclusion that, through no fault of his own, the grievance process at DC Jail is irretrievably broken. As such, the grievance process is unavailable as an administrative procedure. Consequently, Petitioner is excused from having to meet the PRLA's exhaustion of administrative remedies requirement.

195.    In the context of pretrial detention, to exhaust administrative procedures, detainees must follow
        the policies and procedures of the facility relating to complaints or grievances.  For example,
        A detainee must file a grievance or complaint, then wait for the facility to respond, the detainee
        must appeal any adverse ruling, finding, or conclusion.  If there is a hearing process, the
        detainee must go through that as well, prior to suing in federal court.

196.    UNAVAILABILITY:  Petitioner has filed a multitude of grievances since first being detained
        in January 2021.  Petitioner's grievances are filed in compliance with the procedures and
        deadlines established by prison policy that is provided to Petitioner in the prison handbook, be
        that as it may, DC Jail staff simply refuses to entertain Petitioner's grievances and/or creates a
        litany of roadblocks preventing the process from playing out at all— then the grievance process
        is unviable and therefore unavailable, as a matter of law. *See Ross v. Blake,* 578 U.S. 632, 643
        (2016).  These are precisely the kinds of situations that the case law seeks to protect inmates
        and detainees against.  "When the facts on the ground demonstrate that no such potential exists,
        the inmate has no obligation to exhaust the remedy.  *See Ross v. Blake,* 578 U.S. 632, 643
        (2016).

197.    THWARTING AND INTERFERENCE:  DC Jail guards regularly state their intention to avoid
        being sued for their despicable behavior, by forging fake signatures and refusing to sign
        grievances to avoid being identified.  All while jail leadership mocks, ridicules, and retaliates
        against Petitioner and other J6 detainees for having the audacity to grieve them.  "In Woodford,
        we recognized that officials might devise procedural systems to trip up all but the most skillful
        prisoners. *See Woodford v. Ngo*, 548 U.S., at 102, 126 (2006).  This purposeful obfuscation of
        the grievance process is a calculated decision by the jails to prevent Petitioner and others like
        him from being able to demonstrate that he or they have exhausted all administrative remedies

because doing so, will delegitimize detainee claims of misconduct and kill any civil rights lawsuits and/or habeas petitions at conception.

198.    INTIMIDATION, AND THREATS: The staff and leadership at DC Jail work hard to thwart detainees from being able to take advantage of the grievance process through machination, misrepresentation, and intimidation to ensure that the grievance process fails.  And by doing so, communicate to Petitioner, and other detainees, that they should shut up or face torture. "When a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be available." *See Tuckel v. Grover,* 660 F.3d 1249, 1252–1253 (C.A.10 2011)

199.    MISLEADING:    Respondents have repeatedly misled Petitioner regarding the proper grievance procedures, and by doing so have made the grievance process unavailable. Respondents' interference with Petitioner's pursuit of relief has rendered the administrative process unavailable.  *See Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process."  These accusations are also corroborated by the fact that after a surprise inspection the U.S. Marshals declared that the grievance process is broken at DC Jail.  An internal audit of the jail also declared the same.  "An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *See Booth v. Churner*, 532 U.S. 731 (2001).

200.    PETITIONER IS EXCUSED:    Thus, having established that the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

*See Ross v. Blake,* 578 U.S. 632, 643 (2016)   Consequently, Petitioner is excused from having

to meet the PRLA's exhaustion of administrative remedies requirement.

## VIII. CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF:   RESPONDENT'S DELIBERATE INDIFFERENCE TO PETITIONER'S MEDICAL SAFETY AND MEDICAL NEEDS VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE**

201.   Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that

Respondent Garland and Respondent Jones are subjecting him to unlawful pretrial detention

amounting to punishment by acting with deliberate indifference to his health and safety.

202.   New York State's HALT Act and the Mandela Rules define solitary confinement as

confinement for twenty-two hours or more per day absent meaningful human contact, and

prolonged solitary as solitary confinement for more than fifteen days. Both the HALT Act and

the Mandela Rules ban the use of solitary confinement for any period of time against those with

mental or physical disabilities, and ban the use of prolonged solitary confinement under any

set of circumstances— flatly denouncing the practice as torture. Moreover, according to

Senator Elizabeth Warren, the Federal Government's practice of using solitary confinement to

house detainees with mental or physical disabilities is wrongful, because detainees with mental

illness who have been put in solitary have died by suicide.[67]

203.   While neither New York law, international law, or the words of a sitting United States Senator

are controlling authority in this case, when read together, they are persuasive, as the wisdom

reflected therein is indicative of the current trend in moving away from the use of solitary

confinement as a means to punish, because the damage this inhumane practice inflicts on the

human mind significantly outweighs any government interest.

---

[67] *See* Senator Elizabeth Warren's October 31, 2019, letter to the Department of Homeland Security's
Officer for Civil Rights and Liberties.

204. This statement is corroborated by an April 28, 2021, Washington Post Opinion Piece written by Tammy Gregg, the deputy director of the ACLU National Prison Project and Donna Liberman, the executive director of the New York Civil Liberties Union.

> Earlier this month, New York enacted a law affirming what medical experts, human rights advocates and survivors have been saying for years: Prolonged solitary confinement is torture.
>
> With legislators' passage of the Halt Solitary Confinement Act, New York became the first state to codify the United Nations' Nelson Mandela rules, which ban the use of solitary confinement after 15 consecutive days. This is incredible progress for New York, but work cannot stop there. Banning torture in any one state is simply not enough. It's barely a beginning.
>
> The United States has long been an extreme global outlier in the use of solitary confinement. Before the onset of covid-19, an estimated 60,000 to 100,000 people were held in solitary each day in U.S. jails and prisons — a number approximately equal to or greater than the total prison populations of many large countries, including France, Turkey and Spain. The pandemic led to a sharp increase in the use of solitary confinement in the United States, with more than 300,000 people held in these cruel and inhumane conditions as of June 2020.
>
> Solitary confinement is an indictment of the United States' criminal legal system, and its use is not an anomaly. Solitary is a microcosm of the ways U.S. prisons and jails are set up to dehumanize and traumatize people, without the slightest concern for their rehabilitation, their ability to reenter society, their well-being or the well-being of their families. The harms are particularly severe for people who are pregnant, people of color, individuals with disabilities — including mental illness or intellectual disabilities — young people, and incarcerated seniors, immigrants, and transgender people.
>
> . . .
>
> A road map to reform is already in place. For nearly a decade, survivors of solitary confinement and their family members led the fight to end long-term solitary in New York jails and prisons. Their advocacy is a model for other state-based reformers and has set the stage for significant progress in the near future.[68]

205. Petitioner asserts that Respondents were, on multiple occasions, put on notice of Petitioner's serious underlying medical condition. As stated above, petitioner notified Respondents shortly

---

[68] (See *Prolonged solitary confinement is torture. It's time for all states to ban it.* @ https://www.washingtonpost.com/opinions/2021/04/28/ban-prolonged-solitary-confinement/ (last visited on August 9, 2022).

after arriving at DC Jail. Attorney McBride has also spoken directly to this court about Petitioner's PTSD. Petitioner has also filed dozens of mental health related grievances. Clearly, Respondents have subjective knowledge of Petitioner's PTSD diagnosis.

206. Petitioner asserts that Respondents recklessly disregarded the excessive risk to Petitioner's health and safety when they repeatedly placed him in solitary confinement knowing full well that Petitioner is a pretrial detainee with documented PTSD—and in doing so, utterly disregarded the substantial risk or serious damage that it would do to his mind.

207. Petitioner asserts that Respondents that have repeatedly tortured Petitioner by placing him in prolonged solitary confinement on multiple occasions. In April of 2022, Petitioner was placed in prolonged solitary confinement for three weeks for refusing to sign a document that forced him to admit guilt to an act that he did not commit. Petitioner's mental health broke down so badly during that time that he wound up on suicide watch, prompting an April 21, 2022 wellness check from Congressman Louie Gohmert. "The fact that the DC Jail has wrongfully put Mr. Nichols, a veteran living with PTSD, in 'The Hole' is unconscionable. As such, we need you to take immediate action by investigating this matter and checking on Ryan before it is too late."[69]

208. Respondents' wanton disregard for Petitioner's serious pre-existing medical condition has already caused irreparable harm and a substantial likelihood that continued detention will result in catastrophic harm or even death. It is, therefore, certain that Petitioner has been irreparably harmed by Respondents' repeated unlawful conduct.

209. The law requires further that Petitioner prove a substantial likelihood that continued detention will result in continued harm. The aforementioned facts provide overwhelming evidence that

---

[69] *See* https://drive.google.com/file/d/1dqDNuEer_89ATKqLGRqgqX5zGeC8Cxxm/view?usp=sharing

Respondents can no longer be trusted to hold Petitioner in their custody because Respondents are utterly incapable of properly caring for Petitioner.

210. Not only have Respondents failed to meet Petitioner's basic mental health needs they have also maliciously weaponized his medical condition against him in cruel and unusual fashion. This is corroborated by the fact that Petitioner— a United States citizen Pretrial detainee with a serious underlying medical condition, with no criminal record or prior history of violence, continues to be psychologically harmed by Respondents at this very moment, so much so that on August 8, 2022, Congressman Gohmert sent a follow up letter to Director Davis of the US Marshals Service:[70]

> As I relayed in my prior letter, Mr. Nichols continues to be mistreated and his constitutional rights have been repeatedly violated since first arriving at the DC Jail. These violations include disgusting conditions of confinement, lack of access to proper grooming products, lack of access to his discovery, confiscation of discovery, and the wrongful use of prolonged solitary confinement.
>
> . . .
>
> The fact the DC Jail wrongfully put Mr. Nichols, a veteran living with PTSD, in "the hole" is objectively wrong. The fact that he remained in solitary confinement for three weeks is unequivocally unconstitutional. The fact that he requested the intervention of a mental health professional, did not get the help he needed, and ended up on suicide watch, is unconscionable.

### SECOND CLAIM FOR RELIEF: RESPONDENT'S ILLEGAL USE OF SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

211. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are illegally punishing him in violation of his constitutional rights, by repeatedly placing him in solitary confinement.

212. As stated above, there are serious moral questions regarding whether the medieval practice of solitary confinement is acceptable in our modern world. Eighteen states have banned or limited

---

[70] *See* https://drive.google.com/file/d/1dtttwNnS1Mr6hCgJiS14nuswJR3He9WA/view?usp=sharing.

the practice of solitary confinement. New York State law and the United Nations recognize solitary confinement as a form of punishment and prohibit its use against persons with physical or psychological disabilities, pregnant women, those in the first 8 weeks of postpartum recovery, and inmates under 21 or older than 55.

213. The logic is simple, people who are in a weakened state should not be subjected to solitary confinement, not even for even one day, because solitary confinement is the kind of punishment that will expose an already sick or weakened person to unnecessary suffering or serious complications. The reasonable conclusion, therefore, is that solitary confinement should not be used against pretrial detainees except in a very limited set of circumstances— because pretrial detainees are not allowed to be punished.

214. Because Petitioner is a pretrial detainee with PTSD, a severe underlying medical condition, he should have never been placed in solitary confinement— not even for one day. Be that as it may, DC Jail held Petitioner in prolonged confinement for the first almost nine months of detention. More recently, he was held for three weeks under false pretenses and driven to the point of suicide. The evidence, therefore, that his Fifth Amendment due process rights to be free from punishment have been grossly violated— is overwhelming.

### THIRD CLAIM FOR RELIEF: RESPONDENT'S ILLEGAL USE OF PROLONGED SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE AND THE EIGHTH AMENDMENT'S CRUEL AND UNUSUAL PUNISHMENT CLAUSE

215. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are subjecting him to cruel and unusual punishment by locking him in prolonged solitary confinement with the full knowledge that he has a serious pre-existing medical condition, and by doing so violating his Fifth and Eighth Amendment rights.

216. As noted above, prolonged solitary confinement is recognized as torture under New York State and International Law. The use of prolonged solitary confinement, in the context of pretrial

detention, therefore, is flatly illegal because there is no question as to whether prolonged solitary confinement is punishment. The question is whether it is torture.

217.   According to the ACLU's July 2013 report "A Death Before Dying: Solitary Confinement on Death Row" empirical research consistently demonstrates that prisoners subjected to isolation suffer many of the same symptoms caused by physical torture and demonstrate a litany of negative physiological and psychological reactions including hypersensitivity to external stimuli, perceptual distortions and hallucinations, increased anxiety and nervousness, fears of persecution, lack of impulse control, severe chronic depression, appetite, and weight loss, heart palpitations, withdrawal, blunting of affect and apathy, talking to oneself, headaches, problems sleeping, confused thought processes, nightmares, dizziness, self-mutilation, lower levels of brain function– including a decline in EEG after seven days of solitary, and increased suicide rates. As one prison psychiatrist noted, "it's a psychiatric concept; if you put people in isolation, they will go insane… Most people in isolation will fall apart."[71]

218.   The use of prolonged solitary confinement against a convicted inmate with a serious underlying medical condition is unconscionable, and exactly the kind of cruel and unusual punishment that the Eighth Amendment of the United States Constitution is meant to protect against. It is, therefore, particularly egregious and unfortunate that in this case, these horrible acts have been committed against a United States Citizen detainee with a serious underlying medical condition.

---

[71] *See* A Death Before Dying: Solitary Confinement on Death Row @
https://www.aclu.org/sites/default/files/field_document/deathbeforedying-report.pdf (last visited on April 25, 2022)

**FOURTH CLAIM FOR RELIEF: RESPONDENT'S REPEATED INTERFERENCE WITH PETITIONER'S RIGHT TO COUNSEL AND MEANINGFULLY PARTICIPATE IN HIS DEFENSE VIOLATES PETITIONER'S SIXTH AMENDMENT RIGHTS**

219. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are subjecting him to unlawful pretrial detention because Respondents have repeatedly and deliberately interfered with Petitioner's Sixth Amendment Right meaningfully participate in his defense.

220. As stated above, Petitioner's attorney-client privileged calls are routinely and illegally monitored, which is something that has happened since he was first detained.

221. Petitioner routinely has his discovery confiscated without ever being given notice or being told why his discovery is being taken. His discovery was confiscated in November of 2021 while he was preparing for his December 20, 2021 bail hearing. Because of this, Petitioner was precluded from being able to review videos, reports, and meaningfully participate in his defense during the entire time that we were writing a reply brief to his bail motion.

222. Around December 10, 2021, after Petitioner complained about not receiving access to his discovery for a reply motion that was due, the jail removed his ability to access the law library.

223. At the same time, right after he confronted the jail, they prevented him from making legal calls to his lawyer. Prior to this deprivation, he was making calls on a regular basis, working closely with his attorney to prepare a defense. The jail disrupted that routine, grinded it to a halt, and prevented him from participating in his defense.

224. Petitioner was denied access to his discovery for the entire month of May 2022.

225. Petitioner also has a constitutional right to meaningfully participate in his defense. Respondent Garland successfully argued for Petitioner to be held without bond during the coronavirus pandemic. His Department of Justice was granted multiple speedy trial waivers during that time, understanding that discovery would be produced to Petitioner on a rolling basis. Not only

has Respondent Garland failed to adequately provide Petitioner with his discovery, Respondent Garland has also prohibited Petitioner from using the Relativity database to access his discovery for unjustifiable reasons. Attorney McBride has raised the Relativity database issue in front of this court several times, and on three separate occasions, the Hon. Judge Thomas Hogan has instructed the Government to grant Petitioner access to the Relativity database. Despite clear instruction from this Honorable Court, Petitioner remains without access to Relativity as of the day of this writing.

### FIFTH CLAIM FOR RELIEF:  RESPONDENT'S REPEATED RETALIATION FOR SPEAKING TO THE PRESS AND MEMBERS OF CONGRESS ABOUT HIS UNLAWFUL DETENTION VIOLATES PETITIONER'S FIRST AMENDMENT RIGHTS

226. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents' mistreatment and punishment of Petitioner while he is in their custody was done in retaliation for exercising his First Amendment rights of speech and to petition Respondents and Members of Congress to redress his grievances.

227. Petitioner's attorney-client privileged calls have been routinely and illegally monitored since he was first detained. This deliberate interference with the sacred attorney-client privileged relationship is illegal and violates Petitioner's Sixth Amendment right to counsel.

## IX.    CONCLUSION

228. Respondents have repeatedly violated Petitioner's due process rights as a pretrial detainee to be free from punishment while he is being detained for trial. Respondents have also violated Petitioner's right to be free from cruel and unusual punishment by locking Petitioner in prolonged solitary confinement under circumstances that violate his human and civil rights.

229. Respondents have also treated Petitioner's serious underlying medical condition with deliberate indifference. Respondents have not only failed to properly care for Petitioner but have exacerbated his medical condition by purposely inflicting new traumas that nearly led Petitioner to take his own life. The new trauma and psychological damage that has already

been inflicted through unlawful punishment and torture have already altered the course of his life. As a result of his treatment at the DC Jail, Prior to his detainment, Petitioner already had a high risk of suicide due to his experiences in the military and as a rescue worker. Now, as a result of his unlawful treatment at the DC Jail, Petitioner has an even higher risk for developing serious and potentially fatal symptoms of PTSD. Petitioner is at grave risk for continued serious injury or death if he remains in Respondents' custody, as such, Petitioner must be released at once.

## X.    PRAYER FOR RELIEF

230.    Petitioner respectfully requests that this Court:

a.   Grant this Writ and an Order under 28 U.S.C. § 1331, 28 U.S.C. §§ 2201–02, and Federal Rules of Civil Procedure 57 and 65 declaring that Petitioner is being held in violation of his Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, and to Order the Petitioner to be immediately released from Respondents' unlawful custody;

b.   Enter a temporary restraining order, preliminary injunction, and a permanent injunction banning the use of solitary confinement and prolonged solitary confinement against pretrial detainees;

c.   Pending final resolution of this petition, and pursuant to this Court's inherent powers, order Respondents to take all steps necessary to effectuate Petitioner's prompt release to his wife Bonnie Nichols or order an expedited hearing on the Petition;

i.    Award the writ or issue an order directing the Respondents to show cause why the writ should not be granted, pursuant to 28 U.S.C. 2243, within three days;

ii.   Appoint an expert under Federal Rules of Evidence 706 to conduct independent site visits at DC Jail's CTF and make recommendations to the Court about the best practices for housing pretrial detainees;

iii.     Award Petitioner his attorney's fees and costs; and

iv.    Grant such other relief as the Court may deem necessary and appropriate.

Dated: New York, NY
August 10, 2022

Respectfully submitted,

/s/ Joseph D. McBride, Esq.
Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com
*Counsel for Petitioner*

/s/ Jonathan S. Gross, Esq.
*admission pending*
Bar ID: MD1912170138
2833 Smith Ave., Suite 331
Baltimore, MD 21209
p: (443) 813-0141
e: jon@clevengerfirm.com
*Counsel for Petitioner*



PP 4210.2
Attachment J
Inmate Institutional Work Program

# DC DEPARTMENT OF CORRECTIONS
## WORK PERFORMANCE RATING – INMATE

| Inmate's Name Ryan Nichols | DCDC # | Date 8/12/2021 |
|---|---|---|

| Evaluation Period (Month/Year) June - Aug | Squad A&B | Position/Grade Head Unit Detail |
|---|---|---|

**1. Quality of Work**

| | | |
|---|---|---|
| ✓ | Excellent | Does superior work. Does more work than is expected or required. |
| | Satisfactory | Makes fewer mistakes than most workers at this level of training/work. |
| | Good | Acceptable level of work. Produces average volume of work. |
| | Fair | Often makes mistakes; often completes less work than others of same skill level. |
| | Unsatisfactory | Repeatedly makes errors, shows little interest in producing better quality, low output. |

**2. Quantity of Work**

| | | |
|---|---|---|
| ✓ | Excellent | Superior work and exceeds expected productivity. |
| | Good | Motivated to work; does full days work, wastes little time. |
| | Satisfactory | Works steadily but does not push to exceed. |
| | Fair | Does just enough to get by, has to be encouraged to do more. |
| | Unsatisfactory | Very low output, must be prompted to complete work. |

**3. Initiative**

| | | |
|---|---|---|
| ✓ | Excellent | Good ideas to improve work, does work to improve skills, works with positive attitude. |
| | Good | Adapts well to change, works to improve skills, works with above average interest. |
| | Satisfactory | Starts work without being told, generally works with a positive attitude. |
| | Fair | Shows minimal interest, usually relies on others to say what needs to be done. |
| | Unsatisfactory | Shows little job interest, waits to be told what to do, works with a negative attitude. |

**4. Dependability, Safety, Care of Equipment**

| | | |
|---|---|---|
| ✓ | Excellent | Work is very reliable, consistent and thorough, always completes tasks on time. |
| | Good | Work is usually reliable and consistent. |
| | Satisfactory | Completes work on time . |
| | Fair | Work is sometimes unreliable, satisfied to complete a minimum of work. |
| | Unsatisfactory | Work is usually unreliable. Does not accept responsibility and gives up easily. |

**5. Response to Supervision**

| | | |
|---|---|---|
| ✓ | Outstanding | Makes a real effort to please supervisor, does exactly what is required. |
| | Good | Accepts feedback well, tries to improve. |
| | Satisfactory | Generally does what is told, accepts instruction, feedback. |
| | Fair | Resists or ignores suggestions. |
| | Unsatisfactory | Responds with hostility towards work assignments, regularly argues with supervisor. |

**6. Overall Job Proficiency:** If in community based upon inmate's performance would you:

| | |
|---|---|
| ✓ | Promote this inmate to a more demanding job at a higher rate of pay |
| | Raise this inmate's pay but keep individual at same job |
| | Continue to employ this inmate but would not recommend for promotion or pay raise |
| | Transfer this inmate to a less demanding job at a lower rate of pay |
| | Terminate inmate's employment |

| Supervisor's Signature M. ABdullah | Date 8/12/2021 |
|---|---|
| Inmate's Signature Ryan Nichols | Date 8/12/21 |
| Inmate's Response | |

Original — Inmate's Institutional File
Copy — Inmate Worker
— Squad Supervisor

*Note: Resident Nichols serves as Head Xtrl. Outstanding with maintaining Covid Compliance as far as unit Sanitation. No disciplinary or behavioral concerns. Status report submitted to Zone Supervisor.



PP 4210.2
Attachment J
Inmate Institutional Work Program

# DC DEPARTMENT OF CORRECTIONS
## WORK PERFORMANCE RATING – INMATE

| Inmate's Name | | | DCDC # | Date |
|---|---|---|---|---|
| Ryan Nichols | | | 376795 | 8/17/21 |

| Evaluation Period (Month/Year) | | Squad | Position/Grade |
|---|---|---|---|
| | | | |

**1. Quality of Work**

| | | |
|---|---|---|
| X | Excellent | Does superior work. Does more work than is expected or required. |
| | Satisfactory | Makes fewer mistakes than most workers at this level of training/work. |
| | Good | Acceptable level of work. Produces average volume of work. |
| | Fair | Often makes mistakes; often completes less work than others of same skill level. |
| | Unsatisfactory | Repeatedly makes errors, shows little interest in producing better quality, low output. |

**2. Quantity of Work**

| | | |
|---|---|---|
| X | Excellent | Superior work and exceeds expected productivity. |
| | Good | Motivated to work; does full days work, wastes little time. |
| | Satisfactory | Works steadily but does not push to exceed. |
| | Fair | Does just enough to get by, has to be encouraged to do more. |
| | Unsatisfactory | Very low output, must be prompted to complete work. |

**3. Initiative**

| | | |
|---|---|---|
| X | Excellent | Good ideas to improve work, does work to improve skills, works with positive attitude. |
| | Good | Adapts well to change, works to improve skills, works with above average interest. |
| | Satisfactory | Starts work without being told, generally works with a positive attitude. |
| | Fair | Shows minimal interest, usually relies on others to say what needs to be done. |
| | Unsatisfactory | Shows little job interest, waits to be told what to do, works with a negative attitude. |

**4. Dependability, Safety, Care of Equipment**

| | | |
|---|---|---|
| X | Excellent | Work is very reliable, consistent and thorough, always completes tasks on time. |
| | Good | Work is usually reliable and consistent. |
| | Satisfactory | Completes work on time . |
| | Fair | Work is sometimes unreliable, satisfied to complete a minimum of work. |
| | Unsatisfactory | Work is usually unreliable. Does not accept responsibility and gives up easily. |

**5. Response to Supervision**

| | | |
|---|---|---|
| X | Outstanding | Makes a real effort to please supervisor, does exactly what is required. |
| | Good | Accepts feedback well, tries to improve. |
| | Satisfactory | Generally does what is told, accepts instruction, feedback. |
| | Fair | Resists or ignores suggestions. |
| | Unsatisfactory | Responds with hostility towards work assignments, regularly argues with supervisor. |

**6. Overall Job Proficiency:** If in community based upon inmate's performance would you:

| | |
|---|---|
| X | Promote this inmate to a more demanding job at a higher rate of pay |
| | Raise this inmate's pay but keep individual at same job |
| | Continue to employ this inmate but would not recommend for promotion or pay raise |
| | Transfer this inmate to a less demanding job at a lower rate of pay |
| | Terminate inmate's employment |

| Supervisor's Signature | Date 8/17/21 |
|---|---|
| Inmate's Signature Ryan Nichols | Date 8/17/21 |
| Inmate's Response | |

Original    Inmate's Institutional File
Copy      Inmate Worker
           Squad Supervisor



PP 4210.2
Attachment J
Inmate Institutional Work Program

# DC DEPARTMENT OF CORRECTIONS
## WORK PERFORMANCE RATING – INMATE

| Inmate's Name Nichols, Ryan | | DCDC # 376-795 | Date 8-24-21 |
|---|---|---|---|
| Evaluation Period (Month/Year) August 2021 | Squad C2B | Position/Grade Unit Detail | |

**1. Quality of Work**

| | | |
|---|---|---|
| ✓ | Excellent | Does superior work. Does more work than is expected or required. |
| | Satisfactory | Makes fewer mistakes than most workers at this level of training/work. |
| | Good | Acceptable level of work. Produces average volume of work. |
| | Fair | Often makes mistakes; often completes less work than others of same skill level. |
| | Unsatisfactory | Repeatedly makes errors, shows little interest in producing better quality, low output. |

**2. Quantity of Work**

| | | |
|---|---|---|
| ✓ | Excellent | Superior work and exceeds expected productivity. |
| | Good | Motivated to work; does full days work, wastes little time. |
| | Satisfactory | Works steadily but does not push to exceed. |
| | Fair | Does just enough to get by, has to be encouraged to do more. |
| | Unsatisfactory | Very low output, must be prompted to complete work. |

**3. Initiative**

| | | |
|---|---|---|
| ✓ | Excellent | Good ideas to improve work, does work to improve skills, works with positive attitude. |
| | Good | Adapts well to change, works to improve skills, works with above average interest. |
| | Satisfactory | Starts work without being told, generally works with a positive attitude. |
| | Fair | Shows minimal interest, usually relies on others to say what needs to be done. |
| | Unsatisfactory | Shows little job interest, waits to be told what to do, works with a negative attitude. |

**4. Dependability, Safety, Care of Equipment**

| | | |
|---|---|---|
| ✓ | Excellent | Work is very reliable, consistent and thorough, always completes tasks on time. |
| | Good | Work is usually reliable and consistent. |
| | Satisfactory | Completes work on time . |
| | Fair | Work is sometimes unreliable, satisfied to complete a minimum of work. |
| | Unsatisfactory | Work is usually unreliable. Does not accept responsibility and gives up easily. |

**5. Response to Supervision**

| | | |
|---|---|---|
| ✓ | Outstanding | Makes a real effort to please supervisor, does exactly what is required. |
| | Good | Accepts feedback well, tries to improve. |
| | Satisfactory | Generally does what is told, accepts instruction, feedback. |
| | Fair | Resists or ignores suggestions. |
| | Unsatisfactory | Responds with hostility towards work assignments, regularly argues with supervisor. |

**6. Overall Job Proficiency:** If in community based upon inmate's performance would you:

| | |
|---|---|
| ✓ | Promote this inmate to a more demanding job at a higher rate of pay |
| | Raise this inmate's pay but keep individual at same job |
| | Continue to employ this inmate but would not recommend for promotion or pay raise |
| | Transfer this inmate to a less demanding job at a lower rate of pay |
| | Terminate inmate's employment |

| Supervisor's Signature *N. Dubla* | Date 8-24-21 |
|---|---|
| Inmate's Signature *Ryan Nichols* | Date 8/24/21 |
| Inmate's Response | |

| Original | Inmate's Institutional File |
|---|---|
| Copy | Inmate Worker |
| | Squad Supervisor |

*Inmate Nichols goes above & beyond his job duties. Always shows respect and will do watever is asked of him.



PP 4210.2
Attachment J
Inmate Institutional Work Program

## DC DEPARTMENT OF CORRECTIONS
## WORK PERFORMANCE RATING – INMATE

| Inmate's Name | | | DCDC # | Date |
|---|---|---|---|---|
| Nichols, Ryan | | | 376-795 | 9/1/2021 |
| Evaluation Period (Month/Year) | | Squad | Position/Grade | |
| 3/8/21-Present | | In-house | | |

**1. Quality of Work**

| | | |
|---|---|---|
| X | Excellent | Does superior work. Does more work than is expected or required. |
| | Satisfactory | Makes fewer mistakes than most workers at this level of training/work. |
| | Good | Acceptable level of work. Produces average volume of work. |
| | Fair | Often makes mistakes; often completes less work than others of same skill level. |
| | Unsatisfactory | Repeatedly makes errors, shows little interest in producing better quality, low output. |

**2. Quantity of Work**

| | | |
|---|---|---|
| X | Excellent | Superior work and exceeds expected productivity. |
| | Good | Motivated to work; does full days work, wastes little time. |
| | Satisfactory | Works steadily but does not push to exceed. |
| | Fair | Does just enough to get by, has to be encouraged to do more. |
| | Unsatisfactory | Very low output, must be prompted to complete work. |

**3. Initiative**

| | | |
|---|---|---|
| X | Excellent | Good ideas to improve work, does work to improve skills, works with positive attitude. |
| | Good | Adapts well to change, works to improve skills, works with above average interest. |
| | Satisfactory | Starts work without being told, generally works with a positive attitude. |
| | Fair | Shows minimal interest, usually relies on others to say what needs to be done. |
| | Unsatisfactory | Shows little job interest, waits to be told what to do, works with a negative attitude. |

**4. Dependability, Safety, Care of Equipment**

| | | |
|---|---|---|
| X | Excellent | Work is very reliable, consistent and thorough, always completes tasks on time. |
| | Good | Work is usually reliable and consistent. |
| | Satisfactory | Completes work on time . |
| | Fair | Work is sometimes unreliable, satisfied to complete a minimum of work. |
| | Unsatisfactory | Work is usually unreliable. Does not accept responsibility and gives up easily. |

**5. Response to Supervision**

| | | |
|---|---|---|
| X | Outstanding | Makes a real effort to please supervisor, does exactly what is required. |
| | Good | Accepts feedback well, tries to improve. |
| | Satisfactory | Generally does what is told, accepts instruction, feedback. |
| | Fair | Resists or ignores suggestions. |
| | Unsatisfactory | Responds with hostility towards work assignments, regularly argues with supervisor. |

**6. Overall Job Proficiency:** If in community based upon inmate's performance would you:

| | |
|---|---|
| X | Promote this inmate to a more demanding job at a higher rate of pay |
| | Raise this inmate's pay but keep individual at same job |
| | Continue to employ this inmate but would not recommend for promotion or pay raise |
| | Transfer this inmate to a less demanding job at a lower rate of pay |
| | Terminate inmate's employment |

| Supervisor's Signature | Date |
|---|---|
| Sgt. S. Franklin *Sgt S Frnk* | 9/1/2021 |
| Inmate's Signature | Date |
| *Ryan Nichols* | 9/1/21 |
| Inmate's Response | |

Original — Inmate's Institutional File
Copy — Inmate Worker
Squad Supervisor

**Work Performance Comments**

Inmate Nichols, Ryan DCDC 376-795 has been housed in housing unit C2B since entering the Correctional Treatment Facility. Inmate Nichols, Ryan has been an outstanding contribution to C2B since being assigned to the housing unit and the detail squad. His natural leadership ability has been steadfast and unwavering.  Inmate Nichols gives 100% effort in every assignment that is given to him. Since entering the Correctional Treatment Facility Inmate Nichols  hasn't had any adverse action or any Disciplinary Reports for negative institutional behavior, in fact Inmate Nichols consistently shows positive institutional behavior with all staff and the entire inmate population assigned to housing unit C2B. Inmate Nichols is a mentor that is used daily by uniform and non-uniform staff assigned to the housing unit.  Inmate Nichols has been many assignments with little to no supervision. Inmate Nichols  is a morale booster, counselor amongst the Inmate Population assigned to housing unit C2B, his ability to quarrel  disputes between others inmate's is outstanding.  I recommend that Inmate Nichols be given the next position based off of his excellent work ethic and his ability to continue to display his positive institutional behavior.

Sergeant Shawn Franklin

Correctional Treatment Facility

C Building Zone Supervisor

**Work Performance Comments**

Inmate Nichols, Ryan DCDC 376-795 has been housed in housing unit C2B since entering the Correctional Treatment Facility. Inmate Nichols, Ryan has been an outstanding In-housed detail squad member since he had been assigned to the detail squad since March 9, 2021. His assignment   is to ensure the cleanliness of the entire housing unit with little to no supervision. Inmate Nichols, Ryan is consistently shows positive institutional behavior with all staff and the entire inmate population assigned to housing unit C2B. Inmate Nichols, Ryan gives 100% effort in every assignment that is given to him. Inmate Nichols, Ryan is a mentor that is used daily by uniform and non-uniform staff assigned to the housing unit. Inmate Nichols, Ryan is a morale booster amongst the inmate population.

Sgt. Shawn Franklin

C Building Zone Supervisor

Ryan Nichols                                                    Final Copy

# Work Performance Write-Up

Ryan Nichols has been an outstanding member of the detail unit in Pod C-2B since April 16th. He oversees the unit's sanitation and cleanliness, follows all instructions given to him, and gives 100% effort in every task. Mr. Nichols is consistently polite and respectful to all officers and fellow inmates. Last, but certainly not least, Mr. Nichols is a problem solver. When morale is low, Ryan finds a way to uplift the spirits of those around him in order to create a safe, positive, and stable environment.

**DCOL Family Medical**
805 Medical Circle Drive   Longview, TX 75605
903-232-8100  Fax: 903-232-8115

**Print Date:** *November 3, 2021*
Page 1
Chart Summary

**Document Date:** November 3, 2021

**RYAN NICHOLS**
Male  DOB: 12/06/1990

342522-1-DCL

Home: (903)407-8990
Ins: BLUE ADV (1) Grp: 245922

## Patient Information

| | | | |
|---|---|---|---|
| **Name:** | RYAN NICHOLS | **Home Phone:** | (903)407-8990 |
| **Address:** | 110 LACEBARK LN | **Work Phone:** | |
| | LONGVIEW, TX  75605 | | |
| **Patient ID:** | 407541-2562001 | **Fax:** | |
| **Birth Date:** | 12/06/1990 | **Status:** | Active |
| **Gender:** | Male | **Marital Status:** | Married |
| **Contact By:** | Cell Phone | **Race:** | White |
| **Soc Sec No:** | | **Language:** | English |
| **Resp Prov:** | Wendy Wilson, APRN FNP-C | **MRN:** | |
| **Referred by:** | | **Emp. Status:** | |
| **Email:** | ryannichols-32@hotmail.com | **Sens Chart:** | No |
| **Home LOC:** | Diagnostic Clinic of Longview | **External ID:** | 342522-1-DCL |

## Problems

VITAMIN D DEFICIENCY (ICD-268.9) (ICD10-E55.9)
HYPOTHYROIDISM (ICD-244.9) (ICD10-E03.9)
PTSD (ICD-309.81) (ICD10-F43.10)
ANXIETY (ICD-300.00) (ICD10-F41.9)
DIVERTICULITIS (ICD-562.11) (ICD10-K57.92)
FLANK PAIN, LEFT (ICD-789.09) (ICD10-R10.9)
PAIN IN THORACIC SPINE (ICD-724.1) (ICD10-M54.6)
LOW BACK PAIN (ICD-724.2) (ICD10-M54.5)
DERMATITIS (ICD-692.9) (ICD10-L30.9)
POLYARTHRALGIA (ICD-719.49) (ICD10-M25.50)
ABNORMAL THYROID FUNCTION STUDY (ICD-794.5) (ICD10-R94.6)

## Procedures

## Medications

EPIPEN 2-PAK 0.3 MG/0.3ML INJECTION SOLUTION AUTO-INJECTOR (EPINEPHRINE) use as directed as needed for anaphylaxis
Last Refill: #1[Prefilled Pen Syrnge] x 0, 11/27/2018, Wendy Wilson, APRN FNP-C
SERTRALINE 50MG TABLETS (SERTRALINE HCL) TAKE 1 TABLET BY MOUTH ONCE DAILY
Last Refill: #90[Tablet] x 3, 10/23/2019, Wendy Wilson, APRN FNP-C
LEVOTHYROXINE SODIUM 100 MCG ORAL TABLET (LEVOTHYROXINE SODIUM) 1 tab by mouth once a day
Last Refill: #90[Tablet] x 3, 10/23/2019, Wendy Wilson, APRN FNP-C

## Immunizations

## Directives

HIPAA DISCLOSURE  CAN SPEAK TO WIFE BONNIE , MOM PATTI NICHOLS, MOM IN LAW  LISA CHATHAM , CAN LEAVE MESSAGE
WIFE BONNIE  832 364 8432

## Allergies and Adverse Reactions

Report run by Nellie Gruver

**DCOL Family Medical**
805 Medical Circle Drive  Longview, TX 75605
903-232-8100  Fax: 903-232-8115

**Document Date:** November 3, 2021

**RYAN NICHOLS**                                                                Home: (903)407-8990
Male  DOB: 12/06/1990                    342522-1-DCL          Ins: BLUE ADV (1) Grp: 245922

CIPRO (Critical)
FLAGYL (Critical)

**Services Due**
TD BOOSTER or TDAP, BP DIASTOLIC, BP SYSTOLIC, COLONOSCOPY.

RECEIVED
4/1/2022

RECEIVED COMPLETED RECEIVED

DOC Staff Print Name_____ Sign Name_____ Date_____
MAR 3 0 2022
By_____

PP 4030.1
Attachment C

| DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS **INMATE INFORMAL RESOLUTION COMPLAINT FORM** | TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR **IGP NUMBER:** # _20220330-526_ |

**DOC**
THE DEPARTMENT OF CORRECTIONS

## STEP 1: INFORMAL RESOLUTION (To be completed by Inmate)
- Inmate has five (5) days after triggering incident to submit request.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within seven (7) business days.

| INMATE NAME: Ryan Nichols | DCDC#: 376795 | UNIT: C2B | DATE: 3/24/22 |

### SELECT DEPARTMENT/SERVICES NEEDED:

| | | |
|---|---|---|
| ○ Facility Transfer | ○ Property | ○ Facilities Management |
| ○ Fire Safety and Sanitation /Risk Management | ○ Sentence computation, jail credit, over detention | ○ Discrimination |
| ○ Program and Activities | ○ Finance | ○ Transportation |
| ○ Personal Hygiene | ○ Rules and Regulations | ○ Safety and Security |
| ○ Case Management Services | ○ Staff Treatment | ✓ Other |
| ✓ Health Care | ○ Food Service | |
| ○ Communications (mail, visits, telephone, legal) | ○ Religious Services | |

DATE OF INCIDENT: 3/21/22    TIME OF INCIDENT: All Day    OFFENDER: DC DOC

REASON FOR COMPLAINT: On 3/21/22 after returning from my medical visit, I put in a mental Health request. Kenny Harrelson witnessed me put this mental health request in. Since then, I have not been seen by medical, or asked about my mental health status. To date, I have put in multiple requests about mental health, and also have IGP's about my mental health due to my conditions of confinement effecting my diagnoses

INMATE SIGNATURE: _____    DATE: 3/24/22

PTSD. I would like to be seen at mental health, Please. Thank you.

### *** FOR DOC COMPLETION *** Provide response to the IGP Coordinator no later than 4/5/22

DOC RESPONSE: _Seen For Mental Health Appointment on 3/25/2022 And 3/30/2022. Grievance Resolved_

PRINT RESPONDER NAME: _____    RESPONDER SIGNATURE: _____    DATE: 4/1/2022

DEPARTMENT: _____    MANAGER NAME: Covid-19    MANAGER SIGNATURE: _____

INMATE GRIEVANCE COORDINATOR SIGNATURE: _____    DATE: 4/11/2022

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

Witnessed By: Kenneth Harrelson

Revised 3/2019

PP 4030.1
Attachment D

DOC Staff: Print Name:_____ Signature:_____ Date:_____

### DISTRICT OF COLUMBIA
### DEPARTMENT OF CORRECTIONS
### INMATE FORMAL GRIEVANCE FORM

DOC
THE DEPARTMENT OF CORRECTIONS

TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR
IGP NUMBER:
# 20220420-921

**STEP 2: FORMAL GRIEVANCE (To be completed by Inmate)**
- Inmate has five (5) days after receiving response to Informal Resolution to submit Formal Grievance form.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within fifteen (15) business days.

| INMATE NAME: Ryan Nichols | DCDC#: 376795 | UNIT: C2B | DATE: 4/13/22 |

**SELECT DEPARTMENT/SERVICES:**

- o Facility Transfer
- o Fire Safety and Sanitation /Risk Management
- o Program and Activities
- o Personal Hygiene
- o Case Management Services
- o Health Care
- o Communications (mail, visits, telephone,

- o Property
- o Sentence computation, jail credit, over detention
- o Finance
- o Rules and Regulations
- o Staff Treatment
- o Food Service
- o Religious Services

- o Facilities Management
- o Discrimination
- o Transportation
- o Safety and Security
- o Other

FOR INMATE: Has this issue been resolved? YES ☐ or NO ☑ If no, check the "NO" box and place this form in the housing unit IGP Box with a copy of the INFORMAL RESOLUTION FORM WITH RESPONSE.

REASON NOT RESOLVED: In response to Informal Grievance # 20220330-526:
My mental health appointment on 3/25/22 lasted 3-5 minutes, and was ONLY to schedule an appointment with the therapist. My mental health appointment on 3/30/22 was with the therapist, and only lasted around 10 minutes. I spoke for the majority of the time, explained about my PTSD and conditions of confinement, and was told that there "Is no long term mental health therapy at DC DOC." The therapist said she would check in with me

INMATE SIGNATURE: _____ DATE: 4/13/22

*** FOR DOC COMPLETION *** Provide response to the IGP Coordinator no later than _____

DOC RESPONSE: Inmate Nichols has been seen on 3/25/22 + 3/30/22 for evaluation. Per Bruce Reid, he will have a follow up appointment to discuss long term therapy options. Grievance resolved.

PRINT RESPONDER NAME: DeVora Jones RESPONDER SIGNATURE: DeVora Jones DATE: 4/20/22
DEPARTMENT: DHSA MANAGER NAME: Beth Jordan MANAGER SIGNATURE: BJ
INMATE GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 4/20/2022

In 2 weeks. As an honorably discharged Marine Corps veteran with PTSD, I need and deserve more help than 10 minutes every 2 weeks of mental health care. ALSO, Manager Names, etc not filled out correctly.

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

12/2019

*(left margin, handwritten vertically)* Witnessed By: Sgt Kenneth Harrelson U.S. Army

DOC Staff: Print Name: _____

PP 4030.1
Attachment F

Sign Name: _____  Date: _____

RECEIVED
APR 25 2022
By _____

★ ★ ★

**DOC**
**THE DEPARTMENT OF CORRECTIONS**

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
**WARDEN'S ADMINISTRATIVE
REMEDY FORM**

TO BE COMPLETED BY INMATE GRIEVANCE
COORDINATOR
**IGP NUMBER:**
# 20220425-991

## STEP 3: REQUEST FOR WARDEN'S ADMINISTRATIVE REMEDY

- Inmate has five (5) days from receipt of Formal Grievance response to submit request.
- Place this form in the housing unit IGP box. The Warden will issue a response to the grievance within fifteen (15) business days of receipt.
- If the issue has not been resolved, inmate has five (5) business days from receipt of response from the Warden to submit an Appeal - Deputy Director Form with ALL prior responses attached and placed in the IGP Box.

| INMATE NAME: | DCDC#: | UNIT: | DATE: |
|---|---|---|---|
| Ryan Nichols | 376795 | CZB SMV-A | 4/21/22 |

**REASON FOR APPEAL:** In response to IGP (Formal) # 20220420-920: I was not seen for evaluation on 3/25/22. That was to schedule my appointment with a therapist on 3/30/22. On 3/30/22, I was told there was no long term mental health treatment at DC DOC, but would be checked on again in 2 weeks. Today, 3 weeks later, I have still not been checked in on, and my conditions of confinement have become worse, triggering my anxiety and depression that comes with my diagnosed PTSD. My Mental Health Medication was not delivered this morning, even though I asked for it multiple times. I am also now sitting in solitary confinement in segregation as punishment for not signing a form

INMATE SIGNATURE: ~~_____~~  DATE: 4/21/22

*** FOR DOC COMPLETION *** Provide response to IGP Coordinator no later than 5/13/22.

**WARDEN'S RESPONSE:** _____

*No response, Elevated to next level.*

WARDEN SIGNATURE: _____  DATE: _____

INMATE GRIEVANCE COORDINATOR SIGNATURE: _____  DATE: 5/27/22

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

that has nothing to do with me, over an apparent incident that I was never made aware of, and won't know about until 4/27/22 when the housing board returns. This feels retaliatory and discriminitive, as I have often IGPs on this issue. This entire situation is only contributing to a further decline in my mental health.

12/2019

RECEIVED COMPLETED RECEIVED
5/9/2022     MAY 16 2022

DOC Staff: Print Name: _____ Sign Name: _____     Date: _____     Attachment G

By _____

PP 4030.1

★ ★ ★

**DOC**
THE DEPARTMENT
OF CORRECTIONS

_Informal_

| DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS **APPEAL – DEPUTY DIRECTOR FORM** | TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR **IGP NUMBER:** # 20220516-378 |

**STEP 3: APPEAL – DEPUTY DIRECTOR**
- Inmate has five (5) days from receipt of Wardens Administrative Remedy response to submit request.
- Place this form in the housing unit IGP box. The respective Deputy Director will respond within twenty-one (21) business days of receipt.

**SECTION A: To be completed by Inmate (Only)**

| INMATE NAME: | DCDC#: | UNIT: | DATE: |

Ryan Nichols   376795   C2B   5/15/22

**REASON FOR APPEAL:** In Response to Wardens IGP written on 4/21/22: I did not receive a response within 15+ business days, so I am escalating. I have asked for mental health care for weeks/months. My requests for help are being ignored, and I recently ended up in Medical 82 on "Suicide Pre-Caution" due to mental health requests being neglected. I left Medical 82 "Suicide Pre-caution" on 5/9/22 asking once again for mental health help from the psychiatrist and (T Lancaster. Since then, I have not been followed up with on

INMATE SIGNATURE: _____     DATE: 5/15/22

**SECTION B: To be completed by DOC (Only)**
Provide response to IGP Coordinator no later than     5/20/2022

**DEPUTY DIRECTOR RESPONSE:** _____

Seen for Mental Health Appointment on 5/17/2022
Scheduled for Follow-up Appointment with psychiatrist   E.Lau 5/23/2022

AREA: _____

DEPUTY DIRECTOR SIGNATURE: _____     DATE: 5/23/2022

- **THIS IS THE FINAL LEVEL OF REVIEW IN THE DC DEPARTMENT OF CORRECTIONS.**

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate
12/2019

the status of my mental health. I am asking the deputy director to review the informal, formal, and warden IAR's on this iss and help me get the help I am asking for.

PP 4030.1
Attachment C

DOC Staff: Print Name_____  [RECEIVED stamp: MAY 26 2022 By____]  Date_____

★ ★ ★
**DOC**
THE DEPARTMENT
OF CORRECTIONS

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
**INMATE INFORMAL RESOLUTION
COMPLAINT FORM**

TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR
**IGP NUMBER:**
# 20220527-624

## STEP 1: INFORMAL RESOLUTION (To be completed by Inmate)
- Inmate has five (5) days after triggering incident to submit request.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within seven 15 business days.

| INMATE NAME: | DCDC#: | UNIT: | DATE: |
|---|---|---|---|
| Ryan Nichols | 376795 | C2B | 5/24/22 |

SELECT DEPARTMENT/SERVICES NEEDED:

- o Facility Transfer
- o Fire Safety and Sanitation /Risk Management
- o Program and Activities
- o Personal Hygiene
- o Case Management Services
- o Health Care
- o Communications (mail, visits, telephone, legal)

- o Property
- o Sentence computation, jail credit, over detention
- o Finance
- o Rules and Regulations
- ✓ Staff Treatment
- o Food Service
- o Religious Services

- ✓ Facilities Management
- o Discrimination
- o Transportation
- o Safety and Security
- ✓ Other

DATE OF INCIDENT: 5/24/22   TIME OF INCIDENT: Evening Mail   OFFENDER: T. Campbell

REASON FOR COMPLAINT: I sent in a Mental Health IGP as an Informal, Formal, and Wardens IGP. The Informal was sent on 3/24/22, the Formal sent on 4/13/22, and both of these were answered, but not solved. I escalated to a Wardens IGP on 4/21/22, but did not receive a response within 15 business days. I escalated to a Deputy Directors IGP, but received a response by T. Campbell, who intentionally sabotaged

INMATE SIGNATURE: _____   DATE: 5/24/22

and subverted my step 4 Deputy Directors IGP by marking through the "STEP 4" and mark

**\*\*\* FOR DOC COMPLETION \*\*\* Provide response to the IGP Coordinator no later than 6/3/22.**
DOC RESPONSE:

*See attached*

PRINT RESPONDER NAME:_____   RESPONDER SIGNATURE:_____   DATE:_____

DEPARTMENT:_____   MANAGER NAME:_____   MANAGER SIGNATURE:_____

INMATE GRIEVANCE COORDINATOR SIGNATURE:_____   DATE: 6/9/202_

as "STEP 1". This was done maliciously, and directly inhibits my ability to

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

exhaust my IGP remedies. The IGP Process at DC DOC is impossible to follow through with.

Revised 3/2019

Informal Resolution Response

Ryan Nichols ID #: 376-795

IGP#: 20220527-624

After reviewing and investigating Mr. Ryan Nichols Informal Grievance regarding the IGP Coordinator T. Campbell, it was determined that there was no IGP that could be found on file where Ms. Campbell had marked though the Step 4 of The Deputy Director's Appeal and labeled this document as Step 1.

If you, Mr. Nichols have a copy of the specific document in your possession that you are referencing, please provide a copy of that IGP document to allow further investigation into this matter.

Based upon this information, there is no evidence that supports that T. Campbell intentionally or maliciously sabotaged your IGP to going to a Deputy Director's Ste 4 Appeal.

DOC Staff: Print Name_____ Sign Name_____ Date_____

PP 4030.1
Attachment C

**DISTRICT OF COLUMBIA**
**DEPARTMENT OF CORRECTIONS**
**INMATE INFORMAL RESOLUTION**
**COMPLAINT FORM**

DOC
THE DEPARTMENT
OF CORRECTIONS

TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR
**IGP NUMBER:**
#_____

## STEP 1: INFORMAL RESOLUTION (To be completed by Inmate)
- Inmate has five (5) days after triggering incident to submit request.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within seven (7) business days.

| INMATE NAME: Ryan Nichols | DCDC#: 376795 | UNIT: CZB | DATE: 5/10/22 |
|---|---|---|---|

SELECT DEPARTMENT/SERVICES NEEDED: SMU-A

| | | |
|---|---|---|
| o Facility Transfer | o Property | o Facilities Management |
| o Fire Safety and Sanitation /Risk Management | o Sentence computation, jail credit, over detention | o Discrimination |
| o Program and Activities | o Finance | o Transportation |
| o Personal Hygiene | o Rules and Regulations | ✓ Safety and Security |
| o Case Management Services | ✓ Staff Treatment | |
| ✓ Health Care | o Food Service | ✓ Other |
| o Communications (mail, visits, telephone, legal) | o Religious Services | |

DATE OF INCIDENT: 5/5/22   TIME OF INCIDENT: Evening   OFFENDER: LT Allen

REASON FOR COMPLAINT: On 5/5/22, I informed LT Allen that I was suicidal after being in SMU-A solitary confinement for 15 days. He refused to come up and have a conversation with me, and instead told me to, "put a request in." After pleading with him to come have a conversation about my situation, I informed LT Allen that I was suicidal. He turned to walk away, and said, "Sorry you feel that

| INMATE SIGNATURE: _____ | DATE: 5/10/22 |
|---|---|

way. I hope you don't die." He then turns and tells the officer on duty to write that in the book, and leaves without checking on me. I received

*** FOR DOC COMPLETION *** Provide response to the IGP Coordinator no later than_____.
DOC RESPONSE: _____
_____
_____
_____
_____

PRINT RESPONDER NAME: _____ RESPONDER SIGNATURE: _____ DATE: _____

DEPARTMENT: _____ MANAGER NAME: _____ MANAGER SIGNATURE: _____

INMATE GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: _____

No mental health care that night, or the next day, until the following evening, when I saw 4-6 officers of the state of my mental health condition.

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

Revised 3/2019

DOC Staff: Print Name_____ Sign Name_____ Date _____

PP 4030.1
Attachment C

**DISTRICT OF COLUMBIA**
**DEPARTMENT OF CORRECTIONS**
**INMATE INFORMAL RESOLUTION**
**COMPLAINT FORM**

RECEIVED
MAY 1 2 2022
By_____

TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR
**IGP NUMBER:**
# 20220512-289

**STEP 1: INFORMAL RESOLUTION (To be completed by Inmate)**
- Inmate has five (5) days after triggering incident to submit request.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within seven (7) business days.

| INMATE NAME: Ryan Nichols | DCDC#: 376795 | UNIT: CZB & SMU-A | DATE: 5/10/22 |

SELECT DEPARTMENT/SERVICES NEEDED:

- o Facility Transfer
- o Fire Safety and Sanitation /Risk Management
- o Program and Activities
- o Personal Hygiene
- o Case Management Services
- ✓ Health Care
- o Communications (mail, visits, telephone, legal)

- o Property
- o Sentence computation, jail credit, over detention
- o Finance
- o Rules and Regulations
- ✓ Staff Treatment
- o Food Service
- o Religious Services

- o Facilities Management
- o Discrimination
- o Transportation
- ✓ Safety and Security
- ✓ Other

DATE OF INCIDENT: 5/5/22   TIME OF INCIDENT: Evening   OFFENDER: LT Allen

REASON FOR COMPLAINT: On 5/5/22, I informed LT Allen that I was suicidal after being in SMU-A solitary confinement for 15 days. He refused to come up and have a conversation with me, and instead told me to, "put a request in." After pleading with him to care have a conversation about my situation, I informed LT Allen that I was suicidal. He turned to walk away, and said, "Sorry you feel that

INMATE SIGNATURE: _____ DATE: 5/10/22

way. I hope you don't die." He then turns and tells the officer on duty to write that in the book, and leaves without checking on me. I received

*** FOR DOC COMPLETION *** Provide response to the IGP Coordinator no later than 5/18/22.
DOC RESPONSE: DOC Records clearly state that this inmate received mental health treatment when it was deemed necessary in a timely manner. He stayed in medical 82's sole cell 5/6 - 5/9. He stated to this writer what if I was suicidal would my housing assignment change? He never stated that he

PRINT RESPONDER NAME: J. Dix   RESPONDER SIGNATURE: _____   DATE: 5/10/22

DEPARTMENT: _____   MANAGER NAME: COVID-19   MANAGER SIGNATURE: _____

INMATE GRIEVANCE COORDINATOR SIGNATURE: _____   DATE: 5/17/22

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

Revised 3/2019

No mental health care that night, or the next day until the following evening after I told 4-6 officers of the state of my mental health condition.

PP 4030.1
Attachment D

DOC Staff: Print Name: _____ Signature: _____ Date: _____

★ ★ ★

**DOC**
THE DEPARTMENT
OF CORRECTIONS

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
**INMATE FORMAL GRIEVANCE FORM**

TO BE COMPLETED BY INMATE GRIEVANCE COORDINATOR
**IGP NUMBER:**
# _____

**STEP 2: FORMAL GRIEVANCE (To be completed by Inmate)**
- Inmate has five (5) days after receiving response to Informal Resolution to submit Formal Grievance form.
- Place this form in the housing unit IGP box. The IGP coordinator will respond within fifteen (15) business days.

| INMATE NAME: Ryan Nichols | DCDC#: 376795 | UNIT: C2B | DATE: 5/19/22 |

SELECT DEPARTMENT/SERVICES:

- o Facility Transfer
- o Fire Safety and Sanitation /Risk Management
- o Program and Activities
- o Personal Hygiene
- o Case Management Services
- o Health Care
- o Communications (mail, visits, telephone,

- o Property
- o Sentence computation, jail credit, over detention
- o Finance
- o Rules and Regulations
- o Staff Treatment
- o Food Service
- o Religious Services

- o Facilities Management
- o Discrimination
- o Transportation
- o Safety and Security
- o Other

**FOR INMATE:** Has this issue been resolved? YES ☐ or NO ☐ If no, check the "NO" box and place this form in the housing unit IGP Box with a copy of the INFORMAL RESOLUTION FORM WITH RESPONSE.

**REASON NOT RESOLVED:** In response to Informal IGP # 20220512-284. You can check the cameras on 5/5/22, and see the time LT Allen approached my cell and this interaction took place. You can also check cameras to see when the shift officer approached my cell shortly after. I informed LT Allen and the shift officer I was suicidal. I informed the nurse the next morning as well. I also requested mental health care on 5/5/22 and was told I would see someone + we never did. On 5/6/22, almost 24 hours

INMATE SIGNATURE: _____ DATE: 5/19/22

**\*\*\* FOR DOC COMPLETION \*\*\* Provide response to the IGP Coordinator no later than** _____.

**DOC RESPONSE:** _____
_____
_____
_____
_____

PRINT RESPONDER NAME: _____ RESPONDER SIGNATURE: _____ DATE: _____
DEPARTMENT: _____ MANAGER NAME: _____ MANAGER SIGNATURE: _____
INMATE GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: _____

later, I finally told 2-3 more officers I needed mental health help and was still suicidal. One was officer Sumeria... to mental health that I should call 5/4/22

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

12/2019

NO STEP 2 RESP.

DOC Staff: Print Name: _____ Sign Name: _____ Date:_____

**PP 4030.1**
Attachment G

★ ★ ★

**DOC**
THE DEPARTMENT
OF CORRECTIONS

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
**APPEAL – DEPUTY DIRECTOR
FORM**

TO BE COMPLETED BY INMATE
GRIEVANCE COORDINATOR
**IGP NUMBER**:

#

**STEP 4: APPEAL – DEPUTY DIRECTOR**
- Inmate has five (5) days from receipt of Wardens Administrative Remedy response to submit request.
- Place this form in the housing unit IGP box. The respective Deputy Director will respond within twenty-one (21) business days of receipt.

**SECTION A: To be completed by Inmate (Only)**

| INMATE NAME: | DCDC#: | UNIT: | DATE: |
|---|---|---|---|
| Ryan Nichols | 376795 | C2B | 5/15/22 |

REASON FOR APPEAL: In Response to Wardens IGP written on 4/21/22:
I did not receive a response within 15+ business days, so I am
escalating. I have asked for mental health care for weeks/months.
My requests for help are being ignored, and I recently ended up in
Medical 82 on "Suicide pre-caution" due to mental health requests
being neglected. I left Medical 82 "Suicide Pre-caution" on 5/9/22
asking once again for mental health help from the psychiatrist and
(Lancaster Since then, I have still been followed up with an

INMATE SIGNATURE: _____ DATE: 5/15/22

**SECTION B: To be completed by DOC (Only)**
Provide response to IGP Coordinator no later than _____.

DEPUTY DIRECTOR RESPONSE: _____
_____
_____
_____
_____

AREA: _____

DEPUTY DIRECTOR SIGNATURE: _____ DATE: _____

- **THIS IS THE FINAL LEVEL OF REVIEW IN THE DC DEPARTMENT OF CORRECTIONS.**

Original – IGP Coordinator
Copy 1 – Inmate Response
Copy 2 – Inmate

12/2019

The status of my mental health. I am asking the deputy
director to review the informal, formal and written to on this issue
and help me get the help I am asking for