**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 21-cr-00117-RCL-1 |
| **RYAN TAYLOR NICHOLS,** | |
| Defendant | |

<u>**DEFENDANT RYAN NICHOLS' MOTION FOR CONTINUANCE OF TRIAL
AND REMOVAL OF THE PROTECTIVE ORDER**</u>

Defendant RYAN TAYLOR NICHOLS ("Nichols"), by and through the undersigned counsels, Joseph McBride Esq. and Bradford L. Geyer, Esq., hereby moves the Court for a continuance to receive, review, and evaluate new information that will soon be public and which the defense has been denied access. This motion's primary purpose is to ensure that Defendant and this Honorable Court have accurate facts and context surrounding January 6, 2021, thus ensuring that the decision rendered will stand the test of time. For the first time since the inception of this case, the full context of January 6th is receiving intensive public scrutiny as 41,000 hours of CCTV footage relevant to January 6th has been made available to the Defendant and members of the public.  41,000 hours is more than double the amount of CCTV footage previously thought to exist. Undersigned Counsel has obtained permission to examine the totality of the abovementioned footage.  Importantly, since this newly discovered evidence was made available, we have already learned information directly relevant to Defendant's case.  Defendant's position is simple and straightforward: there is no justifiable reason why this newly available evidence had not been made available before today—thus, any possible prejudice to the prosecution from a continuance is dwarfed by Defendant's constitutional right to defend himself.

The Federal Government is the creator of the circumstance we now face. January-Sixth Defendants have universally demanded all available discovery for the past two years.  Defendant and January-Sixth Defendants have been repeatedly denied for the past two years.  The revelation of this newly discovered evidence and the process one must go through to access it has now been thrust upon the Defendant and this Honorable Court.  This evidence and the process to access it will undoubtedly dramatically impact and very likely (based upon revelations so far) upset accepted principles around January 6th.  Again, none of this is the Defendant's fault.

Mr. Nichols has had many medical complications since the inception of this case. For instance, his Post Traumatic Stress Disorder (PTSD) went untreated during the twenty-two months he was incarcerated, during which he was, on multiple occasions, placed in prolonged solitary confinement, which, no doubt, exasperated his PTSD.  After his release, Mr. Nichols found it extremely difficult to adjust to home life.  His mental health has now declined to the point where he rarely exits into his own backyard because of crippling paranoia. Because of this, his ability to participate in his defense is impaired.  Mr. Nichols is currently undergoing mental health treatment, including psychotherapy and a medication regimen designed to help him manage his exasperated state to participate in his defense once again in the most meaningful way possible.

The U.S. Constitution entitles Defendant to due process of law and a fair trial – not an artificially compressed trial.  We also respectfully submit that this Honorable Court should be guarded against actions that "will not age well" as masses of new information continue to be released. Defendant's Constitutional right to access, review and process this newly available evidence is reasonable and paramount to the Government's concern to prosecute January 6th cases according to an arbitrary timeline. Therefore, the prudent course of action is to grant Defendant the time necessary to mount his defense in a way that commiserates with his Constitutional rights.

## STATEMENT OF FACTS

1. Mr. Nichols has had significant challenges accessing his discovery since the inception of this case.

2. Regular, meaningful access to discovery was an ongoing issue during the pendency of Mr. Nichols's pre-trial detention, which lasted from January 18, 2021-November 22, 2022.

3. This, however, follows a dismal background, most of which involves the DC jail system to which the DOJ Bureau of Prisons has delegated responsibility.

4. Mr. Nichols was diagnosed with PTSD years before January 6, 2021.  The Government and DC Jail were notified of this fact when Mr. Nichols was first detained.

5. Mr. Nichols was placed in prolonged solitary confinement on multiple occasions during his time as a pre-trial detainee.  Some of those stints in prolonged solitary confinement lasted months, and one of them landed Defendant on suicide watch.

6. The DC Jail's abuse of the January 6th defendants is well documented in many cases.  E.g., United States v. Worrell, Case No. 1:21-cr-292.  In Worrell, the DC Jail withheld medical treatment from a January 6th defendant and then withheld incriminating documents from the Court until a contempt hearing was set. Worrell, ECF No. 108 at page 14:11-16. See Attachment 1.  This Court held the DC Jail in contempt and ordered the clerk "to transmit a copy of this order to the Attorney General of the United States for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case." Worrell, ECF No. 106.  Attachment 2. The United States Marshal Service subsequently filed a similar recommendation to the Justice Department's civil rights division.  See Attachment 3. To this day, despite the urging of prominent members of Congress,

Republican and Democrat, the Attorney General has refused to investigate the DC Jail.  See Attachment 4.

7.  The abuse of the Defendant culminated with the Defendant filing a civil action against the Jail's warden in August of 2022.  See ECF No. 150, at 2.  Within days of accepting service of the action, the DC Jail guards burst into the Defendant's cell and forcibly confiscated a digital storage device containing the Defendant's discovery materials for this case, as well as confidential communications between the Defendant and his attorney and hundreds of hours of privileged work product.  ECF No. 156.  The Jail returned the digital storage device after sufficient time to copy the contents digitally, only after being contacted by the Defendant's attorney.  A few days later, the Jail mysteriously and for unknown reasons, transferred the Defendant from the DC Jail to Rappahannock Regional Jail, and the Defendant's digital storage device was "lost" during the transfer.

8.  The abuse suffered by the Defendant made it impossible for him to prepare for trial properly while detained at the DC Jail.

9.  The Defendant was moved from the DC Jail to Rappahannock Regional Jail in Virginia.  After just two months of incarceration at Rappahannock, Judge Hogan ordered the Defendant's release to home detention because the judge found that he could not prepare for trial while incarcerated at Rappahannock.  ECF No. 180.

10. The government has provided two databases to view the voluminous discovery; one found at evidence.com and the other found at relativity.com.  Judge Hogan's release order expressly specified that Defendant should have access to both.  ECF No. 180, at 3.

11. Despite multiple requests, Defendant has not been provided meaningful access to either since he was released in November of 2022. In the two years since his incarceration, he has never been provided access to relativity.com or evidence.com since July of 2022.

12. Defendant has also been unconstitutionally prohibited from using the internet to prepare for trial.  Pursuant to Packingham v. North Carolina, 137 S. Ct. 1730, blanket limitations on an individual's ability to access social media were found to burden substantially more speech than necessary.  In today's day and age, it is impossible to do any research or preparation without access to the internet.

13. Access challenges, unfortunately, don't end there.  With video evidence and the types of scenes shown, the actual Defendant – not just his attorneys – must be able to review the evidence.  Often Defendants' attorneys would not recognize people showing up nearby. The Defendant who knows these people better and was actually there may recognize – as a potential witness – someone he knows or whom he talked to in these events.  Counsel might not recognize the people shown on the video the way that the actual Defendant Nichols would.

14. Today we sent two supplemental Brady letter requests to the government requesting crucial information for our defense (Attachments 5 and 6).

15. By January 24, 2023, the number of files ***ballooned by 1 million files – that is from December 2022 to January 2023 --  to over 4.89 million*** (7.23 terabytes of information amounting to a 25% increase). These files now include (but are not limited to) "the results of searches of 750 digital devices and 409 Stored Communications Act accounts; 4,500 FBI FD-302s and related attachments (FD-302s generally consist of memoranda of interviews and other investigative steps); 352 digital recordings of subject interviews; and

129,021 (redacted or anonymous) tips. Over 30,000 files including body-worn and hand-held camera footage from five law enforcement agencies and surveillance-camera footage from three law enforcement agencies have been shared to the defense evidence.com video repository. For context, the files provided amount to over nine terabytes of information and would take at least 361 days to view continuously."  Global Production No. 24 for Capitol Siege Discovery.

16. One of the most extraordinary and atypical aspects of these cases is that the Government – including all its many components involved here – has the cart before the horse.  Instead of investigating and then deciding whether to indict, whom to indict, and for what to indict, and getting the case right from the start, the various components of the U.S. Government[1] are simultaneously continuing to investigate and flooding the process with more information every day, while also prosecuting Defendants at the same time.

17. This makes the entire situation far more complicated and unruly than expected for a typical case. This process is a significant burden upon this Court and other Judges of this District. Everyone would face a more organized, manageable, clear set of cases if the Government was not prosecuting these cases while also conducting the most extensive fact investigation in the history of the Department of Justice.

18. On February 20, 2023, a cable news host announced that he was granted "unfettered access" to more than 40,000 hours of camera footage relevant to January 6, 2021. [2]

---

[1]     And by "Government" we must consider that the U.S. Capitol Police – the lead complaining witness and the lead investigative unit – is an agency of the U.S. Congress, part of the Legislative Branch of the U.S. Federal Government.  So this is a multi-faceted effort.

[2]     Mike Allen, "Exclusive: McCarthy gives Tucker Carlson access to trove of Jan. 6 riot tape," Axios AM (Politics & Policy), February 20, 2023, accessible at: https://www.axios.com/2023/02/20/kevin-mccarthy-tucker-carlson-jan-6-riot-footage

19. However, as late as January 13, 2023, it was reported that the Government only had 14,000 hours.[3]

20. It should be noticed that with video evidence and the kinds of scenes depicted, it is often not possible to skip videos.  With people milling about – even a video showing an apparently empty hallway or unused door – one does not know if at the end of the video the Defendant will show up walking through the scene or a view of a potential witness will show their location at a certain time that would have a bearing on their materiality as a witness.  Similarly, at some point during the video a law enforcement officer may be seen doing something inconsistent with their expected testimony at trial.  Or something the Defendant is accused of may be seen being done by someone else instead.

21. Therefore, as recent disclosures make painfully clear, one must watch all the videos to determine whether one should have watched them.  One cannot skip videos merely guessing that nowhere in the video will something important occur.

22. Furthermore, in prior January 6th trials, the government has chronically shown videos that depict only part of the story.  Videos may be vital because they can show the entire sequence of events, including what happened (or did not happen at all) before or after the segment that the Government relies upon.  For example, videos showing only the crowd standing around peacefully just before a physical exchange broke out with law enforcement may show a very different incident than just a narrow slice of the video alone.  Therefore, counsel and the Defendant will need to view all of the video in order to see where video segments that don't appear to be significant standing alone are actually what happened just

---

[3]      Gaetz on Tucker: Release ALL The J6 Footage!, YouTube, Jan. 13, 2023, www.youtube.com/watch?v=hJBWdDA18Jk

before or just after a vital video segment.  Defendants may need to reassemble video scenes into a coherent sequence.

23. Accordingly, J6 Defendants and their attorneys only have access to 14,000 hours.  But also, the universe of video recordings has increased over the last year and a half from 14,000 hours to an estimated up to 44,000 hours because the Government is simultaneously continuing to investigate while also trying to engage in a disorganized and chaotic prosecution.

24. In part to get clarity on the ramifications of these developments, the undersigned counsel contacted a staff investigator of the Government Weaponization committee that reported that it had also received 100 abandoned boxes of legacy records from the now defunct January 6 Committee.  It is not clear what is contained in these 100 boxes, but these boxes are in the process of being inventoried and it's not clear if January 6, 2021, Defendants (or the Department of Justice) has received access to this information or what channels will be used to turn this information over to the Department of Justice or to J6 defenses directly.

25. Accordingly, we also ask for more time in our capacity as Officers of the Court to ensure that we protect the legitimacy and soundness of any judicial outcomes flowing from this matter. We can see new aspects of this case that have come to our attention in the last month, and we can see and project that the January 6th context will be increasingly in flux.

26. With public disclosures of recently discovered exculpatory evidence just made in the last few weeks, the January 6th evidentiary record is in transition as it dawns on defense counsels that certain defenses are now within reach.  New aspects–that directly impact notions of guilt or innocence–have emerged, and these are likely to accrue and aggregate with many new disclosures to follow.

27. Recent trial testimony in related cases has revealed the involvement of "paramilitaries" that attacked police who appeared trained and organized.  Because their violent actions have not been spelled out, those actions have heretofore been wrongfully attributed to Trump supporters who showed up that day, including the defendant.

28. This unreviewed video evidence, which is no longer expunged from Twitter, is already beginning to show a pattern of MPD unprofessionalism and wanton disregard for the health and welfare of protestors [4] who can be seen on an increasing array of video evidence to express malicious intent to harm protestors and a surprising reliance on munitions.[5]  They

---

[4] Instances of police firing munitions from elevated positions into crowd. https://twitter.com/InvestigateJ6/status/1627767483959595022?s=20; Crowd bombarded with flashbangs, cs gas, and smoke. https://twitter.com/tiffanie_tx/status/1628810249162334216?s=20; https://twitter.com/NoVA_Campaigns/status/1627104604151332865?s=20; Woman kicked down steps https://twitter.com/NoVA_Campaigns/status/1624381941289037829?s=20; protestor pushed off balcony https://twitter.com/InvestigateJ6/status/1627767483959595022?s=20; indiscriminate spraying of pepper spray super soakers https://twitter.com/NoVA_Campaigns/status/1628572768361975814?s=20


[5] Five minutes after police fired rubber bullets from elevated position at victims above chest level, at 1:13 p.m., Commander Thau frantically requests Capitol Police provide him with "blast munitions" to start throwing at the mostly peaceful crowd. https://twitter.com/InvestigateJ6/status/1627767555745107984?s=20; For approximately next ten minutes, Thau repeatedly requests "blast munitions" from different supervisors on the ground https://twitter.com/InvestigateJ6/status/1627767637122994186?s=20; https://twitter.com/InvestigateJ6/status/1627767715363422210?s=20; At 1:17pm, Thau orders Capitol PD elevated 'snipers nest' to continue firing indiscriminately into the crowd. He screams "let's go, fucking shoot them!" "Shoot! Shoot! Shoot!" https://twitter.com/InvestigateJ6/status/1627767831126331394?s=20; At 1:22pm, Thau grabs a DC officer's taser. He then rushes to the front line and proceeds to tase a random protestor who can be heard screaming in pain. The crowd responds angrily to Thau's offensive use of the weapon, yelling "what the fuck is wrong with you guys?!" https://twitter.com/InvestigateJ6/status/1627768203140124679?s=20 We see discussions among police acknowledging they were enraging the crowd and converting peaceful protestors into enraged Americans believing they needed to engage in proportional self defense. https://twitter.com/DC_Draino/status/1628801345686843392?s=20;

also show pre-knowledge of professional agitators,[6] they may engage in the perverse activities themselves,[7] and there also appears to be gross negligence and lack of preparation for the day's events.[8]  MPD admissions regarding the use of excessive force seems to be very common[9], and it seems to be counterproductive with multiple instances where questionable uses of "less than lethal" uses of force backfired and injured police.[10]

---

https://twitter.com/NoVA_Campaigns/status/1629721262057484293?s=20;
https://twitter.com/NoVA_Campaigns/status/1629655992622366720?s=20
At 2:25pm, more 40mm munitions arrive. Thau orders Officer 'Rich' to shoot a CS mortar "over the fucking scaffolding." Rich misfires and gases the entire DC police line, causing them to retreat.
https://twitter.com/InvestigateJ6/status/1627768203140124679?s=20

[6] It's hard to imagine that the Department of Justice and investigative agencies didn't have advanced notice about inauthentic protestors, otherwise known as "suspicious actors."
https://twitter.com/FreeStateWill/status/1564359076359950342?s=20

[7] Drug Enforcement Agency agents were stopped on way to Capitol form the ellipse during President Trump's speech. https://twitter.com/FreeStateWill/status/1628922223984537600?s=20;
Officer Anthony Warner bellowed to the crowd in the East, that he was seeking permission to let the crowd up and onto the East Steps. https://rumble.com/v27algs-january-26-2023.html

[8] Beginning at 1:07 when the first rubber bullet was fired from an elevated position and lodged in the cheek of a protestor, causing him to gush blood all over a white background enraging the crowd, the police systemically engaged in outrageous use of force.
https://twitter.com/InvestigateJ6/status/1628444285317132288/photo/1.  For a period of more than an hour police bombarded the crowd with munitions and pepper spray.
https://twitter.com/InvestigateJ6/status/1627767483959595022?s=20

[9] Officer Dowling bragged about beating protestors with flag poles. https://rumble.com/v2asvhm-officer-dowling-on-use-of-flag-poles.html

[10] We are in the process of gathering multiple expressions of concern raised by police regarding the use of less than lethal munitions. We are beginning to discern a pattern where it is police begging other police to stop what may be illegal conduct that may have evoked reasonable self defensive actions. https://twitter.com/NoVA_Campaigns/status/1628334755568558085?s=20;
https://twitter.com/NoVA_Campaigns/status/1627835949781598211?s=20

29. These statements are commingled with recently discovered video evidence that dramatically changes the proper context within which this Court is being asked to render decisions.

30. Defendant Nichols had an extensive career as a first responder. He entered at 2:45 p.m. into a restricted space that had been clear of police and barriers for almost two hours. Thousands of people were milling about with no consciousness of guilt.

31. Nichols walked up the stairs adjacent to the same route undercover MPD officers also walked, exhorting the crowd to "move up."[11] By 3:01 p.m., Nichols and Harkrider were in the North bleachers taking selfies when they noticed a disturbance at the tunnel. They responded.

32. We have yet to receive the critical video record of what happened next. Although Nick Quested from National Geographic was close by to Nichols and filmed much of what transpired, we have been unable to obtain this footage. Other recently discovered video shows that Nick Quested's camera would have filmed Defendant Nichols and recorded sound around Nichols. But these recordings are missing from the disclosures provided by the Government.

---

[11] https://rumble.com/v2anzx6-february-23-2023.html

## THE PROSECUTION IS RESPONSIBLE FOR CONGRESSIONAL SECURITY CAMERA VIDEO RECORDINGS AND INFORMATION

33. It should be noted that the U.S. Congress and its arm, the U.S. Capitol Police are the two primary complaining witnesses as alleged victims of events on January 6, 2021.

34. Under the jurisprudence of *Brady v. Maryland*, because the U.S. Capitol Police is one of two lead agencies investigating these events along with the Federal Bureau of Investigation, whatever the USCP holds records or information are constructively in possession of the prosecution.  Again, the USCP is both a complaining victim and perhaps the lead (most on site, most on point) investigative agency.

35. While *Brady* obligations do not extend to the entirety of the government, they do include investigative agencies or agencies closely related who knew or should have known that information would be material to a prosecution arising from their direct involvement.  Here the U.S. Capitol Police are directly related and fully aware of the events of January 6, 2021.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial." *Coleman v. United States*, 515 A.2d 439, 446 (D.C.1986). (quoting *Lewis v. United States*, 393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.

The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know—information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused.").

**However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).  Furthermore,*

1. Was the recording in the possession of the government?

The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

"[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied Brady and Jencks requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[12]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved,

---

[12]     This understated reference doesn't fully explain that the prosecution arose directly out of "WMATA regulations" concerning a threatening showdown on the WMATA bus.

WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 U.S. 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

\* \* \*

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

\* \* \*

**The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.**

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added)*.

\* \* \* When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to

disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.

**When the statement being sought by the defense as _Jencks_ material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee,** _cf._ **_United States v. Agurs_, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See _United States v. Deutsch_, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

_Wilson v. United States_, 568 A.2d 817 (D.C. 1990) _(paragraph break added for emphasis and bold emphases added)._

### REVOCATION OF PROTECTIVE ORDER REQUESTED

36. The U.S. Capitol Police always has access to, possession, and ownership of the security camera videos.  Therefore, only the complaining victim USCP presents any hindrance in the USCP delivering these videos to the Department of Justice or the Defendants.  These videos could have been provided at any time during the last 2 years.  They were not.  The USCP is an agency of the complaining victim U.S. Congress.  Therefore, the U.S. Congress can deliver these videos at any time.  But they did not.  The Congress and USCP could have provided these videos with redactions, limitations, and a _Vaughn_ Index rather than coming to this showdown of a complete release without restrictions.  But they did not. Because it would take a single individual over five years to view 44,000 hours of video, it is impossible for any one Defendant to review this discovery comprehensively. Aside from its vast internal resources, the Government works with external "intelligence investigators"

to crowdsource information.[13] This crowdsourcing capability with attendant vast networking effects, grossly advantages the government in a perhaps unprecedented manner.

37. This has resulted in a power and resource imbalance impacting J6 defendants where the Government benefits from exponentially more significant networking effects in everything it does, while each defense team is siloed, stovepiped, and muzzled with extreme deprivations in accessing and engaging in common defense strategies, networking, joint conduct, etc. A government staff taking on the 1,000th prosecution benefits fully from the government's experience in prosecuting 999 prior cases, while the defense must reinvent the wheel, navigating a series of limitations that impact access, sharing, and prevent even the most ordinary use of sharing tools like thumb drives.

38. Tragically, this imbalance of resources and power has been reinforced by overly broad judicial protective orders that have sealed off most of the historical video record from public scrutiny and the context around which courts are being asked to render decisions upon inadequate contextual foundations.

39. As a practical matter, without the vast contribution to defenses that only public access ("crowd sourcing") can provide, there has been up to now, very little scrutiny of the public record by isolated defense teams, none of whom can justify that vast deployment of resources to invent the wheel when there is a remote expectation of return on an investment.

---

[13]    *See, e.g.,* Sedition Hunters,  https://seditionhunters.org
"Sedition Hunters is a global community of open-source intelligence investigators (OSINT) working together to assist the U.S. FBI and Washington D.C. Capitol Police in finding people who allegedly committed crimes in the January 6 capitol riots. We examine thousands of hours of videos and hundreds of images searching for individuals who committed crimes on Jan 6, 2021, at the United States Capitol. As we look for those wanted by the FBI we are able to identify other crimes and pass that information along to law enforcement officers."

40. But what prevented each defense team from thoroughly reviewing and understanding the Mount Everest-sized video record is about to be swept away as defense teams overall (and Courts) receive the benefits of networking effects as staffs can share, collaborate, and benefit from thousands of public reviewers.

41. Especially in terms of no prejudice, it is possible that greater public review of these records may benefit both or either side but will benefit most of all the truth.

42. Regardless of the wisdom of this blanket sealing approach taken now more than two years ago, this phase of protective-ordered information suppression impacting January 6th investigations and prosecutions is ending. Congress is in the process of making this information fully public. This poses unique risks to the judicial system that soon will be evaluating J6 cases upon an exponentially richer contextual foundation made possible by mushrooming networking effects as the public record is pored over by thousands of reviewers who are now no longer censored or canceled from posting their finds on Twitter and other platforms. [14]

43.  To facilitate and expedite this restorative process, we ask the Court to lift the protective order in this case now to allow us to benefit from these network (crowd sourcing) effects and correct unnecessarily restrictive access to discovery.

---

[14]     Note that nothing prevents the Government from remedying this collision of foreseeable problems by dropping the charges, perhaps without prejudice, until such time as the Government is actually ready to proceed.

**REDACTION / WITHHOLDING OF SECURITY INFORMATION**

44. Note that there has been much political criticism in the political class about whether *some* – presumably a very small minority – of videos might disclose things that would be disadvantageous to the Capitol's security.

45. But the balance of interests – and the normal "regular order" procedures – would require the Government to identify what videos or portions it would like to have redacted or withheld.  That, of course would require a *Vaughn* index.  And that of course, would require time to process and prepare.

46. So far, the Defendants' counsel has seen no evidence that:

    a.  Any videos show any security apparatus, cameras, devices, or equipment but only show the scenes viewed by security cameras.

    b.  Any videos reveal the location of any security cameras.  Entrances, hallways, and rooms or spaces that of course, are going to be viewed by security cameras do not reveal anything that is not incredibly obvious.  Of course, cameras will be viewing certain highly trafficked areas of the U.S. Capitol inside and out.

    c.  Any videos show any escape routes

    d.  Any videos show any safe rooms.

    e.  Any aspect of the Capitol's security systems are at all sophisticated, but rather under-funded and very basic.

47. Instead, the complaints are clearly pretextual and gamesmanship claiming security concerns where there are none.

48. However, if the USCP or Government wants to identify specific videos that should be redacted or withheld and submit a *Vaughn* index, the Court would no doubt handle this under well-established, well-accepted procedures and processes.

49. Worse for those complaints, the objection is premised upon an unsustainable assumption: While the political class has been grandstanding, there have been many meetings, reports, plans, and actions by the USCP less covered by the news media focused on hardening and strengthening the Capitol's security and security systems.

50. The assumption that any future intrusion into the Capitol would face precisely the same security plans, situations, or vulnerabilities as existed on January 6, 2021, is untenable and without merit.

51. The assumption that vulnerabilities revealed during January 6, 2021, events won't be remedied with some of the trillions of dollars of infrastructure spending are without merit.

52. The video record is valuable for showing what happened. It is highly unlikely to tell us what would happen in the future if there were any threat to the Capitol later.

53. If the USCP is not closing vulnerabilities and weaknesses, someone is not doing their job. But under-reported testimony and reports show that while the political class is scoring cheap points, the USCP professionals are diligently progressing in a severe fashion.[15]

54. For example, why would it be a security concern to show the location of security cameras? Only if the camera's locations leave a blind spot. But it is easy enough with trillions of dollars of appropriated funds for infrastructure upgrades to merely add more cameras to cover any blind spots noticed.

---

[15]    Luke Barr, "2 years after Jan. 6, Capitol Police chief highlights 100 security improvements: The agency was found to be ill-equipped to handle the deadly riot," ABC News, January 2, 2023, accessible at: https://abcnews.go.com/Politics/capitol-police-chief-highlights-post-jan-6-security/story?id=96091032

55. In fact, a partial release of videos may give a false impression that there are blind spots and thus encourage a future intrusion or attack, while a complete release of videos may discourage and deter any future mischief or attack by convincing bad actors that there is no way to enter or move about the U.S. Capitol undetected.

**CONCLUSION**

56. Because Mr. Nichols has not had consistent, meaningful access to his discovery since the inception of this case, he cannot be expected to be ready for trial at this time.

57. Because recent disclosures indicate in the last month that there are 1 million more documents to review (25% increase) and 30,000 additional hours of video to review (214% increase), he cannot be expected to be ready for trial at this time.

58. Because Mr. Nichols is struggling to manage the symptoms of his post-detainment PTSD while also struggling to access his discovery due to the overly burdensome protective order, he cannot be expected to be ready to trial at this time.

59. Because the available CCTV footage pertaining to January 6, 2021, has more than doubled and has now been made available to the defense and soon to the public, he cannot be expected to be ready to trial at this time.

60. Because the U.S. Constitution entitles Defendant to due process of law and a fair trial – not an artificially compressed trial, and Defendant's right to access, review and process this newly available evidence is paramount to the Government's concern to prosecute Defendant on an arbitrary timeline—we hereby request a lifting of the protective order as it relates to CCTV and the narrow category of bodycam footage that is covered by the protective order as well as a three-month continuance to permit significant changes to the evidentiary and contextual record as it is opened to public scrutiny for the first time.

Dated:  New York, NY
February 27, 2023

Respectfully submitted,

/s/ Joseph D. McBride, Esq.

Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com

/s/ Bradford L. Geyer

FormerFedsGroup.Com, LLC
141 I Route 130, Suite 303
Cinnaminson, NY 08077
e: Brad@FormerFedsGroup.com

## CERTIFICATE OF SERVICE

I hereby certify on this 27th day of February 2023, a copy of the foregoing was served upon all

parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Joseph D. McBride, Esq.

Joseph D. McBride, Esq.