## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

RYAN TAYLOR NICHOLS,

　　　　　　　Defendant

Case No. 21-cr-00117-TFH-1

## DEFENDANT RYAN NICHOLS' [Renewed] MOTION FOR CONTINUANCE OF TRIAL AND REMOVAL OF THE PROTECTIVE ORDER AND MEMORANDUM OF LAW

Defendant RYAN TAYLOR NICHOLS ("Nichols"), by and through the undersigned counsels, Joseph McBride Esq. and Bradford L. Geyer, Esq., hereby provides -- in response to the OPPOSITION (Dkt. # 218) of the Government -- this REPLY in support of his Motion (Dkt. #212) for the Court for a continuance to receive, review, and evaluate new information that will soon be public and which the defense has been denied access. This Motion is a renewed motion, in that new developments have raised new issues and brought previous concerns into focus.  Previously serious possibilities have now transitioned into certainties while arguing for a continuance and other arrangements.

The crux of our motion is this:

The Judicial System needs time to work.

This Honorable Court must give the system time to work.

Nothing good can come from short-circuiting the process.

Injustice is sure to occur absent a meaningful opportunity to mount a defense.

Mr. Nichols has a right to mount his defense, even under these difficult circumstances.

1

## I.  INTRODUCTION AND OVERVIEW

A.    The Government presents in vivid detail and scales the massive nature of the problem when its Opposition recites that:

- "The riot at the United States Capitol on January 6, 2021, was an unprecedented event in the history of the United States. ***As such, it has led to an unprecedented amount of evidence***." *(Emphasis added.)*

- "The United States has provided voluminous discovery in this case."

- "As of March 6, 2023, over 4.91 million files (7.36 terabytes of information) have been provided to the defense Relativity workspace."

- "These files include (but are not limited to) the results of searches of 759 digital devices and 412 Stored Communications Act accounts;"

- "5,254 FBI FD-302s and related attachments (FD- 302s generally consist of memoranda of interviews and other investigative steps);"

- "395 digital recordings of subject interviews;"

- "149,130 (redacted or anonymous) tips."

- "Over 30,000 files that include body-worn and hand-held camera footage from five law enforcement agencies and surveillance-camera footage from three law enforcement agencies have been shared to the defense evidence.com video repositories."

- "With regard to Defendant Nichols, the government has made more than twenty productions in his case-specific discovery."

- "These productions began less than two months after the Defendant's arrest ***and have continued on a rolling basis.***" *(Emphasis added.)*

- "The specific discovery, in this case, is substantial, but it strains credulity to argue that at least sixteen months is an insufficient period to review the materials specific to Defendant Nichols' case.

B.    Therefore, there is no dispute that the sheer magnitude of the information is a massive problem.  All sides agree as to the magnitude of the problem.

C.      However, the Government seeks only the *appearance* of fulfilling the mandates of

*Brady v. Maryland,* 373 U.S. 83 (1963)*,* and progeny, while in fact denying Defendant the *reality*

of it.

D.      The Government's Opposition argues that: "The Defendant has not provided a

sufficient reason as to why, two years into this case and one month prior to the scheduled

commencement of trial, a continuance is necessary."

E.      To the contrary, not only has Defendant shown overwhelming reason as to why a

continuance is necessary, but the Government has shown no reason why an unprepared, premature

rush to trial is appropriate.

F.      The fact that Defendant has consistently and clearly warned that the asserted

disclosure is not working, that Defendant does not have access, yet the Government and even the

Court have ignored these warnings here and in many related January 6, 2021, criminal does not

justify the Government now *continuing* to ignore the problems.  That does not make the problem

go away.

G.      A problem long ignored grows worse, not better.  A problem long ignored does not

turn into a solution by the passage of time. Neither the Court nor the Government can argue that

"If we ignore the problem long enough, it will go away."

H.      The core of the Defendant's motion and the core of the Government's Opposition

is the key disputed assertion that:

> The argument that Defendant Nichols specifically has not had
> sufficient access to the discovery in his case is also unavailing. The
> Defendant posits that he has not been provided "meaningful access"
> to the digital databases of evidence in this case. *See* ECF 212 at 5.

I.      Throughout the entire pendency of this case, the Defendant has persistently warned that the Government has not provided the Defendant with access the information which the Government was required to disclose.

## II. ARGUMENT IN REPLY

This motion's primary purpose is to ensure that Defendant and this Honorable Court have accurate facts and context surrounding January 6, 2021, thus ensuring that the decision rendered will stand the test of time. For the first time since the inception of this case, the full context of January 6th is receiving intensive public scrutiny as 41,000 hours of CCTV footage relevant to January 6th has been made available to the Defendant and members of the public. 41,000 hours is more than double the amount of CCTV footage previously thought to exist.

Undersigned Counsel has obtained permission to examine the totality of the newly released video recordings to the public square. Importantly, since this newly discovered evidence was made available, we have already learned information directly relevant to Defendant's case from the public. Defendant's position is simple and straightforward: there is no justifiable reason why this newly available evidence had not been made available before today—thus, any possible prejudice to the prosecution from a continuance is dwarfed by Defendant's constitutional right to defend himself.

### A. APPEARANCE, NOT REALITY, OF *BRADY* COMPLIANCE

It is mystifying to know how to respond to the Opposition's insistence that Defendant Nichols did not explain why he has not been provided access to the mountains of discovery information.  The government glances over or ignores the showing we made on discovery challenges in ECF 212 paragraphs 1-13.

But the Government's Opposition lets slip too much in complaining

> "Yet, he makes no assertions why, during the months since his release, his attorneys have been seemingly unable to *travel to the Defendant's home to meet with him and review the evidence* or do so virtually." *(Emphasis added.)*

So, the Government lets slip the reality that it has created an unworkable scenario in which the Defendant has been disabled and prevented from accessing the discovery without a chaperone, without being supervised by Defendants' counsel or another chaperone.

The Government admits round-a-bout that it has prevented the Defendant from being able to divide up the work of his defense by allowing the Defendant to pursue one activity while Defendant's counsel pursues other activities.   For the Defendant to access discovery, he has to be accompanied by chaperones. This is expensive and dramatically reduces the number of hours he has available to review discovery.  The Government has resisted repeated requests to fix this.

Because there are tens of thousands of hours of video much less other documents to review, this barrier alone means that defense counsel would need to sit with Defendant Nichols for at least hundreds of hours instead of preparing the case for trial through legal research, strategy, pursuing potentialities for witnesses, etc.  With the imbalance of resources and manpower, the defense team needs to divide up the work not be inefficient.

Defendant Nichols continues to have no access to the Government's chosen Relativity database.

Defendant continues to have no direct access to the Government's chosen database Evidence.com.

The Evidence.com system has massive files and often can't be accessed by an attorney for remote viewing with the client because of these technical problems.  It is mystifying that the Opposition claims that these problems were not explained.

Defendant Nichol's untreated PTSD also limits the amount of time he can spend in close proximity with someone or that he can be exposed to content bringing memories of conflict.

These files frequently strain computer memory causing his computer to crash or videos to skip which complicates and diminishes the value of review.

Since his release from prison in November 2022, Defendant Nichols continues to be barred from the internet. This means that it has fallen on defense counsel to notice on a daily basis when a new relevant video is made public.  Just one example, yesterday from internet posts from local discovery in another case, it turns out there is video from the room in which Defendant Nichols sought refuge (citation omitted based on defense privilege). By pure happenstance, undersigned counsel encountered it. These situations are becoming more frequent as the new Government weaponization committee requests exculpatory video from the public and the public begins reviewing released materials that were previously suppressed.

In footnotes 4-11 in ECF 212 we included a pastiche of links that popped up just as a sample of new video that came to our attention in the last month.  There is likely to be exponentially more that comes to our attention in the months to come to which the Defendant needs access.  This creates a professionally uncomfortable situation for undersigned counsels who feel an obligation not only to our client, but to this Court, to get the relevant information before the Court that permits the Court to fulfill its crucial role.  We can't do that at this juncture as a flood of new information changes the collective understanding of January 6.  This is no fault of ours, nor is it the fault of the line government counsels who is all respects have acted

professionally, but someone in the Government management chain assumed total control over the battle space when these "shock and awe" prosecutions began and now we are all experiencing the fallout.[1]

_____

[1] How "shock and awe" ever could have come into lexicon by the leaders of the Department of Justice is a question best left to future historians. "Shock and Awe" (technically known as rapid dominance) is a military strategy based on the use of overwhelming power and spectacular displays of force to paralyze the enemy's perception of the battlefield and destroy their will to fight. Defense counsels may recognize this as an apt description of the litigation playing field in the District of Columbia since this "shock and awe" operation was launched with the assistance of thousands of agents in Joint Terrorism Task Forces, formed in the wake of 9-11, to pursue Al Quada. In *a CBS Report*, **https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/** the leader of January 6 investigations Acting US Attorney Michael Sherwin set the tenor and standard of the Department's operations when he said he wanted to "ensure that there was shock and awe…." This bled into investigations where there are numerous reports of spouses and family members being painted with laser sights during search warrants to coverage of these defendants on trials where defense exhibits rarely make the public square. For eg., The First Trial of a Capitol Riot Defendant: A Shock-and-Awe Campaign of Video, Audio, and Other Digital Evidence, **https://www.lawfareblog.com/first-trial-capitol-riot-defendant-shock-and-awe-campaign-video-audio-and-other-digital-evidence** Roger Parloff, February 28, 2022. Department of Justice officials using such language publicly seems to have had pernicious effects on behavior

Additionally, these 40,000 to 44,000 videos are gradually being brought out from under the protective order and this is changing mores and practices of defense counsels who are beginning to engage in more sharing and even combined reviews.

We have the emergence of citizen video reviewers now posting relevant videos on Twitter that was suppressed up until a few months ago.

Since filing our motion for a continuance, we continue to unearth new evidence that provides factual context and newly discovered exculpation. As evidence gets released to the public, a vibrant reviewing ecosystem is forming making it newly accessible and useful to defendants.   As a practical matter, the value in this information was not harvestable by defense attorneys because of the time investment by each.

Since Speaker McCarthy's announcement, we have received new exculpatory information daily that can now be shared on Twitter feeds that do not get cancelled. To eliminate any doubt regarding the dramatic effects this information disclosure will have on defenses, McCarthy stated today that all the information will be made public.

Why was this information that has been provided to the defense largely useless to the defense?  Government design.  The government couldn't have designed a discovery system with

---

which did nothing to preserve or respect the humanity of this class of defendants.  Using references evoking blitzkrieg war on foreign nations as it relates to domestic law enforcement here in the United States on US citizens objectively, is wholly inappropriate

poorer accountability as the system seized all networking and information sharing benefits for itself.

Note that the Opposition also makes reference to Defendants' counsel's other experiences, such as with the Oath Keepers' trial. However, the Oath Keepers were present on the East side of the Capitol, while Nichols was on the West side of the Capitol. The circumstances there called for the investment of 1,000's of hours of review concerning the other side of the Capitol. Now we are reviewing the events in the West and we can see that none of the necessary work has been done anywhere by anyone as far as we can tell. Triage requires focusing on the most likely videos. Therefore, there is little ability to recycle efforts from the East side of the Capitol building (which involved very little violence) to the West side.

### B.  RACING TO TRIAL AHEAD OF THE EVIDENCE COLLECTION

The Government seems to be rushing this case to trial before evidence and information that would disprove the charges can become available to the Defendant. There is no reason for this or related cases to be rushed, except perhaps to get out ahead of any new discovery or effective reviews of same. Information control of and prohibitions on information sharing in the battle space are lifting and thousands of eyeballs are coming to bear.

The Government has chosen for itself to scramble and stumble, rushing cases to trial for which the Government is not ready in which due process of Defendants is compromised.

While due process is mandated by the U.S. Constitution, neither convenience nor public interest are. No basis exists in or consistent with the U.S. Constitution to deprive Defendants of their Constitutional rights of due process and other Fifth, Sixth, and Fourteenth Amendment rights, for the administrative convenience of the Government or the Judiciary or to satiate the thirst of the mob or impatience of the nation's political class. If the public is offered a show, our Constitution

requires that we show them a clearly fair trial governed thoroughly by due process.

This serves a non-legal, ulterior purpose:  Former acting U.S. Attorney Michael Sherwin described the protesters on January 6th who would be prosecuted. *Id at footnote one, Sherwin.* These were "the great majority of the people" who were "protesters" and not "rioters." *Id.* He explained when a person crossed from this second camp to the cohort of "internet stars," "You cross the line when you cross a police line aggressively. You throw something at a cop. You hit a cop. You go into a restricted area, knowing you're not supposed to be there." *Id.* [2]

> **[Michael Sherwin]:** After the 6th, we had an inauguration on the 20th. So, I wanted to ensure, and our office wanted to ensure, that there was shock and awe that we could charge as many people as possible before the 20th. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged." *Id.*

Yet, taking the contrary position, the next U.S. Attorney, Channing Phillips and other soon-to-be DOJ attorneys filed a civil lawsuit against the Trump Administration in 2020 called *Don't Shoot Portland, et al., v. Chad Wolf*, et al., 1:20-cv-2040-CRC.  The Improper Purpose arises because it becomes about the *Content of the Message* that has led to the different prosecutorial decisions of what the court has recognized included similar physical violent acts, although Connie Meggs and these Defendants are not specifically alleged to have been violent.

This poses an unacceptable enterprise risk management scenario for the court.  It is being asked (and other courts are being asked) to make final decisions on an unsettled factual record that in the vast majority of cases has never been accessed.  Justice requires more. We need more time.

---

[2]    We must always be careful to notice groupings of things that are not similar.  Crossing a police line and hitting a cop are noticeably different actions with potentially different motivations or even justifications.

### C.  JUDGE HOWELL'S DECISION IN *U.S. V. WILLIAMS*

A serious argument is citation to a decision on a similar motion by Chief Judge Beryl Howell:

> Chief Judge Howell identified this argument's fallacy when considering a similar motion in the context of the January 6 House Select Committee: "Taken to its logical endpoint, defendant's argument would preclude nearly *any* criminal trial on *any* subject, *ever*, from proceeding, as it is *always* possible that relevant information exists somewhere that is not fully known by or in the possession of the parties." *U.S. v. Williams*, No. 1:21-cr-377, ECF No. 108, at 5-6.[8]

However, Judge Howell's decision is inapposite.  First, the objective is not to take a question "to its logical endpoint."  That is not the task.  The task is to balance the clear and undeniable constitutional rights of Defendant Ryan Nichols against other factors that are not constitutionally mandated and of infinitely lesser importance, such as the courtroom schedule as real estate, the Court's schedule, and the administrative convenience of judicial personnel.

When balancing the constitutional due process needs of Defendant Nichols against what is convenient for the Judiciary we are not to take a question "to its logical endpoint."

Nevertheless, Judge Howell's point being "Where do we draw the line?" and "How do we best proceed?" are proper questions.  If we did impose standards that would cause no case to ever make it to trial, they would indeed not be the proper standards.

The error is that here we know as an absolute fact, not as a hypothetical possibility, that there is more potentially *Brady* information still being processed actually in the pipeline, more is coming in every day, and as many as 40,000 to 44,000 hours of video have just been released – not tangential, but highly focused on the events about which the criminal charges are brought.

Why would we ever do this? What organized system would try to conduct trials simultaneously with still collecting more information?   Why wouldn't a rational system simply

(a) complete the data collection process, (b) digest the information, (c) then proceed to trial?

Judge Howell's search for where do we find the balance is based upon the idea that there might hypothetically be more information.  Here, unlike almost any example we can think of, the Government is very aggressively – not accidentally – obtaining more evidence every business hour of every business day, and doing so intentionally and by plan.  The Government is not faced with the mere possibility that someone might throw an envelope over the transom. The Government is proudly as a boast turning the country upside down.  This is not some idle imaginary possibility. This is the plan.    Thus, Judge Howell's analysis in *Williams* of speculation about passive encounters with more information simply does not apply.

### D.  VIDEOS WERE WITHHELD FROM THIS COURT RE: JACOB CHANSLEY

The Opposition argues that it would be speculation that the previously undisclosed videos provided to Tucker Carlson of Fox News[3] – and now promised to all January 6 Defendants by the Speaker of the House – contain exculpatory information.

We know there is exculpatory information in it.  Newly released videos may completely flip the outcome of trials.  One example is the case that this week's broadcast from those videos focused on.  The purpose of focusing on it is to respond to the Government's Objection that we don't yet know if the just-disclosed videos will prove to contain exculpatory information.

We cannot have a situation like that recently revealed with Jacob Chansley where the U.S. Capitol Police concealed from Chansley, his lawyer, and this Court exculpatory evidence.  Among the very videos at issue in this motion, some of the 40,000 to 44,000 videos held by the U.S. Capitol Police broadcast on a television show on Fox News included extensive views of the

---

[3]     Tucker Carlson releases Jan . 6 footage, Fox News, March 6, 2023, **https://www.youtube.com/watch?v=FmWlxssZ_-8&t=264s**

January 6 Defendant dressed up in a Viking costume (buffalo guy or Q Shaman).

Jacob Chansley's attorney Albert Watkins publicly explains that he never saw these videos during the representation of Chansley, despite repeatedly asking for all information.[4]

The Chair of the House of Representatives Select Committee on January 6, Rep. Bennie Thompson, surprisingly admitted that he never saw any of these videos *reported on CNN or presumably others.*[5] [6]

Setting aside the relatively undisputed question of Chansley entering the U.S. Capitol building allegedly in violation of 18 U.S.C. 751(a)(1), the newly released video proved that almost all other counts charged against Chansley were false.  The same may be true of Nichols.

If this Court had access to these videos during sentencing, would the Honorable District Court Judge Royce Lamberth have made a different decision?

> "Judge Royce Lambert said Jacob Chansley's role as a leader among those who went into the Senate chamber and disrupted the electoral vote tally compelled a serious prison sentence."  [7]

---

[4]     Joseph A. Wulfsohn, "Former lawyer for 'QAnon Shaman' says Jan. 6 footage wasn't shown to client, calls prison sentence a 'tragedy':  Albert Watkins told Tucker Carlson the omission is a 'dagger at the heart of our American justice system'," Fox News, March 9, 2023, accessible at:  **https://www.foxnews.com/media/former-lawyer-qanon-shaman-says-jan-6-footage-wasnt-shown-client-calls-prison-sentence-tragedy**

[5]     Alayna Treene, CNN Political Reporter, March 8, 2023, @alaynatreene, ("Thompson said he doesn't think any of the Jan. 6 members themselves ever had access to the footage — they let only staff view it. "I'm actually not aware of any member of the committee who had access. We had a team of employees who kind of went through the video.""), accessible at: **https://twitter.com/alaynatreene/status/1633578749374464005**

[6] *Christina Laila,* "**Former J6 Committee Chairman Bennie Thompson Claims He Didn't Have Access to January 6 Footage,**" The Gateway Pundit**, March 9, 2023,** ***https://www.thegatewaypundit.com/2023/03/former-j6-committee-chairman-bennie-thompson-claims-he-didnt-have-access-to-january-6-footage/***

[7]     Josh Gerstein and Kyle Cheney, "'QAnon shaman' Jacob Chansley is sentenced to 41 months in prison," POLITICO, November 17, 2021, **https://www.politico.com/news/2021/11/17/qanon-shaman-jacob-chansley-sentence-522807**

>Lamberth acknowledged that Chansley had not engaged in physical violence on Jan. 6, but said ***his role as a leader among those who went into the Senate chamber and disrupted the electoral vote tally compelled a serious prison sentence***.
>
>"What you did was terrible. ***You made yourself the epitome of the riot***," said the judge, an appointee of President Ronald Reagan.

*Id. (emphases added).*

But, now, the just-released videos showed that Chansley was not a leader of anything other than himself.  This Court was deceived into declaring during sentencing that Chansley was a leader of attacks on the U.S. Capitol.[8]  The videos of Chansley's entire time inside the Capitol show that that was a falsehood.  With all respect, Jacob Chansley was no more a "leader" than a balloon artist serving on the side lines of a child's birthday party is "running" the birthday party.

>***This Court should not be put again in the situation of being misled.***

This Court also stated:

>You didn't slug anybody, but ***what you did here was actually obstruct*** the functioning of the whole government. It's a serious crime."

*Id. (emphases added) (referring to 18 U.S.C. 1512(c)(2), which is a serious crime).*

But the newly-released videos showed that there was no obstruction of an official proceeding. We can now see very clearly that the U.S. Congress had already recessed before Chansley was escorted by police into *to an empty room.*  What this Court was led to believe, we now know to have been impossible:  Chansley – *like Defendant Nichols here at bar* – *could not*

---

[8]     Chansley committed the "unforgivable sin" of attracting media and social media attention. Only in the world of pure symbolism over substance was Chansley remotely significant in "leading" anything on January 6, 2021.  Earlier in the day Chansley was witnessed simply wandering around outside the Capitol, including by a witness known to counsel.  Inside the Capitol, Chansley is shown *alone* almost all the time except for having a police escort on foot merely every moment. During the newly-released videos, we discover that Chansley was not leading anyone, and indeed was not even *with* anyone other than his police escort.

*obstruct an official proceeding* that had already disbanded before he arrived.  He could not obstruct an empty room.

Like Nichols in the instant case, Chansley could only "obstruct" ***an empty room***.

Like Nichols here, we can see that Chansley did nothing to obstruct anything.[9]  Chansley did not engage in any disorderly or disruptive conduct, did not interfere with any police officer engaged in his duties during a civil disorder, and did not engage in any violent entry.

*Would it not be better to get this trial now at bar right the first time, up front, rather than try to explain why a rush to trial led to an unjust result in light of new evidence?*

### E.  SCALE IS THE ISSUE:  CREATED BY GOVERNMENT CHOICES

A sea change in this scenario is that normally the Government does not prosecute the vast majority of individuals involved in a disturbance, but only the most serious or leading Defendants.[10]  The intentional choice to try to prosecute thousands of people, when that has never been the norm, has created the Government's own problem.

Moreover, whereas the Government imposed only a fine of about $50 for rioters who physically occupied the Hart Senate Office Building disrupting Congressional business and physically entered and disrupted the Senate Judiciary Committee hearings on the elevation of Brent Kavanaugh to the U.S. Supreme Court in September 2018, here the Government has created its own problems by seeking to use new interpretations of old laws and the maximum possible penalties for even the most minor actions here.  This has increased the burden on the Judiciary and the Executive Branch far beyond any norms we are accustomed to.

---

[9]     Others did.  Nichols did not.  Chansley did not.  Seeing the videos actually matters.
[10]    Here, the Government has sought to portray 100% of all Defendants as "the leader" *ad seriatem*.  As the focus shifts from one Defendant or group to the next, the label changes tarring each new Defendant or group as now "the leader."

### F.  U.S. CAPITOL POLICE IS NOT A THIRD PARTY

Meanwhile, the Government erroneously argues every aspect of this incorrectly as information held by a "third party."  But this is erroneous.

The surveillance system camera video of the U.S. Capitol owned by the U.S. Congress and created and maintained by the U.S. Capitol Police and other videos and information are not "third party" records or information.  The information collected by the Select Committee of the U.S. House of Representatives is not NOT "third party" records or information.

Congress is the primary complaining victim / witness of the crimes at bar before the Court alleged against the Defendants.  They are not bystanders, commentators, or third parties.

The U.S. Capitol Police is part of the investigative team of the prosecution, and the primary investigative agency (i.e., closest to the action and the primary on site).

While *Brady* obligations do not extend to the entirety of the government, they do include investigative agencies or agencies closely related who knew or should have known that information would be material to a prosecution arising from their direct involvement.  Here the U.S. Capitol Police are directly related and fully aware of the events of January 6, 2021.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial."** ***Coleman v. United States*, 515 A.2d 439, 446 (D.C.1986). (quoting *Lewis v. United States*, 393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an

16

incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.

The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know—information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused.").

**However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break added*

*for emphasis and bold emphases added). Furthermore,*

    1. Was the recording in the possession of the government?

       The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

       "[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied Brady and Jencks requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to

enforce WMATA regulations[11]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

\* \* \*

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

\* \* \*

**The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the**

---

[11]     This understated reference doesn't fully explain that the prosecution arose directly out of "WMATA regulations" concerning a threatening showdown on the WMATA bus.

18

> tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).*

> * * * When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.
>
> **When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee,** *cf.* ***United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

*Wilson v. United States*, 568 A.2d 817 (D.C. 1990) *(paragraph break added for emphasis and bold emphases added).*

## G.  THE CHOKE POINT AT THE CAPITOL SIEGE PRODUCTION UNIT

To try to handle the volume of material from the Government's perspective, the DoJ including the FBI created a new unit, the Capitol Siege Discovery Unit, a truly unfortunate name evocative of medievil siege , that line prosecuting attorneys seem to play no part in creating or populating.  There is only loose accountability. Local discovery returns by case are determined by someone—we are never really sure whom—and that which isn't deemed relevant to a local case is disclosed on some schedule, maybe, by global discovery returns.  In fact, the most recent one was Thursday.  Distributions of global discovery come with a cover letter signed by a paralegal, not an attorney.

This discovery gets dumped into Project Plum, showcasing the best in 1990's technology

that has the searchability that is somewhat better than a haystack.

The government created a monopoly on what happened, imposed the most prejudicial narrative regarding the day's events, and through total control of battle space information -- lorded supreme over what aspects of the day would be considered as relevant by courts in the District of Columbia.  Often in plausibly deniable coordination with a Congressional subcommittee equally devoted to perverting the objective truth, new prejudicial content was generated and disseminated constantly poisoning the minds of DC residents.  Meanwhile, DOJ claimed to have no ability to obtain this information from another victim agency of itself.

Through planned and selective disclosures playing the most prejudicial aspects of the day on endless loops it controlled what everyone thought about the day.  The 1,000[th] government staff benefitted from everything learned from the prior 999 staff thanks to protective orders and sharing concerns that don't apply to DOJ, while the 1,000[th] defense attorney, like every other defense attorney, invents the wheel each and every time.

The Government planned as the architect of the discovery system that is separate from line prosecutors making representations to courts about the discovery that seems to be managed by non-attorneys who are not accountable.

## III. CONCLUSION

The Court should grant the requested continuance and remove the protective order so that the understaffed defense counsel teams can obtain crowd-sourced assistance in reviewing videos that can be reasonably released.

Dated: Washington, DC
March 10, 2023

Respectfully submitted,

/s/ Bradford L. Geyer
FormerFedsGroup.Com, LLC
141 I Route 130, Suite 303
Cinnaminson, NY 08077
e: **Brad@FormerFedsGroup.com**

/s/ Joseph D. McBride, Esq.
Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com

## CERTIFICATE OF SERVICE

I hereby certify on this 10th day of March 2023, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Joseph D. McBride, Esq.
Joseph D. McBride, Esq.