## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 21-cr-00117-TFH-1 |
| **RYAN TAYLOR NICHOLS,** | |
| Defendant | |

## MEMORANDUM OF LAW IN SUPPORT OF RYAN TAYLOR NICHOLS'S MOTION FOR REQUIRED DISCLOSURE OF POTENTIALLY EXCULPATORY INFORMATION

Defendant RYAN TAYLOR NICHOLS ("Nichols"), through the undersigned counsel, Joseph McBride, Esq. and Bradford L. Geyer, Esq. presents this Memorandum of Law in support his motion for this Court to enter an Order that the U.S. Government disclose to the Defendant promptly, the following information necessary to the Defendant's defense pursuant to pretrial discovery under Rules 6(e)(3)(C) and 16(a)(1)(A) of the Federal Rules of Criminal Procedure, Rule 16 of the same, *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny, and Gray's Due Process rights under the U.S. Constitution.   In support of his motion, Nichols states as follows:

I. **INTRODUCTION, OVERVIEW, AND FACTS PERTINENT TO THE MOTION**

From the minimal factual allegations, Defendant Nichols is accused and being prosecuted, *inter alia*, under

    a. Count One, 18 U.S.C. § 231(a)(3) – Obstructing, impeding, or interfering with any law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which affects interstate commerce

    b. Count Two, 18 U.S.C. § 1512(c)(2) – Obstruction of an Official Proceeding and Aiding and Abetting

1

    c. Count Three, 18 US.C. 111(a)(1) and (b) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon,

    d. Count Four, 18 U.S.C. 641 Theft of Government Property

    e. Count Five, 18 U.S.C. § 1752(a)(1) and (b)(1)(A) – Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon (use and carry a deadly and dangerous weapon, that is, a crowbar and OC/pepper spray handed to him by another)

    f. Count Six, 18 U.S.C. § 1752(a)(2) and (b)(1)(A) – Disorderly or Disruptive Conduct in a Restricted Building with a Dangerous Weapon (a tomahawk axe)

    g. Count Seven, 18 U.S.C. § 1752(a)(2) and (b)(1)(A) – Disorderly or Disruptive Conduct in a Restricted Building with a Dangerous Weapon (a tomahawk axe)

    h. Count Eight (co-Defendant only)

    i. Count Nine, 40 U.S.C. § 5104(e)(1)(A)(i) – Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings (a crowbar and OC pepper spray)

    j. Count Ten, 40 U.S.C. § 5104(e)(1)(A)(i) – Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings (a tomahawk axe)

    k. Count Eleven, 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building

    l. Count Twelve, 40 U.S.C. § 5104(e)(2)(F) – Act of Physical Violence in the Capitol Grounds or Buildings

    m. Count Thirteen, 40 U.S.C. § 5104(e)(2)(G) – Parading, Demonstrating, or Picketing in a Capitol Building

Factually, Defendant RYAN TAYLOR NICHOLS ("Nichols") is accused of

a. Arriving at the West border of the U.S. Capitol grounds at approximately 2:45 PM on or about January 6, 2021.

b. Departing the U.S. Capitol grounds at approximately 4:40 PM on January 6, 2021.

c. Approaching the West Terrace of the U.S. Capitol buildings in a random, uncoordinated, pathway unrelated to anyone else in response to the cries and signs of

injured people in distress, displaying no plans to move in formation toward any objective.

d.  Departing the U.S. Capitol building in a conspicuously uncoordinated, random pathway disconnected from anyone else.

## II.      SUMMARY AND CONTEXT OF THE CASE

The Government claims that the defendant, Mr. Nichols, obstructed the Congressional counting of Electoral College votes for President and Vice President and impeded a police officer's response to civil disorder by entering a Congressional building with a concealed crowbar. However, the charges against Nichols lack important context, and although some context has been made public or revealed in other cases, crucial Brady information that could aid the defense has been withheld despite multiple requests. Furthermore, the Government attributes a plan to disrupt the college certification to Mr. Nichols, even though Nichols denies it, and the evidence against him does not support the Government's conclusion. At the same time, the Government suppresses crucial discovery information regarding others who coordinated, recruited, and executed an actual plan to breach the Capitol on January 6. This raises grave concerns regarding fairness and the need to consider all relevant evidence in this case, including evidence of government complicity.

Ryan Nichols, age 32, was born on December 6, 1990, in Rowlett, Texas. He is the son of Patti Nichols, a schoolteacher of 30+ years, and Don Nichols, a retired Marine and Baptist Pastor. Ryan is a husband to a remarkable wife named Bonnie and a father to two young sons: Ryan Jr. age nine, and Blake age six. Ryan's parents instilled in him the values of faith, family, fidelity, and service early on in life. It is, therefore, unsurprising that he has lived a life of compassion, honor, and public service. Ryan is beloved by his family, valued by church members, highly esteemed by his employees, and counted on by his friends. He is a decorated veteran, successful

businessman, and homeowner with no criminal record or history of violence. He founded a nationally recognized search and rescue 501(c)(3) called Rescue the Universe, which specializes in rescuing humans and animals from natural disasters and other highly dangerous situations. Before January 6, 2021, Ryan spent most of his time running his business and being a devoted family man.  He also spent approximately 50-75 days yearly doing search and rescue missions. Subtract January 6th from Ryan Nichols's life; what you have left over is a life of honor and service. After January 6th, you'll find a man who received five accommodations from the guards at DC-Jail and has since served 200 consecutive days of supervised release absent incident.

### 1% WATCHDOG

Mr. Nichols was introduced to an individual known as "1% Watchdog,"[1]  in 2018 during Hurricane Florence, when 1% Watchdog contacted Mr. Nichols via Zello.  1% Watchdog continued to contact Mr. Nichols from 2018 until January 2021.  During that time, 1% Watchdog manipulated and radicalized Mr. Nichols—so much so that Nichols would not have gone to the Capitol on January 6, but for 1% Watchdog's continued manipulation of Nichols' life.  For instance, Mr. Nichols is a military veteran with PTSD and 1% Watchdog holds himself out as a veteran with PTSD.  1% Watchdog also represented himself as associated with the military and Federal Government.  Specifically, and on multiple occasions during emergency search and rescue situations, 1% Watchdog served as an intermediary between Mr. Nichols and the calling of the US Coast Guard and other government entities to assist in rescues.  1% Watchdog was also famous in Zello circles, known as a "connected government man with important contacts."  As such, military

---

[1]     Private volunteers purporting to investigate January 6 events from open-source videos tentatively assigned described names to people they had not yet identified by name, pending further investigation.  Some such investigations have led to the real identity, but not all.

veterans gravitated to 1% Watchdog out of a sense of purpose and service to country. 1% Watchdog began creating political Zello chats in 2020. He added people and began to talk about patriotism, service, country, and election integrity. 1% Watchdog preyed on these men. He radicalized them to the extent that they were willing to travel and do combat with Antifa because of his grooming and coaching. As the year progressed, veterans who had never been to a single protest in their life, were lining up to go to Washington DC on January 6, 2021.

In the weeks leading up to January 6, 2021, 1% Watchdog organized communication channels and rallied hundreds of people up towards attendance and chaos on Capitol Hill through inflammatory rhetoric. On January 6 itself, 1% Watchdog helped lead protestors to the Capitol, encouraged them to enter, and advocated for violence. As a matter of fact, one of the chat channels used by 1% Watchdog was used in the January 6th Committee Hearings, and in multiple DOJ prosecutions of January 6th Defendants. On one recording 1% Watchdog states "It looks like Pence is doing his traitorous bullshit, and the election stealing is in progress. It looks to me, at this point, that that's a felony high-crime and treason in prison inside the National Capitol building…"[2]. At another point in the Zello chat 1% Watchdog states "I think the VP Folded, friends. Okay guys, apparently the tip of the spear has entered the Capitol building and police are coming from the Washington Monument side…What kind of numbers do we have going into the Capitol??[3]

As stated above, 1% Watchdog played a significant role in the first Oath Keepers trial, which took place between September and November 2022. Defense counsels suspected 1%

---

[2] https://www.wusa9.com/article/news/national/capitol-riots/prosecutors-can-use-boots-on-the-ground-zello-chat-in-oath-keepers-trial-judge-rules-jessica-watkins-stewart-rhodes-thomas-caldwell-kelly-meggs/65-11d9931a-418c-4345-9edc-1ddd38633629

[3] https://amgreatness.com/2022/09/15/the-unidentified-and-uncharged-instigator-in-oath-keepers-case/

Watchdog to be a Confidential Human Source (CHS) but received no useful information from the government despite multiple requests for identification. However, it later emerged that the January 6 Committee had subpoenaed Mark Bradman, also known as "Sundance" at theconservativetreehouse.com, stating that he was 1% Watchdog, according to public sources and committee documents. [4] The Committee and subsequently, two FBI agents working on behalf of the Select Committee, contacted Bradman and eventually disqualified him as 1% Watchdog while giving him the firm impression they had identified the true identity of 1% Watchdog[5]

The fact that a prominent figure like "1% Watchdog" remains unidentified and seemingly "at large" raises concerns about the FBI's apparent lack of curiosity and urgency in apprehending such individuals. These individuals appeared to be well-trained, acted purposefully around operational goals, and coordinated their actions according to specific timetables. The release of a video by a French film crew in early January 2021[6] further revealed the presence of conspicuous provocateurs, many of whom had not been identified or charged at the time. This raises questions about the FBI's selection process, prioritization, and charging decisions, which seem unusual in this case.We believe that 1% Watchdog is a federal asset. We know that he helped change Mr. Nichols' way of thinking and is the "but for" cause as to why Nichols showed up to the Capitol.

---

[4] https://www.dropbox.com/s/j9byvcw9x2su4cj/Occam%27s%20Razor%20-%20Fed%20Entrapment%20-%20The%20Last%20Refuge.pdf?dl=0

[5] Undersigned counsel Geyer interviewed Bradman in the wake of an article being published on May 7, 2023.

[6] https://rumble.com/v27agz4-the-jan6-french-video.html features prominently the actions of coordinated provocateurs who come through the Northeast barriers at 1:58 p.m. and open the Columbus at 2:25 p.m. and again at 2:38:30 much of which was filmed by Marcus DiPaola referenced *infra*.

We have expressed this to the Government, but the Government has refused to discuss 1% Watchdog.  Our February 27, 2023 Rule 16 Discovery Request states: "we require any information the Government has on: James Randall Taylor a/k/a "1% Watchdog" whose last known address is…" The Government has not even acknowledged us. **Based on his prior knowledge of Nichols, 1% Watchdog played a direct, explicit, and personal role in influencing Nichols to come to Washington, D.C., and we are entitled to know what, if any, relationship 1% Watchdog had with the Government.**

**MARCUS DIPAOLA**

Mr. Nichols was introduced to Marcus DiPaola during Hurricane Florence in 2018. DiPaola introduced himself to Nichols in North Carolina via Zello. DiPaola met up with Nichols in Wilmington, North Carolina, and later filmed Nichols rescuing dogs in Leland, North Carolina. DiPaola posted Nichols' acts of heroism to Twitter, which immediately went viral.  Ellen DeGeneres invited Nichols onto her show as a result where he received a $10,000 check as recognition for his efforts. Nichols used the funds to purchase a new rescue boat later used in approximately 200 water rescues.

DiPaola continued to contact Nichols from 2018 until January 2021.  At some point, DiPaola revealed to Nichols that DiPaola was associated with the White House.  DiPaola lifted his rain gear and showed Nichols a shirt with an official White House seal on it as an offer of proof. To prove his association further, DiPaola gave Nichols a challenge coin with the White House proudly displayed on it.  From that moment on, Nichols associated DiPaola with the White House. At one point in early 2020, DiPaola contacted Nichols via cell phone and frantically warned Nichols that government agents were out to get DiPaola and Nichols.  A few days later, DiPaola apologized to Nichols, saying that DiPaola was having psych issues.  Nichols knew DiPaola to be

a decent guy and did not judge the outburst because Nichols had long been diagnosed with Post Traumatic Stress Disorder.

DiPaola contacted Nichols during the weeks leading up to January 6, 2021. DiPaola informed Nichols that there would be counter-protestors and asked if Nichols was bringing body armor. When Nichols responded, "No," DiPaola informed Nichols that he was bringing a gas mask, body armor, and other protective gear to the Capitol on January 6 and that Nichols should, too—for his protection. DiPaola's suggestion to bring protective gear is why Nichols brought protective gear to DC on January 5, 2021.

On January 6, Marcus DiPaola participated in the breach of the Eastern Terrace's Columbus Doors. DiPaola also filmed some of the most incriminating footage used against the January 6th Defendants. Despite wearing body armor, recruiting people to go to the Capitol on January 6, 2021, and materially participating in the events of that day—DiPaola has never been charged. On January 7, 2021, DiPaola contacted Nichols, called Nichols and co-defendant Harkrider his "Favorite Domestic Terrorists," and suggested a meetup, to which Nichols declined. Nichols learned later that a man believed to be Marcus DiPaola incriminated Nichols to the FBI in a sworn statement that has since been memorialized in a 302 form. The name is redacted, we believe that person is Marcus DiPaola.

**Based on his prior knowledge of Nichols and representation to Nichols that he was associated with the Federal Government and the White House. Marcus DiPaola played a direct, explicit, and personal role in influencing Nichols on whether to come to Washington, D.C., and Nichols' decision to wear protective gear on January 6, 2021.**

III.     **ARGUMENT:   SPECIFIC REQUESTS AND REASONS NEEDED**

**A. DISCLOSURE OF CAUSE OF THE OBSTRUCTION OF THE OFFICIAL PROCEEDING (JOINT SESSION OF CONGRESS) UNDER 18 U.S.C 1512(c)(2)**

Nichols is accused of corruptly obstructing an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  Nichols demands any and all communications, messages, radio traffic[8], analyses, conclusions, proposals for action, opinions, recommendations, text messages, email messages, or the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning any reasons for Congress to recess on January 6, 2021. Nichols primarily demands contemporaneous communications and analyses as events were unfolding on January 5-6, 2021, not after-action reports.

Specifically, Nichols is entitled to contemporaneous records of communications, messages, threat assessments, and determinations showing *why* the USCP and other agencies decided that there was a threat possibly requiring the Joint Session of Congress to be recessed,[9] when exactly the USCP decided that the Joint Session of Congress should recess, and from what threat exactly. These will mostly be created in or held within the headquarters of the U.S. Capitol Police.

To Counsel's knowledge, the Government has never attempted to prove that any January 6 Defendant corruptly obstructed the Joint Session of Congress on January 6, 2021.  Certainly, those who illegally entered the House or Senate chamber floor would qualify, except that by the time they

---

[8]     Meaning radio traffic to and from headquarters relevant to the gathering threat assessment and decisions to recess the Congress and evacuate the Capitol.  Random discussions among officers in the field are not the focus.  The official decision to recess and evacuate is.

[9]     Counsel uses the word "recess" because they are advised that this is the correct terminology in Congress.  Adjournment or the like would indicate that a hearing or other session is concluded. Recess apparently indicates that a hearing or session is still open but has been paused temporarily.

did so, the Joint Session of Congress had already recessed, initially starting at 2:13 PM.

Details about the timing and development of the USCP's decisions on January 6, 2021, are exculpatory because it is impossible for Nichols to disrupt something at **2:13 PM** when Nichols arrived **2:45 PM.** The threat analysis and decision to recess the Joint Session will show that Nichols played no role in any aspect of obstructing the official proceeding.   These documents and records are exculpatory because they will present credible, official, and undeniable evidence – not merely for an argument of counsel.

During the first Oath Keepers' trial, it was discovered that the USCP (Speaker's security detail) whisked Speaker of the House of Representatives Nancy Pelosi away from the Speaker's "chair" or "dais" at 2:13 PM according to the testimony of then Parliamentarian Thomas Wickham in a related case, *United States v. Stewart Rhodes,* Case 1:22-cr-00015, on October 19, 2022.  The House then recessed at 2:18 PM, according to the Congressional Record, when the USCP recommended to presiding officer McGovern that he invoke Rule I, Clause 12.  Then the House and the Senate briefly reconvened but finally recessed at 2:29 PM.  The USCP evacuated the Capitol building from approximately 2:45 PM to 2:50 PM.[10]

The requested information likely shows that Nichols did not obstruct the Joint Session of Congress and is likely to lead to witnesses or other evidence, as well as documents and records valuable for cross-examining the Government's witnesses.

### B.  DISCLOSURE OF INFORMATION AND ABOUT PIPE BOMBS

Similar to (A), *supra*, any and all communications, messages, radio traffic,  analyses, conclusions, proposals of action, opinions, recommendations, text messages, email messages,

---

[10]     Clearly, evacuation does not mean that the USCP left or that the building was empty of demonstrators but refers in this context to Members of Congress and their staff.

surveillance video, geo-fencing or the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning the presence of pipe bombs found near the Capitol at the Republican National Committee headquarters and Democratic National Committee headquarters.

For the same reasons as (A), *supra*, these documents and records are likely to show that Defendant Nichols did not obstruct the Joint Session of Congress, but rather the reaction to the discovery the pipe bombs and the risk of there being others on the Capitol grounds was the reason or primary reason for the USCP to make the decision to recommend a recess. Nichols cannot be found guilty beyond a reasonable doubt of obstructing the Joint Session of Congress if in fact it was the discovery of pipe bombs that caused the recess of the official proceeding.  Furthermore, if pipe bombs were planned and planted as a diversion, then whomever planned events on January 6, 2021, would know that Ryan Nichols was not part of the plan.  Communication records would likely confirm that.

### C.  CIRCUMSTANCES UNDER COUNT II OF DELAY OF RESUMPTION OF JOINT SESSION UNDER 18 U.S.C 1512(c)(2)

Similar to (A), *supra*, the Government must disclose all video recordings, plans, reports (especially those prepared prior to January 6, 2021), chats, text messages, social media posts, analyses, radio traffic, instructions from U.S. Capitol Police headquarters or leaders or Metropolitan Police Department leaders concerning (a) how long it would normally take to do a security sweep of the U.S. Capitol building, (b) generally what steps would be involved, (c) what about that process would have been faster if Defendant Nichols had not been there and voluntarily left hours earlier, (d) what steps could have been skipped if Nichols were not there, (e) how the USCP and/or MPD would have cut corners and done the job faster if Nichols were not there, (f) whether the number of

rooms to be searched would have changed if Nichols had not been there, and  (g) what *additional* steps were required before resuming the Joint Session because Ryan Nichols was in or near the Capitol building, or whatever the prosecution intends to try to prove?

Instead of proving a violation of 18 U.S.C. § 1512(c)(2), the Government instead offers the unsupported speculation of some witness – who has not been qualified as an expert – that it takes time (some unspecified time) for law enforcement under the leadership (per statute) of the USCP to sweep the U.S. Capitol building and some (mysteriously unspecified and ever-changing) part of the Capitol grounds immediately around the Capitol building for security before Members of Congress could (or one might say should) return and resume the conduct of the Joint Session of Congress.

However, to the best of counsel's awareness, the Government has never attempted to tell any court or any jury how long it should have taken, whether Defendant Nichol's presence altered that time in any way, or whether there was plenty of slack time such that Nichols' individual presence or absence would not have made any difference.  The Congress in fact resumed at 8:09 PM.

It is no answer to merely offer vague generalities against a burden of presumed innocence until proven guilty beyond a reasonable doubt.  Generic claims that a security sweep would be required are without merit and fail to identify whether Nichols in any way prolonged the required security sweep.  Remember:  Nichols left voluntarily.

Now, it is important to confront that this is the Government's prosecution theory, not a technicality or defense of the Defendant.  The Government is offering fundamentally a hypothetical, counterfactual scenario.  It is the Government trying to plug the hole in its prosecution under 18 U.S.C. § 1512(c)(2).  Prosecutions of this offense have devolved into merely speculating that the time needed for resuming the Joint Session of Congress might possibly have been different between (1) Scenario A with Nichols present and (2) Scenario B with Nichols absent.

Therefore, Nichols is entitled to any information about how long it should take and why would his brief presence have made any difference.

There is only one Capitol building with a fixed number of rooms. The number of rooms to be searched did not decrease or increase based upon Nichols being there.

### D.  ALL INFORMATION ABOUT THE IDENTITY AND ACTIVITIES OF 1% WATCHDOG

Nichols demands of the Government all information about the identity of 1% Watchdog from the Government's investigation and any information about activities on January 6, 2021 or related communications. As detailed in the introduction, 1% Watchdog has previously interacted with Nichols at other events including rescues during disasters and incited Nichols leading up to and on January 6, 2021.  1% Watchdog is a likely witness of Nichols and his intentions.  The Government alleges that Nichols intended to obstruct the Joint Session of Congress as an official proceeding and to do so corruptly.

The Government also alleges that Nichols aided and abetted others – frightfully non-specific as usual – in obstructing an official proceeding.  Those persons around Nichols or in Nichols' vicinity are expected to testify that Nichols did not aid or abet them, which would be strongly exculpatory as to Nichols.  If those allegedly aided and abetted deny that Nichols aided or abetted them, this would be strongly material.

The Government alleges that Nichols had a deadly or dangerous weapon on Capitol grounds which under Federal law includes whether Nichols intended to use an ordinary item or did use it or threaten to use it in a dangerous way.   Furthermore, if 1% Watchdog were involved in planning, inciting, or organizing events on January 6, he would likely know who else was involved and would know that Nichols was not.   The Government alleges that 1 % Watchdog added Ryan Nichols to a Zello chat group, implying that Nichols was knowingly in a plan or conspiracy with him.  However,

Nichols contends that he was unknowingly and involuntarily added to the Zello group and that his membership means nothing.   Information about 1% Watchdog's identity and communications would likely show that there was no coordination or communication between them.

### E.  ALL INFORMATION ABOUT MARCUS DIPAOLA

Nichols demands of the Government all information from its investigation about Marcus DiPaola about activities on January 6, 2021 or related communications, in the nature similar to 1% Watchdog. This would include all communications with any and all agencies and the video he shot on January 6.

Undersigned counsel Geyer represented Oath Keeper Kenneth Harrelson in the first Oath Keeper trial and made extensive requests of the Government adopting a hashtag system developed by the "Sedition Hunters" who are coordinated by a Confidential Human Source (CHS) as disclosed in an unrelated case.[11]   Among those requests to the Government was a request to identify **#redyuppyphotog** who functioned almost as an official videographer of coordinated suspicious actors who were instrumental at breaching and entering in the East.[12]  We subsequently learned that DiPaola is **#redyuppyphotog**. The eyewitness views of DiPaolo would make him an important witness of Nichols' conduct – or lack thereof – on January 6, 2021, for all of the same reasons as identified under (D) 1% Watchdog, *supra.*

### F.  ALL INFORMATION ABOUT ZACHARY JOHNSON

Nichols demands of the Government all information from its investigation about Zachary Johnson about activities on January 6, 2021, or related communications, in a nature similar to 1% Watchdog.

---

[11] https://www.dropbox.com/s/ufraurzii113i2l/IMG_6031.JPG?dl=0

[12] https://www.dropbox.com/s/vgfe0w8kj93cy8m/225-3.pdf?dl=0 pages 5-6.

The Government never sought pretrial detention for Zachary Johnson, even though he was reported to have a prior felony conviction.  Johnson was originally tagged as #Gogglesman by CHS Sedition Hunters. When Nichols responded to the tunnel melee, initially believing that Antifa was attacking protestors with chemical spray and weapons, Johnson handed a canister that the government asserts was pepper spray to Nichols.  This is inexplicable and strange because Johnson could just have sprayed the canister himself.  Why would Johnson hand it to Nichols under any scenario?  Yet unthinking at the moment, Nichols allegedly sprayed a burst in the general direction of police who were actually in the tunnel (thus unlikely to be affected) to signal to them to stop attacking demonstrators and spraying them.  Johnson can be seen on video recordings running around the area before or after his interaction with Nichols tagging protestors and making contact with various weapons.  As with (D) and (E) above, Johnson would be a likely witness of what was going on. Just today the Government has filed a motion for a change of plea hearing where Johnson will plead out to a sole count after multiple counts have been dropped (1:22-cr-00011-RJL; ECF 115).

### G.  MPDC OFFICER MUSTAFFA AK'S BODY CAM VIDEO RECORDING FROM TO 3:55 TO 4:05 PM

Nichols demands that the Government produce Metropolitan Police Department Officer Mustaffa Ak's body-worn camera from 3:55 PM to 4:05 PM. Other video recordings viewing Officer Ak show that MPD Officer Mustaffa Ak's body-worn camera was recording from 3:55 PM to 4:05 PM based on the light showing on the camera.  The camera was located near enough to Nichols to hear what was being said by him and others nearby.  But the Government has withheld this video from the Defendant.  There are plenty of videos showing Ak, but not a video viewed *from* Ak's body cam video.  Defendant contends that the missing video with audio will show Officer Ak drenching Defendant Nichols with tear gas and other officers yelling at him to stop, and saying

"You're going to kill him!"

### H.  INFORMATION ABOUT AND VIDEO FROM "# RED FACE 45" DANIEL DONNELLY'S "GO PRO" BODY-WORN CAMERA FROM 11 AM TO 5 PM

Nichols demands that the Government produce Daniel Donnelly's "GoPro" body-worn camera from 11 AM to 5 PM.

Other videos show that Defendant Nichols was seen in the body-worn camera worn by Daniel Donnelly code-named "Red Face 45" or "Rally Runner."  Yet the video recording of his "Go Pro" camera is missing from the disclosures and discovery production.  This includes the time when "Red Face 45" was in the tunnel in the West side lower terrace, seen handing out weapons to the crowd.  Even though Nichols is clearly in the line of sight of Donnelly's hand-held "Go Pro" camera. The camera is caught in pictures.  Somehow the Government claims to have lost or deleted these videos.

### I.  VIDEO FROM "WAR CORRESPONDENT" DOCUMENTARY FILM-MAKER NICK QUESTED

Nichols demands that the Government produce the videos recorded by Nick Quested on the West side of the Capitol on January 6, 2021, which would show Defendant Nichols but also include the audio of conversations between Nichols, other persons, and law enforcement officers. One of the discoveries made just recently from the Government's belated compliance with discovery is a video showing film-maker Nick Quested standing right next to Defendant Nichols on the West side of the U.S. Capitol, positioned so that Nick Quested's video camera would have both seen and heard Defendant Nichols and events surrounding Nichols.

Nick Quested is a documentary filmmaker who prominently testified in public in an evening hearing of the U.S. House of Representatives Select Committee to Investigate the January 6 Attack

on the Capitol.  Quested claimed under oath that the leaders of the Oath Keepers and the Proud Boys met for approximately 30 minutes in a parking garage on January 5, 2021, and discussed plans for the attack on the Capitol on January 6, 2021.  However, the release of the video of that perfunctory meeting contradicts his claim.   Nevertheless, other video recordings showing Quested filming demonstrate that his camera would have overheard Nichols on the West side of the Capitol on January 6, 2021.

### J.  DISCLOSURE OF LOCATIONS OF BARRICADES AND "AREA CLOSED" SIGNS AT EXACT TIME OF NICHOLS'S ARRIVAL AT 2:45 PM

Nichols demands of the Government all information from its investigation about the existence and survival and state of any signs placing the public on notice of a restricted area as defined in 18 U.S.C. § 1752, *over time* as circumstances changed throughout the day on January 6, 2021, to identify whether Ryan Nichols had effective legal notice on January 6, 2021, when he arrived around 2:45 PM.

The Government claims that certain areas around the U.S. Capitol were legally restricted on January 6, 2021, pursuant to 18 U.S.C. § 1752.  But that is a mixed question of law and fact.  18 U.S.C. § 1752 does not criminalize being in a restricted building or grounds.  18 USC 1752 prohibits ***knowingly*** entering a restricted building or grounds ***without authorization***.  Like all crimes that sound in trespass, this requires knowledge and intent from the standpoint of the accused, not viewed by the accuser.  If a Defendant did not know that he was not allowed to be on the grounds, he cannot as a matter of law be guilty of a trespass-like crime, unless or until ordered to leave and refusing to leave. However, even though everyone loosely talks about demonstrators "trespassing" on the Capitol grounds or in the Capitol building, 18 U.S.C. § 1752 is actually *not* a law against trespassing, strictly speaking.  To be guilty of violating 18 U.S.C. § 1752 there must be a restriction ordered in

aid of the Secret Service protecting a protectee.  It is not so much about being on land or real estate, but allowing the Secret Service to guard a protectee of the Secret Service.

In other words, if the Capitol building were damaged in a rare earthquake like the 2011 Central Virginia earthquake that damaged the National Cathedral, [13] the Capitol building might be closed to the public.  But entering in spite of this closure could not be a violation of 18 U.S.C. § 1752, which only relates to Secret Service protectees.  The Government recites that the Capitol was closed due to COVID.  But COVID is not grounds for a restriction declared under 18 U.S.C. § 1752. There is probably a law that would govern, but it wouldn't be 18 U.S.C. § 1752.

Consider:  If everything about January 6, 2021, were the same as it actually was, except that the Vice President Mike Pence had chosen to allow the President of the Senate to preside and did not attend and the Vice President Elect Kamala Harris had not attended to observe (an incoming V.P. would have no official duties).  If everything else about January 6 had been the same, no one could have been convicted of violating 18 U.S.C. § 1752 because no Secret Service protectees would be present.  (Perhaps the Speaker, but this hypothetical is meant to illustrate the application of the statute not to establish an unchangeable fact.)

Therefore, we are lectured that there were alarms heard going off.  Entering a building with alarms going off is generally not illegal and is not prohibited by 18 U.S.C. § 1752.  Every former high school student is aware that people can pull a fire alarm as a prank or to get out of an exam – here perhaps to disrupt the counting of the Electoral College votes.  That would not make the building or grounds restricted.  It would subject most people to many severe lectures from a mother on the stupidity of hanging around trouble, but it would not violate 18 U.S.C. § 1752.

---

[13]   "10 years since earthquake impacted D.C., damaged Washington Monument, National Cathedral," August 23, 2021, Fox 5 DC,   https://www.fox5dc.com/news/10-years-since-earthquake-impacted-d-c-damaged-washington-monument-national-cathedral

Similarly, we are lectured that demonstrators "must have" seen broken windows. But there is typically no law requiring people to turn and run upon seeing a broken window, and seeing broken windows does not make a place restricted within the meaning of 18 U.S.C. § 1752.

The same is true of witnessing people brawling. Any person would understand that something is wrong particularly if people can be seen brawling with police. But that does not establish a violation of 18 U.S.C. § 1752, which relates only to a Secret Service protectee. That is, 18 U.S.C. § 1752 is not simple trespassing.[14]

On January 4-6, 2021, the U.S. Capitol Police (Governing Board) chose by its own decision not to post any permanent signs or notices on the Capitol grounds warning that sometimes the public park of the grounds might be closed. Instead, the Board directed that small, flimsy signs (some seen in photographs torn in two as being merely paper) be affixed to light-weight, movable bike racks, appearing at a very low height at about waist-high-level in most places.[15]

US Capitol Police also seem to have approved advertised demonstrations and activities that clearly caused confusion.

---

[14]    One could infer a lot about people present and their intentions by arguing that the average citizen would call the police. But if they see that the police are already there, what should they do?

[15]    Most people are conditioned to understand that bike racks either route foot traffic or control when people may enter,  but do not prohibit pedestrian entrance, merely showing where to go, and/or telling pedestrians _when_ the doors to an event open. Bike racks do not signal by themselves to the average person any prohibition of entrance, but rather to signal only timing and the preferred pathway for walking.



Although 18 U.S.C. § 1752 refers to a "building" or "grounds," everyone tends to talk about a "restricted area" probably because "grounds" is hopelessly vague. To have a "Restricted Area" (grounds or building) there must be an "area" to which the restriction applies.   An unidentified, indeterminate area cannot be a restricted area.   For a person to *knowingly* enter a restricted area without authorization, there must be both an identifiable area that is restricted and knowledge by the person of a restriction.   One must be able to *know* (*knowingly*) if they are *on this side of the line* or *on that side of the line*.   If one does not know if they are on the restricted side of the line or on the unrestricted side of the line or on the restricted side of the line, they cannot *knowingly* enter a restricted area.   Until one knows where the line is, they cannot enter an area.

Therefore, under *Brady*, the Government here must provide any and all photographs, video recordings, witnesses, discussions in police radio recordings, etc., of exactly where any signs were visible to the crowds  ***at the time that***  Defendant Nichols arrived at the vicinity of the U.S. Capitol building at around 2:45 PM.  Defendant is entitled to exculpatory evidence as to where signs were ***at that time*** – **not at some other time earlier in the day.**

The Government must identify exactly when and where the Government contends Nichols approached the U.S. Capitol Grounds and the position of any "Restricted Area" signs in that location ***at that time***.  It must identify any and all Government personnel who are witnesses of any "Restricted Area" signs being moved or obscured before any of the Oath Keeper Defendants arrived at the U.S. Capitol.

Videos taken by various persons, including what some are calling "civilian video" taken by random attendees or bystanders, were collected  and posted at "Meet Ray Epps, Part 2: Damning New Details Emerge Exposing Massive Web Of Unindicted Operators At The Heart Of January 6," Revolver News, December 21, 2021, accessible at:  https://www.revolver.news/2021/12/damning-

new-details-massive-web-unindicted-operators-january-6/

It must be emphasized that this is a collection of videos by others. They cannot be dismissed on the grounds of where they were collected and posted in one place. These are not Revolver News' or Darren Beattie's videos. They are the videos of eyewitnesses at the Capitol on January 6, 2021. These are collected and posted there. They are not Revolver's videos.

The point here is that the persons shown removing signs, removing barricades, and rolling up wire mesh fences on which notice signs were affixed are potential witnesses.

Defendant Nichols is accused of ***knowingly*** entering a restricted area without authorization. Those shown in videos removing barricades, moving bike racks, and rolling up wire mesh fencing – and thereby removing all signs providing notice of a restriction – are potential witnesses that may exonerate Defendant Nichols. If the signs were removed before Nichols arrived, then the *knowingly* element of the charged crime cannot be established.

Defendant Nichols is entitled to and hereby demands any and all information of the identification of these persons for the purpose of calling them as witnesses.

### K.  ALL INFORMATION CONCERNING SEDITION HUNTERS

Nichols requests all communications, payment records, raw investigation files, pretrial services files regarding the persons known as "1% Watchdog," Marcus DiPaola, Israel Easterday (#JamesDeanWannabe), Ricky Christopher Willden, James Haffner (#ZZTopPB), Ray Epps, Timothy Allen Hart, Sam Andrews, Ronald Loerke (#MaroonPB), and individuals known as #Pencilbeardinsider, #GooseinGray, #LemonyKickit and #LemonZest, and/or himself regarding anyone with whom the Government has communicated with among the group of private volunteers known as the "Sedition Hunters." Please include all information including raw investigation files for any of these individuals who are symbolled assets, regardless of security classification, all

confidential informants, all confidential sources whether registered or unregistered and regardless of whether they are paid. Also include all government files on all providers of information. Include all payments to these individuals or organizations for which they are members or regarding which they have ownership or management responsibility. This includes direct and indirect payments including grants to NGOs, companies, or individuals. Please include all pretrial services files and probation reports.

We suspect that the Government may be unwittingly shielding CHS that it should have previously disclosed by its 3rd party tip vehicle warehouse relationship with Sedition Hunters or through managing those CHS assets through other state or federal agencies like Homeland Security Investigations where disclosures may be hard to manage.

**L. DISCLOSURE OF ALL INFORMATION COLLECTED BY THE U.S. HOUSE OF REPRESENTATIVES SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6 ATTACK ON THE CAPITOL**

Even if a subpoena is required to be authorized, Nichols demands of the Government all information collected by the Select Committee, including an estimated 40,000 to 41,000 hours of video, along with records, phone records, and deposition transcripts. Nichols is unable to determine from what has been released which items are most relevant, but optimistically assumes that the Select Committee might have decided to index their work. The Select Committee has publicly released a great deal of information that they have gathered about the events on or leading up to January 6, 2021. The outgoing Chair of the Select Committee Rep. Benny Thompson has publicly announced that the Select Committee would publicly release all of the information gathered. However, the Select Committee withheld a great deal of information. For the purposes of due process and a fair trial, the Select Committee must provide this information to the defense counsel. *Brady* is not an "if you feel like it" suggestion. Therefore, the Government must obtain and produce

January 6th Select Committee investigation depositions, closed hearing transcripts, informal interviews, and interview notes for anyone the committee stated it has taken testimony from under oath or likewise interviewed.  This is especially important where there are some witnesses who testified before the Select Committee, were then indicted, and are now legally unavailable to testify for the Defendant because they are now facing prosecution.

Recall that the U.S. Capitol Police is an agency of the U.S. Congress.  Both the Legislative Branch U.S. Capitol Police and the House Select Committee are intimately involved in the investigation and prosecution of the alleged crimes relating to January 6.  Therefore, there is no excuse under *Brady* jurisprudence for the U.S. Attorney's Office not to obtain information directly from the U.S. Capitol Police but not from the Select Committee.

### M. TRAINING MATERIALS AND MANUFACTURER'S INSTRUCTIONS ON USE OF CROWD-CONTROL GAS USED BY USCP OR MPD, ON JANUARY 6, 2021

Nichols demanded production of the USCP and MPD's training materials and manufacturer's warnings and instructions for all types of crowd control gas used by law enforcement officers on January 6, 2021. While, again, these materials may be protected from public release, Defendant Nichols expects that these training materials will emphasize that the various types of crowd-control gas can (and often does) trigger a pharmacological reaction of an extreme aggressor response and rage, particularly if over-used in excessive quantities and/or enclosed spaces.  On one body-worn camera video, a police officer is heard in the West Terrace "tunnel" yelling that the officers "cannot" use the gas "in here" (the tunnel) because it is an enclosed space and that "it will kill people."  Specifically, the officer heard on the video is referring to the fact that some of these gasses chemically binds or sucks up oxygen and people may suffocate because of the excessive doses of the gas in locations where the atmosphere is not freely circulating to replenish oxygen.

Nichols expects that the training materials will warn when the use of the gasses is prohibited and/or dangerous, and when the over-use of gas can trigger a rage response by both police officers and others in the vicinity.

### N. FAILURE TO USE CAPITOL BUILDING'S "BIG VOICE" AMPLIFIED PUBLIC ADDRESS SYSTEM TO NOTIFY CROWDS TO LEAVE

Nichols demanded production of all records and documents concerning the use or decision not to use the Capitol building's massive public address system, sometimes nick-named "Big Voice" to tell crowds to disperse on January 6, 2021. Video recordings indicate that the U.S. Capitol Police used a massive, incredibly-loud public address system (nick-named "Big Voice") *only after dusk* telling people to leave the Capitol Grounds, when the sky was completely dark.

One officer also used a small loudspeaker, called an LRAD. However, an LRAD is designed to throw a voice an extremely long distance not to be heard at close range. Body cam videos show that no one could hear any announcement informing the public that the Capitol grounds and buildings were not available to the public and that the crowds should disperse.

Of course, the laws of trespassing and parallel federal versions including 18 U.S.C. 1752 require advance notice or a request for a person to leave before the person can be prosecuted for trespass. Similarly, 18 U.S.C. 1752 depends upon proof that a person "knowingly" enters a restricted area.

Therefore, it is exculpatory information that the U.S. Capitol Police had the technical capability – which they waited until the sky was dark after dusk to deploy – to notify crowds to depart but chose not to use any means of notifying the crowds that they needed to leave.

Therefore, Nichols is entitled to documents and records of the logs of when any building-wide public address system was used to notify crowds that they were being asked to leave.

IV.      **GOVERNING LAW WITH OVERALL ANALYSIS:**

**A.  RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Rule 16 of the Federal Rules of Criminal Procedure requires that:

> \* \* \*
> Rule 16. Discovery and Inspection
>
> (d) Regulating Discovery. (1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal. (2) Failure to Comply. If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

**B.  LOCAL RULE 5.1**

Local Rule 5.1 "DISCLOSURE OF INFORMATION" prescribes that:

> (a) Unless the parties otherwise agree and where not prohibited by law, the Government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that is known to the Government. This requirement applies regardless of whether the information would itself constitute admissible evidence. The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the Government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case.
>
> (b) The information to be disclosed under (a) includes, but is not limited to: (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged; (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty; (3) Information that tends to

establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged; (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the Government anticipates using in its case-in-chief at trial; and 132 (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the Government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

(c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the Government intends to call at trial, this rule does not require the Government to disclose such information before a trial date is set.

(d) In the event the Government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information.

(e) For purposes of this rule, the Government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The Government has an obligation to seek from these sources all information subject to disclosure under this Rule.

(f) The Court may set specific timelines for disclosure of any information encompassed by this rule.

(g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

## C. DUE PROCESS REQUIREMENTS OF *BRADY V. MARYLAND* NOT SATISFIED BY BURYING DEFENDANTS IN MOUNTAINS OF LARGELY DIVERGENT INFORMATION

Courts in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*. *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

When the Defendant requests *Brady* materials

> **"The Government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.

### D. DUE PROCESS REQUIREMENTS OF *BRADY V. MARYLAND*

Under *Brady*, evidence may still be material and favorable despite being inadmissible, provided it could lead to admissible evidence. *Saffarinia*, 424 F.Supp.3d at 91.

*Brady* information must be disclosed on a rolling basis as available—"the duty to disclose is ongoing." *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987). See *United States v. Celis*, 608 F.3d 818, 835–36 (D.C. Cir. 2010). *Giglio* obligations are also ongoing. Should the Government request it, the Court will enter a protective order precluding counsel from sharing Giglio information with their clients.

 "[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the Government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the Government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would have been different",'

although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963),  is very broad. *See* United States Justice Manual (USJMM) § 9-5.001.  For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence--- including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence.  This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence."  *Id.*

The Defendant is entitled to the documents and the evidence, to the extent potentially or here likely to be exculpatory information as required by *Brady v. Maryland, 373 U.S. 83 (1963)*; *See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014).

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014).

However, the Defendant must raise at least a colorable claim that the material contains

evidence "favorable to him and material to his claim of innocence." *Id*.  Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 134 (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

Even apart from a Rule 29 motion to dismiss at trial, an actual conviction after trial can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the Government which prejudiced the accused. *Id*. Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the Government can be an intentional or inadvertent failure to disclose the evidence. *Id*. at 137.

### E.  *BRADY V. MARYLAND* REQUIREMENTS WHEN SPECIFICALLY REQUESTED VS. GENERAL DUTY OF RELEASING EXCULPATORY INFORMATION

It is highly relevant that the Defendant is explicitly asking for specific information, not passively hoping that the prosecution will notice and think to disclose information on its own initiative.

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

> " The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

However, it is somewhat of an error to understand *Brady* solely in terms of a magic term "exculpatory."   In fact, precedents refer to whether the disclosure of information might be

"material" to the accused's defense, not just straight-up exculpatory:  That is, identity of potential witnesses that the Defendant might call at trial, cross-examination of the Government's witnesses, or investigation that might lead to other information.  That is evidence of innocence might result not from the information disclosed by the Government, but the Government's required *Brady* disclosure might lead Defendant's counsel to the discovery elsewhere of evidence of actual innocence.  *Brady* disclosures could establish an affirmative defense – including a defense that the Defendant's conduct was not illegal (that is, not that the Defendant committed a crime but with an excuse, but that the conduct was not a crime at all).

> "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.[20] Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Id.* at 112.  To extend this point, the U.S. Supreme Court is saying that the requirement that a Defendant be presumed innocent until proven guilty beyond a reasonable doubt is a principle that applies to all aspects of the case, including whether a failure to disclose potentially exculpatory information violates the Due Process Clause.

> "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to a Defendant," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The trial judge's function is limited to determining if a case for production has been successful and supervising the process. *Id.*

Closely associated with the federal rule are several U.S. Supreme Court decisions which hold that a defendant has a right to the testimony of witnesses. *See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l Responsibility Rule 3.8(d).

### F.  GOVERNMENT MUST DISCLOSE FACTUAL BASES OF CRIMES CHARGED

In *Hunter v. District of Columbia* , 47 App. D.C. 406 (D.C. Cir. 1918), for example, the D.C. Circuit Court examined an indictment that alleged that the defendants had

> "congregate[d] and assemble[d] on Pennsylvania avenue, N.W., [and] did then and there crowd, obstruct, and incommode the free use of the sidewalk thereof on said avenue" in violation of the unlawful assembly statute. *Id.* at 408. Beyond the general terms of acts prohibited by the statute, there was no averment of fact "to inform defendants of the nature

of the acts which [were] relied upon by the prosecution as constituting alleged obstruction of the sidewalk, or that would enable defendants to make an intelligent defense, much less to advise the court of the sufficiency of the charge in law to support a conviction." *Id.* at 410. And the fact that the charging document "fail[ed] to set out the acts committed by the defendants which constituted the crowding obstructing of the free use of the walk by them[,]" *Id.* at 409, was a fatal flaw.

As stated by the Hunter Court:

> [i]t is elementary that an information or indictment must set out the ***facts*** constituting the offense, with sufficient clearness to apprise the defendant of the charge he is expected to meet, and to inform the court of their sufficiency to sustain the conviction. ... In other words, when the accused is led to the bar of justice, the information or indictment must contain the elements of the offense with which he is charged, with sufficient clearness to fully advise him of the ***exact*** crime which he is alleged to have committed.

*Id.* at 409, 410 *(emphasis added)* (internal quotation marks and citation omitted).

The *Hunter* Court also observed that the defendants in that case could have engaged in a number of acts that fell outside the scope of the statute, and thus, by failing to specify the defendants' particular conduct, the indictment was "too vague, general, and uncertain to meet the requirements of the established rules of criminal pleading," which in turn rendered it "insufficient in law." *Id.* at 410.

Furthermore, here in this case, the Government has spread the false implication, like an inkblot test, that the U.S. Capitol and its grounds are presumptively restricted areas.  But as Federal courts in this District have reasoned in reaching legal conclusions:

> **<u>The Capitol Grounds</u>** (excluding such places as the Senate and House floors, committee rooms, etc.) ***<u>have traditionally been open to the public</u>***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

The courts in this jurisdiction have long recognized that *"[t]he United States Capitol is a unique situs for demonstration activity"* and *"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,* [a fact which must be weighed] against the Government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added).*

## G.  EVIDENCE OF KNOWLEDGE OF TEMPORARY RESTRICTION IS REQUIRED UNDER *BRADY*

To prosecute anyone under 18 U.S.C. 1752(a)(1), which requires that a Defendant act "knowingly," the Government must prove that the Defendant acted "knowingly."  "Knowingly" is a required element that must be proven to establish guilt.  The Government must not only provide notice of a temporary restriction but must provide such notice in a legally effective way.

Where the U.S. Capitol Police Board attempted – but failed – to provide notice, because it used flimsy paper signs approximately 11 inches by 14 inches, laminated by a thin layer of plastic[16] zip-tied to movable bike racks that were knocked over, hiding the signs, the transformation of a place normally open to the public into a restricted grounds or building has failed to take place, legally.  Even if it was the desire or plan to restrict a building or grounds, if the USCP Board failed to do so effectively, the area was never restricted.  The area was not actually ever restricted because of the inadequacy of notice, but certainly not for those arriving after the bike racks were moved or knocked over, hiding the signs.

## H.  *BRADY* OBLIGATION INCLUDES ALL OF GOVERNMENT TO THE EXTENT REASONABLY FORESEEABLE

---

[16]    At least one photo shows such a sign on a bike rack ripped in two.

While *Brady* obligations do not extend to the entirety of the Government, they do include investigative agencies or agencies closely related who knew or should have known that information would be material to a prosecution arising from their direct involvement.  Here the U.S. Capitol Police are directly related and fully aware of the events of January 6, 2021.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the Government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the Government knew about but failed to disclose to the defendant in time for trial."** ***Coleman v. United States***, **515 A.2d 439, 446 (D.C. 1986). (quoting** ***Lewis v. United States***, **393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.
>
> The Government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know—information which the defendant would like to have but the Government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the Government is required to search for evidence favorable to the accused.").
>
> **However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see** ***Brooks***, **296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).  Furthermore,*

1. Was the recording in the possession of the Government?

The Government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the Government asserts that the Department of Corrections is not an investigative agency for this purpose.

"[T]he duty of disclosure affects not only the prosecutor, *but `the Government as a whole, including its investigative agencies,'* because the Jencks Act refers to evidence gathered by `the Government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied Brady and Jencks requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[17]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the Government). Appellant urges that the Corrections Department should similarly be considered part of the Government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the Government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184,

_____

[17]     This understated reference doesn't fully explain that the prosecution arose directly out of "WMATA regulations" concerning a threatening showdown on the WMATA bus.

223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the Government's behalf, including the police).

* * *

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).*

* * * When WMATA is seeking to enforce its regulations or to protect its employees and involve its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.

**When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee, *cf. United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

*Wilson v. United States*, 568 A.2d 817 (D.C. 1990) *(paragraph break added for emphasis and bold emphases added).*

## V.    CONCLUSION

The Court should order the production of the requested documents and records.

Dated: June 20, 2023
Brooklyn, NY


Respectfully submitted,


 /s/ *Bradford L. Geyer*                               /s/ *Joseph D. McBride, Esq*
Bradford L. Geyer                                     Joseph D. McBride, Esq.
PHV PA 62998                                          Bar ID: NY0403
NJ 022751991                                          THE MCBRIDE LAW FIRM, PLLC
141 I Route 130 South                                 99 Park Avenue, 6th Floor
Cinnaminson, NJ 08077                                 New York, NY 10016
e: radford.geyer@formerfeds.com                       e: jmcbride@mcbridelawnyc.com


## CERTIFICATE OF SERVICE

I hereby certify on this 20th day of June 2023, a copy of the foregoing was served upon all

parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ *Joseph D. McBride*
Joseph D. Mcbride