IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 21-cr-00117-TFH-1 |
| **RYAN TAYLOR NICHOLS,** | |
| Defendant | |

### REPLY TO GOVERNMENT'S RESPONSE (ECF 247)

Defendant RYAN TAYLOR NICHOLS ("Nichols"), through the undersigned counsels, Joseph McBride, Esq. and Bradford L. Geyer, Esq., presents this Reply to the Government's Response in objecting to Mr. Nichols' motion for this Court to enter an Order that the U.S. Government disclose to the Defendant under Rules 6(e)(3)(C) and 16(a)(1)(A) of the Federal Rules of Criminal Procedure, Rule 16 of the same, *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny, and Gray's Due Process rights under the U.S. Constitution.  In support of his Reply, Nichols states as follows:

First, in the tunnel, Metropolitan Police Department (MPD) Officer Ak can be seen at an elevated position drenching the crowd, police and Mr. Nichols with pepper spray under the supervision of MPD Officer Jason Bagshaw. [1] Officers and protestors can be seen pleading with him to stop and one officer appears to say that Ak should stop because spraying the protesters can

---

[1] https://www.dropbox.com/scl/fi/h99xm38genljmdwv7zi9j/Mustafa-Ak-Spraying-Crowd-Kicking-Protestor-In-Face-Bagshaw-Beating-Victoria-While-Protestor-Begs-Her-Not-To.mp4?rlkey=kvfwc1w6bwt87ti0qn0zcfpue&dl=0

kill them.[2] Included in the exchange Ak appears to stomp on a woman.[3] Bagshaw is later observed to beat protestor Victoria White while Ak sprays her in the face while she is pinned in a compressed tangle of police and protestors.[4] The defense is working hard to analyze and interpret this information that changes almost daily because of continuing new disclosures and analyses prompted by public square participation for the first time since draconian censorship controls imposed by the Department of Justice were recently lifted on social media services like Twitter and as long suppressed video has been released by Speaker McCarthy to the media. The defense intends to call one or more experts in use of force to assist the Defense and the Court in interpreting what is a complex visual record on use of force.[5] All first responders, not just Defendant Nichols, were impacted by police use of force that seems objectively extreme.

Second, as the undersigned counsels have previously stated in our last hearing, regardless of the legal restrictions, the defense view is that any discovery failures have impacted defense counsels, line AUSAs, and Trial Attorneys similarly. Prosecutors assigned to these cases are not to blame for the selective disclosures made by others and they, like the defense, have been victims of

---

[2] https://www.dropbox.com/scl/fi/ekmlbfu5di6hsw8weo9xr/Dont-Spray-Em-You-Can-Kill-Em.mp4?rlkey=wdd98h6lvmubtf4go6zkw3hkk&dl=0

[3] Id. at footnote 1.

[4] Earlier in the day, at approximately 2:22 p.m., Bagshaw in front of the inaugural stage can be seen "super-soaking" the crowd with pepper spray and it looks as if second hand spray from Officer Bagshaw may have impacted Officer Brian Sicknick. Epoch Times reporter Joseph Hanneman alerted us to this video. https://www.dropbox.com/scl/fi/5uzf2pota79ka31mpugf8/Jason-Bagshaw-Sprays-Brian-Sicknick-With-Super-Soaker.mp4?rlkey=ojfdbg09m9s4ycedxn1qo5bg0&dl=0

[5] https://twitter.com/CondemnedUSA/status/1661057864851505163?s=20

selective disclosures. The responsibility should be placed on other bureaucratic components such as the Capitol Siege Production Unit, a centralized processing center within the Department of Justice, other agencies including the FBI, HSA, and/or other intelligence agencies, as well as other branches of government such as the District of Columbia and the US Congress.

However, while the Government's response is technically true that the defense did not reference a prior disclosure regarding the identity of 1% Watchdog, that disclosure suggested that the government's efforts to identify and apprehend 1% watchdog hit a dead end at a foreign website, which is not a plausible explanation and does not reflect an earnest effort to identify and apprehend 1% Watchdog. Just like in the case of Ray Epps and certain others, we find the investigative methods employed by the government to lack earnestness, and the intensity of the investigative efforts does not seem proportional to the level of culpability. If someone like a 1% Watchdog played such a defining role as an organizer, instigator, instructor, and advocate for violence against members of Congress, even while protestors were inside the Capitol, one would expect an investigative effort that left no stone unturned.

The government Response denies the relevance of certain defense arguments concerning the applicability of 18 U.S.C. 1512(c)(2), just one example argument being that Mr. Nichols entered the Capitol grounds at 2:45 p.m., over half an hour after the proceedings were disrupted when the House was put into recess at 2:13 p.m.  The government's argument includes the statement:

> "Duplicative causation is the relevant standard for Section 1512 because of the nature of riots generally and the facts specific to the Capitol riots on January 6, 2021.  The delay in the certification had both a single cause, the violent riot, and thousands of causes, the individual rioters.  No one rioter caused the recess of Congress or the subsequent delay in

3

the proceedings and each contributed in part to the ultimate delay in the certification by functioning as a member of a riotous, ever encroaching mass of people who engaged in trespassing, destruction of property, violence, and threatening lawmakers and staff."

Assuming this concept could be a criminal law standard under U.S. law, it still fails because Nichols still arrived on the Capitol Grounds at 2:45 PM – 30 minutes too late. Nichols could not be a part of the duplicative causation because Nichols was not there at the time.

The Honorable District Court Judge Colleen Kollar-Kotelly penned a somewhat poetic metaphor, in her words, about raindrops. Yet, nevertheless, raindrops that fall on a baseball field after the game has already been called for rain and the players have all left the field cannot form any part of the reason that the game was called for rain 30 minutes before those raindrops arrived.

But this puts the cart before the horse. The Government wants to decide we don't need to see the actual documents and records because they can guess that we don't need to see them. The reverse is true: The Defendant is entitled to the information and analysis from these records and documents. And then we can draw what conclusions – or glean such information – as is warranted.

A Secret Service liaison officer "E.G." [6] just testified on July 11, 2023, in *United States v. David Lesperance, et. Al.* about these moments. The noise of crowds approaching outside on the Capitol Grounds triggered only a heightened alert, but did not result in a decision to recess the Capitol or relocate Vice President Mike Pence. She testified publicly on the court record that she notified her superiors who told her to go back and walk the route and check preparations just in case there might be a relocation decision. But no decision was made solely because of there being crowds

---

[6]     Transcript requested.

outside on the Capitol Grounds, was one analysis from her testimony. Her superiors made the decision later without her involvement. She then met the entourage at the bottom of the stairs as they moved down from the Vice President's Capitol office.

While ***Brady*** does have an analysis of "materiality" before the Government has an obligation, there can be no question that if Nichols is charged with disrupting the Joint Session of Congress including under 18 U.S.C. 1512 (c)(2) then it is unavoidably material how, when, and why the Joint Session of Congress was disrupted. Specifically does the recorded, as-it-happened, real-world information about events have anything to do with Defendant Ryan Nichols or not?

It might be possible that the Government cannot or will not produce information because none exists. But that absence of why the Joint Session was disrupted would itself be material information bearing on Nichols' guilt or innocence. If a person were being prosecuted for disrupting an official proceeding about which the prosecutors simply did not know why or how the proceeding was disrupted, it is hard to imagine how that would not be material. Any information that the Joint Session of Congress was recessed for reasons having nothing to do with Ryan Nichols would put an end to Count II under 18 U.S.C. 1512(c)(2). One may be forgiven for wondering if the U.S. Capitol Police and U.S. Attorney's Office is so firmly determined not to disclose why the Joint Session of Congress was recessed because it would be unhelpful to their case.

Nichols simply arrived too late to be part of the Government's theory of the case.

From the evidence the defense has seen, this statement may be incorrect and the information that the defense is requesting is meant to prove to a fact finding body that it is wrong. From the government's perspective, everyone who crossed into a restricted area was a rioter. From that

word-picture "J6 defendant = rioter" the argument easily flows that everyone on the Capitol grounds functioned as part of a riotous, ever encroaching mass of people.[7]

But this is not true for several reasons. The most obvious is that of the high-thousands, if not tens of thousands, of people who entered the Capitol grounds the vast majority of them came, demonstrated, and then left. They never entered the building, came close to any officers, pushed through barriers, destroyed property, committed violence, or threatened anyone. The truth is that these thousands of Americans peacefully entered restricted spaces genuinely believing they had the right to be there. By the time they got there, the signs were down, no officers were there to tell them to leave, and no "Big Voice" was in operation. This is one reason why the defense requests evidence concerning the status of barriers and "Area Closed" signs around the Capitol grounds[8]

The government would have us believe that young children or frail seniors who entered the grounds were automatically "rioters" because they unknowingly crossed a red line that existed only on someone's map.

---

[7] Just today, the Honorable Judge Mehta acquitted James Beeks on all charges even though he entered the Capitol with Oath Keepers in a stack formation who were convicted of having engaged in Sedition and Beeks was part of a smaller group that was alleged to have engaged in an attack on police inside the Senate hallway. So clearly, the government's "one size fits all" prosecution theory is fraying. https://www.cbsnews.com/news/former-broadway-actor-james-beeks-acquitted-of-jan-6-charges/

[8] The government's argument that the defense already has this information conflates having information about where the defendant was with information about where these signs were and their status. Having a video showing where the defendant was does not explain the status of barriers potentially in the field of view of that camera that were blocked on January 6 by intervening objects or in shadows.

A core argument of the defense is that there were in fact two other sets of people who were at the Capitol on January 6:  one set consisting of people who planned, in advance, the storming of the Capitol and the related diversionary acts of leaving bombs at the RNC and DNC; who carried out actions on January 6 in a coordinated way and led the way through police lines; and who left once their work was done.  The other set consisted of thousands of individuals who initially arrived at the Capitol with no thought of participating in any violent, coordinated attack on the Capitol.  The defense is wanting information showing, first, that these two groups existed, and second, showing that the defendant fell in the second group.  What he did that day was done in the heat of the moment.

And now a general observation: the coordinated involvement of thousands of individuals with no prior criminal records in felonious acts, such as trespassing into restricted areas, breaking and entering, and assaulting law enforcement, contradicts established principles of human behavior. Despite the widespread acceptance of this prosecution theory - an attack without precedent initiated by provocateurs prior to the end of President Trump's speech--a 30-minute walk away-- which served as a call to attack during the address by those who did not even attend the address - remains fundamentally implausible.

As video evidence is released and an increasing handful of reviewers see the evidence, the government theory moves from implausible to preposterous as it becomes increasingly clear that original narratives around the day are abjectly false and only made possible through suppression of the evidentiary record. This shows a stunningly incompetent management response.

The official record has been influenced by deceptive government presentations.  Out of context

extreme violence played on endless loops hard baking animus into the population. The infamous red line exhibit used in most, if not all, cases, defending a barrier by a US Capitol Police skeleton crew. [9] These presentations have ingrained false memories and false premises into the public record, necessitating significant efforts to rectify an embedded false record.

The intentional repetition of selective video clips has deeply impacted the collective consciousness of the American people, perpetuating a falsehood that those present on January 6th were hateful, unpatriotic insurrectionists deserving of dehumanizing treatment by the system. Unfortunately, the system went to great lengths to fulfill this narrative, casting a dark shadow of disgrace upon the nation and serving as a stark warning to future enforcement efforts of what law enforcement should never do - turn against a segment of its own citizens with animus.

At the time Mr. Nichols entered the restricted area amongst thousands, there were no visible indicators reasonably indicating that he was breaking the law. He heard or saw, from some distance away, the tail end of indiscriminate and illegal use of less-than-lethal force, which led him to suspect that these were targeted attacks orchestrated by Antifa. The fact that thousands of other peaceful bystanders arrived at the same conclusion serves as confirmation that it must have seemed reasonable.

This is precisely why Mr. Nichols requires access to any and all information regarding the circumstances of his entry, such as the unobstructed path he took to reach the bowl surrounding

---

[9] https://www.dropbox.com/scl/fi/aig8cqlbe2bpvktzxdhjm/Red-Line-Around-Capitol.jpg?rlkey=caif5dgyzncr0yj9y54n7fije&dl=0
This theoretical depiction of laser etched state borders in a Rand McNally road atlas, is false. The grounds never looked like this and to the extent the red lines covered boundaries from what had been declared restricted space, coordinated and possibly trained provocateurs removed signage, fencing and bike racks.

the tunnel and the identities of individuals who swiftly coordinated the removal of barriers. Questions arise regarding the delayed employment of loudspeaker announcements, known as Big Voice, until the evening and the use of excessive and indiscriminate less-than-lethal measures at the same time police ordered a pullback.  Were rank and file police and demonstrators put into a pressure cooker that incited a fight or flight response stoked by anger and panic? What was the role of the epic failure of USCP leadership in the form of Yoagananda Pitman who reportedly ghosted Chief Sund regarding an intelligence meeting just as she ghosted USCP management chains under her who at times begged for approvals to evacuate members of Congress?  Was the USCP and MPD response rational and the response simply be chalked up to incompetence?

Instances of flashbangs and rubber bullets being fired indiscriminately and enraging a crowd of peaceful Americans that simultaneously disabled your own police forces raise concerns Furthermore, when officers themselves were incapacitated by pepper spray and subjected to projectiles (pepper balls and rubber bullets) from behind, it resulted in a collective state of fight or flight among both the crowd and the police. It is important to consider the psychological impact this had on Mr. Nichols and his intentions, as well as intentions of other first responders and former military personnel on both sides of the divide to determine what their reasonable reactions might be when put in a "fight or flight" posture.

It is indeed relevant to any defendant if someone had a plan to create these conditions. Setting up an ambush on Americans is something we all have a common interest in not sponsoring. Mr. Nichols had planned to protest and to protect anyone attacked by Antifa. He never intended to enter restricted spaces, attack the police, or enter the Capitol.

However, by the time he arrived, he was able to stroll unaccosted inside restricted space with thousands of others to just outside the tunnel to take selfies. If this was a natural evolution of events circumstances might still mitigate or even exculpate his actions, but if these conditions were created through some kind of a plan or, even worse, carried out according to a plan by government agents or individuals the government sponsored, this could fully exonerate Mr. Nichols on entrapment and other grounds.

In its response, the government conveniently overlooks the RNC bomb incident because it is reasonable to suspect that whoever had the plan planted the bomb-like explosive devices as a diversion. Here is what we currently know:

Chief Steven Sund listed the time of the RNC bomb discovery at 12:42 p.m. Meanwhile, the Senate staff reports the discovery of the pipe bomb at 12:45 p.m. [10] The discovery of the RNC bomb led to a disruptive change in communications on Ops 1 and Ops 2 channels of police communications precisely when the Ray Epps breach was occurring at the Peace Circle at 12:53 p.m. [11]

Epps went on to lead the breach and played a leadership role in using a large sign as a battering ram by the crowd, and some analysts claim he was extracted by a military "stack" after deploying red smoke. [12] Due to the timing correlation between the bombs and the Ray Epps breach, it is

---

[10] Attachment 1, Page 22. *Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6*, by the Staff for the Committee on Homeland Security and Government Affairs and for the Committee on Rules and Administration. Although it is unclear how precise this 12:45 time estimate is in that it referenced Robert Countee III's testimony to the Senate which says this occurred at "about 12:45 p.m.".

[11] In his book, Sund refers to how "we discussed the pipe bombs and the fact I believed it was a coordinated attack." Location 3658 of 8362 (Kindle).

[12] https://rumble.com/v230vgf-m5-news-has-done-it-again-ray-epps-has-been-caught-breach-no.2-on-j6-uncove.html. This video evidence is also useful in gauging the disposition of the crowd.

reasonable to infer their connection to planned action. We may call independent experts or even former USCP police officials we expect will testify that may be found to share this suspicion.

Because for there to be a plan, there must be planners. We are confident that Mr. Nichols AND THE VAST MAJORITY OF January 6 attendees that the United States Government has demonized through official policy, had no knowledge of this plan and, as a first responder, was put in an impossible position as events unfolded. The fact that the FBI conducted an incompetent investigation into the identity of the bombers, along with its seeming lack of interest or failure to identify suspicious actors and/or material witnesses such as 1% Watchdog, Marcus DiPaola, Ronald Loerke. James Haffner, Ricky Christopher Willden, Israel Easterday, John Sullivan, Zachary Johnson, Timothy Allen Hart, Ray Epps, Sam Andrews, #LemonyKickit, #LemonZest, #PencilBeardInsider, #GooseinGray or handle them in the ordinary course that any trained observer would expect, raises questions about whether one or more federal agencies were responsible for the unfolding events.

Former Lieutenant Tarik Johnson recently issued a public statement regarding malfeasance on the part of the US Capitol Police leadership.[13] He has previously assigned the principal part of the blame to one USCP official whose activities on the day and afterward raise significant questions.[14] Was it malfeasance or incompetence that caused USCP leadership to begin January 6th with a fraction of the usual staff, including a skeleton crew at the point of the initial breach that included Epps, Hart, Loerke, Haffner and others? Chief Sund, in his book, complains about the lack of

---

[13] https://twitter.com/realdefender45/status/1676584184972713989?s=20

[14] https://twitter.com/FreedomExpressM/status/1642570210103250949?s=20

shared intelligence, and Lieutenant Johnson highlights a total failure in leadership where management remained silent as events unfolded. Former Chief Sund has himself raised questions about the failure of the January 6 Committee to have him publicly testify[15] and also raised questions about sharing intelligence and restricting action by the National Guard. [16]

Did inadequate staffing, suppressed intelligence, and leadership failures put everyone - rank and file officers, protesters and members of Congress - at unacceptable risk? The mingling of law-abiding members of the public with agents provocateurs, with understaffed police receiving no guidance and lacking supervisors serving in a traditional "eyes and ears role," made it impossible to properly engage in crowd control and resulted in excessive reliance on "less than lethal" munitions enraging everyone.

In the midst of numerous inexplicable events on January 6th, the lack of arrest of Epps, the FBI's inability to apprehend the pipe bomber who may have planted the bombs as a diversion, intelligence suppression, skeleton staffing and their failure to identify and follow-up on 1% Watchdog and a host of suspicious actors and/or material witnesses in often bizarre enforcement priorities outside the ordinary course all suggest a surprising lack of urgency and capability, which raises doubts about the earnestness of certain investigative efforts. Why?

The government argues that the pipe bombs are not relevant to Mr. Nichols' case and erroneously conflates separate Capitol Hill evacuations on January 6, 2021.  But the Government is offering

---

[15] https://twitter.com/Real_RobN/status/1633296965881696256?s=20

[16] https://twitter.com/InvestigateJ6/status/1643066157518266371?s=20

possible conclusions from records and documents we have not yet seen. Such arguments do not relate to whether the Government must provide the documents. We will learn these matters after seeing what actually happened from the actual documents. *Brady* does not require the Defendant to rely upon the opinions or thoughts of the prosecutors. The timeline is relevant to the overall picture. The possibility that the placement of pipe bombs is apparently designed to be dysfunctional but seemingly set to 1:00 PM might not be unrelated to other events. The Government would have us skip over the part in which *Brady v. Maryland* requires the Government to provide the documents to an accused.

We require this information. We may call upon use-of-force experts who can testify regarding the excessive and unjustifiable use of force against peaceful protesters. We may also seek to have Chief Sund, Officer Tarik Johnson, and others testify for the defense.

**CONCLUSION**

The Court should order the production of the requested documents and records, even if for review in chambers and/or under the existing protective order.

Dated: July 19, 2023

Respectfully submitted,

| | |
|---|---|
| /s/ *Bradford L. Geyer* | /s/ *Joseph D. McBride, Esq* |
| Bradford L. Geyer | Joseph D. McBride, Esq. |
| PHV PA 62998 | Bar ID: NY0403 |
| NJ 022751991 | THE MCBRIDE LAW FIRM, PLLC |
| 141 I Route 130 South | 99 Park Avenue, 6th Floor |
| Cinnaminson, NJ 08077 | New York, NY 10016 |
| e: radford.geyer@formerfeds.com | e: jmcbride@mcbridelawnyc.com |

**CERTIFICATE OF SERVICE**

I hereby certify on this 19th day of July 2023, a copy of the foregoing was refiled as per this Honorable Court's instruction and served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ *Joseph D. McBride*

Joseph D. Mcbride