**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| | |
| **v.** | **Case No. 1:21-cr-00117-RCL** |
| | |
| **RYAN TAYLOR NICHOLS,** *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION**</u>

This is a case about how far the government must go to meet its Constitutional and statutory obligations to turn over evidence to a defendant charged over the January 6, 2021 attack on the United States Capitol. Ryan Taylor Nichols is such a defendant. The government has already provided Mr. Nichols with a considerable amount of information. But he says this is not enough. He has made a sweeping set of fourteen demands for information that he says will help him mount his defense. To resolve those requests, the Court ordered the government to provide more information about its disclosure of surveillance footage in the possession of the United States Capitol Police (USCP). Now that the government has responded, the time has come for the Court to rule on Mr. Nichols's motions.

The Court will deny Mr. Nichols's various requests for additional disclosure. Under the Constitutional doctrine of *Brady v. Maryland*, 373 U.S. 83 (1963) and the statutory regime of Federal Rule of Criminal Procedure 16, defendants bear the burden of establishing their entitlement to the information they demand. Here, Mr. Nichols has not met his burden for any of his fourteen categories and thirteen sub-categories. Some of Mr. Nichols's claims fail because they rely on mere speculation, rather than facts. Others must be rejected because he has not made

the necessary showings of materiality or favorability.  And some of his claims cannot succeed because he requests information not in the possession of the government.

Therefore, the Court will **DENY** Mr. Nichols's motions to compel discovery.

## I.    BACKGROUND

On January 6, 2021, at the United States Capitol, Congress convened in a joint session to certify the vote count of the Electoral College for the 2020 presidential election.  Affidavit in Support of Complaint, ECF No. 1-1, at 3–4.  Then-Vice President Mike Pence presided.  *Id*.  At the time, the Capitol and its exterior plaza were closed to the public and guarded by barricades manned by USCP.  *Id.* at 3–4.  At approximately 2:00 p.m., the immense crowd that had gathered outside the Capitol began to violently force its way past the barricades and officers.  *Id*. at 4.  Shortly after 2:00 p.m., members of the crowd penetrated the Capitol building.  *Id*.  Around 2:20 p.m., members of the United States House of Representatives and United States Senate, as well as Vice President Pence, evacuated the House and Senate chambers, effectively suspending the vote count until around 8:00 p.m.  *Id.* at 5.

The government alleges that Mr. Nichols and Alex Kirk Harkrider took part in the mob that stormed the Capitol and that they intended to obstruct the electoral vote certification.  It also accuses Mr. Nichols of assaulting law enforcement officers in the process. The government has charged Mr. Nichols with two counts: (1) obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; and (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).  Second Superseding Information, ECF No. 262.  The government has charged Mr. Harkrider with seven counts: (1) civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2; (2) obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; (3) theft of government property, in violation of 18 U.S.C. § 641; (4) entering and remaining in a restricted building or

grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (5) disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); (6) disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (7) parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C.  § 5104(e)(2)(G).  *See* Superseding Indictment, ECF No. 59.

On June 20, 2023 Mr. Nichols filed a motion to compel discovery pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).[1]  *See* Nichols Mot., ECF No. 244; Nichols Supp. Mot., ECF No. 245.  Specifically, Mr. Nichols makes the following discovery requests, demanding essentially all information concerning:

1.  USCP surveillance video that has not yet been disclosed;

2.  The cause of the obstruction of the joint session of Congress;

3.  The reasons for Congress's delay in resuming the joint session;

4.  The explosive devices found at the Republican National Committee (RNC) headquarters and Democratic National Committee (DNC) headquarters on January 6, 2021;

5.   Surveillance video recordings of the Capitol Hill Club, RNC headquarters, and nearby area on January 5–6, 2021;

6.   Surveillance video recordings of the DNC headquarters and nearby area on January 5–6, 2021;

---

[1] Mr. Nichols also invoked Federal Rule of Criminal Procedure 6(e)(3)(C).  Nichols Mot. at 1.  This Rule is inapposite, however, because it carves out an exception to the general rule of grand jury secrecy when an attorney for the government seeks to disclose grand-jury matter to another federal grand jury.  Fed. R. Crim. P. 6(e)(3)(C).  None of Mr. Nichols's filings even mention grand jury matters.  The Court will therefore not address what is probably a mistaken, or else a puzzling, argument.  Similarly, Mr. Nichols invokes Rule 16(a)(1)(A), but that concerns oral statements made by the defendant, and Mr. Nichols does not request disclosure of any of his oral statements.  *See* Fed. R. Crim. P. 16(a)(1)(A).

7.  Various alleged government agents or informants, including fifteen specified individuals and one group;

8.  A recording from the body camera of Metropolitan Police Department (MPD) Officer Mustafa Ak from 3:55 p.m. to 4:05 p.m. on January 6, 2021;

9.  Recordings from the body camera of an individual named "Daniel Donnelly";

10.  Videos recorded by a documentary filmmaker named "Nick Quested";

11.  The locations of barricades and "Area Closed" signs as of 2:45 p.m. on January 6, 2021 (the time Mr. Nichols says he arrived at the Capitol);

12.  Materials collected by and records of the House Select Committee to Investigate January 6;

13.  Training materials and manufacturer's warnings and instructions for all types of crowd control gas used by law enforcement on January 6, 2021; and

14.  The use or non-use of the Capitol's "Big Voice" public address system.

The government opposed this motion.  *See* Gov. Response to Nichols Mot., ECF No. 247.  Mr. Nichols filed a reply to the government's opposition.  Nichols Reply, ECF No. 251.  In order to resolve Mr. Nichols's motions, the Court issued an Order requiring "more complete information about the amount and nature of outstanding footage in the possession of the [USCP] that is the subject of those motions."  Order, ECF No. 254, at 1.  In particular, the Court asked the government to address indications that USCP had made thousands of hours of footage available to investigators that had not yet been turned over to January 6 defendants, the announcement of the Speaker of the House of Representatives that he would allow January 6 defendants and their attorneys "access" to non-publicly available surveillance footage from USCP, and the claims of some in the media to have received access to tens of thousands of hours of footage apparently not made available to

defendants in discovery.  Order at 1.   The Court noted that USCP "is a part of the prosecution

team, and evidence in its possession falls within the scope of the government's *Brady* obligations."

Order at 2.

> The Court thus ordered the government to file:

> > a statement(s) by one or more individuals with personal knowledge of the
> > investigative process either (l) certifying that the government has produced in
> > discovery all surveillance footage in USCP's possession that depicts areas of the
> > Capitol building and grounds where defendants Nichols and Harkrider may have
> > been on January 6, 2021 at the time they may have been there, or (2) explaining
> > why any such footage has not been produced in discovery.

Order at 3.  In response, the government informed the Court that "to the best of the government's

knowledge, it has provided all of the Capitol CCV [closed-circuit video] footage that could have

captured [Mr. Nichols's] conduct on January 6, 2021."  Gov. Response to Ct. Order, ECF No. 255.

It stated that its investigation led it to believe that Nichols was present only at the West Front of

the Capitol from approximately 2:30 p.m. to 6:00 p.m., and that Mr. Nichols had not proffered any

information indicating he was present at a different time or place.  *Id.* at 2.  His actions then and

there, the government explained, formed the basis of the indictment.  *Id.*  And the government

stated that it had turned over the footage from every Capitol CCV camera that would have captured

that time and place, except for footage that if disclosed would present a "security concern."  *Id.* at

1–2.

> The government also submitted an affidavit from Thomas A. DiBiase, General Counsel of

the USCP.  Mr. DiBiase stated that USCP has provided the Department of Justice with "all the

USCP footage from the Capitol Complex, with the exception of the Library of Congress, for the

hours of 12:00 p.m. to 8:00 p.m. on January 6, 2021," amounting to 14,000 hours.  DiBiase

Affidavit, ECF No. 255-1, at 1.  Of the footage furnished to DOJ, the Capitol Police Board

designated 17 hours as "security information" pursuant to 2 U.S.C. § 1979, because "it showed

evacuation routes that members of Congress, congressional staff, or official visitors used on January 6, 2021." *Id.* at 1–2.  In addition, USCP designated as off-limits footage depicting sensitive infrastructure or office areas.  *Id.* at 2.  USCP also provided the Select Committee with tens of thousands of hours of footage, including footage from beyond the immediate time and place of the riot.  *Id.* at 2–3.  As for footage USCP provided to Congress, DiBiase stated that USCP is not a party to the process of disclosure and cannot control what the House provides to third parties. *Id.* at 3.  But DiBiase explained that the Committee on House Administration had announced that beginning in September 2023, it would permit January 6 defendants, among others, access to footage, subject to access limitations and security restrictions.  *Id.* at 3; *see also* Comm. on House Admin., Committee on House Administration Access to USCP Video, https://perma.cc/78TY-LK7F (last visited Oct. 3, 2023).

Finally, Mr. Nichols filed a motion for leave to file a reply to the government's response, ECF No. 260, and a reply, Nichols Response to Gov. Response to Ct. Order, ECF No. 261.  In addition, Mr. Harkrider filed an unopposed motion to join his co-defendant's discovery motions, ECF No. 256, which the Court granted, ECF No. 259.[2]  The motions are now ripe for review.

## II.   LEGAL STANDARDS

### A.  Disclosure Under *Brady* and Its Progeny

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  It is important to be clear about what *Brady* is and is not.  *Brady* and its

---

[2] While Mr. Nichols filed the motions, and the government responded to the motions on that basis, the Court will treat them as coming from both co-defendants.  So while this Opinion refers to Mr. Nichols, what is said concerning him applies *mutatis mutandis* to Mr. Harkrider.

progeny have established a specific standard for evidence that the government must disclose.  But "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  If evidence does not meet the standard of *Brady*, then the defendant has no right to that information unless the Federal Rules of Criminal Procedure or a court's local rules provide otherwise.

The threshold issue is whether *Brady* applies.  In *United States v. Ruiz*, the Supreme Court held that a defendant has no *Brady* right to impeachment evidence before pleading guilty.  536 U.S. 622, 629 (2002).  Yet the Court did not decide whether the right to *exculpatory* evidence applies at this stage.  Circuit courts are split on whether a defendant has a *Brady* right to exculpatory evidence before pleading guilty.[3]  The D.C. Circuit has not entered the fray, *see United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015) (declining to reach the issue of whether a defendant waived his *Brady* argument when he pleaded guilty), and judges in the District Court are divided.  *Compare United States v. Pray*, 764 F. Supp. 2d 184, 189 (D.D.C. 2011) ("[T]he Court agrees that *Brady* disclosure is a trial right."), *with United States v. Nelson*, 979 F. Supp. 2d 123, 130 (D.D.C. 2013) (acknowledging the circuit split but holding that a defendant could "assert his *Brady* claim to argue that his guilty plea was not knowing and voluntary.").

When *Brady* does apply, "[t]here are three components of a true *Brady* violation."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching" of the government's

---

[3] The First, Second, Fourth, and Fifth Circuits have held that the *Brady* duty to disclose exculpatory evidence does not apply in the plea-bargain context.  *See United States v. Mathur*, 624 F.3d 498, 507 (1st Cir. 2010); *Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010); *United States v. Moussaoui*, 591 F.3d 263, 285–86 (4th Cir. 2010); *Alvarez v. City of Brownsville*, 904 F.3d 382, 395 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 2690 (2019).  The Seventh, Ninth, and Tenth Circuits disagree.  *See McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003); *Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007); *United States v. Ohiri*, 133 F. App'x 555, 561–62 (10th Cir. 2005).

witnesses. *Id.* Second, "that evidence must have been suppressed by the State, either willfully or inadvertently." *Id.* So, evidence must be in the government's possession, *United States v. Trie*, 21 F. Supp. 2d 7, 23 (D.D.C. 1998), although the prosecution also "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Third, the defendant must have "established the prejudice necessary to satisfy the 'materiality' inquiry." *Id.* For evidence to be material, there must be a "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* The evidence may be material "either to guilt or punishment." *Brady*, 373 U.S. at 87 (1963). Materiality "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). Materiality is thus assessed "based on the suppressed evidence as a whole rather than an 'item by item' basis." *United States v. Martin*, No. 98-cr-329 (RCL), 2021 WL 4989983, at *4 (D.D.C. 2021) (quoting *Kyles*, 514 U.S. at 420 (1995)).

A defendant seeking to establish a *Brady* violation bears the burden of proving those three requirements. *See United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) ("The defendant bears the burden of showing a reasonable probability of a different outcome."); *United States v. Andrews*, 532 F.3d 900, 907 n.3 (D.C. Cir. 2008) (observing that "the burden of showing a *Brady* violation . . . is on the defendant"). A *Brady* claim must be established by facts, not speculation. "[M]ere speculation is not sufficient to sustain a *Brady* claim." *United States v. Mason*, 951 F.3d 567, 573 (D.C. Cir. 2020) (quoting *United States v. Horton*, 756 F.3d 569, 575 (8th Cir. 2014)). The D.C. Circuit has stressed that "[h]ypothesizing that certain 'information, had it been disclosed

to the defense, might have led [defense] counsel to conduct additional discovery that might have

led to some additional evidence that could have been utilized' is disfavored." *Mason*, 951 F.3d at

573–74 (quoting *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (describing reasoning

as "mere speculation, in violation of the standards" the Supreme Court has established for *Brady*

claims)).  Indeed, multiple Circuits have thought it "unwise to infer the existence of *Brady* material

based upon speculation alone" because unless the "'defendant is able to raise at least a colorable

claim that the [disputed material] contained evidence favorable to [him] and material to his claim

of innocence or to the applicable punishment,' no *Brady* violation will be established." *United

States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996) (quoting *United States v. Ramos*, 27

F.3d 65, 71 (3d Cir. 1994)); *accord United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981);

*Thompson v. Davis*, 941 F.3d 813, 817 (5th Cir. 2019).

      In assessing a *Brady* claim, the government's representations matter.  "Normally," courts

"accept the government's representations as to what documents in its possession are 'material.'"

*United States v. Lloyd*, 992 F.2d 348, 352 (D.C. Cir. 1993); *see also Pennsylvania v. Ritchie*, 480

U.S. 39, 59 (1987) ("Unless defense counsel becomes aware that other exculpatory evidence was

withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.")

(footnote omitted).  Of course, a court will not take the government's representations on faith.  But

"it takes more than the adverse party's conclusory suspicions to impel the adjudicator to delve

behind the government's representation that it has conducted a *Brady* review and found nothing."

*Landry v. F.D.I.C.*, 204 F.3d 1125, 1137 (D.C. Cir. 2000).

## B.  Disclosure Under the Federal Rules of Criminal Procedure

      The federal prosecutor's non-Constitutional disclosure obligations are set forth in Rule

16(a) of the Federal Rules of Criminal Procedure.  Fed. R. Crim. P. 16(a).  Discovery is far more

limited in criminal cases than in civil cases.  This reflects a balance between the defendant's need to mount a defense and the government's obligations to preserve limited resources and prevent defendants from abusing the system.

Rule 16(a) provides that the government must hand over to the defendant several categories of information.  Rule 16(a)(1)(E) requires the government, at a defendant's request, to "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and either (i) "the item is material to preparing the defense;" (ii) the government intends to use the item in its case-in-chief at trial;" or (iii) "the item was obtained from or belongs to the defendant."  Fed. R. Crim. P. 16(a)(1)(E).  Evidence is "material" under Rule 16 "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  *United States v. Slough*, 22 F. Supp. 3d 1, 4 (D.D.C. 2014) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)); *see also United States v. Brock*, 628 F. Supp. 3d 85, 99 (D.D.C. 2022) ("Rule 16 applies only to evidence that may influence or impact the outcome of a defendant's trial or sentencing."), *aff'd*, No. 23-3045, 2023 WL 3671002 (D.C. Cir. 2023).  The Rule 16 materiality standard is "not a heavy burden," but it does mean the government need only disclose information if it "enable[s] the defendant significantly to alter the quantum of proof in his favor."  *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (quoting *Lloyd*, 992 F.2d at 351 and *United States v. Caicedo-Llanos*, 960 F.2d 158, 164 n.4 (D.C. Cir. 1992)).

### III.    DISCUSSION

The government has provided Mr. Nichols with the "global" discovery furnished to January 6 defendants generally.  This includes 5.83 million files, amounting to 8.27 terabytes of

information, consisting of materials such as 507 digital recordings of subject interviews and the results of searches of 813 digital devices. Gov. Response to Nichols Mot. at 9 & n.3. The global discovery also includes over 30,000 files of video footage, including body-worn cameras, hand-held cameras, and surveillance cameras. *Id.* The government has also provided tools to assist defense counsel in sifting through and making sense of this trove of information. *Id.*

In addition, the government has provided Mr. Nichols with case-specific discovery. This includes footage from CCV cameras in the Lower West Tunnel (the site of much of the defendant's alleged criminal activity) for the period of 2:00 p.m. to 5:00 p.m. on January 6, footage from the body-worn cameras of 111 officers who might have been near Mr. Nichols around the Lower West Tunnel, and a number of open-source videos complete with timestamps indicating when Mr. Nichols is visible. *Id.* In response to the Court's order, the government maintains that to the best of its knowledge, it has provided Mr. Nichols with all of the Capitol CCV footage that could have captured his conduct on January 6. Gov. Response to Ct. Order at 1.

Of course, the fact that the government has provided Mr. Nichols with a considerable amount of discovery does not necessarily mean it has fully satisfied its duties under *Brady* and Rule 16. Mr. Nichols argues that the government has failed. He demands "any and all" of fourteen categories and thirteen sub-categories of information. Nichols. Supp. Mot. 1–15. The government can commit egregious violations of its disclosure obligations, and has done so in the past. When that occurs, courts in this district have been willing to take corrective action. *See, e.g.*, *United States v. Stevens*, No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. 2009) (granting the government's motion to set aside the verdict and dismiss the indictment after the government admitted to failing to provide the defense with exculpatory information as required by *Brady*). But this is not such a case.

The Court holds that Mr. Nichols has not met his burden under *Brady* or Rule 16 for any of his numerous claims.  "The government's *Brady* obligations are separate and distinct from its obligations under Rule 16 of the Federal Rules of Criminal Procedure."  *United States v. Flynn*, 411 F. Supp. 3d 15, 28 (D.D.C. 2019).  The Court will address Mr. Nichols's demands by proceeding topic-by-topic and considering whether he has met his burdens under each standard. The Court will discuss each request in detail, but the overarching problem for Mr. Nichols is that his creative zeal for theories is not matched by a willingness to ground those theories in facts or buttress them with specific legal arguments.

## A. Mr. Nichols Is Not Entitled to Further Discovery of USCP Surveillance Video

Mr. Nichols has not met his burdens under *Brady* or Rule 16 to require the government to turn over additional USCP surveillance footage.  The government maintains that is has given Mr. Nichols all the Capitol CCV footage that could have captured him if, as the government believes and he does not dispute, he was only present at the West Front of the Capitol from approximately 2:30 p.m. to 6:00 p.m.  Gov. Response to Ct. Order, at 1–2.  The only exception, the government says, is for raw footage that would present a "security concern" if disclosed.  *Id.*   What additional USCP footage does Mr. Nichols demand?

 He does not maintain that he was present outside the time and space identified by the government, so he is not requesting more footage of himself.  Instead, he appears to seek all footage relating to (1) *any* person who at some point had been in the same general area of Mr. Nichols, *see* Nichols Response, at 14; (2) footage from unaccounted-for cameras Mr. Nichols believes to exist, *see* Nichols Supp. Mot. at 3; (3) footage the government has withheld on the basis that it is irrelevant or that its disclosure would present security risks, *see id.* at 4; (4) footage turned over to

the Select Committee, *see id.* at 13; and (5) footage depicting the DNC or RNC headquarters, *see id.* at 2.

The Court will discuss the last two categories alongside Mr. Nichols's broader requests for information concerning the Select Committee and the DNC and RNC headquarters. Mr. Nichols seeks the first three categories of footage to support his defense of entrapment.[4] The basic idea is that the crisis at the Capitol was an elaborate setup by the United States government designed to ensnare peaceful Trump supporters such as Mr. Nichols. On this view, shadowy teams of plainclothes government agents orchestrated the attack, leaving a far larger number of innocent Americans to take the fall. *See* Nichols Reply at 7. Mr. Nichols advances this theory at every turn. *See, e.g., id.* at 10 (claiming that Mr. Nichols was able to enter the Capitol grounds unobstructed and "if these conditions were created through some kind of a plan or, even worse, carried out according to a plan by government agents or individuals the government sponsored, this could fully exonerate Mr. Nichols on entrapment and other grounds").[5]

Mr. Nichols has not carried his burden to make a *Brady* claim. To begin with, the Court does not credit Mr. Nichols's claim that there is a "potential deficit of 1,100 cameras" the footage of which the government has withheld. *See* Nichols Supp. Mot. at 3. It takes "more than the adverse party's conclusory suspicions to impel the adjudicator to delve behind the government's

---

[4] To the extent Mr. Nichols seeks USCP footage to support his other theories—concerning the suspension and resumption of the joint session—the Court will discuss these demands together with his broader requests for all information in support of those theories.

[5] *See also* Nichols Mot. to Remove Sensitivity Designations From Certain Videos Pursuant to Protective Order, ECF No. 63, at 7 (asserting that "government agent provocateurs whose identity the government does not want revealed" were "sent to the Capitol to urge non-violent protestors to become violent"); Nichols Reply at 8 n.9 (asserting that "coordinated and possibly trained provocateurs removed signage, fencing and bike racks" from the restricted area); *id.* at 11 (asserting that the government's investigation into January 6 "raises questions about whether one or more federal agencies were responsible for the unfolding events"); Nichols Response at 3 (stating that Mr. Nichols deserves to know if other January 6 participants "were, in any way, affiliated with, working alongside, and/or under the direction of any Government agency"); *id.* at 4 (asking "[w]hat role did the federal government, the DC government, Capitol police or undercover assets play in" removing barriers to the Capitol and creating a "festival environment"); *id.* at 4 (claiming that evidence "shows police may have participated or tacitly assisted or approved of wrongful conduct").

representation that it has conducted a *Brady* review and found nothing." *Landry*, 204 F.3d at 1137. "Except for bare speculation," Mr. Nichols "has nothing to suggest the existence of" this lost collection of footage. *See Williams-Davis*, 90 F.3d at 514.

As for footage the government has withheld to prevent security risks, Mr. Nichols criticizes "the current approach of allowing the self-interested prosecution to unilaterally" withhold materials on security grounds. Nichols Supp. Mot. at 4. He scoffs at the concern that releasing the entirety of Capitol CCV footage would compromise USCP's ability to protect the Capitol. *See* Nichols Response at 12 ("[O]ne cannot imagine any way in which knowing the characteristics of the capitol security video cameras would earn a spot on the list of factors that 'could compromise USCP's ability to protect the Capitol.'"). He says it would be enough for the government to disclose the footage to Mr. Nichols subject to a protective order. Nichols Supp. Mot. at 4. But less than three years after rioters stormed the Capitol, injuring over one hundred law enforcement officers, inflicting more than a million dollars of property damage, and interrupting the peaceful transfer of power, the Court is astonished by Mr. Nichols's nonchalance about the Capitol's security. It will not second-guess the government's determination that certain footage cannot be turned over without risking the Capitol's security and will not require the disclosure of such materials. *Cf. Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 541, 545 (D.C. Cir. 1977) (recognizing a "law enforcement evidentiary privilege" that reflects "a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources"); *United States v. Cintolo,* 818 F.2d 980, 1002 (1st Cir. 1987) (recognizing a qualified privilege for the "disclosure of confidential government surveillance information" in part because "discoverability of this kind of information will enable criminals to frustrate future government surveillance").

To the extent there is additional withheld Capitol CCV footage that Mr. Nichols seeks in support of his entrapment defense, he has shown neither materiality nor favorability under *Brady*. Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Mr. Nichols advances an extraordinary theory about the true cause of January 6, but he has not substantiated it with actual evidence. Instead, he relies on vague and unverified factual allegations, *see, e.g.,* Nichols Reply at 8 n.9, baseless conjecture, *see, e.g.,* Nichols Supp. Mot. at 9–10, and his own views of how the government's investigations would proceed if things were above board, *see, e.g.,* Nichols Reply at 11.

This is the sort of "mere speculation" that does not suffice for a *Brady* claim. *See Mason*, 951 F.3d at 572; *Williams-Davis*, 90 F.3d at 514. Taking the evidence in this case cumulatively, *Agurs*, 427 U.S. at 112, there is no reasonable probability that the surveillance footage would prove the government's hidden hand, exculpate Mr. Nichols, and produce a different result at trial or sentencing. Requiring disclosure based on "mere speculation" would "convert *Brady* into a discovery device and impose an undue burden upon the district court." *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984). His theory is nothing but a "shot in the dark." *See id.* at 632 (holding that "[m]ere speculation that a government file may contain *Brady* material" was not enough to require an *in camera* examination). Therefore, Mr. Nichols has not succeeded in establishing that *Brady* requires the government to turn over more USCP footage.

Nor can Mr. Nichols meet his burden under Rule 16. Mr. Nichols has not established that the footage is "material to preparing the defense," is intended by the government to be used in its case-in-chief at trial, or was obtained from or belongs to Mr. Nichols. *See* Fed. R. Crim. P. 16(a)(1)(E). For all of Mr. Nichols's requests, the only conceivably applicable basis for disclosure

would be that the footage is material to preparing his defense.   But although the materiality standard of Rule 16 is not identical to that of *Brady*, Mr. Nichols fails under both for basically the same reason.   Because he is seeking footage to support a wild conspiracy theory, the requested footage would not enable Mr. Nichols to "significantly to alter the quantum of proof in his favor" and does not meet the materiality requirement of Rule 16.   *See Graham*, 83 F.3d at 1474.   In the end, his claim to additional security footage founders because he cannot bridge the gap between his theories and the facts.

### B.   Mr. Nichols Is Not Entitled to Disclosure of Requested Non-Surveillance Footage

Mr. Nichols's requests for three specific sources of footage other than surveillance footage fail because he has not met his burden to show that the requested items are in the government's possession.

First, Nichols demands footage from Metropolitan Police Department Officer Mustafa Ak's body-worn camera from 3:55 p.m. to 4:05 p.m., which Nichols claims will show Officer Ak "drenching" him with tear gas.   Nichols Mot. at 15.   But the government maintains that it has already produced all the footage it obtained from this camera.   Gov. Response to Nichols Mot. at 16.   Mr. Nichols challenges this because he claims that unspecified videos suggest Officer Ak's camera was recording at the time.   Nichols Mot. at 15.   Once again, "it takes more than the adverse party's conclusory suspicions to impel the adjudicator to delve behind the government's representation that it has conducted a *Brady* review and found nothing."   *Landry*, 204 F.3d at 1137.   In light of the government's representation, Mr. Nichols has not met his burden.

Second, Nichols demands footage from the body-worn camera of an individual named Daniel Donnelly and nicknamed "# Red Face 45."   Nichols Mot. at 16.   This appears to be a

reference to an individual who has been charged for his actions during the January 6 riot.[6]  But Mr. Nichols does not explain why the government would be in possession of this footage, and the government says it does not have it.  *See* Gov. Response to Nichols Mot. at 16.  He has therefore not met his burden under *Brady* and Rule 16 to show that the requested item is in the government's possession.

Third, Nichols demands videos recorded by a documentary filmmaker named Nick Quested who was present at the Capitol on January 6.  Nichols Mot. at 16.  The government responds that it has already produced all of the materials from Mr. Quested in its possession, and that any additional footage recorded by this private citizen is not in its possession.  Gov. Response to Nichols Mot. at 15.  Nichols has offered no reason to think that the government has additional footage.  He has thus failed to meet his burdens under *Brady* and Rule 16 to show that the government has possession of the requested item.

### C.  Mr. Nichols Is Not Entitled to Disclosure Concerning Obstruction of Joint Session of Congress

Nichols has not established his entitlement to the information he seeks regarding the cause of the obstruction of the joint session of Congress under *Brady* or Rule 16.  He demands:

> Communications, messages, radio traffic, analyses, conclusions, action plans, recommendations, text messages, email messages, including FBI interview Form 302's, FBI Form 1023's, or the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning any reasons for Congress to recess on January 6, 2021.

---

[6] *See* U.S.A.O. D.C., Missouri Man Arrested on Felony and Misdemeanor Charges for Actions During Jan. 6 Capitol Breach (Aug. 2, 2023), https://perma.cc/4MB6-BN26.

Nichols Supp. Mot. at 2.   Similarly, he submits a broad request for information concerning the reasons it took Congress several hours to resume the joint session.   Nichols Mot. at 11.

His theory is that the *true* reason members of Congress fled to safety as rioters stormed the building was because of explosive devices discovered earlier that day at the RNC and DNC headquarters.   Nichols Response at 10.   He also makes a similarly sweeping demand for information concerning the explosive devices, Nichols Supp. Mot. at 2, and surveillance video concerning the RNC and DNC headquarters and surrounding areas, Nichols Supp. Mot at 5.

Mr. Nichols's proposed alternative explanation is completely implausible.   According to the government, the explosives were located over an hour before the evacuations and had already been contained by then.   Gov. Response to Nichols Mot. at 5–6.   The government points out that in the minutes leading up to the evacuation of both chambers, USCP issued an alert about a threat within the Capitol building and urged those inside to hide and keep quiet, which could not have been a response to the explosives.   *Id.*   To back up his alternative explanation, Mr. Nichols can only offer only unconvincing conjecture.   *See* Nichols Response at 10.

Nichols's requests fail under both *Brady* and Rule 16.   First, he cannot establish materiality under *Brady*.   It is not reasonably probable that disclosure of this information to a jury would produce a result different because "in the context of the entire record," *Agurs*, 427 U.S. at 112, it cannot be a pure coincidence that members of Congress evacuated the House and Senate chambers while rioters were storming the halls of Congress.   *See* Gov. Response to Nichols Mot. at 6.   There is no reasonable probability that he could establish this alternative reality.   Mr. Nichols believes the government is sitting on evidence showing the true cause of the evacuation but is "furiously determined to prevent" him from "finding out the facts of what actually happened."   Nichols Response at 10.   But to succeed on a *Brady* claim, a defendant "is required to do more than 'merely

speculate' about" the nature of evidence. *Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012). Absent any actual indication that the requested footage would support Mr. Nichols's version of events, the information is not material and not subject to disclosure.

Second, Mr. Nichols cannot show materiality under Rule 16. Because no amount of information is likely to substantiate his claim that the obstruction of the joint session was unrelated to the riot, the requested information would not enable Mr. Nichols "significantly to alter the quantum of proof in his favor" and is not material in the sense of Rule 16. *See Graham*, 83 F.3d at 1474.

### D. Mr. Nichols Is Not Entitled to Disclosure Concerning Alleged Government Informants

Mr. Nichols' demands for disclosure concerning alleged government informants do not satisfy the standards of *Brady* or Rule 16. They fail because his allegations are baseless, heavy on conjecture but light on facts.[7] It is regrettable that Mr. Nichols relies on such little evidence to make so many serious allegations about real people, who might as a result face real reputational or safety concerns.

Mr. Nichols requests "[a]ll information about the identity of key individuals . . . some as of yet unidentified, from the Government's investigation and any information relating to activities on January 6, 2021 or related communications." Nichols Supp. Mot. 6. He lists fifteen individuals

---

[7] Even if Mr. Nichols could make a colorable showing that the listed individuals were government informants, his *Brady* claim would still fail if the government invoked its informant's privilege. The government has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). Information may be shielded from disclosure under *Brady* or Rule 16 when it concerns a government informant's identity. *See In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 894–95 (D.C. Cir. 1999); *United States v. Rowell*, 979 F.2d 248 (D.C. Cir. 1992). Under *Roviaro*, the Court would balance the defendant's need for information against the public interest in protecting informants. *See Roviaro*, 353 U.S. at 62. And "[m]ere speculation that the informer might possibly be of some assistance is not sufficient to overcome the public interest in the protection of the informer." *United States v. Skeens*, 449 F.2d 1066, 1071 (D.C. Cir. 1971) (quoting *Lannom v. United States*, 381 F.2d 858 (9th Cir. 1967)).

and one group.  Nichols Supp. Mot. at 6–11.  Mr. Nichols does not offer any evidence that these people were working for the government.  He instead relies on conjecture based on bare suspicions.  For example, he thinks some of those present at the Capitol were government agents because of the enthusiasm with which they rampaged—even though many of the specified individuals have been prosecuted for their activities on January 6.  *See* Gov. Response to Nichols Mot. at 13–15.  For many of the individuals, he says only that they "may" be government agents, *see* Nichols Supp. Mot. at 7.  And he alleges that the group comprises volunteers who have assisted the government in collecting information on those present at the Capitol, but he stops short of asserting that they are actually affiliated with the government.  *See* Nichols Supp. Mot. at 11.

Mr. Nichols's assertions only begin to make any sense if one accepts the premise that the January 6 riot was orchestrated by undercover federal agents and agitators in order to entrap peaceful Trump supporters.  As mentioned already, Mr. Nichols repeatedly advances this view, although he does not provide evidentiary support.  Mr. Nichols's belief that the enumerated individuals are government agents, and that disclosure will prove they entrapped him, is pure speculation.  He has not offered firm evidence of what information, if any, the alleged informants would provide.  He has suggested that some could be witnesses to Mr. Nichols's conduct and intentions, Nichols Mot. at 13–14, or "could" help establish an entrapment defense, Nichols Response at 3.  But Mr. Nichols has not offered a factually grounded explanation of how information from the alleged informants would help prove him innocent.  He has offered only speculation as to the information the alleged informants might provide.  Since there is no indication that any of the alleged informants would provide information that would be exculpatory to Mr. Nichols, he has not shown materiality under either *Brady* or Rule 16.

### E.  Mr. Nichols Is Not Entitled to Further Disclosure Concerning Capitol Signs on January 6

Mr. Nichols is not entitled to further disclosure of information concerning the location of "Area Closed" signs at the time he arrived at the Capitol grounds because such disclosure would be duplicative of video footage already produced, and thus not material under *Brady* or Rule 16.

Mr.  Nichols demands all information concerning the signs.  If they were missing by the time Mr. Nichols arrived, he argues, that would show he lacked notice that the Capitol building and grounds were restricted.  Nichols Mot. at 17.  The government counters that itf has already "labored to provide the defendant with all known video footage from his time in the restricted perimeter on January 6, including from when and where he first crossed into the restricted perimeter."  Gov. Response to Nichols Mot. at 17.  To learn about the state of the barriers and signs at the time Mr. Nichols arrived, the government says, all the defendant must do is review the evidence he already has.  *Id.*  Mr. Nichols has not denied that the government has provided him with footage of where he was when he entered the Capitol grounds.  Nichols Reply at 6 n.8.  But he says this is not good enough.  *Id.* ("Having a video showing where the defendant was does not explain the status of barriers potentially in the field of view of that camera that were blocked on January 6 by intervening objects or in shadows.").  He does not, however, say the government is incorrect that the information he seeks "can be gleaned from review of the video footage that the government has already produced."  Gov. Response to Nichols Mot. at 17.

Implicit in *Brady* and Rule 16 is that the defendant cannot demand information duplicative of what has already been disclosed.  *See United States v. Robinson*, 68 F.4th 1340, 1351 (D.C. Cir. 2023) (holding that a document was material under *Brady* in part because "[i]t was not duplicative" of another document); *United States v. Harris*, No. 06-cr-124 (ESH), 2006 WL 2882711, at *2

(D.D.C. 2006) (finding no *Brady* violation when "defendant [said] nothing to contradict the government's representation that the information contained therein [was] cumulative of information to which [the defendant] already ha[d] access").  Because the government has already produced video evidence on the requested topic, any further, duplicative evidence would not meaningfully affect the outcome of trial or imposition of punishment and is not material under either *Brady* or Rule 16.  Therefore, this request fails.

### F.  Mr. Nichols Is Not Entitled to Disclosure of All Information Collected by the Select Committee

The prosecution need not turn over the entire record of the Select Committee because it was not part of the prosecution team.  Materials from this committee not in possession of the prosecution are thus outside the scope of *Brady* and Rule 16.

The Select Committee was a committee of the House of Representatives created to investigate, among other things, the attack on the Capitol complex.  H.R. Res. 503, 117th Cong. (2021) (enacted).  Nichols demands of the prosecution "all information collected by the Select Committee, including an estimated 40,000 to 41,000 hours of video, along with records, phone records, and deposition transcripts," including "investigation depositions, closed hearing transcripts, informal interviews, and interview notes."  Nichols Mot. at 23–24.  The prosecution responds that it will review the material in its possession from the Select Committee and turn over anything required by *Brady* or Rule 16, but objects that it does not possess the entire record from the Select Committee.  *See* Gov. Response to Nichols Mot. at 18.

As discussed previously, *Brady* and Rule 16 only require the government to disclose evidence "within the government's possession, custody or control."  Fed. R. Crim. P. 16(a)(1)(E).  Under *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to

the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. But that does not mean the prosecution has an obligation to disclose evidence held by *any* part of the leviathan that is the federal government. Rather, "[t]he government's *Brady* and Rule 16 obligations extend to 'files maintained by branches of government *closely aligned* with the prosecution.'" *United States v. Bingert*, No. 1:21-cr-91-1 (RCL), 2023 WL 3203092, at *3 (D.D.C. 2023) (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).

This Court has held that the USCP "is a part of the prosecution team" in this case such that "evidence in its possession falls within the scope of the government's Brady obligations." Order at 2. That is because USCP "has actively assisted the government in the investigation and prosecution of" January 6-related cases. *Id.* But the Court made clear it was not lumping together *all* Legislative Branch entities with the prosecution, as it noted that "[w]hile USCP is under the auspices of the legislative branch, it is a police force, not a legislative body." *Id.* The feature that makes USCP distinctive among entities within the Legislative Branch—its investigative rather than legislative nature—is what brings it within the prosecution's team.

By contrast, the Select Committee was a legislative, rather than law enforcement, body. True, part of its mandate was to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex." H.R. Res. 503 § 3(1). But as the D.C. Circuit has observed, House Resolution 503 "expressly authorize[d] the Committee to propose legislative measures." *Trump v. Thompson*, 20 F.4th 10, 41–42 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) (citing H.R. Res. 503 § 4(a)(3)). In the context of assessing the validity of subpoenas issued by the Select Committee, the D.C. Circuit also rejected the argument that the Select Committee had an "improperly law enforcement purpose" because its "announced purpose [was] to 'issue a final report to the House containing

such findings, conclusions, and recommendations' for such 'changes in law, policy, procedures, rules, or regulations' as the Committee 'may deem necessary[.]'" *Id.* at 42 (quoting H.R. Res. 503 § 4(a)(3),(c)). The Court added that "[t]he mere prospect that misconduct might be exposed does not make the Committee's request prosecutorial." *Id.*

*Trump* is instructive because it confirms that the Select Committee, like all Congressional committees, had a primarily legislative purpose, even if it also uncovered information relevant to prosecutions. And while Nichols asserts that "[b]oth the Legislative Branch U.S. Capitol Police and the House Select Committee are intimately involved in the investigation and prosecution of the alleged crimes relating to January 6," Nichols Mot. at 24, he has offered no evidence or argument to substantiate the claim that the Select Committee and USCP were equally involved in the Executive Branch's investigations and prosecutions. Because the Select Committee, unlike USCP, was a legislative rather than a law enforcement entity, it was not part of the prosecution team. Information from the Committee that is not in the possession of the prosecution is not subject to disclosure under *Brady* or Rule 16.

### G. Mr. Nichols Is Not Entitled to Disclosure Relating to Police Training Materials and Manufacturer's Warnings and Instructions

Mr. Nichols has failed to establish the materiality under *Brady* or Rule 16 of police training materials and crowd control gas manufacturer's warnings and instructions. He demands "production of the USCP and MPD's training materials and manufacturer's warnings and instructions for all types of crowd control gas used by law enforcement officers on January 6, 2021." Nichols Mot. at 24. He suggests that "these training materials will emphasize that the various types of crowd-control gas can (and often does) trigger a pharmacological reaction of an

extreme aggressor response and rage, particularly if over-used in excessive quantities and/or enclosed spaces."  Nichols Mot. at 24.

Under *Brady*, Mr. Nichols must show that these items are "material" in the sense that if the defense does not receive them there is a "reasonable probability" of a different outcome.  *Bagley*, 473 U.S. at 682.  But if Mr. Nichols wishes to persuade a jury of a scientifically testable quality of tear gas—that it "can trigger a pharmacological reaction of an extreme aggressor response or rage," Nichols Mot. at 8—he does not need materials from the police and manufacturers.  He can try to establish this through documents available to him through other avenues, such as scientific literature.  Perhaps Mr. Nichols thinks that such information, if it exists, will be more compelling coming from the police or manufacturers.  But "[t]he mere possibility that an item of undisclosed information might . . . help[] the defense, or might . . . affect[] the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *Agurs*, 427 U.S. at 109–10.  There is no reasonable probability of a different result if a jury received information about tear gas from sources other than the police and manufacturers.

For similar reasons, Mr. Nichols has not established materiality under Rule 16, as he has not shown that these materials would enable him "significantly to alter the quantum of proof in his favor."  *Graham*, 83 F.3d at 1474.  Again, he is seeking documents to prove a point that he can just as easily, if not more easily, support through other available sources.  Therefore, Mr. Nichols has not met his burden under either the Constitution or the Federal Rules to get this information.

## H.  Mr. Nichols Is Not Entitled to Disclosure Concerning the Capitol's Public Address System

Mr. Nichols does not fare any better in establishing materiality and favorability for his request relating to the Capitol's public address system.  He demands "production of all records

and documents concerning the use or decision not to use the Capitol building's massive public address system, sometimes nick-named "Big Voice" to tell crowds to disperse on January 6, 2021." Nichols Mot. at 25.  He claims that this system was not used until after dusk.  Nichols Supp. Mot. at 14–15.  He has not, however, explained why evidence of the absence of one potential method of informing the crowd to disperse would be material or favorable under *Brady* or material under Rule 16.  If the voices of police standing fast against the mob did not provide notice to disperse, as Mr. Nichols seems to believe, why would a loudspeaker?  Mr. Nichols's argument is especially puzzling because he elsewhere argues that the ringing of alarms did not provide notice to rioters that the area was restricted.  Nichols Mot. at 18.  "[T]he government is not required to disclose all evidence that could possibly have some remotely favorable impact on a jury's consideration of the case."  *United States v. Blackley*, 986 F. Supp. 600, 606 (D.D.C. 1997).  Mr. Nichols, then, has failed to establish a Constitutional or statutory obligation to disclose information concerning the public address system.

***

Mr. Nichols dismisses the disruption of the Electoral College certification as "the subject of much hyper-ventilating about the threat to democracy."  Nichols Response at 10.  In truth, as this Court has said before, "January 6, 2021, marked a tragic day in American history."  *United States v. Little*, 590 F. Supp. 3d 340, 342 (D.D.C. 2022), *vacated and remanded*, 78 F.4th 453 (D.C. Cir. 2023).  A defendant cannot compel discovery based on bare theories denying the evident reality that a mob of Americans invaded the United States Capitol and used force to interrupt the transfer of power mandated by the Constitution and this country's republican heritage.

## IV.    CONCLUSION

Neither the Constitution nor the Federal Rules of Criminal Procedure require the prosecution to undertake a "broad or blind fishing expedition among [items] possessed by the Government on the chance that something impeaching" or exculpatory "might turn up." *Jencks v. United States*, 353 U.S. 657, 667 (1957) (quoting *Gordon v. United States*, 344 U.S. 414, 419 (1953) (discussing disclosure under the common law)).   In this case, some of Mr. Nichols's discovery requests are less of a fishing expedition, and more like the hunt for the Loch Ness Monster.  The Court is satisfied that the government has met its duty of disclosure.

For the foregoing reasons, the Court will **DENY** Mr. Nichols's motions for disclosure.  The Court will **GRANT** Mr. Nichols leave to file the reply memorandum to the government's Response to the Order of the Court.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____10/16/23_____

Royce C. Lamberth
United States District Judge