**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

RYAN TAYLOR NICHOLS,

              *Defendant,*

Case No. 21-cr-117 (RCL)

## MEMORANDUM IN AID OF SENTENCING

DEFENDANT RYAN TAYLOR NICHOLS, through undersigned counsel, respectfully submits this memorandum, support letters, and videos—for his sentencing, which this Honorable Court will hear on May 2, 2024. This memo argues that the accurate sentencing range is 24-30 months, and the correct sentence is time served. Alternatively, that time served is the appropriate sentence under the 37-46 months guidelines suggested by Probation. This memo also argues that a downward variant sentence of time served is applicable under 18 USC §3553(a) and relevant case law. There are two sections to the downward variance argument. Section One establishes that January 6, 2021, was a Post-Traumatic Stress Disorder (PTSD)-related aberration in Ryan's law-abiding life and that his military service, charitable efforts, and heroic search and rescue work are exceptional. Section Two describes the Federal Bureau of Prisons' abhorrent mistreatment of Ryan Nichols, including a pattern of deliberate indifference to his underlying medical conditions and multiple instances of medical malpractice that harmed him greatly. As well as how the BOP's wrongful use of prolonged solitary confinement against Ryan Nichols exasperated his PTSD and drove him to the point of suicide. The BOP is unfit to care for Mr. Nichols. Further incarceration is dangerous because it will compound harm and aggravate his serious medical conditions. Mr. Nichols respectfully submits that the totality of these arguments demonstrates that a sentence of time served is sufficient, but not greater than necessary, to comply with 18 USC §3553(a).

1

<u>**Memorandum Supporting A Guidelines Sentence Of Time Served**</u>

The Government made a plea offer to Mr. Nichols on September 27, 2023, the same day the DC Circuit heard oral arguments in *US v. Brock,* 94 F.4th 39 (2024). Mr. Nichols accepted the Government's plea offer on October 2, 2023. He pleaded guilty on November 7, 2023. Undersigned Counsel argued for Mr. Nichols's continued release at that hearing. The Government argued for remand. Mr. Nichols was remanded per the plea agreement.  Mr. Nichols thanked Your Honor for listening to his heartfelt apology and returned to jail. The DC Circuit's *Brock* decision rendered §2J1.2 enhancements inapplicable to January 6 cases, invalidating eleven points worth of enhancements under the first Pre-Sentencing Investigative Report, which grouped the charges and applied enhancements under the 18 USC 1512(c)(2) charge, "Counts 1 and 2 group because one of the counts embodies conduct that is treated as a specific offense characteristic…"  (ECF No. 294, para. 59). The second PSR ungrouped the charges and justified said ungrouping by directly contradicting the language of the first PSR. "Groups 1 and 2 cannot be grouped together… as they represent separate and distinct harms." (ECF No. 301, para. 55). To presumably compensate for the DC Circuit's decision in *Brock,* Probation has now run up the scoreboard on the enhancements under the 18 USC 111(a)(1) charge.  But in doing so, Probation has engaged in the prohibited practice of double counting by compounding multiple enhancements for the same exact conduct.

**The Four Point Specific Offense Characteristic Enhancement Identified in Paragraph 62.b of The PSR Must Be Stricken Because of Double Counting.**

In *United States v. Farrow,* 198 F.3d 179 (6th Cir. 1999), the Sixth Circuit set out the analysis for double counting enhancements under the Guidelines, instructing that "Double counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence

in two separate ways." That is exactly what has happened here. Paragraph 62b of PSR #2 enhances Ryan's calculation by four points for using a dangerous weapon: "…the defendant took a large red canister of OC or pepper spray and delivered two streams of spray hitting multiple officers…" Paragraph 62c then enhances Ryan's calculation by an additional six points for committing an offense in "a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer. . . assaulted such officer…" Probation is wrongfully using the singular event of Ryan assaulting an officer with spray to enhance his guidelines two separate times. This is precisely the kind of double counting that *Farrow* prohibits. Ryan Nichols objects to including the four-point enhancement memorialized in Section 62. b of the revised PSR because it is a product of impermissible double counting. Applied here, Mr. Nichols's Revised Total Offense Level adjusts downward from twenty-one (21) points to seventeen (17) points. Mr. Nichols's USSG Criminal History Category is one (1). **As such, the correct Sentencing Guidelines Range is 24-30 Months, and the applicable sentence is time served.**

### Time Served Is Appropriate Under The Sentencing Guidelines Range of 37-46 Months, Suggested By Probation in the Second Presentence Investigative Report

Ryan Nichols was imprisoned for 674 days from January 18, 2021, to November 22, 2022. He was then incarcerated at home for 350 days from November 23, 2022, to November 7, 2023. He was imprisoned a second time on November 7, 2023, an additional 177 days as of May 2, 2024. (674 prison days) + (177 prison days) = 851 prison days, or 28 months. Mr. Nichols also endured 350 days of home incarceration. (851 days of imprisonment) + (350 days of home incarceration) = 1201 days, or 39.3 months of confinement, which exceeds the bottom of the USGG calculation by two months. Mr. Nichols submits the below memo for a downward variance to support his argument that time served is appropriate in his case, irrespective of the Sentencing Guidelines.

## MEMORANDUM SUPPORTING A DOWNWARD VARIANT SENTENCE OF TIME SERVED UNDER SECTION 3553(A): SECTION ONE

Ryan Nichols enlisted in the Marine Corps to fight for America in the War on Terror. Ryan was deployed to Okinawa, Japan, at the 9th Communications Battalion, not the Middle East.  Ryan was always considered the platoon's go-to non-commissioned officer (NCO) and often led classes and physical training for his fellow Marines.  Ryan was on an Auxiliary Security Force in Okinawa the week of September 11, 2022, when a Japanese nationalist approached his post and threatened to blow up the base. Ryan mitigated the security threat using non-lethal tactics and averted a major disaster. Even though Ryan did a good thing, he was punished because his commanding officer thought that Ryan should have used more force, even deadly force, to eliminate the threat.  This experience traumatized Ryan and made him feel a tremendous amount of shame. Ryan participated in four Typhoon rescue and relief efforts in Okinawa. After Okinawa, Ryan was stationed at Camp Pendleton with the 2nd Battalion 1st Marines, where he led a platoon establishing open roads and communications for an entire Marine battalion. Ryan was honorably discharged as a noncommissioned officer in the U.S. Marine Corps in 2014. He was awarded the Good Conduct Medal, 4th Award Rifle Expert, Global War on Terrorism Medal, National Defense Medal, and Overseas Service Ribbon.[1] Like many veterans, Ryan developed PTSD after his military service—but he ignored it.[2]  His thinking was like this: "I wasn't deployed to Afghanistan or Iraq. Who am I to have PTSD?" He did not consider the compounding effect of his search and rescue work, the Okinawa incident, or military training on his brain.  In his mind, he was not worthy of a PTSD diagnosis because he did not see combat.  Yet inwardly, he struggled with depression, anxiety, feelings of worthlessness, suicidal ideation, self-medication, and drug addiction.

---

[1] *See* EXHIBIT A:  DD214
[2] *See* EXHIBIT B:  Medical Records Indicating PTSD Diagnosis

When a person has PTSD, the physiology of their brain becomes altered. The physical composition of a PTSD brain, synapse activity, and emotional regulation and responses are all affected.  PTSD causes a dysfunctional Anterior Cingulate Cortex (ACC) in brain physiology. This is highly relevant because the ACC detects threat levels in an individual's surroundings and determines responses and conflict resolution regarding any perceived threat.[3] This means that a PTSD brain perceives environments, gauges threats, and reacts differently than a non-PTSD brain.

COURTS HAVE VARIED DOWNWARD IN SITUATIONS WHERE THE DEFENDANT HAD IMPULSE CONTROL PROBLEMS.  In *United States v. Myers,* 503 F.3d 676, 687 (8th Cir. 2007)**,** the Court found that the defendant's Attention Deficit Hyperactivity Disorder, Disruptive Behavior Disorder, and Tourette's Syndrome diagnoses interfered with his ability to control his impulses, which reduced culpability for his actions. The *Myers* Court varied 40% below the Sentencing Guidelines range. The defendant acknowledged at sentencing his mental impairment and his desire to obtain help and treatment. *Notably,* while the defendant made serious threats, he never carried through on any of the threats made. This begs the question, does PTSD affect a person's ability to control their impulses?  Medically, the answer is yes.[4] This begs the follow-up question: To what extent does Ryan Nichols' PTSD affect the analysis of the nature and circumstances of his offense?

---

[3] "The ACC is involved in resolving the extent to which threat is attended to, based on the integration of external and internal clues…In addition, under-engagement of the ACC during negative emotion processing suggests deficiency in error detection, perhaps as it relates to conflict resolution in terms of whether emotional states should be inhibited based on probability of true threat." Functional Neuroanatomy of Emotion and Its Regulation in PTSD Fitzgerald et al (2018)

[4] The presence of PTSD may exacerbate these deficits in decision-making related to emotion-driven impulsivity. Individuals with PTSD display dysfunction in both bottom-up (e.g., perception) and top-down (e.g., appraisal) emotional processing. For instance, individuals with PTSD are more likely to (a) exhibit an emotional response after the presentation of an emotionally See: Emotion in PTSD, Chapter 15- Emotion Driven Impulsivity, Academic Press (2020)

　　　<u>Ryan Nichols went off his psychiatric medication during the summer of 2020.</u> He was happy, life was good, and he had not had a PTSD-related episode in months. Ryan went off his psych meds because he was focused on living clean, which included living chemical-free.  While Ryan's intentions were pure, he should have never gone off his meds.  His mistake is one that's repeated by many people on psychiatric medication. "Warren's aim was to be chemical-free within one month from the start of his withdrawal. The closer Warren got to this goal, the more overwhelming his depression…Experiencing severe suicidal ideation, Warren…restart[ed] the Prozac."[5]

　　　Ryan's earnest desire to legally participate in political protest was hijacked by his PTSD, which told him that America was under attack.  By the time Ryan walked over to the Capitol from the Ellipse on January 6, his PTSD had reached category-5 five hurricane status. His pupils were dilated. His heart was pounding. His worst suspicions were confirmed when he arrived on the Western Terrace. We've all seen the video. It was war. The man out on the ledge calling for people to defend themselves had just learned that Ashli Babbitt had been shot.[6] The man who recorded the speech on the night of January 6 was so detached from reality that neither Ryan nor anyone from his family recognized him. That is a man who lost impulse control because PTSD hit the override button in his brain. "In military veterans, such attributions may be shaped by military training because the ability for military personnel to respond aggressively without hesitation when called to do so is critical to combat operations." [7]

---

[5](*See*:  When  Patients  (Disastrously)  Go  Off  Their  Psych  Medications  @ https://www.psycom.net/prozac-effexor-lithium-patients-off-medications (Last visited on April 27, 2024)

[6] (See EXHIBIT C, at page 4: Ryan received communication that Ashli Babbitt was just shot.

[7]*See:* Posttraumatic Stress Disorder, Hostile Cognitions, and Aggression in Iraq/Afghanistan Era Veterans. Psychiatry. 2016 Spring;79(1):70-84. doi: 10.1080/00332747.2015.1123593. PMID: 27187514; PMCID: PMC4973515

<u>Ryan Nichols does not stand for violence.</u> The entire history of his life is one of service to others. Ryan is mortified by the videos and images depicting his outlandish January 6 behavior. He apologizes sincerely for his words and actions on January 6, 2021, which harmed his family, country, and himself. <u>January 6 is a severe and unfortunate aberration in his law-abiding life.</u>  Like the defendant in *Myers*, Ryan Nichols has a mental illness that interfered with his ability to control his impulses on January 6, 2021, which reduces culpability for his actions under *Myers'* logic.  Ryan Nichols is NOT raising his mental illness as a defense; otherwise, he would not have accepted a plea.  He is, however, raising his mental disability to overcome the notion that he stands for violence—even if those frightful words came out of his own mouth. <u>Juxtaposition of Ryan's military service, charitable efforts, and heroic search and rescue work with his January 6 conduct is proof-positive that January 6 was truly an aberration in the everyday behavior of this law-abiding veteran, husband, and father who has lived a life of exceptional public service.</u>[8]

**Lisa Chatham:** *Ryan's Mother-in-law* (Support Letter Excerpt)

Ryan's family is his whole world…He does not "Stand for Violence."

**James (Jimmy) Chatham:** *Ryan's Brother-in-law* (Support Letter Excerpt)

"He's taken me in and helped me get back on my feet when I was at the lowest point in my life. I had some health issues that led to a massive set back in my life lasting about 4 years in total.

Ryan came and moved me from Houston Texas to Dallas Texas to live with him and my sister. I had lost over fifty pounds and had developed severe depression. Ryan gave me a job (which he was very attentive in adapting the job requirements to best suite my challenges at the time) , a close friend, a place to live and fed me while I got myself back together. This man helped save my life. He helped encourage me to open up my own business and now I have a team of 8 people that I work closely with to serve the greater Houston area…

We all make mistakes in life, sometimes we do and say things that we don't truly mean in the moment while under stress. What I can say is, Ryan Nichols does not stand for violence. The real Ryan Nichols isn't what was shown on January 6th. The real Ryan Nichols is what every American, every father and every man would hope to be."

---

[8] See EXHIBIT J: Videos In Support of Ryan Nichols's Sentencing Memo

COURTS HAVE VARIED DOWNWARD FOR EX-MARINES WHOSE RECORD OF ACTIVE DUTY AND CIVILIAN PUBLIC SERVICE DEMONSTRATES A PREDISPOSITION TOWARD HELPING OTHERS. In *United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005), the court affirmed a downward departure for an ex-Marine who, as a volunteer firefighter, had rescued a three-year-old from a burning building, delivered three babies, and administered CPR to persons in distress. The record plainly demonstrates the "exceptional degree" of Canova's public service and good works. He honorably served in the Marines for six years, mostly in the active reserves. As a Long Island volunteer firefighter, he sustained injuries in the line of duty three times. On one such occasion, he risked his life by entering a burning building to rescue a three-year-old hiding under a bed, but his efforts were to no avail; the child subsequently died in the hospital. He also participated in the successful delivery of three babies and administered cardio-pulmonary resuscitation ("CPR") to persons in distress. In *Canova,* the defendant's military and volunteer service all occurred more than twenty years before sentencing; nevertheless, more recent incidents demonstrated that Canova's commitment to helping persons in distress was an instinctive part of his character.

COURTS HAVE ALSO VARIED DOWNWARD WHERE A DEFENDANT'S "HANDS-ON" CHARITABLE ACTIONS HAVE TANGIBLY HELPED VULNERABLE PERSONS. In *United States v. Huber*, 462 F.3d 945, 952 (8th Cir. 2006), the Eighth Circuit affirmed a downward departure for a defendant who had loaned money to neighbors and fellow farmers in need, saving farms from foreclosure. The *Huber* Court noted that the district court decided that the defendant's conduct compared favorably to that described in *United States v. Woods,* 159 F.3d 1132, 1136 (8th Cir.1998), where a downward departure was affirmed because the defendant took two troubled young women into her home and paid for their schooling and helped the elderly.

Fifty-seven-character letters were submitted in support of Ryan Nichols' Sentencing Memorandum.  Family members submitted fifteen letters. Professional acquaintances and employees submitted fourteen letters.  Twenty-eight letters were submitted by friends and members of his faith community.  These letters describe Ryan as loving, generous, considerate, kind, brave, charitable—and non-violent. (*See* EXHIBIT H. Support Letters)

**Michael Oonk:** *Business Associate & Friend* (Support Letter Excerpt)

When disaster struck Houston in 2017 after a hurricane and flood, Ryan convinced us we had to go help those that couldn't help themselves. He bought supplies, a boat and trailer, rounded us up and off we went to do high water rescues. I saw him take his life jacket off and give it to a senior that we had to paddle to safety on the boat.

Ryan believes in right and wrong. He can't stand to see people or animals suffer. He has all the hallmarks of a good human being. He is not infallible however. He loves the marines, he loves his family, and he loves his country. We could all use more people like Ryan.

**Justin Griffith:** *Ryan's Friend* (Support Letter Excerpt)

In early 2020 I was involved in a vehicle accident. I remember finding myself without transportation and in need of help, Ryan decided to use his social media following on both a personal a business level to raise over $1,000.00 to help me get into another vehicle.

Ryan has been an active part of my life for over 3 years and I can tell you Ryan thrives off of helping other people, he loves to help in times of need.

**Donald Spradling:** *Employee of Ryan's Company* (Support Letter Excerpt)

I experienced first hand his [Ryan's] generosity during the pandemic when I could not find a place to stay due to the pandemic fear, so he set me up with a free place to stay in the warehouse where my office was and made sure I was comfortable and had everything I needed. Because of his heart felt generosity, I not only had a safe haven to sleep in, he also provided me with all the tools I needed to be successful, such as training programs, industry knowledge and Mentoring, and because of his desire to help others, I am in the process of launching my own apparel Brand, and it is because Ryan took the time to show me how much he cared about me and my children!

Ryan and Bonnie Nichols are small business owners at Wholesale Universe, which employs 10-18 people. Ryan spends considerable time coaching e-commerce business owners on managing and scaling their businesses. Ryan offers free online digital training and local seminars for 2,000-3,000 enrolled students who want to learn about e-commerce and how to grow their online business across multiple platforms. Ryan and Bonnie house supplies in their warehouse and donate to local organizations like Highway 80 Rescue Mission, The Women's Shelter, and Heavy Coats for the Homeless in Dallas, Texas. Ryan pays his staff members to take work off to participate in rescue relief with Rescue the Universe.  And Ryan, of course, is committed to helping military veterans suffering from PTSD in the most hands-on way possible.

Ryan Nichols founded a 501(c)(3) called "Rescue The Universe" that specializes in helping military veterans cope with PTSD by sending them on search and rescue missions to rescue people from areas affected by natural disasters.  Ryan and his co-defendant, Alex Harkrider, share a bond in that both suffer from PTSD.  Ryan met Alex in 2011 while in the Marines. In 2019, Ryan surmised that Alex was close to committing PTSD-related suicide after a Facebook post that Alex made.  Ryan showed up unannounced at a restaurant where he knew Alex was. Ryan saw that Alex was clearly distressed and depressed. Ryan is no doctor.  Ryan, however, explained to Alex that the experience of saving people's lives through search and rescue work helped Ryan cope with his PTSD.  Ryan told Alex he needed a guy that he trusted to come on the next mission. Harkrider jumped on board immediately and has been doing search and rescue work ever since. **"Physically, mentally, emotionally, Ryan Nichols saved my life." —Alex Harkrider**



*Ryan Nichols & Alex Harkrider Heading Out on A Water Rescue*

**Alex Harkrider:** USMC Veteran, Purple Heart Recipient (Support Letter Excerpt)

I served 4 years in the United States Marine Corps infantry as an 0311 rifleman and deployed to Iraq and Afghanistan… I struggled desperately upon returning from deployment and those struggles magnified immensely post transition from Marine Corps to civilian life.

For years I've battled with PTSD and everything that comes with it from the sleepless nights to the anxiety, depression, and everything in between. I lost any feeling of any sort of purpose for a very long time. In fact, I credit those days with being by far the lowest and darkest points of my life…

One evening when I was having dinner at a restaurant alone, Ryan took it upon himself to pop in…Before we parted ways…he told me about the disaster relief nonprofit that he started called Rescue the Universe.

He told me he wanted people he could trust to help him with and asked me if I would join him on the next hurricane that came which ended up being hurricane Barry. When I joined him for that, I had no idea how much that little trip would impact and change my life for the better.

11

Ryan has responded to dozens of storms as a search and rescue specialist. His search and rescue work received international recognition after videos of him rescuing puppies during Hurricane Harvey went viral on the Internet. Ryan was featured on The Ellen DeGeneres Show on September 25, 2018.  DeGeneres gave Ryan a ten-thousand-dollar check for a honeymoon trip. Ryan and his wife did not use the check for a honeymoon trip but instead purchased a rescue boat that has since been used to rescue hundreds of lives from dangerous flood waters.[9]



---

[9] *See* Ryan's appearance on Ellen DeGeneres Show @ https://rumble.com/v1ffri1-ryan-nichols-on-the-ellen-degeneres-show.html

Ryan holds himself to an impossible standard, and though he has saved the lives of hundreds of people and animals from the devastation of natural disasters, there were always lives that, despite his herculean efforts, could not be saved. Ryan has personally witnessed people perish from drowning, being crushed, and electrocution. Even when he was able to save a life, the fear and suffering that he saw left him traumatized.  For example, during Hurricane Michael, which ultimately resulted in the deaths of 74 people, Ryan drove from Texas to Florida to assist the Coast Guard in rescue relief.  During the rescue mission, he received a call for help from a woman in the middle of the night.  An eight-month-pregnant woman was trapped in her home, and the roads leading to her house were completely inaccessible.  Fortunately, Ryan saved the woman, but the terrified woman's voice and the look on her face haunt him to this very day.  On another occasion, he was called upon to evacuate several nursing homes.  The staff evacuated and left the elderly residents to die. Ryan tried to save as many lives as possible but could not save everyone.

**Brandon Currie, USMC** (Support Letter Excerpt)

I met Ryan Nichols while I served in the United State Marines Corps with him in Okinawa, Japan. While I served with Ryan, he was one of the best NCO's I served with.

He would talk to Marines for hours going over their problems and struggles seeing if he could ease their pain.

When I personally was struggling with changing circumstances in my life Ryan was there for me. He talked to me for hours listening to my every cry. After this he gave me advice and told me how he had been through a similar situation. He helped me during my time of darkness when no one else was around.

**Cajun Navy 16:** *Non-Profit Org* (Support Letter Excerpt)

Cajun Navy 2016 is grateful to have Ryan Nichols as a volunteer. Ryan is a leader and highly motivated to serve others. He is always one of our first volunteers to step up during times of need. We have been honored to have him as a part of our team for over a year. During which he responded to multiple missing persons, Hurricane Barry, and Hurricane Imelda. Ryan is valued for his many virtues including; honesty, dedication, heart to serve, and leadership abilities.



**TOP LEFT:**  *Ryan Nichols Night Rescue of Woman and Her Toddler From Flood Waters*

**TOP RIGHT:**  *Ryan Nichols Pulling Up To Woman Trapped in Her Home From Flood Waters*

**MID LEFT:**  *Ryan Nichols Rescues Four Children and Two Adults*

**MID RIGHT:**  *Ryan Nichols and Co-Defendant Alex Harkrider*

**BOTTOM:**  *Ryan Nichols Rescues and Elderly Woman and Child*

Ryan Nichols's military service and search and rescue work constitute overwhelming grounds for a downward departure under the line of cases in *United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005), *United States v. Huber*, 462 F.3d 945, 952 (8th Cir. 2006), and *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005). Here are some of the more notable search and rescue efforts completed by Ryan Nichols from 2017 to 2020:

| Storm/Natural Disaster | Year | Notable Efforts |
|---|---|---|
| Hurricane Harvey | 2017 | Ryan and a team of business colleagues worked together to raise over $30,000 in supplies including: a boat, motor, diapers, food, formula, water, and other resources to assist with relief efforts, even though Ryan's own family lost most of their belongings in Harvey. |
| Hurricane Florence | 2018 | Ryan drove over 2000+ miles to lead multiple water rescues where he rescued dozens of women, infants, children, the disabled, the elderly, and animals.<br><br>Ryan was recognized by Ellen DeGeneres on The Ellen Show for search and rescue relief for multiple animals and persons. Ellen sponsored his Non-Profit by donating funds which was used to purchase a new rescue boat. She also donated 25,000 towards the Animal Humane Society in honor of Ryan. |
| Hurricane Michael | 2018 | Ryan worked in conjunction with US Coast Guard in Panama City, Florida for Med-Evac helicopter rescues. He was able to guide the helicopter pilots to specific locations using only his phone.<br><br>Ryan and his father Don Nichols preformed a search and rescue for eight-month pregnant women that was missing, her home had collapsed on top of her completely in Panama City, Florida. |
| Hurricane Barry | 2019 | Rescue the Universe teamed with Cajun Navy in Jennerete, Louisiana. Ryan was recognized on A&E for search and rescue relief in conjunction with Cajun Navy. |
| Hurricane Dorian | 2019 | Ryan and Alex Harkrider helped clear roads for first responders in South Carolina and North Carolina. |

| | | |
|---|---|---|
| Tropical Storm Imelda | 2019 | In Vidor, Texas Ryan preformed a high-water horse rescue for a Texas State Trooper where he led several trained horses to safety. Ryan also performed a rescue for an elderly bedridden man and his disabled family. |
| Hurricane Sally | 2020 | In Foley, Alabama Ryan and his team worked with the City of Orange firefighters and rescued 50+ people that day on video. Many rescues were babies, children, and elderly.<br><br>Worked together with Orange Beach Fire Department and other first responders. They managed to save and remove a man from a collapsed building who was near death. |
| Hurricane Laura | 2020 | Ryan and his team did welfare checks and cleaned the city up. They put distraught mothers in touch with their stranded children in south Louisiana. |
| Hurricane Arthur | 2020 | Ryan and his team pulled people and cars from the ditches as hurricane eyewall was hitting. |
| Hurricane Hanna | 2020 | Ryan and his team pulled people and cars from the ditches as hurricane eyewall was hitting. |
| Tropical Storm Cristobal | 2020 | In Louisiana and Biloxi Mississippi Ryan and his team assisted in the search at Lake Pontchartrain, where a husband and wife went missing.<br><br>Ryan and his team were one of the first on scene when they were found after 24 hours floating in the water.<br><br>Ryan also led his team to rescue 20-30+ people in flooded roads and stopped several cars. |
| Tornado in Post, Texas | 2020 | Ryan and his team rescued an elderly couple from their collapsed roof, and raised funds to help them rebuild their home, and donated to the mayor of Post, TX. |

**Donald L. Nichols, USMC, *Ret.*:** *Ryan's Father* (Support Letter Excerpt)

In the 2nd grade at Waskom Elementary, Ryan was given an award in front of the school for saving another student's life in Mrs. Crippen's class. A student had knocked something large off the filing cabinet and Ryan sprang from his chair and pushed the girl out of harm's way from the falling object.

In the 8th grade, after Hurricane Katrina hit the Louisiana coasts and devastated it, our pastor, Bro. Leland Crawford of FBC Waskom asked for male volunteers to drive down to Baton Rouge, La., to pick up evacuees from New Orleans and put them on a bus and drive them to Dallas, Tx. 3 men and one boy volunteered. I was one of the men and Ryan was the boy. He wanted to help save people from the devastation. We delivered 30 evacuees and he was an integral party in doing this.

Ryan's college was fully funded. He attended Howard Payne University and East Texas Baptist University. He felt led to enlist in the US Marines during his sophomore summer.

After the Marines, he has served as SAR (Search & Rescue) and SAR (Search & Recovery) during at least a dozen hurricanes.

Ryan and I went to Hurricane Michael together. I watched as my son took the lead and called USCG helicopters down with his phone in order to evacuate people that no ambulance could get to. I was proud to serve along side on my son in this event. His leadership was well beyond my capabilities.

To me, he is a shining example of what every man in this country ought to be—heroic.



**Rescue The Universe**
Posted by Don Nichols
Apr 11 · 🌐

This was Panama City after Hurricane Michael. Ryan had called a USCG helicopter in for a medivac! The man in uniform was known as "swimmer". He was normally the guy who jumped in the ocean to rescue someone. Here he was lowered about 100' by cable, and Ryan transported this lady who needed medical attention and the swimmer to the evac sight. Ryan is attending to this lady while we wait for the helicopter to land.



### Memorandum Supporting A Downward Variant Sentence Of Time Served Under Section 3553(a): Section Two

Ryan Nichols informed the US Marshalls and the Government that he had PTSD when he was taken into federal custody on January 18, 2021.  Despite knowing that Ryan had this condition, he was placed in solitary confinement on day one. Ryan spent the first eleven months of his detention in solitary confinement. He did not receive a haircut during the first eleven months of his captivity.  On multiple occasions, Ryan has gone months without being able to cut his finger and toenails. Ryan has been systematically denied access to medical care, sunlight, and necessities. He has been retaliated against for using the Inmate Grievance System to address these wrongs. His mistreatment has been the subject of multiple bond hearings, and a Habeas Petition filed on August 10, 2022, in DC District Court alleging deliberate indifference to his medical conditions and depravation of his First, Fifth, Sixth, and Eighth Amendment rights.  (See: Nichols v. Garland, et al., DC District Court, Case No. 22-cv-02356-TFH). Ryan's Habeas Petition was dismissed without prejudice contemporaneously with his November 2022 release.  After his release, Ryan was informed by his doctors that he had several health problems, including, but not limited to, extreme unexplained weight gain, thyroid dysfunction, liver disease, hormonal imbalances, and a host of psychiatric issues related to the BOP's mismanagement of his PTSD.  Ryan Nichols was reincarcerated on November 7, 2023.  The BOP ignored his treatment plan, lied about his hormonal medication dosing, and failed to inform him about a severe, untreated, underlying medical condition.  We know this because we obtained Ryan's medical records via the Freedom of Information Act. Ryan's records show the BOP's continued deliberate indifference to his underlying medical conditions has intensified.  For these reasons and those stated below, further incarceration is morally unjustifiable because it will compound harm and aggravate his serious medical conditions.

18

COURTS HAVE GRANTED DOWNWARD VARIANCES WHERE THE DEFENDANT HAS BEEN SUBJECTED TO HARSH CONDITIONS OF CONFINEMENT. In *United States v. Sutton*, the Court granted a variance based on conditions in Passaic County Jail, mainly in part to its disgust with the longstanding "shameful" conditions of confinement, the jail's apparent refusal to address the problem, and respect for the moral law and fairness in conditions of detention.[10] In *United States v. Brooks[11]*, the Eastern District of New York granted a downward variance based on the restrictive conditions of pre-sentencing confinement, where, for ten months, the defendant was confined to his cell for 23 hours a day, only permitted one hour per day of outdoor exercise in a cage, and had restricted commissary, family, religious visiting, and telephone privileges even though he had not committed a disciplinary infraction. While the extent of the defendant's physical deterioration may not have been extreme, the impact on his mental health has been severe.[12]

DOWNWARD DEPARTURES MAY BE GRANTED WHERE THE BUREAU OF PRISONS CANNOT ADEQUATELY ACCOMMODATE A DEFENDANT'S MEDICAL NEEDS. In *United States v. Díaz-Rodríguez,* 853 F.3d 540, 547 (1st Cir. 2017), the 1st Circuit denied the defendant's request for a downward departure because it was determined that the BOP could adequately accommodate his medical needs. Logic dictates that the inverse of this rule is also true, namely that departures may be granted where the Bureau of Prisons cannot adequately accommodate the defendant's medical needs. The below facts demonstrate the BOP's inability to accommodate Ryan's medical needs.

---

[10] *United States v. Sutton* No. CRIM. 07-426 (KSH), 2007 WL 3170128, at 9 (D.N.J. Oct. 25, 2007)

[11] *United States v. Brooks*, No. 07-cr-00187, 2008 WL 4693335, at *3-4 (E.D.N.Y. Oct. 23, 2008)

[12] See, e.g., *McClary v. Kelly,* 4 F.Supp.2d 195, 208 (W.D.N.Y.1998) (citing cases discussing the negative psychological impact on inmates who are subject to prolonged periods of solitary confinement)

<u>After being denied shower access for five consecutive days, Ryan appeared in court for his December 20, 2021, bond hearing. Undersigned Counsel pointed to Ryan in court, asked Judge Hogan to look at Ryan, and exclaimed that Ryan looked like "Tom Hanks from Cast Away! [or] … a homeless person on the streets of New York City!"</u>[13] Noticeably troubled by Ryan's disheveled and ungroomed physical appearance, Judge Hogan questioned the Government about the conditions of confinement and whether Ryan's civil rights were being deprived. Undersigned Counsel also informed the Court that in addition to his appearance, Ryan was regularly forced to ingest racist, anti-American, anti-white propaganda from the Nation of Islam in the form of a publication called *The Final Call*, a publication that classified White people as devils descended from Satan and Jews as evil cockroaches and rats. Moreover, this periodical also repeatedly suggested that United States Military Veterans who participated in the war on terror, like Ryan Nichols, committed an offense against God so egregious that it required their presence in hell.[14] This propaganda was distributed to Ryan while he was locked up in solitary confinement for 23 hours a day, with no other reading alternatives. "I accept your argument that his due process rights were violated, and that should be another basis for his release."[15]

Ryan was denied release on December 20, 2021, and requested psychiatric services to help him navigate the psychological impact of bond denial right before Christmas. Ryan's PTSD intensified in terms of seriousness and despondency. No help came. Ryan, instead, was stripped of family video visits without explanation. He ultimately went almost two years without seeing his sons. The damage this did to the Nichols family cannot be overstated. Ryan requested mental

---

[13] *See* EXHIBIT D DECEMBER 2020, BOND HEARING EXCERPT pp. 52-55.

[14] *See* EXHIBIT E Nation Of Islam Publication: Final Call (EXCERPTS)

[15] *See* EXHIBIT D DECEMBER 2020, BOND HEARING EXCERPT pp. 52-55.

health services dozens of times during the first 22 months of his imprisonment. He filed twenty-three (23) legitimate mental health-related grievances.[16] Because of this, on April 20, 2022, in an act of retaliation for using the grievance system, he was thrown into solitary confinement for three weeks. His drinking water was regularly cut off for 20-hour periods. He was harassed and prodded to the point where he was driven to suicide watch.  Suicide watch did not come with mental health services.  Suicide Watch involved Ryan being stripped naked and forced to wear a plastic Tyvek suit in a brightly lit room where the guards continued to harm and encourage him to kill himself.

COURTS HAVE GRANTED DOWNWARD VARIANCES WHERE A DEFENDANT'S POOR HEALTH AND NEED FOR MEDICAL CARE WERE AT ISSUE. In *United States v. McFarlin,* the Court varied downward to a probation sentence because of the defendant's "poor health" and "need for medical care." In *McFarlin,* the defendant suffered from coronary artery disease, peripheral vascular disease, asthma, and other serious conditions. The sentencing record also showed that the defendant was overweight and suffered from sleep apnea, high blood pressure, and asthma. He had also previously been diagnosed with PTSD, anxiety, and depression. And his addiction to pain medication contributed to the criminal activity alleged in the indictment. *United States v. McFarlin,* 535 F.3d 808, 810–12 (8th Cir. 2008)

In *United States v. Coughlin*, 500.F.3d 813 (8th Cir. 2007), in assessing the appropriateness of a departure, the court asked three questions: (1) is the defendant's physical condition such that he would find imprisonment more than the normal hardship? (2) Will imprisonment subject him to more than the normal inconvenience or danger? Specifically, will imprisonment worsen his condition, or is special care needed that the BOP is not providing? (3) Does the physical condition substantially affect the defendant's ability to function?

---

[16] (See EXHIBIT F: Excerpt of Ryan Nichols's Mental Health Grievances)

The BOP and DC Jail have engaged in a pattern of deliberate indifference to Ryan's serious underlying medical conditions since he first arrived in 2021. Undersigned Counsel recently obtained medical records pursuant to a Freedom of Information Request, which stated that On July 29, 2021, Ryan requested mental health services for the management of his PTSD and anxiety. To our great surprise, we discovered that the DOC medical staff classified Ryan as a "worried well" patient.[17] Worried Well is a pejorative term rarely used to describe patients with a medical concern. The definition of the phrase from *Oxford Languages* is "people who are unnecessarily anxious about their physical or mental health."  Again, Ryan Nichols has PTSD.  He asked for help during a time when he was struggling.  Not only was his request for mental health services denied.   This wrongful diagnosis and corresponding pejorative classification encouraged DC Jail Staff to engage in a pattern of ignoring Ryan's earnest pleas for mental health treatment that continues to this very day.

Ryan Nichols's medical records indicate that he likely has an untreated disease that BOP and DC Jail medical staff deliberately failed to report to him.  During his intake medical screening on March 9th, 2021, Ryan's RPR panel lab results came back positive for syphilis. On May 3, 2021, Ryan was determined to be a false positive case for syphilis in accordance with the CDC.[18] However, a Biological False positive for syphilis is frequently indicative of another underlying autoimmune issue causing a person to produce antibodies. Medical practitioners are duty-bound to inform and explain test results to their patients. DC Jail took months to notify Ryan of his lab results.  Ryan requested follow-up testing after learning about his results.  DC Jail denied his follow-up test request.  DC Jail then unethically medically cleared Ryan while his health declined.

---

[17] (*See* EXHIBIT G, p. 1)
[18] (*See* EXHIBIT H, p. 4)

Although Ryan tested negative for syphilis, he was still positive for an unexplored condition that could have been detrimental to his health. "Once a biological false positive reaction is found, serum from the patient should be tested at intervals for at least six months to determine if the reaction is acute or chronic. If a chronic reaction is found, the patient should then be investigated to find the underlying cause."[19]

When Ryan returned to DC Jail on November 7, 2023, his health had noticeably declined. For instance, his weight had increased to 240 lbs., sixty pounds heavier than when he surrendered on January 18, 2021. His blood work showed an abnormally low level of testosterone for his age. Ryan arrived with medical diagnoses that included Hypothyroidism, insurmountable insomnia, anxiety, depression, extreme fatigue, abnormal thyroid levels, lower back pain that started in jail, and elevated liver enzymes due to Steatohepatitis, which is an advanced form of non-alcoholic fatty liver disease.[20]  Medical reports from his personal physician. Dr. Witt indicated that the combination of Zoloft and amitriptyline Ryan was taking to manage his psych conditions and insomnia put him at an increased risk for seizures and Serotonin Syndrome, both of which can be fatal if not treated in time. According to Dr. Witt, Ryan's level of depression, anxiety, and insomnia was so severe that his provider made a clinical decision to weigh the risk of these dangerous side effects as lower than the possible benefit for Ryan's psychological state.

Ryan informed The BOP and DC Jail medical staff about his diagnosis, medication, and hormone therapy after his November 2023 reincarceration. The BOP and DC Jail flatly ignored everything Ryan said.  Instead, DC Jail retested Ryan according to BOP protocol, electing to

---

[19] Garner, M.F. "The biological false positive reaction to serological tests for syphilis," NIH Journal of Clinical Pathology, Volume 23, Issue 1, 1970 pp. 31-34 DOI: 10.1136/jcp.23.1.31DC
[20] (*See* EXHIBIT G, p. 9)

perform the same battery of tests they did when he first arrived in 2021. And guess what? Ryan's labs came back positive for syphilis again.[21] And guess what? It was another false positive.

DC Jail never notified Ryan of the second false positive. On November 13, 2023, Provider Juanita Reed DP issued a printed letter to Ryan stating that his lab results were normal: "This letter is to inform above patient that their lab results and/or X-ray/Imaging results are normal."[22] This is a lie. The lie was discovered only because Undersigned Counsel obtained Ryan's medical records via FOIA out of concern for Ryan's health and sheer distrust of DC Jail.[23]

DC Jail violated Ryan's right as a patient to informed consent about the second consecutive false positive. In doing so, he was denied the right to be retested following a second consecutive false positive test for syphilis. Ryan would have never come to this knowledge, but for the fact that Undersigned Counsel obtained Ryan's medical file from DC Jail via FOIA request.

Ryan found out about his second false positive from his lawyer. DC Jail has yet to discuss this lab result with Ryan. More than six months have passed since Ryan's November 7, 2023, reincarceration and the date of this memo. The BOP and DC Jail have done nothing to help.

**HERE IS THE PROBLEM: Ryan is now medically classified as being a "Chronic Biological False Positive." This indicates that the underlying medical issue that Ryan is suffering from is not an acute disease but rather a chronic disease such as Lupus Erythematosus, Hashimoto's Disease, Rheumatoid Arthritis, Hodgkin's Lymphoma, Sarcoid Disease, or another autoimmune/connective tissue disorder.**

---

[21] (*See* EXHIBIT G, p. 2)
[22] (*See* EXHIBIT G, p. 3)
[23] (*See Id*)

**DC Jail Medical Staff has Repeatedly Lied to Ryan Nichols About His Medical History and Failed to Provide Him with Prescription Hormone Therapy.**

Ryan Nichols informed BOP/DC Jail that he had begun testosterone replacement therapy shortly after his November 22, 2022, pre-trial release and that said therapy was crucial to his current treatment plan for both physiological and psychological purposes.[24]   The DOC medical record reports Ryan's results from the November 28, 2023, testosterone panel blood draw as the following: Free and Total Testosterone: 91 ng/dL (normal range 264-916 ng/dL); Free Testosterone; (Direct): 3.8 pg/mL (normal range 8.7-25.1 pg/mL.)[25] These results indicated that Ryan's testosterone levels were severely low for a man his age.  Yet, DOC provider Ayantu Gute NP prescribed half the dose of the hormone replacement therapy prescribed by Ryan's outpatient doctor without disclosing that information to Ryan.[26] Ryan informed DC Jail medical staff that he was unwell about thirty days after his November 7, 2023, reincarceration.

Ryan suspected his testosterone was being incorrectly dosed and continued to complain that he felt unwell.  Nurse Practitioner Gute repeatedly lied to Ryan, informing him that hormone therapy dosing was no different than he received from his regular doctor. Ryan kept asking for his lab results to be reviewed, but DC Jail withheld them. Undersigned Counsel submitted a request for Ryan's medical records via the Freedom of Information Act and quickly learned that Ryan was not being dosed correctly.  Undersigned Counsel informed Ryan of this via a phone conversation. Undersigned Counsel instructed Ryan to politely confront NP Gute about the information in his medical records. Ryan informed Undersigned Counsel that Nurse Practitioner Ayantu Gute could not be located.

---

[24] (*See* EXHIBIT G, p. 8)
[25] (*See* EXHIBIT G, p. 20)
[26] (*See* EXHIBIT G, p. 17)

<u>Reasonable medical care is a fundamental right that Ryan Nichols is constitutionally entitled to, regardless of his incarnated status, yet it has been systematically denied.</u> Ryan must be afforded the opportunity to advocate for further testing, especially considering DC Jail/BOP's deliberate indifference to his medical conditions. DC Jail's departure from the standard of medical care upheld by the Washington, DC, medical community is medical malpractice, —for which we will undoubtedly sue them. The BOP and DC Jail have proven to be unworthy custodians of Ryan Nichols, incapable of providing meaningful medical care. The likelihood that his physiological and psychological conditions will worsen is certain.  Because of this, a downward variant sentence of time served must be granted to ensure that Ryan will get the medical care he desperately needs.

### JANUARY 6TH WAS TRULY AN ABERRATION IN RYAN NICHOLS'S LAW-ABIDING LIFE.

The fifty-seven letters and thirteen videos submitted in support of Ryan's sentencing are demonstrative of the fact that January 6 was truly an aberration in Ryan's law-abiding life—and that Ryan Nichols is loved, missed, deeply respected, and admired by his family and members of his community. All of which corroborates the notion that Ryan Nichols deserves to come home.

**Blake Nichols:** *Ryan's 8-year-old Son* (Support Letter Excerpt)

"He's a really good Dad and I just want you to help him come home. And Jesus forgives us for our sins and my Dad got forgiven by Jesus and he deserves a 2nd chance. I want my Dad to come home so I can play with him and we can do a lot of fun stuff together….I cry at night before bed time and he used to tuck me and say prayers before bed with me and keep me safe but now I'm all alone. Please bring my Daddy home to me it's my prayer every night."

**Patti Nichols:** *Ryan's Mother* (Support Letter Excerpt)

"He has a willingness to help other people in everyday life. Friends at school who struggled with math, he helped to tutor them elementary through High School. He was willing to stay after school to help teachers with classroom cleaning of class pets' cages. He could be found purchasing extra food at school for students who were hungry. He would even take them clothes when they needed clothing."

**Kristie Chatham:** *Bonnie Nichol's Aunt* (Support Letter Excerpt)

The boys miss their Dad very much, and are at the age where they really need their father...

The boys have been bullied and ridiculed at school, which is heartbreaking and enraging, they have no culpability in any of this.

While what you see in records of January 6 don't reflect it, Ryan's personality thrives on saving or rescuing the hurting. There will be more people and animals who will need rescuing from storms, more community events that will need volunteers to dress up and participate. There are fellow Marines who need his ability to relate with their issues and his willingness to help them.

**Jan LaJoie:** *Ministered to Ryan at Mobberly Baptist Church (*Support Letter Excerpt)

I have had the privilege of knowing Ryan and seeing him each Sunday for months when he returned from his time away this past year. Ryan has followed the rules that were given him, been a great example to others in our Sunday school class. He has been repentant and has honored the Lord in his actions.

**Rodney LaJoie:** *Teacher at Mobberly Baptist Church* (Support Letter Excerpt)

I found Ryan a sincere and forthright man who fears God and loves his family.

I have personally heard Ryan express regret for his actions and take responsibility for those actions.

I would ask during the sentencing phase of the adjudication of his trial, he be shown mercy and leniency from those who are in the position give it. He loves his family and is an integral part of it. Law without grace and mercy is unjust.

**Wayne Taylor:** *Member of Mobberly Baptist Church* (Support Letter Excerpt)

Looking in the mirror and coming to the realization that I was responsible for why I was in prison was probably the single most important thing that happened to me while incarcerated.

No one else was to blame. Not society, my circumstances, or the court system.

Ryan looked in that mirror too and has come to that same conclusion for his life.

Is this not one of the outcomes we hope for when people are sentenced? A person does not have to do 30 years in prison to make amends for their crimes. Since I served so much time in prison, I believe I know a criminal and bad actor when I see one. I used to be one. Ryan is not one of those people.

## <u>CONCLUSION</u>

Ryan Nichols respectfully submits that he has demonstrated that a downward variant sentence of time served is sufficient, but not greater than necessary, to comply with 18 USC § 3553(a). A sentence of time served reflects 39.3 months of incarceration, including 28 months of confinement under horrific prison conditions and 11 months of home incarceration, during which Mr. Nichols's movements and other personal freedoms were severely restricted.  All of this reflects the seriousness of the offense and promotes respect for the law.  Such a sentence is appropriate when balancing the nature and circumstances of the offense against Ryan's history, characteristics, acceptance, responsibility, and unwavering remorse.


Dated: Brooklyn, NY
        April 29, 2024


                                        Respectfully submitted,

                                        **<u>/s/ Joseph D. McBride, Esq.</u>**
                                        Bar ID:  NY0403
                                        THE MCBRIDE LAW FIRM, PLLC
                                        99 Park Avenue,
                                        8th Floor
                                        New York, NY 10016
                                        p: (917) 757-9537
                                        e: jmcbride@mcbridelawnyc.com
                                        *Counsel for Ryan Taylor Nichols*