```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA            CR No. 1:21-cr-00117-RCL-1

v.

                                    Washington, D.C.
RYAN TAYLOR NICHOLS,                Thursday, May 2, 2024
                                    12:30 p.m.
                  Defendant.
- - - - - - - - - - - - - - - -x
```

_____

                   **TRANSCRIPT OF SENTENCING**
         **HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH**
                 **UNITED STATES DISTRICT JUDGE**
_____

APPEARANCES:

For the United States:     Douglas B. Brasher, Esq.
                           Sean P. McCauley, Esq
                           Sarah W. Rocha, Esq.
                           DOJ-USAO
                           Northern District of Texas
                           1100 Commerce Street
                           Third Floor
                           Dallas, TX 75242
                           (214) 659-8604

For the Defendant:         Joseph D. McBride, Esq.
                           THE MCBRIDE LAW FIRM, PLLC
                           99 Park Avenue
                           25th Floor
                           New York, NY 10016
                           (917) 757-9537

                           Bradford L. Geyer, Esq.
                           FORMERFEDSGROUP.COM LCC
                           141 I Route 130 South
                           Suite 303
                           Cinnaminson, NJ 08077
                           (856) 607-5708

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111

<u>**P R O C E E D I N G S**</u>

1

2        THE DEPUTY CLERK:  We're on the record in Criminal

3    Case 21-117-1, United States of America v. Ryan Taylor

4    Nichols.

5        Starting with the Government, please approach the

6    podium and state your appearance for the record.

7        MR. BRASHER:  Good afternoon, Your Honor.  Doug

8    Brasher for the United States of America, and with me at

9    counsel table are Trial Attorney Sarah Rocha and AUSA Sean

10    McCauley.

11        THE COURT:  Okay.

12        MR. MCBRIDE:  Good afternoon, Your Honor.  Joseph

13    McBride on behalf of Mr. Nichols.  I am accompanied today

14    with Co-Counsel Bradford Geyer and my head paralegal and

15    wife Cassandra Dikijian.  Thank you.

16        THE COURT:  Okay.

17        THE PROBATION OFFICER:  Good afternoon, Your

18    Honor.  Sherry Baker on behalf of the Probation Office.  I'm

19    standing in for Andre Wilson.

20        THE COURT:  Okay.  As in all sentencings, we would

21    start with the discussion about the guideline calculations

22    before we go to the allocution and whether there should be

23    an either departure or variation.  In talking to the

24    probation officer beforehand, she advised me that the

25    Probation Office agrees that the calculation was incorrect

1    in the -- Probation agrees was incorrect in the report

2    itself in the -- that they overlooked the six-level victim

3    enhancement in Count 1 and the -- that was in the plea

4    agreement and the three-level bodily injury enhancement in

5    Count 2 so that the Probation Office itself agrees with the

6    Government's objections to those.  Those were not noted by

7    the Government in their -- in any objection to the

8    presentence report at the time the original report was

9    written, but the Probation Office agrees with those

10   objections by the Government.

11        Mr. Nichols also makes an objection to the

12   four-point specific offense characteristic in Count 2

13   relying on out-of-Circuit case law that prohibits this

14   enhancement in his argument by Mr. McBride, saying that

15   because this enhancement is for using a dangerous weapon and

16   there's also a six-level enhancement for assaulting police,

17   that there were -- creating a substantial risk of a serious

18   bodily injury.  There's no in-Circuit authority for that

19   proposition, and so I reject that.

20        And so my calculation, then, would be that with

21   the six-level enhan- -- official victim enhancement in Count

22   1 and three-level bodily injury enhancement in Count 2, the

23   combined total offense level, then, would be 21 -- 24, I'm

24   sorry, as opposed to 20 in the report as originally written.

25   Criminal history category would still be I.

```
 1           So if that was the final level, let me take any
 2     objection to that and then I'll have the probation officer
 3     give us what the guidelines would be, because I have to
 4     announce what the guidelines would be before I let you all
 5     argue about whether there should be either a variance or a
 6     departure from the guidelines.
 7           Any other objections, though, to the guidelines
 8     determination?
 9           MR. BRASHER:  No other objections from the
10     Government, Your Honor.  But just for record purposes, we
11     had a discussion with Mr. McBride before we began today
12     where he agreed to withdraw his objection to the four-level
13     dangerous weapon enhancement for Count 2.  I understand the
14     Court's already ruled on that and has rejected that --
15           THE COURT:  Okay.
16           MR. BRASHER:  -- but I would like just to confirm
17     on the record for any future proceedings that the defendant
18     has agreed to withdraw that.
19           THE COURT:  Okay.
20           MR. MCBRIDE:  Judge, with all due deference and
21     respect to your findings today, it feels a little unfair
22     that the Government is being given the benefit of the doubt
23     for this -- the inclusion of this enhancement.  The
24     Government had a -- has a duty to object in a timely fashion
25     to these enhancements, and that did not happen here.  So I
```

1    would ask that while I have withdrawn my application to have

2    the four-point enhancement withdrawn -- I've dispensed with

3    that application as of this morning -- I would ask for

4    preclusion on the additional enhancement that the

5    Government's failed to object to.

6         Thank you.

7         THE COURT:  Okay.  That's denied, but I agree that

8    they were -- did not timely object.  So if you want

9    additional time, I would grant it.

10         MR. MCBRIDE:  Your Honor, we've all worked very

11    hard to get here today.  So --

12         THE COURT:  Okay.

13         MR. MCBRIDE:  -- we're going to waive the Court's

14    indulgence.  Thank you.

15         THE COURT:  All right, then.  With a Level 24 and

16    Criminal History Category I, let me ask the probation

17    officer if you would give us what the guideline provisions

18    would be.  I think they would be -- 51 to 63 would be the

19    custody guidelines.  Is that right?

20         THE PROBATION OFFICER:  Your Honor, you said with

21    a total offense level of 24?

22         (Brief pause.)

23         Yes, Your Honor.  So based on the calculations, as

24    to the Court's findings, Count 1 is with a total offense

25    level of 20; and Count 2 is with a total offense level of

```
 1   27.  With the grouping analysis, 27 will be the higher where
 2   they are grouped together under 3D1.4.  So 27; then we
 3   subtract 3 for acceptance.  We have 24.  And in a
 4   Category I, it is 51 to --
 5               THE COURT:  Pull that microphone over, would you?
 6               THE PROBATION OFFICER:  Huh?
 7               THE COURT:  Pull the microphone over so I can --
 8               THE PROBATION OFFICER:  Oh, I'm sorry.
 9               THE COURT:  -- hear you.
10               THE PROBATION OFFICER:  I'm sorry.  Do I need to
11   repeat from the beginning?
12               THE COURT REPORTER:  (Indicates affirmatively.)
13               THE PROBATION OFFICER:  Okay.
14               So under Count 1, the total offense level will be
15   20; and then Count 2, the total offense level will be 27.
16   Both of them are grouped under the 3D1.4.  So with 27 and
17   then we subtract 3 for acceptance, we do have a total
18   offense level of 24.  And 24 would give us a guideline range
19   of 51 to 63 months and a fine range of 20,000 to 200,000.
20               THE COURT:  All right.
21               THE PROBATION OFFICER:  And supervised release and
22   probation and all of that will be the same.  It would not
23   change, even though the offense level has changed.
24               THE COURT:  Okay.  So the supervised release would
25   be one to three years.
```

```
 1                THE PROBATION OFFICER:  Yes.

 2                THE COURT:  Probation would still be ineligible.

 3      Fine range would be 20,000 to 200,000.

 4                THE PROBATION OFFICER:  Correct.

 5                THE COURT:  Restitution would remain at 2,000.

 6      And the special assessment would still be $100 per count.

 7                THE PROBATION OFFICER:  Correct, Your Honor.

 8                THE COURT:  So those would be the guidelines.

 9      Okay.

10                THE PROBATION OFFICER:  Correct.

11                THE COURT:  Now, to Counsel, then, the Court

12      would, accepting those as the guidelines, allow you to argue

13      whether I should vary or depart from the guidelines as part

14      of the allocution.  And we'll start with the Government's

15      allocution first.

16                MR. BRASHER:  Thank you, Your Honor.

17                A lot has been said, and a lot will likely still

18      be said, about Ryan Nichols and his hurricane rescue work.

19      But on January 6th, Ryan Nichols was a one-man hurricane; a

20      tempest of terror that left destruction and ruin in his

21      wake.  Just as a hurricane moves slowly offshore, fomenting,

22      swelling, and threatening from afar, Ryan Nichols slowly

23      marched to the Capitol, unleashing a threatening tirade

24      against our elected leaders.  And when Ryan Nichols finally

25      made landfall at the mouth of the lower west terrace tunnel,
```

1    he unleashed his violence on the police officers who stood

2    in his path, raining down on them with their own OC spray.

3         Thankfully, the storm walls of our democracy stood

4    firm that day, but Ryan Nichols's assaulted -- assault

5    against police officers and his violent rhetoric before,

6    during, and after the riot left a festering wound that must

7    be addressed in the sentence of this Court.  And for those

8    reasons, we are asking this Court to vary upward to a

9    sentence of 83 months.  A sentence of 83 months in the

10   context of all the defendant's actions, even though it's an

11   upward variance, would still be a lenient sentence,

12   considering all of the -- of his actions.  And 83 months

13   should be the floor, not the ceiling.

14        I'd like to just show four brief clips that

15   demonstrate the defendant's actions and rhetoric on the --

16   January 6th.

17        We start with the march to the Capitol Building.

18   This is Government's Exhibit-D starting at minute 7 and 36

19   seconds.

20        (Video played.)

21        MR. BRASHER:  Once he reached the tunnel, he

22   beckoned for a cannister of police OC spray.  This is not a

23   personal jogger-size pepper spray.  This is a large

24   cannister of spray; recognized that the person holding it

25   was not doing anything with it, so he beckoned for it, "Give

```
 1    it to me," and then he sprayed it onto the officers.
 2              (Video played.)
 3              MR. BRASHER:  That was Government's Exhibit-E
 4    starting at marker 04 seconds to approximately 37 seconds.
 5              A couple things to point out in this video clip is
 6    that directly in front of Mr. Nichols is a man headed
 7    directing -- the direction opposite, out of the tunnel,
 8    trying to leave.  People were leaving and could leave, but
 9    he was -- Mr. Nichols was still pushing forward and
10    unleashed the spray onto the officers in front of him.
11              Then later that evening back in his hotel room,
12    having had a chance to reflect on his actions that day,
13    Government's Exhibit-I includes the livestream that
14    Mr. Nichols did from his hotel room on Facebook.  Starting
15    at minute 4 and 21 seconds.
16              (Video played.)
17              MR. BRASHER:  Stopping at 5 minutes and 3 seconds
18    and resuming at 7 minutes and 21 seconds.
19              (Video played.)
20              MR. BRASHER:  Stopping at minute 9 and 19 seconds.
21              Your Honor, as this Court knows, a lot of
22    people -- a lot of January 6th defendants have raised a
23    common refrain of being caught up in the crowd, but that's
24    not what happened here.  Ryan Nichols was a leader of that
25    crowd, a self-proclaimed leader, a person who wanted to be a
```

1    leader, a person who stood on a ledge outside of a broken

2    window and encouraged a crowd of rioters to get their

3    weapons.  The Court is familiar with the account of multiple

4    officers who have said they were a hair's trigger away from

5    pulling their own weapons in defense of themselves in the

6    Capitol, and luckily they didn't.  But here is Ryan Nichols

7    on a ledge with a bullhorn calling for people to arm

8    themselves with weapons while he himself is waving a crowbar

9    that he brought as a weapon.

10           This type of political violence -- threatened,

11   committed, encouraged, and encouraged again -- cannot be

12   normalized.  An upward variance is appropriate here because

13   of the danger that Mr. Nichols posed to Congress inside the

14   building as they were performing one of the key aspects of

15   our democratic process.  An upward variance is appropriate

16   for the corruptness of Mr. Nichols in performing his actions

17   and in speaking his words.  When the Court compares his case

18   to others, including one of the most recent sentencings this

19   Court has issued in Mr. Sullivan's case -- admittedly, that

20   was a trial, whereas we have a guilty plea here -- but just

21   looking from the outside, the conduct of Mr. Nichols is

22   much, much worse.

23           THE COURT:  In which case?

24           MR. BRASHER:  John Sullivan.

25           Again, a sentence of 83 months is lenient in light

1    of his actions and his words.

2         The sentencing today is not about Mr. Nichols's

3    medical issues.  It's not about any perceived mistreatment

4    that he has endured while in custody.  The sentence that

5    we're asking for will put him into BOP custody.  He is --

6    BOP is more than capable of addressing any medical issues he

7    has.  In the rare event that they are unable to do that,

8    Mr. Nichols is savvy and knows how to advocate for himself

9    and get the change that he needs, but it's not a reason for

10   leniency today.

11        Similarly, the defendant's prior service in the

12   military, in the Marines, that's not a reason for leniency

13   here either.  As you heard from Mr. Nichols himself, he

14   undertook an oath to defend the United States Constitution,

15   and on January 6th he violated that oath and he continued to

16   call for others to violate it going forward with him.

17        Additionally, while we have agreed to a

18   three-level downward adjustment for acceptance of

19   responsibility, the Court should be somewhat wary of fully

20   accepting the remorse and the acceptance of responsibility

21   by Mr. Nichols.  When he was interviewed by the FBI in March

22   of 2021, he admitted responsibility and took -- said he was

23   remorseful, but after that engaged on a multi-year

24   disputation of his role in the riot, blaming others for his

25   actions, suggesting that it was an under- -- a federal agent

 1    conspiracy that had encouraged him to act as he did, and

 2    other things that are inconsistent with full acceptance of

 3    responsibility.  Then -- so essentially, you know, the

 4    defendant has a history of changing his position on

 5    remorsefulness when it suits him based on the circumstances.

 6    The Court is familiar with cases where defendants have

 7    appeared before a sentencing judge, been remorseful, and

 8    then turn around as they are walking out of court and doing

 9    a complete 180.  The Government has some concerns that that

10    could happen here.

11            THE COURT:  Well, in those, I didn't see all the

12    family come forward as they have here and said he genuinely

13    has changed his mind.  I -- the family videos that I saw --

14    I've never seen family videos like I did here.  I watched

15    all those videos this morning and they're quite powerful,

16    actually, about the story they tell about how he realizes

17    now the mistake he made.  They're pretty powerful.

18            MR. BRASHER:  I don't dispute that, Your Honor.  I

19    do just point out the timing of it; that it was very --

20            THE COURT:  I understand.  It's now.

21            MR. BRASHER:  -- very late in the game.

22            THE COURT:  I understand.

23            MR. BRASHER:  And it's not a game.  I --

24            THE COURT:  And they understand where we are

25    today, too.

1          MR. BRASHER:  Yes.

2          The one thing I would point out as to the letters

3    that were submitted on his behalf, I do want the Court to

4    take notice that, I think, a vast majority of those letters

5    that were submitted with the defense sentencing memorandum

6    were letters that were written in 2021 in connection with

7    his detention hearing at a time when the full conduct and

8    the videos were not well known to the public.  And so I

9    think there's -- somewhat discounted in light of that.

10          But I think, again, as we've stated in our

11   sentencing memorandum --

12          THE COURT:  His father was very impressive,

13   though.  His father is convinced that he really turned his

14   life around.  And his father's a minister; knows something

15   about the character of people, I think, you know?

16          MR. BRASHER:  Yes, I --

17          THE COURT:  His wife -- I understand you might be

18   able to fool your wife, but I don't know about fooling your

19   father.

20          MR. BRASHER:  Well, I think that -- I've heard it

21   said that prosecutors don't like to have ministers on their

22   jury because they're in the business of forgiveness, but I

23   would note that, you know, the one thing I've not mentioned

24   to date is that the defendant came to Washington, D.C. with

25   firearms.  He researched how to do that.  He brought body

1    armor.

2              MR. MCBRIDE:  Judge, I object.  These are facts

3    that are not in the record.  He did not enter Washington,

4    D.C. with firearms.  That is a --

5              MR. BRASHER:  I --

6              MR. MCBRIDE:  -- material --

7              MR. BRASHER:  I will --

8              MR. MCBRIDE:  -- misstatement of fact.

9              MR. BRASHER:  I will -- I'll clarify my statement.

10   He came on his trip to D.C. bringing firearms.  From all

11   evidence that we are aware of, he did not bring them to the

12   Capitol on January 6th, but he brought them in the event

13   that he needed them and they were only a short distance

14   away.  His father helped him construct the box in the truck

15   that would -- that allowed him to bring them.  So there's --

16   again, that --

17             THE COURT:  He came from Texas; right?

18             MR. BRASHER:  I'm sorry?

19             THE COURT:  He came from Texas at that time;

20   right?

21             MR. BRASHER:  Yes.  And I would just point out

22   that that is -- as coming from Texas myself, I know many in

23   this court have ties to Texas.  This is just an unfortunate

24   one more person from the State of Texas that has been

25   involved in this attack on our democracy, the shameful

1    attack, and it needs to be addressed.

2              Your Honor, for all these reasons, we think a

3    sentence of 83 months is sufficient and necessary in light

4    of the defendant's conduct to deter him and others.  The --

5    as the Court is aware, the political season coming up and is

6    upon us is getting heated and has been heated for a while

7    not just on the national level at the presidency but local

8    elections are becoming contentious, and the message needs to

9    be sent that political violence is not acceptable.  It's not

10   acceptable to engage in it, it's not acceptable to encourage

11   it or to call for it or to threaten it, and those are things

12   that the defendant did over and over and over on January

13   6th.  And I think the guidelines come out lower than we

14   expected due to some appellate issues that we're not

15   contesting, but when we -- the parties entered the plea

16   agreement, this range of 83 months was something that was

17   contemplated and agreed upon as something that would be an

18   appropriate sentence in this case.  So I don't think we're

19   asking too much, and we would ask the Court to impose a

20   sentence of 83 months.

21             THE COURT:  Thank you, Mr. Brasher.

22             Mr. McBride?

23             MR. MCBRIDE:  Thank you, Your Honor, for taking

24   the time to hear from me on behalf of Mr. Nichols today.

25             Mr. Nichols, of course, is joined today by his

1    wife, Bonnie [ph]; and his mother, Patty [ph].

2             Judge, Mr. Nichols is a good man.

3             THE COURT:  I didn't mean to denigrate his mother.

4    I saw her on the tape, too, but --

5             (Laughter.)

6             Mothers are always going to say something good

7    about their sons.  Fathers can't be counted on.

8             (Laughter.)

9             MR. MCBRIDE:  That's -- you speak the truth

10   indeed.

11            Mr. Nichols is a good man who did a bad thing.

12   And since the inception of this case, he's always wanted to

13   be held accountable for his actions, but we felt in the

14   beginning that the plea offer that was on the table was

15   truly unfair.  So I did what I had to do to leave no stone

16   unturned in pursuit of justice for him.

17            I take issue with some of the things -- many of

18   the things that the Government has said in its motion and

19   its characterization of Mr. Nichols, and in particular his

20   military service.  The Government states that military

21   service in the case of Mr. Nichols is a double-edged sword.

22   When in God's name is military service to this country ever

23   a double-edged sword?

24            So with that in mind, I don't know who's in the

25   audience today, but if you are a member or former member of

1    the military who served in this country or for anybody else

2    in this courtroom who has ever served, I applaud you and

3    thank you for your service.

4         Ryan, I thank you for your honorable service to

5    this country.

6         To my wife, Cassandra, who was a helicopter

7    mechanic in Afghanistan with the United States Marine Corps,

8    I thank you for your service.

9         And, Judge Lamberth, I thank you for your service

10   to this country, as well.

11        I was in front of Judge Hogan for some time, and

12   it took me some -- quite some time to build a rapport with

13   Judge Hogan.  We come from very different worlds.  I show up

14   in D.C.  It's very different than Brooklyn.  It's very

15   different than New York City, the way things are litigated

16   here.  There's a lot of rules that I don't know about.  And

17   here I am, this loudmouth lawyer just going down what I

18   perceived to be a litany of injustices by the Department of

19   Justice against my client.  And I could tell that, at the

20   time -- and Judge Hogan was more focused on what Ryan had

21   said and did on January 6th, and understandably so.  But at

22   some point, I was able to prove to Judge Hogan that the

23   Department of Justice and the Bureau of Prisons are not

24   giving Ryan his discovery, and his discovery was necessary

25   for him to make an informed decision on whether to go to

```
 1    trial or whether to plead, and because of that -- I mean, we
 2    litigated a habeas motion against D.C. Jail and all this
 3    other stuff, and D.C. Jail lied through their teeth the
 4    entire time about providing Ryan his discovery.
 5    Rappahannock, conversely, had him for two weeks and said,
 6    "Hey, we can't do this right."  Judge Hogan let him out,
 7    boom, right on the spot.  And I hope that that builds some
 8    credibility with some of the things that I want to talk
 9    about today with regard to the horrors of his incarceration.
10            THE COURT:  Well, there's a prior prisoner, you
11    know, that I held the D.C. Corrections people in contempt
12    and it resulted in some changes.  I was disappointed when I
13    read in your sentencing memo that some of those changes
14    haven't been long-lasting, it looks like.
15            MR. MCBRIDE:  That is, in fact, true, Your Honor.
16    I now represent Christopher Worrell --
17            THE COURT:  Oh.  Do you?
18            MR. MCBRIDE:  -- in his -- yeah -- in his
19    forthcoming civil suit against the Bureau of Prisons and
20    D.C. Jail that will be coming at some point, and I read up
21    on your -- on the --
22            THE COURT:  So you know a lot of what I did, then.
23            MR. MCBRIDE:  I know.  I know a lot of what you
24    did, and I'm thankful for it, truly.
25            Before I talk about that case real quick, I just
```

1    want to say that I didn't know what to expect when the case

2    got transferred to you.  Honestly, I didn't know.  And I

3    asked around.  I saw some of the sentences at the time and I

4    said, "Oh, man.  How am I going to get Judge Lamberth to

5    understand my guy?"  And I spoke to -- I have two people --

6    I have a bunch of people who have helped me in navigating

7    D.C.: Brad Geyer, my co-counsel, former Department of

8    Justice guy for 25 years this -- Joe, maybe, you want to

9    slow down on this and not say that a few times -- and Paul

10   Kavanaugh [ph] is my mentor.  He's a guy who's instructed

11   me, and he's in the background of all my January 6th cases.

12              But when I had January 6th-related legal anxiety,

13   there's usually one person I run to, and that's Ms. Kira

14   West.  And I ran to her and I said, "I, you know -- I don't

15   know anything about Judge Lamberth.  He's going to see all

16   this stuff about me.  I'm scared.  What do I do?"  And she

17   said, "Joe, you don't have any reason to be scared.  If

18   there's one thing about Judge Lamberth, I can tell you this.

19   I can describe him in one word when it comes to how he is on

20   the bench," and she said, "Accountability.  He will hold

21   both sides fully accountable for the law."  And when I --

22   when she said that to me, a sense of peace came over me

23   because I knew that I was going to have a fair shot.

24   Despite the difficulties of the situation, despite the crazy

25   politics and everything else that's surrounding it, despite

1    the madness that came out of Ryan's mouth, I knew that you'd

2    give me a fair shot.  I knew that you'd give Ryan a fair

3    shot.

4         And then when I did, you know -- be prepared.

5    You've got to be prepared.  I -- my father raised me to be

6    prepared.  My grandfather, a Korean War veteran, raised me

7    to be prepared.  So I did my homework.  And I realized that,

8    wow, the man that I'm going to be standing in front of went

9    to Vietnam for this country and he defended six Army Rangers

10   on the Jolley Trail who were accused of a great crime after

11   their honorable service because they said some wildly

12   inappropriate stuff, and you defended them.  Not only did

13   you defend them; you went into the jungle on behalf of their

14   defense in a Huey, and that Huey went down.  You did that.

15   You went that far in defense of your clients.  Even though

16   your General was giving you the business and even though

17   everybody else around you was coming at you one way or the

18   other because of it, you did that for them.  And I said,

19   "Man, this is the judge that I'm going to be in front of.

20   He understands justice.  I'm going to get a fair shot."

21         THE COURT:  Well, he understands defense counsel.

22         MR. MCBRIDE:  Thank you.  Yes, and you understand

23   defense counsel.  I mean, the similarities here in the

24   Jolley case for me and Ryan's case, because of what he said,

25   really struck me.  I mean, it struck me.  It struck my wife.

1    I mean, she's a military veteran living with PTSD.  She's 80

2    percent going on 100 percent disabled.  You'd never know it

3    by looking at her because of how beautiful she is, but she

4    walks around with the pain and suffering of that stuff

5    inside of her every day.  It's a real thing.  So just

6    because somebody looks healthy on the outside doesn't mean

7    that everything is okay on the inside all the time.

8            And when it comes to Ryan, Mr. Brasher said that

9    he came in like a Cat 5 hurricane.  Judge, you're from

10   Texas.  You know the difference between a Cat 5 and a

11   tropical storm.  A tropical storm talks a lot.  It doesn't

12   do a lot of damage.  Sometimes it even starts out as a Cat 5

13   but peters out over time.  A real Cat 5 comes in and it

14   wipes everyone and everything out without mercy, without

15   recourse, without consideration.  Ryan said, as those videos

16   demonstrate, some really unfortunate things and he talked

17   like a Cat 5 hurricane, but on January 18th when he found

18   out that the FBI was looking for him, he turned himself in.

19   He didn't run and try to start some new Texas militia.  He

20   didn't run to Tennessee and look for the hideouts of Bowie

21   and Crockett.  He didn't do any of those things.  He said,

22   "I've got to go face the music."  He turned himself in.

23   That is not a guy who is hellbent on delivering on the wild

24   things he said in those videos.  That is a guy who has come

25   to his senses, said, "Oh, man.  I'm a father.  I'm a

1   businessman.  I don't have a criminal record.  I need to get

2   right."  So with his father, Don, they talked about it; they

3   prayed together; and Don told him, "Son, you've got to go

4   face the law," and that's what he did.

5          Since that time, Ryan hasn't said much of

6   anything.  Really, the only public statement he ever made

7   was in front of Your Honor on the 7th of November when

8   Mr. Brasher said that he's been saying this; he's been

9   saying that.  I said, "Hey, wait a minute.  I've been saying

10  everything.  He hasn't said anything.  If you really want to

11  hear what he has to say, let's give him a minute here," and

12  he apologized to you first chance he gets.  "Your Honor, I'm

13  sorry.  I messed up.  It is wrong.  I will talk to you again

14  on the sentencing date.  I apologize.  I am accountable.  I

15  recognize that what I did was wrong."  And he's going to

16  speak to you respectfully again today.

17         There's been -- I saw with, you know -- I'll tip

18  my cap to Mr. Brasher.  He said political violence cannot be

19  normalized.  Well, I know who said that; right?  He's

20  quoting this Court.  He's quoting Your Honor.  That's

21  something that you talk talked about, and you're right.  It

22  shouldn't be normalized.  It's evil.  It's wrong.  It is

23  dangerous.  You have spoken about terms like "hostage" and

24  "political prisoner" and the message that that stuff sends.

25  It's deeply troubling.  And I have participated in that to

1      some extent, but I want to explain myself.  I want to be

2      accountable before you, as well.  Newton's third law, what

3      does it say here?  It says -- I'm no scientist.  I'm going

4      to read it, because if I get it up, the -- if I messed up,

5      the media will never let me live it down.  Newton's third

6      law states that for every action, there is an equal and

7      opposite reaction.  For every action, there is an equal and

8      opposite reaction.

9            Nearly every day since January 6th, our president,

10     Merrick Garland, Christopher Wray have called Mr. Nichols

11     and people like him insurrectionist, terrorist, domestic

12     terrorist, white nationalist, and the list goes on:

13     insurrectionist, political prisoner, MAGA extremist,

14     political hostage.  All that's wrong.  None of it should be

15     happening.  And to the extent that my participation in that

16     type of conversation has offended you, I apologize.  When I

17     got in front of you, I read your rulings; I read the media

18     coverage on you; and I said, "Man, why is he saying this?"

19     And then I thought about it and I prayed about it and I

20     said, "Well, he's right.  So I'm going to tone it down."  I

21     toned it down to the reasonable -- to the extent that I

22     could, all while making sure that his constitutional rights

23     weren't trampled on.

24            Ryan, as we laid out in our motions, has a stellar

25     history of good works and honorable service not just as a

1    Marine but as a man who came out of the Marines, figured out

2    he had a problem, and said, "I'm going to go do this search

3    and rescue work because it helps me, it helps my soul, and

4    it helps other people."  You saw the videos, the letters,

5    the testimonies.  White, Black, brown, gay, straight, it

6    doesn't matter.  He will rescue whoever needs help.  That's

7    just not talk.  The facts are there to back it up, dozens

8    and dozens and dozens of rescues.  When he went viral for

9    rescuing those puppies in 2018 and he went on the Ellen

10    DeGeneres Show, she found out that he had not been on a

11    hurricane -- he had not been on a honeymoon, because on his

12    honeymoon he was working a hurricane.  And she wrote him a

13    check; said, "I'm going to give you $10,000 to go to

14    Hawaii," and she made a $25,000 donation to the Humane

15    Society on his behalf.  And he took the $10,000 check.  And

16    what did him and Bonnie [ph] do?  They went and bought a

17    boat, because Ryan knew that he needed a boat to do more

18    meaningful rescue work.  He had to save the old and the

19    young, the pregnant and the crippled, and everybody else in

20    between, because he's a good man.  He's a good man that was

21    raised by a good family in a good state with a good heart

22    who loves this country.

23            I don't want to diminish what took place at the

24    Capitol.  It's -- I've had a lot of time to think about

25    this.  I've seen one of your recent cases.  Somebody

1    referred to you as having a Ph.D. in January 6th-related
2    matters.  So I hope I have a bachelor's degree at this
3    point.  And I -- there's been a lot of time and a lot of
4    effort and a lot of prayer and a lot of reflection as to
5    what happened that day.  And for the first probably couple
6    years, I only really saw it one way.  And I realized I
7    wasn't putting myself in the shoes of the other people, the
8    other people who see the world differently than me; the
9    other world [sic] who have different religious beliefs,
10   philosophical beliefs, and because of those reasons they
11   support a different candidate.

12            And I reminded myself of, you know -- you've got
13   to put yourself in the other person's shoes.  Mom and dad
14   always taught you that.  That's what Jesus tells you to do.
15   You've got to do it.  And when I put myself in the other
16   person's shoes and everybody else's shoes, the first thing I
17   felt was fear.  And I said, "Oh, man.  Joe, you guys have --
18   you're missing a significant part of it.  That's why
19   everybody's blowing trial here.  It's not that D.C. juries
20   can't get it right out.  It's -- only really one side of the
21   story's being accounted for and being told," and I began to
22   change the way that I thought and felt; Ryan began to change
23   the way that he thought and felt; my family, despite our
24   beliefs, began to change the way that we thought and felt;
25   and we found a more balanced approach.  John Paul II often

1    said that common ground is holy ground.  So we tried to work

2    our way back to center.  And Mr. Brasher talked about, you

3    know, the forthcoming election that's coming.  Sure, it's

4    coming, but we're all changed and we're all different, and

5    nobody -- nobody -- ever wants to see another January 6th

6    ever again.

7              In terms of rhetoric, in terms of some of the

8    stuff that the Department of Justice has said in the

9    prosecution of these cases, the January 6th Committee, this

10   is the greatest attack on democracy.  Okay.  Debatable.  But

11   this is the most devastating attack that has ever happened

12   in our country?  Terrorist attack?  I mean, I was -- I'm

13   from New York City.  9/11.  I know that, from my research on

14   you, you were in close proximity to D.C., possibly even in

15   your car making calls on that day, and you might have even

16   had smoke filling up your car at some point.  We saw the

17   devastation that happened to our country.  These two events,

18   with all due respect to the -- what happened on January 6th,

19   are not comparable.  I know that you sat on the FISA Court

20   early on and then, again, for a substantial amount of time.

21   And I can't even begin to imagine what you're privy to and

22   the types of events and threats to this nation that you've

23   had to process.  And I know that you've been sitting on

24   these January 6th cases for a long time, too, and I think

25   it's fair to say that the two are just not comparable.

1    January 6th is sad.  It's important.  It should never happen

2    again.  But it's not 9/11.  It just simply is not.

3          When you consider the depth of the 57 character

4    letters that were written, right, we had an even greater

5    number of people that wanted to turn in letters.  I turned

6    away a lot of people.  I wanted them to be meaningful, I

7    wanted them to have something to say, and I wanted it to be

8    from the heart, and I wanted it to count.  And I hope that

9    you can see from those letters that Ryan is respected, he's

10   loved, he's missed, he's adored, and that everybody knows

11   that he's a good guy.  In particular, the one letter that my

12   wife prepared me for before she brought it to me because it

13   broke me in half was the letter from his son Blake and the

14   video as well from both of his sons.  These are good boys

15   who have missed a substantial part of their father being in

16   their life and they're being punished because of his crimes.

17   But at some point, the ideas of justice, the ideas of does

18   the punishment fit the crime, they have to factor in.  They

19   have to weigh in.  And I know that they weigh in for you.

20   I'm just saying that so everybody in here hears it, so I

21   hear it.  And it takes a lot for a man who said those things

22   to get up here and to say, "I did that.  I was wrong.  I am

23   sorry.  And I'm not running from it."  Ryan has been

24   incarcerated on and off for about 39 months: 28 months of

25   time specifically spent in jail --

1          THE COURT:  Right.

2          MR. MCBRIDE:  -- another 11 months in --

3          THE COURT:  Hard time.

4          MR. MCBRIDE:  Hard time.

5          THE COURT:  I agree with that.

6          MR. MCBRIDE:  Thank you, Your Honor.  Thank you.

7    I appreciate that from the bottom of my heart.

8          For anybody in the audience who's listening today

9    and, of course, for you, Your Honor, and for me, I'm

10   somebody who has suffered over the past few years with some

11   serious medical illnesses.  I have come to know the

12   difference between a doctor with good bedside manners and

13   bad, a nurse with good bedside manners and bad.  And the

14   idea that your father, your husband, your brother, or your

15   son, somebody you love, the person that you love the most in

16   the world, whoever it is, whether it's your wife or whoever,

17   is going to be cared for by a good physician, a good doctor,

18   a good nurse practitioner, that's a comforting thing.  The

19   idea -- the inverse of that, the idea that one of these

20   people -- somebody you love, the person you cherish the most

21   in the world -- in their most vulnerable state is going to

22   be cared for by somebody who just doesn't even recognize

23   them as a human being --

24         THE COURT:  Well, I still hope the Bureau of

25   Prisons is not like the D.C. Corrections.

```
1              MR. MCBRIDE:  I --

2              THE COURT:  I don't know.

3              MR. MCBRIDE:  I --

4              THE COURT:  It bothers me a little.

5              MR. MCBRIDE:  It should bother you, respectfully,

6    Your Honor.  I represented for a time Christopher Quaglin

7    who was sent to Northern Neck Regional Jail and that place

8    was horrible, as well.

9              THE COURT:  Northern Neck?

10             MR. MCBRIDE:  Northern Neck.  It's -- the place

11   should be shut down as far as I'm concerned.  It's

12   unconscionable, the things that happened there.  And I mean,

13   he has a -- Quaglin had a documented -- evidence of celiac

14   disease and they knowingly fed him none-celiac-safe food.

15   He lost, like, 60 pounds at some point.  It's just -- it's

16   not right.

17             And in terms of Ryan's case, first almost 11

18   months of his incarceration, he was in solitary confinement.

19   Now, there are reasons for that, some justifiable; maybe,

20   some unjustifiable, but the Nelson Mandela Rules, which is

21   the international standard for solitary confinement, defines

22   "solitary confinement" as captivity in a cell or a closed-in

23   area for more than 22 hours a day absent meaningful human

24   contact.  And those rules have been adopted by several

25   states -- New York State, one of them, and they're on the
```

1    books in about 16 other states -- in terms of defining

2    solitary and outlawing the use of solitary in certain

3    instances.

4            Now, Ryan was a pretrial detainee for the first 11

5    months; right?  Fifth Amendment says innocent until proven

6    guilty.  You're being held for safekeeping.  You can't be

7    punished; right?  He was punished.  And solitary -- a few

8    days in solitary is troubling for even the strongest mind,

9    but the mind with PTSD; the mind that is responsible for 24

10   veterans every day blowing their brains out is not the mind

11   that's appropriate for solitary confinement for even one

12   hour.  Never mind 11 months of it.  It's horrible.  It's

13   hard time.  And in terms of how the Court considers those

14   days, I would submit that one day should count for 100 days.

15   That's how I feel about it.  It's that bad.  It's that

16   devastating.  And this is evidenced by the fact that he was

17   driven to suicide watch.  And when he was on suicide watch,

18   they mocked him.  They made fun of him to the point where he

19   was just like, "Look, I'm not suicidal anymore; just get me

20   out of here," because he felt they were encouraging him to

21   take his own life.

22           Ryan gets out.  We stopped the music, we stop the

23   press, and we stop our engagement publicly about his case,

24   because our outrage was about the way he was being treated,

25   and we said, "You're out now.  We've got to focus on whether

```
 1    we plea or go to trial.  And we can't make any more noises
 2    in front of the Court, because we could get in front of the
 3    judge, and if we're talking about anything on sentencing
 4    that we can't justify, he's going to hammer us.  So it's
 5    silence from here on out."  He went back in, and you would
 6    think that after the habeas petition; that after Your Honor
 7    holding them in contempt -- that they stood here in your
 8    court and said, "We got it wrong this time, but, you know,
 9    we're going to learn our lesson and we're going to get it
10    right next time."  They lied.  They didn't get it right,
11    because when he came back to jail, jacked up, liver issues,
12    blood issues, testosterone issues, vitamin C deficiencies,
13    60 pounds heavier, no one knew what was going on with him,
14    and we had 11 months' worth of work that was -- that the
15    jail was in possession of.  He told them, "This is my
16    treatment.  This is what I'm getting.  I need a certain
17    level of testosterone medication because it helps me with my
18    liver; it helps me with my enzymes; it helps me with this.
19    I need" --
20              THE COURT REPORTER:  Slow down.
21              MR. MCBRIDE:  Sorry.  I apologize.  That's -- just
22    throw something at me.  I'm sorry.
23              So he needs various treatment options.  He had a
24    treatment plan.  We made sure that we -- in anticipation of
25    him going in, that we had good -- a good doctor with good
```

1    notes that was going to let them know, "He's got PTSD

2    issues.  He's got problems with his liver.  He's got

3    problems with his hormones.  This is what you need to do."

4    We go in there, and they give him the same battery of tests

5    in -- back in -- that he did back in 2021 before you heard

6    Christopher Worrell's case in here.  They didn't care about

7    anything that we gave them.  They didn't care about anything

8    that you said.  They just -- "We're going to treat you the

9    way we're going to treat you and you're going to deal with

10   it.  Because who's going to say anything to us?  We're in

11   control, and that's the end of it."

12            And, as we stated in the motion, he had a positive

13   test for syphilis, of all things, in 2021.  Now, it came

14   back as a biological false positive.  And he said, "Listen,

15   I understand it come back as a false positive, but I'd like

16   to be retested here because that's scary business.

17   Syphilis was -- Al Capone died from syphilis.  What year are

18   we living in here?  This is scary.  I'm in jail.  Syphilis,

19   tuberculosis, I don't know what's going on.  Help me."  They

20   denied him the test.  Okay?  We go back out into the world.

21   He comes back in.  They given him another test, comes up for

22   syphilis again, but it turns out it's a biological false

23   positive again.  So we do the research.  What does this

24   mean?  If you have consecutive biological false positives,

25   it is an indication that you have a serious underlying

1    condition.  And we put those underlying conditions into our

2    memo; right?  But this time, they didn't even tell him that

3    he had another biological false positive.  They sent him a

4    letter saying, "Your lab results are normal."  That is a

5    lie.  And we FOIA'd his medical records --

6              THE COURT:  This is a contractor for the jail or

7    what?

8              MR. MCBRIDE:  This is D.C. Jail Medical staff,

9    whoever's taking care of him.  So generally, we, you know --

10   he had a nurse practitioner, Gute, who was taking care of

11   him until we FOIA'd the records.  And when they found out

12   that we FOIA'd the records, they went berserk in there.

13   Gute disappeared.  Can't find her.  She's not there anymore.

14   And they know that we got them dead to rights on lying to

15   him on patient consent, on informed consent.  They misdosed

16   purposely his testosterone levels.  They just did whatever

17   they wanted to do, and they hurt him because of it.  And

18   this is medical stuff.  You get one liver, you get one pair

19   of lungs, you get one pair of kidneys, you get one heart,

20   and you get one brain.  And we don't know what's happened to

21   him.  But as we argued at length in the motion, is that our

22   position is that the BOP is historically, in our

23   experience -- and especially when it comes to him and D.C.

24   Jail -- utterly and grossly incompetent when it comes to

25   taking care of people with serious underlying medical

1    issues.  They had not one chance but two chances to get it

2    right, and they got it very, very wrong in both cases.  And

3    when you juxtapose that with his life of service and his

4    military history and the fact that PTSD does affect the

5    brain and there are impulse-control issues with the fact

6    that he has said, "I'm guilty"; with the fact that he has

7    said, "I'm sorry"; with the fact that he said, "I have

8    repented of my sins and that I am no longer interested as I

9    learned my lesson," the reasonable conclusion is that time

10   served would be the best sentence.

11          Now, I just want to leave you with this quote, and

12   I think you actually touched on it earlier.  Judge John

13   Sirica, the Watergate judge who was the Chief Justice of

14   this court -- Chief Judge of this court at some point, he

15   said a great intellectual doesn't make a great trial judge.

16   A man who's been a trial lawyer is a better judge of human

17   nature than Professor X at Harvard who's probably never been

18   in the well of a courtroom.  The important question is

19   whether a judge is honest.  And does he have the courage of

20   his convictions to do what is right at the moment?  Your

21   Honor, I have no doubt whether you're honest or have the

22   courage of your convictions.  I'm quoting that because that

23   was an article published by the Federal Bar Association

24   about you and it was holding you out to be that type of man,

25   to be that type of judge, and they were honoring you because

 1    of that.

 2              I'm glad I've had the opportunity to make these

 3    arguments with you today.  I ask for mercy and compassion on

 4    behalf of Ryan Nichols.  When Jesus was informed that

 5    Lazarus had passed away, he cried because Lazarus was his

 6    friend.  And because Lazarus was his friend, he went and he

 7    raised him from the dead.  I don't know if that was planned

 8    or if the Father had that planned or that was in store,

 9    whatever it was, but I know that he cried.  He was moved

10    with compassion.  Ryan Nichols is my friend, he's my

11    brother, and I love him, and I hope that you let him go

12    home.

13              Thank you.

14              THE COURT:  Mr. Nichols, let me hear from you

15    last.

16              Let me ask the Government.  Did -- does the

17    Government know any more about the medical issues at the

18    jail?

19              MR. BRASHER:  Your Honor, all we have are the

20    records that were submitted in connection with sentencing.

21    It appears some of those records are incomplete.  But I have

22    yet to encounter a situation where BOP has not been able to

23    address an inmate's medical issues.

24              THE COURT:  All right.  Mr. Nichols, if you'd come

25    forward, I'm going to take a short recess, but I want to

1    hear what you have to say before I do.  I know you'd be

2    nervous at a time like this, but I heard from all of your

3    family.  So I want to hear whatever you want to say.

4              THE DEFENDANT:  Yes, sir.  And first, I'd like to

5    apologize for how I look.  They didn't bring the clippers

6    in.  I didn't get a chance -- I'd like to come, you know,

7    clean-shaven, clean-cut, but that wasn't --

8              THE COURT:  I understand.

9              THE DEFENDANT:  -- made available.

10             I have a couple papers here.  It will take just a

11   couple minutes to go through.

12             THE COURT:  Sure.

13             THE DEFENDANT:  I want to say to the Honorable

14   Judge Lamberth, the Government, and the victims of January

15   6th, after three-plus years since January 6th, many of which

16   I've spent in a jail cell, I'm extremely thankful and

17   grateful to finally get the opportunity to address you

18   directly in detail about my personal thoughts pertaining to

19   the events before, during, and after January 6th as they

20   relate to me.

21             Following the year since January 6th and my

22   arrest, there are many thoughts that I have wished to

23   express; however, following my legal counsel's advice, I

24   have kept my mouth closed until it was my turn in the

25   process to speak.  My intentions during this process have

1    been to, one, never disrespect the Court or Government; and,

2    two, always respect the Court's decision.  With that being

3    said, it is my hope that this Honorable Court and the

4    Government accept that my silence until now was meant to

5    respect the judicial process.  Furthermore, I want to assure

6    this Honorable Court and the Government that my silence

7    never constituted a lack of remorse and compassion for the

8    victims of January 6th and that I don't take full

9    responsibility for my actions on January 6th.

10           Though I was allowed to address the Court on

11   November 7th, 2023, I didn't come close to saying everything

12   that needed to be said in the few minutes that I spoke.  As

13   advised by my attorney, Mr. Joseph McBride, the plea hearing

14   was not the time nor the place to tell you everything I'm

15   about to tell you and say now.

16           First and foremost, I'd like to apologize directly

17   to the victims that suffered on and after January 6th.

18   Those victims include members of the 117th Congress; Capitol

19   Police; D.C. Metropolitan Police Department; peaceful

20   protesters; family members of Congress; Capitol Police; MPD;

21   and protesters; and the citizens of Washington, D.C.

22           After much thought and reflection over the last

23   three-plus years, I realize that my actions on January 6th

24   caused pain, heartache, and trauma for these victims, and

25   for that I deeply apologize and express my sincere regret

1    for hurting you.  Had I known the pain that would be caused

2    that day beforehand, not only would I have not partaken in

3    it; I would have actively spoken out against it.  However,

4    hindsight is 20/20 and I cannot change the past.  I can

5    learn from this mistake and make sure it does not happen to

6    me again.

7            Before I leave the topic of the victims and

8    directly address the Government and this Honorable Court,

9    I'd like to express, once again, my sincerest apologies and

10   empathy for the trauma and PTSD that was inflicted on you

11   that day that you'll forever carry.  As a Marine Corps

12   veteran with diagnosed PTSD, I know all too well that trauma

13   is long-lasting and a burden to carry.  I hope and pray you

14   have already or eventually find ease and peace surrounding

15   January 6th.  Though you may not be willing to forgive, even

16   after three years, I do seek your forgiveness as my

17   intention was never to pass the trauma and PTSD that I carry

18   over to you, even though that's exactly what happened.  You

19   certainly didn't deserve that, and I'll spend the rest of my

20   life guilting and shaming myself for this.  I'm sorry.

21           To this Honorable Court and the Government, I,

22   once again, would like to take a few minutes and acknowledge

23   the seriousness of my crimes.  My actions and my words that

24   day were heinous, disgusting, and awful.  Assault on anyone,

25   especially law enforcement officers, is both unacceptable

1    and out of character for me.  As someone who has worked

2    alongside law enforcement, first responders, and military

3    for years, I am deeply ashamed to now forever be a convicted

4    felon who assaulted the men and women who protect this

5    nation on a daily basis.  As someone with longtime friends

6    back home who are law enforcement and first responders, I am

7    unsure and even scared to look these good people in the eye,

8    as I know that my actions on January 6th have irrevocably

9    stripped that trust that was once there.  Due to the

10   seriousness of my crime and that trust being broken, I don't

11   know if I'll ever again have the opportunity to do

12   hurricane, tornado, and missing persons search and rescue

13   with law enforcement and first responders that, for years, I

14   worked beside as we saved hundreds of lives during

15   life-and-death situations.  Though I'll one day leave jail

16   and prison and never come back, I'll forever be punished if

17   I'm not able to rescue another human being who's about to

18   lose their life.  To me, there's not many things in life

19   more fulfilling than that, saving a life.

20            Your Honor, you've been appointed to this court

21   for quite some time.  I imagine that the level of offense

22   towards you specifically of not only my crime but all other

23   indicted protesters that day is great.  This courthouse sits

24   right across the street from our nation's Capitol.  I'm sure

25   you were able to look out of a window or even walk outside

1    and see what was happening that day.  I'm sure that what you

2    witnessed and/or heard deeply troubled you and even possibly

3    caused you great anger.  For that, I apologize on my behalf

4    and on the behalf of the other indicted and unindicted

5    January 6th defendants that caused you any anger, pain, or

6    trauma.  You didn't deserve that, and I'm sorry.

7            I'd also like to address the Government.

8    Mr. Brasher, I've watched you work on my case as well as

9    many other January 6th defendants for years.  You've put in

10   many hours and much travel in between Dallas and Washington,

11   D.C.  Though it may look like it's a you-versus-me scenario,

12   I want you to know that I don't hold any ill will or

13   animosity towards you.  I appreciate and respect the work

14   you do on a daily basis and am forever grateful that you

15   were willing to work together with my attorneys, Joseph

16   McBride and Brad Geyer, to work a deal that kept us from

17   going to trial.  I hope that when this is over, you can see

18   me not as a bad guy who made a bad mistake but rather a good

19   guy that made a bad mistake and has paid my debt to society.

20   And, once again, thank you for your service and the service

21   of those on your team.

22           Your Honor, I've spoken to the victims; this

23   Honorable Court; and the Government.  I'd like to now wrap

24   this up by speaking on behalf of myself which is something I

25   haven't had the opportunity to do in the last

1    three-and-a-half years.  There are three quick points I'd

2    like to discuss.

3            They are, one, I want to explain why January 6th

4    was an aberration in my life.  I've never been involved in

5    any protests before in my life.  January 6th was the first

6    rally and protest I have ever been involved with and, after

7    this experience, will undoubtedly be my last.  Not only will

8    I be held accountable by myself and Probation for the next

9    few years, but my loving wife in the back of the courtroom

10   will see to it, Your Honor, that this man will never see

11   another political rally or protest.  My wife, Bonnie [ph],

12   often jokes that when I come home, she's going to chain me

13   to the bed.  Something in me tells me that there may be a

14   little truth to this.  As we speak at this very moment,

15   there are protests breaking out across the country, none of

16   which I find amusing, interesting.  What I see are a lot of

17   angry people who, just like me, are going to end up in jail

18   for an extended period of time and have their entire lives

19   altered if they don't learn from the mistakes of people like

20   me.

21           Your Honor, January 6th was a one-time event in my

22   life that I can assure you will never happen again.  I'm a

23   risk-to-reward type of guy, and the risk of going to jail

24   and losing my wife and children again far outweighs any

25   potential reward I would ever receive for being at another

1    political rally or protest.  You have my word as a man on

2    this matter.  Should I ever go back on my word, I would

3    recommend that you throw the book at me and bury me under

4    the jail, but please allow me the chance to prove my word to

5    you, to this Honorable Court, and the Government, that I

6    will never be involved in anything like this again.

7         Two, I'd like to speak directly about my words and

8    actions on January 6th.  By now, it's no secret that my

9    words and actions on January 6th were disgusting and

10    completely out of character for a United States citizen,

11    honorably-discharged Marine Corps veteran, husband, and

12    especially a father.  This is not an example I want to set

13    for my seven- and nine-year-old sons on how to be a good and

14    honorable man.

15         Your Honor, I have a diagnosed mental illness

16    called post-traumatic stress disorder, or PTSD, that, when

17    left untreated, I say and do things that I would normally

18    never do.  I came off of my prescribed Zoloft and Xanax

19    during the 2020 hurricane season and leading into the

20    election.  I wanted to be chemically free and independent

21    and lean on the high of life-and-death rescues during

22    hurricanes and tornadoes to self-medicate.  What a terrible

23    decision that was.  The first three days were easy, but on

24    the fourth day I started having out-of-body experiences,

25    suicidal thoughts, and instant moments of anger and rage.

1   To say it almost killed me is an understatement.  What I

2   didn't realize then that I fully realize now after much

3   research was that the SSRI chemical component of Zoloft was

4   meant to rewire my brain so my mental illness, PTSD, was for

5   the main part subdued.  When the SSRI chemical component of

6   Zoloft is taken away, an unrecognizable version of myself

7   comes to life, as shamed as I am to say that.

8            Some of the events that caused this mental illness

9   to fester in my brain include, one, my father and I being

10  robbed at gunpoint in our yard when I was 16 years old; two,

11  watching my Marine Corps buddies go to war and come home

12  with no legs, no arms, no mind left, or outright dead and

13  I'm not able to attend their funerals; three, guarding the

14  entrance of a Marine Corps base overseas on the 10th

15  anniversary of 9/11 and having a man with what was a

16  suspected VBIED, or vehicle-borne improvised explosive

17  device, drive to the gate and threaten to blow us up.  After

18  holding him at gunpoint outside the gate, he got back in his

19  car and left.  I was later chewed out by a senior Marine

20  Corps official for not simply shooting the man, but I stand

21  by my decision.

22           In August and September of 2013 while doing combat

23  training in the Mojave Desert, I watched as an AAV

24  backfired, exploded, and I watched a marine burn alive and

25  melt to the back of the AAV.

1          During Hurricane Harvey, I saved a man from

2    drowning by pulling him by his hair from under the water, as

3    his hair was all I could grab.  I had never seen anything

4    like that in my life.  Later that day during search and

5    rescue, I got a call from a mother on our rescue chat who

6    said her and her children were stuck in the attic as the

7    waters were rising into the attic.  Due to the major

8    flooding and rode closures, we were not able to reach them

9    and I never heard from them again, and this still haunts me

10   to this day.

11         Since then, I have participated in hundreds of

12   these same rescues of children as young as six weeks old and

13   women as old as 90.  Black, white, brown, Republican, or

14   Democrat, it didn't matter.  If you needed a rescue, I was

15   going to be there.  We rescued everyone, people and animals

16   alike.  During my many years of rescue, I worked directly

17   with law enforcement and first responders.  I lived a

18   law-abiding life doing whatever I could do to continue

19   serving this country, my community, my family, and my

20   business.

21         With all this being said, I went into election

22   season off of my medications and completely mentally

23   unstable.  After the night of the election and having -- and

24   hearing that the election had been stolen, I believed that

25   America was under attack and needed a rescue.  Obviously, I

1  wasn't thinking clearly or rationally.  Leading up to and on

2  January 6th, I made statements that now, being on my mental

3  health meds, literally make me physically uncomfortable to

4  watch just as it was a few minutes ago for me.  I'm deeply

5  ashamed and embarrassed each time those videos are played.

6          While on the Capitol grounds on January 6th, I

7  believed for a moment in time that the government was

8  attacking U.S. citizens.  I watched women like Victoria

9  White get sprayed, punched, and beaten in the tunnel as she

10  and others pleaded for mercy and screamed for help.  Moments

11  later, Alex and I received a phone call from my father that

12  another protester, who we now know was Ashli Babbitt, was

13  shot and killed inside.  Moments later, after that, another

14  woman right beside us, who we know was Rosanne Boyland, also

15  died and her lifeless body was drug back and forth.  In

16  full-blown meltdown mode and my PTSD fully inflamed with no

17  medications, I went absolutely crazy.  I made statements the

18  rest of the day that were terrible and completely out of

19  character.  During this meltdown, I ultimately ended up

20  making a life-altering decision of assaulting an officer.

21  Though I know I wasn't in my right mind, I want to be clear.

22  I take full responsibility for my actions, and I'm deeply

23  regretful to the officer in which I assaulted.  He or she

24  was merely doing their job and didn't deserve that, and I'm

25  sorry.

1          Last, I want to speak on the time I've spent,

2    served, and my lessons learned.  Though I was off my meds on

3    January 18th when the FBI task force raided my home and I

4    was at my in-laws house four hours away, I still had enough

5    common sense to drive the same day and self-surrender.  For

6    the following two years and even until now, my life has been

7    nothing short of a nightmare.  I spent months in solitary

8    confinement for 23 to 32-plus hours at a time due to COVID

9    protocols, only allowed out for one hour to shower or make a

10   phone call just to be locked in that 10-by-7-foot cell for

11   another 23 to 32-plus hours at a time.  Mental torture is an

12   understatement.  I heard grown men screaming and crying out

13   for their mothers, me included.  Many nights, I cried myself

14   to sleep.  With no court dates, no discovery, and no ending

15   in sight, I felt hopeless and my mental health spiraled out

16   of control.  Eventually, I decided that, maybe, I needed to

17   seek professional help.  I put in a mental health request,

18   and two weeks later I was back on Zoloft.  Though this

19   certainly helped control my mind and get my emotional

20   imbalance in alignment, the solitary confinement was still

21   overwhelming.

22          I started writing requests for mental health care

23   only to be outright ignored for weeks and months.  These

24   requests turned to grievances.  I followed the law and

25   policy regarding the grievance process and was still

ignored.  My cries for help, as I became suicidal, were blatantly disregarded.  At my lowest point in April of 2022, I worked up the courage to tell a lieutenant that I was feeling suicidal, only to have him respond, "Well, hope you don't die," as he turned his back on me and walked out of the pod.  This lieutenant was a military veteran and an officer in the jail I respected.  It took me having to tell three more officers that day before I was finally taken to Medical.  All Medical did was take me to a suicide room, strip me down naked, turn the light on 24/7 on a cold, bare room, and watch me through a glass for four days.  I received no help, and I wasn't allowed out of that room until I would admit that I was no longer suicidal.  No real help ever came.

During and since these days of being in jail, before I was released on home confinement, I witnessed officers spray inmates with OC spray for not wearing masks, I being mistakenly sprayed in the crossfire multiple times. At least one of those officers, if not more, were later fired for their misconduct.

What ultimately saved my life and turned things around were my wife, Bonnie [ph], and my attorney, Joseph McBride, coming to rescue me.  In November of 2022, I was released by the Honorable Judge Hogan to home confinement for 11-and-a-half months, all of which I abided by all rules

1    and regulations, passing all required drug tests, never

2    being out of bounds, and having a great relationship with my

3    probation officer, Mr. Watson.

4          Your Honor, I feel that my debt to society has

5    been paid in full.  My punishment as a pretrial detainee and

6    presentencing detainee has been sufficiently exerted.  This

7    process has punished not only me but my wife and two young

8    sons as well who are now fatherless and in danger of going

9    down a terrible path in life if I cannot return to them and

10   be a meaningful part of their childhood.  I know I deserve

11   to be punished, and I have been punished, but please help me

12   not to punish my wife and children any longer.  If I could

13   take everything back, I would do it instantly; however, I

14   can't take back what happened, and I'm extremely remorseful,

15   and I own every single bit of it.

16         Your Honor, three-and-a-half years ago, I was

17   deemed a danger to society.  I want to assure you right now

18   I'm no longer a danger to society and never will be again.

19   I'm on my medications and never will come off of them.  I am

20   actively seeking counseling, though I don't receive any.

21   Only by going home can I fully heal myself by seeking the

22   counseling and medical treatment that I so long desire.  I

23   know what I said, but I want to assure you I do not stand

24   for violence.  I have missed my children's first baseball,

25   football, and soccer games.  I've missed their first days of

1    school and kindergarten graduations.  I've missed their

2    birthdays, holidays, happy days, and sad days.  I have great

3    fear that they will grow up to hate and resent me because I

4    wasn't there when they needed me.  This punishment alone has

5    broken my spirit as a father and destroyed my personal value

6    of self-worth.  I could work an entire lifetime and never

7    come close to making up for the time lost.

8            Your Honor, I know, after almost two-and-a-half

9    years of incarceration, how terrible jail and prison is.

10   The entire atmosphere is violent, dark, and unforgiving.

11   For the majority of my life, I've heard, but never been able

12   to empathize with, people of color when they testified to

13   the harsh environment and treatment within the jail and the

14   prison system.  Make no mistake, I am now a witness to their

15   testimony.  Being in jail and prison is a living hell of

16   eternal separation from the light.  Sometimes it feels like

17   not even God himself can penetrate those walls.

18           So this is where I'd like to redirect my energy in

19   life.  I'd like to continue serving locally by finding ways

20   of helping the recently or active incarcerated individuals

21   reintegrate back into society and become productive and

22   respected members of society again, just the same as I long

23   to do.  I also want to earn my way into working with law

24   enforcement and first responders to do search and rescue

25   again.  Your Honor, respectfully, I'm asking for grace,

1    mercy, and a second chance to return to society and become a

2    positive contribution to my family and community.  I've

3    learned my lesson tenfold, and I do not stand for violence.

4    I can comply to any restrictions you wish to give me, as I

5    have already done so.  Just please give me a chance.  You

6    have my word that I will not make a fool out of you.

7          Thank you, Your Honor.

8          THE COURT:  Okay.  We'll take a short recess and

9    we'll come back for sentencing.

10          THE DEPUTY CLERK:  All rise.

11          (Brief recess taken.)

12          THE COURT:  The defendant can come forward.

13          All right.  Pursuant to the Sentencing Reform Act

14    of 1984 and in consideration of the provisions of 18 U.S.C.

15    Section 3553, it's the judgment of the Court that you, Ryan

16    Taylor Nichols, are hereby committed to the custody of the

17    Bureau of Prisons for concurrent terms of 63 months on

18    Counts 1 and 2.  You're further sentenced to serve

19    concurrent terms of supervised release of 36 months on

20    Counts 1 and 2.  In addition, you're ordered to pay a

21    special assessment of $200 in accordance with 18 U.S.C.

22    Section 3013.  The Court declines the request for upward

23    departure, a downward departure, and has determined to

24    sentence you in accordance with the sentencing guidelines.

25    Neither an upward or downward departure or a variance are

1    appropriate in this case.

2         Turning to the issue of departure, the Court finds

3    that you appear to be sincere in your expressions today, but

4    the Court has not had great success in determining

5    necessarily the sincerity of January 6th defendants and

6    those expressions at time of sentencing, especially when

7    continued comments have been made during period of

8    incarceration and other times while the case has been

9    pending that are inconsistent, and especially in light of

10   the very vigorous comments that you made in the tapes that

11   were played at the time of the incident.

12        I have some other things to read, but I also have

13   to say that in terms of arriving at the protest wearing a

14   ballistic plate and the plate carrier and armed with a

15   crowbar, this is not a case in which this was just a

16   political protest gone awry.

17        The other problem in sentencing as well is the

18   question of a fine.  So the Court will impose a fine in the

19   amount of $200,000, which is a guideline range for the fine.

20   The Court frequently declines to impose a fine because of

21   defendants' inability to pay a fine, but Mr. Nichols did not

22   show an inability to pay a fine.  He declined to cooperate

23   with the probation officer in its investigation of the

24   financial condition based on Paragraph 106 of the

25   presentence report.  So based on available financial data,

1    it does not appear that he would not be able to pay the

2    fine.  So the fine will be imposed as well as the $2,000

3    disbursement to the Architect of the Capitol for

4    restitution.

5            While on supervision, the defendant shall abide by

6    the following mandatory conditions of supervision as well as

7    the discretionary conditions recommended by the probation

8    officer in Part D, the sentencing options, of the

9    presentence report which are imposed to establish the basic

10   expectations for your conduct while on supervision.

11           The mandatory conditions include, one, you must

12   not commit another federal, state, or local crime.

13           Two, you must not unlawfully possess a controlled

14   substance.

15           Three, you must refrain from any unlawful use of a

16   controlled substance.  You must submit to one drug test

17   within 15 days of placement on supervision and at least two

18   periodic drug tests thereafter as determined by the Court.

19           Four, you must cooperate in the collection of DNA

20   as directed by the probation officer.

21           And, five, you must make restitution in accordance

22   with 18 U.S.C. Section 3663 and 3663A or any other statute

23   authorizing restitution.

24           Restitution payments shall be made to the Clerk of

25   Court, U.S. District Court, the District of Columbia, for

1    disbursement to the following victim: Architect of the

2    Capitol, in the amount of $2,000; Office of the Chief

3    Financial Officer; Ford House Office Building; Room H2-205B;

4    Washington, D.C. 20515.

5         You must provide the probation officer access to

6    any requested financial information and authorize the

7    release of any financial information.  The probation officer

8    may share financial information with the U.S. Attorney's

9    Office.

10        You must not incur new credit charges or open

11    additional lines of credit without the approval of the

12    probation officer.

13        (Brief pause.)

14        Financial obligations are payable to the Clerk of

15   Court, U.S. District Court, 333 Constitution Avenue, NW,

16   Washington, D.C. 20001.  Within 30 days of any change of

17   address, you shall notify the Clerk of Court of the change

18   until such time as the complete financial obligation is paid

19   in full.

20        Probation Office shall release the presentence

21   investigation report to all appropriate agencies which

22   includes the Probation Office in the approved district of

23   residence in order to execute the sentence of the Court.

24   Treatment agencies shall return the presentence report to

25   the Probation Office upon the defendant's completion or

1    termination from treatment.

2            You can appeal your conviction to the U.S. Court

3    of Appeals for the District of Columbia Circuit if you

4    believe your guilty plea was somehow unlawful or involuntary

5    or there's some other fundamental defect in the proceeding

6    that was not waived in your plea agreement.

7            Under some circumstances, you have the right to

8    appeal the sentence to the D.C. Circuit.  Defendant may

9    waive that right as part of the plea agreement, however, and

10   you have entered into such a plea agreement that waives some

11   of your rights to appeal the sentence itself.  Such waivers

12   are generally enforceable, but if you believe the waiver

13   itself is not valid, you can present that theory to the

14   appellate court.

15           Pursuant to 28 U.S.C. Section 2255, you also have

16   the right to challenge the conviction entered or sentence

17   imposed to the extent permitted by that statute and your

18   plea agreement.

19           Any notice of appeal must be filed within 14 days

20   of the entry of judgment or within 14 days of the filing of

21   a notice of appeal by the Government.

22           If you're unable to afford the costs of an appeal,

23   you may request permission from the Court to file an appeal

24   without costs to you.

25           On appeal, you may also apply for Court-appointed

1    counsel.

2          First, as to Counsel, are there any objections to

3    the sentence as imposed that are not already noted on the

4    record under U.S. v. Hunter, 809 F.3d 677, from the

5    Government?

6          MR. BRASHER:  No, Your Honor.

7          THE COURT:  Mr. McBride?

8          MR. MCBRIDE:  Your Honor, did you say that the

9    fine was $200,000?

10         THE COURT:  Yes.  That's the guideline -- maximum

11   under the guidelines.

12         MR. MCBRIDE:  I guess we'll have to just raise the

13   issue on appeal.  The guidelines, as -- over our objection

14   this -- we objected this morning, and --

15         THE COURT:  Okay.

16         MR. MCBRIDE:  -- the guidelines have significantly

17   moved the goalpost here on what that fine is.  So we're just

18   going to reiterate the objection as it relates to the

19   corresponding fine.

20         THE COURT:  Okay.  And then any recommendation you

21   want to make regarding place of incarceration?

22         MR. MCBRIDE:  Yes.

23         (Brief pause.)

24         We were looking at Seagoville in Texas, Your

25   Honor.

```
 1                 THE COURT:  Seagoville?  Okay.

 2                 MR. MCBRIDE:  Yes.

 3                 THE COURT:  All right.  The defendant is remanded.

 4          Good luck to you.

 5                 THE DEFENDANT:  Thank you, Your Honor.

 6                 MR. BRASHER:  Your Honor --

 7                 THE COURT:  The Court will be in recess.

 8                 MR. BRASHER:  I'm sorry.

 9                 THE COURT:  Yes?

10                 MR. BRASHER:  The Government moves to dismiss the

11          remaining counts --

12                 THE COURT:  Remaining counts are dismissed on

13          motion of the United States.

14                 MR. BRASHER:  Thank you.

15                 THE COURT:  The Court will be in recess, and then

16          I'll take the pretrial as soon as we're set up.

17                 (Proceedings concluded at 2:19 p.m.)

18                      *  *  *  *  *  *  *  *  *  *  *
```

```
19                 CERTIFICATE OF OFFICIAL COURT REPORTER

20          I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

21          that the above and foregoing constitutes a true and accurate

22          transcript of my stenographic notes and is a full, true and

23          complete transcript of the proceedings to the best of my

24          ability, dated this 7th day of May 2024.

25                                  /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                    Official Court Reporter
```

United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001